**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STOCKTON EAST WATER DISTRICT, et al., Plaintiffs, | No. 04-541 L |
| v. | Judge Christine Odell Cook Miller |
| UNITED STATES, Defendant. | |

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Plaintiffs, Stockton East Water District, Central San Joaquin Water Conservation District, County of San Joaquin, City of Stockton, and California Water Service Company, submit these Contentions of Fact and Law in accordance with Appendix A, subsection VI, paragraph 14 (a) of the Rules of this Court and pursuant to this Court's Order, dated April 26, 2006.

**Introduction**

This is an action for breach of contract and unconstitutional taking arising out of the United States Bureau of Reclamation's failure to furnish to Plaintiffs water to which they were contractually and constitutionally entitled. Plaintiffs' claims were transferred from the United States District Court for the Eastern District of California to the United States Court of Federal Claims on April 1, 2004. On October 4, 2004, this Court denied Defendant's motion to dismiss. *Stockton East Water Dist. v. United States*, 62 Fed. Cl. 379, 387 (2004).

On April 10, 2006, the court disposed of the Parties' cross motions for summary judgment on liability for the contract claims only and ordered the parties to trial on certain

identified issues. *Stockton East Water Dist. v. United States,* 70 Fed. Cl. 515 (2006). That trial, scheduled for two weeks, will commence on October 23, 2006, in Sacramento, California.[1]

## I. CONCISE STATEMENT OF FACTS THAT PLAINTIFFS EXPECT TO PROVE AT TRIAL

### A. In 1983 Plaintiffs Entered Into Water Delivery Contracts That Were Intended to Provide Them with a Stable and Reliable Supply of Surface Water; Without This Water, Plaintiffs Would Remain Dependant on a Critically Over-Drafted Groundwater Basin.

Plaintiffs will introduce the testimony of witnesses who actually negotiated and signed the contracts at issue in this case, both for the Districts and for the United States. Testimony will establish that the parties entered into the contracts in order to provide a reliable surface water supply for municipal and industrial demands in the city of Stockton; to provide a reliable surface water supply for San Joaquin County farmers; to relieve pressure on the severely over-drafted groundwater basin; and to provide much needed revenue for the Central Valley Project.

Plaintiffs' quest for a contract for water from the Central Valley Project was one of necessity. Historical reliance on groundwater pumping to meet water demands for both the urban and agricultural area had resulted in a state of critical groundwater overdraft. Groundwater levels had not only declined, but were so low that saline waters at the western edge of the groundwater basin were intruding, contaminating, and permanently destroying portions of the basin. This contamination cannot be reversed and can only be stopped by increasing groundwater levels. The state legislature and Plaintiffs recognized that only a replacement supply of renewable surface water would avoid calamity. As the California legislature found:

> The water supplies in the [San Joaquin] underground basin in the area of the Stockton-East Water District are insufficient to meet the water demands of the

[1] The parties understand that Plaintiffs' takings claim is not a part of the upcoming October 23, 2006 trial, and that this Court has reserved consideration of the taking claim until after it rules on the breach of contract claim in this trial.

> area, and, because of the geologic conditions peculiar to the area and because excessive pumping has seriously depleted the underground water storage, there has been an intrusion of saline water into the underground water basin causing serious water quality deterioration and the destruction of the usefulness of a portion of the underground water basin. Further excessive pumping, without proper management of the underground water basin and the provision of supplemental water supplies, is certain to destroy the usefulness of a major portion of the underground water basin and endanger the health and welfare of the district.

Chapter 1287, § 3(b), Statutes of 1980 (California).

Plaintiffs Stockton East and Central originally negotiated contracts with Reclamation for water from the American River through the planned Auburn Dam and Folsom South Canal, but extended litigation ultimately terminated that project and it was never built. Reclamation directed the parties to the New Melones, which was under construction in the Sierra foothills and authorized by Congress to provide water for the local area. On June 29, 1981, the Undersecretary of the Interior signed a Record of Decision finding that a supply of 180,000 acre-feet per year was available from New Melones for Stockton East and Central. Reclamation's Regional Director, David Houston (who signed the contracts for the United States), will testify that Reclamation intended this as a reliable water supply for Plaintiffs' that would not be taken away for additional fishery enhancement.

Plaintiffs understood that the United States was making a firm commitment to supply water under the contracts. Reclamation's water right (State Water Board permit) for New Melones prohibited Reclamation from filling the reservoir until it had "firm commitments" to provide water for consumptive use. Common sense indicates that the Plaintiffs would not have spent 70 million dollars to construct the conveyance facilities required under the contracts if the water supply were not reliable. Throughout the contract negotiations Reclamation consistently expressed its commitment to provide this water to Plaintiffs. Indeed, Reclamation's own studies

determined the amount of firm and interim water commitment set forth in the contracts, as well as the maximum amounts of water that would be dedicated to fish. Moreover, the contracts themselves explicitly obligated the United States to furnish the water unless prevented by drought or by an act of God. Contracts, Art. 9. Plaintiffs also had letters of administration for the contracts from the Regional Director of Reclamation explaining that their maximum dry year deficiency under the contracts would be 35%.

As public agencies responsible for providing a water supply to hundreds of thousands of residents and businesses, Plaintiffs confirmed the reliability of that water supply. Plaintiffs' witnesses will testify that, because of the huge investment the Districts were contractually required to make in order to convey the New Melones water to their customers, the Districts' reliance on this water as a major (in the case of Central, its sole) source of water supply, and the findings of the Interior Department that 180,000 acre-feet was available for them, the Districts reasonably believed that the United States would perform the contracts unless a drought or other *force majeure* occurrence prevented performance.

**B. Plaintiffs Carried Out Their End of the Bargain, Including Building Expensive Water Delivery Facilities.**

Plaintiffs have performed their obligations under the contracts by, *inter alia*, constructing the $70 million water conveyance facility, consistently demanding water under their contracts, paying Reclamation for the water and other expenses due under the contract, and complying with the reporting, maintenance, and other similar contract obligations required for a functional water delivery system. Although Defendant raises concerns about Plaintiffs' performance under the contracts (e.g., timeliness of the submission of a revised conservation plan, repair of a metering gauge, a late payment), none of these issues rise to the level of a substantial breach that would

excuse Defendant's performance. Indeed, outside of this litigation, Defendant has never asserted that it need not furnish water because Plaintiffs are in breach.

**C. Defendant Has Failed to Perform Its End of the Agreement; Defendant Has Consistently Failed to Furnish Plaintiffs the Quantities of Water To Which They Were Contractually Entitled.**

Throughout the five-year construction period required by the contract (1989-1993), Plaintiffs kept Defendant apprised of their progress in building the water delivery facilities required under the contracts. By 1993, Plaintiffs had completed construction of the Goodwin Tunnel and the other critical infrastructure required to receive New Melones water. However, in 1993, when Plaintiffs requested a mere 10,000 acre-feet of water under the contracts, Reclamation informed Plaintiffs that it would not furnish water to them, citing as its reason the passage of CVPIA.

The evidence will demonstrate that Plaintiffs vigorously protested Reclamation's decision. In fact, Plaintiffs filed suit in district court to require Reclamation to furnish water to them. In 1994, Plaintiffs again demanded that Reclamation furnish water in accordance with their contracts, and Defendant again refused. Defendant also specifically instructed Plaintiffs not to ask for water until Reclamation informed them of the amount it would allocate to them, consistent with Reclamation's overall CVP allocation process. The parties then settled into a pattern in which Reclamation would allocate to Plaintiffs less than their contractual entitlement, whereupon Plaintiffs would protest Reclamation's allocation and insist on receipt of water in accordance with their contracts. Reclamation ignored these protests and continued to allocate water pursuant to its 1997 Interim Plan of Operations (IPO), approved by the United States Fish and Wildlife Service. Under the IPO, Reclamation limited Plaintiffs' allocations in even the wettest years when the reservoir was spilling. Only after the hearings on summary judgment in

this case did Reclamation, for the first time, allocate Plaintiffs the full amount of the contracts (2006). It is these annual refusals to furnish water in accordance with Plaintiffs' contracts that constitute the gravamen of this breach of contract action.

