# EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---oOo---

STOCKTON EAST WATER DISTRICT, )
CENTRAL SAN JOAQUIN WATER )
CONSERVATION DISTRICT, COUNTY )
OF SAN JOAQUIN, CITY OF )
STOCKTON, and CALIFORNIA WATER)
SERVICE COMPANY, )
Plaintiff, )
)
vs. ) No. 04-541L
)
UNITED STATES, )
)
)
Defendants. )
___________________________________)

---oOo---

DEPOSITION OF PEGGY MANZA

VOLUME I Pages 1 - 230

Tuesday, April 5, 2005

Taken at the location of:

LAW OFFICES OF HERUM, CRABTREE & BROWN

2991 W March Lane, Suite B-100

Stockton, California 95207

---oOo---

Reported by Mary Jackson, CSR #8688

09:57:45 needs and the firm contract.
09:57:46 MS. KAPPLER: Same objection.
09:57:50 THE WITNESS: And, again, I'm not a lawyer.
09:57:54 All I can say is I am told to meet our permit
09:58:03 obligations. Permit obligations are fishery
09:58:05 releases, water quality, dissolved oxygen. Those
09:58:10 must be met.
09:58:12 MS. SPALETTA: Q. To clarify your response in
09:58:14 my mind, are you saying that you were told you had
09:58:16 to meet your permit obligations prior to delivering
09:58:20 water for firm contracts?
09:58:23 MS. KAPPLER: Objection to the extent the
09:58:24 inquiry calls for information protected by the
09:58:27 attorney-client privilege.
09:58:30 THE WITNESS: During the time that I was
09:58:31 operating New Melones, I was using the Interim Plan
09:58:34 of Operations as a guideline. The Interim Plan of
09:58:38 Operations is very clear under what water supply
09:58:42 conditions there is water available to the CVP
09:58:47 contracts.
09:58:48 It was not necessary for me to say, oh, I need
09:58:54 to provide water over here and take it away over
09:58:57 here. That was not done. Water was provided under
09:59:00 the Interim Plan of Operations, what that plan
09:59:06 called for to the contractors. I was not required

09:59:09 to make that kind of a decision.

09:59:11 MS. SPALETTA: Q. Just so I can clarify then
09:59:13 in my mind, when you were doing annual operations of
09:59:17 the reservoir, you operated the reservoir in
09:59:20 accordance with the allocations that fell out in the
09:59:24 wash, let's say, from the Interim Plan of
09:59:26 Operations?

09:59:28 A. I used the Interim Opera -- Plan of
09:59:31 Operations as the guidelines, the starting point.
09:59:35 It provided the allocations to all project purposes.
09:59:40 If there was a need for a release that exceeded what
09:59:45 the allocations called for, for a permit obligation,
09:59:51 that determination on whether or not to make that
09:59:54 release was done after consultation with my
09:59:58 supervisors, Fish and Wildlife Service, State Board,
10:00:01 but it did not come at the cost of saying, "Okay.
10:00:07 We're so sorry, CVP contractors. You don't get your
10:00:11 allocation this year because we're going to take it
10:00:13 and give it to this other purpose." The allocations
10:00:17 that were called for were provided, and if an
10:00:20 additional release was needed to meet a project
10:00:24 purpose, permit obligation, that release was made in
10:00:29 addition to the allocation.

10:00:31 Q. By making these additional releases
10:00:35 outside of the Interim Operations Plan, for example,

10:00:39 to meet a permit requirement, did that in effect
10:00:42 then lower carryover storage to the next year which
10:00:47 had an impact then on Interim Plan of Operation
10:00:51 allocations in the next water year?
10:00:56 A. There is the potential because the
10:01:00 Interim Plan of Operations does function based on
10:01:04 end-of-February storage plus forecasted
10:01:07 March-through-September inflow to come up with a
10:01:13 hydrologic category -- I'm sure you'll get me into
10:01:15 more detail on this later -- to determine what the
10:01:17 allocation is. If that end-of-February storage is
10:01:22 lower, there is the potential it could cause some
10:01:25 change.
10:01:27 Now, it would have to be significantly lower to
10:01:30 cause any significant change. But I do recall there
10:01:33 was one year where we did make an accommodation to
10:01:37 Stockton-East and Central by, in effect, taking the
10:01:41 additional release that we made for a project
10:01:44 purpose that was not accounted for in the IPO
10:01:49 allocations, we added that back into our storage for
10:01:52 that year so that your allocations for that year
10:01:55 were not affected by that additional release.
10:02:00 Q. And again --
10:02:00 A. And that was documented in a letter to
10:02:03 the districts.

10:02:04 Q. Again, just to be clear, when you're talking about allocations to the district, you're not referring to allocations under their contracts, but instead, you're referring to allocations that the Bureau determined they would make to the district based on the Interim Plan of Operations?

