# EXHIBIT A
(Part 2)

y from Mary Wells
to the Committee
and her family's
f the various
om the perspective
In addition, Mary
sistencies by
, when we in
grown with Federal
reasoned action
rops on the other
tural community.
ram crops, we
an adequate and
l.

rea of
he bill relies
cesses. On the
right to
lity standards are
te a significant
purposes, without
ces Control Board

y concerned about
tion measures are
ould be shared
parative benefits
the same token,
ome responsibility
ronmental problems
r, and that fact
nism is included

early, I have
isions of H.R.
measure
e fair and
basis for
despite the
approaches, on
en now to enhance
e time provide
municipal water

Chairman MILLER. Thank you very much, Vic, for your helpful and constructive remarks. I think you hit the nail right on the head and that is that delay is in nobody's interest. There is nobody who is going to benefit from this because either the project will come under increasing attack, it will not be in the nature of comprehensive reforms—piecemeal attacks—and/or we will continue to see a degradation of the environment and those problems will get so severe that, as our friend said, those in the Northwest have lost control of their economy. Because of those efforts we too can lose control of the State's economy as it relates to water through those efforts.

Mr. Herger.

## STATEMENT OF HON. WALLY HERGER

Mr. HERGER. I join in thanking you for this hearing and I would also like to recognize a constituent of mine, Mary Wells from Williams, a farmer and general manager of the West Side Water District, who will be testifying to you later.

As you are aware, we, in California, are in the midst of our sixth year of an unprecedented drought and face the challenge of restoring anadromous fish populations to the Sacramento Valley. While I applaud the attempts of the Chairman to restore the fishery resources of the Sacramento Valley I believe that H.R. 5099, in its present form, would decimate our local economies. It promises questionable results at a very great cost not only in terms of dollars but in the devastating effect that it will have on local communities.

In our present situation everyone is having to cope with reductions in water supplies among CVP customers. Most of our agricultural users will receive only 25 percent of their water contract supplies. In comparison, urban contractors and wildlife refuges will receive 75 percent of their water contract supplies. We must remember that an attempt to solve one problem can often result in a myriad of new problems.

We must also keep in mind that drastically altering major projects such as the CVP would dramatically impact the lives of real people. While the national unemployment rate stands at 7.3 percent the counties in my district most affected by H.R. 5099, Glenn and Colusa, already are suffering through a 21.7 percent and a 27.2 percent unemployment rate, respectively. Another blow, such as H.R. 5099, could very likely result in the complete bankruptcy of these counties.

The debate is not over whether or when we should restore the Sacramento Valley's fishery resources but it is over how we can best accomplish this objective. I believe that a consensus approach which ensures long term community compliance and viability is the only rational course to pursue.

Unfortunately, Mr. Chairman, H.R. 5099 is seen by the communities I represent as an extreme approach that only takes into account its effect on fish. While we have an obligation to ensure the preservation of Sacramento Valley fish stocks we also have an obligation to do so without bankrupting local communities and destroying people's livelihoods.

We can solve these problems by working together. As currently written this legislation would force agricultural producers to survive on essentially year to year water contracts making it nearly impossible for them to obtain essential agricultural financing.

Not only would this affect our farmers and related businesses but it may also increase the instances of bank failures and bankruptcy in our rural communities while its effectiveness in restoring fish populations is highly uncertain.

Another major concern is that at a time when total 1992 water deliveries for the CVP are projected at 3.5 million acre-feet this legislation authorizes that more than two of the 3.5 million acre-feet be immediately dedicated for unclear fish and wildlife objectives. This type of mandatory allocation of a major portion of CVP water, I feel, Mr. Chairman, is both inequitable and unproductive. Should this legislation be implemented the reduction in farming activity which is the predominant employer in these communities would push the already high unemployment rates even higher and increase the demand on local, state and Federal governments for services.

Also, uncertain water supplies would decimate local economies by reducing the communities tax bases and by pulling down all of the Sacramento Valley businesses which are dependent on the agricultural economy.

It is my sincere hope that the Committee will pursue a consensus solution to the problems facing the Central Valley Projects and not pursue a course that will assuredly bankrupt an entire sector of California's economy.

Thank you.

