# EXHIBIT A
(Part 3)

**PANEL CONSISTING OF MARY WELLS, FARMER AND GENERAL MANAGER, WESTSIDE WATER DISTRICT, WILLIAMS, CA; DAVID McCABE, GRASSLANDS WATER DISTRICT AND GRASSLANDS RESOURCE CONSERVATION DISTRICT, LOS BANOS, CA; RICHARD ATWATER, GENERAL MANAGER, WEST BASIN WATER DISTRICT AND CENTRAL BASIN WATER DISTRICT, CARSON, CA; AND ROGER FONTES, ASSISTANT GENERAL MANAGER, NORTHERN CALIFORNIA POWER AGENCY, ROSEVILLE, CA**

Chairman MILLER. The Committee will reconvene to hear from a panel made up of Mary Wells, Farmer and General Manager, Westside Water District, Williams, California; David McCabe, Grassland Water District & Grasslands Resource Conservation District, Los Banos, California; Richard Atwater, General Manager, West Basin Water District; and Roger Fontes, Assistant General Manager, Northern California Power Agency, Roseville, California.

Thank you for sticking with us today. Welcome to the Committee and, again, we ask that you summarize your testimony so that we have time for questions.

Ms. Wells, we will begin with you. Your formal statements will be put into the record in their entirety.

**STATEMENT OF MARY WELLS**

Ms. WELLS. Mr. Chairman and members of the Committee, I am Mary Wells, a farmer in Colusa County in the Sacramento Valley of California. I am also the manager of Westside Water District which buys Central Valley Project water for agricultural use from the Bureau of Reclamation's Tehama-Colusa Canal.

I would be quite satisfied with those two roles, but because California water is the topic of the decade, I have had to venture far from the farm and district as an active representative for the Tehama-Colusa Canal, the CVP and Northern California Water Associations.

Like several of my neighbors in Colusa County, my family settled the area back in the 1850s. As a youngster, I remember my grandfather's land supporting a dry land wheat crop, if and when it rained, and if and when it didn't flood. Following wheat harvest, sheep were brought in to feed off the stubble. Every third year the land was fallowed with some sheep grazing. More vividly, however, I remember standing on my tiptoes to see the "big map" of the "big canal" that would transform our dry valley into a consistently productive garden of crops that the fertile soil and ideal climate could easily support. There was a great excitement, because at last generations of dreams could be realized with the coming of a dependable supply of water. You see progressive farmers in the area had many times tried to develop water by drilling wells, but the fact remains today, it just isn't there.

Little did I know then that I would be the one to sign, not only as a landowner, but also as a district officer, the contracts providing Reclamation water to that very land. Landowner debt, district debt and CVP repayment has accumulated to around $3,000 an acre, all of which is to be repaid by the year 2030 if water users are allowed to receive adequate water at an affordable cost.



The early returns to our project in increased tax base and third-party economic benefits tour agriculture based communities were encouraging, until the drought. This year farmer's in the T-C service area, like many others in the CVP, are again receiving only 25 percent of their water supplies, due to the continuing drought and operational restrictions put on the Bureau as a result of endangered species considerations. No one can change the weather, and we are actively addressing the endangered species problems, but I am here to warn you that H.R. 5099 threatens to legislate a permanent drought for us.

If the CVP must dedicate all the water called for in H.R. 5099, in addition to the estimated 800,000 plus acre-feet already earmarked for fish and wildlife purposes, the farmers in our service area will have at best a ten percent supply, year after year. This dedication will absolutely eliminate our ability to produce non-program crops such as processing tomatoes, sugar beets, and vineseeds. One half of an acre foot per acre will not even keep our trees alive. Our current 28 percent unemployment will be legislated to a new high. Is it the intent of Congress to take us back to grandfather's dry land operation? Please remember this land still bears the tremendous debt of development as well as the CVP capital costs and operational deficit. I hope this Congress will allow me to meet those obligations in my lifetime. I sure can't do it with wheat which would be about the only crop that can be grown with the H.R. 5099 reduced supply, merely as a supplement to winter rainfall. You are asking me to do without. You are asking me to dedicate water to the environment when the quantity of water allocated to that purpose is not even based on reasoned analysis or credible evidence. You are asking me to do this at the expense of my being reduced to grandfather's wheat operation.

Speaking of low value grain crops, how can we deal with the punitive nature of H.R. 5099s surplus crop provisions? The assessment of full cost rates for any water used to grow crops for which a USDA acreage reduction program is in effect, even if the farmer is not enrolled in the program, is double punishment to us. We will be forced to grow a program crop because of lack of sufficient water to grow the higher returning, non-program crops such as tomatoes, vineseeds, almonds and sugarbeets. Does Congress want us to grow non-program alternate crops within the CVP where possible, repay debt, reduce the CVP deficit, decrease record unemployment and basically contribute toward California's economic survival or not?

We do not suggest that other demands for water be ignored. No one segment of the agriculture, environmental, urban triangle should flourish at the expense of any other segment. Negative economic, social and ecological consequences to all sides of the triangle will ultimately result without balance. Collapse of all segments is an ever present threat to California.

The transfer of agriculture water can be a positive component in working toward a balanced, flexible water policy. I must warn, however, separating water rights from the land by granting individuals such authority as is proposed in H.R. 5099 has the potential to bring economic and social upheaval to the state's agriculture based communities.

