# EXHIBIT A
(Part 4)

Chairman MILLER. We're going to recess for a moment so we can go vote on a measure on the floor and then we will come right back and start with the questioning.

Thank you.

[Recess.]

Chairman MILLER. The Committee will come to order. We will go ahead and start and if people want to engage in conversations I would ask that they do it outside, please.

Thank you all very much for your testimony and your willingness to be here today to help us sort out some of the issues here.

Mr. Brown, let me ask you a question. On page six of your testimony, on the paragraph that is headlined Transfers, you say that you are concerned about the transfers by an individual from a water district without the involvement of the district or grower restrictions is of concern to you. It is of concern because, quote "we have no means of determining that a borrower is dewatering a property that had been devalued and taken as a loan collateral on the basis of its being irrigated. Our experience is that compensation to our borrowers for transferred water would not be a guarantee that our loans would be repaid as agreed to and that forced collection and loss would ensue."

Why is that so?

Mr. BROWN. Because whenever we've gotten into a distressed loan situation we find that typically a grower will pay everybody but us. We usually are at the bottom of the line.

Chairman MILLER. Why would that be a distressed loan situation?

Mr. BROWN. We are simply saying that the fact that a person is being compensated for the water he sells would be no guarantee that our loan would be protected.

Chairman MILLER. So we would assume that if we allow for water transfers that you would make no changes in the conditions and terms of your loans?

Mr. BROWN. For new loans we have no problems. We can put a covenant in, it will protect any water being sold without our approval. For the $4.2 billion of loans that we have out there, the existing loans, we have no means of dealing with that except through a monitoring process that is not available to us through this bill.

Chairman MILLER. Let me ask you: are you telling us—What do you have out there?

Mr. BROWN. $4.2 billion.

Chairman MILLER. You have $4.2 billion of——

Mr. BROWN. Short term, intermediate, long term loans.

Chairman MILLER. And I guess if a person made a deal, which we assume would be in their financial interests, to transfer their water and received a contract to transfer it over a period of years, what are you telling us? These are basically dishonorable people you are dealing with?

Mr. BROWN. If we get into a distressed loan situation and we have to take action to foreclose all of the sudden we find for the first time that there is no water on the property. The value that we loaned on that property was based on appraisal of irrigated value and if that value is no longer present we have got a very serious problem facing us and we have no way to deal with that.



Chairman MILLER. Your solution is not to allow transfers. Wouldn't a better solution be to cut you in on the action so that people have to notify you?

Mr. BROWN. We are not opposed to transfers as long as there is a reasonable process that allows us to become aware of it, to sit down and talk with our borrower, and if we find it is a situation that could threaten the solvency of the loan then we would call the loan, if it were a serious situation.

And we do support the provisions of the Lehman, Dooley bill that would provide an opportunity—well, actually it is a transfer bill that has been introduced in the state that would allow that kind of opportunity through an application process or through the water districts' establishing transfer policy which we feel would provide us a means of monitoring. This provides us absolutely no way of knowing when this occurs.

Chairman MILLER. We see large lending institutions that have very large portfolios in farm real estate and loans supporting the farm's position. Why is that, Mr. McGill?

Mr. BROWN. Because they're not long term lenders. They are short term lenders. They're what we call the commercial lenders. They make the crop loans, the fertilizer loans and that sort of thing. Most of the commercial banks have backed out of long term lending. That's the reason they're taking this position. My view is that they are no longer supportive of agricultural. They pretty much have washed their hands of this.

Chairman MILLER. Mr. McGill?

Mr. MCGILL. Let me relate an anecdote of a discussion that occurred at the California Business Roundtable Water Taskforce. A major grower, as we were discussing the idea of water transfers, asked a major banker who was sitting across the table, "Aren't you worried that if transfers were to occur the value of the land might be affected because the crops growing on that land might diminish?" The banker responded two fold. First, in our view, as expressed in the report, the amount of water transferred would not be that great a quantity and fallowing would rarely occur. Secondly, if there were a long term contract for water it probably would provide a more predictable stream of income for that land than the less predictable growing of crops would do and therefore the loan could be switched and secured by the value of the profit being made on the water transferred.

Chairman MILLER. What is the impact, Mr. Brown, of a 20 year loan versus a 30 year loan or a 40 year loan, a contract period for water?

Mr. BROWN. Our typical loan is from 20 to 30 years on long term lending. The impact would be higher rates imposed upon a reduced term period, imposed upon less water.

Chairman MILLER. Wait, wait, wait. Back up. You say that you loan between 20 and 30 years.

Mr. BROWN. For long term loans.

Chairman MILLER. So a 40 year contract has little impact on you?

Mr. BROWN. We can go to 40 years but environmental and other constraints now——

Chairman MILLER. You're already at 20 years so a 20 year contract would be within the parameters of which you already lend.

Mr. BROWN. That is if a 20 year contract were provided without restrictions. That is not the case in this bill.

Chairman MILLER. You don't know that yet.

Mr. BROWN. I think in most cases we would be faced with a lesser period than 20 years.

Chairman MILLER. Why would that be since the bill talks about 20 years?

Mr. BROWN. You have to evaluate direct, indirect cumulative impacts which could be a fairly lengthy process. It is my belief that in most cases it would result in a lesser period than 20 years.

Chairman MILLER. So you know something that nobody else involved in this knows? That 20 years is not 20 years.

Mr. BROWN. I am very familiar with the environmental analysis process and results. I have been directly involved for a long time.

Chairman MILLER. If somebody has a 20 year contract for a specified amount of water they don't have a 20 year contract for the specified amount of water?

Mr. BROWN. The bill says up to 20 years. I don't see any guarantee that a 20 year contract—

Chairman MILLER. You are now lending on a 20 year basis?

Mr. BROWN. 20 to 30 years on an average. Average range.

Chairman MILLER. You are lending for less than 20 years?

Mr. BROWN. We make short term loans for one year, we make intermediate loans for up to seven. It depends entirely on the situation but for our collateral loans people are buying farm land and equipment, putting in wells and that sort of thing. We make long term loans.

Chairman MILLER. The term itself is not the sole conditioner of your claim?

Mr. BROWN. It is. We are the only one making long term loans to farmers and ranchers throughout the United States.

Chairman MILLER. If we just change the term what impact would that have?

Mr. BROWN. I mentioned that the costs would be significantly higher.

Chairman MILLER. How much higher?

Mr. BROWN. I'm not a credit person, I can't give you that.

Chairman MILLER. Would it be two percent, three percent? What do you think the ballpark would be?

Mr. BROWN. I'm sorry, but I'm not involved in credit issues.

Chairman MILLER. Would you supply that information to the Committee?

