**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT, SAN JOAQUIN COUNTY, STOCKTON CITY, CALIFORNIA WATER SERVICE COMPANY, | ) | |
| Plaintiffs, | ) | No. 04-541 L |
| v. | ) | Judge Christine Odell Cook Miller |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Div.

WILLIAM J. SHAPIRO
United States Department of Justice
Environment and Natural Resources Div.
Natural Resources Section
501 I Street, Room 9-700
Sacramento, CA 95814

KRISTINE S. TARDIFF
United States Department of Justice
Environment and Natural Resources Div.
53 Pleasant Street, 4th Floor
Concord, NH 03301

LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 663
Washington, DC 20044-0663

October 9, 2006

OF COUNSEL:

SHELLY RANDEL
United States Department of the Interior
Office of the Solicitor
Branch of Water and Power
Division of Land and Water Resources
1849 C St., N.W.
Washington, DC

JAMES E. TURNER
Assistant Regional Solicitor
United States Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825

## TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . v

DEFENDANT'S PRETRIAL MEMORANDUM . . . . . 1

I. INTRODUCTION . . . . . 1

II. DEFENDANT'S CONTENTIONS OF LAW REGARDING THE FEDERAL AND STATE LAWS WHICH IMPACT CVP OPERATIONS . . . . . 3

A. Federal Reclamation Law and the Authorizations Governing the Construction and Operation of the Central Valley Project . . . . . 4

1. Flood Control Operations . . . . . 4

2. New Melones Yield Studies . . . . . 6

3. The Central Valley Project Improvement Act . . . . . 8

B. State Law Permitting the Use of Stanislaus River Water and Affecting the Operation of the CVP and New Melones . . . . . 10

1. Background Principles of California State Law . . . . . 11

a. Public Trust Doctrine . . . . . 12

b. Doctrine of Public Ownership of Wildlife . . . . . 13

c. Doctrine of Reasonable Use . . . . . 13

2. Reclamation's State Permits for New Melones . . . . . 16

a. Reclamation's 1973 State Permits . . . . . 17

b. Reclamation's 1988 State Permits . . . . . 21

c. The 1999 Revisions to Reclamation's State Permits . . . . . 23

III. DEFENDANT'S CONTENTIONS OF LAW AND FACT REGARDING THE CONTRACTS . . . . . 25

A. The Contracts Are Subject to Future Reclamation Laws . . . . . 26

B. Article 9 Limits Reclamation's Liability for Shortage of Water . . . . . . . . . . . . 28

1. The Contracts Give Reclamation Broad Discretion in Making Decisions About the Availability of Water . . . . . . . . . . . . . . 28

2. The Phrase "Which, In the Opinion of the Contracting Officer Are Beyond the Control of the United States" Does Not Limit the Shortage Provision in Any Significant Way . . . . . . . . . . . . . . . . . . . 30

C. Reclamation's Operations of New Melones Reservoir from 1993 to 2004 Did Not Breach Plaintiffs' Contracts . . . . . . . . . . . . . . . . . . . . . . . 37

1. The Contracts Require Plaintiffs to Submit Annual Water Schedules . . 37

2. Reclamation Did Not Breach the Subject Contracts in 1993-1996 . . . . . 38

i. Reclamation Did Not Breach the Subject Contracts in 1993 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ii. Reclamation Did Not Breach the Subject Contracts in 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

iii. Reclamation Did Not Breach the Subject Contracts in 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

iv. Reclamation Did Not Breach the Subject Contracts in 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

3. Reclamation Did Not Breach the Subject Contracts in 1997-Present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

i. The Interim Plan of Operations . . . . . . . . . . . . . . . . . . . . . . . . . 42

ii. Reclamation Did Not Breach the Subject Contracts in 1997-1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

iii. Reclamation did not Breach the Subject Contracts in 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

iv. Reclamation Did Not Breach the Subject Contracts in 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

v. Reclamation Did Not Breach the Subject Contracts in 2001 . . . 46

vi. Reclamation Did Not Breach the Subject Contracts in 2002 . . . 47

vii. Reclamation Did Not Breach the Subject Contracts in 2003 . . . 47

viii. Reclamation Did Not Breach the Subject Contracts in 2004 . . . 48

ix. Allocations After 2004 . . . 48

V. THE SOVEREIGN ACTS DOCTRINE AND THE UNMISTAKABILITY DOCTRINE PRECLUDE A FINDING THAT THE SUBJECT CONTRACTS WERE BREACHED . . . 49

A. The Sovereign Acts Doctrine Precludes a Finding a Liability . . . 49

1. The CVPIA is a Sovereign Act . . . 51

2. It Was Not Possible To Comply With CVPIA Without Using Water From New Melones Under CVPIA Section 3406(b)(2) . . . 55

a. Plaintiffs' Articulation of the "Impossibility" Standard is Not the Correct Legal Standard . . . 55

b. The Other 248 CVP Water Service Contracts Are Not Relevant to the Impossibility of Performance Inquiry . . . 58

c. Plaintiffs' "Physical Impossibility" Argument is Misplaced . . . 60

B. The Contracts Do Not Contain Unmistakable Terms Exempting Plaintiffs From the Application of Future Legislation . . . 63

V. PLAINTIFFS HAD NO CONTRACTUAL RIGHTS UNTIL AFTER THEIR WATER CONSERVATION PLANS WERE APPROVED . . . 64

VI. THE THIRD PARTY PLAINTIFFS ARE NOT INTENDED THIRD-PARTY BENEFICIARIES OF THE SEWD CONTRACT . . . . . . . . . . . . . . . . . 65

A. The Third Party Plaintiffs Are Not Identified as Intended Third Party Beneficiaries in SEWD's Contract . . . . . . . . . . . . . . . . . . . . . . . . . . 66

B. An Intent to Directly Benefit Water Users SEWD's Contract Would Be Contrary to Reclamation Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

C. Extrinsic Evidence Will Not Unequivocally Demonstrate That The Third Party Plaintiffs Are Intended Third-Party Beneficiaries . . . . . . . . . . . 69

VII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

# TABLE OF AUTHORITIES

## FEDERAL CASES

Allegre Villa v. United States,
60 Fed. Cl. 11 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Amber Resources Co. v. United States,
68 Fed. Cl. 535 (Fed. Cl. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Barcellos & Wolfsen, Inc. v. Westlands Water Dist.,
849 F. Supp. 717 (E.D. Cal. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Barcellos and Wolfsen, Inc. v. Westlands Water Dist.,
899 F.2d 814 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

California v. United States,
438 U.S. 645 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

Carabetta Enterprises, Inc. v. United States,
58 Fed. Cl. 563 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Casitas Municipal Water Dist. v. United States,
No. 05-168L, slip op. (Fed. Cl. Oct. 2, 2006) (Weise, J.) . . . . . . . . . . . . . . . . . . . . . 55-58

Centex Corp. v. United States,
395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Central Delta Water Agency v. Bureau of Reclamation,
452 F.3d 1021 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Central Delta Water Agency v. United States,
306 F.3d 938 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Coast-to-Coast Fin. Corp. v. United States,
45 Fed. Cl. 796 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

German Alliance Ins. Co. v. Home Water Supply Co.
226 U.S. 220 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Glass v. United States,
258 F.3d 1349 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

H.F. Allen Orchards v. United States,
749 F.2d 1571 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68

Henderson County Drainage Dist. No. 3 v. United States,
53 Fed. Cl. 48 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Horowitz v. United States,
267 U.S. 458 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Jones v. United States,
1 Ct. Cl. 383 (1865) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Klamath Irrig. Dist. v. United States,
67 Fed. Cl. 504 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Klamath Water Users Protective Ass'n v. Patterson,
204 F.3d 1206 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Natural Resources Defense Council v. Patterson,
333 F.Supp. 2d 906 (E.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Natural Resources Defense Council v. Houston,
146 F.3d 1118 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Orff v. United States,
358 F.3d 1137 (9th Cir. 2004), aff'd on other grounds,
125 S. Ct. 2606 (2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

O'Neill v. United States,
50 F.3d 677 (9th Cir. 1995), cert. denied,
516 U.S. 1028 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 32, 52, 63

O'Neill v. United States,
231 Ct. Cl. 823 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Peterson v. U.S. Dep't of the Interior,
899 F.2d 799 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

R&B Falcon Drilling Co. v. Am. Exploration Co.,
154 F. Supp.2d 969 (S.D. Texas 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Roedler v. Dept. of Energy,
255 F.3d 1347 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 68

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002), affirming, 41 Fed. Cl. 401 (1998) . . . . . . . . . . . . . 36, 61

Smith v. Central Arizona Water Conservation District,
418 F.3d 1028 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Stockton East Water Dist. v. United States,
70 Fed. Cl. 515 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Stockton East Water Dist. v. United States,
No. CV-F-93-5896 OWW, slip op. (E.D. Cal. Nov. 4, 1996) . . . . . . . . . . . . . . . . . . . . . 52

Transatlantic Fin. Corp. v. United States,
363 F.2d 312 (Fed. Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Turlock Irrig. Dist. v. Zanker,
140 Cal.App.4th 1047 (Cal. Ct. App. 5th Dist. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

United States v. Nordic Vill., Inc.,
503 U.S. 30 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

United States v. SWRCB,
182 Cal.App.3d 82 (Cal. Ct. App. 1st Dist. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

United States v. Westlands Water Dist.,
134 F. Supp. 2d 1111 (E.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

United States v. Winstar Corp.,
518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

Westlands Water District v. United States,
850 F.Supp. 1388 (E.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Yankee Atomic Elec. Co. v. United States,
112 F.3d 1569 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998) . . . . . . . 49, 51, 54, 55

**STATE CASES**

Allegretti & Co. v. County of Imperial,
138 Cal.App.4th 1261 (Cal. Ct. App. 4th Dist. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cal. Trout v. Sup. Ct. of Sacramento County,
218 Cal.App.3d 187 (Cal. Ct. App. 3d Dist. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Environmental Defense Fund, Inc. v. East Bay Municipal Utility Dist.,
26 Cal.3d 183 (Cal. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Marks v. Whitney,
6 Cal.3d 251 (Cal. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Nat'l Audubon Society v. Superior Ct. of Alpine County,
658 P.2d 709 (Cal. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

People v. Truckee Lumber Co.,
116 Cal. 397 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

State Water Resources Control Board Cases,
39 Cal.Rptr.3d 189 (Cal. Ct. App. 3rd Dist. 2006), cert denied,
75 U.S.L.W. 3081 (U.S. Oct. 2, 2006)(No. 96-238) . . . . . . . . . . . . . . . . . . . 12, 17, 24, 30

United States v. SWRCB,
182 Cal.App.3d 82 (Cal. Ct. App. 1st Dist. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

**STATUTES**

43 U.S.C. § 485h(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
43 U.S.C. §§ 485h(d), (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
43 U.S.C. § 383 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
43 U.S.C. § 423e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
43 U.S.C. § 485a(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Flood Control Act of December 22, 1944,
58 Stat. 887 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26

Central Valley Project Improvement Act of October 30, 1992,
Title XXXIV, Pub. L. 102-575, 106 Stat. 4706 ("CVPIA") . . . . . . . . . . . . . . . 1, 8, 10, 27

Flood Control Act of October 23, 1962,
Pub. L. 87-874, 76 Stat. 1173 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 27

**STATE STATUTES**

Cal. Const. Art. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14
Cal. Water Code § 100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Cal. Water Code § 1260 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Cal. Water Code § 275 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15
Cal. Water Code §§ 1310-1317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Cal. Water Code § 1321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Cal. Water Code § 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
West's Ann. Cal. Fish & Game Code § 5937 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**REGULATIONS**

33 C.F.R. § 208.11 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**DEFENDANT'S PRETRIAL MEMORANDUM**

On September 25, 2006, Plaintiffs Stockton East Water District ("SEWD"), Central San Joaquin Water Conservation District ("Central"), San Joaquin County, Stockton City and California Water Service Company (collectively, "Third Party Plaintiffs"), submitted their pretrial memorandum of contentions of fact and law. Pursuant to RCFC, Appendix A, ¶ 14(b), Defendant hereby submits this responsive pretrial memorandum of contentions of fact and law.

I. INTRODUCTION

This case arises out of the operation of the Central Valley Project ("CVP"), which consists of 20 reservoirs, 11 power plants, and over 500 miles of major canals. See http://www.usbr.gov/dataweb/html/cvp.html#general (last visited Sept. 19, 2006). In operating the CVP, the United States Bureau of Reclamation ("Reclamation") is faced with what has been accurately described as "an extremely difficult task: to operate the country's largest federal water management project in a manner so as to meet the Bureau's many obligations." Central Delta Water Agency v. Bureau of Reclamation, 452 F.3d 1021, 1027 (9th Cir. 2006). These obligations include: compliance with federal reclamation laws, including the specific authorizing statutes for the CVP and its components; compliance with other federal laws, including flood control laws, the Central Valley Project Improvement Act, Title XXXIV, Pub. L. 102-575, 106 Stat. 4607 ("CVPIA"), and the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"); and compliance with California state law, including the numerous conditions set forth in the permits issued to it by the State Water Resources Control Board ("SWRCB" or "Board"). In addition, the delivery of CVP water for consumptive uses such as agriculture or municipal and industrial ("M&I") use generally occurs pursuant to water service contracts entered into between water districts and

Reclamation. Currently, there are approximately 250 such water service contracts for the CVP. The balancing of these obligations frequently requires difficult decisions regarding the allocation of a limited (and often insufficient) supply of available water. As the Ninth Circuit has explained in one of countless cases that have arisen out of the operation of the CVP, Congress recognized the difficulties presented in operating the CVP and granted Reclamation "considerable discretion in determining how to meet those obligations." Central Delta Water Agency, 452 F.3d at 1027. That discretion is preserved in all CVP water service contracts.

This case involves two of Reclamation's water service contracts. Plaintiffs allege that Reclamation breached these contracts by failing to make 155,000 AF of water available to them each year between 1993 and 2004.[1/] The parties previously filed cross-motions for summary judgment on the question of whether Defendant had breached the subject contracts during any of the years in question. In its opinion of April 10, 2006, the Court denied the parties' cross-motions for summary judgment. Stockton East Water Dist. v. United States, 70 Fed. Cl. 515 (2006). In so doing, the Court articulated the questions that need to be addressed by the parties at trial. Defendant's contentions of law and fact with respect to these question are set forth below.

The Court should find that Defendant did not breach its contracts with Central and SEWD for three independent and alternative reasons. First, Plaintiffs' contractual rights are subject to both state law and to future federal Reclamation laws. Accordingly, a reduction in the

---

[1/]Plaintiffs also allege Fifth Amendment takings claims based on the same operative facts and for the same period of time. The takings claims are stayed pending resolution of the contract claims and are not at issue in the trial scheduled to begin on October 23, 2006. See Pls.' Am. Compl. (dated Apr. 20, 2004).

amount of water available for delivery to Plaintiffs due to Reclamation's compliance with state and federal law is not, as a matter of law, a breach of contract. See discussion, *infra*, at Sec. II, III.A. Second, the contracts' shortage provisions, which give Reclamation broad discretion to make decisions about the availability of water, limit Defendant's liability for breach of contract. See discussion, *infra*, at Sec. III.B. This is especially true when one considers the annual water schedules Plaintiffs submitted and the quantities of water Reclamation delivered. See discussion, *infra*, at Sec. III.C. Finally, even if the Court determines that Defendant would otherwise be liable for breach of contract under the terms of the contracts themselves, Defendant's compliance with the CVPIA is not a breach of contract due to the application of the sovereign acts doctrine and the doctrine of unmistakability.

