**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT, SAN JOAQUIN COUNTY, STOCKTON CITY, CALIFORNIA WATER SERVICE COMPANY, | ) | |
| | ) | No. 04-541 L |
| Plaintiffs, | ) | |
| v. | ) | Judge Christine Odell Cook Miller |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO DEFENDANT'S PRETRIAL BRIEF**

For the Court's convenience, Defendant hereby submits the following Appendix to Defendant's Pretrial Brief, containing the following unpublished decisions:

Casitas v. United States, No. 05-168L, slip op. (Fed. Cl. Oct. 2, 2006) (Weise, J.) (to be published);

Stockton East Water Dist. v. United States, No. CV-F-93-5896 OWW, slip op. (E.D. Cal. Nov. 4, 1996).

# Tab A

# In the United States Court of Federal Claims

No. 05-168L
Filed: October 2, 2006

| | |
|---|---|
| CASITAS MUNICIPAL WATER DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Contract: (1) Costs associated with the construction of a fish passage facility that was built to remedy the injurious effects resulting from the operation of the water reclamation project constitute operation and maintenance expenses. (2) The provision in the parties' contract entitling plaintiff to "the perpetual right to use all water that becomes available through the construction and operation of the project" merely recites a condition of the parties' exchange and imposes no affirmative obligation on the government to guarantee plaintiff's water supply. Sovereign Acts Defense: (1) Where an agency action has no effect on the government's economic interests as a contractor, the government may successfully invoke the sovereign acts defense. (2) The fact that a government agency had available to it alternatives to the action it ultimately took in the implementation of a statute does not preclude the government, acting in its role of contractor, from raising an impossibility defense. |

Roger J. Marzulla and Nancie G. Marzulla, Marzulla & Marzulla, Washington, DC, counsel for plaintiff.

Kathleen L. Doster and James D. Gette, with whom was Assistant Attorney General Sue Ellen Wooldridge, U.S. Department of Justice, Environment and Natural Resources Division, Natural Resources Section, Washington, DC, counsel for defendant.

## OPINION

WIESE, Judge.

Plaintiff, Casitas Municipal Water District (formerly the Ventura River Municipal Water District), entered into a contract with the United States Bureau of Reclamation for the construction and operation of a water reclamation project on the Ventura River in Ventura County, California ("the Ventura River Project"). The contract, commonly referred to as the "repayment contract," contemplated the expenditure by the United States of an agreed-upon ceiling amount of $30.9 million in construction costs, which was to be repaid by plaintiff over a period of 40 years. The contract additionally specified that plaintiff would assume all operation and maintenance costs of the project from the time of its completion.

Plaintiff now alleges that the United States breached the contract by requiring plaintiff to (i) construct a fish passage facility at a cost over and above the explicit ceiling amount on construction costs contained in the contract, and (ii) provide 3,200 acre-feet of water annually from the Ventura River Project to protect the West Coast steelhead trout in contravention of plaintiff's alleged contract right to the use of all of the river flow for irrigation.[1] The parties have crossed-moved for summary judgment and the court heard oral argument on August 30, 2006. For the reasons set forth below, we grant defendant's motion for summary judgment and deny plaintiff's cross-motion.

## FACTS

On March 1, 1956, Congress authorized the construction of the Ventura River Project, a facility designed to supply Ventura County, California, with water for the irrigation of farmland as well as for other municipal, domestic, and industrial uses. Pub. L. No. 423, 70 Stat. 32 (1956). Pursuant to that grant of authority, the Secretary of the Department of the Interior, acting through the Bureau of Reclamation ("BOR"), entered into a contract with plaintiff ("Casitas" or the "District") on March 7, 1956, providing for the construction of the project. Under the terms of the contract, Casitas agreed to "repay to the United States the actual reimbursable [construction] cost, but not in excess of . . . $27,500,000" (later amended to $30,900,000), and upon completion of the project, to "take over and at its own expense operate and maintain the project works." In addition, the contract provided

---

[1] In its complaint, plaintiff also asserts that the requirement that it divert a portion of the Ventura River Project water supply for fish preservation purposes constitutes a Fifth Amendment taking for which just compensation is due. Pursuant to the agreement of the parties, however, resolution of this issue has been deferred pending a ruling on plaintiff's contract claim.

that "the District shall have a prior right in perpetuity to the use of the water made available by the project works, subject only to existing vested rights." Title to the project works, however, remained with the United States.

Before construction of the project began, a question arose concerning the need for the installation of a fish passage facility to accommodate the migration of the West Coast steelhead trout. Initially, the California Department of Fish and Game maintained that such a facility should be included as part of the proposed construction. The Department later changed its position, however, accepting plaintiff's written assurance that "if and when [the] need develops our District will cooperate fully with your Department toward the installation of an adequate fish ladder." The project, as completed, thus contained no such fish passage facility.

Forty years after the construction of the project, the issue of fish protection again emerged. On May 27, 1994, the National Marine Fisheries Service ("NMFS") proposed listing the West Coast steelhead trout as an endangered species, 59 Fed. Reg. 102 (May 27, 1994), a step NMFS in fact took on August 18, 1997, 62 Fed. Reg. 159 (Aug. 18, 1997). As a result of this determination, it became unlawful under Section 9 of the Endangered Species Act ("ESA") "for any person subject to the jurisdiction of the United States to . . . take any such [endangered] species within the United States." 16 U.S.C. § 1538(a)(1) (2000).[2]

While NMFS was contemplating the classification of the steelhead trout as an endangered species, Casitas itself was concerned about the adverse effects of the project's operation on the steelhead population in the watershed and began planning for impending federal ESA requirements. Casitas ultimately joined with a number of its local water users to create a Habitat Conservation Plan to minimize the water supply impacts of listing the steelhead trout as an endangered species. This effort was cut short in December 1998, however, when Casitas received notice that California Trout, Inc., a nonprofit environmental group, intended to file suit charging both Casitas and BOR with violating the ESA by operating the project without a fish ladder or other means of ensuring the passage of migrating fish and without fish screens to prevent their capture and entrapment.

To address the concerns raised by California Trout, Casitas requested BOR to seek an informal consultation with NMFS pursuant to Section 7 of the ESA to enlist that agency's technical assistance in the design, construction, operation, and

---

[2] To "take" an endangered species as that term is used in the ESA means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19).

maintenance of a fish ladder and screen for the project.[3] Additionally, Casitas engaged the services of consulting engineers to develop a biological assessment of the project addressing, inter alia, the status of the steelhead trout in the Ventura River watershed, the measures necessary to mitigate the adverse effects of the project on the steelhead population in the watershed, and the design of a fish ladder and screen.

Over the next several years, Casitas, BOR, and NMFS held regular meetings to develop the design of a fish passage facility and new operations criteria for the project that would meet the needs of the steelhead trout. The results of this process were reflected in a final Biological Opinion issued by NMFS on March 31, 2003. That opinion concluded that construction of the fish passage facility as designed, together with a new set of operating criteria to facilitate upstream and downstream passage of the fish, were necessary to avoid jeopardy to the steelhead trout.

Thereafter, Casitas adopted a resolution agreeing to implement the requirements set forth in the Biological Opinion. That resolution, however, was conditioned upon Casitas's requesting and receiving from BOR a directive ordering it to proceed with the construction of the fish passage facility and to implement the related operational requirements set forth in the Biological Opinion. BOR provided such a directive on May 2, 2003, saying in part as follows:

> In order to be exempt from the Take Provisions of the ESA, non-discretionary terms and conditions have been established in the [Biological Opinion] and must be implemented.
>
> The Casitas Municipal Water District operates the Ventura Project on Reclamation's behalf, pursuant to Contract 14-06-200-5257 as amended, and as such must also comply with the Terms and Conditions of the [Biological Opinion].

In compliance with BOR's directive, Casitas constructed the fish passage facility for a total cost of approximately $9.1 million and implemented the revised operational criteria contained in the Biological Opinion, thus incurring an alleged water loss of up to 3,200 acre-feet per year. Casitas in turn filed suit in this court on January 26, 2005, seeking contract damages and/or just compensation pursuant to the

---

[3] Pursuant to Section 7 of the ESA, a "consultation with and with the assistance of the Secretary" is the first step in the process of determining whether any action that is authorized, funded, or carried out by a federal agency is "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

Fifth Amendment. As noted above, we limit the discussion below to plaintiff's breach of contract claim.

