**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **STOCKTON EAST WATER DISTRICT,** et al.,<br>Plaintiffs,<br>**v.**<br>**UNITED STATES,**<br>Defendants. | **Case No. 04-541 L**<br>**Judge Christine Odell Cook Miller**<br>**ELECTRONICALLY FILED ON October 10, 2006** |

**PRE-TRIAL BRIEF OF AMICUS CURIAE CALIFORNIA STATE WATER RESOURCES CONTROL BOARD IN SUPPORT OF THE UNITED STATES**

CLIFFORD T. LEE (S.B. # 74687)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Telephone: (415) 703-5546
Facsimile: (415) 703-5480
Email: Cliff.Lee@doj.ca.gov

TARA L. MUELLER (S.B. # 161536)
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 622-2136
Facsimile: (510) 622-2270
Email: Tara.Mueller@doj.ca.gov

Attorneys for Amicus Curiae California State Water Resources Control Board

# TABLE OF CONTENTS


**Page**

INTRODUCTION 1

STATEMENT OF THE QUESTION INVOLVED 2

STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT 3

ARGUMENT 4

I. Federal Reclamation Law Requires the United States to Comply With All Requirements of Californnia Water Law in Operating the New Melones Project. 4

II. Under Background Principles of California Law Applicable to the United States' Appropriative Water Right Permits for the New Melones Project, Neither the United States nor the Plaintiffs Ever Had Any Right to Use Water for Consumptive Purposes if Such Uses Would Adversely Affect Downstream Water Quality and Fisheries. 9

A. Overview of Background Principles of California Law That Inhere in the United States' Appropriative Water Rights Permits. 11

1. All water rights in California are subject to the self-executing constitutional limitation of reasonable and beneficial use. 13

2. All water rights in California are subject to the ongoing limitations of the common law public trust doctrine. 15

3. All water rights in California must continually be exercised in a manner that does not interfere with the state's property right in its fishery resources. 19

4. Section 5937 of the Fish and Game Code also requires the United States to bypass water from New Melones Dam sufficient to keep fish below the dam in good condition. 22

5. The federal and state courts and the State Board have concurrent jurisdiction to apply the reasonable and beneficial use and public trust doctrines. 23

# TABLE OF CONTENTS (continued)


| | Page |
|---|---|
| B. Water Deliveries to Stockton East and Central San Joaquin are Subject to Overriding Terms and Conditions in the United States' Water Right Permits That Require Protection of Water Quality and Fisheries in the Stanislaus and San Joaquin River Basins. | 25 |
| 1. Water Right Decision 1422. | 25 |
| 2. Order WR 83-3. | 27 |
| 3. Water Right Decision 1616. | 28 |
| 4. The 1995 Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary. | 29 |
| 5. Water Right Order WR 95-6. | 30 |
| 6. Water Right Decision 1641. | 31 |
| 7. Summary and Conclusion. | 33 |
| C. Background Principles of California Water Law and the Terms and Conditions of the United States' Water Right Permits Apply to the CVP Contractors, Including the Plaintiffs. | 33 |
| III. The Plaintiffs' Contracts Themselves Require Compliance With All Applicable Requirements of California Law. | 36 |
| CONCLUSION | 40 |

# TABLE OF AUTHORITIES

**Page**

**Cases**


*Allegretti v. County of Imperial*
138 Cal. App. 4th 1261 (2006) 15

*Barcellos & Wolfsen, Inc. v. Westlands Water Dist*.
849 F. Supp. 717 (E.D. Cal. 1993) 39

*California Oregon Power Co. v. Beaver Portland Cement Co.*
295 U.S. 142 (1935) 5, 6

*California Pastoral and Agricultural Co. v. Madera Canal and Irrig. Dist*.
167 Cal. 78 (1914) 15

*California Trout, Inc. v. State Water Resources Control Bd.*
207 Cal. App. 3d 585 (1989) 19, 22

*California Trout, Inc. v. Superior Court*
218 Cal. App. 3d 187 (1990) 22

*California v. United States*
438 U.S. 645 (1978) 4-7, 33

*Central and West Basin Water Replenishment Dist. v. Southern California Water Co.*
109 Cal. App. 4th 891 (2003) 13

*Central Delta Water Agency v. U.S. Bureau of Reclamation*
452 F.3d 1021 (9th Cir. 2006) 33

*City of Torrance v. Workers' Comp. Bd.*
32 Cal. 3d 371 (1982) 37

*Colberg, Inc. v. State of Cal. Dep't of Pub. Works*
67 Cal. 2d 408 (1967) 15, 16

*Eddy v. Simpson*
(1853) 3 Cal. 249 11

*Eldridge v. Cowell*
4 Cal. 80 (1854) 15

**TABLE OF AUTHORITIES (continued)**

**Page**

*Environmental Defense Fund, Inc. v. East Bay Municipal Utility Dist.*
26 Cal.3d 183 (1980) 2, 14, 23

*Gin S. Chow v. City of Santa Barbara*
217 Cal. 673 (1933) 13, 15

*Imperial Irrig. Dist. v. State Water Resources Control Bd.*
186 Cal. App. 3d 1162 (1990) 14

*Joerger v. Pacific Gas & Elec. Co.*
207 Cal. 8 (1929) 15

*Joslin v. Marin Municipal Water Dist.*
67 Cal. 2d 132 (1967) 14, 15

*Kansas v. Colorado*
206 U.S. 46 (1907) 4, 5

*Kidd v. Laird*
(1860) 15 Cal. 162 11

*Klamath Irrig. Dist. v. United States*
67 Fed. Cl. 504 (2005) 9, 24, 34

*Loveladies Harbor, Inc. v. United States*
28 F.3d 1171 (Fed. Cir. 1994) 10

*Marks v. Whitney*
6 Cal. 3d 251 (1971) 16

*Meridian, Ltd. v. City and County of San Francisco*
13 Cal. 2d 424 (1939) 13

*National Audubon Society v. Superior Court*
33 Cal. 3d 419 (1983) *passim*

*Natural Resources Defense Council v. Houston*
146 F.3d 1118 (9th Cir. 1998) 22

*Natural Resources Defense Council v. Patterson*
333 F. Supp.2d 906 (E.D. Cal. 2004) 22

**TABLE OF AUTHORITIES (continued)**

**Page**


*O'Neill v. United States*
50 F.3d 677 — 39

*Peabody v. City of Vallejo*
2 Cal. 2d 351 (1935) — 12, 14, 15

*People v. Forni*
54 Cal. App. 3d 743 (1976) — 15

*People v. Glenn Colusa Irrigation Dist.*
127 Cal. App. 30 (1932) — 21

*People v. Gold Run Ditch and Mining Co.*
66 Cal. 138 (1884) — 16, 18

*People v. K. Hovden Co.*
215 Cal. 54 (1932) — 21

*People v. Monterey Fish Products Co.*
195 Cal. 548 (1925) — 19, 21

*People v. Murrison*
101 Cal. App. 4th 349 (2002) — 11, 12, 19

*People v. Shirokow*
26 Cal. 3d 301 (1980) — 2

*People v. Stafford Packing Co.*
193 Cal. 719 (1924) — 21

*People v. Truckee Lumber Co.*
116 Cal. 397 (1897) — 19, 20, 21

*People v. Weaver*
147 Cal. App. 3d Supp. 23 (1983) — 11

*Pollard v. Hagan*
44 U.S. (3 How.) 212 (1845) — 4

*Rith Energy v. United States*
44 Fed. Cl. 108 (1999) — 4, 10, 11

**TABLE OF AUTHORITIES (continued)**

**Page**

*Shively v. Bowlby*
152 U.S. 1 (1894) 4

*State Water Resources Control Board Cases*
136 Cal. App. 4th 674 (2006) *passim*

*Stockton East Water Dist. v. United States*
70 Fed. Cl. 515 (2006) 37

*Town of Antioch v. Williams Irrig. Dist.*
188 Cal. 451 (1922) 14

*Tulare Irrigation Dist. v. Lindsay-Strathmore Irrig. Dist.*
3 Cal. 2d 489 (1935) 13, 14, 23

*Tulare Lake Basin Water Storage Dist. v. United States*
49 Fed. Cl. 313 (2001) 23, 34, 35

*United States v. Rio Grande Dam Irrig. Co.*
174 U.S. 670 (1899) 7

*United States v. State of California*
694 F.2d 1171 (9th Cir. 1982) 7, 8

*United States v. State Water Resources Control Bd.*
182 Cal. App. 3d 82 (1986) *passim*

*United States v. Willow River Power Company*
324 U.S. 499 (1945) 11

*Ward v. Mulford*
32 Cal. 365 (1867) 15

**Statutes**

16 United States Code
§ 1531 18

43 United States Code
§ 372 6
§ 383 6
§ 391 6

## TABLE OF AUTHORITIES (continued)

| | Page |
|---|---|
| California Civil Code | |
| § 3479 | 20 |
| California Constitution, Article X | |
| § 2 | 12, 13, 15, 23 |
| California Fish and Game Code | |
| § 5900 | 22 |
| § 5902 | 22 |
| § 5937 | 12, 21, 22 |
| California Water Code | |
| § 100 | 13 |
| § 102 | 11, 12 |
| § 174 | 1 |
| § 275 | 1, 14 |
| § 1000 | 37 |
| § 1001 | 12 |
| § 1225 | 1 |
| § 1243 | 25 |
| § 1243.5 | 37 |
| § 1253 | 25 |
| § 1257 | 25, 37 |
| § 1258 | 37 |
| § 1675 | 1 |
| § 2000 | 23 |
| § 2075 | 23 |
| § 13000 | 37 |
| **Other Authorities** | |
| Pub. L. 102-575, 106 Stat. 4706 | |
| § 3402 | 18 |
| § 3406 | 18, 33 |

**INTRODUCTION**

Amicus curiae California State Water Resources Control Board (State Board), an agency of the State of California, respectfully submits the following amicus curiae brief in support of the United States' position at trial. The portion of the case now being tried involves the question whether the United States breached its contractual obligations to the Stockton East Water District (Stockton East) and Central San Joaquin Water Conservation District (Central San Joaquin) in failing to deliver the full amount of the plaintiffs' claimed contractual entitlements during the 1993-2004 time period. The plaintiff water districts contend that the United States breached its water service contracts with the districts by using water impounded behind the New Melones Dam, part of the New Melones Unit of the Central Valley Project (CVP), to meet various water quality and fishery protection requirements of state and federal law. Thus, the key legal question posed by this case is whether the United States can be held liable for breach of contract because it complied with requirements of state and federal law for protection of water quality and fisheries.