**D. Plaintiffs Were Substantially Damaged by Defendant's Breach**

Defendant's breach has caused Plaintiffs substantial damage. Beyond the enormous reliance damages suffered as a result of the indebtedness associated with the tunnel and canals constructed to bring New Melones water to their service areas, Plaintiffs have also been damaged by their forced reliance on groundwater and the cost of expensive mitigation measures.

Plaintiffs will present witnesses and exhibits illustrating their planned internal delivery infrastructure required to take and use the full contractual allocation of 155,000 acre-feet of water. The majority of this water was to be delivered to farmers who would convert from groundwater wells to surface water delivery systems. This required convincing farmers to make the capital investment necessary to change their operations to rely on the new surface water supply. Once Defendant refused to provide water under the contracts in 1993 and 1994, and then provided water in only a constrained and erratic fashion, the farmers reasonably refused to make this investment. This left the region dependent on groundwater from the critically over-drafted basin and frustrated Plaintiffs ability to use the New Melones water that was eventually allocated to them.

Plaintiffs attempted to mitigate the damages causes by Defendant's breach by purchasing water from neighboring districts at considerable expense to ensure they could meet their minimum surface water needs given the complete unreliability of the New Melones contracts. Stockton East, the City, County and California Water purchased 30,000 acre-feet per year, for ten years, from a neighboring district with senior water rights to ensure a supply to the water

treatment plant that serves the Stockton urban area. Plaintiffs' witnesses will explain that had the United States performed as required under the contracts, Plaintiffs would have completed their internal infrastructure, would have never needed to purchase expensive transfer water, and would have been able to use the full 155,000 acre-feet of water under their contracts within approximately five years of 1993.

Finally, Plaintiffs will present testimony demonstrating that if Plaintiffs had received the water to which they were entitled under their contracts, they could have significantly reduced groundwater extractions from the overdrafted basin, prevented further saline intrusion and degradation of the basin, minimized pumping costs, and minimized or eliminated expensive arsenic treatment for the groundwater that the urban area was forced to rely on in the absence of the New Melones supply. Plaintiffs also could have avoided millions of dollars in expenditures by the City and Stockton East on new water right applications seeking alternative surface water for the region.[2]

## II. STATEMENT OF THE DISPUTED ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT AT TRIAL

In its April 10, 2006 Order, the Court identified several issues that are not in dispute. The parties do not dispute that valid, binding contracts exist. There is also no dispute that the United States has never withdrawn water from the Plaintiffs to provide it to other in-basin contractors as contemplated in Article 3 of the contracts.

As the Court explained, this trial is required to resolve the following issues for which

[2] Because this is a trial on liability only, Plaintiffs reserve the right to assert additional and more detailed damages claims at the appropriate stage in this proceeding. *See Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 188 (2005) ("Boston Edison is required to show that it has suffered some damages in order to be granted judgment on liability.") (citing *Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605-06 (Ct. Cl. 1971) ("[T]here must be some evidence of damage to support a finding on liability. . . . [I]t is only sufficient to demonstrate that the issue of liability is not purely academic; that some damage has been incurred."))

there are material facts in dispute:

- Can Defendant meet its burden of proving that the passage of the CVPIA made performance under the contracts impossible?
- If so, did Congress target the class of CVP contracts in passing the CVPIA?
- Is Defendant relieved of liability for non-performance in every year because of a shortage due to drought or other causes beyond its control pursuant to Article 9(a) of the Contracts?
- What is meant by the term "opinions and determinations" of the Contracting Officer under Article 12 of the Contract? What opinions and determinations did the Contracting Officer make regarding the causes of water shortage and were they reasonable or were they arbitrary and capricious?
- Do Plaintiffs have a reasonable explanation for their failure to submit annual schedules for more water than Defendant furnished?
- Did Plaintiffs agree to modify their contracts to reduce the quantity of water to which they are entitled, substituting instead the lesser amounts allotted to them under Reclamation's Interim Plan of Operations (IPO)?
- Are the City, County and California Water Service Company third-party beneficiaries to the Stockton East contract?

## III. PLAINTIFFS' CONTENTIONS REGARDING ISSUES OF FACT AND LAW THAT DEFENDANT IS LIKELY TO ASSERT

### A. The Impossibility Defense: Can Defendant meet its burden of proving that the passage of the CVPIA made performance under the contracts impossible?

In order to prevail on its sovereign acts defense, Defendant bears the burden of proving both (1) that passage of CVPIA made performance of Plaintiffs' contracts impossible, and (2) CVPIA did not target the class of CVP contracts such as Plaintiffs as the source of water it re-allocated to fish purposes. Regarding the first step of the analysis—impossibility—the Court's April 10 order states:

> Defendant also asks for summary judgment on the grounds that, even if it is found in breach of the contract, the sovereign acts and unmistakability doctrines shield the Government from liability. Plaintiffs contend both that the sovereign acts doctrine would not apply and that defendant failed to plead these affirmative defenses in its answer and, therefore, waived them.
>
> * * *
>
> The court finds that the possibility or impossibility of performance by Reclamation of its Stockton East and Central contracts constitutes a material dispute. Summary judgment on the issue thus is inappropriate. In order to take advantage of the sovereign acts doctrine, defendant has the burden of proving that performance in the face of the supposed sovereign act-in this case, the CVPIA-was impossible.

*Stockton East Water Dist.*, 70 Fed. Cl. at 528, 530.

To prevail on its impossibility defense, Defendant must prove: 1) a supervening event made performance impracticable; 2) the non-occurrence of the event was a basic assumption upon which the contract was based; and 3) that the party asserting the defense did not assume the risk of occurrence." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002).

**1. CVPIA Did Not Make Performance of these Contracts Impossible**

Defendant's burden is to prove that performance of Plaintiffs' contracts was made objectively impossible by CVPIA: "[p]erformance is only excused under this doctrine when it is objectively impossible. It is thus not enough for Seaboard to show that it was incapable of performing on the contract; it must show that no similarly-situated contractor could have performed." *Id*. (citing *Jennie-O Foods, Inc. v. United States*, 217 Ct. Cl. 314, 580 F.2d 400, 409 (1978)).

Defendant will argue that its performance was made impossible by passage of the CVPIA. That is to say, it will argue that it believed it was required to honor U.S. Fish and Wildlife Service's annual requests for water pursuant to CVPIA § 3406(b)(2). However,

Defendant's evidence will show only that CVPIA made its compliance with Plaintiffs' contracts more difficult—not impossible.

Plaintiffs' expert witness, Avry Dotan, will testify that performance was physically possible every year under examination. Defendant's rebuttal expert, Peggy Manza, is expected to agree. Ms. Manza is expected to testify that in 1993, 1994 and 2004, it may not have been prudent to furnish water to Plaintiffs because the water was used for CVPIA fishery enhancement. That reason, however, does not rise to the level of objective impossibility and thus falls short of Defendant's burden of proof for those years. For the remaining years, Defendant has not offered any evidence that performance was impossible, in effect, conceding it could have performed.