10:02:21 A. Yes. But obviously the Interim Plan of Operation would not have had that in there if you did not hold contracts.

10:02:31 Q. Let me just be clear because we don't have the document in front of us. The allocation in the Interim Plan of Operations, is it equal to the contractual amounts in the Stockton-East and Central contracts?

10:02:44 MS. KAPPLER: Objection. Calls for a legal conclusion.

10:02:48 THE WITNESS: That depends on which -- or which -- which one or ones of the contracts you're referring to. The IPO has allocations to CVP contractors of up to 90,000 acre-feet at a maximum. You hold firm contracts for 49,000. Clearly, 90 exceeds 49. It is, however, less than the full 155 that you do hold.

10:03:19 MS. SPALETTA: Q. And in which water years is the 90,000 acre-feet allocation provided in the --

10:03:26 A. Above normal and wet.
10:03:28 Q. I'm sorry?
10:03:29 A. Above normal and wet.
10:03:30 Q. And for every other type of water year,
10:03:32 what is the allocation in the IPO for CVP
10:03:36 contractors?
10:03:37 A. I would refer you to the document. I
10:03:38 don't have the numbers memorized.
10:03:41 Q. Okay. We'll get to the document later
10:03:42 this afternoon.
10:03:52 Speaking of the contracts, did you read the
10:03:56 Stockton-East and Central contracts at any time?
10:04:00 A. Yes, at some point in the distant past I
10:04:03 have read them.
10:04:04 Q. Were they something you referred to often
10:04:07 when you were the operator of the New Melones
10:04:08 Project?
10:04:09 A. No.
10:04:15 Q. What meaning were you told by your
10:04:18 supervisors that those contracts had in your
10:04:20 operation of the project?
10:04:31 A. That sort of discussion doesn't take
10:04:37 place.
10:04:37 Q. So you never had a discussion with Chet
10:04:37 and Paul about the meaning of the Stockton-East and

Central contracts with respect to your operations of the New Melones Project?

A. Not the meaning of the contracts, no.

Q. What types of discussions did you have with Chet and Paul about the contracts?

A. Certainly we have discussed that the CVP contractors have contracts. The IPO does not allocate full water under the contracts. This is a concern. We've had those discussions many times.

Q. Did you ever feel that more water needed to be allocated to the districts in the Interim Plan of Operations or in any other operations plan?

A. Did I personally, or did I as a Reclamation representative?

Q. Did you personally?

A. I personally would have liked to have seen the allocation be higher, but as an engineering professional looking at the amount of water available, I did not see how it could be done without not meeting permit obligations.

Q. What about the impact of the CVPIA? How did that impact the availability of water to the contractors?

A. Well, certainly --

MS. KAPPLER: Objection to the use of the term

10:06:21 "available." Define the phrase, please.
10:06:27 MS. SPALETTA: Q. First, I'd like you to answer the question. Then if we need to, we'll go into more detail discussion.
10:06:34 A. My attorney objected to the word "available." Please define "available."
10:06:38 Q. In your operation of the New Melones Project, if you had not had to make releases for CVPIA purposes, would there have been additional water available to provide to the contractors?
10:06:50 MS. KAPPLER: Same objection.
10:06:54 MS. SPALETTA: Q. You can answer the question over the objection.
10:06:58 A. That would be impossible to answer because the IPO takes the CVPIA into account as an integral part of it. If CVPIA had not come into being, the IPO either wouldn't exist or would have a different format than what it does now. Right now the Interim Plan calls for fishery release up to 467,000 acre-feet annually. Under the conditions that existed prior to CVPIA, the maximum that could have been allocated to fisheries was 302.3 thousand -- hundred thousand acre-feet.
10:07:42 Q. To explain for the record the 302,000 acre-feet, what was that based on?

11:41:10 given index, you put in a percentage for the deficiency. The sums on that can change. But they might have input, say, a 50 percent deficiency. So if it's a year Type 2, you have a 50 percent deficiency, then the allocation to that purpose would be 50 instead of 100.

11:41:29 Q. Okay. So instead of using a stepped-down method of allocation in STANMOD, PROSIM and SANJASM use a deficiency percentage?

11:41:39 A. A deficiency percentage based on a year type of index.

11:41:56 Q. I see that in the water management study, for example, on Scenario A, in the box related to the annual CVP deliveries, the options in this box range from 0 to 155, which is the total amount of the Central and Stockton East Water District contracts; is that correct?

11:42:18 A. Yes.

11:42:18 Q. Now, my understanding is that under the Interim Plan of Operations that was adopted, the annual CVP delivery options range from 0 to 90?

11:42:30 A. Correct.

11:42:31 Q. How was the decision made to alter from the CVP delivery options that were already in STANMOD ranging from 0 to 155 to a lower option