[The prepared statement of Congressman Herger follows:]

HO

MR. CHAIRMAN:
AS YOU
SEVERE PROBL
UNPRECEDENTE
AND RESTORIN
VALLEY.
WHILE I
FISHERY RESO
IN ITS PRESE
PROMISES QUE
TERMS OF DOL
LOCAL COMMUN
IN THE
ANADROMOUS F
IN WATER SUP
USERS HAVE H
WILL RECEIVE
COMPARISON,
75% OF THEIR
THESE D
ALREADY SLUG
AND STRAINED

Chairman MILLER. Mr. Errotabere.

## STATEMENT OF DAN ERROTABERE

Mr. ERROTABERE. I am a second generation farmer from Riverdale, in western Fresno County, in California. Currently, my two brothers, our mother and I farm together, growing a variety of crops: wheat, vegetables, cotton and seed crops. Farming constitutes the sole source of income for our family, and each of us is actively involved on a daily basis in our farming operation. I am here today representing not only my family farm, but also the thousands of other family farms like ours receiving water from the Central Valley Project sources.

Let me begin by emphasizing that the agricultural community shares the concerns of many Californians about fish and wildlife resources in our State. We acknowledge that there are legitimate environmental issues which can be addressed, in part, by the CVP. Our active participation in efforts to address such concerns is exemplified by our widespread support for H.R. 3876 [and S. 2016, now included as Title XXXIV of H.R. 429 as passed by the Senate].

As you know, Mr. Chairman, it was no easy task to gain agriculture's support for H.R. 3876, as implementing these measures will cost CVP farmers millions of dollars each year and will redirect precious water away from traditional agricultural uses. Nevertheless, farmers recognized that action needed to be taken, and that this bill, H.R. 3876, provided a practical, balanced and credible approach to resolving CVP fish and wildlife problems. H.R. 3876 is a fair, and although painful for California agriculture, will allow family farmers throughout the State to continue farming while providing meaningful environmental enhancement.

Conversely, H.R. 5099 would have extremely adverse implications for family farms operating within the CVP. For instance, by immediately dedicating over two million acre feet of existing CVP supplies for largely unspecified fish and wildlife purposes, H.R. 5099 would legislate permanent drought for family farms throughout the Central Valley. The reallocation of this water would amount to about a 50 percent cut in supply to CVP agriculture—in a wet year. Groundwater supplies are not a viable option in many areas due to chronic overdraft, and as others today will testify, efficient water use is a mandate not an option for a successful farm.

Furthermore, without the security of adequate and long term water supplies, it will become extremely difficult for farmers to qualify for capital financing. This, in turn, will erode my generation's ability to establish a strong agricultural base for our children. Put simply, the loss of a significant portion of our surface water supply will have a direct and quantifiable impact on thousands of families and on the future of the agricultural economy of our State.

Two independent studies published in May of this year—one by the California Department of Food and Agriculture and one by the University of California—indicate that a loss of one million acre feet of annual CVP supplies to agriculture would ultimately result in a loss of between $310-640 million in crop value per year, and a loss of between $420 million and $2.6 billion per year in lost income



within the State. Mr. Chairman, may I request that these studies be placed in the record along with my written testimony?

Chairman MILLER. Without objection.

[EDITOR'S NOTE.—See Appendix.]

Mr. ERROTABERE. The CDFA study also projected that a loss of one million acre feet of annual Central Valley Project supplies to agriculture could result in: the loss of 400,000 acres of irrigated farmland; the elimination of almost 3,000 sustainable farms; and, a decrease in rural population by 48,000 people.

Keep in mind these figures relate to a loss of one million acre feet per year, H.R. 5099 would reduce CVP allocations to agriculture by over two million acre feet per year.

For too long, the Environmental Defense Fund, SHARE the Water and others proposed nebulous concepts associated with a quantity of water that it would take to meet the fish and wildlife provisions of S. 484. Ultimately, due to the persistence of agriculture representatives, these groups modified a document which provided up to six million acre feet would be needed for environmental purposes.

When the agriculture representatives balked at the consequences of that figure, the amount of "up front water" that would be needed was quickly reduced first to 3.6 million acre feet, then 1.5 million acre feet annually. These figures did not include water already committed to environmental protection; they did not include higher flows which may result from the California State Water Resources Control Board Bay/Delta process; and they did not include any water that would be needed to meet Federal Endangered Species Act obligations. Moreover, the EDF justification of this figure also included export limitations from the Delta.