Please understand that there are areas of origin that are still contractually water deficient. A great portion of California will suffer without well defined transfer limitations. This is particularly true with regard to land fallowing and underground water basin overdraft. Such vital limitations are set forth in H.R. 3876. The returns from agricultural commodities, particularly in the north, can not compete with the magnetic attraction of dollars southward. Are we to create a southward watershed, the velocity of which is propelled with dollars. I ask this Congress to seriously consider the consequences of a free market which will not be free to any services, and ultimately the California taxpayer as the state faces the avalanche of displaced, dysfunctional communities. Can California afford this economic experiment proposed in H.R. 5099, a fish and wildlife restoration Act? H.R. 3876 provides for reasonable transfers when it makes good sense. Congress must realize that in reality transfers are only on ingredient in a water solution consisting of new facilities, conjunctive use and limited transfers.

We do not suggest that protection of the winter run and the other fish and wildlife in the Sacramento Valley is not important. We know firsthand the impacts of changes in water deliver timing and reliability caused by fish and wildlife concerns. In addition to the continuing restriction in our water supply, for about five years now, deliveries through the Tehama-Colusa Canal from December through March have been limited due to the winter run salmon migration. This year the gates at the diversion dam were left open one month longer and will be reopened the first of November. This in effect has reduced our diversion capabilities from nine months to six months. In a normal supply year, this is devastating to the early processing tomato crop which needs sprinkling as early as February 1.

Our support for H.R. 3876 is proof of our genuine concern for the fish and wildlife needs. We who have lived in the Sacramento Valley are also doing more. We have cooperated with the Bureau in their new operations of the Tehama-Colusa Canal, as best we can. The Tehama-Colusa Water Users Association, of which my district is a member, has hired a premier authority on the winter run salmon to examine ways that might have been overlooked thus far to improve their passage at the Red Bluff Diversion Dam. In my own district I have implemented cooperative agreements with the Department of Fish and Game which provide for the maintenance of natural creeks for the betterment of wildlife habitat.

We are very frustrated. Our area had representatives who participated in the development of the Upper Sacramento River fisheries management plan. We looked forward to the bi-partisan introduction of a bill in late 1989, so that we could go about the business of fixing some important fish and wildlife problems in the Sacramento Valley. We have lost the last two and a half years not because anyone opposed the contents of the plan, but because it has been caught up in the politics of bills like H.R. 5099 and H.R. 1306, which add universal, sweeping changes in water and social policy that have little or nothing to do with the real problems at hand. We have no choice but to oppose efforts to reduce our water supplies to nearly nothing with little justification of real benefits for the species, to raise the cost of what water remains beyond our



ability to pay, and to in reality limit the length of our contracts to periods that will not support necessary financing.

We will not be fooled. What the Chairman and others are doing here is to make farmers use less water and pay more for it. The truly sad thing for those of us who must live with the outcome is that by their attempts to do everything we will be able to do nothing at all, and the winter run salmon will remain on a growing list of victims.

We ask for your support of H.R. 3876 so that we can get on with fixing fish and wildlife problems associated with the Central Valley Project. Please reject H.R. 5099 and H.R. 1306 with their counter-productive measures.

Thank you for your time and attention.

[The prepared statement of Ms. Wells follows:]

STATEMENT OF MARY WELLS
before the
HOUSE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS
**Subcommittee of Water, Power and Offshore Energy Resources**
United States House of Representatives

May 14, 1992

Mr. Chairman and Members of the Committee:

I am Mary Wells, a farmer in Colusa County, in the Sacramento Valley of California. I am also the Manager of Westside Water District, which buys Central Valley Project water for agricultural use from the Bureau of Reclamation's Tehama-Colusa Canal. I would be quite satisfied with those two roles, but because California water is the topic of the decade, I have had to venture far from the farm and district as an active representative for the Tehama-Colusa Canal, the CVP and Northern California Water Associations.

Like several of my neighbors in Colusa County, my family settled the area back in the 1850's. As a youngster, I remember my grandfather's land supporting a dryland wheat crop, if and when it rained, and if and when it didn't flood. Following wheat harvest, sheep were brought in to feed off the stubble. Every third year the land was fallowed with some sheep grazing. More vividly however, I remember standing on my tiptoes to see the "big map" of the "big canal" that would transform our dry valley into a consistently productive garden of crops that the fertile soil and ideal climate could easily support. There was great excitement, because at last generations of dreams could be realized with the coming of a dependable supply of water. You see progressive farmers in the area had many times tried to develop water by drilling wells, but the fact remains today, it just isn't there.

Little did I know then that I would be the one to sign, not only as a landowner, but also as a district officer, the contracts providing Reclamation water to that very land. I was also the one to commit that land to long-term debt! For CVP water users this can include the landowner's cost of leveling and preparing the land for irrigation, the district's obligation to the federal government and private institutions for the distribution system from the canal to the landowner turnouts, the district's obligation for the CVP capital costs, the deficit of operating and maintaining the CVP beyond collected rates, and interest compounded on that deficit since 1986, in our case. All of this currently totals $3,000 per acre from 1977 to date, and all of it will be repaid by the year 2030 if water users are allowed to receive adequate water at an affordable cost.

The early returns to our project in increased tax base and third-party economic benefits to our agriculture based communities were encouraging, until the drought. This year farmer's in the T-C



service area, like many others in the CVP, are again receiving only twenty-five percent of their water supplies, due to the continuing drought and operational restrictions put on the Bureau as a result of endangered species considerations. No one can change the weather, and we are actively addressing the endangered species problems, but I am here to warn you that H.R. 5099 threatens to legislate a permanent drought for us.