Mr. BROWN. I would be happy to do that.

Chairman MILLER. It's important. You're now lending money at 20 years and you say that if we go to 20 years that the cost would be significantly higher. What factors do you take in today when you lend farmers money for these long terms?

Mr. BROWN. We have five credit factors that we evaluate and water has become a very much larger portion of the process that we go through in evaluating the lendability of particular properties. Because of diminished supply of water now we place a much



higher emphasis on the availability of that supply in adequate amounts of good quality.

So the sum of those five credit factors have been pretty much relegated to an unimportant level now because of the critical water situation in this state and more and more we are having to condition our loans on the basis of water that is available.

And we have to try to project out to 30 or 40 years. We are a very conservative organization and in over 75 years we have developed a close working relationship with the farm communities and being able to project out to 30 or 40 year periods based on a reliable, dependable source of water. That would be pretty much eliminated by this bill and it would place us in a position of being no different than a commercial lender or the Farmers Home Administration, lender of last resort.

The nitch that was carved by Congress for us to perform would not be available to us and that's our view and that is the view of our directors.

Chairman MILLER. Do you lend to the recipients of state water project water also?

Mr. BROWN. Yes.

Chairman MILLER. How do those loans differ from the federal loans that you make?

Mr. BROWN. In what way?

Chairman MILLER. You have recipients of federal water that are growing the same crops of recipients of state water.

Mr. BROWN. We don't have the contract provisions to deal with it that would change the allocations and the amount.

Chairman MILLER. Sorry, I don't follow.

Mr. BROWN. The state water service area, we're not faced with those kinds of problems.

Chairman MILLER. So the state water contractors get a better contract? They get a lower rate of interest than federal water contractors?

Mr. BROWN. No, I'm not saying that. I'm saying that they are a different type of contract and our evaluation of water in those areas is based on a different set of criterion.

Chairman MILLER. Do federal water contractors who are in the same cropping patterns and same geographic areas of the state get a benefit? Do they get a better contract?

Mr. BROWN. A better contract from us?

Chairman MILLER. Lower interest rates?

Mr. BROWN. No, we treat everybody pretty much the same. If there is plenty of water available then it's not a major concern. It is a fairly minor item if it is reasonable for long term periods. It changes the equation completely if you shorten up the term period and we haven't had to face those shortened contract periods with the state system.

Chairman MILLER. So currently if we are both growing cotton, we're both growing tomatoes and I am paying—in a federal project I am paying $35 an acre foot or $15 an acre foot and the state is paying $52 an acre foot there is no benefit to the farmer in terms of lower interest rates or better contracts is what you're telling us?

Mr. BROWN. No. As a matter of fact, we do not make a lot of loans in the state service area because they do not have an alterna-

tive source of water. They've got a single source with very little flexibility, no back up ground water to speak of, and they have drainage problems. So, being very conservative, we evaluate each loan on a case by case basis. We don't red circle anything. But the reality is we do not have high exposures in those regions because of some of the problems.

Chairman MILLER. That's what I'm trying to get at, Mr. Brown. Listen to the question this time. Are the loans the same? You earlier testimony is that they are, in fact, the same. There is no benefit that flows to the farmer, i.e. the consumer, in lower costs whether you farm in a subsidized area or a non-subsidized area. Is that correct?

Mr. BROWN. I think I just answered that most of our lending is in the Bureau area.

Chairman MILLER. Where you make those loans—I wouldn't be asking the question if your answer was you aren't making any loans in the state area—Where you testified that you make loans in the state, recipients of state water is considerably higher than federal water. Do federal contractors get a better deal because they have a lower cost of doing business than their state counterparts?

Mr. BROWN. I can't answer that.

Chairman MILLER. Okay.

How many of your loans out there are long term?

Mr. BROWN. I don't have a percentage figure on that but I can check on that.

Chairman MILLER. Can I ask you to supply that for the Committee?

Mr. BROWN. Yes, sir.

Chairman MILLER. And can you supply for the Committee the breakdown of those loans by term, 10, 20, 30, 40 years?

Do you take into account what the Bureau of Reclamation says about a farmer's ability to pay when you make these loans? If the Bureau calculates that the ability to pay is better for one farmer than another does that help the farmer?

Mr. BROWN. No. We evaluate that situation independently of any Bureau decision. In Arizona I just completed a study of seven water districts and their ability to pay was far from reality. In fact, they were slowly going broke in many districts that I looked at and were not able to pay.

Chairman MILLER. I'm sorry.

Mr. BROWN. In that case we were not very excited about making loans in those districts.

Chairman MILLER. Were you also a supply—Let me ask you the question, and that is, how many loans do you make to farmers whose only source of water is the Bureau project? They don't have a substitute to maintain the level of farming if they lose 75 percent of their water, 90 percent of their water, whatever the drought has happened in the past? Do you know how many farmers you loan to?

Mr. BROWN. It would be by far the predominant group of them. Almost all of them receive Bureau water as supplemental water.

Chairman MILLER. They all have alternate sources that they can maintain?



Mr. BROWN. It is supplemental but it is the major portion in many cases. In other words, what I'm saying is they do have to have an alternative supply in many cases. I didn't mean to say supplemental but in many cases it is a primary source, has to be backed up with some additional water. That's why we go through a very careful analysis to look at those two components, water right water, whatever kind of water they might have.

Chairman MILLER. Mr. McGill, let me ask you, your paper on using—the report on Using Water Better, it took you how long to develop that report?

Mr. MCGILL. Approximately six months.

Chairman MILLER. And the conclusion is, again, that you believe there should be a market developed for water transfers, is that correct?

Mr. MCGILL. That is correct.

Chairman MILLER. And, again, the conclusion is that that would not be disruptive to California's economy?

Mr. MCGILL. That is correct. And we cite in the report extensive research that has been done by two of the top agricultural economists in the state, Richard Howe and Henry Vaux at U.C. Riverside, who did a very sophisticated computer model projecting what would happen were a free market established for water in California and they found that both rural and urban California would profit as a result of the operation of a water market which encouraged water transfers to occur.

Chairman MILLER. Mr. Lehman?

Mr. LEHMAN. Thank you, Mr. Chairman.

First, Tom Graff, good to see you, we have talked many times. It is nice to get you together in this atmosphere today since you are obviously a person who is critically involved in the drafting of one of these bills.

Earlier I gave the number of the yield of the CVP as 7 million acre-feet. I stick to that number because I got it from the Chairman and I assume that it is accurate. I think that's pretty much agreed.

Out of the 7 million acre-feet, for purposes of this Act, you would have to deduct the water going to those who have prior rights and those who have exchange contracts, which amounts to about 3 million acre-feet, leaving you with about four. I also identified about another million acre-feet but I will leave that out right now.