## II. DEFENDANT'S CONTENTIONS OF LAW REGARDING THE FEDERAL AND STATE LAWS WHICH IMPACT CVP OPERATIONS

Although the CVP is a federal reclamation project, the operation of the CVP is impacted by both federal and state law. In general, federal law governs construction of CVP dams and related facilities and ongoing operation of the CVP, including the operation of New Melones Reservoir. Applicable federal law is described below in Section II.A.

California state law also affects the operation of the CVP because federal law requires the United States, in its operation of reclamation projects such as the CVP, to comply with state laws relating to the control, appropriation, use or distribution of water unless the law in question is inconsistent with clear congressional directives. The restrictions placed on the operation of the CVP under California law are a critical aspect of this case. The relevant aspects of state law are described below in Section II.B.

A. Federal Reclamation Law and the Authorizations Governing the Construction and Operation of the Central Valley Project

The CVP is a vast water management system that has been constructed over several decades. New Melones Reservoir, which is located on the Stanislaus River, was first authorized by the Flood Control Act of December 22, 1944, 58 Stat. 887, to alleviate flooding problems along the Stanislaus and Lower San Joaquin Rivers. The CVP was subsequently expanded by additional authorizing acts, including section 203 of the Flood Control Act of October 23, 1962, Pub. L. 87-874, 76 Stat. 1173 ("1962 Act"), which specifically modified the authorization for New Melones. The 1962 Act required that, upon the completion and construction of the New Melones dam and power plant, the project "shall become an integral part of the [CVP] and be operated and maintained by the Secretary of the Interior pursuant to the Federal reclamation laws, except that the flood control operation of the project shall be in accordance with the rules and regulations prescribed by the Secretary of the Army."[2/]

1. Flood Control Operations

The operation of New Melones for flood control purposes is thus governed by federal law. The rules and regulations governing flood control operations of New Melones are set forth in 33 C.F.R. § 208.11 (1980), as amended, and are explained in a report prepared by the Army Corps of Engineers titled "Report on Reservoir Regulation for Flood Control," for the New Melones Dam and Lake, dated January 1980 ("1980 Flood Control Operations Report") (DX-7). This report, which serves as the guide for operating New Melones for flood control purposes, defines the objectives for the operation of the New Melones project as follows:

[2/] The authorization for the CVP was further amended and modified in 1992 with the enactment of the CVPIA, which is discussed, *infra*, at Section II.A.3.

a. To restrict flows in the Stanislaus River downstream from New Melones Dam to a controlling rate of 8,000 cubic feet per second ("cfs") at the stream gage at Orange Blossom Bridge, insofar as possible.

b. To provide the maximum conservation storage practicable without impairing the flood control function of the reservoir.

c. To provide the maximum amount of power practicable without impairing the flood control and conservation functions of the reservoir.

d. To provide releases to enhance an anadromous fishery on the lower Stanislaus River.[3]

e. To provide releases to meet established water quality objectives for the Stanislaus River and the San Joaquin River at Vernalis.

f. To maintain a minimum pool of at least 300,000 AF for power and recreation.

DX-7 at 26 (footnote added).

Under the applicable flood control rules and regulations, 450,000 AF of the 2.4 million AF capacity of New Melones is reserved for flood control. This flood control space must be made available annually from November 1 to March 20. In addition, depending on forecasts of runoff and irrigation demand, as much as 450,000 AF of conditional flood control space must be made available annually between March 20 to June 1, decreasing to zero on August 1. See DX-7 at 24, A-1 to A-5.

---

[3] The 1980 Flood Control Operations Report identifies the "schedule of required *minimum* flows below Goodwin dam" based on a 1962 report by the United States Fish and Wildlife Service. DX-7 at 28 (emphasis added). The minimum releases identified in the report for fish purposes were 98,000 AF annually in normal water years and 69,000 AF annually in dry water years. Id.

2. New Melones Yield Studies

The 1962 Act, which authorized construction of New Melones Dam, provided that,

> before initiating any diversion of water from the Stanislaus River Basin in connection with the operation of the Central Valley project, the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within the basin and the diversions shall at all times be subordinate to the quantities so determined: *Provided further*, That the Secretary of the Army adopt appropriate measures to insure the preservation and propagation of fish and wildlife . . . *And provided further*, That the Secretary of the Army give consideration during the preconstruction planning for the New Melones project to the advisability of including storage for the regulation of streamflow for the purpose of downstream water quality control.

P.L. 87-874. To assist the Secretary in complying with this mandate, the Department of the Interior ("DOI") prepared the "New Melones Unit, Central Valley Project - California, Stanislaus River Basin Alternative and Water Allocation, Special Report, September 1980" ("1980 Special Report"), JX-5, and a 1981 Record of Decision, JX-6.

These documents show that pre-contractual yield studies anticipated that operations at New Melones would impound up to 2,400,000 AF of water behind the dam and create 180,000 AF of water that could be marketed to contractors. The 1980 Special Report, for example, anticipated that:

> [w]ith a gross reservoir capacity of 2,400,000 [AF] and a minimum pool of 300,000 [AF] . . . an estimated 180,000 [AF] of new water supply would be provided to serve the needs of the Stanislaus River Basin and other possible CVP service areas. In addition, 98,000 [AF] of water would be available annually for downstream fishery, and up to a maximum of 70,000 [AF] of water annually to meet specified water quality criteria on the Stanislaus and Lower San Joaquin Rivers, as authorized.

JX-5 at 2.[4] Based on these early studies, Reclamation was willing to market up to 155,000 AF

---

[4] A 1982 Basis of Negotiation mirrored this early expectation:

of the expected 180,000 AF of marketable yield to contractors. The remaining 2,245,000 AF of water was to be stored or used to serve other beneficial purposes, including fish and water quality purposes.

The 180,000 AF of marketable yield did not materialize for four primary reasons. First, the early reservoir studies, including the 1980 Special Report, had anticipated that no more than 98,000 AF of water would be needed for fish in any year. However, these early estimates proved to be far too low. Under an agreement with the State of California's Department of Fish and Game ("DFG") known as the 1987 DFG Agreement, which is a permit requirement, releases for fish have averaged 183,789 AF, a nearly 100% increase of the expected releases anticipated in the 1980 Special Report. In five of the 12 years relevant to this case, releases under the 1987 DFG Agreement approached 302,000 AF, a three-fold increase over expected fish-related releases.

Second, early studies anticipated that releases for water quality purposes would use only 70,000 AF. That amount of water has been inadequate in many years. In 1994, 2001, 2002, and 2003, water quality releases exceeded 130,000 AF, nearly twice the quantity expected.

Third, compliance with CVPIA has required significant water releases from New Melones. During the relevant time period, more than 1,500,000 AF of water has been required to comply with CVPIA, an average of more than 125,000 AF of water every year. These

---

> New Melones Reservoir will be operated as authorized at the full maximum capacity of 2,400,000 [AF] and would provide 180,000 [AF] of conservation yield to meet present and future agriculture and [M&I] water needs until approximately the year 2020.

JX-8 at 2.

releases were not anticipated at the time of the 1980 Special Report or at the time the parties executed the contracts.

Finally, California experienced a record drought between 1987 and 1992 that had a significant impact on Reclamation's subsequent operation of New Melones Reservoir. At the beginning of 1987, for example, New Melones storage approached 2,000,000 AF. See DX-224. In 1992, reservoir storage levels dropped below 90,000 AF, and by the end of that year, storage levels were below 120,000 AF, or approximately 5% of capacity. See id. The first year of this lawsuit – 1993 – coincided with the end of this record drought, when storage levels were low and uncertainty of future hydrology was high.

These unexpected increases in the quantity of water needed to meet existing requirements, together with the 1987-1992 drought, severely reduced the available marketable yield in any particular year and greatly impacted operational decisions to ensure enough water would be available to meet these requirements in future years.

3. The Central Valley Project Improvement Act

The operation of the CVP was significantly impacted in 1992 by the enactment of CVPIA, a landmark piece of legislation that sought to reform and address the impacts of the CVP on fish, wildlife and associated habitats. The CVPIA specifically amended the CVP's authorization by making "fish and wildlife *mitigation, protection and restoration* purposes" equal in priority to operation for irrigation and domestic uses, and by making operation for "fish and wildlife *enhancement*" equal in priority to operation for power purposes. CVPIA, Sec. 3406(a) (emphasis added). By adding fish and wildlife obligations to the authorized purposes of the CVP, Congress sought to achieve a reasonable balance among competing demands for use of

CVP water that did not previously exist as a matter of federal law. See CVPIA, Sec. 3402 (purposes of the CVPIA). This change applies to all CVP dams and reservoirs, including New Melones.

The CVPIA required Reclamation to operate the CVP to meet all obligations under state and federal law, including the federal ESA and all decisions of the SWRCB. Id., Sec. 3406(b). One of CVPIA's most ambitious goals was the requirement that the Secretary of the Interior develop and implement a program to double the number of anadromous fish in Central Valley rivers and streams, including in the Stanislaus River, within 10 years (by 2002). Id., Sec. 3406(b)(1). This provision contemplates that the natural production of anadromous fish will not only be doubled, but that those increased numbers "will be sustainable, on a long-term basis[.]" Id. To achieve the goals of this doubling program, the CVPIA authorizes and requires CVP operations to be modified "to provide flows of suitable quality, quantity, and timing to protect all life stages of anadromous fish[.]" Id., Sec. 3406(b)(1)(B). In addition, Section 3406(b)(2) authorizes and requires the Secretary to dedicate 800,000 AF of CVP yield annually for fish purposes.[5/] This 800,000 AF of water is referred to as "(b)(2) water."

---

[5/] Section 3406(b)(1)(B) requires the Secretary to:

> dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act.

Id.

Implementation of CVPIA has had a significant impact on the operation of the CVP, and the amount of water that Reclamation has been able to make available to Plaintiffs. To comply with CVPIA, Reclamation modified its operation of the CVP, including New Melones, to provide flows of suitable quality, quantity, and timing to protect all life stages of anadromous fish in the Stanislaus River. Water release decisions are coordinated with input from the United States Fish and Wildlife Service ("FWS") and the DFG, as required by the CVPIA. Id., Sec. 3406(b)(1). These operational changes, including the use of 800,000 AF of CVP yield for fish and wildlife restoration purposes under Section 3406(b)(2), have reduced the quantity of water available for delivery to CVP contractors, including to Plaintiffs. Defendant's witnesses will provide testimony at trial regarding the impact of the enactment and implementation of the CVPIA on CVP operations, including the operation of New Melones. Defendant's witnesses will explain the use of (b)(2) water throughout the CVP in compliance with the CVPIA, including the justification for releasing water from New Melones under (b)(2). Defendant's witnesses will also explain that despite several years of significant (b)(2) releases from New Melones since 1992, the anadromous fish doubling goal set by the CVPIA has not been met on the Stanislaus. These difficulties demonstrate why the use of (b)(2) water on the Stanislaus River remains an important part of CVPIA implementation and compliance.

B. State Law Permitting the Use of Stanislaus River Water and Affecting the Operation of the CVP and New Melones

California state law impacts the operation of the CVP as a result of Section 8 of the Reclamation Act of 1902, which states in relevant part:

> Nothing in this Act shall be construed as affecting or intending to affect or in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right

> acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws. . . .

43 U.S.C. § 383. The Supreme Court has explained that this provision requires the United States, in its operation of a reclamation project such as the CVP, to comply with state laws relating to the control, appropriation, use or distribution of water unless the law in question is inconsistent with clear congressional directives. California v. United States, 438 U.S. 645, 668 (1978).

1. Background Principles of California State Law

California law relating to the control, appropriation, use and distribution of water is extensive. These state laws are relevant here because Plaintiffs' contractual rights are derived from, and thus limited by, the water rights acquired by Reclamation for New Melones under state law. Plaintiffs do not possess a contractual right to receive and use water from New Melones under their contracts if the delivery and use of such water are not supported by background principles of state law.

An understanding of California law and the limits that such law place on the operation of the CVP and, correspondingly, on Plaintiffs' contractual rights, necessarily begin with several state law doctrines that govern the use of water in California. Plaintiffs' consumptive use of water from the Stanislaus River is subject to the public trust doctrine, and the doctrine of public ownership of wildlife, and the doctrine of reasonable and beneficial use.

a. Public Trust Doctrine

Under the public trust doctrine, a public trust easement exists and provides protection for "the values and uses of waterways." Nat'l Audubon Society v. Superior Ct. of Alpine County, 658 P.2d 709, 719 (Cal. 1983). This doctrine, which is "sufficiently flexible to encompass changing public needs[,]" protects the public's interest in traditional uses of waterways such as navigation, commerce and fisheries, but also protects ecological and recreational values. Id. (quoting Marks v. Whitney, 6 Cal.3d 251, 259-60 (Cal. 1971)). The State of California has "the sovereign power and duty to exercise continued supervision over the trust." Id. at 721. Consequently, "parties acquiring rights in trust property generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust."[6] Id. at 721. In addition, because the sovereign power under the public trust doctrine extends to the adjustment or revocation of previously granted rights to use public trust resources, a person using public trust resources – including the diversion and consumptive use of water – has no right or expectation that limits on that use will not change over time. Id. at 723; see also id. at 728 ("the state is not confined by past allocation decisions which may be incorrect in light of current knowledge or inconsistent with current needs" but instead "has the power to reconsider allocation decisions even though those decisions were made after due consideration of their effect on the public trust"). Here, the appropriative water rights of the United States, and the derivative contractual rights of its CVP contractors, are both subject to the public trust doctrine. State Water Resources Control Board ("SWRCB") Cases, 39 Cal.Rptr.3d 189, 294 n.54 (Cal. Ct.

[6] Enforcement of the public trust doctrine is not limited to action by the State of California. Instead, the Supreme Court of California has held that any member of the public has standing to sue to protect the public trust. Id. at 716 n.11.

App. 3rd Dist. 2006), cert denied, 75 U.S.L.W. 3081 (U.S. Oct. 2, 2006) (No. 96-238).

b. Doctrine of Public Ownership of Fish and Wildlife

California state law also recognizes and protects the public's ownership of fish and wildlife. For example, the state has long recognized that "[t]he fish within our waters constitute the most important constituent of that species of property commonly designated as wild game, the general right and ownership of which is in the people of the state." People v. Truckee Lumber Co., 116 Cal. 397, 399 (1897). Under California law, the State possesses "the right and power to protect and preserve such property for the common use and benefit[.]" Id. at 399-400. The use of the State's waters in a manner that is injurious to the fish in those waters violates this doctrine and is subject to enforcement action by the State and may be enjoined by the courts as a public nuisance. Id. at 399-402.

c. Doctrine of Reasonable Use

In addition, the right to use water under California law is limited by the doctrine of reasonable use. Allegretti & Co. v. County of Imperial, 138 Cal.App.4th 1261, 1279 (Cal. Ct. App. 4th Dist. 2006). This doctrine is embodied in Article 10, Section 2 of California's Constitution, which provides in pertinent part:

> It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

Cal. Const. Art. 10, Sec. 2. Although the state legislature is authorized to enact laws in furtherance of the policy set forth in Section 2, the section is "self-executing." Id. As with the public trust doctrine, private parties may enforce the prohibition against unreasonable diversions and uses of the State's waters through court action. Environmental Defense Fund, Inc. v. East Bay Municipal Utility Dist. ("EDF v. EBMUD"), 26 Cal.3d 183, 193-200 (Cal. 1980). In addition, the doctrine of reasonable use is not static, but is sufficiently flexible to adapt to changing circumstances. See id. at 194 ("[w]hat constitutes reasonable water use is dependent upon not only the entire circumstances presented but varies as the current situation changes"); United States v. SWRCB, 182 Cal.App.3d 82, 130 (Cal. Ct. App. 1st Dist. 1986) (holding that the SWRCB has authority to modify permit conditions when "changed circumstances revealed in new information" show that the use of water authorized under the permit has become unreasonable). Accordingly, appropriative water rights – and contractual rights derived therefrom – remain subject to the requirement of reasonable use.