DISCUSSION

Plaintiff contends that defendant breached the contract in 2003 when it required Casitas to build a $9.1 million fish passage facility and to relinquish a portion of the project water supply to assist the migratory passage of the steelhead trout in the Ventura River. Defendant counters that the costs at issue here were not incurred in the performance of work deemed necessary for completion of the project and therefore do not fall within the cost reimbursement limitations of the contract. Rather, defendant maintains, these costs are more appropriately regarded as operation and maintenance expenditures and as such are costs for which plaintiff is contractually responsible. Defendant additionally argues that the contract imposed no duty on the government to guarantee Casitas's water supply and that any reduction in that supply was the result of compliance with the ESA—a sovereign act for which the government in its role as a contractor is not responsible. We address these arguments in turn below.

A.

Article 7 of the parties' contract (titled "Transfer of Operation and Maintenance to District") provides that upon notice of transfer of the project works by the United States, "[t]he District agrees to accept, upon the effective date of the transfer notice, the care, operation, and maintenance of the transferred works and thereafter, without expense to the United States, to care for, operate, and maintain the transferred works . . . ." Defendant maintains that the costs of constructing the fish passage facility are thus plaintiff's contractual responsibility since those costs are properly regarded as operation and maintenance expenditures.

In support of this argument, defendant relies on Nampa & Meridian Irrigation District v. Bond, 268 U.S. 50 (1925), a case in which, as here, the court was called upon to address the classification of construction costs under a repayment contract between an irrigation district and BOR. Therein, the Supreme Court determined that costs associated with the construction of a drainage system built to relieve the injurious effects of a rise in groundwater levels caused by the irrigation project constituted operation and maintenance expenditures that were chargeable to the irrigation district, rather than additional charges for construction for which the irrigation district was not contractually responsible. In reaching its conclusion, the Court drew a distinction between expenditures necessary to construct an irrigation system and those necessary "to remedy conditions brought about by the *use* of the system." Id. at 53. The latter, the Court declared, constituted operating charges. The Court explained its reasoning as follows:

> Section 4 of the Reclamation Extension Act . . . prevents an increase in the *construction* charges to be imposed upon the water users without the consent of a majority of them after the amount thereof has been fixed. But this is far from saying that, after the completion of the irrigation system in accordance with the original plan in respect of which the construction charges were fixed, should the need arise to remedy conditions brought about by the *use* of the system, the government must bear the expense if a majority of the water users withhold their consent. Expenditures necessary to construct an irrigation system and put it in condition to furnish and properly to distribute a supply of water are chargeable to construction: but, when the irrigation system is completed, expenditures made to maintain it as an efficient going concern, and to operate it effectively to the end for which it was designed are, at least generally, maintenance and operating expenses. The expenditure in question was not for extensions to new lands, or for changes in or additional to the system made necessary by faulty original construction in violation of contractual or statutory obligations, but was for the purpose of overcoming injurious consequences arising from the normal and ordinary operation of the completed plant which, so far as appears, was itself well constructed. The fact that the need of drainage for the district lands, already existing or foreseen, had been supplied, and the cost thereof charged to all the water users as a part of the original *construction*, by no means compels the conclusion that an expenditure of the same character, the necessity for which subsequently developed as an incident of operation, is not a proper *operating* charge. The same kind of work under one set of facts may be chargeable to construction and under a different set of facts may be chargeable to maintenance and operation.

Id. at 53–54 (citations omitted).

As in Nampa, we are concerned here with construction costs that were incurred after the irrigation project was satisfactorily completed to remedy injurious effects encountered as a consequence of the project's operation. Except for differences in the nature of the injuries involved—in Nampa, rising groundwater levels that impaired the agricultural usefulness of the land, and in the instant case, impediments to fish passage that threatened the survivability of the steelhead trout—the cases are identical. According to Nampa, then, the expenditures incurred

by Casitas in the construction of the fish passage facility must be regarded as operation and maintenance expenses.[4]

Plaintiff attempts to distinguish Nampa by asserting that the addition of a structure that was originally contemplated as part of a reclamation project but never built (i.e., the fish ladder and screen) is a construction cost, not an expense of ordinary maintenance and operation. In support of this proposition, plaintiff refers us to United States v. Fort Belknap Irrigation District, 197 F. Supp. 812, 821 (D. Mont. 1961), in which the court held that the construction of a new spillway could not be charged to operation and maintenance but was instead a construction charge because the spillway as originally planned and paid for by the irrigation districts was never completed and for more than 40 years the system had been operated without a spillway.

We do not believe, however, that Fort Belknap supports plaintiff's position. The spillway construction at issue in that case was intended to achieve what had originally been planned and paid for but never satisfactorily accomplished in the first instance—the construction of a functioning spillway. Fort Belknap, in other words, was not about adding a capability that may have been discussed but never constructed; it was, instead, about remedying a deficiency in the original construction. In simplest terms, Fort Belknap expresses the idea that an irrigation district should not have to pay twice for the same construction.

We do not encounter that situation in the instant case. As the facts reveal, the installation of a fish ladder and screen, though discussed, was never planned as part of the original construction and no funds to support such facilities were ever expended. At the time of its transfer to Casitas, then, the project was deemed to be complete without the addition of a fish ladder and screen. With the passage of time, however, operation of the project proved to be injurious to the steelhead trout. The decision in Nampa declares that such construction costs undertaken to correct the injurious effects of system operation are chargeable as operation and maintenance expenditures.

---

[4] Even if our resolution of this issue were not dictated by Nampa, we would be unable to accept plaintiff's contention that defendant breached the contract by requiring Casitas to expend $9.1 million in excess of its obligation under the contract to reimburse the United States for construction costs up to the maximum amount of $30.9 million. The contract provision upon which plaintiff relies (Article 5, titled "Payment By District") does not extend to all construction costs but rather is confined to the actual reimbursable costs incurred by the United States "in providing the project works." The reimbursement obligation, in other words, extends only to the construction costs incurred in the completion of the project and not to construction costs that may arise after completion. As to the latter, the contract is silent.

Plaintiff also cites Central Arizona Water Conservation District v. United States, 32 F. Supp. 2d 1117 (D. Ariz. 1998), to support the proposition that the installation of a fish ladder and screen qualifies as a construction cost rather than an operating and maintenance expenditure. In Central Arizona, the court held that a water district was not responsible for construction costs in excess of the contract's repayment ceiling amount, noting that the "cost estimates . . . did not take into consideration the full impact of new environmental legislation, including the Endangered Species Act." Id. at 1123. Plaintiff maintains that the quoted text affirms its position that construction costs made necessary by the ESA are properly chargeable to construction rather than maintenance and operation.

We cannot accept plaintiff's argument. Notably, the court's observation regarding the ESA was not central to its holding and as such may be disregarded as dicta. More importantly, however, the case does not address the question we now have before us—whether construction costs incurred after project completion to remedy later-recognized operational hazards are properly chargeable as operation and maintenance expenditures. The decision in Nampa tells us the answer is yes.

Despite the weight of the case law in the government's favor, however, plaintiff contends that defendant should be estopped from arguing that the costs in question are not chargeable to contract construction because defendant successfully argued in an earlier suit involving the same contract that all construction-related expenditures were chargeable as contract construction costs. United States v. Casitas Mun. Water Dist., 735 F.2d 1373 (9th Cir. 1984) (unpublished table decision). Plaintiff thus argues that defendant, having prevailed on its original argument, should not now be permitted to do an about-face and argue in favor of a different contract interpretation.

Plaintiff is of course correct that defendant may not assert a litigating position contrary to a position on which it had prevailed in an earlier litigation between the same parties involving the same subject matter. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996) (precluding a party who "successfully urges a particular position in a legal proceeding . . . from taking a contrary position in a subsequent proceeding where its interests have changed"). The instant case, however, is not one in which defendant is taking up a position contrary to the one on which it had earlier prevailed.

In the 1984 litigation, the United States sought a declaratory judgment to resolve the question of whether the costs of relocating a water main, initially placed by the United States alongside a state highway pursuant to a state-granted encroachment permit and later moved to accommodate highway reconstruction work, were chargeable, as the United States contended, as construction costs for which Casitas would be liable (up to the contractual limit of $30.9 million). Casitas argued

that the costs should not be classified as construction costs under the contract since they were incurred after Casitas had received notice of the contract's final reimbursable cost.[5] Holding that such costs were indeed chargeable to Casitas, the Ninth Circuit stated:

> Regardless of how one characterizes the relocation costs, the enabling legislation and the contract indicate that both Congress and the parties intended that Casitas pay all of the costs connected with the project. Article 9 of the contract clearly states, "the District's construction obligations shall embrace all expenditures of whatsoever kind in connection with, growing out of, or resulting from work performed in connection with the project."