The State Board has a unique interest in this case and is particularly well qualified to assist this Court in addressing this important legal issue. The State Board is the agency to which the California Legislature has delegated responsibility "for the orderly and efficient administration of the water resources of the state" and which has therefore been granted "the adjudicatory and regulatory functions of the state in the field of water resources." Cal. Water Code § 174. The State Board possesses the exclusive authority to issue water right permits and licenses for the appropriation of water in California, and has issued the water right permits to the United States which are directly at issue in this case. Cal. Water Code § 1225. The State Board is further entrusted to "take all appropriate proceedings or actions before executive, legislative or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in the state." Cal. Water Code § 275.

As the California Supreme Court has explained, "the Legislature . . . delegated to the board . . . the authority to protect the public interest not only in the issuance of appropriative permits and licenses, but also in their later administration." *Environmental Defense Fund, Inc. v. East Bay Municipal Utility Dist.*, 26 Cal. 3d 183, 198 (1980). An important component of this "broad authority" is the State Board's power to provide for the "protection of the environment." *Id.* As explained in detail in this brief, the California constitutional requirement of reasonable and beneficial use, the common law public trust doctrine, the statutory water rights system and other state law requirements "vest[] in the board expansive powers to safeguard the scarce water resources of the state." *People v. Shirokow*, 26 Cal. 3d 301, 309 (1980). The State Board's powers under these authorities, and the concurrent jurisdiction of the state and federal courts to address these issues, are not restricted by any concept of "vested rights" and include "the power and duty to provide water quality protection to the fish and wildlife that make up the delicate ecosystem within the [Sacramento-San Joaquin] Delta." *National Audubon Society v. Superior Court*, 33 Cal. 3d 419, 447 (1983); *State Water Resources Control Board Cases*, 136 Cal. App. 4th 674, 699 (2006).

For the reasons explained below, the State Board respectfully submits that the United States cannot be held liable for failing to deliver water that it either was or could have been required to release for water quality and fishery protection purposes due to the overriding obligations of state law.

**STATEMENT OF THE QUESTION INVOLVED**

At issue in this case is the question whether a federal reclamation contractor has the right to recover damages from the United States for limiting deliveries of water from a federal reclamation project, where such limitations are either required by, or are consistent with, numerous principles of state constitutional, statutory and common law which restrict the nature, scope, and exercise of the state water rights upon which the federal water service contracts are predicated.

**STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT**

In 1983, the United States entered into water service contracts with the plaintiff water districts for delivery of water from the New Melones Unit of the CVP (hereafter the "New Melones Project"). The plaintiffs contend that the United States breached its contracts in each of the years from 1993 to 2004 by failing to deliver to plaintiffs for their consumptive use all of the water they assert they are entitled to receive under their contracts. The plaintiffs' pre-trial brief claims that this was due to the United States' discretionary determination not to deliver water to the plaintiffs and instead to use water from New Melones Dam to meet the fishery flow requirements of the Central Valley Project Improvement Act of 1992 (CVPIA) to the New Melones Project. According to the plaintiffs:

> Simply put, CVPIA required Reclamation to re-allocate a maximum of 800,000 acre-feet of CVP yield to fish. *This [the] Defendant could have easily done, while still furnishing Plaintiffs with all of the water to which they were contractually entitled*.

Plaintiffs' Memorandum of Contentions of Fact and Law at 10, emphasis added; see also *id*. at 20, 25.

The State Board respectfully contests these contentions. As the following will show: (1) federal reclamation law obligates the United States to operate the New Melones Project in a manner consistent with the California water law; (2) the United States holds appropriative water rights under California law, and California law does not guarantee a water right holder a permanent or vested right to divert and store a specific quantity of water; (4) both California law and the specific terms and conditions of the United States' permits impose numerous water quality and fishery protection obligations on the United States' operation of the New Melones Project, and these obligations have a first claim of priority to New Melones water that supercedes any contract rights to receive water; (4) the plaintiffs, as entities that contract with a water right holder for the delivery of water, do not

possess any greater right to use water than does the holder of the water right itself and accordingly are subject to all requirements of California law and the terms and conditions of the United States' water right permits; and (5) the plaintiffs' contracts themselves mandate compliance with these requirements of state water law and the United States' permits.

The State Board therefore respectfully requests that this Court deny the plaintiffs' breach of contract claim to the extent that reduced water deliveries to the plaintiffs are due to the United States' compliance with California law or federal law requirements that mirror the results that could be achieved under California law. *Rith Energy v. United States*, 44 Fed. Cl. 108, 113 (1999).

## ARGUMENT

### I. Federal Reclamation Law Requires the United States to Comply With All Requirements of California State Water Law in Operating the New Melones Project.

In the complicated field of federal/state relationships, Congress has spoken with a clear and consistent voice regarding the issue of water resource allocation. As the U.S. Supreme Court has observed:

> The history of the relationship between the Federal Government and the States in the reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent thread of purposeful continued deference to state water law by Congress.

*California v. United States*, 438 U.S. 645, 653 (1978). This policy of deference to state water law was first applied in California in 1850, when Congress admitted California to the Union as a state "on an equal footing with the original states in all respects whatever." Act of Sept. 9, 1850, 9 Stat. 452. Pursuant to this "equal footing" doctrine, Congress granted each of the western states, upon their admission to the Union, exclusive sovereignty over the unappropriated waters in their streams. *Kansas v. Colorado*, 206 U.S. 46, 95 (1907); *Shively v. Bowlby*, 152 U.S. 1, 49

(1894); *Pollard v. Hagan*, 44 U.S. (3 How.) 212, 223-24 (1845).

In *Kansas v. Colorado*, a case involving a dispute over the flow of the Arkansas River, Kansas argued that Congress had expressly applied English common law to both Kansas and Colorado and that the common law included the riparian system of water rights. The U.S. Supreme Court rejected this view and held that:

> [Each state] may determine itself whether the common law rule in respect to riparian rights or that doctrine which obtains in the arid regions of the West of the appropriation of waters for the purposes of irrigation shall control. Congress cannot enforce either rule upon any State.

*Kansas v. Colorado*, 206 U.S. at 94. Thus, the "equal footing" doctrine represents a congressional recognition of the right of the individual states to set their own water resource destinies.

Congress reaffirmed this policy of deference to state water right law in the Desert Land Act of 1877. The Desert Land Act followed numerous mining and homestead acts which encouraged reclamation and settlement of public domain land. *California v. United States*, 438 U.S. at 655-657. The Desert Land Act also authorized the entry onto and cultivation of public land. Upon compliance with certain conditions, a settler would receive a land patent. With regard to water, the Act authorized settlers to appropriate water for irrigation and reclamation. However, the Act specifically provided that all sources of water upon public lands were to "be held free for the appropriation and use of the public." Desert Land Act of 1877, 19 Stat. 377.

In *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935), the U.S. Supreme Court interpreted the Desert Land Act as affirming the longstanding policy of deference to state water law. At issue in *California Oregon Power* was whether a federal land patent carried with it a common law riparian water right. After reviewing the statutory

language, the Court held that:

> If this language is to be given its natural meaning, . . ., it *effected a severance of all waters upon the public domain, not theretofore appropriated, from the land itself.* From that premise, it follows that a patent issued thereafter for lands in a desert-land state or territory, under any of the land laws of the United States, carried with it, of its own force, no common law right to the water flowing through or bordering upon the lands conveyed.

*California Oregon Power Co.*, 295 U.S. at 158, emphasis added. Thus, the Court determined that the Desert Land Act severed the right to water from public domain land and reserved to the states the power to allocate their water resources. *Id.* at 164.

Congress reaffirmed this reservation of water rights authority to the states in its passage of the Federal Reclamation Act of 1902. The Act authorized the federal government to construct water resource development projects and, at least initially, to finance these facilities through the sale of public domain land. 43 U.S.C. § 391. However, Section 8 of the 1902 Act provided in pertinent part that:

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws.

43 U.S.C. § 372; see also § 383.

In 1978, in the landmark case of *California v. United States*, 438 U.S. 645, the U.S. Supreme Court was called upon to interpret this section of the Reclamation Act and to synthesize the various lines of cases establishing a pattern of congressional deference to state water law. In *California v. United States*, the United States had challenged the authority of the State Board to impose terms and conditions on the United States' appropriative water right permits for operation of the New Melones Project. The United States contended that the State Board lacked the power to impose any terms and conditions on its operation of a federal

reclamation project. However, the Supreme Court rejected the United States' argument and concluded that the "cooperative federalism" approach reflected in Section 8 of the Reclamation Act required the United States to comply with all state water laws unless a given law could be shown to be directly inconsistent with clear congressional directives regarding the particular project. *Id.* at 650, 678.