Simply put, CVPIA required Reclamation to re-allocate a maximum of 800,000 acre-feet of CVP yield to fish. This Defendant could have easily done, while still furnishing Plaintiffs with all of the water to which they were contractually entitled. Yet, Defendants went beyond the statutory direction of CVPIA with respect to New Melones. In addition to dedicating released water to fish, Reclamation also withheld water from Plaintiffs in order to carryover more storage in New Melones to dedicate to fish in future years. Plaintiffs expect that Defendant will argue that this higher carry-over storage goal was part of its "drought planning." This argument is unavailing because any such use of CVP yield goes above and beyond CVPIA's authorization for dedication of 800,000 acre-feet for fish. Instead, it represents another voluntary decision by Reclamation to take water from Plaintiffs and give it to fish, which has no place in the impossibility analysis.

Defendant's witnesses will also concede that there were other ways to operate New Melones Reservoir; that there were other ways to meet the requirements of CVPIA; and that

Reclamation always had more than one alternative available to it to meet the many demands imposed upon it and still provide Plaintiffs with water. Thus, Defendant's refusal to furnish water to Plaintiffs was not a function of statutorily created impossibility, but resulted from the exercise of its discretion in one manner as opposed to several different discretionary actions allowed by Congress.

One alternative course of action that could have provided Plaintiffs with water under their contracts is expressly provided for in CVPIA. Congress gave the Secretary the statutory authority to reduce the 800,000 acre feet dedication to fisheries by up to 25% in any year in which agricultural water deliveries (including Plaintiffs) were reduced:

> "The Secretary may temporarily reduce deliveries of the quantity of water dedicated under this paragraph up to 25 percent of such total whenever reductions due to hydrologic circumstances are imposed upon agricultural deliveries of Central Valley Project water. . . .

CVPIA § 3406(b)(2)(C). Because Plaintiffs' water supply has been reduced by more than 25 percent in every year under examination, Defendant could easily have augmented Plaintiffs' allocation by a corresponding reduction in fish allocations. Yet this provision has never been invoked.

Second, Defendant could have lessened the impact on New Melones by taking more CVPIA (b)(2) water from other CVP units in a manner that would not have breached these other CVP contracts.[3] These other contracts contain shortage provisions different from those in Plaintiffs' contracts. A federal court has already concluded that one of these other contracts specifically allocated the risk of such legislation to the water users, and expressly allows Reclamation to reallocate water pursuant to these contracts for purposes of CVPIA Section

[3] Plaintiffs have undertaken a review of almost all of the CVP contracts and will present a summary of their shortage provisions for use at trial.

3406(b)(2). *Barcellos and Wolfsen, Inc. v. Westlands Water Dist.* 849 F. Supp. 717, 723-24 (E.D. Cal. 1993), *aff'd O'Neill v. United States* 50 F.3d 677, 684 (9th Cir. 1995); *Westlands Water District v. United States* 850 F. Supp. 1388, 1400 (E.D. Cal. 1994).

As Plaintiff's summary of CVP contracts demonstrates, the Westlands contract alone is for over 1 million acre-feet of water. A mere 1 percent reduction in deliveries to Westlands is worth more than 10,000 acre-feet of water—Plaintiffs' entire scheduling request in 1993.

**2. The non-occurrence of the event was not a basic assumption upon which the contract was based.**

The impossibility defense also requires Defendant to prove that the non-occurrence of the event (passage of a statute dedicating CVP water to fisheries purposes) was a basic assumption of the parties:

> Seaboard must show that the non-occurrence of a slump in the timber market was a basic assumption of the . . . contract. "[I]f [the risk] was foreseeable there should have been a provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed." In Winstar Corp., the contracts at issue provided that the government would give certain regulatory treatment with regard to capital reserve requirements to parties who purchased failed thrifts. The Supreme Court held that the government's substantive performance in the contracts—the favorable regulatory treatment-implied that the regulatory environment might change and, "*a fortiori*, allocate[d] the risk of regulatory change" to the government. The Supreme Court also found that the statutes and regulations governing capital requirements had in fact changed numerous times. As a result, the non-occurrence of a regulatory amendment was not a basic assumption of the contract at issue.

*Seaboard Lumber Co*., 308 F.3d at 1295 (citations omitted).

Defendant cannot sustain this burden. At the time the contracts were entered into the Reclamation Act had been repeatedly amended, as had the authorizing legislation for the Central Valley Project, which was itself an amendment to the Reclamation Act. The Parties' contracts clearly state that they are made pursuant to Reclamation law as amended and existing at the time of the contracts. Contracts at 1 ("[I]n pursuance generally of the Act of June 17, 1902 (32 Stat.

388), and acts amendatory or supplementary thereto . . . all collectively hereinafter referred to as the Federal reclamation laws.") Because additional future amendments were foreseeable, it is Defendant (the non-performing party) that bears the risk of the change. *Blackstone Consulting, Inc. v. U.S.*, 65 Fed. Cl. 463, 472 (2005) ("If the event was foreseeable, then it will be implied that the non-performing party assumed the risk. In such circumstances the non-performing party would be potentially liable for breach of the agreement.")

**3. The contract imposed the risk of statutory amendment squarely upon the United States.**

Proof that the parties contemplated future amendment of the Reclamation Act is further found in the fact that the parties actually provided for it in the contracts and allocated that risk, with certain exceptions, to Defendant. *See, e.g.*, Contracts at Art. 12(a) & (b). The fact that Plaintiffs assumed the risk of certain statutory amendments demonstrates that they did not assume the risk of all such amendments; otherwise, the enumeration of certain risks would be meaningless.

The Supreme Court applied this principle in *Mobil Oil v. United States*, 530 U.S. 604 (2002). In *Mobil Oil*, the parties allocated to the plaintiff the risk of certain regulatory changes. When Congress placed a moratorium on permits (a risk not allocated to plaintiff), the Supreme Court held that the contract, by specifically allocating certain risks to Mobil Oil, by implication allocated other risks that were in the contemplation of the parties to the United States; therefore, the United States was in breach. *Id.* at 616-17.

Here, Plaintiffs assumed only the risk of change to "acreage and ownership limitations and pricing provisions of Reclamation law" and "regulations promulgated by the Secretary of Interior covering the enforcement and administration of those limitations and provisions." Contracts at Art. 12. As in *Mobil Oil*, the fact that the contract imposed the risk of specific

statutory changes on Plaintiffs compels the conclusion that the risk of all other statutory changes remained with Defendant. *Accord Amber Resources Co. v. United States*, 68 Fed. Cl. 535, 556 (2005) ("According to Section 1, the leases incorporate only those statutes 'in existence upon the Effective Date of [each] lease.' This provision embodies the government's promise to the lessees that it would bear the risk of changes made to the governing law after the leases were formed.")

Other CVP contracts do, in fact, allocate the risk of subsequent changes in the Reclamation law, as a whole, to the contractor. For example, the Westlands Water District contract at issue in *O'Neil v. United States*, 50 F.3d 677, 683 (9th Cir. 1995), and *Barcellos & Wolfsen, Inc. v. Westlands Water District*, 849 F. Supp. 717 (E.D. Cal. 1993), contained a provision entitled "Amendment of Federal Reclamation Laws" that specifically contemplates enactment of subsequent legislation, and provides a specific remedy upon that occurrence.[4] The *O'Neill* court ruled this language (Article 26 in the Westlands contract) gave Westlands "a choice between renegotiating their contracts to bring them into conformity with the new law or withdrawing from the reclamation program." *O'Neill*, 50 F.3d at 683-84 (citing *Peterson v. Dept. of Interior*, 899 F.2d 799, 812 (9th Cir. 1990) (construing an identical provision)). Plaintiffs' contracts contain no such provision.