Contrary to EDFs contentions, CVP Water Association representatives did offer counter proposals which contained a commitment for up front water. These included flows on the Upper Sacramento and Lower American Rivers, wildlife refuge water and proposals to solve problems on the San Joaquin River and in the Delta. All of these proposals have been dismissed out of hand by EDF and SHARE.

The CVP rejection of the EDF and SHARE proposals was, of course, based in part upon the impact that such a commitment would have on CVP water supplies. Additionally, however, the EDF and SHARE numbers simply are not supported by any credible evidence; nor can they be justified. Indeed, EDF and SHARE themselves admit that the numbers derive from a discredited 1988 SWRCB staff draft report. That report was so incredible in its findings and conclusions that the SWRCB refused to hold hearings on it. Far from being a "political" reaction as has been contended by EDF and SHARE, the withdrawal of the draft staff report was the only way to deal with a document of such dubious value.

Finally, the EDFs and SHAREs continued assertion that their adversaries are unwilling to engage in substantive debate is simply absurd. Not only have numerous face to face meetings occurred, but the CVPWAs lead negotiator has also offered to meet privately with Mr. Graff to discuss these matters with the CVPWA, without also being present.

Along with the economic consequence of H.R. 5099 would be the very real human toll on farm workers and the communities that rely upon agriculture. It is predictable that a significant decrease in the agricultural economy would result in a major dislocation for farm laborers; tearing at the family unit by requiring laborers to travel great distances in search of new work.

CHAIRMAN MILLER. I would ask you to summarize the remainder of your statement.

Mr. ERROTABERE. We don't have other alternatives available when the water is stripped away. H.R. 3876 provides a workable solution for family farms in addressing both the environmental questions and allowing us to survive along with those solutions.

Thank you.

Chairman MILLER. Thank you.

[The prepared statement of Mr. Errotabere follows:]



**TESTIMONY OF DANIEL D. ERROTABERE**
**BEFORE THE HOUSE INTERIOR AND INSULAR AFFAIRS**
**SUBCOMMITTEE ON WATER, POWER AND OFFSHORE ENERGY**
**RESOURCES**
**HEARING ON**
**CENTRAL VALLEY PROJECT LEGISLATION**

**MAY 14, 1992**

Mr. Chairman and Members of the Subcommittee:

My name is Daniel Errotabere. I am a second generation farmer from Riverdale, in western Fresno County, in California. Currently, my two brothers, our mother and I farm together, growing a variety of crops: wheat, vegetables, cotton and seed crops. Farming constitutes the sole source of income for our family, and each of us is actively involved on a daily basis in our farming operation. I am here today representing not only my family farm, but also the thousands of other family farms like ours receiving water from Central Valley Project (CVP) sources.

Let me begin by emphasizing that the agricultural community shares the concerns of many Californians about fish and wildlife resources in our State. We acknowledge that there are legitimate environmental issues which can be addressed, in part, by the CVP. Our active participation in efforts to address such concerns is exemplified by our widespread support for H.R. 3876 (and S. 2016, now included as Title XXXIV of H.R. 429 as passed by the Senate).

As you know, Mr. Chairman, it was no easy task to gain agriculture's support for H.R. 3876, as implementing these measures will cost CVP farmers millions of dollars each year and will redirect precious water away from traditional agricultural uses. Nevertheless, farmers recognized that action needed to be taken, and that this bill (H.R. 3876) provided a practical, balanced and credible approach to resolving CVP fish and wildlife problems. H.R. 3876 is fair, and although painful for California agriculture, will allow family farmers throughout the State to continue farming while providing meaningful environmental enhancement.

Conversely, H.R. 5099 would have extremely adverse implications for family farms operating within the CVP. For instance, by immediately dedicating over two million acre feet of existing CVP supplies for largely unspecified fish and wildlife purposes, H.R. 5099 would legislate permanent drought for family farms throughout the Central Valley. The reallocation of this water would amount to about a 50% cut in supply to CVP agriculture - in a "wet" year. Groundwater supplies are not a viable option in many areas due to chronic overdraft, and as others today will testify, efficient water use is a mandate not an option for a successful farm.