If the CVP must dedicate all the water called for in H.R. 5099, in addition to the estimated 800,000+ acre-feet already earmarked for fish & wildlife purposes, the farmers in our service area will have at best a ten percent supply, year after year. This dedication will absolutely eliminate our ability to produce non-program crops such as processing tomatoes sugarbeets, and vineseeds. One-half of an acre-foot per acre will not even keep our trees alive! Our current 28% unemployment will be legislated to a new high. Is it the intent of Congress to take us back to grandfather's dryland operation? Please remember this land still bears the tremendous debt of development as well as the CVP capital costs and operational deficit. I hope this Congress will allow me meet those obligations my lifetime. I sure can't do it with wheat which would be about the only crop that can be grown with the H.R. 5099 reduced supply, merely as a supplement to winter rainfall. You are asking me to do without. You are asking me to dedicate water to the environment when the quantity of water allocated to that purpose is not even based on reasoned analysis or credible evidence. You are asking me to do this at the expense of my being reduced to grandfather's wheat operation.

Speaking of low value grain crops, how can we deal with the punitive nature of H.R 5099's surplus crop provisions? The assessment of full cost rates for any water used to grow crops for which a USDA acreage reduction program is in effect, even if the farmer is not enrolled in the program, is double punishment to us. We will be forced to grow a program crop because of lack of sufficient water to grow the higher returning, non-program crops such as tomatoes, vineseeds, almonds and sugarbeets. Does Congress want us to grow non-program alternate crops within the CVP where possible, repay debt, reduce the CVP deficit, decrease record unemployment and basically contribute toward California's economic survival or not?

We do not suggest that other demands for water be ignored. No one segment of the agriculture, environmental, urban triangle should flourish at the expense of any other segment. Negative economic, social and ecological consequences to all sides of the triangle will ultimately result without balance. Collapse of all segments is an ever-present threat to California.

The transfer of agriculture water can be a positive component in working toward a balanced, flexible water policy. I must warn, however, separating water rights from the land by granting individuals such authority as is proposed in H.R. 5099 has the potential to bring economic and social upheaval to the State's

agriculture based communities. Please understand that there are areas of origin that are still contractually water deficient. A great portion of California will suffer without well defined transfer limitations. This is particularly true with regard to land fallowing and underground water basin overdraft. Such vital limitations are set forth in H.R. 3876. The returns from agricultural commodities, particularly in the north, cannot compete with the magnetic attraction of dollars southward. Are we to create a southward watershed, the velocity of which is propelled with dollars. I ask this Congress to seriously consider the consequences of a "free market" which will not be free to any agribusiness, rural tax base supporting schools and social services, and ultimately the California taxpayer as the State faces the avalanche of displaced, dysfunctional communities. Can California afford this economic experiment proposed in H.R. 5099, a fish and wildlife restoration Act? H.R. 3876 provides for reasonable transfers when it makes good sense. Congress must realize that in reality transfers are only one ingredient in a water solution consisting of new facilities, conjunctive use and limited transfers.

We do not suggest that protection of the winter run and the other fish and wildlife in the Sacramento Valley is not important. We know firsthand the impacts of changes in water delivery timing and reliability caused by fish and wildlife concerns. In addition to the continuing restriction in our water supply, for about five years now, deliveries through the Tehama-Colusa Canal from December through March have been limited due to the winter run salmon migration. This year the gates at the diversion dam were left open one month longer and will be reopened the first of November. This in effect has reduced our diversion capabilities from nine months to six months. In a normal supply year, this is devastating to the early processing tomato crop which needs sprinkling as early as February 1.

Our support for H.R. 3876 is proof of our genuine concern for the fish and wildlife needs. We who live in the Sacramento Valley are also doing more. We have cooperated with the Bureau in their new operations of the Tehama-Colusa Canal, as best we can. The Tehama-Colusa Water Users Association, of which my district is a member, has hired a premier authority on the winter run salmon to examine ways that might have been overlooked thus far to improve their passage at the Red Bluff Diversion Dam. In my own district I have implemented cooperative agreements with the Department of Fish and Game which provide for the maintenance of natural creeks for the betterment of wildlife habitat.

We are very frustrated. Our area had representatives who participated in the development of the Upper Sacramento River fisheries management plan. We looked forward to the bi-partisan introduction of a bill in late 1989, so that we could go about the business of fixing some important fish and wildlife problems in the Sacramento Valley. We have lost the last two and a half years not because anyone opposed the contents of that plan, but because it



has been caught up in the politics of bills like H.R. 5099 and H.R. 1306, which add universal, sweeping changes in water and social policy that have little or nothing to do with the real problems at hand. We have no choice but to oppose efforts to reduce our water supplies to nearly nothing with little justification of real benefits for the species, to raise the cost of what water remains beyond our ability to pay, and to in reality limit the length of our contracts to periods that will not support necessary financing.

We will not be fooled. What the Chairman and others are doing here is to make farmers use less water and pay more for it. The truly sad thing, for those of us who must live with the outcome, is that by their attempts to do everything, we will be able to do nothing at all, and the winter run salmon will remain on a growing list of victims.

We ask for your support of H.R. 3876, so that we can get on with fixing fish and wildlife problems associated with the Central Valley Project. Please reject H.R. 5099 and H.R. 1306 with their counterproductive measures.