Let's see, there's three to four million acre-feet left. Then the bill would reallocate a million and a half acre-feet for fish. Another increment, I guess it is about—maybe Mr. Dooley can help—300,000 acre-feet or so for ducks. 100,000 acre-feet for transfer to urban interests and then some miscellaneous water. I'm not sure where it goes, Trinity River water might be in the water already identified so let's leave it out right now too.

Let's say you're up to about two million acre-feet out of a total of less than four available to take that from. Now, the first question I have is where are you going to get the million and a half acre-feet. I'm not clear on where it is going to come from? Which basins are going to be affected? Which users are going to bear the brunt of this?

Mr. GRAFF. Congressman Lehman, the way I read the bill with the 1.5 million acre-feet, what it is, I used the word set aside in my testimony, I'm not sure that's exactly the right word. It is an allocation of CVP yield to fish and wildlife which has the same priority as that of the prior rights and exchange contractors whom you referenced earlier. So the effect of that, and subject to shortages as they are, so effectively——

Mr. LEHMAN. We're talking about the same numbers then?

Mr. GRAFF. Roughly. Seven million, even though apparently the source was Chairman Miller. There are various ways you can slice the CVP, the Bureau of Reclamation.

Chairman MILLER. I think it is closer to ten. [Laughter.]

Mr. GRAFF. The CVP, as late as 1988 when it was promoting the sale of an additional million and a half acre-feet to agriculture as opposed to dedication to fish and wildlife, which is, of course, referenced in H.R. 3876 as a possible additional commitment of CVP water—I might add from the Seymour bill in the Senate—one thing that I understand held up your bill for a few days and moved it behind Seymour's. So I guess at some level there is at least a belief that there is water out there to be allocated, albeit not to fish and wildlife.

But the million and a half acre-feet gets the same priority as the prior rights contractors but, of course, is as subject to shortage, therefore, in dry periods as they are.

The practical effect of that is that in critical periods the number is less than a million and a half. That is not recognized in many of these economic impact studies that are being thrown around.

It is also true that the million and a half acre-feet is not necessarily all consumptive use. The way it is stated is that its primary use is to be for fish and wildlife but it can be used for fish and wildlife purposes and then re-diverted for other purposes.

And lastly, the add ons that you put in there, the refuge and Trinity add ons are not ones that would affect the project significantly in critical years such as we are in now.

Mr. LEHMAN. Explain that.

Mr. GRAFF. Let me get that right. The refuge number would not be an add on in average years. The Trinity would not be an add on in critical years. So Trinity is already getting 340,000 acre-feet. What the bill would do would be to add water to the Trinity in average and above normal years. The refuges currently get about 100,000 acre-feet. They would get about 300 in critical years whereas in normal years they now get 360. They might get a slight add on to about 400. So they are different.

But the point is you can't simply take all of these numbers and add them and say that it is a 2.5 million acre-feet hit. It is nothing like that in either dry years or average years.

And, having said all that, let me make a point clear that I hope that—I had it in my written testimony but we really didn't get to it in the shortened oral version. There is a lot of water involved here. Fish and wildlife are not going to be protected in California without a lot of water. That is unfortunately the case. And ultimately it has to come from somewhere and the major user of consumptive water in California is agriculture. So we are talking



about a significant reallocation of water in the state from agriculture to fish and wildlife.

Mr. LEHMAN. That goes back to my question. Where are you going to get it from? To say it is coming from agriculture, this ten percent figure that we tossed out earlier is out of a pool of all of the water used by agriculture in the state whether it's spent from the underground in the state system or in the CVP. This water is coming from the CVP. Who is it coming from?

Mr. GRAFF. It is coming from the CVP contractor is who it is coming from.

I might point out that in our original effort to negotiate numbers with the CVP beneficiaries we pointed out that responsibility to meet fish and wildlife needs in the state are not solely those of the CVP contractors. It would also be the responsibility of state contractors and local water users as well. A piece of comprehensive federal legislation ought to account for that and ought to, in one way or another, bring in the state and local users and make them contribute their fair share. I agree with that but that is difficult to do. It is particularly difficult to do when they are really unable to negotiate with those on the CVP side.

Mr. LEHMAN. So we don't know who the water comes from? We don't know which basins it comes from?

Mr. GRAFF. Under the bill it comes from the CVP contractors.

Mr. LEHMAN. And it is in essence taken from them?

Mr. GRAFF. I wouldn't call it taking. That's got some legal—There are some legal terminologies to that word. The way I would view it is that the federal government, the Congress, decides who the beneficiaries of a federal project are. And they aren't revisiting the question of who those beneficiaries should be into the future from where they have been in the past. That is not a taking, in my judgement.

Mr. LEHMAN. We could argue that. That is a different forum.

Chairman MILLER. If you would yield.

Mr. LEHMAN. Sure.

Chairman MILLER. It is an important point. Taking is an important word in this committee.

Mr. LEHMAN. I didn't use it lightly.

Chairman MILLER. My point is there are contracts here and there and there are contracts that will all come up for renewal. The terms and conditions of those contracts can be specified by the federal government and people can either enter into those contracts use, as we all refinance our homes or businesses or commercial ventures or whatever it is, that may be the terms and conditions. And that is not a taking because if you don't want the water you don't have to use it. You have no right beyond your 40 year contract. That is the benefit that was extended by virtue of contract. That contract can, in fact, be rewritten and that is part of the deliberation.

Mr. LEHMAN. I'm only going down this line to point why we are here, why we are here with the absence of any economic analysis at all. How is this going to impact the different basins? How is it going to impact—I'm very concerned about this—permanent crops versus non-permanent crops, where people have a substantial in-

vestment and suffer the same loss of water as people who can make a decision every year whether or not they're going to plant.

And then what it is going to do on the third party impacts when a person, to save the level at which they are producing today, decides to pump the underground, which is their right and I certainly wouldn't stop them from doing that. But again, tremendous economic impacts there all resulting from no idea of where we are really going to get the water. And I will tell you, the people on the other side of this feel it is being taken so I guess maybe it is your perspective here.

And maybe I will get back to this in a moment but you also bring up another point where I agree with you on the need for some sharing here in this. And I just can't help from being a little provincial. I get a little up in my blood when somebody from San Francisco comes and tries to tell us how to take care of the environment.

Maybe I should ask Mr. McGill if they have done any economic studies of the effects of the urbanization in San Francisco on the environment. San Francisco's water supply comes from Hetch-Hetchy in my district, by the way. We are helping the people. And, by the way, the federal government isn't getting paid for that water, we give it to them. Talk about a subsidy. They haven't even paid the one penny that was alluded to earlier. And the East Bay has the one right below it at San Pedro.