The state constitutional limitation on unreasonable use and unreasonable method of diversion is implemented "in a myriad of ways" including the State's Water Code. Turlock Irrig. Dist. v. Zanker, 140 Cal.App.4th 1047, 1061 (Cal. Ct. App. 5th Dist. 2006). The Water Code provides that all water within the State of California "is the property of the people of the State[.]" Cal. Water Code § 102. However, as in most western states that follow some variation of the prior appropriation doctrine, "the right to the use of water may be acquired by appropriation in the manner provided by law."[7/] Id. This right to use of water is regulated under California law

---

[7/] California follows a "dual-system" of water rights under which both appropriative and riparian rights are recognized. Nat'l Audubon Society, 33 Cal.3d at 441, 658 P.2d at 724. The water rights acquired by the United States under California state law for the CVP are appropriative

"both to protect water users and to protect the resource itself." Turlock Irrig. Dist., 140 Cal.App.4th at 1061.

The State's Water Code also governs the appropriation of unappropriated water in California, and incorporates the state constitutional prohibition on unreasonable use or diversion of water. See Cal. Water Code § 100. In addition, the SWRCB – the state agency responsible for considering applications for and issuing permits authorizing the diversion and use of the State's waters – is authorized and directed under the Water Code to take necessary actions to prevent the unreasonable use of water. See Cal. Water Code § 275.

The State constitutional limitation on unreasonable use or method of diversion, as well as the underlying doctrines discussed above, are also implemented through certain provisions of California's Fish and Game Code, including § 5937 of that Code, which governs the operation of dams in California:

> The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam. During the minimum flow of water in any river or stream, permission may be granted by the department to the owner of any dam to allow sufficient water to pass through a culvert, waste gate, or over or around the dam, to keep in good condition any fish that may be planted or exist below the dam, when, in the judgment of the department, it is impracticable or detrimental to the owner to pass the water through the fishway.

West's Ann. Cal. Fish & Game Code § 5937. See Natural Resources Defense Council ("NRDC") v. Patterson, 333 F.Supp.2d 906, 913-14, 924-25 (finding that Reclamation's operation of Friant Dam, which is located on the San Joaquin River and is part of the CVP, violated § 5937); NRDC v. Houston, 146 F.3d 1118, 1131-32 (9th Cir. 1998) (finding CVPIA did

---

water rights.

not preempt application of § 5937).[8]

2. Reclamation's State Permits for New Melones

The State of California has developed and enacted "a comprehensive system for development, issuance, and administrative regulation of appropriative water rights." EDF v. EBMUD, 26 Cal.3d at 195. Under this system, any person wishing to appropriate water must file an application for a permit with the SWRCB. Id. (citing Cal. Water Code § 1260). Notice of the application is provided to the public and to certain interested parties. Id. at 196 (citing Cal. Water Code §§ 1310-1317, 1321). State law allows "any person" to file a protest to the application based on interference with prior vested water rights or "on grounds that the appropriation will not best conserve the public interest or will be contrary to law." Id. (citing applicable Cal. Water Code and Admin. Code provisions). The SWRCB thereafter holds a public hearing in which all interested parties may participate. Id. Following consideration of factors required by state law, including factors related to the public interest and beneficial use, the Board may issue a permit authorizing the appropriation and use of the state's waters. Id. at 197. Such permits are subject to state law, including any terms and conditions imposed by the Board. Id. Although Reclamation retains discretion in terms of how it will comply with its permit conditions, it lacks discretion to violate those conditions. Central Delta Water Agency, 452 F.3d at 1026. In addition, the Board retains jurisdiction to revise or supplement permit terms and conditions as necessary based on changed circumstances or new information. Id.

---

[8] The court noted that prior state court decisions indicated that the amount of water that must be released from a dam into a dry river to comply with § 5937 is "enough to restore the historic fishery." NRDC v. Patterson, 333 F. Supp.2d at 924 (quoting Cal. Trout v. Sup. Ct. of Sacramento County, 218 Cal.App.3d 187, 210 (Cal. Ct. App. 3d Dist. 1990)).

As set forth below, Reclamation applied for and obtained permits from the SWRCB for the use of water from the Stanislaus River in connection with the development and operation of the New Melones Reservoir. Although Reclamation possesses the right to use the waters from the Stanislaus River under these permits, under California law such usufructory water rights, unlike real property rights, are considered "limited and uncertain" because the quantity of water actually available for use "is largely determined by natural forces." SWRCB, 182 Cal.App.3d at 104. Reclamation's permits, including the terms and conditions imposed therein, are highly relevant to this case because Plaintiffs' contractual right to receive water from New Melones is subject to, and limited by, the "limited and uncertain" appropriative water rights obtained by Reclamation for New Melones. See SWRCB Cases, 39 Cal.Rptr.3d at 294 n.54 (holding that an appropriator of water cannot give away, by contract, more rights than it has under state law); Klamath Irrig. Dist. v. United States, 67 Fed. Cl. 504, 535 (2005) (applying, in a similar context, the venerable maxim "nemo dat qui non habet" or "one who does not have cannot give").

a. Reclamation's 1973 State Permits

Following Congressional authorization for the construction of New Melones, Reclamation applied for permits from the SWRCB to appropriate water from the Stanislaus River for power generation, irrigation, domestic, municipal, industrial, fish culture, recreation and water quality purposes. Although studies conducted in connection with these applications predicted the availability of unappropriated water, those studies also revealed a significant fluctuation in the quantity of water available annually. As summarized by the SWRCB, based on the hydrologic cycle equivalent to the period of 1923 to 1953, "annual average surplus is an estimated 335,000 acre-feet and varies from zero which occurs in nine years out of the period of

study to 1,980,000 acre-feet." SWRCB Decision 1422 ("D-1422") at 10.

Several groups filed protests to the federal government's permit applications, including prior right holders and California DFG. These protests were resolved through a combination of terms and conditions imposed on the permits eventually issued by the SWRCB, including the following:

- Conditions Related to Senior Water Rights. A number of senior water rights holders, including Oakdale Irrigation District ("OID"), South San Joaquin Irrigation District ("SSJID"), Calaveras County Water District, and Tuolumne County Water District, protested Reclamation's application due to concerns over the impact of New Melones operations on their senior water rights.[9] Because Reclamation's operation of New Melones could not interfere with these senior water rights, Reclamation and OID/SSJID entered into an agreement to define those prior rights. Under this agreement, which provided for the dismissal of the districts' protests, Reclamation is required to deliver all of the inflow of the New Melones Reservoir up to 654,000 AF in each year for rediversion by the districts at Goodwin Dam in satisfaction of the OID/SSJID's senior water rights. The SWRCB recognized OID and SSJID's rights and noted that these districts divert most of the flow of the Stanislaus River, other than flood flows. As a result of these existing diversions, the SWRCB noted that the Stanislaus River "is frequently dry immediately below Goodwin Dam during the summer months." D-1422 at 7-8. Reclamation entered into similar agreements with Calaveras and Tuolumne in

[9] OID and SSJID are the "major holders of prior rights to the water of the Stanislaus River." D-1422. These districts constructed the original Melones Reservoir, along with three other reservoirs (Tulloch, Donnells and Beardsley) that are known as the Tri-Dam Project.

1972. In D-1422, the SWRCB indicated that "[a]ny permits issued will be subject to all prior rights and will not authorize any interference with such rights" and noted that such a condition is a standard permit term. Id. at 6.

- Conditions Related to Water Quality. Reclamation's applications to the SWRCB also generated concerns regarding water quality, which is measured at the USGS gaging station at Vernalis, just below the point where the Stanislaus flows into the San Joaquin River. Water quality is assessed by measuring the concentration of total dissolved solids ("TDS"), which includes salinity. An increase in salinity adversely affects other beneficial uses of the water. The Board recognized that the "Stanislaus River is an important source of dilution water required to reduce the TDS in the lower San Joaquin River to usable levels." Id. at 11. In setting water quality related conditions, the Board recognized "the uncertainty inherent in the problems of proper releases." Id. at 13. The Board thus imposed a condition requiring sufficient releases from New Melones to meet specified water quality standards, but reserved jurisdiction to revise these water release requirements based on further studies. See id. at 31 (Condition 5). As noted above, the quantity of water needed to meet these requirements has been significantly higher than originally anticipated in many years.
- Conditions Related to Fishery Purposes. The California DFG filed a protest to Reclamation's applications to the SWRCB related to the quality and quantity of water that should be released from New Melones for fish preservation and enhancement. See id. at 6, 11-13, 20-21. With respect to water quality, the Board imposed a requirement that Reclamation meet a dissolved oxygen ("DO") measurement and

reserved jurisdiction to adjust this water quality requirement. Id. at 12-13. With respect to the quantity of water needed for fishery purposes, DFG recommended annual releases of 262,000 AF from New Melones for preservation and enhancement of the fishery in the Stanislaus River and an additional 50,000 AF for the same purposes in the Delta. The Board explains in its decision that DFG's "drastic revision upward" from the 98,000 AF proposed by the Bureau for such purposes was due in part to the state agency's position that "it is the ability of the spring flows to flush juvenile salmon to the ocean which determines the success of the spawning run two and one-half years later when the same salmon return to the river." Id. at 20. Despite the difference in opinion on the quantity of water needed for fish, Reclamation and DFG committed to conduct further studies. The SWRCB required releases of up to 98,000 AF for the maintenance of fish and wildlife (as proposed by Reclamation), but reserved jurisdiction to revise the releases for preservation and enhancement of fish and wildlife based upon the planned studies. See id. at 21.

- The SWRCB's Reserved Jurisdiction. In addition to the reservation of jurisdiction to revise release requirements for water quality and fish purposes, D-1422 also states that,

> All rights and privileges under this permit, including method of diversion, method of use, and quantity of water diverted, are subject to the continuing authority of the [SWRCB] in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of said water.

Id. at 33 (Condition 13).

The conditions described above reflect the fact that the quantity of water that would need to be released from New Melones to meet water quality standards in the Delta (at Vernalis) and for instream fishery needs in both the Stanislaus River and the Delta was expected to change

based on future studies that were either ongoing or planned.[10] As explained above, the SWRCB has authority to change permit terms and conditions based on changed circumstances and new information. Accordingly, because Plaintiffs' contractual rights are based on and derivative of Defendant's rights to use water under its permits, Plaintiffs cannot claim a contractual expectancy that the quantity of water that must be released from New Melones to meet water quality objectives and fishery objectives would not change over time.

b. Reclamation's 1988 State Permits

Reclamation reapplied for direct diversion water rights on May 3, 1982. The SWRCB's decision on these applications, which was issued following consideration of several protests to the applications and a public hearing, is contained in Decision 1616 ("D-1616"), issued in January 1988. Among other things, D-1616 included the following restrictions:

- Conditions Related to Senior Water Rights. OID and SSJID again filed protests asserting that the diversions and uses proposed by Reclamation's applications would interfere with their vested rights. In response, the Board required Reclamation to negotiate an agreement with OID and SSJID. D-1616 at 31 (Condition 7). In accordance with this requirement, the parties reached an Agreement and Stipulation on August 30, 1988, see DX-41, which amended the parties' earlier agreement.
- Conditions Related to Water Quality. Continuing concerns related to the impact of

[10] As set forth in the Court's pretrial opinion, after the SWRCB issued D-1422, the United States appealed the decision, arguing that the State of California lacked the authority to impose terms and conditions upon federally authorized water projects. This case was eventually appealed to the Supreme Court, which held that the CVP is subject to terms and conditions imposed by the SWRCB, except where those terms and conditions are contrary to congressional directives. California v. United States, 438 U.S. at 672, 674.

consumptive use of water from New Melones on downstream water quality led to protests by several groups. The SWRCB addressed water quality by revising the water quality condition in D-1422 to preclude consumptive use diversions unless the specified TDS standards (salinity) and DO standards (related to fisheries) were met. See D-1616 at 32 (Condition 12). The Board again reserved its jurisdiction to revise instream flow requirements for water quality objectives. See id. at 33 (Condition 15).

- Conditions Related to Fishery Purposes. California DFG again filed protests to Reclamation's applications based on the need for increased instream flow releases from New Melones for fishery purposes. See id. at 6-7. Reclamation resolved this protest by entering into the 1987 DFG Agreement, which the SWRCB included as a permit requirement in D-1616. See JX-17. Under the 1987 Agreement, Reclamation was required to meet instream flow requirements of between 98,300 and 302,100 AF per year as part of a long-term study to determine fishery resource protection needs. See D-1616 at 6.[11/] The SWRCB again reserved jurisdiction to revise the required instream flow releases, if needed. See id. at 33 (Conditions 14-15). The Board specifically noted that including these conditions "will serve to protect public trust resources affected by the Stanislaus River flows and will allow for further Board action as appropriate when the instream flow studies are complete." Id. at 7.

[11/] In its decision, the SWRCB noted that it had recognized the need for such studies when it had issued D-1422, and concluded that the 1987 Agreement "prescribes a reasonable method for conducting those studies as well as an agreed upon approach for making instream flow releases during the period of the study." D-1616 at 6-7.

c. The 1999 Revisions to Reclamation's State Permits

On December 29, 1999, the SWRCB issued Decision 1641 ("D-1641") as part of the Board's implementation of the 1995 Bay-Delta Plan, which sets forth the current water quality objectives for the Bay-Delta Estuary. See D-1641 at 5. D-1641 was subsequently revised in accordance with Order WR 2000-02, issued on March 15, 2000. D-1641, as revised, amended a number of permits issued to Reclamation for the CVP, including Reclamation's permits for New Melones, by revising or adding terms and conditions to those permits. These conditions require Reclamation to release water from New Melones to meet specified agricultural salinity objectives at Vernalis, water quality objectives at Vernalis (measured by a DO concentration), target flow and pulse flow objectives for fish and wildlife, and certain flow objectives set forth in the 1999 San Joaquin River Agreement ("SJRA"). See id. at 160-62. D-1641 further states that these conditions "do not mandate that the Permittee use water under these permits to meet these conditions if it uses other sources of water or other means to meet these conditions." Id. at 160 n.87. Like D-1616, D-1641 limits Reclamation's ability to deliver water to its contractors if the permit standards are not met. See id. at 162.[12/]

Numerous parties, including the Plaintiffs herein, filed appeals regarding D-1641. In a

---

[12/] D-1641 provides:

> For the protection of water quality, no diversion is authorized for consumptive uses under this permit unless the San Joaquin River at Airport Way Bridge, Vernalis, salinity objective for agricultural beneficial uses, as specified in Table 2, attached, is met and the dissolved oxygen objectives in the Stanislaus River are met as specified in the Water Quality Control Plan for the Sacramento and San Joaquin River basins.