Casitas, No. 83-6053, slip op. at 5 (9th Cir. May 4, 1984). The court additionally noted that "[b]oth parties knew that the cost[s] would be incurred before project completion" and that those costs "were not incurred to remedy conditions brought about by the use of the system." Id. at 4–5.

Given the basis for the court's conclusion—that the costs were construction costs because they were not incurred to remedy conditions resulting from the project's operation—we discern no inconsistency between the position defendant advanced in the earlier litigation and the argument it presents here. Although both situations involve construction costs, the critical distinction is that the instant costs were incurred to remedy problems arising from the operation of the project. Under the rule laid down in Nampa, 268 U.S. at 53–54, these costs must be regarded as operating costs chargeable to Casitas.

B.

Plaintiff's second principal argument focuses on Article 4 of the contract (titled "Permanent Right to the Use of Water") which provides that "the District shall have the perpetual right to use all water that becomes available through the construction and operation of the Project." Plaintiff maintains that defendant breached this contract provision by requiring Casitas to dedicate a portion of the irrigation system's water supply—up to 3,200 acre-feet per year—to the water passage needs of migratory fish in accordance with the requirements of the Biological Opinion. This forced relinquishment of use, plaintiff maintains, violated its

---

[5] Article 2 of the contract provided that the project would be deemed to be complete upon the contracting officer's written notification to Casitas either that "total expenditures have been made to the limit [specified in the contract], or so much thereof as the contracting officer considers necessary and useful for the construction of the project works."

unambiguous contract right to the exclusive use of "all water" made available by construction of the Ventura River Project.

In defendant's view, the diversion of project water to ensure the survival of the steelhead trout states no enforceable contract claim against the United States. In support of this position, defendant argues first that Article 4 is not a promise by BOR to supply water to Casitas, but is instead simply an acknowledgment of Casitas's existing right to the use of the project water as granted under a permit issued by the State Water Resources Control Board. Article 4, in other words, merely recites a condition of the parties' exchange and as such places no affirmative obligation on BOR to act as the guarantor of Casitas's water supply.[6] In addition, defendant argues that any implied obligation that BOR may have had under Article 4 to refrain from interfering with Casitas's water rights was not breached by the issuance of the May 2, 2003, directive advising Casitas that it was obligated to comply with the requirements of the Biological Opinion. Those requirements, defendant maintains, originated in a sovereign act—NMFS's issuance of the Biological Opinion under the ESA—that was as much binding on BOR as owner of the project as it was on Casitas as operator of the project. Given these circumstances, defendant contends that any intrusion by BOR upon Casitas's water rights originated in the need for compliance with the requirements of the Biological Opinion and not in the independent actions of BOR acting as a contracting party.

Plaintiff, for its part, maintains that the proper application of the sovereign acts doctrine requires a focus not on the ESA itself, but on the individual government actions taken pursuant to the ESA. Plaintiff thus argues that defendant may not invoke the sovereign acts defense to shield itself from liability for the loss of water caused by the change in the project's operational criteria because (i) the Biological Opinion, and ultimately BOR's letter of May 2, 2003, directing its implementation, do not qualify, as application of the sovereign acts defense would require, as governmental actions that are public and general in their reach but are instead actions specifically targeted at the project and its operation, and (ii) BOR's performance of

---

[6] Defendant's interpretation of Article 4 is confirmed by Article 25 of the contract (titled "United States Not Liable for Water Shortage") which provides in relevant part, as follows:

> (a) There may occur at times a shortage in the amount of water available for furnishing to the District through and by means of the Project, but in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage direct or indirect to the District or the water users, arising from a shortage on account of errors in operation, drought, or unavoidable cause.

its contract responsibilities was not rendered impossible by the ESA but rather by the requirements of a discretionary remedy imposed by NMFS (the construction of a fish ladder and screen in lieu of a financially more modest measure of relief, e.g., fish trapping and trucking). Based on these circumstances, plaintiff maintains that the sovereign acts defense is unavailable as a matter of law.

The sovereign acts doctrine is a defense to a breach of contract claim that may be invoked by the government, acting as a contracting party, where its performance of a contract duty is rendered impossible because of an intervening act of the government, acting in its sovereign capacity, that was not anticipated at the time the contract was entered into and the risk of which was not otherwise assumed. United States v. Winstar Corp., 518 U.S. 839, 891–92, 907–08 (1996). In essence, the sovereign acts doctrine extends to the government in its role as contractor the same principle of discharge of duty on grounds of impossibility of performance that applies in contracts between private parties. Restatement (Second) of Contracts §§ 261, 264 (1981).

An important limitation on the government's use of the sovereign acts defense, however, is that the sovereign act must be public and general in its reach; the government may not use its power as a sovereign to target contracts to which it is a party to bar performance of what it had contractually committed itself to do. Winstar, 518 U.S. at 895–98. Where that form of governmental self-help has occurred, the government as contractor may not avail itself of the sovereign acts defense to seek discharge on grounds of impossibility. Id. at 900–03. Instead, the failure to perform will be deemed a breach of contract. Id.

This last point takes us back to plaintiff's several arguments against the applicability here of the sovereign acts defense. Plaintiff maintains, first of all, that where governmental action affecting the performance of a contract is not specifically spelled out in the words of a statute but rests instead on the requirements prescribed by an executive agency acting in implementation of the statute's more broadly stated policy objectives, then it is those requirements that are to provide the baseline for determining whether the government may rely on the sovereign acts defense. And, therefore, the argument continues, when, as here, those requirements, even though prescribed in furtherance of broad public policy objectives, specifically target a particular contract to which the government is a party, then the sovereign acts defense is not available.

We agree with the proposition that for purposes of determining the applicability of the sovereign acts defense, the actions of an administrative agency taken in fulfillment of policy objectives declared in a statute must be examined in the same light as if Congress itself had directed those actions. This is the case because, as is generally recognized in administrative law, "[w]hen Congress enacts a statute

to be administered by an agency, it has delegated to the agency resolution of all policy disputes that arise under that statute that Congress did not itself resolve." Richard J. Pierce, Jr., Administrative Law Treatise § 3.3, at 144 (4th ed. 2002).[7]

Fundamentally, then, the actions of the agency are to be seen as the actions of Congress. It is therefore appropriate to proceed, as plaintiff contends, by examining the applicability of the sovereign acts defense in light of NMFS's actions under the ESA rather than in light of the ESA itself. That said, however, we do not agree with plaintiff's contention that because NMFS's Biological Opinion is specifically focused upon the Ventura River Project and its mode of operation, such targeting renders the sovereign acts defense unavailable to the government.

The targeting of a particular contract is not itself an action that would foreclose reliance on the sovereign acts doctrine. Rather, the defense is unavailable where the government's action also serves to relieve the government of its own contractual responsibilities. The Supreme Court explained this principle as follows:

> [G]overnmental action will not be held against the Government for purposes of the impossibility defense so long as the action's impact upon public contracts is . . . merely incidental to the accomplishment of a broader governmental objective. See O'Neill v. United States, 231 Ct. Cl. 823, 826 (1982) (noting that the sovereign acts doctrine recognizes that "the Government's actions, otherwise legal, will occasionally incidentally impair the performance of contracts"). The greater the Government's self-interest, however, the more suspect

---

[7] In Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843–44 (1984) (citation and footnotes omitted), the Supreme Court explained the role of an administrative agency acting in furtherance of a statutory purpose as follows:

> "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

> becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence, and where a substantial part of the impact of the Government's action rendering performance impossible falls on its own contractual obligations, the defense will be unavailable.

Winstar, 518 U.S. at 898 (footnote omitted). The Court went on to identify as governmental self-interest those "instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties." Id. at 896.

In the instant case, however, neither the Biological Opinion nor BOR's May 2, 2003, letter implementing it, effected the shifting of anticipated contract costs from BOR to Casitas—a circumstance that wholly undermines plaintiff's objection to defendant's sovereign acts defense. BOR, as we have said, had no obligation to supply water to Casitas, but only to respect the water rights that Casitas held under law. Nor was BOR's observance of that obligation affected by the issuance of the Biological Opinion. In short, no economic advantage accrued to the United States, as a contracting party, as a result of the issuance and implementation of the Biological Opinion so as to invalidate defendant's sovereign acts defense.