In reaching this conclusion, the Court relied upon its previous decision in *United States v. Rio Grande Dam Irrig. Co.*, 174 U.S. 670, 702-703 (1899), which described the broad scope of state jurisdiction over its internal waters:

> The Court noted that there are two limitations to the State's exclusive control of its streams - reserved rights 'so far at least as may be necessary for the beneficial uses of the government property,' *id.*, at 703, and the navigation servitude. The Court, however, was careful to emphasize with respect to these limitations on the States' power that, *except where the reserved rights or navigation servitude of the United States are invoked, the State has total authority over its internal waters*.

*California v. United States*, 438 U.S. at 662, emphasis added. In applying these principles to the instant case, at least two points bear emphasis.

First, a conflicting congressional directive that displaces state law by definition must be *statutory* in nature. In *California v. United States*, the U.S. Supreme Court has expressly recognized that the term "congressional directives" refers only to "legislative enactments." *Id.* at 677-678. On remand of that case, the Ninth Circuit Court of Appeals confirmed that the term "congressional directive" was intended to mean a "federal statute." *United States v. State of California*, 694 F.2d 1171, 1176 (9th Cir. 1982).

Second, a congressional directive cannot be shown to conflict with state law simply because a provision of federal reclamation law covers the same subject area as state law. In *United States v. State of California*, 694 F.2d 1171, the United States asked the Ninth Circuit, on remand from the Supreme Court decision in *California v. United States*, 438 U.S. 645, to

invalidate State Board conditions for the New Melones Project which required the project to meet state water quality goals and area of origin preferences, on the ground that these conditions conflicted with clear congressional objectives for the project. The United States argued that because the federal statute authorizing construction of the New Melones Project also required the project to address water quality and area of origin concerns, the state conditions were invalid because Congress intended that the federal government, rather than the state, be the final arbiter of these matters. *United States v. State of California*, 694 F.2d at 1181.

The Ninth Circuit, however, rejected the United States' "subject-area" conflict preemption argument, reasoning that:

> In its broad form, the argument would render invalid all conditions imposed by the California Water Board, since in the absence of Board action, decisions on matters covered by state-imposed conditions would have been made by federal agencies. This would ignore the federalism concerns, visible in the Supreme Court's 1978 decision. It is true that a state cannot require an action solely because a federal agency, on its own initiative, could have decided to do it. But we are not convinced, in the face of section 8 of the Reclamation Act, that Congress's mere direction to federal agencies to operate the New Melones project is a directive which permits federal agencies to ignore state law in the impoundment and distribution of water.

*Id.* at 1181. The Ninth Circuit then upheld the State Board's application of water quality and area of origin conditions to the New Melones Project. *Id.*

As applied to the present case, the above authorities require the United States to deliver water to the plaintiffs subject to all of the requirements of California water law. As the following will show, these requirements include numerous obligations to bypass or release New Melones Project water, as a first order of priority, for the protection of downstream agricultural water quality and fisheries.

## II. Under Background Principles of California Law Applicable to the United States' Appropriative Water Right Permits for the New Melones Project, Neither the United States nor the Plaintiffs Ever Had Any Right to Use Water for Consumptive Purposes if Such Uses Would Adversely Affect Downstream Water Quality and Fisheries.

Under section 8 of the federal Reclamation Act and California law, the plaintiffs cannot claim any contract expectancy in full contractual deliveries from the New Melones Project for their consumptive use because the United States' state appropriative water rights for the project are subject to numerous, overriding restrictions and background principles that limit the United States' ability to deliver water to the plaintiffs for such purposes. These state law restrictions apply by derivation to the plaintiffs' contract rights to receive water from that project, which are necessarily predicated upon, and circumscribed by, the United States' permits. *State Water Board Cases*, 136 Cal. App. 4th at 806, n.54 ("[a]n appropriator cannot give away more rights than he or she has"); see also *Klamath Irrig. Dist. v. United States*, 67 Fed. Cl. 504, 535 (2005) ("*nemo dat qui non habet*. . . one who does not have cannot give"); see section II.C, *post*.

As discussed below, these fundamental requirements of California water law limit the nature, scope *and* exercise of the United States' water rights, and require the United States to exercise its water rights in a manner which protects other reasonable and beneficial uses of the water supply, including downstream water quality and fish and wildlife uses. Neither the United States nor the plaintiffs now has, or ever has had, any right to use water in a manner inconsistent with these state law principles. Thus, any non-delivery or reductions in deliveries from the New Melones Project necessary to comply with "the restrictions that background principles of the State's law of property and nuisance already place" upon the United States' water right permits, or any requirements of federal law that parallel these state law restrictions on title, cannot constitute a breach of plaintiffs' contracts with the United States. *Rith Energy*, 44 Fed. Cl. at 113.

As explained in section II.B, *post*, some of these state law requirements are reflected in the express terms and conditions of the United States' state water right permits. However, the fundamental background principles of state law described below also constitute inherent limitations on the nature, extent and exercise of all state water rights at all times, even absent any express terms and conditions in a water right permit.[1/]

Consequently, the inherent restrictions imposed on the United States' appropriative water right permits by background principles of state water law also are relevant to the analysis of any additional flow requirements, above and beyond the specific terms and conditions the State Board imposed on the United States' permits from 1973 onward, that may have been imposed through the mandates of the CVPIA and/or federal Endangered Species Act (ESA). This conclusion follows from the U.S. Court of Federal Claims' holding in *Rith Energy v. United States*, 44 Fed. Cl. 108.

In that case, the court held that the United States was not liable for denial of a mining permit under the federal Surface Mining Control and Reclamation Act (SMRCA) due to the high probability of acid mine drainage. The court held that [r]estrictions on the use of property that have their source in federal law also come within" the background principles rule "to the extent that such restrictions do no more than mirror the results that could be achieved" under state law. *Id*. at 113, citing *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1182 (Fed. Cir. 1994). The court reasoned that no liability should accrue because the federal government's decision paralleled a result that could have been achieved under Tennessee's nuisance law, public trust doctrine and water quality control laws, all of which protected the state's

1. As such, these requirements are particularly pertinent to the analysis of the United States' release of water from New Melones Dam for San Joaquin River fishery flows prior to the time the State Board amended the Bureau's water rights permits in 2000 to expressly include the Vernalis fishery flow condition.

groundwater resources from pollution such as acid mine drainage. *Id*. at 114-115.

In denying the plaintiffs' motion for reconsideration, the court stated that "whether the enforcement of [state law] restrictions is accomplished by the state regulatory body or by federal officials acting under the authority of SMCRA is not an issue relevant to the [property rights] analysis. . . . The property use that was denied here . . . is not a property use plaintiff could legitimately claim it had a right to pursue in consonance with relevant state property and nuisance principles." *Rith Energy*, 44 Fed. Cl. 366 (1999).

Similarly, in this case, any fishery flows that may have been imposed by the CVPIA or ESA, but which were not specifically mandated by the terms and conditions of the United States' water right permits, nevertheless cannot constitute the basis for liability if these flows were consistent with the application of fundamental background principles of California water law which inhere in the United States' water right permits for the New Melones Project. As explained further below, here, as in *Rith Energy,* any additional CVPIA- or ESA- mandated fishery flows also could have been required by the application and enforcement of inherent state law limitations on the United States' water rights. Therefore, no liability should accrue because neither the United States nor the plaintiffs ever had a vested right to use these additional flows for consumptive purposes in the first instance.

### A. Overview of Background Principles of California Law That Inhere in the United States' Appropriative Water Rights Permits.

As the United States Supreme Court said long ago "[r]ights, property or otherwise, which are absolute against all the world are certainly rare, and water rights are not among them." *United States v. Willow River Power Company*, 324 U.S. 499, 510 (1945). This statement is particularly true in California, where water rights "have been the subject of pervasive regulation." *People v. Weaver*, 147 Cal. App. 3d Supp. 23, 30 (1983). Moreover,

water rights are not like real property rights, and by their very nature are "limited and uncertain." *People v. Murrison*, 101 Cal. App. 4th 349, 359 (2002). This is true for several reasons.

First, water rights are not possessory interests, but rather are solely usufructuary. *Eddy v. Simpson* (1853) 3 Cal. 249, 252. Thus, "[t]he right of property in water . . . consists not so much of the fluid itself as the advantage of its use." *Id*. As a corollary to the usufructuary nature of the property interest in water, "running water, so long as it continues to flow in its natural course, is not, and cannot be made the subject of private ownership. A right may be acquired to its use . . . but . . . this right carries with it no specific property in the water itself." *Kidd v. Laird* (1860) 15 Cal. 162, 180; see also *Eddy*, 3 Cal. at 253; Cal. Water Code § 102 ("the right to the *use* of water may be acquired by appropriation in the manner provided by law"), emphasis added. This principle that the corpus of the water cannot be privately owned is reflected in the Water Code. See, e.g. Cal. Water Code § 1001 ("[n]othing in [the Water Code] shall be construed as giving or confirming any right, title, or interest to or in the corpus of any water"). The Water Code further provides that the corpus of the water is owned and controlled by the people of the State of California. Cal. Water Code § 102 ("all water within the State is the property of the people of the State").

Indeed, it would be practically impossible for anyone to possess the right to the corpus of the water itself, as opposed to the mere right to its use, since "[t]he available supply of water is largely determined by natural forces." *Murrison*, 101 Cal. App. 4th at 359. As the California Supreme Court explained over 70 years ago in *Peabody v. City of Vallejo*, 2 Cal. 2d 351 (1935):

> [t]he waters of our streams are not like land which is static . . . Water is constantly shifting, and the supply changes to some extent every day. A stream supply may be divided but the product of the division in nowise remains the same. *When the supply is limited the public interest requires that there be the greatest number of beneficial uses which the supply can yield*.