**B. The Sovereign Acts Defense: Did Congress target the class of CVP contracts in passing the CVPIA?**

The second step of the sovereign acts defense is to determine whether, assuming CVPIA made performance of Plaintiffs' contracts impossible, the statute was nonetheless targeted at the

[4] Article 26 of the Westlands' contract states: "In the event that the Congress of the United States . . . amends . . . provisions of the Federal reclamation laws, the United States agrees, at the option of the District, to negotiate amendments of appropriate articles of this contract, all consistently with the provisions of such . . . amendment." *O'Neill v. United States*, 50 F.3d 677, 683 (9th Cir. 1995).

class of CVP contracts. If it was, the sovereign acts defense will not prevail. The April 10, 2006 Order states:

> If the court determines at trial that performance by Reclamation was impossible, then it will resolve the parties' arguments regarding whether the sovereign acts doctrine is applicable. This is a "case-specific inquiry" that determines whether the Government is acting as a contractor or a sovereign. *Yankee Atomic Elec.*, 112 F.3d at 1575. If the CVPIA is " 'legislation targeting a class of contracts to which [the Government] is a party [,]" ' *Centrex*, 395 F.3d at 1306 (quoting *Winstar*, 518 U.S. at 898 n. 45), the sovereign acts doctrine will not protect defendant from liability. If the CVPIA is found not to be targeted so specifically, the Government will be immune from liability, as plaintiffs admit that the unmistakability doctrine is not applicable.

*Stockton East Water Dist.*, 70 Fed. Cl. at 531.

In Section 3406(b)(2) of CVPIA, Congress directed the Secretary of the Interior to "dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title . . . ." Pub. L. No. 102-575, 106 Stat. 4600, 4715. That Central Valley Project yield was already committed to existing CVP contractors such as Plaintiffs, a fact underlying Defendants' contention that passage of CVPIA made performance of Plaintiffs' contracts impossible. The fact that the impact of CVPIA fell substantially on Defendant's contracting partners, without more, bars its sovereign acts defense: "Even though an act at issue may not formally target particular transactions, the government is still not relieved of its contractual obligations if a measures' impact nonetheless falls substantially on the governments' contracting partners." *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436, 441 (2002) (citing *Winstar*, 518 U.S. at 902-03).

The legislative record demonstrates that Congress knew that this water would have to be taken from CVP contractors. Addressing the impact of HR 5099 (which subsequently became CVPIA), California Rep. Calvin Dooley, in a hearing before the House of Representatives' Sub

Committee on Water, Power and Offshore Energy Resources of the Committee on Interior and Insular Affairs stated that, "[t]his year those contractors will receive only 25 percent of their normal allocation because of the drought. If 5099 were in place those 5,000 farmers would receive absolutely no CVP water because H.R. 5099 gives environmental use as a priority. Not equal treatment but a priority over some farmers in a drought." H.R. Rep. No. 102-575 (1992), Legislative History of the Reclamation Projects Authorization and Adjustment Act, at 142, 1992 (1993).

In the same hearing the Commissioner of Reclamation, Dennis B. Underwood, admitted that HR 5099 would drastically reduce the water which could be furnished to CVP contractors:

> If the burden of meeting the cumulative requirements of H.R. 5099 falls on agricultural water service contractors and excludes water rights, and municipal and industrial and wildlife obligations, the result would be a reduction in project supply available to meet agricultural contracts to about 20 percent of the demand. The provision of this bill, together with Title XXX (Trinity River) of H.R. 429, would reduce the normal supply for agriculture from the 3 million acre-feet to 500,000 acre-feet.

*Id*. at 367.

In a colloquy with yet another Congressman, Tom Graff of the Environmental Defense Fund stated that, "Fish and wildlife are not going to be protected in California without a lot of water. That is unfortunately the case. And ultimately it has to come from somewhere and the major use of consumptive water in California is agriculture. . . ." Congressman Lehman then interrupted him and said, "[t]hat goes back to my question. Where are you going to get it from?" Mr. Graff replied that, "[i]t is coming from the CVP contractor is who it is coming from." *Id.* at 226.

Chairman George Miller summed up the testimony, explicitly placing the burden of providing fish and wildlife water on the CVP contractors:

> Obviously you can see from this discussion that has taken place after your testimony we are kind of down to the nub of the issue and that is there are very few places where you can, in fact, get the water. The question is how will we equitably do that? And the water is now under contract. Some of that water is going to have to be released in the original Central Valley fish bill. . . .

*Id*. at 240.

As the sovereign act doctrine does not allow the United States as sovereign to relieve itself of obligations it has entered into as a contractor, *Winstar*, 518 U.S. at 904, Defendant cannot prevail in its sovereign acts defense based on CVPIA.

### C. The Article 9(a) Shortage Provision: Did the Parties intend this *force majeure* provision to excuse Defendant's liability only for drought and other similar acts of God, or does Article 9 encompass discretionary actions within Defendant's control? Is passage of CVPIA such a *force majeure*?

Plaintiffs expect Defendant to assert that it is excused from contract liability under Article 9 of the contracts (the *force majeure* provision). Addressing this issue in its April 10, 2006 Order, this Court stated:

> Perhaps more important is defendant's allegation that the Government's liability is excused under Article 9(a) because the CVPIA, passed by Congress, was a circumstance "beyond the control of the United States." Again, Article 9(a) provides, in pertinent part:
>
> > [T]he United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall [accrue] against the United States. . . .
>
> Stockton East Contract art. 9(a). Plaintiffs argue that this language is, in effect, an "act of God" provision that only excuses performance in drought, flood, terrorist attack, or similar disaster. Defendant reads this provision as comprehensive in that it contemplated any unexpected occurrence, including, but not limited to, drought. Thus, the passage of the CVPIA would qualify as such a circumstance beyond the Government's control. Defendant and amicus also argue that the "all reasonable means" language, read in context, indicates that, as long as "the government has used 'reasonable means' to avoid a shortage-but a shortage nonetheless has occurred-the government has discharged its contractual duty." Plaintiffs counter

> that Reclamation's duty to act reasonably was separate from the protection from liability in cases where events occurred beyond its control.
>
> * * *
>
> In short, the parties' intentions are unclear, and the language is susceptible to at least two different, but reasonable, readings. In such a situation, extrinsic evidence may be considered to clarify the intentions of the parties. However, while the extrinsic evidence in this case is voluminous, it is not briefed adequately, but, for the most part, framed generally. Therefore, trial is required, to allow the parties the opportunity to develop a complete, and hopefully consistent, record on their intentions regarding the language in Article 9 of the contract.

*Stockton East Water Dist.*, 70 Fed. Cl. at 534 (citations omitted).

**1. The parties intended causes "beyond the control" of the United States to be limited to "acts of God" and other instances of *force majeure*.**

Article 9(a) of Plaintiffs contracts is a classic *force majeure* clause in which the parties to a contract agree that certain future events that can neither be anticipated nor controlled will relieve one of them of liability. BLACKS LAW DICTIONARY (8th ed. 2004) ("A contractual provision allocating the risk if performance becomes impossible or impracticable, especially as a result of an event or effect that the parties could not have anticipated or controlled.")

The scope of a *force majeure* clause is determined by the language the parties choose to adopt:

> To determine whether a certain event excuses performance, a court should look to the language that the parties specifically bargained for in the contract to determine the parties' intent, rather than resorting to any traditional definition of the term. Contractual terms are controlling regarding force majeure with common law rules merely filling in gaps left by the document. In other words, when parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure. The burden is on the party claiming force majeure to demonstrate that an act of God occurred or that the event was beyond the control of the party.