Furthermore, without the security of adequate and long-term water supplies, it will become extremely difficult for farmers to qualify for capital financing. This, in turn, will erode my generation's ability to establish a strong agricultural base for

our children. Put simply, the loss of a significant portion of our surface water supply will have a direct and quantifiable impact on thousands of families and on the future of the agricultural economy of our State.

Two independent studies published in May of this year - one by the California Department of Food and Agriculture (CDFA) and one by the University of California (UC) - indicate that a loss of one million acre feet of annual CVP supplies to agriculture would ultimately result in a loss of between $310-640 million in crop value per year, and a loss of between $420 million and $2.6 billion per year in lost income within the State. (Mr. Chairman, may I request that these studies be placed in the record along with my written testimony?) The CDFA study also projected that a loss of one million acre feet of annual Central Valley Project supplies to agriculture could result in:

-the loss of 400,000 acres of irrigated farmland;
-the elimination of almost 3,000 sustainable farms; and
-a decrease in rural population by 48,000 people.

Keep in mind these figures relate to a loss of <u>one million acre feet per year</u>. H.R. 5099 would reduce CVP allocations to agriculture by over <u>two million</u> acre feet per year.

For too long, the Environmental Defense Fund (EDF), SHARE the Water and others proposed nebulous concepts associated with a quantity of water that it would take to meet the fish and wildlife provisions of S. 484. Ultimately, due to the persistence of agriculture representatives, these groups modified a document which provided up to 6 million acre feet would be needed for environmental purposes.

When the agriculture representatives balked at the consequences of that figure, the amount of "up front water" that would be needed was quickly reduced first to 3.6 million acre feet, then 1.5 million acre feet annually. These figures did not include water already committed to environmental protection; they did not include higher flows which may result from the California State Water Resources Control Board (SWRCB) "Bay/Delta" process; and they did not include any water that would be needed to meet Federal Endangered Species Act obligations. Moreover, the EDF justification of this figure also included export limitations from the Delta.

Contrary to EDF's contentions, CVP Water Association (CVPWA) representatives did offer counter-proposals which contained a commitment for "up front" water. These included flows on the Upper Sacramento and Lower American Rivers, wildlife refuge water and proposals to solve problems on the San Joaquin River and in the Delta. All of these proposals have been dismissed out-of hand by EDF and SHARE.

The CVP rejection of the EDF and SHARE proposals was, of course, based in part upon the impact that such a commitment would have on CVP water supplies. Additionally, however, the EDF and SHARE numbers simply are not supported by any credible evidence; nor can they be justified. Indeed, EDF and SHARE themselves





admit that the numbers derive from a discredited 1988 SWRCB staff draft report. That report was so incredible in its findings and conclusions that the SWRCB refused to hold hearings on it. Far from being a "political" reaction as has been contended by EDF and SHARE, the withdrawal of the draft staff report was the only way to deal with a document of such dubious value.

Finally, EDF's and SHARE's continued assertion that their adversaries are unwilling to engage in substantive debate is simply absurd. Not only have numerous face to face meetings occurred, but the CVPWA's lead negotiator has also offered to meet privately with Mr. Graff of the EDF to discuss all of the relevant issues including the request for "up front" water, at any time Mr. Graff wishes. It is my understanding that these meetings have not taken place, at least in part, because not all of SHARE's membership trust Mr. Graff to discuss these matters with the CVPWA, without also being present.

Along with the economic consequence of H.R. 5099 would be the very real human toll on farmworkers and the communities that rely upon agriculture. It is predictable that a significant decrease in the agricultural economy would result in a major dislocation for farm laborers; tearing at the family unit by requiring laborers to travel great distances in search of new work. Overburdened social services in rural communities would face an insurmountable task, and lost revenues from a greatly reduced tax base would only add to many communities' struggle to make ends meet.

It is important to note that these consequences of H.R. 5099 are not merely speculation. CVP farmers, now entering their sixth consecutive year of persistent drought, have all too much experience with the results of water shortages. In my area alone, the last few years groundwater pumping has increased enormously, with the substantial additional expense of groundwater eating into the already diminished profitability of family farms.

Many farmers have been forced to lay off personnel, and obtaining both short-term crop financing and long-term capital financing has become extremely difficult in this water short environment. Small businesses in our rural communities continue to close their doors and unemployment rates are at, or are nearing, all time highs throughout the CVP service area. I can therefore tell you that the forecasts prepared by economists like those at the CDFA and the UC are borne out in real life, with an enormous human toll.