Thank you for your time and attention.

about the importance of cautious use of scarce water supply, about the importance of planning for the future of the state's water supply.

Many of us have testified over the course of these hearings in California and Washington. The important change that I think in our position results from the fact that we now have, as the Governor said we would have, for the first time in at least two decades a comprehensive plan for the future of California's water supply, which plan the Governor announced a month ago and which is in the process now of being implemented.

Among its most important features, it seems to us, is the notion of linkage. That is that we accomplish all of the needs of California's competing water users simultaneously and the notion of consensus which has been advanced by the three way dialogue from whom we borrowed many of the concepts which are embodied in the Governor's proposal.

Those concepts include water marketing, increased conservation—both by the ag and the municipal and industrial sectors—the construction of new facilities, building on the success of the water bank which was very helpful during the drought, facilitated marketing aside from the water bank, ground water management, reclamation, conjunctive use of water, new technologies, and, finally, transfer of the CVP.

I think it is important—and, again, we have made this point right from the start—to recognize that the CVP is a part of a comprehensive strategy for California, not a means unto itself, and that by limiting our focus here and in the state only to marginal change in the way in which it operates we lose sight of that fact.

California, even under the best of times, could expect about a quarter of its supply from the CVP. We can not develop a comprehensive state supply program by concerning ourselves only with a quarter of that supply. So when the Governor proposed transfer of the CVP he did it expressly in the context of a state-wide water policy for the next 20 years which includes those many elements that I have described.

We are pleased that the Secretary of the Interior has responded very positively to that suggestion and that negotiations have already begun concerning the ways in which that transfer might occur.

I want also to bring you up to date on a couple of the other important steps now ongoing to implement the Governor's water policy. I have already mentioned that we have begun negotiations. In fact, two meetings have occurred between representatives of the state, principally Mr. Kennedy and myself, and representatives of the Department of the Interior and the Bureau of Reclamation.

We will shortly appoint a committee comprised of Californians across the spectrum of water interests to correspond to those discussions and to advise us on them.

We have asked for, and the Water Resources Control Board of the state has announced, that within four to five days, in fact, on June the 22nd, it will begin hearings on the establishment of interim standards for the Bay Delta, perhaps the most critical, urgent need for fish and wildlife, and to ensure the construction of facilities much needed in the future.



I underscore that because the Delta, from our standpoint, is an important issue not addressed by the pending legislation and which needs to be addressed both in the short term, as the interim standards would address it, and in the long term as does the Governor's proposal for a three year study within the framework of NEPA and SEQUA to find a solution both in the interest of environment and the interest of water supply.

In addition to those actions, we have asked the Department of Fish and Game for the development of a fish and wildlife action plan by year's end. Which action plan will address aquatic ecosystems on an ecosystem basis outside of the Delta so that we have got all of the territory covered. This would suggest to us as an integrated approach much needed to meet all of the needs of California and its resources.

I think it is preferable than attempting to deal only with the CVP element. Certainly preferable to the arbitrary assignment of a specific amount of water to a specific purpose by one or another of these bills, and notably the Johnston Bill which has now been embodied in 5099. It neither solves the problem for the environment and it causes substantial disruption of California's important agricultural economy.

Let me conclude, Mr. Chairman, just by urging that we don't suggest therefore a piecemeal approach to this problem. We believe that a California based solution is far preferable to one that is determined in part in Washington and in part in California. We believe that real reform can only be achieved through a coordinated approach to all of California's water needs and it is the Governor's commitment to provide that reform.

Chairman MILLER. Mr. Underwood.

### STATEMENT OF HON. DENNIS UNDERWOOD

Mr. UNDERWOOD. Thank you, Mr. Chairman. Thank you for the opportunity to provide the Administration's views on the three bills dealing with the Central Valley Project.

First, I would like to thank the Subcommittee for passage of the Reclamation Acts' States Emergency Drought Relief Act, which was very beneficial in dealing with the six year drought in many parts of the west.

I would like to request that my written statement be part of the record and I will only summarize the positions of the Administration and highlight some points that I believe will be beneficial to the Subcommittee in considering these bills which also support our position.

First, let me deal with H.R.——

Chairman MILLER. I would never deny your request.

Mr. UNDERWOOD. I knew you wouldn't.

Let me first summarize the Administration's position on H.R. 4687, the bill to direct the Secretary of the Interior to enter into negotiations with the State of California to transfer the Central Valley Project to the State.

First, we would like to commend Congressman Campbell for his leadership and his efforts on this issue. The Administration agrees with the goals of the legislation. The Secretary of the Interior has

stated his strong support for the transfer of the Central Valley Project to the State of California following negotiations providing reasonable terms and conditions.

Two formal meetings have been held with the State on this matter. Four subgroups have been established to identify issues and develop a work plan for negotiations. The Department and the State are working toward reaching agreement in principle within the six months time frame requested by the Governor, thereby outlining the steps necessary to reach a final agreement.

Having established the initial time frame and process, the Administration is concerned that this legislation may be premature in requiring a final agreement within the five months of its enactment. We look forward to working with Congressman Campbell and the members of the Subcommittee to develop appropriate legislative language if it is at the proper point in the negotiations.