Chairman MILLER. Where is Hodel when you need him?

Mr. LEHMAN. The salmon are not swimming in Yosemite and it's not the CVP that took them away but it was the federal allocation made to dedicate the water to San Francisco. I'm the only one who tried to look at the Raken Act. You should see what happened then. The mayor of San Francisco, great environmentalist, told me it was her birthright—that is her exact words—to have that water at Hetch-Hetchy. It wasn't given to them in any different manner, a vote of the Congress has created the CVP out there. Yet I don't see my friends in San Francisco doing any analysis of the effects of urbanization on the areas that they have taken the water from.

Mr. Brown, let me ask you a couple of questions because, again, I think the discourse, the discussion you had with Mr. Miller, again points out the need for more economic information here.

The Chairman has advocated on the floor of the house putting a three year limit on water contracts. Is that what you did? Was it one or three? Take your pick, okay? What would be the impact of that if we passed it on agricultural lending.

Mr. BROWN. My feeling is there wouldn't be any long term lending at all. It would all be crop loans, fertilizer loans. You know, commercial loans that we make year to year.

Mr. LEHMAN. Is there any reason to suspect that might not be the case? Is there another side to that argument?

Mr. BROWN. Maybe not three years but it would be something a lot less than we have become accustomed to.

Mr. LEHMAN. Is there—let's just get it on the table here then. I'm not hiding behind a 40 year contract and I think that's what Mr. Miller was trying to get to. Is there a period of time at which you can continue lending as you do now? And, by the way, the shorter you make the terms the higher you make the payments.



All of this is factored into the economy. But is there a life—let's not stick with 40 here.

Mr. BROWN. We can make the crop loans. We can do the annual loans. We can do the short term loans, certain part of our banking system. The Federal Land Bank, which is the element of our system that makes the long term loans, would probably be out of business. There would not be any long term credit available because with that kind of uncertainty there would always be the threat hanging over us that every time the contract is renewed there's going to be another increment of water loss.

Mr. LEHMAN. Let me ask you this: most of the farmers I know are doing everything they possibly can to get to high tech water conservation. They understand that clearly and it has to be done for their own economic benefit. The only way that they do that is to borrow money. Am I just out of the ballpark here to suggest that this kind of restriction on the contract could have an impact on your ability to make the kind of improvements necessary to use water more efficiently?

Mr. BROWN. There is no question that we think this would. The interesting thing about the bill is it requires reduced contracts, water being given up for fish and wildlife purposes. But then there is a third element which is penalty, financial cost penalty for doing those things. Twenty-five percent transfer tax, cost for metering ground and surface water, a surcharge on CVP water and power sales, a possible cost to prepare a plan to mitigate. Not only are you taking water and reducing periods but you are taking money with it which, again, impacts our ability to provide services.

Mr. LEHMAN. Has the discussion we have been having back here on these issues and the uncertainties over the supply already had an impact on lending?

Mr. BROWN. We are much more conservative now. We are not making nearly the loans we have been making because of all of the uncertainty that is surrounding environmental regulations, the future of water supplies and being conservative and trying to protect our cooperative farmer lenders. We are just not making the loans we used to make for most of these same kinds of reasons. It has dramatically dropped, if that is the question you are asking.

Mr. LEHMAN. Tom, I just hope that we can put into this discussion and into the solution some of the things that we have talked about here in terms of the impacts that it has on real people. We sit and talk about farmers. We understand that every one of those farmers has many employees. And Cal is a farmer, he can probably tell you how many to an acre are employed there. And the effect of unemploying those people—let's face it, these are not high paying jobs. These are not people who have lots of ability to move to San Francisco and take up computer programming. Maybe we should provide that for them but, you know, that impact is real. Let me tell you, the farm workers I have talked to, these aren't people being herded out at the point of bullwhips to make statements. They are genuinely concerned about this.

I just think we should try to do something. No one wants to kill the Pacific Flyway, as I said earlier. We can find reconciliation with the salmon people, let's not go out and meat cleaver, destroy

this whole economy and the people who have made their living in it.

Mr. GRAFF. At the risk of getting in trouble with your own constituents I would like to acknowledge some of the things that you have done for environmental values. But I also——

Mr. LEHMAN. I have done my share.

Mr. GRAFF. On the other hand I think it is also clear that the bill before this Committee, and I think the efforts of Senators Bradley and Johnston in the Senate, I think they genuinely attempt to reach out to the agricultural community and say that we are providing you with some offsetting benefits to offset some of the reductions in very generous benefits in that community and your community over time. I understand you are not embracing that effort but I think it ought to be clear that we are reaching out to try to do that.

And I cite at least two of those things: 20 year contract renewals. That is a long period. And the ability to profit from the sale of subsidized water which I know some of my constituents, if you can call them that, are quite skeptical of. Those are both in the bill and do have a positive impact on agriculture.

Mr. LEHMAN. Thank you.

I want 30 seconds here. As you pointed out on numerous instances there, and as I tried to do earlier, we have tried to be responsible. We have protected many of our rivers. We have tried to protect our watershed. We have set aside land. We are not here to destroy the place that we live in.

Mr. MCGILL. Congressman Lehman, would you mind asking me the question that you said you should have asked me so I can answer that question?

Mr. LEHMAN. I am interested in any economic analysis of the effect of urbanization in San Francisco on the environment.

Mr. MCGILL. With regard to the operation of Hetch-Hetchy?

Mr. LEHMAN. I took that as one example. Mr. Miller can talk about the infill in the Bay. He knows it much better than I do. We can talk about the land mass itself, that doesn't have any—well, forget it.

Mr. MCGILL. So you don't want me to answer?

Mr. LEHMAN. By all means.

Mr. MCGILL. First of all, San Francisco, I would argue, behaves much different than most California cities in its attitude toward the environment and the operation of its economy vis a vis the environment because it has such a high density population per acre. There is such a tremendous amount of transit service provided so that as of right now about three fourths of all trips into downtown during the peak commuter period are in transit or car pools so it minimizes energy consumption and it minimizes air pollution.

It also has a unitary sewage treatment system so it is not a source of pollution to the Bay from run off or sewage effluence. It built Hetch-Hetchy because the Raker Act was passed. It paid for Hetch-Hetchy entirely itself with no federal or state financing involved. It has imposed mandatory water rationing as a result of the current six year drought that the city has experienced.

It is imposed on itself and the 2.6 million people that it serves on down the peninsula to Silicon Valley.