Id. at 162.

decision issued on February 9, 2006, the California Court of Appeals for the Third District issued a lengthy decision that largely affirms D-1641. SWRCB Cases, 39 Cal.Rptr.3d 189 (Cal. Ct. App. 3rd Dist. 2006). In so doing, the court specifically rejected Plaintiffs' contention that, under state law, their consumptive use of New Melones water must be given priority over agricultural uses in the southern Delta that the SWRCB sought to protect with the Vernalis salinity objectives, or over fish and wildlife purposes that the SWRCB sought to protect with the Vernalis flow objective and the Delta outflow objective. Id. at 255-58. The court also rejected Plaintiffs' argument that the use of New Melones water to meet the Vernalis objectives constitutes an unreasonable use of water in violation of article X, section 2 of the California Constitution. Id. at 258-59. In affirming this aspect of the SWRCB's decision, the state court recognized that although Reclamation is not required to use water from New Melones to meet these various objectives, New Melones is the obvious and logical source of water to meet these state law requirements:

> [T]he New Melones project, unlike the other CVP facilities, is in a location close to Vernalis where it can conveniently meet the objectives at Vernalis by water releases, and has historically been required to meet Vernalis objectives, whereas other CVP facilities have less influence on Vernalis flows.

Id. at 261 (quoting the SWRCB's order on reconsideration of D-1641). Based on this observation, the court found that substantial evidence supported the Board's decision to permit Reclamation to meet the Vernalis salinity objective with water from New Melones. Id. Plaintiffs' petition for a writ of certiorari on this issue was recently denied. 75 U.S.L.W. 3081 (U.S. Oct. 2, 2006).

## III. DEFENDANT'S CONTENTIONS OF LAW AND FACT REGARDING THE CONTRACTS

The subject contracts do not guarantee that 155,000 AF of water from New Melones will be available for delivery to Plaintiffs every year. The 155,000 AF of water identified in the contracts simply represents the maximum amount of water that may be delivered to Plaintiffs on an annual basis. The actual quantity of water to which Plaintiffs are contractually entitled to receive in any given year is a function of water availability, which is impacted by many factors including changes in annual and long-term hydrology, legal constraints on Project operations, and the amount and timing of water deliveries requested by Plaintiffs in the schedules they are required to submit to Reclamation. Although Reclamation commits to use all reasonable means to guard against a water shortage, shortages are anticipated under the contracts. So long as such shortages are not the result of unreasonable or arbitrary actions by Reclamation, the risk of such shortages is allocated under the contracts to the Plaintiffs. See SEWD and Central Contracts at Arts. 9, 12.

Defendant contends that it is not liable for breach of contract under the terms of the contracts themselves based on the following:

A. The contracts are subject to future Reclamation laws;

B. The contracts' shortage provisions limit Defendant's liability; and

C. A review of Plaintiffs' annual water schedules and Reclamation's annual decisions shows Defendant is not liable for breach of contract.

Each of these points is discussed below.

A. The Contracts Are Subject to Future Reclamation Laws

One of the issues that was not resolved at summary judgment and that remains an issue for trial is the question of whether the subject contracts are "intended to incorporate future Reclamation laws or only those existing at the time of the contract." Stockton East Water Dist., 70 Fed. Cl. at 520. The resolution of this question impacts whether Plaintiffs' claims can be resolved based on the contracts alone or whether the Court must consider the government's alternative defenses under the sovereign acts and unmistakability doctrines. See discussion, *infra*, at Section IV.

As explained below, these contracts are intended to incorporate future Reclamation laws. Accordingly, the rights and obligations under the contracts are subject to the 1992 enactment of the CVPIA, which amended the Reclamation laws existing at the time the contracts were entered into. Plaintiffs' contractual right to receive water under the contracts was thus subject to the constraints placed on Project operations under the CVPIA, including the requirement that 800,000 AF of CVP water be dedicated to and used for fish and wildlife purposes on an annual basis. Reclamation's compliance with these requirements does not constitute a breach of the subject contracts even though compliance with the CVPIA reduced the quantity of water available to the Plaintiffs.

The conclusion that the Central and SEWD contracts are subject to future Reclamation laws is supported by reference to the authorizing legislation for New Melones and the terms of the contracts. New Melones was first authorized in 1944 for flood control purposes. Flood Control Act of December 22, 1944, 58 Stat. 887. When Congress reauthorized New Melones in 1962, it stated that the project "shall become an integral part of the [CVP] and be operated and

maintained by the Secretary of the Interior pursuant to the Federal reclamation laws. . . ." Flood Control Act of 1962, 76 Stat. 1173 § 203.

The parties entered into these contracts pursuant to the Federal reclamation laws, which are identified in the contracts as "the Act of June 17, 1902 (32 Stat. 388), and acts amendatory or supplementary thereto including but not limited to the Act of August 26, 1937 (50 Stat. 844), as amended and supplemented, and the Act of August 4, 1939 (53 Stat. 1187), as amended and supplemented[.]" SEWD and Central Contracts at 1 (Preamble). The contracts acknowledge that New Melones Reservoir was transferred to the Secretary of the Interior to become an integral part of the CVP and that it is "to be operated and maintained pursuant to the authorizing acts and Federal reclamation laws." Id. at 2 (Explanatory Recitals). In addition, the contracts state that Plaintiffs desired "to contract pursuant to Federal reclamation laws and the laws of the State of California, for water service from the [CVP]. . . ." Id. at 3.

This language is standard contract language because it is those very laws that provide the authorization to operate the CVP and enter into such contracts. It is well-established that this contractual language includes future changes to federal Reclamation laws. See O'Neill v. United States, 50 F.3d 677, 680-86 (9th Cir. 1995) (considering similar contractual language), cert. denied, 516 U.S. 1028 (1995).

The CVPIA amends federal Reclamation laws. Section 3408(g) of the CVPIA, for example, states that "[t]his title shall amend and supplement the Act of June 17, 1902, and Acts supplementary thereto and amendatory thereof." In addition, Section 3406(a) of the CVPIA expressly amends Section 2 of the 1937 Act referenced in the preamble of the contracts. See O'Neill, 50 F.3d at 681-86 (finding that the CVPIA amended the 1937 CVP reauthorization

statute and constituted a "shift in reclamation law modifying the priority of water uses"). Because the CVPIA amended applicable federal reclamation laws, and because the contracts are expressly subject to such laws, Defendant's compliance with the CVPIA cannot, as a matter of law, constitute a breach of the contracts.

B. Article 9 Limits Reclamation's Liability for Shortage of Water

If the Court determines that the contracts are not subject to future changes in Reclamation law, including the CVPIA, then the Court should conclude that the contracts' shortage provisions excuse the government from liability in the circumstances presented in this case.

1. The Contracts Give Reclamation Broad Discretion in Making Decisions About the Availability of Water

As a general matter, it is important to note that the contracts require Reclamation to determine how much water is available to meet the various demands. Article 9(b), for example, states that "[i]n *any year* that the Contracting Officer *determines that there is a shortage of water available* to customers of the United States from the New Melones Unit of the Project" (emphasis added). Similarly, Article 6 refers to the Contracting Officer's determination of water availability by allowing for adjustments for overpayments "due to the quantity of *water actually available* for the Contractor during any year, *as determined by the Contracting Officer*" (emphasis added). Article 3 of the contracts also anticipates and addresses Reclamation's determination of water availability:

> [i]f in any year after the Contracting Officer has approved a schedule or any revision thereof submitted by the Contractor, the United States is unable to furnish any of the water in the quantities and at the times requested in the schedule or revision thereof and the Contractor does not elect to receive and does not receive such water at other times during such year, the Contractor shall be entitled to an adjustment as provided in Article 6.

SEWD and Central Contracts at Art. 3(j). Reclamation's determination of water availability is also referenced in Article 3(g), which allows "additional Project water, *if available as determined by the Contracting Officer*" to be furnished the Contractors under specified conditions (emphasis added). These provisions simply reflect the actual practice of making determinations of water availability. Defendant's witnesses will testify at trial regarding Reclamation's operation of the CVP, including Reclamation's annual determinations of water availability for CVP contractors. These witnesses will explain that, although Reclamation makes an initial determination of water availability early each year based on information available at that time, this initial determination is subject to continuous review as the various factors that impact water availability change over the course of the year.

Reclamation's determination of water availability necessarily includes consideration of whether the shortage is due to a cause that is beyond its control. That determination is constrained by Article 12(d), under which such opinions and determinations must not be "arbitrary, capricious or unreasonable."[13/] In other words, Reclamation may not operate the CVP in a manner that arbitrarily imposes a condition of shortage. If, however, in its operation of the CVP, Reclamation makes a reasonable determination that the quantity of water to be made available to its contractors is limited due to causes beyond its control, then Article 9 provides that the United States will not be liable due to the water shortage. See Barcellos & Wolfsen, Inc. v. Westlands Water Dist., 849 F. Supp. 717, 729 (E.D. Cal. 1993) (noting that "[t]he existence of

---

13/ In the context of an Administrative Procedures Act ("APA") proceeding, the Supreme Court stated that the "arbitrary and capricious" standard addresses "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

a shortage and the lack of available water are two sides of the same coin.”).

Reclamation’s determinations of water availability are difficult because they are based on imperfect forecasts and competing demands for a limited and frequently inadequate supply of water. These contracts are not divorced from the reality of managing and operating the CVP as a whole under these circumstances. Instead, the subject contracts recognize that Reclamation must exercise substantial discretion in the day-to-day decision-making involved in the operation of the CVP. For example, the contracts state that “[t]he United States shall make all reasonable efforts, *consistent with the most efficient overall operation of the Project*, to furnish water at the delivery point established pursuant to Article 7.” SEWD and Central Contracts at Art. 8(a) (emphasis added). See also id. at Art. 9(a) (“*In its operation of the Project*, the United States will use all reasonable means to guard against the condition of shortage in the quantity of water available to the Contractor pursuant to this contract.”); id. at Art. 4(a) (providing for the submission of schedules by November 1 of each year or at such other times as determined by the Contracting Officer *to assure coordination of Project operations*”) (emphasis added to each quote).

### 2. The Phrase “Which, In the Opinion of the Contracting Officer, Are Beyond the Control of the United States” Does Not Limit the Shortage Provision in Any Significant Way

Due to the uncertainties and difficulties in managing the CVP, Reclamation cannot unconditionally guarantee a specific quantity of water to any of its contractors. Hence, water service contracts always include shortage provisions. See SWRCB Cases, 39 Cal.Rptr.3d at 293 (noting and ultimately agreeing with Reclamation’s point “that neither Westlands nor any other CVP contractor is entitled to a fixed supply of CVP water every year”). Plaintiffs’ contractual right to receive CVP water is no greater than the rights of any other CVP contractors. Although

Reclamation can and does commit through its contracts to use all reasonable means to avoid water shortages, the quantity of water actually available for delivery to contractors varies from year to year and is subject to conditions and contingencies that cannot always be anticipated or controlled. Given this situation, water shortage provisions, as a general matter, do two things: (1) they provide that the United States is not liable for water shortages (Article 9(a)), and (2) they indicate how water will be made available to contractors when water shortages occur (Article 9(b)).

In this case, the shortage clause states, in part:

> In its operations of the Project, the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall accrue against the United States or any of its officers or employees for any damage, direct or indirect, arising therefrom.

SEWD and Central Contracts at Art. 9(a). The interpretation of the shortage provision at issue in this case requires consideration of Article 9 in its entirety, and the relationship between Article 9 and the contract as a whole. In the first sentence of Article 9, the word "Project" is defined as the entire CVP, not just New Melones. Hence, this provision begins with the premise that water availability is determined based on the operation of the CVP as a whole and that Reclamation's operation of the CVP must be "reasonable." The standard of reasonableness is employed in Article 9 and elsewhere in the Contracts (see Art. 8(a) and 12(d)).[14/] The first word of the second

---

[14/]The obligation to act reasonably in exercising the discretion necessary to manage and operate the CVP has been applied even in the absence of the type of express language found in the subject contracts. See Barcellos & Wolfsen, 849 F. Supp. at 733 (noting that "a requirement of reasonableness has been interpolated into the government's promise to deliver the full allotment of water unless shortage lawfully occurs").

sentence – "[n]evertheless" – ties the second sentence to the first and indicates that the parties understood that even when the United States uses all reasonable means in its operation of the CVP to guard against a condition of shortage, water shortages may occur.

References to "drought or other causes" in shortage provisions are common.[15] This type of language has been consistently interpreted as encompassing mandatory compliance with federal statutes, including the CVPIA and the ESA.[16] Inclusion of the phrase "which, in the opinion of the Contracting Officer, are beyond the control of the United States" does not change this interpretation because the term "United States" is clearly intended to refer to the United States acting in its proprietary capacity as a party to the contract, not the United States acting in its sovereign capacity. As discussed in more detail below in Section IV, the law recognizes a distinction between the actions of the United States as a party to a contract and the actions of the

---

[15] Some Reclamation contracts contain variations on the "other causes" language, such as "any other causes" or "other avoidable causes." Those differences are irrelevant because the clause is intended to be a "catchall" without specifically identifying any particular cause. Absent other limiting language, the use of such a catchall phrase cannot be read to *exclude* certain causes that have not been specifically identified.

[16] See Barcellos & Wolfsen, 849 F. Supp. at 723-24 (holding that a shortage provision covering "drought, or any other causes" was unambiguous, and that a "shortage" due to "any other causes" clearly encompasses mandatory compliance with federal statutes, including the CVPIA and ESA); id. at 729 ("Mandatory compliance with valid federal law meets the definition of 'other cause'"); O'Neill, 50 F.3d at 684 (affirming Barcellos, finding that the shortage provision was unambiguous, and holding that "an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.'"); id. at 689 (holding that the shortage provision "unambiguously absolves the government from liability for its failure to deliver the full contractual amount of water where there is a shortage caused by statutory mandate]"); see also Klamath Irrig. Dist., 67 Fed. Cl. at 535 (examining similar shortage provisions and observing that "[t]he plain language of these provisions expressly absolves the United States from liability for all types of water shortages–not only the hydrologic causes, as claimed by plaintiffs, but also any other cause that impacts the availability of water through the system.").

United States as the sovereign. Enactment and implementation of the CVPIA is an act of the United States in its sovereign capacity, rather than an act of the United States as a party to the subject contracts. Hence, to the extent that enactment of the CVPIA (and Reclamation's implementation of the CVPIA) caused or contributed to water shortages, those causes are "beyond the control of the United States" as that phrase is used in Article 9. To hold otherwise requires the Court to determine that the United States unmistakably surrendered its sovereign power to enact legislation and exempted Plaintiffs from the effect of such legislation. As discussed in Section IV.B, *infra*, there are no such unmistakable terms in the subject contracts.