Even if the United States received no economic advantage from the Biological Opinion or from BOR's May 2, 2003, letter implementing it, however, plaintiff argues that the sovereign acts defense is nonetheless inapplicable because defendant cannot claim impossibility of performance when it had other options available to it. Specifically, plaintiff contends that its annual loss of 3,200 acre-feet of water was neither required by the ESA nor essential for the successful migratory passage of the steelhead trout, but was instead a discretionary remedy chosen by NMFS. A far less elaborate and less costly system (e.g., fish trapping and trucking), plaintiff maintains, would have accomplished NMFS's goals and, at the same time, permitted Casitas to retain a badly needed water supply. Given, then, both the absence of any specific directive in the ESA regarding the means of ensuring fish preservation and the availability of an alternative approach to accomplishing that goal without accompanying water loss, plaintiff contends that defendant's contractual obligation to honor Casitas's water rights was not rendered impossible by a sovereign act but rather was abridged by a wholly discretionary determination instigated by NMFS. Under such circumstances, plaintiff maintains, the defense of impossibility based on a sovereign act must fail.

This argument too is unavailing. The premise implicit in plaintiff's position—that BOR may not invoke the sovereign acts defense because it was responding to a discretionary directive on the part of NMFS—is not analytically sound. As noted above, for purposes of determining the applicability of the

sovereign acts defense, no meaningful distinction may be drawn between statutes whose implementing details have been spelled out by Congress and statutes whose implementation Congress has left for administrative determination. In either case, the governmental action is sovereign in character and where its effect is to render contract performance impossible (even though the action is otherwise public and general in its reach), the sovereign acts defense may be invoked. Thus, the fact that NMFS could have addressed the issue of ensuring fish passage by a means other than requiring the dedication of a certain water supply does not alter the sovereign character of its action any more than if that requirement had originated with Congress itself.

CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied.

# Tab B

FILED
NOV 4 8 11 AM '96
BY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT, COUNTY OF SAN JOAQUIN, CITY OF STOCKTON, CALIFORNIA WATER SERVICE COMPANY,<br>Plaintiffs,<br>v.<br>UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, BUREAU OF RECLAMATION; UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, FISH AND WILDLIFE SERVICE; BRUCE BABBITT, SECRETARY OF THE INTERIOR,<br>Defendants. | CV-F-93-5896 OWW<br><br>MEMORANDUM OPINION AND ORDER RE: FEDERAL DEFENDANTS' MOTION REQUIRING PLAINTIFFS TO EXHAUST ADMINISTRATIVE REMEDIES; PLAINTIFFS' AND FEDERAL DEFENDANTS' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND NOTICE OF INTENT TO CONSOLIDATE CASES |

## I. INTRODUCTION

On November 28, 1995 Federal Defendants (the United States of America, Department of the Interior, Bureau of Reclamation; United States of America, Department of the Interior, Fish and Wildlife Service; and Bruce Babbitt, Secretary of the Interior) moved to dismiss the complaint to require Plaintiffs (Stockton East Water District, San Joaquin Water

Conservation District, County of San Joaquin, City of Stockton, California Water Service Company) to exhaust administrative remedies before the State Water Resources Control Board ("SWRCB") before pursuing remedies in federal court. Alternatively, Federal Defendants moved the court to abstain from hearing the case. Plaintiffs oppose the motions.

On April 8, 1996 pursuant to Fed. R. Civ. Proc. 56(c), Plaintiffs moved for partial summary judgment. Federal Defendants opposed the motion and made a cross-motion for partial summary judgment on April 29, 1996. Intervenors Friant Water Users, San Luis Water District, and Panoche Water District also filed opposition to Plaintiffs' summary judgment motion on April 29, 1996.

## II. BACKGROUND

The action was originally filed by Stockton East Water District ("Stockton East") et al. on October 1, 1993 against Federal Defendants in the Sacramento division of the court. The case was related to and partially consolidated with cases of Westland Water District and other San Joaquin Valley CVP water contractors, who have challenged CVP water allocations and implementation of the Central Valley Project Improvement Act ("CVPIA")[1] in 1993 and 1994. The complaint focuses on: 1) water service contracts executed "pursuant to Federal reclamation laws and laws of the State of California," between Stockton East,

---

1 Title XXXIV of Pub. L. No. 102-575, 106 Stat. 4606.

Central San Joaquin Water Conservation District ("Central") and the Bureau to supply water from the Central Valley Project ("CVP"); 2) Defendant Bureau's alleged mismanagement of the CVP New Melones Unit in violation of water permits issued by the SWRCB; and 3) implementation of the CVPIA in derogation of Stockton East's contract.

Stockton East's original complaint asserted five claims for relief:

1. Injunctive relief for violation of vested property rights under the Fifth Amendment, and breach of contract; (2) violation of National Environmental Policy Act ("NEPA") in implementing the CVPIA without compliance with the Environmental Impact Statement process; (3) violation of the CVPIA in diverting water outside the permitted area of use for the New Melones Project; (4) arbitrary and capricious actions and abuse of the Bureau's discretion in implementing the CVPIA, resulting in the deprivation of contractual water rights; and (5) violation of Stockton East's vested property rights under the Fifth Amendment and breach of contract.

Federal Defendants moved to dismiss claims one, two and five. The motion to dismiss Plaintiffs' fifth claim for relief was granted, and denied as to the first and second claims. Recognizing that many parties were potentially affected by the CVPIA and changes in CVP water allocations, the court established a deadline for intervention by November 1, 1995.

In the related Westlands 93 case, after hearing, a

preliminary injunction was granted to restrain compliance with certain CVPIA sections before NEPA compliance was effected. The Court of Appeal vacated the preliminary injunction and held that the provisions of the CVPIA and NEPA are in irreconcilable conflict. This holding effectively eliminates the second claim for violation of NEPA.

At a May 8, 1995 status conference in Westlands 93 and this case, certain of the parties proposed to dismiss their ESA and NEPA claims, while other parties sought to dismiss their entire complaints without prejudice.

Stockton East's September 22, 1995 amended complaint challenges the December 15, 1994 "Principles Agreement," by which the Bureau contracted to provide water flows to the San Joaquin River at Vernalis (supplied in part from the New Melones Reservoir) in alleged violation of the contract; federal law, 43 U.S.C. § 383; and state law, California Water Code § 11460, 11128, et seq. The amended complaint asserts ten separate claims:

1. First Claim - violation of due process (800,000 acre-feet) on the ground that Plaintiffs have been deprived of their vested rights to New Melones water deliveries as a result of Defendant's allocation of this water to the 800,000 acre-feet dedication.

2. Second Claim - violation of due process (Principles Agreement) on the ground the Principles Agreement has deprived Plaintiffs of vested rights to water deliveries from New

Melones.

3. <u>Third Claim</u> - declaratory relief (800,000 acre-feet) on the grounds that Federal Defendants' allocation of New Melones water to the 800,000 acre-feet dedication has deprived Plaintiffs of their vested rights to water deliveries from New Melones.

4. <u>Fourth Claim</u> - declaratory relief (Principles Agreement) on the ground that the Principles Agreement has deprived Plaintiffs of their vested rights to water deliveries from New Melones.

5. <u>Fifth Claim</u> - violation of the APA on the ground Federal Defendants have acted arbitrarily and capriciously and abused their discretion in developing and implementing the disputed water Prescriptions.

6. <u>Sixth Claim</u> - violation of § 553 of the APA on the ground Defendant's development and implementation of the 1993-1995 Prescriptions constituted informal rulemaking which failed to comply with APA procedures.

7. <u>Seventh Claim</u> - violation of the APA and § 3411(a) of the CVPIA on the ground that Federal Defendants have not obtained modifications to State water permits for use of water outside the place of use limitations in these permits.

8. <u>Eighth Claim</u> - violation of § 8 of the 1902 Reclamation Act and the APA on the ground Federal Defendants' use of water outside the watershed violates Cal. Water Code §11460 <u>et seq.</u>

9. Ninth Claim - violation of § 8 of the 1902 Reclamation Act and the APA on the ground that Federal Defendants are using water from New Melones for a non-beneficial use in violation of Article X, § 2 of the California Constitution.