*Id.* at 368, emphasis added.

In addition to these inherent limitations on the nature of the water right itself, all water rights in California are subject to several important doctrines which further limit the scope and exercise of such rights: (1) the doctrine of reasonable and beneficial use in Article X, section 2 of the California Constitution; (2) the common law public trust doctrine; (3) statutory and common law of nuisance and the doctrine of public ownership of fishery resources; (4) California statutes implementing the common law public trust doctrine, such as section 5937 of the California Fish and Game Code; and (5) the doctrine of concurrent jurisdiction. Each of these background principles of California law, and their application to the instant case, is discussed below.

**1. All water rights in California are subject to the self-executing constitutional limitation of reasonable and beneficial use.**

The doctrine of reasonable and beneficial use set forth in Article X, section 2 of the California Constitution is "an overriding constitutional limitation" that is "superimposed on [the] basic principles defining water rights." *United States v. State Water Resources Control Bd.,* 182 Cal. App. 3d 82, 105 (1986). This "paramount limitation," first enacted in 1928, applies to all water rights in California. *Id*. at 106. Thus, "no water rights are inviolable; all water rights are subject to governmental regulation." *Id.* Article X, section 2[2/] provides that:

> because of the conditions prevailing in this State, the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare.

See also Cal. Water Code § 100.

---

2. This section was formerly numbered Article XIV, section 3, but has not been amended since its enactment.

The purpose of this constitutional amendment "was to ensure that the state's water resources would be 'available for the constantly increasing needs of all of its people'." *Central and West Basin Water Replenishment Dist. v. Southern California Water Co.*, 109 Cal. App. 4th 891, 904 (2003), quoting *Meridian, Ltd. v. City and County of San Francisco*, 13 Cal. 2d 424, 449 (1939). In *Gin S. Chow v. City of Santa Barbara*, 217 Cal. 673, 701 (1933), the California Supreme Court held that Article X, section 2 was a lawful exercise of the state's police power. See also *Tulare Irrigation Dist. v. Lindsay-Strathmore Irrig. Dist.*, 3 Cal. 2d 489, 529 (1935). Importantly, this provision is expressly declared to be "self-executing," meaning that water rights must constantly be adjusted to meet its dictates. Cal. Const., art. X, § 2. Furthermore, all water rights are subject to the continuing authority of the State Board (as well as the courts) to prevent waste and unreasonable use. *United States v. State Board*, 182 Cal. App. 3d at 129; Cal. Water Code §§ 275, 1675.

What is a reasonable use or method of use of water "depends upon the circumstances of each case," and "cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance," such as the paramount "ever increasing need for the conservation of water in this state." *Joslin v. Marin Municipal Water Dist.*, 67 Cal. 2d 132, 140 (1967); see also *Environmental Defense Fund*, 26 Cal. 3d at 194 (what constitutes a reasonable use of water "varies as the current situation changes"); *Peabody,* 2 Cal. 2d at 368 (what constitutes a waste or reasonable use of water "depends upon the circumstances of each case and the time when waste is required to be prevented").

Thus, uses of water, once reasonable, may subsequently become unreasonable in light of changed circumstances and their effects on other water users or the environment. *Tulare Irrig. Dist.*, 3 Cal. 2d at 567 ("[w]hat is a [reasonable and] beneficial use at one time may, because of changed conditions, become a waste of water at a later time"); see, e.g. *Town of Antioch v.*

*Williams Irrig. Dist*., 188 Cal. 451 (1922) (point of diversion became unreasonable in light of additional demands for consumptive uses of water); *Natl. Audubon Society*, 33 Cal. 3d 419 (adverse effects of licensed appropriative water rights on Mono Lake ecosystem deemed unreasonable in light of increasing ecological damage); *Imperial Irrig. Dist. v. State Water Resources Control Bd.*, 186 Cal. App. 3d 1162 (1990) (exercise of appropriative water rights deemed unreasonable in light of flooding caused by wasteful water delivery and irrigation practices); *United States v. State Board*, 182 Cal. App. 3d at 129-130 (diversion or use is unreasonable to the extent changes are required to protect other beneficial uses and avoid violation of state water quality objectives).

Furthermore, the California courts have repeatedly held that, because there is no property right in an unreasonable use of water, a water user can never obtain a vested right to use water in an manner inconsistent with Article X, § 2 of the California Constitution. *Joslin,* 67 Cal. 2d at 144-145; *California Pastoral and Agricultural Co. v. Madera Canal and Irrig. Dist*., 167 Cal. 78, 85-86 (1914); *Joerger v. Pacific Gas & Elec. Co.*, 207 Cal. 8, 22 (1929); *Gin S. Chow*, 217 Cal. at 703; *Peabody*, 2 Cal. 2d at 369; *People v. Forni*, 54 Cal. App. 3d 743, 753 (1976); *Allegretti v. County of Imperial*, 138 Cal. App. 4th 1261, 1279 (2006) (all holding that there is no protectable property interest or vested property right in an unreasonable use of water).

Thus, under California's self-executing constitutional reasonable and beneficial use doctrine, the United States, as the holder of appropriative water rights for the New Melones Project, must release water from the project sufficient to protect other reasonable and beneficial uses in the Stanislaus and San Joaquin River watersheds, including reasonable protections for water quality for downstream users and fisheries. Any release of water for such purposes by the United States, even if pursuant to the CVPIA or ESA, did not breach the United States'

contractual obligations to the plaintiffs because the United States, and therefore the plaintiffs, never had a vested right in the first instance to use a specified quantity of water for consumptive purposes under the United States' appropriative water rights permits.

### 2. All water rights in California are subject to the ongoing limitations of the common law public trust doctrine.

A "further significant limitation on water rights" in California is the public trust doctrine. *United States v. State Board*, 182 Cal. App. 3d at 106. California courts acknowledged the common law public trust doctrine as early as 1854, recognizing its applicability to all of the state's tidelands and navigable waters and lands underlying those waters. *Eldridge v. Cowell*, 4 Cal. 80, 87 (1854). The doctrine originally applied to protect the public's right to use the state's tidelands and navigable waterways for purposes of commerce, navigation and fishing. *Ward v. Mulford*, 32 Cal. 365, 372 (1867); *Colberg, Inc. v. State of Cal. Dep't of Pub. Works*, 67 Cal. 2d 408, 417 (1967). More recent decisions also have recognized that the doctrine includes the public's right to use sovereign lands and waters for hunting, fishing, bathing, swimming, boating, and general recreational purposes, as well as to preserve trust lands and waters in their natural state, "so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area." *Marks v. Whitney*, 6 Cal. 3d 251, 259-260 (1971).

The state's "power to control, regulate and utilize [its] waters within the terms of the trust is absolute except as limited by the paramount supervisory power of the federal government over navigable waters." *Colberg, Inc.*, 67 Cal. 2d at 416; see also *People v. Gold Run Ditch and Mining Co.*, 66 Cal. 138, 151 (1884) ("the rights of the people in the navigable rivers of the State are paramount and controlling. The state holds the absolute right to all navigable waters and the soils under them . . . [which] she holds as a trustee of a public trust for

the benefit of the people”).

In *National Audubon Society*, 33 Cal. 3d 419, decided in 1983, the California Supreme Court held that the public trust doctrine applies directly to state appropriative water rights as well as to rights in tidelands and submerged lands. At issue in the *National Audubon* case was whether the City of Los Angeles’ diversion of water from tributaries to the Mono Lake Basin violated the public trust by harming fish and wildlife and recreational resources in Mono Lake. The Court found that the State Board had not properly considered the effect of the diversions on the public trust when it issued the City’s water right licenses. The Court concluded that the “state as a sovereign retains continuing supervisory control over its navigable waters and the lands beneath those waters. This principle, fundamental to the concept of the public trust, applies to rights in flowing waters as well as to rights in tidelands and lakeshores.” *Id*. at 445.

In so holding, the Court stated that, in administering the public trust, “the state has an *affirmative duty* to take the public trust into account . . . and to protect trust uses whenever feasible.” *Id.* at 446. The Court explained that:

> the public trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state to protect the people’s common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust.

*Id*. at 441.

The Court outlined three key aspects of the state’s public trust duty. First, the “dominant theme” and “core” of this duty is the state's obligation to “exercise continuous supervision and control” over the navigable waters of the state and the lands underlying those waters. *Id.* at 425, 437; see also 445, 452. In exercising its continuing supervisory power, “the state is not confined by past allocation decisions which may be incorrect in light of current knowledge or inconsistent with current needs.” *Id*. at 447. The state accordingly has the inherent power to reconsider past

decisions "even though those decisions were made after due consideration of their effect on the public trust. . . . No vested rights bar such reconsideration." *Id*.

Second, the state must act to prevent parties from using trust resources in a harmful manner, and must "protect public trust resources whenever feasible." *Id.* at 446, 437; see also 426. In this regard, the state has a continuing duty to seek an accommodation between competing interests and "to preserve, so far as is consistent with the public interest, the uses protected by the trust." *Id.* at 447. Third, as trustee, the state has a responsibility to "bear in mind" its duty as trustee and consider the effect of its own actions upon the public trust. *Id.* at 446, 452, 426. Thus, the state has "an affirmative duty to take the public trust into account" in all of its decision making. *Id.* at 425, 446.

The *National Audubon* Court also held that "parties acquiring rights in trust property generally hold those rights subject to the trust, and *can assert no vested right to use those rights in a manner harmful to the trust*," nor can they claim a "vested right to bar recognition of the trust or state action to carry out its purposes." *Id.* at 437, 440, emphasis added; see also *id*. at 426, 445, 447, 452 and *People v. Gold Run Ditch and Mining Co.*, 66 Cal. at 151 (same).