*R&B Falcon Corp. v. American Exploration Co.*, 154 F.Supp.2d 969, 973 (S.D. Texas 2001).

Plaintiffs will present the testimony of negotiators for Plaintiffs and Reclamation regarding their discussions, intentions, and expectation concerning this provision. This testimony will demonstrate that the parties intended that Plaintiffs would receive a reliable water supply, subject only to reductions caused by drought or similar acts of God that are beyond the control of the United States. Specifically, Mr. Roberts, who negotiated the contract for Central will testify that Reclamation explained this clause during negotiations to mean that the water would be furnished unless there was simply no available water in the reservoir, or the facility itself failed. Defendant is not expected to offer any contrary testimony.

This intent is evidenced by the language in Article 9 itself, which specifically lists items of *force majeure* including drought and other causes beyond the control of the United States. Here, Defendant bears the burden to demonstrate that the event excusing performance (CVPIA) is of the same general character as those specifically listed in the clause. *Matador Drilling Co. v. Post* 662 F.2d 1190 (5th Cir. 1981)

In *Matador Drilling Co.* the plaintiff claimed that a *force majeure* event caused damage to its drill pipe and forced it to suspend work. *Id* at 1197. The court required the Plaintiff to show that the cessation of operations resulted from a cause beyond its control, of the same general character as strikes, actions of the elements, water conditions, inability to obtain fuel or other critical materials (events all specifically listed in the force majeure clause). *Id.* at 1198. Because the damage occurred during normal operations under the control and supervision of the plaintiff, and the delay was not entirely due to causes beyond the plaintiff's control, the *force majeure* clause did not apply. *Id.* The court stated the event claimed by the plaintiff was not the kind of calamitous and unanticipated event that the *force majeure* clause contemplated. *Id.*

Similarly, Defendant cannot prove that subsequent federal legislation to give more water to fish was the kind of calamitous and unanticipated event that Article 9(a) contemplated.

**2. The Government's liability is not excused under Article 9(a) because the CVPIA, passed by Congress, was not a circumstance "beyond the control" of the United States.**

In order to invoke a *force majeure* provision, the averred *force majeure* must be beyond the control of the party invoking the provision. *Willems Industries, Inc. v. United States*, 295 F.2d 822, 829 (Ct. Cl. 1961) (stating that the alleged *force majeure* must be beyond the plaintiff's control "to be within the purview of any *force majeure* clause"); *see also Seaboard Lumber Co. v. United States*, 41 Fed. Cl. 401, 416 (1998) ("Parties cannot invoke *force majeure* clause protection merely because they are experiencing financial difficulties that are arguably caused by general government policies.") Thus, "[a] *force majeure* clause is not intended to buffer a party against the normal risks of a contract." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1293 (Fed. Cir. 2002) (quoting *Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 275 (7th Cir. 1986)).

In every year when Reclamation reduced Plaintiff's contractual allocations for the benefit of fish, they did so by choice not compulsion,[5] as noted in Section III.A.1. Had it wished to, Reclamation could have furnished 155,000 acre-feet of water to Plaintiff in every year while still making releases for all other purposes. Defendant simply cannot sustain its burden of proving that there was water shortage in every year, let along a shortage due to drought or other causes beyond its control, as specifically contemplated in Article 9(a).

[5] The evidence will show that drought was a contributing factor in 1994 only, but in no other year under examination.

**3. Other CVP contracts demonstrate how a clause could have been drafted to relieve Defendant of liability for discretionary water allocation decisions.**

In a summary of *force majeure* clauses from other CVP contracts, Plaintiffs will demonstrate how Defendant has successfully protected itself from liability for failure to furnish water for even the broadest discretionary choice in other instances. For example, Defendant has protected itself from liability for any reason: "There may occur at times a shortage during any year in the quantity of water [or "Project Water"] available for furnishing to the District by the United States pursuant to this contract through and by means of the Project, but *in no event* shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, therefrom."[6] *See also Westlands Water Dist. v. United States*, 337 F.3d 1092, 1097-98 (9th Cir. 2003) (stating that Article 11(a) of Westlands' contract provides that "[i]n any year in which there may occur a shortage from *any cause*, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts . . . .") (emphasis added).

Given that Defendant drafted the contracts at issue, and was very familiar with different, and broader shortage provisions, it could have easily chosen a broader shortage provision—but did not. To the extent there is any ambiguity in Article 9(a), the United States created it, and should not be allowed in this case to take advantage of its own ambiguous drafting. *See e.g.*, *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992) ("Where such a latent ambiguity exists, the court will construe the ambiguous term against the drafter of the contract when the nondrafter's interpretation is reasonable.")

---

[6] *See, e.g.*, Contracts of Mercy Springs Water District, Gravelly Ford Water District, West Stanislaus Irrigation District, Reclamation District 1606, Colusa County Water District, Contra Costa Water District, Placer County Water Agency.

**4. Reclamation's duty to act reasonably does not excuse it from performance.**

Defendant is mistaken in arguing that the requirement in the first sentence of Article 9(a)—that it use "all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract"—means that, provided the government acts reasonably in operating New Melones reservoir, it cannot be held liable for breach. First, as a matter of fact, Defendant did not act reasonably to avoid shortage to Plaintiffs, but instead re-allocated to other purposes New Melones water that was physically available and contractually committed to Plaintiffs. Second, on its face the *force majeure* provision of the contract does not relieve Defendant of liability so long as it acts reasonably to avoid shortage, but only for shortage "due to drought or other cause beyond the control of the United States. . . ."; Defendant cannot now re-write the contracts to provide otherwise.

A contract must be "interpreted so as to harmonize and give meaning to all of its provisions, and [thus] an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of its useless, in explicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical results." *Arizona v. United States*, 216 Ct. Cl. 221, 236 (1978). Similarly, in California, where these contract were written, the rules of construction requires that "[i]n the construction of a statute or an instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, *or to omit what has been inserted: and if there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.* Cal. Code Civ. Proc. §1858 (emphasis added).

With regard Article 9(a), these rules of interpretation require that the express statement in the second phrase—that liability could only be avoided for "drought, or other causes which, in

the opinion of the Contracting Officer, are beyond the control of the United States"—excludes any implication that liability could be avoided by simply acting "reasonably." In short, the first sentence of Article 9(a) imposes a contractual duty upon Defendant to act reasonably to avoid a shortage in Plaintiffs' water supply. The second sentence prescribes the conditions under which Defendant is not liable for failure to furnish water to Plaintiffs. Had Defendant acted reasonably to avoid a shortage in the quantity of water available to Plaintiffs (which it did not), Defendant would have merely satisfied its duty to perform under the first sentence. Defendant may escape liability here, however, only under the second sentence of Article 9(a), which imposes liability on Defendant unless the cause of shortage was beyond its control.

### D. Article 12 of the Contract: What opinions and determinations did the Contracting Officer make regarding water shortage due to drought or other causes beyond the control of the United States? Were they reasonable or were they arbitrary and capricious?

Defendant is expected to contend that the Contracting Officer made an opinion or determination there was a water shortage in each and every year at issue in this case. The April 10, 2006 Order states:

> First, the contract is ambiguous as to what sort of "opinions and determinations" were necessary under the contracts. Plaintiffs believe a formal declaration, such as they received in 1994, was necessary. Although such a requirement is not set forth explicitly in the contract, it might be implicit in the phrase and, indeed, makes some sense in order to have a written record of the factual determination for the appeal to the Secretary. Nonetheless, the evidence regarding what sort of "opinions and determinations" was required to be issued by the contracting officer, as well as what decisions he actually issued, has not been developed sufficiently enough to sustain a finding. Second, assuming that the contracting officer issued the necessary determinations, it remains to be determined if they were arbitrary, capricious, or unreasonable under the circumstances. Trial will allow the parties to expand upon the evidence bearing on both of these questions.