In regard to a particular aspect of the debate surrounding the CVP, I would like to clear up one common misconception. Much has been made of the idea that CVP farmers can simply shift to alternative, higher value crops once a man-made, permanent drought is imposed upon them. Please be assured that those alternative, high value crops simply do not exist. If they did, my family would not wait until they are on the verge of bankruptcy to shift to them. Although farming is our family's way of life, we would be more than happy to be more profitable, and if different crops would be more financially rewarding, they would be in our crop rotation.

Some critics claim that if farmers are prevented from growing price support commodities or are charged full-cost for CVP water, they will simply elect to grow alternative crops. It is alleged that the proposed restrictions will in fact "prompt farmers to switch production from field crops to specialty commodity crops, fruits, nuts, and vegetables, which require less water." This is not the case.

This simplistic argument does not address the facts that many so-called "surplus crops" are not in surplus or excess; and that many farmers are precluded from changing cropping patterns by short growing seasons, adverse climatic conditions, diverse soil types, inability to substitute crops, and varying availability of financing, marketing, and processing resources. When alternative crops literally cannot be grown, changes to federal water and farm policy will not result in farmers growing different crops and using less water. The changes may force farmers to use non-renewable resources such as groundwater (if available), or merely prohibit many farmers from farming.

Under the provisions of H.R. 5099, CVP water delivery reductions would be allocated first to growers of "surplus crops", in amounts equal to water delivered in the previous year - irrespective of whether the grower had altered cropping patterns. This would likely result in the elimination of many crop rotation practices which utilize the alternate planting of "surplus crops" such as wheat or barley or corn. The environmental benefits of crop rotation, essential and integral components of maintaining soil nutrients, controlling weeds and pests, preventing erosion, and reducing agricultural chemical use, would be lost.

Even if farmers' growing conditions allowed them to shift from "surplus crops" to vegetables, for example, it is not likely that the market would be able to bear the supply due to the extremely delicate balance between supply and demand for vegetables and specialty crops. For example, there are several weeks each year when the vast majority of all lettuce consumed in the United States comes from my area. In a typical season, approximately 9,000 thousand acres in my area will be planted to lettuce. It has been estimated that a difference of only several 100 hundred acres in plantings, one way or the other, will either make or break the market. In bad markets, lettuce cannot even be harvested, because it costs more just to pick it than it can return in the market. A wholesale shifting of plantings would permanently destroy the lettuce market, and it is therefore not possible. The same market forces apply to virtually any other crop which could be grown in my area.

In closing, let me reiterate that the health of our State's environment is of great concern to all of us. However, in searching for solutions, the health of the family farm must also be considered. Responsibility for solutions must be fairly balanced among all those contributing to and benefiting from the solutions, and all legitimate interests must be considered. Draconian approaches, such as cutting CVP supplies through H.R. 5099, are simply unwise and unfair. I urge the Committee in the strongest possible terms to remember the agricultural community when it acts on the bills now before it, and I implore you to adopt a balanced approach. Otherwise, you will surely put many families and their farms out of business.

to the environment have received all but official sanction from both Administrations. To repeat, however, nothing has emerged on the needs of fish and wildlife.

Mr. Chairman, as I noted above, in the absence of any persuasive evidence that contradicts the environmental water needs you are attempting to address in H.R. 5099, EDF asks that you stand firm in moving your bill through the legislative process.

Thank you again for asking me to testify. I would be pleased to respond to any questions the Chairman or other members of the Committee might have.





Chairman MILLER. Thank you.

Mr. McGill.

STATEMENT OF MICHAEL McGILL

Mr. McGILL. Thank you.

Mr. Chairman, members of the Committee, my name is Michael McGill, and I am the executive director of the Bay Area Economic Forum. My organization is a partnership between the public and private sectors, concerned with sustaining the economic vitality of the San Francisco Bay Area.

Last year, we issued a report entitled Using Water Better. This report calls for establishing a free market for water in California. It lays out four practical steps to get from here to there. It has been endorsed, not only by my board and by the Environmental Defense Fund, as Tom Graff says, but also by the Santa Clara Manufacturing Group, the industrial spokesman for Silicon Valley and it has been endorsed by the California Business Roundtable, an organization of CEOs from the 100 largest banks and corporations in California.