In terms of H.R. 3876, a bill to establish and restore enhanced fish and wildlife habitat within the Central Valley of California to mitigate the Central Valley Project impacts, in order to maintain continued orderly operation of the Central Valley Project and other purposes the objectives of the bill are mitigation and enhancement of fish and wildlife resources in the Central Valley of California while maintaining the productivity of the other purposes of the Bureau of Reclamation's Central Valley Project.

The Administration supports these objectives but has major reservations regarding the bill's mechanisms to achieve these goals. Consequently, we may oppose the bill as written.

The bill is an effort to resolve issues regarding allocation of water supplies in the Central Valley at the State and local levels. The Administration supports that principle; however, H.R. 3876 may preempt California State water law by providing a Congressional directive defining transfer of water as a beneficial use. It is recommended that this definition be deleted from the bill and that that issue be resolved at the State level.

H.R. 3876 also has significant budgetary implications. Assuming all action contained in H.R. 3876 were implemented on a timely basis, the ten year cost is approximately $435 million. That results in a Federal non-reimbursable share of approximately $210 million. While the non-reimbursable expenditure might be somewhat compensated by sale of Project water at higher rates, the cost sharing formulas are still unacceptable to the Administration.

We support voluntary water transfers and are concerned about the need for equitable treatment of all parties. H.R. 3876 moves in this direction.

Let me move to H.R. 5099, the bill to provide restoration of fish and wildlife and their habitat in the Central Valley of California and other purposes.

We agree that there is a need to improve the fish and wildlife conditions in the Central Valley. We support mitigation of the Central Valley Project impacts and the need to improve fish and wildlife populations in the Central Valley of California. We are willing to work with the Committee to address these issues.

However, H.R. 5099 is not the means for such improvements. The Administration strongly opposes H.R. 5099 based on Federal intrusion that the bill represents, its adverse impacts on California econ-



omy, and the associated costs of the bill. Further, it should not be the sole responsibility of the Central Valley Project and its beneficiaries to solve statewide water and fish and wildlife issues.

The question of State primacy and Federal intrusion upon State prerogatives is very much an issue with respect to H.R. 5099. The Administration strongly supports the principle of resolving water allocation issues at State and local levels in accordance with applicable State laws. Accordingly, Reclamation is guided by the long-standing principle of deference to the provisions of State law in the allocation, distribution and use of Federal reclamation project water except where compliance with such provisions would be inconsistent with Congressional directives concerning reclamation projects and programs. The State of California must be allowed the primary role in determining its comprehensive balance in a flexible manner.

We are concerned with the idea by some that allocation of water is the only cure for the State fish and wildlife habitat problems. We recognize that fish and wildlife mitigation and improvement cannot be realized without adequate water supplies. We object to the arbitrary assignment of 1.5 million acre-feet of Central Valley Project yield exclusively for that purpose. Such an allocation reduces both operational flexibility to meet needs and opportunities for multiple use of resources.

We believe we should continue to pursue our efforts to determine the extent to which fish and wildlife needs can be addressed through multiple uses of water, and improved water management in project operations. Only after such efforts have been exhausted can we determine whether additional allocations are reasonable or necessary.

The Subcommittee should also be made aware of the Federal-State ongoing efforts relative to determining instream flow needs for the Trinity River, Stanislaus River, Sacramento River, San Joaquin River and the American River. We believe real progress has been made and in my written statement there are examples on pages three through seven of what we believe are substantial accomplishments.

Mr. Chairman, I can do an impact report or I can wait for questions in terms of impact of H.R. 5099. Would you like me to wait?

Chairman MILLER. Why don't you go through the positive impacts. [Laughter.]

Mr. UNDERWOOD. My time is up. [Laughter.]

Chairman MILLER. Why don't we go to questions? Obviously——

Mr. UNDERWOOD. There are a couple of points that I think should be made. Let me just run through these. I'll try to be as brief as possible.

Reclamation. We did an analysis. This analysis is a preliminary analysis because we haven't had time to do a substantial, thorough analysis. Generally there is the carry-over storage. This level of carry-over storage gives us confidence that the project will be able to meet all obligations in the event that precipitation in the following year is below normal. Under current obligations we are able to reach this level about two out of three years.

If H.R. 5099 is enacted we estimate that we would be able to reach this level only two years out of ten years. And, again, we're trying to meet all obligations of the project.

If the burden of meeting the cumulative requirements of H.R. 5099 falls only on the Central Valley Project agriculture water service contractors and excludes water rights, municipal and industrial wildlife obligations, the results would be the reduction in the Project's supply available to meet agricultural water service contracts to about 20 percent of the contracted amount.

This provision of the bill, along with title XXX, dealing with the Trinity River, of H.R. 429, would reduce the normal supply for agricultural water service contractors from 3 million acre-feet to 500,000 acre-feet per year. Other requirements of the Delta outflow and endangered species would reduce the available supply further.

The biggest impact of H.R. 5099 would come in dry and critical years. We estimate if the bill had been in place a dozen years ago under the water supply conditions that California has been subjected to, no water would have been available for Central Valley Project agriculture or municipal-industrial contractors in 1990, 1991, or 1992 and reduced deliveries would have been necessary in 1988, 1989.

Because of the reduction of supplies the economic impacts would fall heavily on reservoir, recreation and the power industry.

In summary, we believe if the legislation were enacted it would lead to more litigation and continuation of status quo rather than real progress. The avoidance of tradeoffs between the environment and the economy through multiple use of water, improved water management and project operation is the preferred approach in contrast to the approach pursued by the bill.