You can also consider the third party impacts of the operation of the present water system in California on the Bay area. Last year, as you are well aware, the Endangered Species Act was involved as a reason to stop the disposal of dredge materials in San Francisco Bay. Thanks to the intervention of Congress this did not occur but the rationale was whether the Chinook salmon was endangered, that the dredging contributed to the endangerment and therefore dredge disposal must cease in the Bay. Every year 10 million cubic yards of sediment flow into San Francisco Bay from up stream and if dredging does not occur deep sea shipping activity, ferry boat service, pleasure boating ceases. A study that the Corps of Engineers commissioned found that within five years if dredging ceased, of the annual $5.5 billion of revenue generated by the shipping industry in the Bay area, there would be an annual loss of $3.3 billion.

So there is a very serious problem, as I have already alluded to, as well as in Silicon Valley with the economic health of San Francisco Bay because of the present operation of the water system in California.

Mr. LEHMAN. I appreciate that and my point is that the water from Hetch-Hetchy is not going into the Bay. It is not helping any of those things, it's going directly into San Francisco. We can put it through the Bay, you can take it out someplace else—and we can argue all of this—but I appreciate your statement on the behalf of citizens of San Francisco.

Chairman MILLER. Mr. Rhodes.

Mr. RHODES. Mr. Brown, can you tell us what an acre-foot of agricultural water in the Central Valley Project is priced at now?

Mr. BROWN. I think it varies. Historically, it was $3.50 an acre-foot for the non-Friant users who are contractors. Then, when the St. Louis unit came in the price went up slightly and there was a long history of litigation to the point where I think now that unit is paying—and it could be less than $15 an acre-foot. I believe as contracts are now being renewed for the Friant division and eventually for the canal in Sack Valley the price is scheduled to go up into the neighborhood of $10–15, that general range.

Mr. RHODES. Go up by $10?

Mr. BROWN. No. To that level. And, by comparison, Congressman Miller mentioned earlier straight project water roughly comparable climatological and soil areas is three or four times that, $30 or $40, some cases even more.

Mr. RHODES. Have any of you, Mr. Brown or any of the rest of you, have you calculated what the cost of agricultural water per acre-foot would be if 5099 were law today?

Mr. BROWN. No, we have not. It would vary so tremendously depending on the other costs that are associated with providing water. And that is just one cost. The district passes on to its members. It also has its own costs which can be very significant, in many cases three or four times what the Bureau cost is. There are many other costs involved with providing water.

Mr. RHODES. I understand that but I'm specifically asking if 5099 were the law—I'm trying to get a feel for his statement—what the impact of the pricing provisions in 5099 would be on the cost of an acre-foot of agricultural water?

Mr. BROWN. Assuming we would go from a 30 year loan down to a 10 year loan?

Chairman MILLER. Assuming 40 to 20.

Mr. RHODES. Yes, that's fine.

Mr. BROWN. I don't have that information but we would be glad to try to generate it for you.

Mr. GRAFF. I might be able to help. The $30 million surcharge, which is the main new pricing provision, it is a little obscure how much of that would be water users and how much power users. But if you take the worst case from the water users perspective you would hear from the power users later that they don't want to pay any of that. You're talking $30 million over, say, four or five million acre-foot water sales components. So that is six or seven dollars an acre-foot extra.

Mr. RHODES. Can you give us an estimate of what it costs to pump an acre-foot of water in the Central Valley Project?

Mr. ERROTABERE. I think I can answer that. We have some wells on our ranch. The total power cost in addition to the capital repayment of the wells in interest and such runs us about $60 to $70 an acre-foot.

Mr. RHODES. $60 to $70 to pump an acre-foot. And what are you paying for CVP water?

Mr. ERROTABERE. We're paying about $33. That is all of the components put together. The water quality though, on the deep wells are considerably worse quality than the surface water so it is not a very good long term option to keep pumping those waters and it is very punitive to pump.

Mr. RHODES. I guess the question I would like to ask—and I guess I will ask it of other panels as well—do you have information available to you, any of you, that could tell us what the economic impact of 5099 would be on the operations of the Central Valley Project itself? I presume CVP is still required to recover its costs, to be able to cover its operation and maintenance expenses. I simply don't know if there is any repayment obligation left in CVP but if you take a million and a half acre-feet off of the top of its available supply for which nobody pays then you parcel out the remainder among some beneficiaries who do pay and some who do not, some who pay full costs and some who do not, under the terms of 5099 have any of you done the empirical data collection and analysis to determine what the impact of this bill would be on the Project itself, on the ability of the Project to sustain itself?

Mr. ERROTABERE. I can only comment from the growers' perspective, that without water it is hard to assign a cost impact when we don't have any. In addition to the $30 million charge that would be added on top just an observation is it would be high.

Mr. GRAFF. GAO did a study last fall which laid out the amount by which the CVP is in arrears to the Treasury and I think the number is five or six million out of seven. It is not like the Central Arizona Project which at least has to pay a substantial part of its cost back. The CVP does not, or hasn't at least.

Mr. RHODES. You're talking about capital repayment.

Mr. GRAFF. No, it's capital and operating. Basically it is historic data operating expense that they have to also make up.



Mr. RHODES. I guess what my concern is do we know or can we find out what the impact of 5099 would be on the operating costs of the CVP and then to the extent that there shortfalls in that who makes it up? Do we?

Chairman MILLER. We would be making it up as we do today because we provide $460 million a year in subsidies to the operation of this project. Half a billion dollars a year goes into the operating subsidies of this project.

Mr. RHODES. Do we have any level of confidence that the enactment of 5099 would increase, decrease or leave that operating subsidy the same?

Chairman MILLER. Well, we envision that those changes in the project would be spread over the—theoretically it would not have an impact on that because they would have to pay for those improvements or the changes, the various projects the state has undertaken and the Feds would join in. We are sending the bill to people for those.

Mr. RHODES. I understand that. And you're sending the bill to people in the form of the amount that they pay for their water. And the follow on question is do we know at what point in time that we're going to bill them to the point that they're going to stop taking the water and turn their pumps back on? I'm just asking do we know the answers to those questions.

Chairman MILLER. They would never come close to this but the state, you know, water project water users are still taking the water, the $50 an acre-foot.

Mr. LEHMAN. On that point, those then who don't—there would be much less water purchased, at least a million and a half acre-feet less so that the cost would be spread both over less acreage and less water, correct?

Mr. RHODES. That's right.

Mr. LEHMAN. No analysis has been done on that?

Mr. RHODES. The million and a half acre-feet of water has to be transferred from someplace to someplace else. That costs money and the fish don't pay for it.

Chairman MILLER. Some of it can just be left in the river, thank you.

Mr. RHODES. There's no cost associated——

Chairman MILLER. What are you going to charge the federal government for the water? Are you going to charge us $3 or $1.50 as some of the farmers are getting it? Are you going to charge us $60 when it is made available to farmers?