The Court, and the District Court for the Eastern District of California, has already determined that this shortage provision is ambiguous and susceptible to different reasonable interpretations. See 70 Fed. Cl. at 534 (finding that the "language is susceptible to at least two different, but reasonable, readings," including the interpretation asserted by Defendant here); Westlands Water District v. United States, 850 F.Supp. 1388, 1407-08 (E.D. Cal. 1994) (considering these contracts and describing four different reasonable interpretations of this provision, including the one asserted by Defendant here). Because the contracts give Reclamation significant and exclusive discretion in making decisions about water availability – including shortage determinations – the ambiguity in Article 9 must be resolved in favor of the Defendant. That is, Reclamation's decisions about water availability can only result in a breach of contract if its decisions were unreasonable, arbitrary or capricious. See SEWD and Central Contracts at Arts. 9, 12. Reclamation's decisions about water availability were based on its understanding of its contractual rights and its need to comply with pre-contract and post-contract federal and state law, including CVPIA. The fact that two courts – including this one – have

determined that interpretation of the shortage provision is one of several reasonable interpretations means that Reclamation's shortage determinations were not unreasonable, arbitrary or capricious. Hence, the precise meaning of the shortage provision is largely beside the point.

In any event, Plaintiffs now argue that the term "United States" refers not just to the executive branch agency that entered into the subject contract but also the legislative branch (*i.e.*, all acts of Congress) and presumably the judicial branch (*i.e.*, any court order or injunction that affects CVP operations). See Pls.' Pretrial Br. at 20. The contracts do not support that interpretation. Consider, for example, the preamble of both contracts, which states that the contract is "between THE UNITED STATES OF AMERICA, hereinafter referred to as the United States," and either Central or SEWD. That same preamble also indicates that the contracts are entered into pursuant to federal reclamation laws, which authorize only the Department of the Interior (acting through the Bureau of Reclamation) to enter into contracts such as the ones in question. Consistent with the authorizations referenced in the preamble, the "Definitions" section of the contracts defines "Secretary" or "Contracting Officer" as "the Secretary of the Interior or his duly authorized representative." SEWD and Central Contracts at Art. 1(a) (Definitions). Accordingly, the term "United States," as used in Article 9, has only one reasonable meaning: it refers to the Department of the Interior as the contracting party.

Plaintiffs also appear to be arguing that the discretionary nature of Section 3406(b)(2) somehow makes Reclamation's compliance with CVPIA outside of Article 9, no matter what the correct interpretation. See Pls.' Pretrial Br. at 20. This is incorrect. The United States, as a contracting party, is required to comply with the CVPIA and must dedicate 800,000 AF of CVP

yield annually for fish restoration purposes. As explained below in Section IV, both the enactment of the CVPIA and the implementation of that statute are sovereign acts rather than the actions of the United States as a party to the subject contract. The fact that Reclamation complied with the fish restoration goals set by the CVPIA by using a portion of the 800,000 AF of (b)(2) water on the Stanislaus, does not convert Reclamation's compliance with the CVPIA into a discretionary determination that somehow gives rise to a breach of contract claim.[17/]

Plaintiffs also take the position that the only causes that are beyond the control of the United States within the meaning of Article 9 are "acts of God" and similar instances of *force majeure*. Pls.' Pretrial Br. at 18-19. Plaintiffs' interpretation must be rejected because it not based on the plain language contained in Article 9. As a matter of law, it is the language the parties specifically bargained for and included in their contracts, rather than any traditional understanding of the term "force majeure," that both defines "the contours of *force majeure*" and dictates "the application, effect, and scope of *force majeure*." R&B Falcon Drilling Co. v. Am. Exploration Co., 154 F. Supp.2d 969, 973 (S.D. Texas 2001) (cited in Pls.' Pretrial Br. at 18). The subject contracts limit the liability of the government when there is a shortage of water available for delivery under the contracts "because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States[.]" Article 9(a).

---

[17/] Importantly, Plaintiffs are not entitled to challenge Interior's implementation of the CVPIA in this case by folding their APA claims – which remain pending in federal district court – into their contract claims. The question here is not whether Interior's implementation of the CVPIA or its operational decisions, including any final agency action allocating Project water in a particular year, were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA, 5 U.S.C. § 706. Instead, the question is whether Defendant breached Plaintiffs' contracts when it did not make 155,000 AF of water available in each of the years in question. This is primarily a question of contract interpretation.

In arguing that this provision only applies to drought and other "acts of God," Plaintiffs insert limiting language into Article 9 that the parties did not bargain for by arguing that the Court should read Article 9 as limiting liability for shortages caused by "drought or other similar acts of God." See Pls.' Pretrial Br. at 17, 19. Plaintiffs then argue that compliance with a newly enacted federal law is not an "act of God," and thus is not covered by Article 9. However, as explained above, the actual language of Article 9 does not contain the limitations Plaintiffs seek to write into it.[18/] Accordingly, Plaintiffs' attempt to re-write their contracts to limit the contours of Article 9 in a manner that the parties did not bargain for should be rejected as inconsistent with the plain language of those contracts.

In summary, Reclamation had broad discretion to make determinations about water availability and could only breach the contracts if its decisions were unreasonable, arbitrary and capricious. This Court has already determined that Defendant's interpretation of Article 9 is reasonable. Given Reclamation's broad discretion under Articles 9 and 12 of these contracts to make determinations about water availability, the Court need go no farther.

To the extent such evidence is necessary, the evidence will show that Reclamation's compliance with CVPIA and Reclamation's decisions about water availability during the years

---

[18/] In making this argument, Plaintiffs cite to cases that include more traditional *force majeure* provisions. See Pls.' Pretrial Br. at 19-20. For example, the provision interpreted in Seaboard Lumber Co. v. United States specifically identified causes beyond the contracting parties' control as including but not limited to "acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods." 308 F.3d 1283, 1292 (Fed. Cir. 2002), affirming 41 Fed. Cl. 401 (1998). Notably, even the Seaboard *force majeure* provision expressly includes "acts of Government," which refers to sovereign acts of the government. The "drought or other causes" language found in the instant action is far more general and much broader than this type of *force majeure* language, and quite clearly does not exclude sovereign acts.

in question was entirely reasonable. See discussion, *infra*, at Section III.C. Under these circumstances, the Court should find that the United States is not liable for breach of contract based on the contracts themselves.[19]

C. Reclamation's Operation of New Melones Reservoir from 1993 to 2004 Did Not Breach Plaintiffs' Contracts

1. The Contracts Require Plaintiffs to Submit Annual Water Schedules

The contracts require Plaintiffs to submit annual water schedules, indicating the amounts of water required monthly, "not later than November 1 of each year or at such other times as determined by the Contracting Officer to assure coordination of Project operations." See SEWD and Central Contracts at Art. 4(a). The required annual schedules are legally significant because they help setting the government's initial contractual obligation by defining the quantity of water to be "made available" under the contracts.[20]

Article 3 of both contracts provides that the "United States shall make available to the [Plaintiff] the annual quantities of agricultural water up to a maximum quantity [of 65,000 AF for SEWD or 80,000 AF for Central] as specified in the schedule submitted by the Contractor in accordance with Article 4. . . ." SEWD and Central Contracts at Art. 3(c) (emphasis added). The contracts contemplated a change in the contractual "maximum" amount in Article 3(c)(3):

---

[19] Plaintiffs' argument that the Defendant cannot rely upon Article 9 because it did not issue a formal finding of shortage, see Pls.' Pretrial Br. at 24, ignores Reclamation's letters to Plaintiffs and public notices informing all CVP contractors – including Plaintiffs – of the annual water allocations. Rather than administratively appeal the allocation decisions, Plaintiffs filed an APA claim in district court in 1993.

[20] The government's duty under these contracts is limited by other contractual terms, including the shortage provision. In addition, the doctrine of sovereign acts may be implicated in some years. This discussion is limited to the scheduling requirement only.

the "United States shall not be obligated to furnish any quantity [of agricultural water] greater than the quantity scheduled in the 11th year and such quantity shall constitute the **new contract maximum** for the remaining contract term." (emphasis added).[21/] The contract also sets forth a "minimum" quantity of water that the "United States shall make available and the Contractor shall pay for, as a minimum," which changes depending on the Contract Year. See SEWD and Central Contracts at Art. 3(c).[22/]

Article 3, then, defines a minimum quantity of water and a maximum quantity of water. If Plaintiffs scheduled water in accordance with Article 4, then Plaintiffs have no claim for breach of contract if the United States made available the amount scheduled. The other contractual provisions and other legal arguments are implicated only if the United States failed to "make available" at least the amounts scheduled pursuant to Article 4.

As discussed below, the evidence will show that the United States made available the scheduled quantities in at least 1993, 1996, 1997, 1998, 1999 and 2000 (for both contractors) and 2001, 2002, and 2003 (for Central). Plaintiffs' claims for these years should be rejected without having to consider any other contractual provision or legal argument.

2. Reclamation Did Not Breach the Subject Contracts in 1993-1996

i. Reclamation Did Not Breach the Subject Contracts in 1993

By the end of 1992, storage levels at New Melones had dropped to less than 120,000 AF,

---

21/ The Court's decision inadvertently, it appears, terms the amount scheduled in Year 11 to be the new contract **minimum**. See Stockton East Water Dist., 70 Fed. Cl. at 521. In fact, both contracts state that the amount scheduled in 1999 will be the new contract **maximum**.

22/ Reclamation notified Plaintiffs that the "initial delivery date," for purposes of the contracts, was January 1, 1989. See DX-37; JX-20. Hence, Contract Year 1 was 1989. See SEWD and Central Contracts at Art. 3(c)(1).

or approximately 5% of capacity. For 1993 (Contract Year 5), Article 3 of the contracts required that the "United States shall make available and the Contractor shall pay for, as a minimum . . . the quantity of water specified in [the contractor's] schedule. . . ." Central did not submit a schedule for water to be delivered in 1993. See DX-229. SEWD submitted a "projected delivery schedule" for water to be delivered in 1993, but not until October 22, 1993, over a year too late. See JX-44.

Pursuant to Article 3, the United States had no duty to make available any quantity of water in 1993. Hence, Plaintiffs' breach of contract claims for 1993 should be rejected.

ii. Reclamation Did Not Breach the Subject Contracts in 1994

By December 1993, the storage levels at New Melones Reservoir had increased from approximately 100,000 AF up to approximately 750,000 AF (or 31% of capacity). Reclamation forecasted low inflows for 1994, and 1994 was "critically dry" in terms of water year type. See DX-226. By the end of 1994, New Melones storage levels fell to approximately 400,000 AF. See DX-224. Pursuant to their contract, the entire inflow in 1994 – approximately 477,000 AF – was allocated to OID and SSJID. Due to limited water supplies, Reclamation failed to meet the water quality requirements imposed by D-1422 in 1994.

SEWD submitted an initial "projected delivery schedule" pursuant to Article 4 of its contract on October 22, 1993, requesting 65,300 AF of water for 1994. On March 15, 1994, SEWD submitted its final schedule, "as required by Section 4(a) of [its] Contract" for 18,564 AF to be delivered in 1995. See JX-48. Central did not submit a schedule prior to November 1, 1993, but did submit a schedule for 25,000 AF on March 17, 1994. See JX-49. Since its schedule was not timely submitted, Central does not have a viable claim for breach of contract in

1994.

In 1994, Reclamation was required to make large releases of water – 134,430 AF – to meet the water quality standard set forth in the New Melones permit, and more than 70,000 AF was released to comply with CVPIA. In addition, Reclamation released 99,745 AF to comply with the 1987 DFG Agreement, a permit requirement.

By May 1994, Reclamation had determined that 1994 was a "critically dry year" and declared a water shortage in the CVP. See JX-55. Even under Plaintiffs' narrow reading of the shortage provision, the government is immune from liability in 1994. Given its other reservoir demands, Reclamation's need to recover New Melones storage levels, the forecasted low inflows, and Reclamation's need to operate the reservoir to meet future demands, Reclamation determined that no water could be made available for marketing to Plaintiffs. Therefore, Reclamation did not breach the contracts in 1994.

iii. Reclamation Did Not Breach the Subject Contracts in 1995

In January 1995, storage levels were low (approximately 400,000 AF). See DX-224. Reclamation was required to release nearly 150,000 AF to comply with CVPIA, and nearly 500,000 AF to satisfy OID and SSJID's prior water rights. See DX-230.

SEWD initially scheduled 65,000 AF for delivery in 1995 in accordance with Article 4 of its contract, and Central initially scheduled 50,000 AF for delivery in 1995 in accordance with Article 4 of its contract. See DX-229. Based on the existing hydrologic conditions and other reservoir demands, Reclamation made available 37,000 AF of water to Central on April 10,

1995. See JX-70.[23] In response to Reclamation's offer, Central modified its schedule to request "approximately 5,000 AF of water." DX-98. Reclamation complied with Central's request.

The 32,000 AF of water that Central declined was then offered to SEWD. See JX-84. SEWD then modified its request, asking that 6,750 AF be delivered in 1995. See JX-85.[24]

Reclamation, therefore, "made available" more than the minimum amounts set forth in Article 3 of both contracts,[25] but determined that it was not prudent to make available the entire amount the contractors had initially scheduled. In response to Reclamation's 37,000 AF allocation, both Plaintiffs lowered their water requests to 11,750 AF, and ended up accepting a combined 8,567 AF. Reclamation did not breach the contracts in 1995.

iv. Reclamation Did Not Breach the Subject Contracts in 1996

New Melones storage levels had risen by the end of 1995. SEWD submitted a timely initial schedule in accordance with Article 4 of its contract for 32,400 AF, see JX-89, and Central submitted a late initial schedule for 40,000 AF, see JX-93. As in 1995, the contractors subsequently modified these initial schedules.

Despite its other demands, 1996 was a "wet" year in terms of water year type, and Reclamation made available 49,000 AF to Plaintiffs on February 22, 1996. The entire 49,000

---

[23] The water was made available to Central first, in accordance with Article 9(b) of the contracts.

[24] SEWD requested that the remaining 25,250 AF be stored pursuant to CVPIA for future use, but that request was denied. See JX-85. SEWD has no contractual right to store water in New Melones Reservoir.

[25] 1995 was Contract Year 7. Based on Article 3 of the contracts, Reclamation was to "make available" a minimum of 28,000 AF to Central and 23,450 AF to SEWD. See SEWD and Central Contracts at Art. 3.

AF of water was offered to Central first, thereby entirely satisfying Central's initial scheduled request. Central accepted only 14,273 AF, however. Reclamation clearly did not breach Central's contract in 1996.

Reclamation then informed SEWD that it would be able to deliver water in accordance with SEWD's initial schedule. See JX-100. Hence, Reclamation fully satisfied its contractual obligation to SEWD in 1996. SEWD responded to Reclamation's offer by reducing its request to 4,000 AF. See JX-101. According to SEWD, the reduction was necessary "because of the wet, '95-'96 winter, and because of the unusually large amount of storage in New Hogan Reservoir, the District's primary source." Id. The parties agree that Reclamation delivered more than 15,000 AF to SEWD in 1996 – more than twice the amount SEWD had requested. Reclamation, therefore, did not breach SEWD's contract in 1996.

3. Reclamation Did Not Breach the Subject Contracts in 1997-Present

i. The Interim Plan of Operations

The 1997 Interim Plan of Operations ("IPO") is, of course, relevant for New Melones operations in 1997 and thereafter. As the Court is aware, the parties dispute the legal significance of the IPO, and one of the questions to be resolved at trial is whether the development and implementation of the IPO for New Melones represented a mutual agreement to reduce water deliveries to Plaintiffs under Article 3(h) of the contracts. 70 Fed. Cl. at 534.