10. Tenth Claim - violation of § 8 of the 1902 Reclamation Act and the APA on the ground Federal Defendants are using New Melones water in violation of the restrictions of its water permits in violation of California Water Code §§ 1381 and 1391.

Following a December 15, 1995 scheduling conference, the Court issued an order requested by the parties: 1) continuing Federal Defendants' Motion to Stay the case to February 26, 1996; 2) limiting discovery in the action pending a hearing on Federal Defendants' Motion, at which time the stay would be revisited; 3) staying the designation and finalization of the administrative record for the 1994 CVP Water Prescription; and 4) ordering a further scheduling conference for March 11, 1996. The court issued a subsequent order on February 9, 1996, vacating the February 26, 1996 hearing date and taking the stay motion off calendar to await the outcome of a motion to dismiss a state court action brought by the Stockton East and Central Delta parties that challenged many of the Bureau and State water agencies' actions at dispute in this case. The state court dismissed that case on February 6, 1996, for inability to join an indispensable party, the Bureau, over which state jurisdiction could not be obtained. Plaintiffs have appealed that decision.

Plaintiffs also filed a complaint with the SWRCB on September 22, 1995. The SWRCB responded in February 1996 that complaints would be evaluated in 30 days. The SWRCB proceeding is pending. Plaintiffs claim the SWRCB may never decide their complaint.

## III. STANDARD

### A. Motion for Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. Anderson v. Liberty Lobby, 477 U.S. 242, 252-56 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. Id. at 249.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other

facts immaterial.

Celotex, 477 U.S. at 322-23.

The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." Liberty Lobby, 477 U.S. at 255. Even where the basic facts are undisputed, if reasonable minds could differ as to the inferences to be drawn from those facts, summary judgment should be denied. Hopkins v. Andaya, 958 F.2d 881, 888 (9th Cir. 1992). The Court's role on summary judgment, however, is not to weigh the evidence, i.e., issue resolution, but rather it is issue finding. Id.

Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standard articulated in 56(e). Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1989). Properly authenticated documents, including discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration. United States v. One Parcel of Real Property, 904 F.2d 487, 491-492 (9th Cir. 1990); Zoslaw v. MCA Distributing Corp., 693 F.2d 870, 883 (9th Cir. 1982), cert. denied, 460 U.S. 1085 (1983). Supporting and opposing affidavits must be made on personal knowledge, shall set

forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e); see also Taylor v. List, 880 F.2d 1040, 1045 n.3 (9th Cir. 1989).

B. Standards for Interpreting Contract Provisions

Federal common law controls the interpretation of a contract entered pursuant to federal law when the United States is a party. Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032 (9th Cir. 1989). "A written contract must be read as a whole and every part interpreted with reference to the whole. Preference must be given to reasonable interpretation as opposed to those that are unreasonable, or that would make the contract illusory." Id.

"Extrinsic evidence is inadmissible to contradict a clear contract term . . ." Pierce Cty. Hotel Emp. & Rest. Emp. Health Trust v. Elks Lodge, B.P.O.E. No. 1450, 827 F.2d 1324, 1327 (9th Cir. 1987). On the other hand, "where a contract's meaning is not clear on its face, its interpretation depends upon the parties' intent at the time it was executed." Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co., 753 F.2d 1512, 1515 (9th Cir. 1985) (quotation omitted). The basis for the rule that "extrinsic evidence [is] inadmissible to interpret, vary or add to the terms of an unambiguous written instrument" is that

> [i]f parties to an agreement could not rely on written words to express their consent to the express terms of that

> agreement, those words would become little more than sideshows in a circus of self-serving declaration[s] as to what the parties to the agreement really had in mind. The parole evidence rule thus enables parties to rely on written instruments as embodying a complete memorial of their agreement, and to avoid costly and disruptive litigation over the existence of oral and implied terms that may or may not have been contemplated by the parties.

Wilson Arlington Co. v. Prudential Ins. Co., 912 F.2d 366, 370 (9th Cir. 1990).

"The existence of an ambiguity must be determined as a matter of law." State Farm Mut. Auto. Ins. Co. v. Fernandez, 767 F.2d 1299, 1301 (9th Cir. 1985). "A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." Kennewick Irrigation Dist., 880 F.2d at 1032. "'The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous.'" Id. (quoting International Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1406 (9th Cir. 1985)).

## IV. UNDISPUTED MATERIAL FACTS

The following facts are undisputed, based on the statements of the parties.

1. Plaintiff Stockton East Water District ("Stockton East") is a water district formed pursuant to a special act of the California Legislature and is authorized to commence and maintain any action involving or affecting the ownership or use

of water on behalf of landowners within its boundaries.

2. Plaintiff Central San Joaquin Water Conservation District ("Central") is a water conservation district formed and organized under the Water Conservation District Law of the State of California.

3. Plaintiff County of San Joaquin is a county and political subdivision of the State of California.

4. Plaintiff City of Stockton is a City organized and existing as a political subdivision of the State of California and is located within the County of San Joaquin.

5. Plaintiff California Water Service Company is a corporation duly organized and existing under the laws of the State of California and provides municipal water service to portions of the City of Stockton and County of San Joaquin.

6. Defendant Bureau of Reclamation ("Bureau") is an agency of the United States Government, within the Department of the Interior, and is charged with administration of, *inter alia*, the 1902 Reclamation Act and acts amendatory thereof and supplementary thereto.

7. Defendant Fish & Wildlife Service is an agency of the United States Government within the Department of the Interior.

8. Defendant Bruce Babbitt is the Secretary of the Department of the Interior ("Secretary"). The Secretary is responsible for administration of Federal Reclamation Law.

9. The Central Valley Project ("CVP") is a project of

Bureau authorized by various Acts of Congress, including, *inter alia*, the Rivers and Harbors Act of August 1930, 1935 (49 Stat. 1028, 1038). The CVP was made subject to Federal Reclamation Law by the Rivers and Harbors Act of August 26, 1937 (50 Stat. 844, 850), and operates under water rights permits and licenses granted by the California State Water Resources Control Board ("SWRCB") and the SWRCB's predecessors.

10. Under the provisions of the Flood Control Act of December 22, 1944, and October 23, 1962, construction of the New Melones Unit, consisting of New Melones Dam and Reservoir on the Stanislaus River, as part of the CVP was authorized for flood control, irrigation, and municipal and industrial uses for the benefit of land in the Stanislaus River Basin and adjoining lands outside of the Basin, including lands within the boundaries of Stockton East and Central. Its designated purpose was to alleviate serious flooding problems along the Stanislaus and lower San Joaquin Rivers.

11. The 1962 reauthorization of the New Melones Project requires diversions as follows: "Provided further, that before initiating any diversions of water from the Stanislaus River Basin in connection with the operation of the Central Valley project, the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin and the diversions shall at all times be subordinate to the quantities so determined: Provided further, that the Secretary of the Army

adopt appropriate measures to insure the preservation and propagation of fish and wildlife in the New Melones project and shall allocate to the preservation and propagation of fish and wildlife, as provided in the Act of August 14, 1946 (60 Stat. 1908), an appropriate share of the cost of constructing the Stanislaus River diversion and of operating and maintaining the same: . . . ."

12. Prior to the construction of the New Melones Unit, the Department of the Interior determined the scope of the Stanislaus River Basin and determined the current and projected in-Basin uses for water, including water for fishery purposes. It was then determined that water from New Melones Reservoir would be available for use outside the Basin for a period of at least 40 years.

13. The New Melones Unit is permitted to store and divert water by the State of California pursuant to six permits issued to the Bureau by the SWCRB. (Permit numbers 16597, 16598, 16599, 16600, 20245 and 20246.)

14. In conjunction with the construction and operation of New Melones, the Bureau issued an environmental impact statement in November, 1972.

15. In 1978, the SWRCB promulgated new water standards for the San Francisco Bay/Sacramento-San Joaquin Delta.

16. In 1954, Bulletin No. 11, page 5-4 states: "[t]he present requirement for supplemental water in the San Joaquin Area, in order to prevent progressive perennial lowering of

ground water levels and to eliminate the threat of attendant degregation of mineral quality of ground water is about 95,000 acre feet per season."