In *United States v. State Board,* 182 Cal. App. 3d 82, the First District Court of Appeal rejected arguments by the United States that the State Board had no authority to modify an appropriative water rights permit once issued and that imposition of new standards for fish and wildlife protection would impair the United States' claimed vested right to appropriate. The Court of Appeal reasoned that:

> This issue is now clearly controlled by *National Audubon Society v. Superior Court* [citation omitted] . . . . In that case, the Supreme Court clarified the scope of the "public trust doctrine" and held that the state as trustee of the public trust retains supervisory control over the state's waters such that no party has a vested right to appropriate water in a manner harmful to the interests protected by the public trust. . . . This landmark decision directly refutes the [United States'] contentions and firmly establishes that the state . . . has continuing jurisdiction

over appropriation permits and is free to reexamine allocation decisions.

*Id.* at 149-150. Thus, the court concluded, in light of *National Audubon*, "the Board unquestionably possessed the legal authority under the public trust doctrine to exercise supervision over appropriators in order to protect fish and wildlife. That important role was not conditioned on a recital of authority. It exists as a matter of law itself." *Id.* at 150.

As with the self-executing limitations imposed on its water rights by the reasonable and beneficial use doctrine, the United States is required to continually exercise its water rights in a manner consistent with the public trust doctrine, by releasing sufficient water from the New Melones Project to protect the state's public trust resources, including fisheries. Neither the United States nor the plaintiffs possess a vested right to utilize water for consumptive purposes in a manner that would harm these public trust resources. Because the CVPIA and federal ESA likewise are intended to protect the public's interest in fisheries (see Pub. L. 102-575, 106 Stat. 4706, §§ 3402, 3406; 16 U.S.C. § 1531), any releases pursuant to those statutes parallels the limitations already imposed upon the United States' water rights by the state's common law public trust doctrine. Therefore, the United States did not breach its contracts with the plaintiffs by failing to deliver water which was needed to comply with state and federal fishery flow requirements to protect public trust resources.

**3. All water rights in California must continually be exercised in a manner that does not interfere with the state's property right in its fishery resources.**

In California there is a separate, but related, branch of the public trust doctrine that protects fish and wildlife resources in and of themselves, independent of navigable waters. In California, "[w]ild fish have always been recognized as a species of property the general right and ownership of which is in the people of the state." *California Trout, Inc. v. State Water Resources Control Bd.*, 207 Cal. App. 3d 585, 630 (1989); see also *People v. Monterey Fish*

*Products Co.*, 195 Cal. 548, 563 (1925) ("[t]he title to and property in the fish within the waters of the state are vested in the state of California and held by it in trust for the people of the state"); *People v. Murrison*, 101 Cal. App. 4th at 360 ("the State owns the fish in its streams in trust for the public").

As the California Supreme Court held over one hundred years ago in the landmark case of *People v. Truckee Lumber Co.*, 116 Cal. 397 (1897):

> [t]he fish within our waters constitute the most important constituent of that species of property commonly designated as wild game, the general right and ownership of which is in the people of the state (*Ex Parte Maier*, 103 Cal. 476, 483) . . . and the right and power to protect and preserve such property for the common use and benefit is one of the recognized prerogatives of the sovereign.

*Id.* at 399-400. This public property interest in fish extends to *all* waters of the state, whether navigable or non-navigable, and whether flowing over public or private lands. *Id.* at 400. Thus, even waters flowing entirely over private lands, "[t]o the extent that waters are the common passageway for fish, . . . they are deemed for such purposes public waters, and subject to all laws of the state regulating the right of fishery." *Id.* at 401.

California courts have repeatedly held that acts which may harm the state's fishery resources may be characterized as both common law and statutory nuisances, on the ground that such acts interfere with the state's property interest in fish.[3] This principle was first established in 1897 in *People v. Truckee Lumber Co.* In that case, the state Attorney General brought an

---

3. California Civil Code section 3479, first codified in 1873, defines a "nuisance" generally as:

> Anything which is injurious to health, or is indecent or offensive to the senses, or *an obstruction to the free use of property*, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin.

Emphasis added.

action to enjoin operation of a sawmill and box factory, located on the banks of the Truckee River, as a public nuisance. The complaint alleged that the defendant company, in operating its mill, placed large quantities of refuse matter into the river, which polluted and killed the fish in the water and consequently unlawfully interfered with the property rights of the people of the State of California.

The California Supreme Court held that, because the defendant's acts impaired the state's property right in its fishery resources, the California Attorney General had sufficiently alleged and proven both a statutory and a common law public nuisance. *Id*. at 400. Consequently, the Court upheld an injunction prohibiting the private defendant from discharging sawdust and other deleterious substances into the Truckee River in amounts harmful to fish. *Id*. at 402. The court explained that "[i]t is a well-established principle that every person shall so use and enjoy his own property, however absolute and unqualified his title, that his use of it shall not be injurious . . . to the rights of the public." *Id*.

Numerous other California cases have followed the reasoning of *Truckee Lumber* and held that acts which kill fish in the state's waterways constitute a public nuisance and an unlawful invasion of the public's property right in fish. *People v. Glenn Colusa Irrigation Dist*., 127 Cal. App. 30, 34-35, 38 (1932) (enjoining unscreened diversion of water from Sacramento River which killed numerous fish species); *People v. Monterey Fish Co.*, 195 Cal. 548, 563-66 (1925) (enjoining the waste of fish and fish products in fish reduction plant); *People v. K. Hovden Co.*, 215 Cal. 54, 56 (1932) (enjoining the excessive use of fish at sardine cannery); *People v. Stafford Packing Co.*, 193 Cal. 719, 725-727, 730 (1924) (same).

In sum, California nuisance law and the doctrine of public ownership of fishery resources, similar the constitutional reasonable and beneficial use limitation and common law public trust doctrine, require the United States to release sufficient water from the New Melones

Project to protect the state's overriding property interest in its fishery resources in the Stanislaus and San Joaquin Rivers. Because the United States never had a vested right to use water impounded behind New Melones Dam to the detriment of these downstream fishery resources, the United States cannot be held liable to the plaintiffs for bypassing water over the dam to protect fish, whether pursuant to state or federal law.

**4. Section 5937 of the Fish and Game Code also requires the United States to bypass water from New Melones Dam sufficient to keep fish below the dam in good condition**.

In addition to being subject to the State constitutional limitation on unreasonable use and unreasonable method or manner of diversion, the common law public trust doctrine, and California nuisance law, the United States, as the owner of New Melones Dam, also is subject to the requirements of section 5937 of the California Fish and Game Code. That section provides in pertinent part that:

> The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam.

Cal. Fish & Game Code § 5937. This section has been in effect in substantially the same terms since 1937, and applicable to the United States since 1945. See *id.*, §§ 5900, 5902. Section 5937 is a legislative reflection and implementation of the common law public trust doctrine. See *California Trout*, 207 Cal. App. 3d at 631.

In *Natural Resources Defense Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998), the Ninth Circuit Court of Appeals held that there was no clear congressional directive in the CVPIA which would preempt application of section 5937 to the United States' operation of Friant Dam, another component of the CVP, under section 8 of the 1902 Reclamation Act. On remand, the district court held that section 5937 in fact applied to the operation of Friant Dam,

whether or not this requirement had been expressly incorporated into the United States' water right permits for the project. *Natural Resources Defense Council v. Patterson*, 333 F. Supp.2d 906, 913-14 and 924-25 (E.D. Cal. 2004), citing *California Trout, Inc. v. Superior Court*, 218 Cal. App. 3d 187, 210 (1990). Furthermore, the court concluded that operations of Friant Dam were in violation of section 5937 because sufficient water was not being released downstream of Friant Dam to maintain historic fisheries. *Id.*

Section 5937 likewise applies to the United States' operation of New Melones Dam, thereby both reflecting and strengthening the requirements that are similarly imposed upon operation of the New Melones Project by the California constitution, common law public trust doctrine and statutory nuisance law to protect downstream fishery resources.

**5. The federal and state courts and the State Board have concurrent jurisdiction to apply the reasonable and beneficial use and public trust doctrines.**

Under California law, both the reasonable and beneficial use doctrine and the public trust doctrine may be enforced and applied by state and federal courts as well as by the State Board. In *Environmental Defense Fund*, 26 Cal. 3d 183, the California Supreme Court rejected the argument that a party first had to exhaust its administrative remedies before the State Board before it could pursue a reasonable and beneficial use claim in court. The Court held that, aside from "overriding considerations such as are presented by health and safety dangers involved in reclamation of wastewater, we are satisfied that the courts have concurrent jurisdiction with the legislatively established administrative agencies to enforce the self-executing provisions of article X, section 2." *Id.* at 200. Accordingly, the Court concluded, "[p]rivate parties thus may seek court aid in the first instance to prevent unreasonable water use or unreasonable method of diversion," *even if* the State Board has expressly retained jurisdiction over the matter. *Id.*

Three years later, in the *National Audubon* case, the California Supreme Court held that

the doctrine of concurrent jurisdiction applied to public trust claims as well as to reasonable and beneficial use claims. In so deciding, the Court expressly declined to overrule its earlier holding in *Environmental Defense Fund* and "declare that henceforth the Board has exclusive primary jurisdiction in matters falling within its purview." *National Audubon*, 33 Cal. 3d at 451. The Court reasoned that the California Legislature had chosen not to grant the State Board exclusive jurisdiction and instead had:

> chosen an alternative means of reconciling board expertise and judicial precedent. Instead of granting the board exclusive jurisdiction, it has enacted a series of statutes designed to permit state courts, *and even federal courts*, to make use of the experience and knowledge of the board [citing Cal. Water Code § 2000 *et seq*. (state court reference procedures) and Cal. Water Code § 2075 *et seq*. (federal court reference procedures)].