*Stockton East Water Dist.*, 70 Fed. Cl. at 535.

Under Article 9(a) the Defendant is relieved of liability only if (1) there is a water shortage, and (2) in the opinion of the Contracting Officer, that water shortage is due to "drought or other causes beyond the control of the United States." Contracts, Art. 9. Article 12 of the contracts allows Plaintiffs to appeal any such determination to the Secretary, who must decide whether the Contracting Officer's determination was arbitrary or capricious. To give meaning to this right of appeal, the contracting officer must render a decision sufficiently clear to allow review by the Secretary. In other words, Plaintiffs maintain that Article 9(a) of the contracts must be formally invoked by the Contracting Officer because, if this is not the case, then Article 12 of the contracts becomes meaningless. A contract must be "interpreted so as to harmonize and give meaning to all of its provisions, and [thus] an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona v. United States,* 216 Ct. Cl. 221, 236 (1978).

The documentary record discloses that the Contracting Officer made a finding of shortage only in 1994.[7] That declaration of shortage, however, cited several causes; among them was Congress' passage of CVPIA, an event which was certainly not beyond the control of the United States. Consequently, the Contracting Officer's finding does not support Defendant's Article 9 defense in 1994.

Even if there had been a water shortage due to drought or other causes beyond the control of the United States in every year under review (1993-present), Defendant could assert Article 9's protection only for 1994. To hold otherwise would be to deprive Plaintiffs of their right to an Article 12 appeal.

---

[7] Although not at issue in this case, the Contracting Officer also rendered such findings in 1991 and 1992.

The evidence will prove that there was not a water shortage due to drought or other cause beyond the control of the United States in any year from 1993 to the present. Rather, this has been an above-normal hydrologic period in history. Any "shortage" that resulted was not due to drought, but due to a conscious choice by Reclamation to give the water to fish instead of the contractors. This is highlighted by the fact that the Plaintiffs requested only 10,000 acre-feet of water in 1993—which they did not receive. At the same time, Reclamation released more than 130,000 acre-feet of water from the reservoir for fish pursuant to CVPIA(b)(2). After making this huge release, Reclamation cannot be heard to complain about extremely low storage levels in 1994, which prevented deliveries to contractors.

In the years after 1994, this Court will also have little trouble discerning that no "shortage" existed. Rather than hydrology, it has been Reclamation's conscious choice to operate under the IPO which has shorted the contractors. The IPO sets 90,000 acre-feet as the very maximum Stockton East and Central together can receive in any one year—65,000 acre-feet below the maximums established in their contracts. During this same period, it is undisputed that it was physically possible to deliver 155,000 acre-feet of water to these Plaintiffs each year, in addition to all of the historical releases that were actually made. In 1996 through 2000, and 2005 through 2006, the reservoir was so full that it spilled hundreds of thousands of acre-feet of water that could have been allocated to Plaintiffs. In 1995, and 2001 through 2003, the reservoir did not spill, but it had storage well in excess of 1 million acre-feet.

**E. The Scheduling Requirements of the Contract: Do Plaintiffs have a reasonable explanation for their failure to submit annual schedules?**

Defendant is expected to contend that Plaintiffs' failure to submit annual schedules relieved Defendant of its duty to furnish water. Addressing this issue in the April 10, 2006 Order, this Court stated:

> Defendant argues that a breach situation could not occur if Reclamation provided plaintiffs with exactly the amount of water that they requested under the contract schedules.
>
> Plaintiffs admit that they did not schedule water in some years and often submitted schedules for very low amounts of water, which duly was provided to them. *See* Tr. at 94-96. However, plaintiffs' counsel represented that this was because "the whole scheduling system . . . broke down[.]" Tr. at 95. At some point during the contract, Reclamation began informing plaintiffs how much water they could schedule. . . .
>
> Plaintiffs contend that, "[t]he schedules in short, . . . became meaningless [.]" Tr. at 95. Submitting them "was a futile exercise in legalism. Stockton East . . . and Central could have submitted schedules . . . every . . . year and it would have had zero impact on the amount [of water] they were allocated because . . . Reclamation had decided [they didn't] have enough water. . . ."
>
> In order to show liability, plaintiffs must offer a reasonable explanation, consistent with their obligations under the contract, for their failure to submit schedules or their submission of schedules for smaller-than-desired quantities of water. In order to establish damages, plaintiffs must prove the amount of water that they should have received above the reduced amount that they actually received. The cross-motions for summary judgment on breach are premature for those reasons.

*Stockton East Water Dist.*, 70 Fed. Cl. at 533 (citations omitted).

**1. Plaintiffs' alleged failure to submit monthly schedules under articles 3 and 4 of the contracts does not relieve Defendant of breach of contract liability.**

Defendant has asserted that its performance is at least partially excused by the fact that Plaintiffs allegedly did not provide a delivery schedule to Reclamation in each year at issue in this case. However, Plaintiffs will testify that they submitted schedules at the times and in the form as requested by the Contracting Officer, and that until briefing in this case Reclamation *never* claimed failure to submit an Article 4 schedule as a reason for failing to deliver water.

Article 4 of the contracts provides in relevant part that:

> For each year the Contractor will submit a schedule, subject to the provisions of Article 3, indicating the amounts of agricultural and M&I water required monthly. The first schedule shall be submitted 2 months prior to the initial delivery of water. Thereafter, annual schedules indicating monthly water requirements for

> the subsequent years shall be submitted not later than November 1 of each year or *at such other times as determined by the Contracting Officer* to assure coordination of Project operations.

Contracts at Art. 4(a). (emphasis added). This provision is intended to assure coordination of Project operations—in other words, to notify Reclamation in advance how much water Plaintiffs will require and on what schedule. However, Defendant does not assert that it did not know how much water to make available to Plaintiffs or when to make it available. Rather, Defendant argues that Plaintiffs' alleged failure to comply with every procedural minutiae of the contract excuses it from performance.

Defendant ignores the long-standing maxim of jurisprudence that "one may not take advantage of his own wrong." *See e.g*., *Cheney v. Libby,* 134 U.S. 68, 79 (1890). At trial, Plaintiffs' and Defendant's witnesses will testify that after attempting to schedule water in the Fall, for the coming year, as provided in the contract, in at least 1993, 1994 and 1995, Reclamation officials specifically told Stockton East and Central not to submit schedules until after Reclamation made an allocation of water to them in the Spring of the year. Plaintiffs did as they were requested and submitted schedules only in response to Reclamation's minimized allocations. Plaintiffs will also testify, that they maintained regular meetings and correspondence with Reclamation criticizing operational decisions and demanding more water under their contracts.

Reclamation's own witnesses will testify that schedule or not, there was nothing that the Plaintiffs could have done to increase the allocations that Reclamation made to them, and that operational officials at Reclamation did not even consider schedules when determining allocations to the contractors. In particular, from 1997 through 2004, Reclamation explicitly allocated water to Plaintiffs in accordance with its Interim Operations Plan, without regard for

any delivery schedule submitted by Plaintiffs, and without regard for the 155,000 acre-foot allocation contained in Plaintiffs' contracts.