Our perspective has been that the problem facing California is not necessarily one of inadequate water supply but of poor water allocation. Right now urban California, where most of the people live, where most of the people work, where most of the jobs are, generates more than 95 percent of the state's gross domestic product and uses less than 20 percent of the state's developed water supply.

Agriculture, on the other hand, uses more than 80 percent of the state's developed water supply and generates less than five percent of the state's gross domestic product. By way of comparison, agriculture generates something like $17 billion a year in gross domestic product. High technology generates $35 billion a year and provides far more jobs.

Now, this is not to say that agriculture is not a significant sector of the state economy but it is to say that there is a misallocation of one of the state's most precious natural resources: water. Too much water is going to too little economic activity and urban California and the business community is suffering as a result. Silicon Valley is not able to add any new chip fabricating plants because chip fabricating plants need a reliable source of water of predictable quality and that can no longer be guaranteed to the Bay area.

There have been earlier witnesses today suggesting that urban and business California wants to create a vast Owens Valley stretch from one end of the state to the other. That is absurd. If urban California were able to get 100 percent of the developed water supply of the state of California urban California would drown. A shift of less than 10 percent of the state's developed water supply from agriculture to urban uses would accommodate 25 years of population growth.

At the same time, if it occurred through a voluntary free market transaction the decision would be made by willing sellers choosing to making a profit to buyers transferring a small portion of their water to mutual benefit.

Now, reform of the CVP is absolutely crucial. It is the largest developer, subsidizer and transporter of water in the state of California and right now non-CVP customers are excluded from any access to that water.

Both bills being heard today, H.R. 3876 and H.R. 5099, supposedly allow transfers to occur but from our perspective H.R. 5099 is a far better bill in this regard. First of all, H.R. 3876 does indeed provide an agricultural water district veto. It specifies that agricultural water districts must be a party to any contract to transfer water from a CVP contractor to a non-CVP contractor. Now, it does indeed specify criterion that that district must apply but what it creates is a situation where the district itself decides whether or not it is applying the criterion properly and whether or not it will agree to the sale. for a free market to work, for it to result in more efficient water the land owner or farmer must decide whether, when and how much water to sell and using the profit motive then decide how to change coping patterns or how to change irrigation practices so that he or she will continue to make a profit while selling a portion of his or her water. H.R. 5099 goes further but it does—we are troubled by state law will govern the role of agricultural water districts.

Right now there is a bill in Sacramento, A.B. 2090, by Senator Richard Katz, which would prohibit water vetoes. It specifies if a water agricultural project and that farmer can not agree on a transfer of water out of the district binding arbitration must occur within two weeks. That is a reasonable approach that allows the interest of all parties to be properly considered. So we would urge you to modify H.R. 5099 to not simply defer to state law because Senator Katz' bill is opposed by Governor Wilson.

We also believe there is a very troublesome provision in H.R. 3876 allowing any long term transfer to automatically result in an automatic extension of water district's contract with the Bureau of Reclamation for the entire supply of water to match the length of that contract.

Finally, H.R. 5099 establishes what we think is essential and that is an environmental baseline beyond which water may be transferred freely and without that baseline the environment will not be protected.

Thank you.

[The prepared statement of Mr. McGill follows:]



BAY AREA ECONOMIC FORUM

A Partnership of the Association of Bay Area Governments and the Bay Area Council

May 14, 1992

**TESTIMONY BEFORE THE HOUSE SUBCOMMITTEE ON WATER, POWER, AND OFFSHORE ENERGY RESOURCES REGARDING LEGISLATION TO REFORM THE CENTRAL VALLEY PROJECT**

by Michael S. McGill
Executive Director
Bay Area Economic Forum

Mr. Chairman, members of the Committee, my name is Michael McGill, and I am the executive director of the Bay Area Economic Forum. My organization is a partnership between the public and private sectors, concerned with sustaining the economic vitality of the San Francisco Bay Area. Our Board of Directors includes the top leadership in our region from the political, academic, and corporate sectors.

Last year, we issued a report entitled Using Water Better, which calls for the creation of a free market for water in California. We published this document because water supply is becoming an increasingly serious constraint on the continued growth of the Bay Area economy.