In recent years the Bureau of Reclamation, Fish and Wildlife Service, and National Marine Fisheries Service, in coordination with state and local entities, have worked well in a cooperative spirit to improve fish and wildlife conditions in the Central Valley. In accordance with our preferred approach we believe much has been accomplished. Regardless of the outcome of the Central Valley Project legislation before your Committee, this cooperative management will continue because much remains to be done.

Thank you, Mr. Chairman.

[The written statements of Dennis B. Underwood, Commissioner of Reclamation, Department of the Interior follows:]



**STATEMENT OF DENNIS B. UNDERWOOD**

**COMMISSIONER OF RECLAMATION**

**DEPARTMENT OF THE INTERIOR**

before the

**SUBCOMMITTEE ON WATER, POWER AND OFFSHORE ENERGY RESOURCES**

**HOUSE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS**

on H.R. 5099

May 14, 1992

Thank you Mr. Chairman. I appreciate the opportunity to appear today to discuss H.R. 5099, to provide for the restoration of fish and wildlife and their habitat in the Central Valley of California, and for other purposes.

The Administration strongly opposes H.R. 5099 based on the Federal intrusion the bill represents and the costs associated with the bill.

If enacted, H.R. 5099 would result in significant change in the focus of the Central Valley Project. It would also dramatically change water allocation priorities, repayment responsibilities, and water transfer and marketing policies.

It is the Administration's view that the legislation could result in substantial frustration of the original purposes of the Central Valley Project, without accomplishing its intended purpose. We certainly agree there is need for improvement in fish and wildlife conditions in the Central Valley, but H.R. 5099 is not the means for such improvement. We believe that, if enacted, this legislation will lead to more litigation and continuation of the status quo rather than to real progress. It is our view, Mr. Chairman, that fish and wildlife improvements can be achieved without unnecessary and counterproductive divisiveness.

The question of state primacy is very much at issue with respect to H.R. 5099. As also pointed out in the hearing statement on H.R. 3876, the Central Valley Project Fish and Wildlife Act of 1991, the Administration strongly supports the principle of resolving water allocation issues at the State and local level in accordance with applicable State law.

Accordingly, Reclamation is guided by the long-standing principle of deference to the provisions of State water laws in the allocation, distribution, and use of Federal reclamation project water, except where compliance with such provision would be inconsistent with Congressional directives concerning reclamation projects and programs.

Mr. Chairman, we support mitigation of Central Valley Project impacts and the need to improve fish and wildlife populations in the Central Valley of California. We are willing to work with the Committee to address these issues.

A number of things have taken place since we last testified on this subject: The drought has continued unabated into its sixth year, exacerbating an already stressed environment for both wildlife and human population. Discussions and negotiations about the Central Valley Project have taken place among the Congress, the water users, and the environmental community (from which the Administration has been largely excluded). Reclamation has entered into consultation with the National Marine Fisheries Service (NMFS) concerning 1992 and long-term Central Valley Project operations to protect the winter-run chinook salmon and with the U.S. Fish and Wildlife Service concerning the Bald Eagle.

The reasonable and prudent alternative developed for 1992 operations during the NMFS consultation included the following measures: Reduction of diversions from Montezuma Slough into Suisun Marsh, preserving sufficient storage in Shasta Reservoir for temperature control for late summer and fall releases, extension of the length of time the gates remained open at Red Bluff Diversion Dam, closure of the Delta Cross-Channel gates to assist out-migration of juvenile salmon, improvements in the efficiency of the Tracy Fish Collection Facility, increased monitoring of out-migrating salmon, and expansion of the temperature and water quality monitoring program.

A water conservation office has been opened in Reclamation's Sacramento office to provide advice, information, and technical assistance to water users and a cooperative water conservation agreement has been entered into with the California Department of Water Resources with respect to the development and updating of water conservation plans.

Water transfer language is being included in the Friant Division renewal contracts which will facilitate transfers of Central Valley Project water among willing buyers and sellers.

Reclamation has undertaken the San Joaquin River Basin Resource Management Initiative, directed at improving the riverine environment in the San Joaquin River.



Other examples of actions and activities that have been taken to conserve and enhance fish and wildlife populations include:

- Reservoir operations have been modified to enhance conditions for endangered species.
- During this extended drought, Reclamation has released nearly 100,000 acre-feet of water from Shasta Dam to dilute toxic discharges from the Iron Mountain Mine Super Fund Site.
- Reclamation is installing temporary temperature control curtains in Lewiston Afterbay to assist in controlling temperature at the Lewiston Hatchery, in the Trinity River, and in the diversions to the Sacramento.
- Reclamation has initiated discussions with the Fish and Wildlife Service on long-term contracts for delivery of water to National Wildlife Refuges in the Central Valley.
- Design work has begun on a pilot pumping plant which, if successful, will allow us to remove the salmon migration barrier of the Red Bluff Diversion Dam on the Sacramento River.
- Designs and specifications are nearing completion on a temperature control device for Shasta Dam.
- The State of California has initiated an effort to develop a San Joaquin River Management Program through the efforts of the Advisory Council and Action Team. Reclamation is currently participating in this effort with the State of California and others.
- Reclamation is providing a minimum of 340,000 acre-feet of water annually to the Trinity River for the period 1992-1996, based on Secretary Lujan's decision of 1991, after which time the recommendations of the Fish and Wildlife Service on flow requirements will be considered by the Secretary.
- Secretary Lujan, responding to Governor Wilson's request in January, 1991, created a Special Assistant for California water issues to assist Reclamation and the Service in resolution of barriers to water deliveries while maintaining reasonable protections for California's natural resource water-dependent assets.
- Initial repairs to the fish trap at Keswick Dam have been completed. Designs and specifications will be completed in June of this year on additional repairs and modifications.