Mr. RHODES. We know what is analogous to an instream flow doesn't get charged. That goes without saying. But there is still costs associated to a million and a half acre-feet and presumably somebody is going to pay those costs. I'm just wondering—obviously the answer is no but the question was do we know how much that is going to increase the cost to the other beneficiaries?

Chairman MILLER. Mr. Dooley?

Mr. DOOLEY. Yes. Mr. Graff, I would like to get back to some of the figures. Would you agree that since 1974 the average deliveries by the CVP has been about 6 million acre-feet? I have basically a report that identifies the annual flows which are annual deliveries. That's what they came up with.

Mr. GRAFF. Including prior rights or not including prior rights?

Mr. DOOLEY. Including prior rights.

Mr. GRAFF. I will accept your number.

Mr. DOOLEY. Then if we say that 5099 was put into place with this six million and then we make the corresponding reductions of the 25 percent reduction in the prior rights, which is about three million acre-feet, which would take that down to 2.25 we still have the provisions to provide for some of the Trinity water, the duct water, and then we also factor in what would be required as a result of 5099, the one and a half million. I would assume that would maybe even include the 100,000 that is going to be offered up front to municipal users and maybe make a 25 percent reduction in that which gets us down to 1.2 which gets us about four million acre-feet that is allocated to prior rights contractors plus some of the other provisions included in the legislation.

Does that seem in the ballpark probably?

Mr. GRAFF. You went awfully fast but if I didn't follow I will respond.

Mr. DOOLEY. We say we have four million acre-feet out of six million acre-feet that has already been allocated. We have 800,000 M & I which we might see some reduction in, debatable at times. And we could get to the point where we would have about a million to maybe 1.5 million acre-feet of water that is left to serve the service contractors. What would be the average annual deliveries over the last 18 years?

Mr. GRAFF. In fact, we have been trying to look into those numbers. A big question that agriculture actually has to face on its own is how it is going to react to the historic difference—I was almost going to use the word inequity—between the prior rights and exchange contractors on the one hand and the CVP contractors on the other. As you know, Westland's water district has filed suit against the Bureau of Reclamation.

Mr. DOOLEY. I think the status—there is nothing in this legislation which is changing any of that.

Mr. GRAFF. That's right. As I indicated in my answer to Congressman Lehman, one of the effects of the legislation is to impact disproportionately the contractors as opposed to the prior rights.

Mr. DOOLEY. In effect, what would happen is that what we're seeing, we would see the service contractor provided with about 25 percent, about one million acre-feet. If 5099 was in place for the last 18 years they would have been getting on average 25 percent of the deliveries, the same as they are getting now. Would that be accurate?

Mr. GRAFF. Well, I don't know. Actually what I think we can do for you, we can send you a detailed—what's the right word—summary of what would have been the case under, say, a 20 year hydrology, under what we think are reasonable assumptions. And what we come out with is if you had equity between all of the contractors then the total deliveries would be over that period something like 80 to 90 percent of what actually was delivered. And if you didn't you would end up with substantially less for the contractors and somewhat more for the prior rights and exchange contractors.



Mr. DOOLEY. I would question that just on the basis of if it is, in fact, six million on average that has been delivered—let's take the prior rights contractors clear out of the mix and move them down to the same as the ag service contractors. Basically the only thing you're gaining then is the 25 percent that they have not, you know, that has been the limitation on them.

So you're spreading it over a larger number of people and maybe you're spreading it over twice as many so we would get everybody then shorted by 50 percent which would make the numbers match because you've got about the same number of prior rights contractors as you do service contractors in terms of volume. So basically the legislation, even if you went through that way, would result in 50 percent across the board reduction.

Mr. GRAFF. It wouldn't. One of the things that the Department of Food and Agriculture study "doesn't account for" is that in wet years you can still deliver the full six million to contractors and 1.5 to fish and wildlife and not short anybody. In fact, you've got water left over.

Mr. DOOLEY. But the fact is in the last 20 years there haven't been, on average, enough wet years. On average we have only delivered six million acre-feet.

Mr. GRAFF. Yes. That's one of the problems we have as well, I might point out, because in the first four years of the drought, which, as you point out, were not wet the six million were delivered and what happened was fish and wildlife didn't get anything.

Mr. DOOLEY. I guess you can understand the dilemma that we are faced with is when we are faced with a piece of legislation which is going to automatically impose in what is a normal situation as documented over the past 18 years, an average 25 percent delivery to our communities, and not just agriculture, it is difficult for us to be at least supportive of it without seeing significant changes.

I would like to touch just a little bit on Mr. McGill. You made some comments and one of your statements in your testimony is our legislation 'fails to treat fish and wildlife as a primary purpose of the CVP, so that creating a firm baseline for the environment is impossible'.

What I then also understand, or assume, that you would also say that whether it be a state water development project, whether it be a private water development project that there should be prioritive purpose for fish and wildlife?

Mr. MCGILL. Our report does not merely address the CVP. It addresses water allocation in California in general.

Mr. DOOLEY. If we have Mr. Graff, whose organization has made an assumption that it would take approximately 30 to 35 percent of the developed water in the CVP for environmental purposes as a ballpark figure and you support something along that line then your organization would also be willing to support a 35 percent reduction in the private water projects, including Hetch-Hetchy, and the state water projects in order to provide that water for environmental purposes?

Mr. MCGILL. We do not have the expertise to say 1.5 million acre-feet is the proper number. However, the point of my testimony is that in your legislation in dry years water is disproportionately

Case 1:04-cv-00541-CCM Document 120-5 Filed 10/05/2006 Page 10 of 12



taken from the environment versus the contractors whereas in H.R. 5099 the reductions are made in equal proportions.

Mr. DOOLEY. If we were going to say though, that this is a level objective—and maybe we ought to be providing the environment a higher priority even in dry years, that this is something that ought to be embraced not only in the federal projects but in state and private projects—then would you in the Bay area be willing to advocate for the operations of Hetch-Hetchy, that, because the environment has to be a primary project purpose that they should take priority?

Mr. MCGILL. One thing you ought to consider is that Hetch-Hetchy right now is required to release minimum fish flows. There would not be——

Mr. DOOLEY. What kind of salmon run would we have in the aqueduct at Hetch-Hetchy?

Mr. MCGILL. Right now, what if Hetch-Hetchy were demolished. The entire flood that goes into Hetch-Hetchy would go into Don Pedro. Don Pedro hardly ever spills so it would make no difference to the San Joaquim River is Hetch-Hetchy were demolished.

Mr. DOOLEY. That is assuming status quo even on Don Pedro.