Following the 1987-1992 drought and passage of CVPIA, Reclamation recognized a need to re-evaluate the yield of New Melones. In 1994, Reclamation conducted a preliminary analysis to re-evaluate the historical yield of New Melones Reservoir. See JX-52. The re-evaluation involved simulating New Melones Reservoir operations during historic periods with varying

assumptions in order to evaluate end of the period storage levels. In the best case scenario, the end of period storage was estimated to be 337,000 AF, barely enough for power production; in the worst case scenario, the end of the period storage was calculated at *negative* 862,000 AF, meaning that there was zero yield.

The 1994 re-evaluation of yield concluded that making releases to meet only permit requirements, satisfy OID/SSJID's prior rights, and meet minimum fish releases would have dried up the reservoir by 1992. See JX-52. Accordingly, the report concluded that "[b]ased on inflow conditions alone, approximately 200,000 [AF] less per year is available than indicated in the historical yield analysis." Id. Since the historical yield analysis predicted a marketable yield of only 180,000 AF, the 1994 study revealed that actual hydrologic conditions were very different than originally expected.

DOI initiated a dialogue with interested groups (termed "Stakeholders") to identify and address issues related to implementation of CVPIA in 1995. E.g., DX-149.[26] Since development of a long-term operating plan was not feasible in 1997, the parties agreed on the IPO for New Melones. See JX-116. By providing a set of rules to calculate water quantities for

---

[26] DOI conducted a series of public meetings in 1995 and 1996, ultimately identifying 12 major areas of concern and enlisting volunteers from a variety of groups to discuss, and hopefully resolve, some of the myriad of issues raised by implementation of CVPIA. E.g., DX-149. Drafts of "Administrative Proposals" were completed, circulated, and commented upon, prior to issuance of Final Administrative Proposals. The Final Administrative Proposal for the Stanislaus River, which was completed in June 1997, noted that

> Most of the issues [raised by the Stakeholders] derive from the fact that New Melones yield is insufficient to meet the conflicting project needs, a situation that predated the passage of CVPIA and cannot be resolved by changes in the implementation of the CVPIA.

DX-150 at SE21758.

various demands, the IPO provides a useful guide for making reliable and predictable allocations from New Melones. The final iteration of the IPO was agreed to in concept in a stakeholders' meeting on January 29, 1997, and transmitted to Stakeholders in May 1997. See id. The IPO was intended to be a two-year compromise among interested groups until a long-term agreement could be reached among the stakeholder group.

The allocations calculated under the IPO are based on storage levels and expected inflows. In these discussions, SEWD informed Reclamation that Plaintiffs would be able to accept and use only 90,000 AF per year. Hence, the IPO used a maximum allocation of 90,000 AF for the contractors. Although Plaintiffs complain that the IPO gives them less water than the maximum quantity identified in the contracts, the fact is that the IPO provides some objective criteria for determining annual allocations, and the IPO allocation represents the amount of water that Reclamation has determined could reasonably be provided, especially in light of the 1994 yield re-evaluation.

Although the IPO was intended to be temporary, it continues to guide the operation of New Melones. See Central Delta Water Agency v. BOR, 452 F.3d 1021, 1025 (9th Cir. 2006) (finding that although Reclamation still operates New Melones pursuant to the IPO, it "does not blindly adhere to it" and that Reclamation deviates from the IPO "when necessary in order to meet its various obligations, including compliance with the Vernalis Salinity Standard" set forth in its state permits). In 2004, for example, the calculated allocation to the Plaintiffs under the IPO was 0 AF. Reclamation departed from the IPO in order to make 15,000 AF available to the Plaintiffs in that year. Similarly, Reclamation departed from the IPO in 2005 and 2006 and made 155,000 AF of water available to Plaintiffs in both years due to favorable hydrologic

conditions.

ii. Reclamation Did Not Breach the Subject Contracts in 1997-1998

1997 and 1998 were Contract Years 9 and 10, respectively. In 1997, significant releases of water were required to comply with the 1987 DFG Agreement – nearly 302,000 AF. In addition, nearly 130,000 AF was released to satisfy CVPIA, meaning that more than 334,000 AF of water more than the quantity anticipated in the 1980 Special Report (98,000 AF) was released for fish purposes in 1997. The result of these releases meant that the available marketable yield was nonexistent.[27] Despite this, Reclamation determined that it could make available 90,000 AF of water to the contractors in 1997.

The contractors, however, decided that rather than having 90,000 AF in 1997 and an uncertain water allocation in 1998, that they would prefer a guaranteed 50,000 AF in both years. SEWD did not submit a schedule for water to be delivered in 1997 until February 24, 1997, when it requested 23,000 AF. See JX-113. Central submitted a schedule for 27,000 AF of water in December 1996. As agreed, Reclamation made available 50,000 AF of water in 1997, see JX-112, and both Plaintiffs received more water than they had scheduled. See DX-229.

Central did not submit a schedule for water to delivered in 1998. See id. SEWD submitted a timely schedule on October 23, 1997, requesting 23,000 AF, the same amount it had requested in 1997. See id. The contractors received more than they had scheduled in 1998. See id. (SEWD received 41,103 AF in 1998, and Central received 26,680 AF in 1998).

Reclamation, therefore, did not breach the contracts in 1997 or 1998.

[27] Even higher releases for fish were required in 1998: 302,000 AF to comply with the 1987 DFG Agreement and nearly 180,000 AF to satisfy CVPIA. See DX-230.

iii. Reclamation did not Breach the Subject Contracts in 1999

1999 was Contract Year 11. As noted above, Article 3 of both contracts provided that the "United States shall not be obligated to furnish any quantity [of agricultural water] greater than the quantity scheduled in the 11th year and such quantity shall constitute the **new contract maximum** for the remaining contract term." SEWD and Central Contracts at Art. 3(c) (emphasis added). SEWD submitted a schedule on January 11, 1999, for 23,000 AF. See DX-168. Central did not submit a schedule for water in 1999. Hence, under the terms of the contracts themselves, the maximum amount of agricultural water for the remainder of SEWD's contract is no more than 23,000 AF and Central has no contractual rights to any water under its contract for 1999 or thereafter.

Reclamation released nearly 200,000 AF in 1999 to comply with the CVPIA, and 302,000 AF to comply with the 1987 DFG Agreement. Despite these releases, Reclamation guaranteed 60,000 AF of water to the contractors in 1999. See DX-229. SEWD requested 23,000 AF, and Reclamation delivered 34,437 AF to SEWD in that year. Central did not submit a written schedule, but accepted 26,680 AF. Because it made available more water than was required under the contracts or that Plaintiffs requested, Reclamation did not breach the contracts in 1999.

iv. Reclamation Did Not Breach the Subject Contracts in 2000

Reclamation made 90,000 AF of water available to the contractors in 2000. Central did not submit a written schedule. See DX-229. SEWD submitted a schedule for water in 2000 in July 2001, 18 months after it was due. Although Reclamation had made 90,000 AF of water available in 2000, the contractors accepted a combined 35,136 AF. See DX-230. Reclamation

made available more water than Plaintiffs scheduled or accepted, and therefore did not breach the contracts in 2000.

v. Reclamation Did Not Breach the Subject Contracts in 2001

2001 was a dry year for New Melones Reservoir. In order to comply with its permit obligations, Reclamation released 128,376 AF for water quality purposes, nearly 60,000 AF more than the quantity anticipated to be needed for that purpose in the 1980 Special Report. In addition, Reclamation released 100,000 AF to comply with CVPIA, and approximately 111,000 AF to comply with the 1987 DFG Agreement.

Despite these other reservoir demands and the low forecasted inflows, Reclamation made 34,000 AF of water available to the contractors in 2001. Central did not submit a written schedule, but accepted delivery of 25,747 AF of water. See DX-229. SEWD submitted a schedule for 24,000 AF of water eight months after it was due according to Article 4 of its contract. SEWD accepted delivery of 5,558 AF of water in 2001. Reclamation's allocation decision was reasonable and in compliance with (or in excess to) its contractual responsibility. Accordingly, Reclamation did not breach the contracts in 2001.

vi. Reclamation Did Not Breach the Subject Contracts in 2002

In 2002, Reclamation made significant releases to comply with water quality permit requirements (133,914 AF) and nearly 100,000 AF to comply with CVPIA. Central submitted a late schedule for water in 2002, requesting 12,000 AF. Despite other reservoir requirements, Reclamation delivered more than 18,000 AF of water to Central in 2002, more than Central had requested. Reclamation's allocation decision was reasonable and in excess of its contractual responsibility. Reclamation therefore did not breach Central's contract in 2002.

SEWD submitted a schedule for water in 2002 on July 23, 2001, requesting 24,000 AF. Given the other reservoir demands, Reclamation decided that it could deliver only 3,500 AF to SEWD. Reclamation's decision was reasonable and prudent, and did not breach SEWD's contract in 2002.

vii. Reclamation Did Not Breach the Subject Contracts in 2003

Inflows for 2003 were forecasted to be relatively low, and 2003 inflows were below normal. Significant releases – nearly 170,000 AF – had to be made to meet water quality requirements and more than 100,000 AF was required to comply with CVPIA. These releases were far in excess of those anticipated in the 1980 Special Report, and resulted in a significant reduction in the available marketable yield.

SEWD submitted a schedule for 6,000 AF of water on May 6, 2003, and Reclamation made the reasonable decision that 10,000 AF of water available to the contractors on May 22, 2003. Reclamation's allocation was reasonable given the circumstances, and in compliance with its contractual responsibility. SEWD and Central then submitted a joint schedule, requesting the full 10,000 AF. See JX-173. Accordingly, Reclamation did not breach the contracts in 2003.

viii. Reclamation Did Not Breach the Subject Contracts in 2004

2004 was a dry year, and storage levels at New Melones Reservoir continued to fall. More than 500,00 AF was released to OID/SSJID and more than 100,000 AF was required for CVPIA purposes. Central submitted a late request for 25,000 AF in 2004, and SEWD did not submit a schedule. Given the relatively low forecasted inflow, Reclamation made the reasonable initial decision that no water could be made available to the contractors, but subsequently made 15,000 AF available. Given these circumstances, Reclamation did not breach the contracts in

2004.

ix. Allocations After 2004

By the end of 2004, New Melones Reservoir storage had improved dramatically, due to Reclamation's reasonable operation and favorable inflows. Under the IPO, the Plaintiffs' allocations were less than 50,000 AF in 2005 and 90,000 AF in 2006. However, based on the favorable outlook, Reclamation made 155,000 AF available to Plaintiffs for delivery in both years. Although Reclamation made the maximum contractual amount available, Plaintiffs accepted far less in both years.

## IV. THE SOVEREIGN ACTS DOCTRINE AND THE UNMISTAKABILITY DOCTRINE PRECLUDE A FINDING THAT THE SUBJECT CONTRACTS WERE BREACHED

If the Court determines that the United States would otherwise be liable for breach of contract based on the terms of the contracts themselves, Defendant submits that the application of the sovereign acts doctrine and the unmistakability doctrines precludes a finding of liability.[28/] Specifically, the CVPIA and the ESA are acts of the government as sovereign rather than acts of the government as a contracting party. As such, Defendant's compliance with those statutes falls squarely within the sovereign acts doctrine. In addition, because the contracts in question do not contain an unambiguous waiver of the government's sovereign authority to enact legislation such as CVPIA, those contracts do not unmistakably confer a contract right to be immune from subsequent changes in the law, such as CVPIA, that may affect water availability. These same

[28/] The Court does not need to reach and address these defenses unless it finds that the CVPIA is not an amendment to the Reclamation laws to which the parties' contractual rights are expressly subject, and further finds that Article 9 does not protect the United States against liability for shortages caused by its compliance with federal laws such as the CVPIA and the ESA.

doctrines also apply to actions taken by Reclamation in compliance with the ESA.

A. The Sovereign Acts Doctrine Precludes a Finding of Liability

"The sovereign acts doctrine is an affirmative defense under which the United States, when sued as a party to a contract, 'cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.'" Allegre Villa v. United States, 60 Fed. Cl. 11, 16 (2004) (quoting Horowitz v. United States, 267 U.S. 458, 461 (1925)). See also Jones v. United States, 1 Ct. Cl. 383, 385 (1865) ("the United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign"). The sovereign acts doctrine thus draws a distinction between actions taken by the government as a party to contract and actions taken by the government in its sovereign capacity in a manner that seeks to balance "the Government's need for freedom to legislate with its obligation to honor its contracts." United States v. Winstar Corp., 518 U.S. 839, 896 (1996). In so doing, the sovereign acts doctrine levels the contractual playing field by ensuring that government contractors and private contractors are affected the same way when the government, acting in its sovereign capacity, legislates or otherwise acts in a way that impacts existing contractual rights. In other words, the government as contractor is not entitled to any special benefit from the acts of the government as sovereign. Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1575 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998). Likewise, "'the Government in its contracting role, like its private counterpart, should not incur liability for its act done in the governing role.'" Id. at 1574 n.3 (quoting O'Neill v. United States, 231 Ct. Cl. 823, 826 (1982)). As the Court explained in its pretrial opinion, "[t]he gravamen of the sovereign acts doctrine [is] to immunize the Government for unintentional breaches of contract

caused by the passage of laws of general applicability, but not those laws specifically aimed at relieving the Government of contractual liability." Stockton East Water Dist., 70 Fed. Cl. at 529 (citations omitted).

As applied here, the sovereign acts defense requires a determination as to whether the CVPIA is a sovereign act, and whether Reclamation's performance of the subject contracts was rendered impossible because of this legislation. Id. at 529-31. Both elements are addressed below, recognizing that the Court has directed that "the possibility or impossibility of performance despite or because of the CVPIA . . . must be established at trial" and that if impossibility is established the Court will then determine whether the CVPIA is a sovereign act Id. at 531.

1. The CVPIA is a Sovereign Act

In order for the sovereign acts doctrine to provide a defense to Plaintiffs' contract claims in this case, the Court must first determine whether the CVPIA is a "sovereign act." This determination turns on whether the act "'is properly attributable to the Government *as contractor*.'" Yankee Atomic, 112 F.3d at 1575 (quoting Winstar, 518 U.S. at 896) (emphasis added). This case and fact-specific inquiry "focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior government contracts." Id. As explained in Carabetta Enterprises, Inc. v. United States, an "inquiry into possible 'targeting' by Congress is relevant to determining whether the alleged breach is merely an incidental effect of a sovereign act designed to promote the public good, or instead is a deliberate attempt by Congress to alter its previous bargain with the contractor." 58 Fed. Cl. 563, 568 (2003) (quoting Coast-to-Coast Fin. Corp. v. United States, 45 Fed. Cl. 796, 804

(2000)). See also Klamath Irrig. Dist., 67 Fed. Cl. at 537 ("[a]n act of government will be considered sovereign so long as its impact on a contract is 'merely incidental to the accomplishment of a broader governmental objective.'" (quoting Winstar, 518 U.S. at 898)).