17. Bulletin No. 11 at page 5-5 states: "[U]nder ultimate conditions of development, the requirement of supplemental water in the San Joaquin area will increase to about 385,000 acre-feet per season, distributed among these several units . . ." Bulletin No. 11 states the New Melones Project "would provide new irrigation yield to meet the present supplemental water requirement in the Littlejohn's Unit . . ."

18. In 1985 the Department of Water Resources issued a report which concluded that poor quality ground water was moving into the Stockton area at a lateral rate of 140 to 150 feet per year.

19. In 1980 the predecessor to the Bureau of Reclamation issued a report entitled "New Melones Unit, Central Valley Project - California, Stanislaus River, Basin Alternatives and Water Allocation, Special Report." The Report was prepared pursuant to Federal Reclamation law and the findings were not to be construed as representing either approval or disapproval of the Secretary of the Interior.

20. The Special Report examined three alternative basins that would use a water supply from the Stanislaus River. A record of Decision states that among reasons given for selecting the Basin plan adopted was to help improve the ground water overdrafting problem in the Central San Joaquin and the Stockton

East Irrigation Districts. The Bureau, by letter in the period 1981 and 1982, stated: "During the build-up period, we are marketing the unused Basin allocation to users outside the Basin on an interim basis for as long as it is available." The letter went on: "[B]ecause of the Basin priority, the New Melones contracting program differentiates between the firm water supply offered contractors within the Basin and that offered Contractors outside the Basin." The letter further stated: "[T]he water supply will be provided to the water users according to the following priority: first to contracts within the Basin; second to Central which is outside the Basin, but has been allocated a long term firm supply of 49,000 acre feet; last to contractors an interim water supply."

21. At a hearing, the SWRCB conditioned permits to require the permittee have firm commitments to deliver water for purposes which would require storage in excess of that required for preservation enhancement of fish & wildlife, maintenance of water quality conditions, and prior rights. The purpose of the hearing was to determine whether to authorize the Bureau to store water in New Melones for consumptive use purposes and hydroelectric power generation. The Bureau negotiated with purchasers of water in the Counties of Calaveras, Stanislaus, Tuolumne and San Joaquin to deliver water from New Melones Reservoir.

22. The SWRCB recognized that when Basin users reached their full Basin allocation, purchases of interim water for use

outside the Basin would cease to be served from New Melones.

23. Decision 1422 of the SWRCB restricts filling New Melones Reservoir for the purpose of hydroelectric power. In 1983 the SWRCB determined in Decision WR 83-3 that the Bureau would not be authorized to store water in excess of the amount required for fish, wildlife, water quality and prior water rights holders unless it could show there were commitments for consumptive use of such water.

24. The SWRCB found that the Bureau had firm commitments to deliver the full yield of New Melones water for consumptive uses.

25. The water rights of Oakdale Irrigation District and South San Joaquin Irrigation District pre-existed the Project. . . The water supplied to these districts qualifies as "other flow . . . requirements imposed by the terms and conditions existing in . . . other agreements pertaining to the CVP under applicable State or Federal law existing at the time of enactment of the CVPIA.

26. The commitment of water to the Exchange Contractors is one of the "other flow and operation requirements imposed by the terms and conditions existing in . . . agreements pertaining to the CVP" that must be satisfied before the calculation of CVP yield is made.

27. The SWRCB granted the Bureau direct diversion rights for New Melones Reservoir effective April 6, 1988.

28. The April 6, 1988, permit issued to the Bureau

granting it direct diversion rights for New Melones contained a condition that required the Bureau to conduct fishery studies on the Stanislaus River in cooperation with California Fish & Game and U.S. Fish & Wildlife Service ("FWS").

29. In May of 1988, the Bureau advised Stockton East, "the SWRCB may be forced to set arbitrary flow releases for the lower Stanislaus River to protect the fishery [unless] the total amount of Project available for delivery from New Melones may be reduced."

30. The SWRCB held in Decision 1422 that the Bureau had firm commitments to deliver the full yield of New Melones water for consumptive uses and based thereon, added consumptive uses of irrigation, domestic, municipal, and industrial uses and amended the Bureau's permits to allow the reservoir to be filled to its maximum capacity of 2.8 million acre feet.

31. Of the total 2.4 million acre feet capacity of New Melones, 98,000 acre feet were for fish and wildlife enhancement. The balance was for irrigation, domestic, municipal, recreational, and water quality uses. Decision 1422 at 25-27. The area of use for New Melones water was limited in WR83-3 to the four-county area of Stanislaus, Calaveras, Tuolumne, and San Joaquin Counties.

32. The Bureau transmitted the disputed contracts to the Secretary of the Interior for approval on July 8, 1983. The Bureau described the need for water in the Stockton East District due to overdraft, salt water intrusion and land subsidence. The

proposed contracts were not intended to impact the District's ability to obtain a firm water supply from the Folsom South Canal.

33. The SWRCB recognized as the Basin needs developed, the interim water supply will be withdrawn and made available to Basin users. Central and Stockton East are outside the Basin and do not have the right to renew their interim water supply.

34. The proposed contracts provide a total of 155,000 acre-feet of interim water supply to Central and Stockton East. The quantities of water under the contracts with Stockton East and Central represent 86% of the yield of New Melones Unit.

35. The contract between the United States and Stockton East, Exhibit C to the complaint, was executed December 19, 1993. The contract between the United States and Central, Exhibit D to the complaint, was executed on December 19, 1983. Both contracts require the construction of conveyance facilities without cost to the United States.

36. The Bureau issued a Supplemental Environmental Impact Statement concerning environmental impacts associated with use of the water in the Stanislaus River Basin prior to execution of water services contracts.

37. Under the SEWD contract, SEWD would receive an "interim" supply of water. "Interim" is defined in the contract as "that portion of the water supply available from New Melones Unit during the buildup to full Basin requirements which will be withdrawn as the needs within the Basin develop."

38. The SEWD contract provides "The Contractor understands and agrees that the water supply provided pursuant to this contract is an interim water supply.

39. The contract with Central provides that Central would receive both a firm and interim supply of water. "Firm water" is defined as "the maximum amount of water that can be provided each year on a usable pattern to meet Project obligations, with allowable deficiencies in dry or critically dry years."

40. The contracts with SEWD and Central provide that "[in] its operation of the [CVP], the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to [the districts] pursuant to [the] contract[s]. Nevertheless, if a shortage does occur during any year because of drought or other causes which . . . are beyond the control of the United States, no liability shall accrue against the United States . . . ."

41. Section 2(b) of the contracts provides that "water availability shall not be declared until all applicable requirements of State and Federal law with respect to utilization and delivery of Stanislaus River water for the purpose of this contract has been complied with . . . ."

42. Stockton East issued a draft Environmental Impact Report (EIR) for the Farmington Canal Project in October 1988.

43. Stockton East has made payments on its contract with the Bureau.

44. The Bureau was informally advised that Stockton East and Central wished to receive CVP water deliveries in 1993.

45. Congress enacted the Central Valley Project Improvement Act (CVPIA) signed by the President into law on October 30, 1992.

46. In April 1993, the California Department of Fish & Game correspondence to the Bureau noted: 1) It submitted an instream flow schedule as required in the 1987 Fishery Study Agreement between the BOR and Fish & Game; 2) that conjunctive use of required fishery and water quality water supplies from New Melones had become during the recent drought; 3) Fish & Game submitted a schedule assuming that past practice would continue and incorporated a portion of the 200,000 acre feet of additional yield from the Stanislaus River drainage as part of the 800,000 acre-feet of CVP yield required under the CVPIA.

47. The SWRCB has not yet acted on the Bureau or Fish & Wildlife's applications for modification of New Melones permits.

48. The Goodwin Tunnel Financing Authorty, a joint powers association whose members are plaintiffs and San Joaquin County, undertook the construction of the Goodwin Tunnel and a related water conveyance system. The final cost of the project was 63.7 million dollars.

49. On or about June 28, 1993, the Bureau orally advised Stockton East and Central it would not deliver water under either contract in 1993.

50. On or about May 4, 1994, Stockton East requested its

allocation of water pursuant to its contract for the 1994 water year.

51. The FWS released a prescription for the 1994 water year on May 5, 1994.

52. In February 1994, the Bureau's CVP water supply for 1994 forecast that pre-project water rights holders would receive the minimum under their respective contracts; agricultural contractors were to receive 35% of their contractual amounts under long-term CVP contracts; Central and Stockton East were to receive no water supply.

53. The May 5, 1994, FWS prescription designated 238,095.6 acre feet of water would be released from Goodwin Dam for the lower Stanislaus River stream flow for water year 1994.