*Id*., emphasis added; see also 452.[4/]

Therefore, under California law, this court has the authority to consider the United States' pre-existing and overriding duty to comply with the reasonable and beneficial use doctrine, public trust doctrine and other fundamental requirements of state law when considering whether the United States' actions in curtailing water deliveries to the plaintiffs breached its contracts with the plaintiffs.

---

4. In *Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed. Cl. 313 (2001), the court concluded that once the State Board has made a water resource allocation, "that determination defines the scope of plaintiffs' property rights" and that "in the absence of a reallocation by the State Water Resources Control Board, or a determination of illegality by the California courts, the allocation scheme imposed by [a State Board water right decision] defines the scope of the plaintiffs' contract rights." *Id.* at 322; see also 321, 323-324. This conclusion is erroneous, as it ignores the California Supreme Court's holding in *National Audubon* that the federal courts share concurrent jurisdiction with the State Board and state courts to reallocate water through enforcement and application of the reasonable and beneficial use and public trust doctrines. See *Klamath v. United States,* 67 Fed. Cl. at 538.

### B. Water Deliveries to Stockton East and Central San Joaquin are Subject to Overriding Terms and Conditions in the United States' Water Right Permits That Require Protection of Water Quality and Fisheries in the Stanislaus and San Joaquin River Basins.

As the foregoing discussion shows, under California law, the right to divert and store water is contingent upon the water right holder's compliance with numerous requirements aimed at protecting the overall public interest in the use of water, including the state constitutional requirement of reasonable and beneficial use and the public trust doctrine. Moreover, as discussed in section II.C. *post*, an entity that contracts for water delivery from a water right holder receives no greater security as to its water supply than the original holder of the water right. The history of the State Board's regulation of the New Melones Project, and the express terms and conditions of the United States' water right permits for the project, as described below, fully reflects this contingent nature of water resource allocation under California law.[5]

#### 1. Water Right Decision 1422.

The United States originally received authority to divert and store water from the Stanislaus River for the New Melones Project in Water Right Decision 1422, issued in 1973. Decision 1422 approved, in part, four separate water rights applications for the use of Stanislaus River water. Decision 1422 at 28-29. The State Board declined in Decision 1422 to authorize the United States to divert and store water for purposes other than for the preservation and enhancement of fish and wildlife and the protection of recreation and water quality, absent a showing that the "permittee had firm commitments to deliver water for such [other] purposes." *Id.* at 18 and 30. The State Board based this determination on the countervailing public interest in protecting upstream recreational beneficial uses of water on the Stanislaus River, such as

---

5. All of the documents referenced in this section II.B can be found at www.waterrights.ca.gov.

white water boating. *Id.* at 16-20.[6] Nevertheless, the State Board's decision to condition full storage of New Melones Project water for consumptive uses on the United States' execution of contractual commitments for delivery of such water did not in any way reduce or otherwise affect the United States' separate duties under Decision 1422 to meet downstream water quality and fishery requirements.[7] Three terms and conditions in the decision are of particular importance in this regard.

First, Condition 2 of Decision 1422 allowed storage of up to 98,000 acre-feet of New Melones Project water for fishery protection purposes on the Stanislaus River and "such additional water as is necessary to maintain the water quality conditions set forth in [Condition] 5." Decision 1422 at 30. Second, Condition 5 in turn provided that "[r]eleases of conserved water from New Melones Reservoir for water quality control purposes shall be scheduled so as to maintain a mean monthly total dissolved solids [TDS] concentration in the San Joaquin River at Vernalis of 500 parts per million or less and a dissolved oxygen concentration in the Stanislaus River as specified in the Water Quality Control Plan (Interim)." *Id.* at 31. Third, Condition 6 stated that, "[t]he State Water Resources Control Board reserves jurisdiction over these permits for the purpose of revising water release requirements for water quality objectives and fish releases . . ." *Id.* at 32.

Importantly, the order portion of Decision 1422, which delineated the actual water right permit terms and conditions, required storage up to 98,000-acre feet of New Melones water to

---

6. The California Water Code specifically authorizes the State Board to impose public interest terms and conditions on the issuance of water right permits. Cal. Water Code § 1253. These public interest terms and conditions include terms and conditions necessary to protect water quality and fishery beneficial uses of water. Cal. Water Code §§ 1243 and 1257.

7. Nor, under the background principles of California water law discussed in section II.A, *ante*, could the State Board have committed the entire project yield to consumptive purposes.

be released for protection of the Stanislaus River fishery, but did not similarly place any upward limit on the amount of water required to be released for water quality purposes on the San Joaquin River.[8] Moreover, Condition 13 expressly reserved State Board jurisdiction to revisit "[a]ll rights and privileges under this permit, including method of diversion and method of use and quantity of water diverted" pursuant to the State Board's continuing authority under the reasonable use doctrine. *Id*. at 33. This includes the water quality and fishery terms and conditions, thus placing all parties on notice that these public interest terms and conditions were not to be treated as the final word on the subject of water quality and fishery protections.

**2. Order WR 83-3.**

Approximately ten years later, on March 8, 1983, the State Board issued Order WR 83-3. In that order, the State Board found that the United States had adopted a plan for the allocation of New Melones Project water that described the areas where water would be delivered and the likely recipients of this water. The order also noted that the United States had taken "substantial steps" toward executing water service contracts with four public agencies, including the plaintiffs in this case. Order WR 83-3 at 18-19. Based on these facts and other evidence, the State Board found that the United States "has established that it has firm commitments to deliver the full yield of New Melones water for consumptive use." *Id.* at 20.

However, Order WR 83-3 did not (nor legally could not) guarantee or commit the

---

8. The text of Decision 1422 did note that a report prepared by the U.S. Public Health Service had concluded that the releases necessary to meet the water quality objectives would not likely exceed 70,000 acre-feet a year. Decision 1422 at 11. However, the decision went on to observe that the "assumptions" behind this report "may not be valid" and that "only meager data has been presented by the Bureau concerning the flow versus TDS concentrations in the earlier years." *Id.* at 12. At no point in the decision did the State Board find that the release of only 70,000 acre-feet of water would satisfy the decision's water quality requirements, nor did the order portion of the decision limit the United States' water quality obligations to the release of only 70,000 acre-feet a year. *See id.* at 27, 30, and 31.

totality of New Melones Project yield to consumptive use by federal water contractors such as the plaintiffs. On the contrary, the order reaffirmed the contingent nature of water delivery under the United States' water right permits. In the proceedings leading to the issuance of Order WR 83-3, the California Department of Fish and Game and the South Delta Water Agency had asked the State Board to revisit the water quality and fishery conditions in Decision 1422. The State Board declined to decide these requests because they would have required the Board to address issues outside of those identified in the administrative hearing notice issued for the proceedings. Order WR 83-3 at 22. However, the State Board stated that it could address those issues in future administrative proceedings:

> [W]e note that the reservations of jurisdiction in Condition 6 [of Decision 1422] remain in full force and effect. Any deliveries of water which the Bureau may make for consumptive uses are subject to changes in the Bureau's water right permits which, in the future, be made pursuant to Condition 6. *Such changes could include increases in the flows required for maintenance of water quality and for fish releases.*

*Id.* at 22, emphasis added. Thus, the State Board once again placed all parties on notice that the delivery of water under the water right permits for the New Melones Project was contingent on the satisfaction, as a first order of priority, of water quality and fishery release requirements and that those requirements may in the future necessitate increased project releases to the detriment of contractual water deliveries for consumptive purposes.

**3. Water Right Decision 1616.**

About three years later, on January 21, 1988, the State Board issued Water Right Decision 1616. Decision 1616 responded to the United States' request that the State Board modify the water rights issued to the United States in Decision 1422 to allow the United States to divert water directly from the Stanislaus River for consumptive uses and hydro-power purposes. Decision 1616 at 2. The State Board granted the United States' request in part, but

imposed several new water quality and fishery terms and conditions on the United States' operation of the New Melones Project.

First, Condition 12 of Decision 1616 reaffirmed the project's obligation to meet, as a matter of first priority, the downstream 500 parts per million salinity standard on the San Joaquin River at Vernalis and the dissolved oxygen standard for the Stanislaus River set forth in the State Board's interim water quality control plan. *Id.* at 32. However, Condition 12 added a new clause that stated, "[i]n the event that the water quality control plan is amended or superseded the foregoing water quality objectives shall be modified to conform to then current criteria." *Id.* Second, Condition 14 of Decision 1616 modified the fishery requirements contained in Decision 1422 by removing the 98,000 acre-foot release requirement for protection of the Stanislaus River fisheries and replacing it with a new condition requiring the United States to release the fishery flows specified in a June 1987 agreement between the California Department of Fish and Game and the United States regarding protection of the Stanislaus River fishery. *Id.* at 33.

**4. The 1995 Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary.**

In May of 1995, the State Board adopted a new Water Quality Control Plan for the Bay-Delta Estuary (hereafter the "1995 Plan"). The 1995 Plan listed the beneficial uses of water to be protected within the Bay-Delta Estuary, identified the water quality objectives needed to provide a reasonable level of protection for those beneficial uses and described an implementation program for achieving these objectives. The 1995 Plan anticipated that the State Board would implement the flow-dependent water quality objectives through a subsequent water rights proceeding. 1995 Plan at 1-4, 27-28.