Defendant's failure to provide water in response to submitted schedules, and its directions to Plaintiffs not to submit schedules as required by the contract, made submission of schedules as specified by Article 4 of the contracts a completely useless exercise. *See Border Brokerage Co v. United States*, 36 C.C.P.A. 83, 86 (1949)[8] ("The general rule is a sound one, that when the tender of performance of an act is necessary to the establishment of any right against another party, the tender or offer to perform is waived or becomes unnecessary, when it is reasonably certain that the offer will be refused") (citations omitted); 17A Am. Jur. 2d Contracts § 598 ("[A] tender or offer of performance is unnecessary, even though it might otherwise be required, if it appears that it would be useless.")

Finally, even if Plaintiffs had failed to comply with Article 4 in some technical respect, they substantially performed their duties under the contracts and such a minor deviation is immaterial. "Substantial performance, as traditionally understood, is an equitable doctrine that shields a contracting party 'against forfeiture in situations where [the] party's contract performance departs in minor respects from that which had been promised." *Blinderman Const. Co., Inc. v. United States*, 39 Fed. Cl. 529, 572 (1997) (quoting *Franklin E. Penny Co. v. United States*, 207 Ct. Cl. 842, 856, 524 F.2d 668 (1975)); *see also* 17A Am. Jur. 2d Contracts § 619 (contract performance "does not require exact performance of every detail, or an exact correspondence with the contract, but only the performance of all important parts. Technical or unimportant omissions or defects in either party's performance will not result in the denial of recovery"). Stated differently, the test of whether Defendant's performance is excused by any

[8] *BMW Mfg. Corp. v. United States*, 241 F.3d 1357, 1362 n.3 (Fed. Cir. 2001) ("Decisions of the Court of Customs and Patent Appeals are binding precedent on this court.")

failure to provide delivery schedules, is not whether Plaintiffs literally complied with every detail of the contracts' terms, but whether Plaintiffs substantially complied with the terms of the contracts. 17A Am. Jur. 2d Contracts § 616 ("The general test of performance . . . is not whether a party has literally complied with a contract's terms, but whether one has substantially done so.")

By specifically telling Plaintiffs to submit schedules only in response to allocations, and never informing Plaintiffs that they could obtain more water by submitting a larger schedule, Reclamation waived any right to claim the failure to submit schedules pursuant to the contracts as a defense.

**F. The IPO: Did Plaintiffs agree to amend their contracts to reduce the amount of water to which they were entitled?**

Defendant has asserted that the 1997-98 Interim Plan of Operations (IPO) was a modification of Plaintiffs contracts that reduced the amount of water to which they were contractually entitled. The Court's April 10, 2006 Order states:

> Article 3(h) provides that water delivery could be reduced contractually by mutual agreement of the contracting parties. Amicus raises the possibility that the New Melones Interim Plan of Operation, to which the parties allegedly agreed in 1997, may be such a mutual agreement. Amicus Br. filed Jan. 3, 2006, at 9. The circumstances surrounding this agreement must be developed fully at trial.

*Stockton East Water Dist.*, 70 Fed. Cl. at 534.[9]

---

[9] The Court also stated that:

> The court notes that while defendant claims that Stockton East and Central "participated in, negotiated and ultimately agreed to the [1997 New Melones Interim Plan of Operations] for valuable consideration," Def.'s Br. filed Oct. 26, 2006, at 18, the version included in the record does not include the signatures of Stockton East or Central.

*Stockton East Water Dist. v. United States*, 70 Fed. Cl. 515, 523 n.10 (2006).

Plaintiffs did not agree to the IPO and, therefore, did not, through the IPO, modify or amend their contracts in 1997. By its own terms, the IPO is a two-year agreement between Reclamation and U.S. Fish and Wildlife Service, and signed by only Reclamation and U.S. Fish and Wildlife Service. The IPO does not purport to modify Plaintiffs' contracts. Plaintiffs will present several witnesses who will confirm that they have never agreed to modify their contracts, and who will further testify that throughout the period from 1997 to the present they have continued to demand that Reclamation furnish water in compliance with their original 1983 contracts.

Rather than agree to it, Plaintiffs responded to Reclamation's stated intention to impose the IPO upon them by scheduling water under the IPO to mitigate their damages. In 1996, Reclamation presented the IPO to the stakeholders, and informed the contractors that they would receive 90,000 acre feet of water in contract year 1997 and would not be guaranteed any water in 1998. Desperate for reliability and needing to mitigate their damages, Plaintiff asked that 50,000 acre-feet be delivered each year instead of 90,000 acre-feet and then possibility zero. This was nothing more than the Plaintiffs selecting which form of Defendant's breach would harm them the least—not a choice to substitute a new allocation in place of their long-term written contract.

Further, Plaintiffs' witnesses will testify that Stockton East representatives specifically met with Reclamation during this period of time to ask about amending their contract for other reasons, and were told by Reclamation officials that such modification was difficult, time-consuming, and burdensome (given National Environmental Policy Act, 42 U.S.C. §§ 4321-4370, and other regulatory requirements) and, therefore, was not recommended.

**G. Third Party Beneficiaries: Did Stockton East and Reclamation intend for the City of Stockton, San Joaquin County, and California Water to be third-party beneficiaries of the Stockton East contract?**

Defendant contends that the City of Stockton, County of San Joaquin, and California Water Service Company are not intended third-party beneficiaries of the Stockton East contract, and that they therefore have no contract claim against Defendant. In its April 10, 2006 Order this Court addressed the issue as follows:

> The facts involving the intent of the parties regarding third-party beneficiary status are disputed and will be resolved at trial. Reclamation is an entity charged with the provision of irrigation water to users in dry areas. Stockton East is a public agency formed by special act of the California Legislature to provide both irrigation and drinking water to the residents of San Joaquin County and the City of Stockton. The court shares plaintiffs' basic incredulity that, when these two specially formed public entities contracted, they did not intend to benefit Stockton East's associated city, county, or water purification company. The contractual statements cited by plaintiffs, while ambiguous, provide some evidence of this. Defendant's affidavits, on the other hand, show only that the alleged third-party beneficiaries did not participate directly in the creation of the contract; this does not prove that the parties did not intend to benefit them. The court also notes that, while H.F. Allen Orchards and Klamath Irrigation Dist. are distinguishable, they do provide support for the proposition that, in factually analogous disputes, third-party beneficiary status has been granted. Therefore, the parties will prove their intentions at trial, citing evidence from outside the contract as needed to demonstrate whether Reclamation and Stockton East intended California Water, the City of Stockton, and the County of San Joaquin to be beneficiaries of their water contract.

*Stockton East Water Dist.*, 70 Fed. Cl. at 528.

As this Court has noted, in factually analogous cases the Federal Circuit has held that agricultural water users are third-party beneficiaries of water service contracts between water districts and the Bureau of Reclamation. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1576 (Fed. Cir. 1984) ("The irrigation districts, which contracted with the Bureau, act as a surrogate for the aggregation of farmers. They use no water themselves.") This Court recently reached the same conclusion in another water service contract case, stating: "[S]everal cases in

this circuit have found similarly-situated irrigators were third-party beneficiaries under drainage district agreements." *Klamath Irrigation Dist. v. United States*, 67 Fed. Cl. 504, 533 (2005). The Ninth Circuit has come to the same conclusion. *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*, 899 F.2d 814, 815-16 (9th Cir. 1990) ("[T]he District bought water . . . from a federal reclamation project . . . for resale under certain conditions to subscribers within the District. *As subscribers, the appellants are beneficiaries of the 1963 Contract, even though they are not parties to it*.") (emphasis added)[10]; *see also Henderson County Drainage District No. 3 v. United States*, 53 Fed. Cl. 48 (2002) (farmers in drainage district are third-party beneficiaries of contract between district and the United States).