Projections indicate that eight of the nine counties in our region will have exceeded their current water supply and delivery capacity by the year 2010. Our high technology industrial sector in Silicon Valley is already suffering from water suppy problems, forcing major manufacturers to curtail expansion plans and to spend enormous amounts of money recyclying their existing supply for reuse in their plants. We believe that creating a free market for water in California is the quickest, most efficient option available to meet both immediate and long term water supply needs for the Bay Area.

My organization's involvement in this issue marks the first time in California that the business community has become involved in the debate over water policy reform. The concerns of the business community obviously extend beyond the borders of the Bay Area. Our report has been endorsed by the California Business Roundtable, an organization of CEOs from the 100 largest banks and corporations in California. As has been communicated to your Committee by their Water Policy Task Force, they also share my organization's views regarding reform of the Central Valley Project, which is the subject of my testimony today.

**Moving Toward a Free Market**
The Economic Forum believes that the major water policy issue facing California is not one of supply, but one of allocation. At a time when Eastern Europe and the former Soviet Union are trying to switch to a free market economy, the allocation of water in California represents perhaps the last vestige of the discredited 'command and control' system for allocating resources that proved to be so disastrous to these countries.

Because water supplies were developed and initially distributed at a time when California's largest economic sector was agriculture, most of the state's water is still given to and consumed by its agricultural community. With the economic changes that have occurred between then and now, there exists in California a gross misallocation of our most valuable natural resource. At present, agriculture accounts for less than 5% of the state's gross domestic product, while consuming more than 80% of our developed water supply. Conversely, all other economic activity, and all domestic consmption, consumes less than one fifth of this water supply.

If a free market were created for water in California, projections indicate that less than 10% of the existing water supply would be transferred from willing agricultural sellers to willing urban buyers. The sellers would make such transactions for a profit, and the water sold would comprise the cheapest alternative source of supply for our urban areas. It would also accommodate projected growth for more than two decades.

**The Central Valley Project Must Be Reformed**
The Central Valley Project is the largest developer, transporter, and subsidizer of water in California. It controls 20% of the developed water supply in the state. Current law prevents the sale and transfer of this water to non-CVP customers. Indeed, current law encourages the wasteful use of this water, by providing it at subsidized prices, on a virtual 'use it, or lose it' basis.

Absent passage of the legislation being discussed today, this situation will continue. As the General Accounting Office report on the Central Valley Project issued last fall points out, unless legislation to reform the CVP is passed, the Secretary of the Interior will continue to automatically renew 40-year contracts for water on virtually the same terms that were agreed to back in the 1950s.

Times have changed, and my first message to you is that the business community in California is deeply concerned that CVP reform legislation be enacted, as soon as possible.

**Creation of a Free Market is the Most Important Reform**
The concept of creating a market for water transfers is gaining increasing popularity in California. However, it is usually treated as one of a series of changes that should be enacted. My organization suggests that creation of a free market for water is the single most important reform.





The advantage of creating a free market for water is that it automatically creates an objective means for evaluating the true value of this resource. Do we need to develop more water? We don't know right now, because we lack the means of measuring the true value of the existing supply, and therefore cannot determine whether any new project will be able to provide water at a price that people will be willing to pay.

**Moving Toward a Free Market**
How do we establish a free market for water? We do so in four steps.

1. <u>Create a Baseline for the Environment</u>: Markets are not very effective means for allocating water to the environment. Therefore, we suggest that the first step toward establishing a market for water is to reserve a sufficient supply up front to meet environmental needs. This then indicates how much water is left to be allocated for other purposes.

We recognize that creation of such a baseline is no simple task, but there are a number of efforts now underway to do so and a great deal of analysis has gone into the issue. At present, the U.S. Environmental Protection Agency has informed the California State Water Resources Control Board that it must propose adequate measures to restore and protect the Bay/Delta estuary by December, or EPA will do so instead.

2. <u>Firm Up Remaining Water Rights</u>: Having determined how much water must be reserved for the environment, we are then ready to allocate rights to the remaining water. These rights must be made as firm as possible, so that their holders are able to sell them without risks of losing them. And they should be controlled by the people who apply the water to the land, and who therefore have the greatest incentive to use it wisely.