- The Fish and Wildlife Service, in response to the increasing volume of work on water-related natural resource issues, has opened a Regional Director's field office in Sacramento to facilitate the often daily negotiations between the Service and Reclamation.

- Gravel has been stockpiled along the Sacramento River for use in replenishing spawning areas. Placement is waiting on the proper flow regime to distribute the gravel effectively.

- Reclamation reached agreement with the California Department of Fish and Game concerning mitigation of the direct fishery impacts of the Tracy Pumping Plant. We also are considering an agreement with the State of California regarding indirect impacts.

- Reclamation is preparing an Environmental Impact Statement (EIS) for the Friant Division contract renewals, and provisions are being included in the contracts to provide for implementation of the results of the EIS and Section 7 Endangered Species Act consultation.

From the foregoing examples, it is clear that Reclamation, the Fish and Wildlife Service, and others, are working to obtain specific improvement in fish and wildlife conditions in the Central Valley. We believe that these are the appropriate vehicles to accomplish that result. Reclamation has undertaken these actions in cooperation with other Federal, state and local agencies.

It should be noted that the State of California is strongly opposed to this bill. California Governor Wilson, in his February 26, 1992, letter to Chairman J. Bennett Johnston of the Senate Committee on Energy and Natural Resources, stated ". . . California can not and will not be steered toward a process that seeks to adopt unworkable formulae pitting environmental protection efforts against our need for food and fiber and jobs. Nor can we tolerate constraints on, or abrogations of, the State's authority to appropriate and regulate its water to optimally meet its full range of beneficial uses, including food and fiber protection, domestic uses, and meeting the needs of fish and wildlife. It would be a tragedy if the Congress were to usurp any State's jurisdiction over its own water, as this bill proposes."

The Administration believes that the State of California must be allowed the primary role in determining in a comprehensive, balanced and flexible manner, how its water resources are to be allocated.



Mr. Chairman, we are particularly concerned with the identification by some that allocation of water is the only cure for the State's fish and wildlife habitat problems. While we recognize that mitigation and improvement cannot be realized without the availability of adequate supplies of water, we object to the arbitrary assignment of 1.5 million acre-feet of Central Valley Project yield to that purpose. We support the concept of water transfers, but are concerned about the need for equitable treatment for all parties. H.R. 3876 moves in this direction. We believe that we should continue to pursue our efforts to determine the extent to which fish and wildlife needs can be addressed through multiple uses of water, improved water management, and project operations to meet the fish and wildlife objectives of H.R 5099. Only after such efforts have been exhausted can we determine whether additional allocations are either reasonable or necessary. The bill's allocation of 1.5 million acre-feet of Central Valley Project water for fish without consideration of such measures has not been demonstrated. Such an allocation will reduce both operational flexibility to meet needs and opportunities for multiple-use of the resource.

This allocation of water could be in addition to any action the State Water Resources Control Board may take during the current hearings on Decision 1485 and any water required for compliance with the Endangered Species Act.

In normal and above-normal years, meeting the additional fish allocation may not be a problem, depending on the pattern of delivery and other Delta and endangered species requirements.

However, if a significant portion of the 1.5 million acre-feet is required to be released from storage in the late summer, a significant impact would result.

If the burden of meeting the cumulative requirements of H.R. 5099 falls on agricultural water service contractors and excludes water rights, and municipal and industrial and wildlife obligations, the result would be a reduction in project supply available to meet agricultural contracts to about 20 percent of the demand. The provision of this bill, together with Title XXX (Trinity River) of H.R. 429, would reduce the normal supply for agriculture from the 3 million acre-feet to 500,000 acre-feet.

The biggest impact of H.R. 5099 would come in dry and critically dry years. We estimate if the bill had been in place a dozen years ago, under the water supply conditions California has been subjected to, absolutely no water would have been available for agricultural or municipal and industrial contractors in 1990, 1991, or 1992 and reduced deliveries would have been necessary in 1988 and 1989. Because of the reduction of carryover supplies in many years, the economic impacts will fall just as heavily on reservoir recreation and the power industry.

Lower reservoir levels will result in a less enjoyable recreation experience and a drop in revenue to the recreation industry and in available power and power revenue. It should also be understood that none of the costs associated with furnishing this water are shifted from the water users, even though the bill significantly reduces the amount of water available to them.

The avoidance of tradeoffs between the environment and the economy through multiple uses of water, improved water management and project operation is the preferred approach, in contrast to the approach pursued by the bill.

We are also concerned that this bill constitutes what could be considered a legislative abrogation of existing water delivery contracts by dedicating existing contracted-for supplies to fish and wildlife.

In our view, this reallocation exacerbates competition and conflict for limited water supplies.

It provides project revenues to fund both project and non-project related fish and wildlife activities, and places an unlimited call on project power for fish and wildlife at reduced rates.

Contracting limitations coupled with the water pricing scheme will result in greater use of ground water, diminished water sales and a reduced capability to recover the Federal investment.