I think what we had all committed ourselves to is that there is not going to be a status quo in the federal project.

Mr. LEHMAN. Would the gentleman yield?

The point is when it's your water you take the same attitude that we do and that's what I find, you know—

Mr. MCGILL. First of all we are not arguing about noble objectives, okay? We're saying that the environment—

Chairman MILLER. What do you mean?

[Laughter.]

Mr. MCGILL. Economists don't use words like noble. The environment is an externality.

The market can not solve the environments problems so somebody has to and then you know how much water is left to distribute. You firm up the rights so they don't lose them. If you sold them you'd create a free market so they could be traded and you regulate the delivery systems as common carriers so the water can get from seller to buyer. That is basically our scheme.

We do not have the scientific expertise to tell you what the proper flow is for the Bay/Delta Estuary or other rivers and streams and wetlands in the state of California. We do know that there has to be an adequate baseline guaranteed by state, federal, private, local, public districts and those guarantees have to be established based on sound scientific evidence.

Mr. DOOLEY. You would also endorse the concept of the equal sharing of all of the people who contributed and participated in water development in California?

Mr. MCGILL. For the specific environmental characteristics related to the operation of their system.

Mr. DOOLEY. I would like to touch on one other point in 5099. If you accept that we're only going to have a 25 percent aggregation to our ag service contractors that certainly impacts the marketability of those contracts, I would assume. Have the economic studies been done on what is the value of something in this new world



when you're only going to have water being available very seldom, actually?

Mr. MCGILL. Again, we don't say 1.5 is right or wrong. I am a little concerned about the application you are following. For instance, right now in California, as I understand it—and I'm not a lawyer—the Raconelli decision is the basis for the State Water Resources Control Board to establish appropriate flows for the Bay/Delta Estuary. The Raconelli decision specifically says that all existing water rights should be considered vulnerable to meet those minimum flow requirements. It doesn't mean just CVP. That means—And it doesn't mean just CVP minus the prior rights of CVP. It says all water rights in California should be considered vulnerable in the Bay/Delta——

Mr. DOOLEY. I would not quarrel with that. I wanted to make sure that I was convinced that your commitment to providing for environmental mitigation was just as strong in some of the projects which you are benefiting from, your region is benefiting from, as is so important to the economy of the valley. Because what Rick Lehman and many of the others of us who represent the valley are seeing right now is that we are asked to shoulder the burden. Our economy is the one that is being asked to suffer the greatest negative consequences to provide for the environmental mitigation that has resulted not solely from the CVP but from private projects and from the state water projects. It is a disservice to our constituencies if we do not provide effective representation, advocacy on their behalf.

The other issue I want to touch on with you is you support and your organization supports basically the free marketing of water. You state that we should not be concerned about any threat of an Owens Valley situation because you only want 10 percent of the water and whatnot. But you do not have any limitations on what an individual could do such as Mr. Errotabere, who can sell his service water and then draw on the underground resource, which is a public resource, which then is mining that and causing the economic degradation of the entire region.

Mr. MCGILL. We propose more controls over ground water than you do in your legislation. Your legislation says for every transfer that occurs from inside to outside the CVP a 25 percent tax should be charged, one half of which is allocated to replenishing ground water and overdrafted basins. Yet you make no mention or provision for the management or even monitoring of groundwater drafts. Therefore the taxes put in the ground to replenish the groundwater and there is no control whatsoever to see who draws what from that groundwater basin.

Mr. DOOLEY. Actually that is not entirely accurate. What we do is establish a 20 percent tax, you're right. We identify what is the net water consumed by the plant. That is the water that we allow to be transferred. What we then provide for is that water that is allowed to be transported that only 80 percent of it can go out. What it also requires is the land which that surface water is being serviced or provided to has to go out of production. It has to go fallow. So, in fact, what we are doing—our intent was obviously to ensure that the ground water was not negatively impacted. And it can not happen.

And I'll tell you, I take great offense at people who insinuate that water districts have an absolute veto, which has been indicated by Mr. Graff as well as yourself, over our transfer provisions. They absolutely do not. If an individual land owner has the willing buyer for water they are able to sell up to 20 percent of the water which is provided that district providing they ensure that there is not a net negative impact on the groundwater. The district has no legal authority. If they do veto it when they meet those requirements they are in violation of the law as any other person has violated a law that would pass this institution. They do not have a veto.

Mr. McGill. Well, Congressman, it is true that a buyer could say that a district's refusal to sign their contract of sale constituted a violation of your law and they would go to court at great expense and time to win the case. Now, perhaps a large, urban water district or a large agricultural land owner or farmer could afford the time, cost and delay imposed by that kind of process when most people can not.

Our concern is that there is a pyramiding of restrictions and conditions on the transfer process that, taken in its totality, is especially cumbersome and discouraging toward transfers.

Now, the Katz bill in Sacramento, which we have endorsed, has similar provisions on fallowing, on the total amount of water that may be transferred out of a district. It tries to discourage the Owens Valley syndrome. It also has criterion that must be honored by an agricultural water district complaint. If it says we're losing money and here is why or if it says we are screwing up our operations and here is why it's got to be recognized and compensated as part of the transaction. But at the end the water district is not the final judge and the water districts do not have the incentive that an individual land owner or farmer does to make a profit selling water.

Mr. Dooley. And I would not have any problem with perhaps putting in an arbitration process within ours but the bottom line is your insinuation is the water district is the final judge and that is absolutely false. The final judge in this case would be when it did go to court, when a determination is made whether or not it lived up to the mandates that were written into this law. And if we need to make some changes in order to facilitate this.

But my concern is if you go in and advocate basically an open marketing for water it has the potential to have tremendous negative third party impacts. It has the potential to lead to people who are profiteering from water, which, quite frankly, none of us want to see federal water contractors necessarily unfairly benefiting from inability to market their market. That's our concern in that instance is you have to have reasonable restrictions to ensure that the impacts are not devastating to a particular region.

Chairman Miller. Any additional questions?

Mr. Dooley. One more follow up.

It's kind of like—you know, the Chairman's bill and others, you state that they want to have transfers subject to state laws. In this case when there is no state law out there it is kind of like committing yourself to a contract without knowing the conditions.



Mr. Graff, how do you have confidence that state law is going to be better than what we are proposing in our bill?

Mr. Graff. I think the main problem with trying to legislate a complex set of requirements in federal law that apply only to CVP contracts is you're going to end up with two sets of complex laws because the state has already legislated and will continue to legislate in the field and you're going to end up with inconsistencies and basically chaos as a result.

Ironically—and we have discussed this obviously with both CVP contractor representatives and with urban interests, particularly metropolitan—both of them believe that the state legislature is hostile to their interests. I certainly believe the state legislature is hostile to our interests.