The question of whether the CVPIA is a sovereign act is not a question of first impression. For example, in the district court proceedings related to this case, the district court found that unlike the legislation at issue in the Winstar case, "the CVPIA did not have the specific objective of relieving the government of its contractual obligations." Stockton East Water Dist. v. United States, No. CV-F-93-5896 OWW, slip op. at 39 n.4 (E.D. Cal. Nov. 4, 1996) (attached to Def.'s Pretrial Br.). Similarly, in O'Neill, *supra*, the Ninth Circuit found that the CVPIA marked "a shift in reclamation law modifying the priority of water uses," and that nothing in the water service contract before it surrendered, in unmistakable terms, Congress's sovereign power to enact such legislation. 50 F.3d at 686. Implicit in this determination is the conclusion that the enactment of the CVPIA was such a sovereign act. Id.

These prior determinations that the CVPIA is a sovereign act are fully supported by the language of the legislation. The purposes of the CVPIA are broad and public. They include:

(1) the protection, restoration, and enhancement of fish, wildlife and associated habitat in the Central Valley and Trinity River basins of California, which encompasses a significant portion of the State of California;

(2) addressing the impacts of the CVP on fish, wildlife and associated habitats;

(3) improving the operational flexibility of the CVP;

(4) increasing water-related benefits provided by the CVP to the State of California by expanding voluntary transfers of water and improving water conservation;

(5) contributing to the State's efforts to protect the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and

(6) achieving "a reasonable balance among competing demands for use" of CVP water.

CVPIA, Sec. 3402. Although the implementation of these goals incidentally impacts all of the existing 250 CVP water service contracts, the CVPIA does not specifically target those contracts or repudiate those contracts.[29] Moreover, although Plaintiffs focus on aspects of the CVPIA that have reduced the availability of CVP water in certain years, other provisions of the Act are intended to increase operational flexibility of the CVP and otherwise increase the water related-benefits of the CVP in a manner that *benefits* existing CVP contractors. See, e.g., CVPIA, Sec. 3405(a) (authorizing the transfer of water between CVP contractors and other parties); CVPIA, Sec. 3405(e) (requiring the implementation of water conservation best management practices to promote "the highest level of water use efficiency reasonably achievable by project contractors"); CVPIA, Sec. 3406(b)-(c) (requiring the development and implementation of numerous programs and studies that are intended to enhance the firm yield of the CVP).

In arguing that the CVPIA specifically targeted their contracts, Plaintiffs contend that the

[29] The CVPIA also stands in contrast to another piece of legislation involving a Reclamation contract that has been construed as "targeting" piece of legislation. United States v. Westlands Water Dist., 134 F. Supp. 2d 1111 (E.D. Cal. 2001), involved a contract between Reclamation and a water district for the delivery of water from the CVP. That contract (unlike the contracts at issue here) set a specific price of $8.00 per AF of water and a specific drainage service rate. Id. at 1142. Congress then passed an act which "abrogate[d]" the water and drainage service rate, requiring that the government charge its "full cost" to Plaintiffs. Id. at 1144. The court determined that the act in question had the "singular overriding purpose" of "target[ing] contractors who had contractual promises" for a low fixed price. Id. at 1153. The CVPIA does not abrogate any particular provision of Plaintiffs' contracts.

800,000 AF of CVP yield dedicated to fish and wildlife restoration under Section 3406(b)(2) is water that was taken directly from the CVP contractors. Pls.' Pretrial Br. at 15-16. Of course, this argument presumes that Plaintiffs' contracts unconditionally guaranteed them a certain quantity of water each year, which they do not.

Moreover, even to the extent that the reduction in the quantity of the CVP's yield that is available for delivery to CVP contractors is considered a "cost" of the CVPIA that must be borne by the CVP contractors, that does not compel a conclusion that the CVPIA is not a sovereign act. Indeed, this very issue was addressed by the Federal Circuit in Yankee Atomic, *supra*. There, the plaintiffs alleged a breach of contract based on legislation that imposed a special assessment against certain utility companies, the purpose of which was to help fund the clean up of old uranium enrichment plants that had been used to generate and supply uranium at fixed prices under prior contracts. 112 F.3d at 1572-73. In finding that the legislation was a sovereign act, the Federal Circuit emphasized that even though it "targeted" utility companies that used and benefitted from the government's uranium enrichment services, the purpose of doing so was to spread the costs of a societal problem (uranium contamination) among those who benefitted from the source of that problem (the utility companies who received uranium from the contaminated facilities). Id. at 1575-76. Given the purpose of the legislation, the Federal Circuit concluded that any impact that the legislation had on the prior contracts to supply uranium was "merely incidental to the accomplishment of a broader governmental objective." Id. at 1576 (quoting Winstar, 518 U.S. at 898).

Like the legislation at issue in Yankee Atomic, the CVPIA was enacted in response to environmental problems that the historic operation of the CVP allegedly caused or contributed

to. See Central Delta Water Agency v. United States, 306 F.3d 938, 944 (9th Cir. 2002) (noting that the passage of the CVPIA "followed significant lobbying efforts by environmental groups and consists primarily of provisions designed to ensure that the Project is managed to further the protection and restoration of the natural environment"). Although the implementation of the CVPIA impacts CVP contractors, the purpose of the legislation is not to abrogate those contracts, but is instead to spread the costs of a societal problem (decreased water quality and fishery losses) among those who benefitted from the source of that problem (the water districts who receive and make consumptive use of water from the CVP). Thus, like the legislation in Yankee Atomic, the CVPIA is legislation passed for the benefit of the public (*i.e.*, a sovereign act), rather than legislation passed for the benefit of the Government-as-contractor.

2. It Was Not Possible To Comply With CVPIA Without Using Water From New Melones Under CVPIA Section 3406(b)(2)

In their Pretrial Brief, Plaintiffs' arguments and the evidence they intend to present at trial on the issue of impossibility focus on two issues: (1) whether Reclamation could have delivered more water to Plaintiffs by taking water from other contractors for the purposes of CVPIA, and (2) whether it was *physically* possible to deliver more water to Central and SEWD during the years in question. In either case, Plaintiffs contend that Reclamation's performance was not rendered impossible by the CVPIA, but instead "resulted from the exercise of its discretion in one manner as opposed to several different discretionary actions allowed by Congress." Pls.' Pretrial Br. at 11. These arguments fail as a matter of law because they are premised on an erroneous interpretation of the legal standard for determining "impossibility." Plaintiffs' arguments also fail because they are based on erroneous assumptions regarding CVP hydrology.

a. Plaintiffs' Articulation of the "Impossibility" Standard is Not the Correct Legal Standard

Plaintiffs contend that the sovereign acts doctrine does not apply because even if compliance with the CVPIA was mandatory, Reclamation had discretion in terms of how it implements the requirements of the Act. This exact interpretation of the sovereign acts doctrine and the issue of impossibility was made by another Reclamation contractor alleging a breach of contract, and rejected by the Court of Federal Claims, in Casitas Municipal Water Dist. v. United States, No. 05-168L, slip op. (Fed. Cl. Oct. 2, 2006) (Weise, J.) (attached to Def.'s Pretrial Br.).

The Casitas case involves a breach of contract claim arising out of the operation of the Ventura River Project in Ventura County, California. The water district alleged that Reclamation breached its contract by requiring the district to construct a fish passage facility and provide 3,200 AF of water per year to protect steelhead trout in the Ventura River in order to comply with the ESA. Casitas, slip op. at 2. In response to the government's assertion of a sovereign acts defense, the district asserted that no such defense was available because performance of the contract was not rendered impossible by the ESA, but was instead abridged by a "wholly discretionary determination" as to how to comply with the ESA. Id. at 10-13. The plaintiff asserted that, under these circumstances, because the government had other options available to it in terms of how to comply with the ESA, performance of the contract was not rendered impossible by its discretionary selection of one of these options. Id. at 11, 13.

The CFC squarely rejected the plaintiff's spin on the sovereign acts doctrine and the question of impossibility, explaining that,

> The premise implicit in plaintiff's position – that BOR may not invoke the sovereign acts defense because it was responding to a discretionary directive on the part of [the National Marine Fisheries Service]– is not analytically sound. As

> noted above, for purposes of determining the applicability of the sovereign acts defense, no meaningful distinction may be drawn between statutes whose implementing details have been spelled out by Congress and statutes whose implementation Congress has left for administrative determination. In either case, the governmental action is sovereign in character and where its effect is to render contract performance impossible (even though the action is otherwise public and general in its reach), the sovereign acts defense may be invoked. Thus, the fact that NMFS could have addressed the issue of ensuring fish passage by means other than requiring the dedication of a certain water supply does not alter the sovereign character of its action any more than if that requirement had originated with Congress itself.

Id. at 13-14. On this basis, Judge Weiss granted summary judgment in favor of the United States on the district's contract claims. Significantly, in holding that the government's determination as to how to comply with the ESA was itself a sovereign act, the Court determined that the question of whether there were other options available for complying with the ESA that would have been less costly and would have provided the district with more water was simply irrelevant.

The federal district court reached a similar conclusion in Barcellos & Wolfsen, *supra*, 849 F. Supp. 717 (E.D. Cal. 1993), a case in which several CVP contractors sought to enforce a judgment and obtain a declaration that Reclamation was required under the terms of their contract to make a specified quantity of water available for sale to them each year. In response to the government's argument that it was not possible to make this quantity of water available because of Reclamation's compliance with the ESA and the CVPIA, the plaintiffs argued that Reclamation was not required by these statutes to make water allocations for environmental purposes. Id. at 733. In declining to address these arguments, the court noted that the plaintiff's arguments "concern the Bureau's *method* of compliance with the ESA and the CVPIA, rather than the *necessity* of the Bureau's compliance." Id. The court found that the proper forum to challenge the manner in which Reclamation was complying with the environmental statutes was

in a separate proceeding, namely an APA challenge. Id. at 733-34.

Plaintiffs' arguments in this case suffer from the same legal defects as the arguments made by the Casitas and Barcellos plaintiffs. Here, the crux of Plaintiffs' response to the government's sovereign acts defense is that Defendant's inability to deliver water under the subject contracts was "not a function of statutorily created impossibility," but instead resulted from discretionary decisions made by the government as to how the CVPIA would be implemented and how the requirements of that Act would be met. Pls.' Pretrial Br. at 9-12. As the CFC correctly held in Casitas, the government's implementation of a sovereign act is itself a sovereign act. Accordingly, the implementation of the CVPIA in this case – including the government's decisions as to how to comply the requirements of the Act, how to achieve the fish doubling goals, and where to use the 800,000 AF of (b)(2) water that is dedicated under the Act to fish restoration purposes – are all sovereign acts. Plaintiffs' attempt to challenge these actions by arguing that there were other means of complying with the CVPIA is simply irrelevant.[30/]

b. The Other 248 CVP Water Service Contracts Are Not Relevant to the Impossibility of Performance Inquiry

At summary judgment, Plaintiffs challenged "the notion that it was impossible for Reclamation to perform its contractual obligations to plaintiffs even under the CVPIA because the CVPIA allowed Reclamation to choose from which contractors it took the water." Stockton East Water Dist., 70 Fed. Cl. at 530. Plaintiffs make this same argument in their pretrial brief, asserting that Defendant "could have lessened the impact on New Melones by taking more

---

[30/] As the Barcellos case indicates, any challenge to Reclamation's method of compliance with the CVPIA needs to be brought under the APA and is likely to "involve extremely complex and time-consuming proceedings." Barcellos & Wolfsen, 849 F. Supp. at 734.

CVPIA (b)(2) water from other CVP units in a manner that would not have breached these other CVP contracts" because those contracts contain different shortage provisions that specifically allocate the risk of future legislative changes to the water users. Pls.' Pretrial Br. at 11. This aspect of Plaintiffs' arguments fails in the first instance because, as explained above, Defendant's determination as to how to comply with the CVPIA is a sovereign act for which Defendant cannot be held liable under a breach of contract theory.

Moreover, even if that determination were not a sovereign act, Plaintiffs erroneously assume that Reclamation could have reduced the quantity of (b)(2) water needed out of New Melones by simply taking that water from other CVP units. This argument ignores the hydrology of the CVP, and the specific geographic and hydrologic situation Reclamation faces in operating the New Melones Reservoir.

The CVPIA sets a goal of doubling the natural production of anadromous fish in all Central Valley rivers and streams, and the 800,000 AF of (b)(2) water is to be used to help achieve this goal and other related purposes. CVPIA, Sec. 3406(b). The Stanislaus River is one of the Central Valley streams to which the doubling goal applies, and the New Melones Reservoir is the only reservoir owned and controlled by the United States on that river. Accordingly, in order to help achieve the fish doubling goal on the Stanislaus through (b)(2), Reclamation's only option is to release water from New Melones Reservoir. In addition, Defendant cannot simply offset the impact of such releases on Plaintiffs by delivering less water to another CVP contractor because there are no other CVP water service contractors that get their water directly from New Melones.

Plaintiffs also contend that Reclamation could have increased its deliveries to Plaintiffs

by simply reducing its water deliveries to another contractor that receives CVP water from another unit of the CVP, such as Westlands Water District. Pls.' Pretrial Br. at 11-12 (suggesting that Reclamation could have met Plaintiffs' request in 1993 by reducing Westlands Water District's delivery by 10,000 AF). This argument also fails because it too is based on a fundamental misunderstanding of CVP hydrology. Using the example offered by Plaintiffs, there is simply no feasible way to take 10,000 AF of water that would otherwise by delivered to Westlands, which is located south of the Delta, and move that water to an upstream location on the Stanislaus River where it could be diverted by Plaintiffs under their contracts.

c. Plaintiffs' "Physical Impossibility" Argument is Misplaced

In addition to the arguments addressed above, Plaintiffs contend that compliance with the CVPIA did not make it *physically* impossible for Reclamation to deliver a full 155,000 AF of water to Plaintiffs in each of the years in question. This argument must be rejected because it is based on a misinterpretation of the legal standard for determining impossibility of performance under the sovereign acts doctrine, and because the analysis that supports the argument improperly challenges Reclamation's determination of water availability based on a hindsight modeling.

Contracts with the government are generally subject to and controlled by the same law that governs contracts between private parties. "Rather than shield the government from the implications of this principle, the sovereign acts doctrine ensures its effectiveness by preserving for the government an impossibility defense that would be available to a private defendant under the same circumstances." Amber Resources Co. v. United States, 68 Fed. Cl. 535, 554 n.39 (Fed. Cl. 2005).

The question presented in this case is one of legal impossibility: whether the enactment and implementation of the CVPIA, and Reclamation's compliance with the requirements of that Act in its operation of the CVP, made it impossible to deliver a full 155,000 AF of water to Plaintiffs pursuant to the contracts. See Restatement (Second) Contracts § 264 (1981) ("If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."). Contrary to Plaintiffs' assertion, "impossibility" as used in this context does not mean "physical impossibility." For example, the Federal Circuit has "long recognized that the doctrine of impossibility *does not require a showing of actual or literal impossibility of performance* but only a showing of *commercial impracticability*." Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002) (emphasis added). In addition, the issue of commercial impracticality is an objective determination as to "'whether the promise can *reasonably* be performed rather than a subjective inquiry into the promisor's capability of performing as agreed.'" Transatlantic Fin. Corp. v. United States, 363 F.2d 312, 319 n.13 (Fed. Cir. 1966) (citation omitted) (emphasis added).