54. On or about May 24, 1994, Stockton East was notified in writing by the Bureau it would receive no water for 1994.

55. On or about December 15, 1994, Defendants entered into an agreement entitled "Principles for Agreement on Bay-Delta Standards Between the State of California and the Federal Government."

56. On or about December 29, 1994, the Bureau published a notice in the Federal Register providing notice of proposed rule making for the implementation of § 3406(b)(2) of the CVPIA.

57. On or about March 6, 1995, the Bureau notified Central in writing it would receive 37,000 acre-feet or 75% of its firm supply, 45% of its full contractual amount.

58. On or about March 6, 1995, FWS issued a no-jeopardy

Biological Opinion for the Delta Smelt.

59. On or about July 10, 1995, the FWS issued its 1995 flow objectives.

60. On or about August 10, 1995, the Bureau notified Stockton East in writing that 32,000 acre-feet of water not utilized by Central during the 1995 water year would be made available to Stockton East.

61. On or about September 15, 1995, the Bureau and the FWS released "interim guidelines" for the allocation of the 800,000 acre-feet of CVP yield pursuant to CVPIA section 3406(b)(2).

62. Exhibit 10 to the Second Request for Judicial Notice is a preliminary prescription for the management of the 800,000 acre-feet of CVP yield required to be managed under the CVPIA for fish & wildlife purposes.

63. In 1995, the Bureau stated: "The New Melones authorization requires needs in the defined Stanislaus River Basin must be met prior to delivery of the CVP water out of Basin. We recognize that the Department of the Interior has made a commitment to sell a minimum of 10,000 acre-feet of CVP water to Stockton East Water Distict (Stockton East) this year. We anticipate that such proposed delivery would be considered after the Stanislaus River Basin Fishery objectives are met."

V. DISCUSSION

**A. Exhaustion of Administrative Remedies**

Federal Defendants move to dismiss to require Plaintiffs

to exhaust administrative remedies before the State Water Resources Control Board. Federal Defendants maintain that Plaintiffs have asserted similar claims in three fora: the SWRCB, state court[2], and federal court, which could result in inconsistent determinations. All three complaints raise allegations that the Bureau has denied water to Plaintiffs from New Melones Reservoir in violation of water right permits on the Stanislaus River, and other provisions of state law.

In the complaint before the SWRCB, Stockton East asserts the Bureau is violating the terms of the New Melones permits, Cal. Water Code § 11460, and Article X, § 2 of the California Constitution. According to Federal Defendants, Plaintiffs' state court complaint also raised claims under California Water Code § 11460, as well as §§ 12203 and 12204.

Federal Defendants maintain that several of the same issues before the SWRCB are alleged in the federal complaint. For example, Stockton East has requested that the SWRCB hold hearings to determine whether other waters are available to meet water quality objectives for fish and wildlife. Plaintiffs allege in ¶ 56 of their first amended complaint ("FAC"): that the BOR "did not consider or require reallocations from [other] CVP [units] capable of releasing water to the San Joaquin River."

Federal Defendants maintain that claims 7, 8, 9, and 10

---

[2] Federal Defendants made the motion to require exhaustion prior to the dismissal of the state court action. As the dismissal has been appealed, Federal Defendants' arguments regarding the state court action will be examined.

of the FAC are state law claims -- analogous to those raised in the state court complaint under Water Code §§ 11460, 12203 and 12204. Federal Defendants argue the state law claims which seek administrative remedies, must be exhausted in the administrative forum prior to a judicial challenge to the administrative decision. Citing White Mountain Apache Tribe v. Hodel, 840 F.2d 675, 677 (9th Cir. 1988). Federal Defendants maintain the SWRCB must first decide issues within its jurisdiction, before the court reviews such issues.

Plaintiffs respond that the issues before the three different fora are different, and because the state court case[3] has been dismissed this court is the only forum capable of resolving Plaintiffs' claims. The FAC asserts that Federal Defendants are violating federal contractual obligations to Plaintiffs and using the CVPIA as justification. Plaintiffs seek remedies to redress alleged violation of their Fifth Amendment due process rights arising out of the federal water contract; violations of federal law, the CVPIA; and supplemental state water law claims. The specific relief sought is to require Federal Defendants to provide water to satisfy the federal water service contract.

Plaintiffs argue that claims in the SWRCB complaint

---

[3] Judge Cecil dismissed the state court complaint on February 21, 1996 for failure to join Federal Defendants as an indispensable party in part based on Federal Defendants' assertion that this court was the proper forum to litigate justiciable claims. Plaintiffs have appealed the decision.

allege violations including: 1) that the place of use of New Melones Water is beyond the four-county area permitted by Decision 1422; 2) that a substantial change in use of New Melones water has occurred in violation of Decision 1616; 3) that Federal Defendants are exporting water in violation of Order 83-3; 4) that Federal Defendants are operating Central Valley projects without a proper drain -- leading to the use of New Melones water to mitigate water quality problems; and 5) that Federal Defendants are using water in violation of Water Code § 11460. However, the SWRCB complaint does not allege any of the issues asserted in claims 1-6. The SWRCB has concurrent jurisdiction over claims 7-10. Plaintiffs have asked the SWRCB to order Federal Defendants to cease and desist using water "in a particular manner." (Plaintiffs' Opposition Papers at 7:2-22.)

Plaintiffs maintain that there is no duty to exhaust administrative remedies under state water law, federal law or in connection with APA claims. Plaintiffs argue that courts and the SWRCB have concurrent jurisdiction to resolve water rights cases, and that dismissal or stay of federal water litigation due to failure to exhaust administrative remedies, would be error. Citing California v. United States, 438 U.S. 645 (1978); National Audubon Society v. Superior Court, 33 Cal.3d 419 (1983), cert. denied, City of L.A. Dept of Water & Power v. National Audubon Society, 464 U.S. 977 (1983); and Elmore v. Imperial Irrigation Dist., 159 Cal. App. 3d 185 (1984).

Plaintiffs interpret McCarthy v. Madigan, 503 U.S. 140

(1992), to say that under federal law, exhaustion of administrative remedies is not warranted where any of the following circumstances exist: 1) where prejudice may result from an unreasonable or indefinite time frame for administrative action; 2) where it is uncertain that the agency has the power to grant effective relief; and 3) where the administrative body is shown to be biased. Plaintiffs argue that in this case, all three McCarthy factors mitigate against exhaustion. They claim that prejudice will result from the indefinite time-frame for administrative action. The SWRCB cannot provide relief; i.e., order the Bureau to perform Plaintiffs' water service contracts. They claim the SWRCB is biased as it is a signatory to the Bay-Delta Accord and under that Accord has a duty to reallocate CVP water that should have been delivered to Plaintiffs.

Plaintiffs also maintain there is no duty to exhaust remedies involving APA claims unless the duty is clearly specified in the APA. Citing Darby v. Cisneros, 509 U.S. 137 (1993). Given that four of Plaintiffs' claims involve the APA, Plaintiffs maintain it would be error to require an exhaustion of remedies.

Federal Defendants respond that Plaintiffs' reliance on McCarthy v. Madigan, 503 U.S. 140 (1992) to support the proposition that there is no duty to exhaust under federal law is misplaced. Federal Defendants maintain that McCarthy acknowledges the general rule that parties exhaust their administrative remedies before seeking relief from federal

courts, id. at 144-45, but the three exceptions to the general rule of exhaustion do not apply here because: 1) Plaintiffs cannot maintain they need a quick resolution of the claims, as they have not acted to accelerate the process; 2) Plaintiffs cannot maintain the SWRCB's remedy would be inadequate as the remedy they seek in federal court (an order directing the Bureau to deliver water) cannot legally be granted; and 3) the SWRCB is not biased.

As to the APA claims, Federal Defendants acknowledge that Darby provides that exhaustion is not required where a party invokes the jurisdiction of the federal court under the APA. However, they maintain that the exhaustion doctrine continues to apply to state law claims. Federal Defendants argue the state interest in the subject water is great and that, contrary to Plaintiffs' assertion, the SWRCB is a "specialized agency," before which Plaintiffs should exhaust their administrative remedies as to specific state law claims.