The 1995 Plan modified the downstream agricultural salinity requirement at Vernalis by

substituting the existing TDS metric for a metric based upon electrical conductivity (EC).[9] Specifically, the 1995 Plan changed the agricultural salinity objective at Vernalis to require 0.7 EC from April through August and 1.0 EC from September through March. 1995 Plan at 14 and Table 2 at 17. The 1995 Plan also added a new fishery flow requirement, designed to protect anadromous fisheries on the San Joaquin River at Vernalis, as part of the Plan's overall water quality objectives for protection of fishery beneficial uses. 1995 Plan at 14-15 and Table 3 at 19.

**5. Water Right Order WR 95-6.**

In Order WR 95-6, adopted in June of 1995, the State Board responded to a joint petition by the California Department of Water Resources and the United States to conform their respective water right permits to some of the new water quality objectives set forth in the 1995 Plan for an interim period of three years until a long-term water right decision could be adopted. Order WR 95-6 at 4-7. Consistent with this plan, Order WR 95-6 amended the United States' water right permits for the New Melones Project by substituting the 0.7 and 1.0 EC objectives set forth in the 1995 Plan for the 500 parts per million TDS standard in Decision 1422. As explained by the State Board:

> The new standard would provide better protection (lower salinity) to agriculture in the spring and early summer when good water quality is most important and provide slightly worse water quality (higher salinity) in the late summer, fall and winter when water quality is less critical. The water supply impact of this new standard is the same as the 500 mg/TDS requirement in D-1422.

Order WR 95-6 at 39. Thus, from its June 8, 1995 adoption date, Order WR 95-6 imposed the new Vernalis EC salinity standard as an enforceable term and condition on the New Melones

---

9. A TDS metric measures the level of salinity in a unit of water according to the total amount of dissolved sodium chloride solids. An electrical conductivity metric measures the rate of conductivity of the water: the higher the rate of electrical conductivity or "EC," the higher the level of salinity in the water.

Project.[10/]

**6. Water Right Decision 1641.**

On December 29, 1999, the State Board adopted Water Right Decision1641.[11/] Under this decision, the State Board assigned responsibility among water rights holders for meeting the flow-dependent water quality objectives set forth in the 1995 Plan. Decision 1641 at 6. Decision 1641 specifically addressed the issue of the United States' responsibility for meeting the Vernalis salinity objective and the Vernalis fishery flow requirements.

As to the Vernalis salinity objective, the State Board observed that:

> In D-1422, notwithstanding that the [Bureau] estimated that no more than 70 taf [thousand acre-feet] would be needed for salinity control at Vernalis, the SWRCB required the [Bureau] to meet the Vernalis objective, *without setting a limit of 70 taf.*

Decision 1641 at 79, emphasis added.[12/] Decision 1641 then reaffirmed the applicability of the salinity objective at Vernalis, as well as the dissolved oxygen objective on the Stanislaus River, to the United States' operation of the New Melones Project, through amendments to the United

---

10. By its terms, Order WR 95-6 was set to expire on December 31, 1998. On December 3, 1998, the State Board adopted Order WR 98-9. This order extended the EC amendment to the New Melones permits' Vernalis salinity standard and other Bay-Delta related requirements until December 31, 1999. Order WR 98-09 at 23-24. After that date, the new Vernalis salinity standard was incorporated into the United States' permits by Decision 1641, discussed *post*.

11. Decision 1641 was subsequently revised on March 15, 2000 in accordance with Order WR 2000-02.

12. Decision 1641 also required the United States to comply with additional agricultural salinity standards in the southern Delta. Decision 1641 at 161. However, because the decision deferred the obligation to comply with these standards until April 1, 2005, they are not relevant to the instant case, which only involves the 1993-2004 time period. *Id.* at 182, n. 5. The California Court of Appeal for the Third District recently concluded that the State Board should not have deferred its obligation to meet these standards, unless it first complied with the requirements for amending the 1995 Plan, but because the court did not issue its opinion until 2006, by that time, the issue had become moot. *State Water Board Cases*, 136 Cal. App. 4th at 735.

States' water right permits for the project. *Id.* at 160. In doing so, the State Board specifically stated that the "Licensee/Permittee shall, at all times, meet the Vernalis water quality objectives for agricultural beneficial uses at Vernalis." *Id.* at 161. The State Board indicated that, in the absence of compliance with these salinity and dissolved oxygen water quality objectives, "no diversion is authorized for consumptive uses." *Id.* at 162.

As to the Vernalis fishery flow requirements, Decision 1641 amended the United States' water right permits for the New Melones Project to require the United States to comply with the flows set forth in the 1995 Plan, except to the extent and for the interim period that those flows had been modified by the San Joaquin River Agreement.[13/]

Decision 1641 did offer the United States some flexibility as to how to achieve compliance with these water quality and fishery requirements. In footnote 87 of the decision, the State Board provided that the water quality and fishery flow conditions "do not mandate that the Permittee use water under these permits to meet these conditions if it uses other sources of water or other means to meet these conditions." Decision 1641 at 160, n. 87. Thus, Decision 1641 allows the United States to meet the water quality and fishery requirements of its permits though means other than New Melones Dam releases, where feasible alternatives are available to the United States. However, the State Board is not aware of any feasible alternatives to releases from New Melones Dam that were available to the United States during the 1993-2004

13. The San Joaquin River Agreement allows the United States and the other parties to the agreement to comply with a less stringent set of fishery protection objectives during April and May for the duration of the agreement. *Id*. at 48-49. The California Court of Appeal for the Third District recently invalidated this aspect of Decision 1641 on the grounds that the State Board failed to fully implement the San Joaquin River fishery flow requirements set forth in the 1995 Plan in its water right decision. *State Water Board Cases*, 136 Cal. App. 4th at 733-734. The Court of Appeal concluded that the State Board must first amend the 1995 Plan before the it could alter the fishery flow requirements in the water right decision. *Id.*

time period and that would have satisfied these requirements. See *State Water Board Cases*, 136 Cal. App. 4th at 764.

**7. Summary and Conclusion.**

The water quality and fishery flow permits terms and conditions applicable to the New Melones project during the 1993-2004 time period can be summarized as follows.[14/] First, since the State Board issued Decision 1422 in 1973, the United States has been required to meet an agricultural salinity objective on the San Joaquin River at Vernalis. Second, also since the State Board's adoption of Decision 1422, the United States has been required to meet a dissolved oxygen objective on the Stanislaus River. Third, since Decision 1422 in 1973, as modified by Decision 1616 in 1988, the State Board has required the United States to meet a fishery flow requirement on the Stanislaus River. Finally, in Decision 1641 in 2000, the State Board reaffirmed the applicability of the above requirements to the New Melones Project and added a new fishery flow requirement on the San Joaquin River at Vernalis.

Because all of these requirements reflect applicable California law relating to the control, appropriation, use and distribution of water within the meaning of Section 8 of the Reclamation Act of 1902, the United States is obligated to meet these requirements in operating the New Melones Project as a matter of first priority, before delivering any water to the plaintiffs. *California v. United States*, 438 U.S. at 674; see also *Central Delta Water Agency v. U.S. Bureau of Reclamation*, 452 F.3d 1021, 1026 (9th Cir. 2006) (United States lacks discretion to violate the Vernalis salinity standard). Indeed, the CVPIA itself affirms this conclusion, inasmuch as it directs the Secretary of the Interior (acting through the Bureau of

14. These specific requirements imposed by the State Board are in addition to, and not a limitation on, the requirements applicable under the background principles of California law discussed in section II.A, *ante.*

Reclamation) to operate the CVP "to meet all obligations under State and Federal law, including but not limited to . . . all decisions of the California State Water Resources Control Board on applicable licenses and permits for the project." CVPIA, Pub., L. 102-575, 106 Stat. 4706, § 3406 (b). Therefore, to the extent that the plaintiffs did not receive all of the water to which they believed they were entitled during the 1993-2004 time period on account of the United States' mandatory compliance with the water quality and fishery flow terms and conditions of its water right permits, the United States cannot be held liable for a breach of contract.

### C. Background Principles of California Water Law and the Terms and Conditions of the United States' Water Right Permits Apply to the CVP Contractors, Including the Plaintiffs.

All of the foregoing background principles of state law and terms and conditions of the United States' water right permits apply to the CVP contractors as fully as to the United States. Because all CVP contracts are derivative of, and not independent from, the Bureau's appropriative water rights, the CVP contractors cannot obtain any greater rights than those possessed by the United States.

In *State Water Board Cases*, 136 Cal. App. 4th 674, the Third District California Court of Appeal observed that:

> because the rights of an appropriator are always subject to the public trust doctrine (see *National Audubon Society v. Superior Court*, *supra*, 33 Cal. 3d at p. 447 [parallel citation omitted]), the same is true of the rights of a person who contracts with an appropriator for the use of the water appropriated. An appropriator cannot give away more rights than he or she has.

*Id.* at 806, n. 54.[15] Later in the opinion, the court addressed the question whether the State

---

15. Although incorrect on many points of California law, the *Tulare Lake* court properly agreed that water service contractors' rights are derivative of, and subject to all limitations of, the underlying appropriative water right. See *Tulare Lake v. United States*, 49 Fed. Cl. at 318, n.6, 321; see also *Klamath v. United States*, 67 Fed. Cl. at 535 (plaintiff water users "could not obtain an interest from the districts better than what the districts themselves possessed" since "one who does not have cannot give"), see also *id*. at 538.