Reclamation's actions during the negotiations made it reasonable for the City, County, and California Water to rely on Reclamation's promise to confer a right on them through the contract. At the time of contract negotiations, Reclamation knew that Stockton East had already contracted with California Water, the City of Stockton, and San Joaquin County to provide treated surface water that the City, County, and Cal Water delivered to their customers. Reclamation specifically asked how much municipal water should be included in the contract; in response, the City of Stockton adopted a resolution indicating that 10,000 acre feet of water would be needed from the contract for municipal purposes, and Reclamation inserted this

---

[10] The decisions in *Klamath Water Users Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999) and *Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) do not apply here. *Patterson* did not involve a water delivery contract nor a delivery contract of any kind; rather, the contract was a contract to operate the dam to produce hydropower. *Klamath Water Users Ass'n v. Patterson*, 15 F. Supp.2d 990, 992 (D. Ore. 1998). *Roedler* involved another power generation contract in which consumers claimed to be third-party beneficiaries of an agreement to dispose of nuclear waste from power plants. In both *Patterson* and *Roedler*, the contracting party was a for-profit power company, not a government agency, such as an irrigation or drainage district, formed specifically to benefit its water users.

quantity into the Stockton East contract based specifically on this resolution from the City of Stockton.

Moreover, the language of the contract itself evidences the intent that these three entities (the City, the County, and Cal Water) were intended to be third-party beneficiaries of the Stockton East contract. First, the contract references Reclamation's recognition of the important need for additional water supplies for the City and County: "investigations by the United States indicate that the Contractor has a present and potential need for an irrigation and municipal and industrial water supply." *See* Stockton East Contract at 2. Second, the payment section of the contract demonstrates that the parties intended the water to benefit third parties: "The obligation of the contractor to pay the United States . . . is a general obligation of the Contractor notwithstanding the manner in which the obligation may be distributed among the Contractor's *water users*." Stockton East Contract at Art. 13(a) (emphasis added). Additionally, the contract states that "[w]ater furnished to the Contractor pursuant to this contract shall not be sold, exchanged, or otherwise disposed of for use outside the Contractor's service area." Stockton East Contract at Art. 10.

## IV. DEFENDANT HAS NO OTHER DEFENSE TO CONTRACT LIABILITY IN THIS CASE.

Of all of Defendant's minor technical defenses, Plaintiffs address only the issue of water conservation plans here due to the express California law on the subject.

The evidence at trial will show that Stockton East's Water Conservation Plan was submitted in 1986 and specifically approved by Reclamation in 1987. Central timely submitted a water conservation plan to Reclamation by 1993. Reclamation failed to timely review these plans and did not submit them to the California State Water Resources Control Board until 1995.

Any changes that Reclamation requested to be made to the plans were minor, and were based on Reclamation preferences, not on State Board requirements.

As a matter of law, any suggestion by Defendant that the "United States had no legal authority to provide the Plaintiffs with water until [the water conservation] plans were finally approved by the SWRCB" is flat wrong. Defendant points to no contractual language or terms in the water right permits that support this conclusion. The permit expressly obligates the United States, not Stockton East and Central, to obtain approval for its Water Management Program:

> Prior to any diversion of water for municipal, domestic or irrigation purposes, Permittee [Reclamation] shall consult with the Chief of the Division of Water Rights and develop a Water Management Program in conformance with State Water Resources Control Board requirements as appropriate. The proposed program shall be presented to the Board for approval.

State Board Decision 1616 (1988), Condition 21.

More importantly, however, the permit term in D-1616 only requires that Water Management Programs be "developed" prior to the delivery of water, not approved. *Id*. Likewise, the California Water Code itself limits the State Board's ability to deny water deliveries by providing that a water supplier's "adoption of a plan satisfies any requirements of state statute, regulation, or order, including those of the State Water Resources Control Board, for the preparation of water management plans." Cal. Water Code § 10845.

Contrary to Defendant's argument, the districts' water conservation plans did not have to be approved by the State Board. Rather, the State Board required Reclamation to submit a Water Management Program as a standard term of Reclamation's water permit for the New Melones project.

The districts' role in facilitating Reclamation's formulation of its Water Management Program was satisfied when, as stated in the California Water Code, the districts, "adopt[ed] a

plan . . . [that] satisfies any requirements of state statute, regulation, or order, including those of the State Water Resources Control Board, for the preparation of water management plans. If the board requires additional information concerning water conservation to implement its existing authority, nothing in this part limits the board in obtaining that information." Cal. Water Code § 10845. Once a board of directors acts to approve a plan, as the boards of directors for both Stockton East and Central did, the districts' water management plans are deemed adopted for purposes of the statute.

## V. PLAINTIFFS' OBJECTIONS TO WITNESSES AND EXHIBITS.

Plaintiffs' objections to Defendant's trial exhibits are attached hereto as Exhibit A. Plaintiffs have objected to several categories of documents on grounds of relevance and Rule 403 (such as documents relating numerous water right permit filings with the State Water Resources Control Board, the water conservation plan issues, or to biological explanations for fishery releases). Plaintiffs expect that the relevance of these exhibits will be determined by pre-trial stipulations of the parties, or by the Court through rulings on motions in limine. To the extent that the issues covered by these documents become relevant at trial, Plaintiffs reserve the right to withdraw or modify their objections.

In addition, Plaintiffs object to Defendant's offering any of the witnesses listed in Defendant's preliminary witness list as experts. Specifically, Defendant has indicated that testimony from Chester Bowling, John Burke, John Davis, Michael Delamore, Paul Fujitani, Roger Guinee, Derek Hilts, Peggy Manza, Dan Meier, Roger Patterson, Lloyd Petterson, Lowell Ploss, John Renning, and Kirk Rodgers, may include testimony covered under Federal Rule of Evidence 702. In accordance with this Court's order of September 18, 2006, Plaintiffs will fully set forth their objections to these witnesses in motions *in limine* to be filed September 29, 2006.

However, in summary, Plaintiffs object that these witnesses, with limited exception, were not made available for deposition *after* their designation as experts. Moreover, Defendant did not provide expert reports for these witnesses citing the exception in RCFC 26(a)(2)(B) for employees. Despite whether these witnesses were required to provide export reports, under RCFC 26(b)(4)(A) "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial." Plaintiffs never had the opportunity to depose these witnesses as experts.

Furthermore, Plaintiffs object to F.R.E. 702 testimony by Messrs. Ploss, Bowling, Patterson, and Renning, on the additional ground that they are employees "retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." RCFC 26(a)(2)(B). In accordance with RCFC 26(a)(2)(B), such witnesses must provide written expert reports. Defendant has not provided expert reports for these witnesses. Finally, Plaintiffs object to Peggy Manza providing testimony under F.R.E. 702 on the additional grounds that Ms. Manza's proposed testimony is not relevant to any issue in this case under, *inter alia, Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), and its progeny and that Ms. Manza's expert report does not comply with the requirements of RCFC 26(a)(2)(B).

Accordingly, to the extent that the above-listed witnesses' testimony is only admissible under F.R.E. 702, it should be excluded.

Respectfully submitted,

s/ Roger J. Marzulla

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
202-822-6760
202-882-6774 (fax)

Dated: September 25, 2006

Counsel for Plaintiffs

Of Counsel:

Jeanne M. Zolezzi
Jennifer L. Spaletta
Herum Crabtree Brown
2291 West March Lane
Suite B100
Stockton, CA 95207
(209) 472-7700
(209) 472-7986 (facsimile)