At present, water supplies are over allocated in California, so some existing holders may lose a portion of their rights. Compensation may be appropriate, but it can be provided in a number of ways. For instance, CVP rights holders may lose a portion of their historic supply but be compensated by continuing to receive subsidies for the remainder. Or, a surcharge could be imposed on water use to provide a compensation fund.

3. <u>Manage Groundwater</u>: Once sales of water supplies begin, groundwater must somehow be managed so that sellers of surface supplies do not simply overdraft groundwater supplies to make up the difference. California remains one of the few states in the west which do not manage groundwater.

4. <u>Regulate Conveyance Facilities as a Common Carrier</u>: Finally, the extensive network of conveyance facilities in California must be accessible to buyers and sellers of water, so that it can be delivered. This requires treating these facilities as regulated common carriers.

**CVP Reform Legislation**

Given our approach to creating a free market for water, we have specific comments we would like to make regarding the legislation you are considering in this hearing. My comments will be focused on two bills, H.R. 5099, and the version of H.R. 3876 as introduced in the Senate by Senator John Seymour and incorporated in H.R. 429 by the Senate.

<u>H.R. 3876</u>: We are concerned with a number of features in this bill that discourage water transfers from occurring. First, and most important, it specifies that any water transfer "must include a Central Valley Project water contractor....as a contracting party...." This, in our view, gives water contractors in the CVP authority to veto transfers.

As I said above, it is of critical importance that those who apply the water to the land have the major say in deciding on transfers. They are the ones who will make a profit, who can use that profit to change their cropping patterns or irrigation practices, and who therefore are the logical sellers of the water. Agricultural water districts should be compensated for any environmental, technical, or financial damages they suffer as the result of a transfer. But, their priority is to provide water to their customers, and they do not have any incentive to sell that water to outsiders.

There are other provisions that are troublesome in this legislation regarding transfers, including limiting the amount of water that may be sold in a given service area if land is to be fallowed, and a tax on each transfer. It also allows a CVP contractor to sell a small portion of its water for a time period extending beyond the life of its contract with the Bureau of Reclamation, and in doing so to automatically extend the life of its entire contract to match. What this provision would do would be to allow one CVP contractor to sell a portion of its water to another CVP contractor, thereby binding the Bureau to providing its full allotment of water for a period longer than its existing contract.

There are also important omissions from this bill. While it imposes a tax on transfers that is allocated to replenishing groundwater supplies, it does not manage groundwater. It also fails to treat fish and wildlife as a primary purpose of the CVP, so that creating a firm baseline for the environment is impossible. It says nothing about solving the problems we face in the Bay/Delta estuary. Finally, while it specifies that additional water must be allocated for specific environmental purposes, it provides no way of providing water for that purpose, since it calls for renewing existing contracts at full supply for another 40 years.

<u>H.R. 5099</u>: In our view, this bill goes much further toward creating the kind of free market for water that we advocate. It makes environmental protection a primary purpose of the CVP, specifically makes protection of the Bay/Delta estuary a priority, allocates water for the environment, calls for steps which would begin the process of managing groundwater, and





provides 100,000 acre feet of water up front for sale to non-CVP customers.

However, as attractive as this legislation is, we are concerned that it, too, does not sufficiently facilitate creation of a free market. Most importantly, it delegates regulation of the transfer process to state law. At present, state law gives agricultural water districts a veto over transfers. While California Assemblyman Richard Katz has introduced legislation to reverse this provision, it has yet to pass and is likely to be opposed by Governor Pete Wilson.

There are other provisions in the bill which place conditions on each transfer that are similar to H.R. 3876, including a tax on transfers outside the CVP. It also would impose a higher price to be paid to the Bureau for water that is so transferred. Our concern here is not that any one of these provisions would kill transfers, but rather that the more burdens that are placed on these transactions the fewer will occur.

**Conclusion**

In conclusion, I want to emphasize again how important it is that Central Valley Project reform legislation be passed this year. With six years of drought under our belt, and an omnibus water bill going through Congress, we have an unprecedented opportunity to achieve reforms that are long overdue.

Inaction--the passage of no reform legislation--is our worst possible alternative. The status quo will result in further destruction of our environmental resources, and the denial of water controlled by the largest water developer in the state to most of the state's citizens.

The California business community is ready and willing to work with you in crafting and implementing meaningful reform legislation.

Thank you.