The bill would charge full cost for water delivered for production of surplus commodities regardless of compliance with the ownership and acreage limitations of the Federal Reclamation law. Further, the bill would require payment of full cost on a portion of water used for the production of any crop, regardless of national priorities, and regardless of the conservation efforts of the water users if a District used all of the water available to it under its contract.

Mr. Chairman, the Administration is opposed to the provision in the bill which requires payment of full cost for water delivered to a landholding producing surplus crops regardless of participation in ASCS programs. We also believe that determining water allocations during time of drought based on the previous year's production figures is onerous and unfair.

The bill hamstrings the Secretary from entering into water supply contracts pursuant to the Reclamation States Emergency Drought Relief Act of 1991, the Reclamation Reform Act, and general Federal Reclamation law -- with the exception of contracts for fish and wildlife purposes and a contract for 100,000 acre feet of water for municipal and industrial use.

Mr. Chairman, that concludes my prepared remarks. I would be glad to respond to any questions.



**STATEMENT OF DENNIS B. UNDERWOOD**

**COMMISSIONER OF RECLAMATION**

**DEPARTMENT OF THE INTERIOR**

before the

**SUBCOMMITTEE ON WATER, POWER, AND OFFSHORE ENERGY RESOURCES**

**HOUSE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS**

on H.R. 3876

May 14, 1992

Thank you Mr. Chairman. I appreciate the opportunity to appear before the Subcommittee today to discuss H.R. 3876, a bill to protect, restore, and enhance fish and wildlife habitat within the Central Valley of California, mitigate Central Valley Project Impacts in order to maintain the continued orderly operation of the Central Valley Project, and for other purposes.

As introduced, H.R. 3876 has as its primary objectives the mitigation of impacts on and the enhancement of fish and wildlife resources in the Central Valley of California while maintaining the productivity of the other project purposes of the Bureau of Reclamation's Central Valley Project. The Administration of the Interior supports these objectives, but has major reservations regarding the bill's mechanisms to achieve these goals. Thus, we strongly oppose the bill as written.

First, the Administration strongly supports the principle of resolving water allocation issues at the State and local level in accordance with applicable State law. Accordingly, Reclamation is guided by the longstanding principle of deference to the provisions of State water laws in the allocation, distribution, and use of Federal reclamation project water, except where compliance with such provisions would be inconsistent with Congressional directives concerning reclamation projects and programs. H.R. 3876 is a effort to resolve most of the issues regarding allocation of the water supplies of the Central Valley Project at the State and local level; however, as introduced, H.R. 3876 may preempt California State water law by providing a Congressional directive defining "transfer" of water as a beneficial use.

It is strongly recommended that this definition be deleted from the bill and that this issue be resolved at the State level.

SAMPLING OF LETTERS IN OPPOSITION FOLLOW

**BOARD OF SUPERVISORS**

SUPERVISORS

| | |
|---|---|
| ROY ASHBURN | District No. 1 |
| BEN AUSTIN | District No. 2 |
| PAULINE LARWOOD | District No. 3 |
| KARL F. HETTINGER | District No. 4 |
| MARY K. SHELL | District No. 5 |

SUE LASITER
Clerk of Board of Supervisors
Administration and Courts Building
1115 Truxtun Avenue, Room 505
Bakersfield, California 93301
Telephone (805)861-2167

May 12, 1992

Honorable George Miller, Chairman
House Committee on Interior and Insular Affairs
2228 Rayburn House Office Building
Washington, D.C. 20515

Dear Mr. Chairman:

Enclosed is a resolution adopted by the Board of Supervisors of Kern County, California on March 17, 1992, voicing our support for Central Valley Project reform legislation authored by Senator John Seymour (S 2016) and Representative Calvin Dooley (HR 3876) and expressing our opposition to the "Chairman's Mark" legislation by Senator Bennett Johnston.

The Board is also opposed to HR 5099, which is even more damaging than the "Chairman's Mark". In our view, HR 3876 and HR 429 as passed by the Senate provide ample protection for California fish and wildlife while recognizing the importance to urban dwellers and farmers of stable, long-term water supplies from the Central Valley Project.

HR 5099 would not only devastate Kern County's and California's farm industry, it would endanger an important water source for many cities in the San Francisco Bay Area and central California. The bill dedicates nearly half of the Central Valley Project's contracted water supply to fish and wildlife purposes. In a dry year such as 1992, virtually no water would be available for urban or agricultural water deliveries from the Delta, and very little water would be available to cities or farms in the southern San Joaquin Valley.

California has already suffered substantial damage from a six-year natural drought; the artificial drought created by HR 5099 would make matters even worse. Statewide, the California Department of Food and Agriculture estimates that HR 5099 would cost 10,000 jobs, $210 million annually in lost wages and more than $1 billion in lost farm receipts. At least 800,000 acres of farmland would be idled. People in cities which contract for Central Valley Project water would also see their supplies shrink as they are diverted for fish and wildlife uses.

We recognize the need to reserve water for fish and wildlife habitat, but this goal must not divert the Central Valley Project from its principal mission: to supply water to California's farms and urban users. HR 5099 would inflict hardships on Californians in pursuit of expensive and possibly unachievable environmental goals. We respectfully urge your Committee's support instead for HR 3876 and the Senate-passed HR 429, which represent balanced, reasonable approaches to Central Valley Project reform.

Sincerely,

Mary K. Shell, Chairman
Kern County Board of Supervisors

MKS:dr\cvprefor.m
attachment
cc: Representative William M. Thomas
Representative Calvin Dooley
James Wise