But you really need to have one law on transfers for California and I think we all are going to have to end up taking our chances in Sacramento on that point. I think the only real federal interests that need to be protected are the financial interests of the United States. I think what is justified is a general policy that says transfers should be allowed by not just districts but individuals because the Bureau of Reclamation has taken the point of view up, until now anyway, that individual growers can not sell water. It has to be districts. But beyond that I think we all ought to take our chances in Sacramento.

The one thing that has come up in discussions over the last few months is maybe there needs to be a transitional period. Federal law applies for a period until Sacramento can get its act together. Unfortunately, Governor Wilson hasn't exactly been cooperative on this point so maybe that is justified. Ultimately I think you want to have one law governing transfers in California.

Mr. Dooley. I want to make one last point.

In our discussions with you, Tom, and others a lot of the substantiation for your flows and whatnot are based on the State Water Resources staff report that was out in, I guess, '88, which obviously some of us that content that perhaps it was not the most substantive or backed up by the documentation and science as is needed for it to be accurate and I guess the basis for making some of these critical decisions. I know that you contend that there was a lot of politics involved with that report being thrown out.

But I would like to bring attention to the Committee report that came out of the last Congress dealing with the Chairman's CVP bill at that time in which it states "To date very little information has been developed to determine the specific in steam flows necessary to ensure successful reproduction and the survival of the early phases in the main rivers and streams in the Central Valley". This is dealing with the salmon. And then it goes on further to say "Without this knowledge it would be difficult, if not impossible, to ensure the proper balance among all water needs".

I would just contend that I haven't seen any subsequent studies to this 1990 report that we have had here that has really given us the body of knowledge that allows us to correctly and accurately assess what those in stream flows and some of these things that are so necessary to providing well benefits to the fish.

Mr. Graff. That was a board report until the contractors trashed it and then it became a staff report. Secondly, for the agricultural

community to say that an administration project—and remember, this isn't Jerry Brown—that finally after several decades of study indicated that some additional springtime outflow was necessary to protect the Bay/Delta Estuary, which anybody who has ever studied that system would have to agree is required, that that is somehow an illegitimate basis for us environmentalists to rely on in saying water is, in fact, needed for fish and wildlife I think is just improper.

The fact is we asked. Somebody indicated earlier, my colleague here on the panel, that originally we thought something on the order of five to six million acre-feet was required if you really wanted to protect the estuary and that is a compromise number itself. It is not unreasonable.

Mr. DOOLEY. I don't contend it is unreasonable to assume that we need additional water to flow out to the Bay. And I think all of us will agree that any legislation that passes is going to result in that.

I guess the concern we have is we have one and a half million out there. We don't know how much of that is actually through Delta out into the Bay. We don't know how much of that can be used to meet multiple objectives.

I guess in order to develop the most comprehensive and equitable policy it is difficult without us finding ourselves being polarized and making our arguments based on sometimes not on the most sound science but basically out of fear, which is happening here. We have the environmental community making their arguments out of fear oftentimes. You have myself, you know, trying to substantiate the views of my constituencies which is out of fear because of what we see as a very real threat of this legislation.

And hopefully we have the opportunity here to document what some of these real flows can mean so that we can convince our relative constituencies of yes, we can achieve the objectives of this legislation without causing the devastation of a region, the economy of a region.

Chairman MILLER. Rick, do you have any further questions?

Well, let me thank you for your time and your testimony and the work that you have done on this issue. Obviously you can see from this discussion that has taken place after your testimony we are kind of down to the nub of the issue and that is that there is very few places where you can, in fact, get the water.

The question is how will we equitably do that? And the water is now under contract. Some of that water is going to have to be released in the original Central Valley fish bill Congressman Lehman made it very clear that this was going to be a shared experience by everybody in the state. It is not just the rural folks that have screwed up the environment here. Everybody has their own favorite project whether they are developing power or water and that is going to have to be a state wide contribution to this problem. The water is going to have to be a part of that and that is what we are negotiating over.

I really think that there has been—I guess there will continue to be for some time, hopefully members have seen it all before, there is just wild accusations made on almost every side of this issue about what will or will not happen. The fact is that people understand that that is really not how the policy is, in fact, going to evolve. And there will be change.



You know, I find it rather interesting that—to suggest that this is a unique experience to the Central Valley when, in fact, businesses all over my district and all over the state of California responding to the Clean Water Act, the Clean Air Act and all kinds of proposals which are causing them to make internal changes and efficiencies and doing business in a different fashion, responding to the market.

And that has happened to every sector of our economy and we cannot hold agriculture harmless in that process. And that is not to suggest that they are, in fact, doing nothing but clearly the decision was made 30 years ago to punch a hole in the bottom of the Sacramento Delta and let the water run south. We now see the consequences. Owens Valley showed it very early. These consequences have now evolved over a period of 25 or 30 years. We may not clearly understand the impact of continuing to allow the status quo; hopefully, we will be able to forge an agreement. I want to thank the panel very much for helping us arrive at that point.

Thank you.

[Panel excused.]

**PANEL CONSISTING OF JAY GILLETTE OF DINUBA, CA; PHIL LARSON OF KERMAN, CA; ZEKE GRADER, EXECUTIVE DIRECTOR, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INC. [PCFFA], SAN FRANCISCO; PATRICIA MULROY, CHAIR, WESTERN URBAN WATER COALITION; AND CARL BORONKAY, GENERAL MANAGER, THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, LOS ANGELES, CA**

Chairman MILLER. The next panel will be made of Mr. Jay Gillette, from Dinuba, California; Mr. Phil Larson, from Kerman, California; Mr. Zeke Grader, who is the executive director of the Pacific Coast Federation and Fishermen's Association, from San Francisco; Ms. Patricia Mulroy, chair of the Western urban Water Coalition, from Las Vegas, Nevada; and Mr. Carl Boronkay, who is the general manager for the Metropolitan Water District of Southern, California in Los Angeles.

Welcome to the Committee and, again, your prepared statements will be placed in the record of this hearing in their entirety and you can summarize or proceed in the manner in which you are most comfortable for five minutes. You can see why we are asked to impose a time limit on you because all of this stimulates a long series of questions by members.

Mr. Gillette, we're going to begin with you.

**STATEMENT OF JAY GILLETTE**

Mr. GILLETTE. Mr. Chairman, members of the Subcommittee, my name is Jay Gillette. I live in Dinuba, California, a rural community of approximately 13,000 people. Like the majority of my neighbors my family farms citrus and relies on the water supplies of the Central Valley Project. My family has farmed citrus in California since the late 1800s. Originally we were located in Southern California but due to urbanization we were forced to move north.