Here, Defendant's witnesses will testify about the day-to-day operation of the CVP, with a particular focus on the operation of New Melones. See Central Delta Water Agency, 452 F.3d at 1027 (recognizing that operating the CVP is "an extremely difficult task . . . Congress granted the Bureau considerable discretion in determining how to meet [its] many obligations."). These witnesses will explain the numerous factors that impact operations, including legal constraints (such as flood control requirements), senior water rights, permit conditions (including releases of

water to meet water quality standards and instream fish flows), and the additional requirements imposed under the CVPIA. In addition to these legal constraints, the Project is not and cannot be operated on a short-sighted basis looking only at the needs and demands in a given year. Instead, the Project is operated to serve all of its purposes – flood control, power, fish and wildlife restoration and enhancement, and providing water for consumptive uses – on a sustained, long-term basis. In addition, these witnesses will testify how reservoir operators make decisions based on historical knowledge of instream flows and drought occurrences, current reservoir conditions, and forecasts of instream flow conditions. Defendant's witnesses will also testify about how all of these factors impacted Reclamation's determination of water availability in each of the years in question.

Plaintiffs attack Reclamation's actual operation of New Melones with testimony from their only designated expert witness, Avry Dotan. Mr. Dotan has no experience in the actual operation of a reclamation project or any other similar facility. Instead, Mr. Dotan's assignment was quite limited, and his resulting analysis and conclusion are ultimately irrelevant to the question of legal standard of impossibility. Mr. Dotan comes into this case as the proverbial Monday morning quarterback. Sitting at a computer, and dropping all of the historical data on New Melones operations into a spreadsheet model, Mr. Dotan opines that it was "physically possible" for Reclamation to deliver 155,000 AF of water to Plaintiffs in each of the years in question without "drying up the reservoir." Dotan Report at 24.

Defendant will call several present and former Reclamation employees to testify about how CVP operations are coordinated and how allocation decisions at New Melones Reservoir are reached. These witnesses, including Peggy Manza, who will rebut Mr. Dotan's report, will

explain that Mr. Dotan's hindsight analysis is irrelevant to, and significantly different from, actual, real-time operation of New Melones. In operating New Melones, Reclamation has knowledge of past conditions, including annual inflow to the reservoir, drought conditions, and the quantity of water needed to meet permit conditions and other requirements in prior years. In making its determination of water availability in each year, it is also armed with knowledge of current reservoir conditions, requests for water for the coming year, and forecasts of flow conditions. However, Reclamation does not have perfect foresight. It can only make water availability determinations based on the information it has before it, which does not include perfect knowledge of what conditions will exist in the years to come. Accordingly, Mr. Dotan's analysis – which is a hindsight analysis – is not relevant to deciding whether it was commercially impracticable in each of the years in question, based on information available to Reclamation at that time, to deliver more water to Plaintiffs than was actually delivered.

B. The Contracts Do Not Contain Unmistakable Terms Exempting Plaintiffs From the Application of Future Legislation

A second doctrine that shields the United States from liability in this case is the unmistakability doctrine. As recently explained by the Federal Circuit,

> the unmistakability doctrine is a doctrine of contract construction instructing that "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act, nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of a sovereign power."

Centex Corp. v. United States, 395 F.3d 1283, 1306 (Fed. Cir. 2005) (quoting Winstar, 518 U.S. at 878).

Although the Court has deferred ruling on whether CVPIA is a sovereign act, the Court did find in its pretrial opinion that "all parties agree that the contracts do not contain an

'unmistakable promise' not to legislate." 70 Fed. Cl. at 530. The lack of a dispute on this particular issue is not surprising given the number of decisions interpreting similar reclamation contracts and finding such contracts do not contain unmistakable terms exempting the other contracting party from subsequent sovereign acts. For example, in O'Neill, *supra*, water users within the Westlands Water District of the CVP sought to prevent BOR from reducing deliveries of water under the district's water service contract. The Ninth Circuit held that "[e]ven if the water service contract did obligate the government to supply, without exception, 900,000 acre-feet of water," the trial court correctly held that the district was not entitled to prevail because nothing in the contract surrendered, in "unmistakable terms," Congress's sovereign power to enact subsequent legislation such as the CVPIA. Id. at 686.

Accordingly, if the Court determines that CVPIA is a sovereign act, then the United States is immune from liability because the subject contracts did not shift the risks associated with the enactment of future sovereign acts such as the CVPIA to Reclamation. See 70 Fed. Cl. at 531.

## V. PLAINTIFFS HAD NO CONTRACTUAL RIGHTS UNTIL AFTER THEIR WATER CONSERVATION PLANS WERE APPROVED

If the Court determines that Defendant would be liable for breach of contract despite the arguments set forth above, the Court should nevertheless conclude that Defendant is not liable for any years prior to August 1995, when Plaintiffs' water conservation plans were approved. As will be discussed in more detail in Defendant's Response to Plaintiffs' Motion in Limine to Exclude Evidence Relating to Alleged "Immaterial Breaches of the Contracts" ("Defendant's Response"), Reclamation had no authority to deliver water to Plaintiffs until after Reclamation

and the SWRCB approved Plaintiffs' water conservation plans.[31] These plans were not approved until August 1995. Hence, Defendant could not be liable for breach of contract in 1993, 1994, or part of 1995.

## VI. THE THIRD PARTY PLAINTIFFS ARE NOT INTENDED THIRD-PARTY BENEFICIARIES OF THE SEWD CONTRACT

The Third Party Plaintiffs, who did not sign either contract, claim that they are entitled to sue Defendant because they are *intended* third-party beneficiaries of the SEWD contract. Neither the law nor the facts support their allegation and their claims should be dismissed.

The consent of the United States to be sued under a contract requires a waiver of sovereign immunity. Chancellor Manor v. United States, 331 F.3d 891, 898 (Fed. Cir. 2003). Such waivers, "to be effective, must be unequivocally expressed" and are to be "construed narrowly." United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992) (internal quotations and citations omitted). In order to prove that they are intended beneficiaries who have the right to enforce the contract against the United States, as opposed to incidental beneficiaries who may benefit from the contract but have no enforcement rights, the Third Party Plaintiffs must demonstrate:

> that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly. Third party beneficiary status is an "exceptional privilege" and, to avail oneself of this exceptional privilege, a party must "as least show that [the contract] was intended

---

[31] Rather than repeat the same arguments set forth in Defendant's Response, Defendant notes that only that the contracts provide that "[t]he Contractor shall develop and implement an effective water conservation program for all uses of water which is provided from, or conveyed through, Federally constructed or Federal financed facilities for the Contractor's use." SEWD and Central Contracts at Art. 19(a). In addition, Reclamation's state law permits prevented Reclamation from diverting water to Plaintiffs until after development of a water management program in conformance with SWRCB's requirements. See D-1616 at 35.

for his *direct* benefit."

Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)) (emphasis in original). Application of this test is a mixed question of law and fact, but whether certain parties are, in fact, intended third-party beneficiaries is ultimately a question of law. Glass, 258 F.3d at 1353. The Third Party Plaintiffs have the burden of demonstrating that they are intended third-party beneficiaries under this test and that the United States waived its sovereign immunity. See Chancellor Manor, 331 F.3d at 898.

The Third Party Plaintiffs may show that the SEWD contract was for their direct benefit in one of two ways: (1) that they are identified as third-party beneficiaries in the contract, or (2) if the intent to benefit the third party is not expressly stated, "evidence thereof may be adduced." See Roedler v. Dept. of Energy, 255 F.3d 1347, 1352 (Fed. Cir. 2001). The Court has directed that the parties provide evidence of the intent to benefit the alleged third-party beneficiaries at trial "citing evidence from outside the contracts as needed to demonstrate whether Reclamation and SEWD intended the City, and the County, and California Water to be beneficiaries of their water contract." Stockton East Water Dist. v. United States, 70 Fed. Cl. at 528.

A. The Third Party Plaintiffs Are Not Identified as Intended Third Party Beneficiaries in SEWD's Contract

It is undisputed that the Third Party Plaintiffs are neither identified as intended third-party beneficiaries in SEWD's contract, nor mentioned in the contract. Plaintiffs rely on three provisions of the SEWD contract to support their third-party beneficiary argument: (1) a clause in the recitals stating: "the Contractor has present and potential need for an irrigation and municipal and industrial water supply"; (2) a payment provision stating that the obligation of the

contractor to pay for the water is not dependent on "the manner in which the obligation may be distributed among the Contractor's users"; and (3) a provision stating: "Water furnished to the Contractor pursuant to this contract shall not be sold, exchanged, or otherwise disposed of for use outside the Contractor's service area." See Pls.' Pretrial Br. at 33. None of these provisions expressly confers contractual rights upon any of the Third Party Plaintiffs.

The argument that water users are intended third-party beneficiaries by virtue of the fact that they buy water from water districts who contract with the United States has been rejected in similar water rights disputes. E.g., Smith v. Central Arizona Water Conservation District, 418 F.3d 1028, 1036-37 (9th Cir. 2005) ("We conclude here, as we did in Klamath [Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1212 (9th Cir. 1999)], that to allow third-party beneficiary status to all of the groups potentially benefitted under the subcontracts would produce a result certainly not intended."); see also Orff v. United States, 358 F.3d 1137 (9th Cir. 2004) (holding that farmers were not intended third party beneficiaries of water delivery contracts where they failed to satisfy the "clear intent" standard required to establish third-party beneficiary status), aff'd on other grounds, 125 S. Ct. 2606 (2005);[32/] Klamath Water Users Protective Ass'n. v. Patterson, 204 F.3d 1206 (9th Cir. 2000) (holding that water users association and other irrigators are not intended third-party beneficiaries of contract between the United States and dam operator, and therefore cannot sue for breach of contract for failure to release

---

[32/] The Ninth Circuit recently recognized that while the Supreme Court affirmed Orff on other grounds, "[the Ninth Circuit's] holding in Orff was not disturbed by the Supreme Court." See Smith, 418 F.3d at 1036 n.6.

water).[33]

Plaintiffs continue to rely on H.F. Allen Orchards v. United States, 749 F.2d 1571 (Fed. Cir. 1984), and Klamath Irrigation District v. United States, 67 Fed. Cl. 504 (2005), to support their contention that they are intended third party beneficiaries. Pls.' Pretrial Br. at 31-32. Both cases are distinguishable. The language in H.F. Allen Orchards relied upon by Plaintiffs to support their third-party beneficiary argument, is, as the Court noted, *dicta* and therefore not binding on this Court. Stockton East Water Dist., 70 Fed. Cl. at 527. H.F. Allen Orchards is also distinguishable because the water users in that case were found to be intended third party beneficiaries based upon a "1945 consent decree [that] was entered ending a suit for declaratory judgment to determine the obligation of the Bureau to deliver water to the Sunnyside irrigation district and to determine the respective water rights of all users of the Yakima River." 749 F.2d at 1574-75. No such consent decree regarding the rights of all water users is at issue here.

In addition, as the Court has recognized, Klamath is distinguishable because many of the contracts at issue there include references to or incorporated preexisting contracts between individual water users and the United States. Klamath, 67 Fed. Cl. at 533. Here, in contrast, the Third Party Plaintiffs had no preexisting contracts with the United States or other prior water rights that were incorporated into SEWD's contract.[34]

---

[33] Plaintiffs' attempt to distinguish Patterson on the basis that it involved only a contract for the operation of a dam to produce water, not for water delivery, is unavailing. See Pls.' Pretrial Br. at 32 n.10. Although the contract at issue did primarily involve hydropower, that was not the basis for the court's decision, and, in fact, the contract also had provisions dealing with water for "domestic, municipal, and irrigation purposes." See Patterson, 204 F.3d at 1211. In any case, the contracts in Smith and Orff were water delivery contracts.

[34] The other cases relied upon by Plaintiffs provide little guidance to the factual circumstances here. In Barcellos and Wolfsen, Inc. v. Westlands Water Dist., 899 F.2d 814 (9th Cir. 1990), the

B. An Intent to Directly Benefit Water Users Under SEWD's Contract Would Be Contrary to Reclamation Law

In determining whether certain entities are intended third-party beneficiaries, where "the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." Roedler, 255 F.3d at 1352. At the time that the subject contracts were entered into, the Secretary of the Interior was not authorized to enter into repayment or water service contracts with individual water users, but was instead only authorized to enter into such contracts with districts and other entities organized under state law. See 43 U.S.C. § 423e; see also Peterson v. U.S. Dep't of the Interior, 899 F.2d 799, 804 (9th Cir. 1990) (discussing 43 U.S.C. § 423e, which required DOI to "enter into long-term water service contracts with irrigation districts organized under state law" and leave to "the individual districts to execute subcontracts with the actual users of water and to deliver the water").

Similarly, Sections 9(d) and 9(e) of the Reclamation Project Act of August 4, 1939, 53 Stat. 1187, required the Secretary of the Interior to enter into repayment and water service contracts only with "an organization" as that term is defined in section 2 of that Act, 43 U.S.C. § 485a(g), not with any water user or any entity that subcontracts with a Federal Reclamation Project repayment or water service contractor. See 43 U.S.C. §§ 485h(d) and (e). Hence, Congress determined that Reclamation should only contract with a district created under state law with authority to enter into such contracts. It necessarily follows that Reclamation's

Ninth Circuit *assumed*, without any substantive analysis, that the plaintiffs were third party beneficiaries and went on to decide the case on the merits against them. Id. at 816. Henderson County Drainage Dist. No. 3 v. United States, 53 Fed. Cl. 48, 52 (2002), involved a drainage district, which is based upon an entirely different statutory and contractual framework than the water districts at issue in this case.

contractual rights and obligations are limited to its contractual relationship with those districts that it contracts with, and does not extend to each and every end user of the water who may subcontract with the contractor. Given these clear statutory mandates, the Court should conclude that the Defendant did not intend to confer contractual rights upon the Third Party Plaintiffs.

### C. Extrinsic Evidence Will Not Unequivocally Demonstrate That The Third Party Plaintiffs Are Intended Third-Party Beneficiaries

The evidence will show that the Third Party Plaintiffs did not participate in the drafting of SEWD's contract, nor did they participate in the negotiation of the contracts. These parties are merely subcontractors, whose right to receive water from New Melones is totally dependent on contracts they entered into with SEWD. The Third Party Plaintiffs contracted with SEWD for a certain amount of treated water per year regardless of the source of that water. To the extent that these third parties have enforceable contractual rights to receive water, those rights are derived from and limited by the terms of their subcontracts. These rights, if any, are enforceable only against SEWD, not against the United States. Defendant's alleged knowledge of these subcontracts and the alleged input from the City of Stockton about the water needs of its residents (see Pls.' Pretrial Br. at 32) is irrelevant, and certainly does not unequivocally demonstrate that any of the Third Party Plaintiffs are intended third-party beneficiaries under this contract.

## VII. CONCLUSION

For the reasons stated above, as well as based on the evidence to be presented at trial, Defendant respectfully requests that the Court find that the United States did not breach the subject contracts in any year between 1993 and 2004, and enter judgment for the United States.

Dated: October 9, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division

s/ William J. Shapiro
WILLIAM J. SHAPIRO
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
501 I Street, Room 9-700
Sacramento, CA 95814
(tel) (916) 930-2207

Counsel of Record for Defendant

KRISTINE S. TARDIFF
United States Department of Justice
Environment and Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301

LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 663
Washington, DC 20044-0663

OF COUNSEL:
SHELLY RANDEL
United States Department of the Interior

Office of the Solicitor
Branch of Water and Power
Division of Land and Water Resources
1849 C St., N.W.
Washington, DC

JAMES E. TURNER
Assistant Regional Solicitor
United States Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825