"A long line of decisions indicates that remedies before the SWRCB are not exclusive, but that courts have concurrent original jurisdiction." National Audubon Society, 33 Cal. 3d 419, 449 (1983). Plaintiffs are not required to exhaust administrative remedies in water cases before filing suit in state superior court. Id.; Elmore v. Imperial Irrigation Dist., 159 Cal. App. 3d 185, 192 (1984). Here, Plaintiffs filed the case in Sacramento Superior Court. Federal Defendants did not submit to the state court's jurisdiction. The State Judge

dismissed the entire case for lack of jurisdiction on finding Federal Defendants indispensable parties. The dismissal is on appeal; however, Federal Defendants have made clear they will not submit to state court jurisdiction. Federal Defendants' refusal to submit to state court jurisdiction has foreclosed one forum with potential jurisdiction over the state water law issues.

Plaintiffs need not exhaust administrative remedies before filing suit in federal court. When a suit is brought in federal court for determination of water rights to water within, or partially within, California, the Board may accept a reference of such suit as master or referee for the federal court. See California Water Code § 2075. A federal court with jurisdiction over a federal water contract may refer specific issues to the SWRCB.

Federal Defendants cite White Mountain Apache Tribe v. Hodel, 840 F.2d 675 (9th Cir. 1988), which held B.I.A. regulations dictated exhaustion of administrative remedies before federal courts could assert jurisdiction. Id. at 677. Where Congress specifically mandates, exhaustion is required. McCarthy v. Madigan, 503 U.S. 140, 145 (1992). However, where neither a statute or agency rule dictates exhaustion of remedies, sound judicial discretion governs. Id. The recent Ninth Circuit decision in Acura of Bellevue et al. v. Robert B. Reich, Secretary of Dept. of Labor, 90 F.3d 1403 (9th Cir. 1996), does not require otherwise. In Acura, the Ninth Circuit found that once a party has begun an administrative appeal, the party is

required to exhaust administrative remedies before seeking judicial review of the same action. Id. at 1408-09. In Acura Plaintiffs filed an administrative appeal before seeking judicial review.

Here, Plaintiffs filed two separate complaints; the first was in federal court. Stockton East filed the case in federal court in October 1993, and an amended complaint with ten claims on September 22, 1995. It also filed a complaint with the SWRCB on September 22, 1995. In its complaint, Stockton East does not seek judicial review over the SWRCB action. Claims 1-6 are not raised at all in the complaint before the SWRCB, and SWRCB shares jurisdiction over claims 7-10. Nor is the Court acting "in the middle of the agency review process" so as to "unjustifiably interfere with the agency's right to consider and possibly change its position. . ." Id. at 8588. Plaintiffs filed a complaint with the SWRCB in September 1995. The SWRCB responded in February 1996 that it would evaluate the complaint in 30 days. No evidence of SWRCB action has been provided. A court's determination of the issues before it cannot be considered interfering in the middle of SWRCB's review process when the SWRCB has not acted on Plaintiffs' complaint for a year. Federal Defendants' motion for an order compelling Plaintiffs to exhaust their administrative remedies is DENIED.

B. Whether the Federal Court Must Abstain

Federal Defendants urge the court to decline jurisdiction and abstain from issuing a decision under the doctrines

articulated in New Orleans Public Service v. Council of New Orleans ("NOPSI"), 491 U.S. 350, 359 (1989), or Colorado River Water Conservation District v. United States, 424 U.S. 800, 817 (1976). Under NOPSI, abstention is appropriate when a state agency has specialized knowledge about a state regulatory scheme. NOPSI, 491 U.S. at 359-360. Federal Defendants maintain that under Colorado River, the court can abstain when there are concurrent state and agency proceedings. Colorado River, 424 U.S. at 817. They also argue that the court may exercise its discretion to refuse to exercise jurisdiction for policy reasons. Citing Garamendi v. Allstate Insurance Co., 47 F.3d 350, 355 (9th Cir. 1995), aff'd, __U.S.__, 116 S. Ct. 1712 (1995). Plaintiffs argue that the doctrine of abstention is applied in limited circumstances, and that neither the NOPSI nor Colorado River doctrines apply to this case. Citing Moses Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 25 (1983).

Plaintiffs maintain that even when the requirements for abstention are present, the court must still balance abstention against the heavily weighted preference for exercise of jurisdiction, where a federal question is presented. Id. at 16. A key element in balancing is the question of which forum will provide a prompt resolution of all claims. Citing Intel Corp. v. Advanced Micro. Devices, 12 F.3d 908, 913 (9th Cir. 1993) cert. denied, Advanced Micro Devices v. Intel, __U.S.__, 114 S. Ct. 2675 (1994). Plaintiffs argue that the federal court is the only court which can adjudicate all of the issues in the FAC;

abstention would not allow for prompt resolution of the claims.

According to Plaintiffs, Colorado River holds that a federal court should not dismiss a suit merely because a state court could entertain it, or because there is potential for conflicting results. Colorado River, 424 U.S. at 813-816. Plaintiffs recognize the Younger abstention doctrine is not applicable to this case as the requirements for Younger abstention are absent: 1) there is no ongoing state judicial proceeding; 2) there is no important state interest involved; and 3) the state judicial proceeding cannot adequately address the federal questions raised in the federal complaint. Middlesex County Ethics Committee v. Garden State Bar Assn., 457 U.S. 423, 431 (1982).

Plaintiffs argue that Federal Defendants fail to satisfy the six part test required under Colorado River: 1) that there are exceptional circumstances; 2) the state proceeding has concurrent jurisdiction to provide the same relief; 3) the state proceeding has jurisdiction over any res or property at issue; 4) the federal forum is inconvenient relative to the state forum; 5) the desirability of avoiding piecemeal litigation; and 6) the order in which jurisdiction was obtained. Plaintiffs argue that there is no concurrent jurisdiction between the SWRCB and the federal court, and the SWRCB has no jurisdiction over the Bureau contract, the res of the federal court action.

Plaintiffs assert Burford abstention is also inapplicable because the state court must have concurrent jurisdiction and

here it does not. Id. at 327. Plaintiffs maintain that the SWRCB is not a "specialized agency," as any superior court in any county in the state could adjudicate claims similar to the SWRCB complaint. Citing Knudsen Corp. v. Nevada State Dairy Commission, 676 F.2d 374, 377 (9th Cir. 1982). This contention is meritless. The SWRCB has specific water rights expertise, more so than courts of general trial jurisdiction.

Federal Defendants reply they do not seek Younger abstention and acknowledge Colorado River is not applicable after dismissal of Plaintiffs' state complaint. Federal Defendants reiterate that NOPSI supports abstention. Courts may withhold authorized equitable relief to avoid undue interference with state proceedings because it "is the normal thing to do." NOPSI, 491 U.S. at 359.

> The doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in exceptional circumstances. Colorado River Water Conservation District v. U.S., 424 U.S. 800 at 814.

This case has proceeded for three years, during which time has drawn out as stays have been granted and hearing dates vacated primarily at the request of Federal Defendants. The court has jurisdiction over the federal contract and issues raised under the ESA and CVPIA. It has the obligation to timely adjudicate the federal controversy. Plaintiffs have availed themselves of the remedies of the SWRCB by filing a complaint

September 22, 1995, which Federal Defendants answered. The SWRCB sent a letter to Plaintiffs on February 20, 1996 (five months later) stating that Plaintiffs had thirty days in which to submit additional evidence supporting the allegations or concerning the responses. (Exhibit A to Federal Defendants' Reply.) The SWRCB indicated that "the complaints will be evaluated after the thirty days have expired." (Exhibit A.) Neither party indicates that Plaintiffs submitted additional evidence to the SWRCB, or that the Board has commenced its evaluation.

Title 23, Article 18 § 821 of the California Code of Regulations reads:

> If, after investigation, the board's staff finds that a violation of the terms and conditions of a permit or license has occurred which might be cause for enforcement action by the board, the matter may be referred to the board for hearing in accordance with the provisions of Water Code Sections 1410 et seq., 1675 et seq. or 1825 et seq. If the board's staff finds that no such violation has occurred, the complainant will be notified and no further action will be taken unless the complainant requests a hearing in which event the board will determine whether to hold a hearing based on information supplied by the complainant and staff.

Apparently the SWRCB has not completed an investigation into the alleged violations of the terms and conditions of the permit or license. Deferral to the expertise of the SWRCB is appropriate. The issue of bias raised by Plaintiffs can be addressed by that Board and its counsel. If a conflict exists, the Board has a duty to disclose the existence of any conflict,