Board, in Decision 1641, had appropriately excluded delivery of water to certain lands (the so-called "expansion lands") within the Westlands Water District, another CVP contractor. In upholding the State Board's decision, the court noted that, while the owners of the expansion lands had become "entitled to the benefits of the 1963 water service contract between the Westlands and the Bureau, . . . *that contract was itself subject to the terms of the Bureau's permits*, including the place of use authorized in those permits." *State Water Board Cases*, 136 Cal. App. 4th at 824, emphasis added.

Two decades earlier, the First District California Court of Appeal reached the same conclusion. In *United States v. State Board*, 182 Cal. App. 3d 82, the court considered the question whether, in adopting Decision 1485 (which established water quality standards for the Sacramento-San Joaquin Delta and placed conditions on the coordinated operation of the CVP and the State Water Project), the State Board had failed to protect the CVP contractors' claimed vested rights to use Delta water. In rejecting the CVP contractors' claim, the court held that:

> The CVP's appropriated water rights are, by definition, conditional – subject to the continuing supervisory authority of the Board, the constitutional limitation of reasonable use, and the priorities of senior rights holders. Logically, *neither the project nor the contractors could have any reasonable expectation of certainty that the agreed quantity of water will be delivered*.

*Id.* at 147, emphasis added; see also *State Water Board Cases*, 136 Cal. App. 4th at 805.[16/]

Thus, the Stockton East and Central San Joaquin contracts, being wholly derivative of the United States' appropriative water right permits, are subject to all provisions of California law limiting the United States' exercise of its appropriative water rights, as well as to all terms and conditions of the United States' permits.[17/] These terms and conditions, as well as the

---

16. To the extent the *Tulare Lake* court concluded otherwise (see *Tulare Lake*, 49 Fed. Cl. at 318), it is simply incorrect as a matter of California law.

17. As discussed below, the plaintiffs' contracts themselves also require compliance with all applicable requirements of state water rights and water quality laws.

background principles of California law discussed in section II.A, *ante*, demonstrate that plaintiffs have no contract right to receive a specific quantity of water, and that the amount of water they would be able to receive under their contracts would be subject to change over time.

## III. The Plaintiffs' Contracts Themselves Require Compliance With All Applicable Requirements of California Law.

Finally, in addition to the requirement imposed by section 8 of the federal Reclamation Act that the United States must comply with the requirements of state water law in operating the New Melones Project, the contracts between Stockton East and Central San Joaquin and the United States themselves are expressly made subject to all requirements of state water rights and water quality law and all terms and conditions of the United States' water rights permits. This is set forth in at least three provisions of the contracts.

First, the ninth "whereas" clause of both contracts states that "the Contractor desires to contract *pursuant to* Federal reclamation laws and *the laws of the State of California*, for water service from the Central Valley Project pursuant to the conditions hereinafter set forth." Stockton East Contract at 3; Central San Joaquin Contract at 3, emphasis added.

Second, Article 2(b) of both contracts provides that:

> (b) The contracting Officer shall provide a written notification to the Contractor announcing the initial delivery date which shall be January 1 of the year following the date that water from the Project is first available to the Contractor: Provided *That water availability shall not be declared until all applicable requirements of State and Federal law with respect to utilization and delivery of Stanislaus River water for the purpose of this contract have been complied with*.

Stockton East Contract at 4, Central San Joaquin Contract at 5, emphasis added.

Third, Article 16 of the contracts provides as follows:

> The Contractor, in carrying out this contract, *shall comply with all applicable water and air pollution laws and regulations of* the United States and *the State of California* and shall obtain all required permits or licenses from the appropriate Federal, State or local authorities.

Stockton East Contract at 20; Central San Joaquin Contract at 20, emphasis added.

As discussed in section II.B, *ante*, beginning in 1973 and continuing to the present day, the State Board has imposed numerous terms and conditions on the United States' water right permits for the New Melones Project, including: (1) the agricultural salinity water quality objective on the San Joaquin River at Vernalis and the dissolved oxygen objective on the Stanislaus River, both of which the State Board initially adopted as express limitations on the United States' water right permits in Decision 1422 in 1973, and later re-adopted in Decision 1616 in 1988; (2) the fishery flow objective on the San Joaquin River at Vernalis, which the State Board initially established in its 1995 Bay-Delta Water Quality Control Plan, and later adopted as an express limitation on the United States' permits in Decision 1641 in 2000; and (3) the Stanislaus River fishery flows, which the State Board initially included in the United States' permits in Decision 1422 in 1973, and modified in Decision 1616 in 1988. In addition, as discussed in section II.A, *ante*, other fundamental requirements of state law, including the reasonable and beneficial use doctrine, public trust doctrine, and common law of nuisance and public property interest in fishery resources, continually restrict the nature, scope and exercise of the United States' water rights.

These terms and conditions of the New Melones permits and other requirements of state law are "applicable" state water rights and water quality laws within the meaning of the ninth whereas clause and Articles 2(b) and 16 of the Stockton East and Central San Joaquin contracts.[18/] As such, these state law requirements apply to the contractors by the very terms of

18. The terms and conditions the State Board imposed on the United States' permits implement the State Board's water rights authority pursuant to the Water Commission Act of 1913, Cal. Water Code § 1000 *et seq*., as well as its water quality authority pursuant to the Porter Cologne Water Quality Control Act, Cal. Water Code § 13000 *et seq*., and California Water Code sections 1243.5, 1257 and 1258.

their contracts.[19]

Furthermore, Article 2(b) of the contracts states that the United States shall not declare water to be available for use by the federal water contractors until all applicable requirements of state law have *first* been satisfied. The United States ultimately issued this declaration of availability in a letter dated May 5, 1988, following the State Board's issuance of Decision 1616 in January 1988. *Stockton East Water Dist. v. United States*, 70 Fed. Cl. 515, 520-521 (2006). This date is significant because, under California law, while laws in effect at the time the contract was executed are assumed to be part of the contract, "laws enacted subsequent to the execution of an agreement . . . are not ordinarily deemed to become part of the agreement unless its language clearly indicates this to have been the intention of the parties." *City of Torrance v. Workers' Comp. Bd.*, 32 Cal. 3d 371, 379 (1982). Thus, putting aside the United States' ongoing obligations to comply with all pertinent requirements of state water law at all times, Article 2(b) by its terms reflects the parties' intention that Stockton East's and Central San Joaquin's "right to use of water" be dependent upon the status of California law in 1988, not in 1983, the year the contracts were executed.

This means that the interim Stanislaus River fishery flows mandated by the 1987 DFG fisheries agreement also are mandated by the terms of Article 2(b). Moreover, as discussed in section II.C, *ante*, Decision 1616, which was issued prior to the United States' declaration of water availability under the contracts in 1988, expressly states that "the State Water Resources Control Board reserves jurisdiction over this permit for the purpose of revising instream flow requirements for water quality objectives and fishery purposes . . ." Decision 1616 at 33. This

---

19. As discussed in section II.C, *ante*, these state law requirements also apply to the contractors independent of the terms of their contracts by virtue of the fact that a contractor cannot obtain a greater right than that possessed by the water right holder. *State Board Cases*, 136 Cal. App. 4th at 806, n.54; *United States v. State Board*, 182 Cal. App. 3d at 147.

reservation of jurisdiction placed the plaintiffs on notice of the State Board's continuing authority to oversee and modify the fishery flows as necessary to comply with public trust doctrine, as it had been explained by the California Supreme Court in the *National Audubon* case in 1983. *Id*. at 7.

In sum, the contracts themselves recognize that the terms and conditions in Decision 1422 in 1973 were not the sole restrictions of California law applicable to the contracts, but rather they were subject to all requirements in effect as of May 5, 1988, as well as any fishery and water quality protection requirements for New Melones that the State Board subsequently imposed pursuant to its express reservation of jurisdiction in Decision 1616 and under the constitutional limitation of reasonable and beneficial use and the common law public trust doctrine. Therefore, because the Stockton East and Central San Joaquin contracts themselves require the contractors to comply with all requirements of state water rights and water quality laws, the United States' release of water from New Melones Dam and reduction in deliveries to the contractors in order to meet these requirements did not constitute a breach of the contracts.

Finally, in addition to the ninth whereas clause and Articles 2(b) and 16, the contractors' duty to comply with state law is implicit in Article 9(a) of the contracts, the so-called "shortage provision," which relieves the United States of liability for any water shortage that occurs "during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States." (Stockton East Contract at 17; Central San Joaquin Contract at 17.) As discussed in sections I and II, *ante*, because the United States was *required* to comply with all inchoate requirements of California law and federal law as well as the express terms and conditions of its appropriative water rights permits, such compliance constitutes a cause "beyond the control of the United States" and relieves the United States of liability for non-delivery or reduction in delivery of water in order to meet these supervening

requirements of state and federal law. *Barcellos & Wolfsen, Inc. v. Westlands Water Dist*., 849 F. Supp. 717, 723, 733 (E.D. Cal. 1993), affd. *O'Neill v. United States*, 50 F.3d 677, 684, 686, 689.

**CONCLUSION**

For the foregoing reasons, the State Board respectfully requests that the court find at trial that the plaintiffs have not sustained their burden of establishing that the United States is liable for breach of the plaintiffs' contracts.

Dated: October 10, 2006

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California
MARY E. HACKENBRACHT
J. MATTHEW RODRIQUEZ
Senior Assistant Attorneys General

By: /s/ Clifford T. Lee
CLIFFORD T. LEE
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Telephone: (415) 703-5546
Facsimile: (415) 703-5480
Email: Cliff.Lee@doj.ca.gov

By: /s/ Tara L. Mueller
TARA L. MUELLER
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 622-2136
Facsimile: (510) 622-2270
Email: Tara.Mueller@doj.ca.gov

Attorneys for Amicus Curiae California
State Water Resources Control Board