IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT, SAN JOAQUIN COUNTY, STOCKTON CITY, CALIFORNIA WATER SERVICE DISTRICT | ) | No. 04-541-L<br>Judge Christine Odell Cook Miller |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**CORRECTED PRETRIAL MEMORANDUM OF *AMICUS CURIAE* NATURAL RESOURCES DEFENSE COUNCIL**

John D. Echeverria
Sanjukta Misra
Georgetown Environmental Law
& Policy Institute
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9850
(202) 662-9005 (fax)

Hamilton Candee
Natural Resources Defense Council
111 Sutter St., 20th floor
San Francisco, CA 94104
(415) 875-6100
(415) 875-6161 (fax)

Counsel for *amicus curiae* NRDC

October 10, 2006

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .......... ii

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 2

I. THE SHORTAGE CLAUSE IN EACH CONTRACT BARS PLAINTIFFS FROM ESTABLISHING A BREACH OF CONTRACT .......... 2

II. PLAINTIFFS' CONTRACT RIGHTS ARE EXPRESSLY SUBJECT TO FUTURE AMENDMENTS TO THE RECLAMATION LAWS, INCLUDING THE CENTRAL VALLEY PROJECT IMPROVEMENT ACT .......... 14

III. PLAINTIFFS' CLAIMS ARE BARRED BY BACKGROUND PRINCIPLES OF CALIFORNIA WATER LAW .......... 18

IV. PLAINTIFFS' CLAIMS ARE BARRED BY THE SOVEREIGN ACTS DOCTRINE .......... 31

V. PLAINTIFFS ARE SEEKING AN UNFAIR WINDFALL AT TAXPAYER EXPENSE .......... 39

CONCLUSION .......... 44

# TABLE OF AUTHORITIES

CASES PAGE

Allegretti & Co. v. County of Imperial, 138 Cal.App.4th 1261 (2006)............................30

American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363 (Fed. Cir. 2004)....................................................................................................20

Barcellos & Wolfson Inc. v. Westlands Water Dist., 849 F.Supp. 717 (E.D. Cal. 1993)....................................................................................................36

Bennett v. Spear, 520 U.S. 154 (1997)..............................................................36

Bernhardt v. Polygraphic Co., 350 U.S. 190 (1956)...........................................28

Bishop v. United States, 126 F.Supp. 449 (Ct.Cl. 1954)....................................20

Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41 (1986).......................................................................................18

California Trout, Inc v. State Water Res. Control Bd., 207 Cal. Rptr. 184 (Cal.Ct.App. 1989).............................................................................................19

Casitas Municipal Water Dist.. v. United States, --- Fed.Cl. ----, 2006 WL 2838882 (Fed.Cl., Oct 2, 2006)..........................................................31, 35, 39

Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005)...........................32, 37

Central Delta Water Agency v. Bureau of Reclamation, 452 F.2d 1021 (9th Cir. 2006)..................................................................................................13

Chao v. Gunite Corp., 442 F.3d 550 (7th Cir. 2006)..............................................4

Clawson v. United States, 24 Cl. Ct. 366 (1991)..................................................21

Commonwealth Edison Co. v. United States, 271 F.3d 1327 (Fed. Cir 1997)..................32

Croman Corp. v. U.S., 44 Fed.Cl. 796 (1999), reconsidered, 49 Fed.Cl. 776 (2001), vacated on other grounds, 89 Fed.Appx 237 (Fed. Cir. 2004)...................................36

Cuyahoga Metr. Housing Auth. v. United States, 57 Fed.Cl. 751 (2003)........................34

Deming v. United States, 1 Cl.Ct. 190 (1865)......................................................32

Dynalectron Corp. v. U.S., 4 Cl.Ct. 424 (1984)......................................................6

Erie Railroad v. Tompkins, 304 U.S. 64 (1938) ....................27

Esplanade Properties, LLC v. City of Seattle, 307 F.3d 978 (9th Cir. 2002), cert. denied, 123 S. Ct. 2574 (2003) ....................20, 28

Guaranty Trust Co. v. York, 326 U.S. 99 (1945)....................28

Horowitz v. United States, 267 U.S. 458 (1925) ....................32

Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 296 (1958) ....................42

Jones v. United States, 1 Ct.Cl. 383 (1865) ....................32

Kennedy v. Wright, 867 F.2d 616 (Fed. Cir. 1989)....................21

Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504 (2005) ....................21, 30

Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992) ....................20, 28

Madera Irr. Dist v. Hancock, 985 F.2d 1397 (9th Cir. 1993) ....................16, 18

McQueen v. South Carolina Coastal Council, 580 S.E.2d 116 (S.C. 2003)....................20

Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000)....................33

Nat'l Audubon Society v. Superior Court of Alpine County, 658 P.2d 709 (Cal. 1983) ....................19, 25, 26, 29

O'Neill v. United States, 50 F3d 677 (9th Cir. 1995)....................15

Penzoil-Quaker State Co. & Subsidiaries v. United States, 62 Fed.Cl. 689 (2004) ....................32

People v. Monterey Fish Products Co., 234 P. 398, 404-05 (Cal. 1925)....................19

People v. Truckee Lumber Co, 48 P. 374 (Cal. 1897)....................19

Peterson v. U.S. Department of the Interior, 899 F.2d 799 (9th Cir. 1990) ....................42

Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998)....................28

Precision Pine & Timber, Inc. v. U.S., 50 Fed.Cl. 35 (2001)....................36

Rith Energy v. United States, 44 Fed. Cl. 108 (1999) ....................29

Ruckleshaus v. Monsanto Co., 467 U.S. 986 (1984)....................23

Ryco Const., Inc. v. U.S., 55 Fed.Cl 184 (2002) ....................36

San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957 (Fed. Cir. 1989) ...........23

San-Luis & Delta-Mondota Water Authority v. United States, Nos. CV-F-97-6140, CV-F-98-5261 ...........37

State Water Resources Control Board Cases, 39 Cal.Rptr.3d 189 (Cal.Ct.App. 2006)........... passim

Stockton East Water Dist v. United States, 70 Fed.Cl. 515 (2005) ........... passim

Stockton East Water District v. United States, 62 Fed.Cl. 379 (2004)...........17

Tulare Lake Basin Water Storage District v. United States, 49 Fed Cl. 313 (2001) ........... passim

Village of Bensenville v. Federal Aviation Admin., 457 F.3d 52 (D.C. Cir.2006)...........4

Westlands Water District v. Natural Resources Defense Council, 43 F.3d 457 (9th Cir. 1994) ...........17, 18

Westlands Water District v. U.S. Department of Interior, 805 F.Supp. 1503 (E.D. Cal. 1992), aff'd, Westlands Water District v. Firebaugh Canal, 10 F.3d 667 (9th Cir. 1993) ...........13

Westlands Water District v. United States, 153 F.Supp.2d 1133 (E.D. Cal. 2001)...........13

Westlands Water District v. United States, 850 F.Supp.1388 (E.D.Cal. 1994)...........5

Westlands Water District v. United States, 864 F.Supp. 1536 (E.D. Ca. 1994)...........4

Wickard v. Filburn, 317 U.S. 111 (1942) ...........42

Winstar Corp. v. United States, 518 U.S. 839 (1996)...........32, 33, 37, 39

Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569 (Fed. Cir. 1997) ...........32, 34

CONSTITUTION AND STATUTES

Administrative Procedure Act, 5 U.S.C. § 706...........4

Central Valley Project Improvement Act of 1992. Pub.L. No. 102-575 ...........11, 14, 17

43 U.S.C. § 371...........15

75 Cong.Ch. 832 § 2, August 26, 1937, 50 Stat. 844 ...........10

Flood Control Act of 1944, 78 Cong. Ch. 665, December 22, 1944, 58 Stat. 887...........10, 15

Flood Control Act of 1952, 87 Cong. Ch. 874 § 203, October 23, 1962,
76 Stat. 1173 ....................................................................................10, 40

Act of October 14, 1949, 63 Stat. 852 ....................................................................11

Act of September 26, 1950, 64 Stat. 1036 ..............................................................11

Act of August 12, 1955, 69 Stat. 719.......................................................................11

Act of June 3, 1960, 74 Stat. 156............................................................................11

Act of September 2, 1965, 79 Stat. 615 ..................................................................11

Act of August 27, 1967, 81 Stat. 173......................................................................11

Act of October 23, 1970, 84 Stat. 1097 ..................................................................11

Act of September 28, 1976, 90 Stat. 1324 ..............................................................11

LAW REVIEW ARTICLES

John Cibinic, Jr., "Retroactive Legislation and Regulations and Federal Government Contracts," 51 Ala.L.Rev. 963, 971-72 (2000)..........................................................33

James Gordley, "Impossibility and Changed and Unforeseen Circumstances," 52 Am.J.Comp.L. 513 (2004)..........................................................................34

OTHER AUTHORITIES

Central San Joaquin Water Conservation District Contract ..................................... passim

E. Allan Farnsworth, Contracts (4th ed. 2004) ..................................................31, 33

Gregory C. Sisk, LITIGATING WITH THE FEDERAL GOVERNMENT: CASES AND MATERIALS 567 (2000)..........................................................33

http://www.sbr.gov/mp/cvp.waterates/ratebooks.......................................................41, 42

Judge Wanger Order After Evidentiary Hearing for Preliminary Injunction, December 20, 1999 ..............................................................................37, 38

Robert Cooter & Thomas Ulen, LAW AND ECONOMICS (1988) ................................34

Stockton East Water District Contract.................................................................. passim

SWRCB Order D-1422 (issued April 4, 1973, available on the SWRCB website) ....18, 41

U.S. General Accounting Office, "Bureau of Reclamation: Information on Allocation and Repayment of Costs of Constructing Water Projects " (July 1996)(GAO/RCED-96-108) (available on GAO website) ................................................41

Water Transfer Agreement By and Between Oakdale Irrigation District, South San Joaquin Irrigation District and Stockton East Water District, dated April 1, 1997 ...........42

Wright & Miller, Federal Practice & Procedure..........................................................27, 28

www.publicaffairs.water.ca.gov/swp/history_swp.cfm....................................................10

# INTRODUCTION AND SUMMARY OF ARGUMENT

Amicus NRDC respectfully submits this memorandum to assist the Court in framing the issues for the scheduled trial in this case. The trial will likely provide the Court a better understanding of the historical context for this dispute, the complicated nature of Central Valley Project ("CVP") operations, and the challenges faced by the U.S. Bureau of Reclamation in implementing the Central Valley Project Improvement Act ("CVPIA). However, NRDC believes that the decisive issues are likely to be either purely legal questions or questions about the meaning of specific terms in the contracts on which witnesses are unlikely to be able to shed meaningful light.

In this memorandum NRDC does not seek to address each and every one of the potentially dispositive liability issues before the Court. Instead, this memorandum focuses on several points that provide the clearest and most straightforward support for resolving this case in favor of the United States. Section I argues that the "shortage clause" in each contract excuses the government from liability for the reductions in deliveries in controversy. Section II argues that plaintiffs' breach of contract claims should fail because the contracts were made subject to future amendments in the federal reclamation laws, including enactments such as the CVPIA. Section III argues that the claims are barred under background principles of California water law, including the public trust doctrine and the doctrine of public ownership of wildlife. Section IV argues that, even if the government's action would otherwise constitute a breach, the claims are barred by the sovereign acts doctrine. Finally, Section V argues that rejection of plaintiffs' claims would represent a fair and equitable resolution of this case.

# ARGUMENT

## I. THE SHORTAGE CLAUSE IN EACH CONTRACT BARS PLAINTIFFS FROM ESTABLISHING A BREACH OF CONTRACT

The Court should reject plaintiffs' contract claims because the "shortage" clause in each contract excuses the government from liability in the circumstances of this case. The shortage clause reads as follows:

> In its operations of the Project, the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting officer, are beyond the control of the United States, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom."

Stockton Contract, Para. 9(a); Central Contract, Para 9(a). Under this language, the United States cannot be liable for reductions in water deliveries from the CVP which, in the opinion of officials of the Bureau of Reclamation, are "beyond the control of the United States." Because Bureau officials were not arbitrary and capricious in concluding that enactment of the CVPIA, and indeed the entire biological crisis in the Sacramento-San Joaquin system leading to adoption of this measure, was such a cause, the United States is not liable for breach of contract.

The key language, "other causes which, in the opinion of the Contracting officer, are beyond the control of the United States," supports this conclusion The phrase "other causes… beyond the control of the United States," read in context, refers to causes beyond the control of the United States in its contracting capacity as opposed to its sovereign capacity. The term "United States" refers to the Bureau of Reclamation and/or its officers responsible for contract formation and administration. This meaning is evidenced by the first sentence of paragraph 9(a), which starts with the words, "[i]n its operation of the Project, the United States," necessarily referring to the Bureau because it is the project operator. By logical extension, the term United States should be read to have the same meaning in the second sentence, referring to causes "beyond the control of the United States." Thus, the contract does not indicate that the term "United States" was intended to include Congress and/or executive branch officials engaging in sovereign actions such as adopting or implementing new legislative policies to address serious environmental problems.

Furthermore, any possible ambiguity in the meaning of the phrase "other causes" must be resolved in favor of the United States. The parties plainly could not anticipate all of the causes of shortages, aside from physical drought, that might justifiably excuse the government from liability. Thus, they agreed that any question about whether a cause "was beyond the control of the United States" should be resolved by deferring to "the opinion" of officials of the Bureau of Reclamation. Importantly, section 12(d) of the contract states that, "[w]here the terms of the contract provide for an action to be based upon the opinion or determination of either party to this contract, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or

unreasonable opinions or determinations." This provision means that decisions under the contracts committed to the opinion of either party, as in this case, must be accepted unless arbitrary, capricious, or unreasonable. See Westlands Water District v. United States, 864 F.Supp. 1536, 1542, 1545, 1548 (E.D. Cal. 1994) (reading essentially identical language in Westlands contract to mean that Bureau decisions should not be rejected unless they are "arbitrary, capricious or unreasonable").

This standard is borrowed directly from the traditional standard for review of agency action under the Administrative Procedure Act. See 5 U.S.C. § 706 (a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Courts have always found this standard of review to be highly deferential. See Village of Bensenville v. Federal Aviation Admin., 457 F.3d 52, 70 (D.C. Cir. 2006) (review under APA section 706 requires plaintiff to carry the "heavy burden" of showing that the agency "made a clear error in judgment"); Chao v. Gunite Corp., 442 F.3d 550, 556 (7th Cir. 2006) (court "review[s] interpretations of law with deference to determine only whether they are 'arbitrary or capricious' or contrary to law").

Even if it were not the only plausible reading of the contract language, it is plainly not arbitrary, capricious, or unreasonable to read the phrase "other causes" in paragraph 9(a) to encompass supervening congressional legislation such as the CVPIA. Indeed, the Court already recognized the appropriateness of this conclusion, in its April 10, 2006, Opinion, stating "it is not at all unreasonable [to conclude] that the parties might have contemplated changes in the controlling law or regulation to be circumstances beyond their control that might alter the contract." Stockton East Water Dist v. United States, 70

Fed.Cl. 515, 534 (2005). The Court also stated that "the language is susceptible to at least two different, but reasonable readings;" that is, that the shortage clause is limited to "Acts of God" or that it encompasses changes in "controlling law." Id. Given the Court's (correct, in our view) conclusion that it is "reasonable" to read the shortage clause as encompassing changes in controlling law, and given that the contract dictates that the government's interpretation of the scope of the contract clause must prevail unless it is "arbitrary, capricious, or unreasonable," NRDC respectfully suggests that the government is plainly entitled to judgment based on the shortage clause.

In addition, the U.S. District Court, in a prior phase of this very litigation before it was transferred to this Court, explicitly concluded that it is not unreasonable to treat the CVPIA as "a cause beyond the control of the United States." See Westlands Water District v. United States, 850 F.Supp. 1388 (E.D. Cal. 1994). On cross motions for summary judgment, the District Court described four possible interpretations of paragraph 9(a), including that "the provision[] can be read to require the Bureau to use its best efforts to provide water under the contracts, subject to limitations of water availability and any changes caused by subsequent legislation." Id. at 1407-08 (emphasis added). The Court concluded that each of the four alternative readings, including that "other causes" means new legislation such as the CVPIA, were "plausible," id. at 1407, and "reasonable." Id. at 1408. Thus, the parties already have had an opportunity to contest the proper interpretation of section 9(a), and the federal District Court determined, just as this Court concluded in its April 10 Opinion, that it is "reasonable" to interpret paragraph 9(a) to encompass enactment of the CVPIA. Plaintiffs should not be permitted to relitigate the District Court's interpretation of the shortage clause of the

contracts in this Court. See Dynalectron Corp. v. United States., 4 Cl.Ct. 424, 431 (1984) (rulings made in case by the District Court prior to transfer of case to the claims court are law of the case for the purpose of subsequent proceedings in the claims court).

Plaintiffs' principal response to the government's invocation of the shortage clause is that the government allegedly failed to satisfy a procedural prerequisite. Specifically, plaintiffs assert that the government was required to formally memorialize its conclusion that some "other cause" justified a reduction in water deliveries in order to rely on this provision. Plaintiffs contend that this requirement derives from paragraph 12(d) of the contract, which states, "In the event that the Contractor questions any factual determination made by the Contracting Officer, the findings as to the facts shall be made by the secretary only after consultation with the Contractor and shall be conclusive on the parties." According to plaintiffs, paragraph 12(d) implicitly creates a right to a memorialized decision because the "appeal" right established by this provision is meaningful only if plaintiffs receive some formal decision from which they can appeal.

The argument is problematic for several different reasons. First, it is questionable whether paragraph 12(d) implicitly creates an entitlement to a memorialized decision; a right of appeal does not necessarily depend on a memorialized decision to be effective. Furthermore, it is difficult to see how failure to comply with this alleged requirement could be a material breach of the contract, given that, in fact, plaintiffs received more than adequate notice of the Bureau's decision to reduce deliveries from New Melones Dam to carry out the CVPIA. Any technical failure on the part of Bureau officials to memorialize their decision did not deprive plaintiffs of any right of appeal they possessed and might have wished to pursue.

Another problem with plaintiffs' argument is that, regardless of whether the appeal process impliedly creates a memorialization requirement, it does not support extending this requirement to the kinds of "opinions" referred to in paragraph 9(a). Paragraph 12(d) refers to "factual determinations made by the Contracting Officer," whereas paragraph 9(a) refers to "opinion[s] of the Contracting Officer." The drafters used the terms "determinations" and "opinions" differently in different provisions of the contracts and, therefore, it must be presumed they intended these terms to convey different meanings. For example, compare paragraph 9(a) (referring to "opinions"), the first sentence of paragraph 12(d) (referring to "opinions" and "determinations"), and the second sentence of paragraph 12(d) (referring to "determinations"). Since the last sentence of paragraph 12(d) refers only to appeals from "factual determinations," this provision cannot be read to create a right of appeal from "opinions." Therefore, there is no basis for inferring from the appeal process, applicable only to determinations, any requirement that opinions be memorialized.

There is a sensible practical reason why the drafters treated factual determinations differently than opinions. As the Court explained in its April 10 decision, "it makes some sense in order to have a written record of the factual determination for the appeal to the Secretary." Id. at 535 (emphasis added). But the same reasoning does not apply to what is essentially a legal "opinion" about whether enactment of the CVPIA represents a cause beyond the control of the United States.

Plaintiffs' other argument is that, even if the CVPIA does constitute a cause "beyond the control of the United States," the CVPIA did not actually cause the reductions in deliveries from New Melones Dam because the Bureau allegedly could

have obtained water from other units of the CVP. This argument is factually debatable given the enormous physical obstacles to addressing Stanislaus instream flows using other CVP facilities. But, in any event, the argument should be rejected because the shortage clause excuses the government from liability for shortages arising from management of the Central Valley Project as a whole, and not the New Melones Dam individually.

This is confirmed by an examination of the actual words used in the shortage clause. The opening words of the shortage clause are "In its operation of the Project…" The word "Project" is a defined term in the contracts, and means "the Central Valley Project." See Stockton Contract, Para. 1(b); Central Contract, Para 1(b). Thus, the first sentence of the clause represents a commitment by the United States to use "all reasonable means" in operating the Central Valley Project as a whole to avoid a shortage in the quantity of water delivered to plaintiffs. The focus on the project as a whole carries forward to the second sentence of the shortage clause, as indicated by the opening word of the second sentence, "Nevertheless." This word signifies that if, notwithstanding the Bureau's efforts to avoid a shortage on a project-wide basis, the plaintiffs' deliveries are reduced, the United States is not liable for any resulting damage. The most natural reading of paragraph 9(a) is that the United States has an obligation to make its best efforts, on a project-wide basis, to deliver water, and thus the existence of a shortage that excuses the United States from liability also should be determined on a project-wide basis. In other words, the shortage clause reflects the parties' understanding that the plaintiffs are receiving both the benefits and burdens of integrated management of the CVP as a whole. That is what the parties evidently bargained for.

Under this reading of the contracts, plaintiffs cannot escape the shortage clause simply by pointing to other units of the CVP that might have provided an alternative supply of water to meet CVPIA goals. Because the shortage clause presupposes integrated management of the CVP as a whole, the issue of whether some cause led to a reduction in water deliveries must be assessed in relation to the project as a whole. This means that the shortage clause leaves it to the Bureau's informed judgment how to deal with shortages affecting the entire project, including allocating the burden of dealing with a shortage among different project units. As a matter of basic administrative law, the government could not, of course, arbitrarily single out districts receiving water from New Melones Dam to bear a disproportionate share of the burden for an illegitimate reason or for no reason at all. But, subject to that narrow limitation, the United States cannot be held liable for exercising its informed judgment about how to manage the New Melones Dam as part of an integrated strategy for managing the CVP to meet project goals. Unless the plaintiffs can demonstrate at trial that the Bureau's allocation of the burden of CVP implementation among the project units was arbitrary or capricious, plaintiffs' breach of contract claim should fail based on the shortage clause.

The conclusion that the shortage clause addresses management of the Central Valley Project as a whole, and not the New Melones Dam individually, is further supported by the fact that Congress and the Department of the Interior plainly intended for the New Melones Dam, and other CVP facilities, to be managed as an integrated project. The CVP was originally proposed as a part of a unified California water plan designed to transport water from the Sacramento River system to the San Joaquin Valley.

See www.publicaffairs.water.ca.gov/swp/history_swp.cfm. After the federal government took over the project during the Depression, this unified vision was retained:

> [T]he entire Central Valley project, California, … is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for [storage and delivery of water], for the reclamation of [lands], and other beneficial uses, and for [power generation as a revenue source] in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes.

75 Cong.Ch. 832 § 2, August 26, 1937, 50 Stat. 844, 850. See also Id. (stating that "construction, operation, and maintenance" of the "entire project" would be subject to the reclamation laws).

The specific statutory authorization for the New Melones unit also reflects the fact that the unit was intended to be operated as an integral part of the CVP. The New Melones Dam was originally authorized, primarily for flood control purposes, in the Flood Control Act of 1944, 78 Cong. Ch. 665, December 22, 1944, 58 Stat. 887. When Congress reauthorized the dam in 1962, it affirmed that "The New Melones project, Stanislaus River, California, authorized by the Flood Control Act … upon completion of the dam and powerplant … shall become an integral part of the Central Valley Project and be operated and maintained … pursuant to the Federal reclamation laws.…" 87 Cong. Ch. 874 § 203, October 23, 1962, 76 Stat. 1173, 1191 (emphasis added).[1]

---

[1] The language in the authorizing legislation for the New Melones unit is consistent with the statutory authorization for other units of the CVP. In 1949, Congress authorized American River basin development by stating that "the operation of said works [shall] be coordinated and integrated with the operation of existing and future features of the [CVP] so as to most fully utilize the [CVP land and water resources] for the widest possible

The integrated nature of CVP management is also reflected in numerous provisions of the Central Valley Project Improvement Act. See Pub.L. No. 102-575. The Act defines "the terms 'Central Valley Project' or 'project' [to] mean all Federal reclamation projects located within or diverting water from or to the watershed of the Sacramento and San Joaquin rivers and their tributaries." § 3403(d). Similarly, the term "Central Valley Project water" is defined to mean "all water that is developed, diverted, stored, or delivered by the Secretary in accordance with the statutes authorizing the Central Valley Project…." § 3403(f) (emphasis added). The Act mandates that the CVP continue to be managed as a single system, directing that "The Secretary … shall operate the Central Valley Project to meet all obligations under State and Federal law, [including the Endangered Species Act]…." § 3406(b). Similarly, in amending the CVP's purposes, Congress declared that "mitigation for fish and wildlife losses incurred as a result of construction, operation or maintenance of the Central Valley Project shall be based on the replacement of ecologically equivalent habitat…." § 3406(a)(3). And specifically with regard to CVPIA goals, the Secretary was directed to "modify Central Valley Project operations" as necessary. § 3406(b)(1)(B).

This theme of CVP integrated management is also reflected in other provisions of these contracts besides the shortage clauses. The first three explanatory recitals of the Stockton East Contract read as follows

public benefit." Act of October 14, 1949, 63 Stat. 852. Similar integration language was included in the authorizations for the Sacramento Valley irrigation canals (Act of September 26, 1950, 64 Stat. 1036), Trinity River division (Act of August 12, 1955, 69 Stat. 719), San Luis unit (Act of June 3, 1960, 74 Stat. 156), Aurora Folsom South unit (Act of September 2, 1965, 79 Stat. 615), San Felipe division (Act of August 27, 1967, 81 Stat. 173), Black Butte project (Act of October 23, 1970, 84 Stat. 1097), and Allen Camp unit (Act of September 28, 1976, 90 Stat. 1324).

> WHEREAS, the United States is constructing and operating the Central Valley Project, California, for the purpose, among others, of furnishing water for irrigation, municipal, industrial, domestic, and other beneficial uses; and
>
> WHEREAS, pursuant to the Flood Control Acts of December 22, 1944 (58 Stat. 887) and October 23, 1962 (76 Stat. 1173), the Corps of Engineers, United States Army was authorized to construct the New Melones Dam on the Stanislaus River, California, for the multipurpose uses of flood control, irrigation, municipal and industrial, power generation, and recreation, among other beneficial purposes; and
>
> WHEREAS, pursuant to said acts, New Melones Dam and Reservoir were constructed by the Corps of Engineers and transferred to the Secretary of the Interior to become an integral part of the Central Valley Project to be operated and maintained pursuant to the authorizing acts and Federal reclamation laws.
>
> (Emphasis added.)

The first three explanatory recitals of the Central contract are substantively identical. These recitals make two clear points: first, that the principal water management unit for the purpose of the contracts is the CVP itself rather than the New Melones Dam alone and, second, that the parties understood that the New Melones Dam was to be operated as an "an integral unit of the Central Valley Project." In the same vein, the last explanatory recital of each contract states that "the Contractor desires to contract pursuant to Federal reclamation laws and laws of the State of California, for water service from the Central Valley Project pursuant to the conditions hereinafter set forth." (Emphasis added.) In addition, paragraph 8(a) of each contract states, "The United States shall make all reasonable efforts, consistent with the most efficient overall operation of the Project, to

furnish water to the Contractor at the delivery points established pursuant to Article 7." (Emphasis added.) All of these provisions help frame the shortage clause, and are consistent with the conclusion that, for the purpose of interpretation, any shortage applies to the CVP as a whole rather than to the New Melones Dam specifically.

Finally, the Department's overarching responsibility to manage each of the constituent units of the CVP as an integrated whole is reflected in many of the prior judicial decisions arising from disputes over management of the CVP. For example, in Central Delta Water Agency v. Bureau of Reclamation, 452 F.2d 1021, 1027 (9th Cir. 2006), the Ninth Circuit affirmed dismissal of claims by water users that the Bureau was failing to operate the CVP in order to meet salinity requirements on the San Joaquin River, commenting "it is equally clear that the Bureau's is an extremely difficult task: to operate the country's largest federal water management project in a manner so as to meet the Bureau's many obligations. Recognizing this difficulty, Congress granted the Bureau considerable discretion in determining how to meet those obligations." See also Westlands Water District v. U.S. Department of Interior, 805 F.Supp. 1503, 1513 (E.D. Cal. 1992), aff'd, Westlands Water District v. Firebaugh Canal, 10 F.3d 667 (9th Cir. 1993) ("[The Bureau] has been made the operator of an integrated water storage and delivery project… The Bureau's water allocation decisions are entitled to judicial deference."); Westlands Water District v. United States, 153 F.Supp.2d at 1168 ("The Bureau has discretion to prioritize and reprioritize releases from CVP water allocations to rebalance the overall CVP."); Id. at 1170 ("The Bureau owns all the state-law rights to CVP water, which it uses to operate the CVP as an integrated unit."). These judicial statements demonstrate that the entire history of CVP management supports the

conclusion that the shortage clause in these contracts should be read as applying to the CVP as a whole rather than to New Melones Dam individually

## II. PLAINTIFFS' CONTRACT RIGHTS ARE EXPRESSLY SUBJECT TO FUTURE AMENDMENTS TO THE RECLAMATION LAWS, INCLUDING THE CENTRAL VALLEY PROJECT IMPROVEMENT ACT.

A second reason judgment should be entered for the United States is that the contracts were expressly made subject to the condition that future amendments to the federal reclamation laws, including the Central Valley Project Improvement Act, could override their terms. The opening paragraph of each contract states that the contract is made

> in pursuance generally of the Act of June 17, 1902 (32 Stat. 388), and acts amendatory or supplementary thereto, including but not limited to the Act of August 26, 1937 (50 Stat. 844), as amended and supplemented, and the Act of August 4, 1938 (53 Stat. 1187), as amended and supplemented, all collectively hereinafter referred to as the Federal reclamation laws.

This provision makes clear that the contracts were made "pursuant" to the federal reclamation laws, including all "acts amendatory or supplementary thereto." The CVPIA amends the federal reclamation laws; indeed, section 3408(g) of the CVPIA expressly states, "This title shall amend and supplement the Act of June 17, 1902, and Acts supplementary thereto and amendatory thereof." Accordingly, plaintiffs' contract rights are subordinate to the mandates of the CVPIA and no breach of contract can arise from the Bureau's implementation of the CVPIA.

Significantly, the contract language is consistent with the original statutory authorization for the New Melones Dam, which indicated that the project operations

would be subject not only to the existing reclamation laws but also to amendments and supplements to those laws. The New Melones Dam was originally authorized by the Flood Control Act of December 22, 1944, 58 Stat. 887. The Flood Control Act states that the project is subject to the "[f]ederal reclamation laws," which the Act specifically defined to include the original 1902 Reclamation Act "and Acts amendatory thereof and supplementary thereto." Id. This definition is consistent with 43 U.S.C. § 371, a general provision of reclamation law, applicable to various reclamation projects, which defines the "reclamation laws" to mean "the Act of June 17, 1902 (32 State. 388), and all Acts amendatory thereof or supplementary thereto." Thus, the New Melones authorization language is consistent with the understanding that the reclamation statutes – as they have been and may be amended from time to time in the future – constitute the organic legislative framework governing operation of this unit. See Stockton East Water Dist v. United States, 70 Fed. Cl. 515, 517 (2005) ("The New Melones Dam is part of the Central Valley Project, a federal reclamation project authorized by the Flood Control Acts of 1944 and 1962 and the Central Valley Project Improvement Act of October 30, 1992.") (emphases added).

Decisions of other courts addressing the meaning of the "amendatory and supplementary" language in reclamation contracts support this reading. In O'Neill v. United States, 50 F.3d 677, 686 (9th Cir. 1995), a case that closely parallels this case in many respects, the Court rejected a breach of contract claim based on, among other things, the "amendatory or supplementary" language in a Bureau water contract. The Ninth Circuit rejected the very position being asserted by plaintiffs in this case that a water contract created fixed rights immune from legislative revision, observing that "the

contract was executed pursuant to the 1902 Reclamation act and all acts amendatory or supplementary thereto." See also Madera Irr. Dist v. Hancock, 985 F.2d 1397, 1407 (9th Cir. 1993) (Hall, J. concurring) (stating that the "amendatory or supplementary" language "appears to reserve Congress' right to exercise sovereign powers").

More recently, in State Water Resources Control Board Cases, 39 Cal. Rptr. 3d 189 (Cal. Ct.App. 2006), the California Court of Appeals adopted the same reasoning in rejecting a claim that the state water board caused injury to the Westlands Irrigation District's "legally protectable rights" by amending the Bureau's permits to allow the Bureau to comply with the CVPIA.[2] Relying on the Ninth Circuit's O'Neill decision, the Court concluded that Westlands lacked a protected right because its water contract with the Bureau had been executed pursuant to the Reclamation Act "and all acts amendatory thereto." See id. at 294 (describing the O'Neill decision as ruling "that because 'the contract was executed pursuant to the 1902 Reclamation act and all acts amendatory or supplementary thereto,' the contract 'contemplates future changes in reclamation laws'"). The California court reasoned that because the Westlands contract was made subject to the requirements of the reclamation laws, and because the CVPIA amended those laws, permit changes to help implement the CVPIA did not interfere with any rights held by Westlands. In the Court's words, "Because Westlands has no right to CVP water that Congress directed the Bureau to put to other uses in the Central Valley Project Improvement Act, changes in the Bureau's permits that will allow the Bureau to comply with the Central Valley Project Improvement Act will not interfere with

---

[2] As discussed below, the permits for the New Melones Dam always contained provisions allowing the Bureau to operate the dam in compliance with the CVPIA.

Westlands' rights, and therefore the changes will not operate to the injury of Westlands as a legal user of CVP water…." Id.

One potential, but ultimately frivolous, objection to the conclusion that the contracts were made subject to future enactments such as the CVPIA might be advanced based on section 3411 of the Act, which provides:

> Notwithstanding any other provision of this title, the Secretary shall, prior to the reallocation of water from any purpose of use or place of use specified within applicable Central Valley Project water rights permits and licenses to a purpose of use or place of use not specified within said permits or licenses, obtain a modification in those permits and licenses, in a manner consistent with the provisions of applicable State law, to allow such change in purpose of use or place of use.

It might be contended that this provision required the Bureau of Reclamation, prior to devoting any additional water from New Melones Dam to fish protection and restoration, to obtain modifications of the applicable state water permit. This Court has several times suggested that this provision might be viewed as having some relevance to this case. See Stockton East Water Dist. v. United States, 70 Fed. Cl. 515, 530 (2005); Stockton East Water Dist. v. United States, 62 Fed. Cl. 379, 383 (2004). But cf. Westlands Water District v. Natural Resources Defense Council, 43 F.3d 457, 461 n. 1 (9th Cir. 1994) (holding that section 3411 was no barrier to immediate implementation of the Central Valley Project Improvement Act).

Whatever significance this provision might or might not have in other contexts, it has no relevance to the New Melones Dam. The original state water board permits for

the New Melones Dam explicitly made fish and wildlife protection authorized project purposes. See, e g., SWRCB Order D-1422, paragraphs 1-a, 1-d (issued April 4, 1973, available on the SWRCB website). Both federal and state courts have repeatedly discussed the fact that the state permits for the New Melones Dam have always authorized use of water from this facility for fish-protection purposes. See Westlands Water District v. Natural Resources Defense Council, 43 F.3d at 461 n. 1; State Water Resources Control Board Cases, 39 Cal. Rptr. 3d 189, 262 (Cal. App. 2006). Accordingly, there was no need to modify the New Melones permits in order to allow the Bureau to operate this facility in compliance with the CVPIA.

Finally, contrary to plaintiffs' previously stated position, the fact that the contracts were made subject to future amendments to the reclamation laws authorizing the New Melones Dam does not render the contracts illusory. The courts have long recognized that "The government, like any contracting party, can enter into a binding agreement subject to a qualified right of modification or other avoidance of obligations." Madera Irr. Dist. v. Hancock, 985 F.2d 1397 (9th Cir. 1993); see Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 53 (1986) (contract between a private party and an executive branch agency is not illusory simply because it recognizes Congress's power to legislate on the subject of the contract).

## III. PLAINTIFFS' CLAIMS ARE BARRED BY BACKGROUND PRINCIPLES OF CALIFORNIA WATER LAW.

A third reason judgment should be entered for the United States is that these contract claims are barred by background principles of California law, in particular the public trust doctrine and the doctrine of public ownership of fish and wildlife.

NRDC understands that both the United States and amicus State Water Resources Control Board will discuss in their pretrial memoranda the nature and scope of these doctrines in detail. For present purposes it is sufficient to observe that the public trust doctrine protects "the values and uses of public waterways," Nat'l Audubon Society v. Superior Court of Alpine County, 658 P.2d 709, 719 (Cal. 1983), including the commercial, ecological, and recreational values of fisheries. "One consequence" of the doctrine, the California Supreme Court has explained, "is that parties acquiring rights in trust property generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust." Id. at 437; see also id. at 445 (stating that the public trust doctrine "prevents any party from acquiring a vested right to appropriate water in a manner harmful to the interests protected by the public trust"); id. at 452 ("The public trust doctrine... precludes anyone from acquiring a vested right to harm the public trust....").

Similarly, under the doctrine of public ownership of wildlife, all of the fish and wildlife within the state's borders are held in trust for the people. See California Trout, Inc v. State Water Res. Control Bd., 207 Cal. Rptr. 184, 211-12 (Cal.Ct.App. 1989); People v. Monterey Fish Products Co., 234 P. 398, 404-05 (Cal. 1925) ("[t]he title to and property in the fish within the waters of the state are vested in the state of California and held in trust for the people of the state"). As with the public trust doctrine, no private party can claim a protected property right to engage in activity that harms the public's wildlife. See People v. Truckee Lumber Co, 48 P. 374 (Cal. 1897) ("the right and power to protect and preserve such property for the common use and benefit is one of the recognized prerogatives of the sovereign").

To assist the Court, this section of the memorandum will focus on two specific issues related to the application of these doctrines to this case: (1) whether these principles of California law can serve to bar a breach of contract claim, and (2) whether these principles can bar a breach of contract claim when state regulators have not exercised their legal authority to restrict water use to the same extent as federal regulators.

Relevance of Background Principles in a Contract Suit. As an initial matter, there can be no dispute that the California public trust doctrine and the doctrine of public ownership of wildlife represent "background principles" that would serve to defeat a claim for compensation under the Takings Clause. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). The U.S. Court of Appeals for the Federal Circuit has specifically recognized that the doctrine of public ownership of fish and wildlife defeats a takings claim. See, e.g., American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1379 (Fed.Cir. 2004) (taking claim based on fishing restrictions barred by public ownership doctrine); Bishop v. United States, 126 F.Supp. 449, 452-53 (Ct.Cl. 1954) (taking claim based on hunting restrictions under the Migratory Bird Treaty Act barred by public ownership doctrine). Similarly, both federal and state courts have repeatedly recognized that the public trust doctrine bars a taking claim. See, e.g., Esplanade Properties, LLC v. City of Seattle, 307 F.3d 978 (9th Cir. 2002) (rejecting claim based on restriction on filling of coastal tidelands based on the public trust doctrine); McQueen v. South Carolina Coastal Council, 580 S.E.2d 116 (S.C. 2003) (same).

The same background principles defense bars a breach of contract claim brought by a party holding a contract right to the use of an appropriative water right, as in this

case. This conclusion is based on the venerable principle that a contracting party cannot convey by contract what he does not possess -- nemo dat qui non habet. As Judge Francis Allegra of the U.S. Court of Federal Claims recently observed, "This common sense principle... has been applied in a variety of contractual contexts." Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504, 535 n. 52 (2005). Thus, for example, it has been applied to prevent government officials from granting mining rights they were powerless to convey, see Clawson v. United States, 24 Cl. Ct. 366 (1991), and to prevent holders of patent rights for conveying greater patent rights than they themselves possessed. See, e.g., Kennedy v. Wright, 867 F.2d 616 (Fed. Cir. 1989).

The courts have recognized that this principle applies in the specific context of water rights. For example, in State Water Resources Control Board Cases, 39 Cal.Rptr.3d 189 (Cal.Ct.App. 2006), the California Court of Appeals observed that the California public trust doctrine necessarily limits contract rights in water. The Court stated, "[B]ecause the rights of an appropriator are always subject to the public trust doctrine (see National Audubon Society v. Superior Court []), the same is true of the rights of a person who contracts with an appropriator for the use of the water appropriated. An appropriator cannot give away more rights than he or she has." Id. at 294 n.54.

The U.S. Court of Federal Claims in Tulare Lake Basin Water Storage District v. United States, 49 Fed. Cl. 313 (2001), also applied this principle in a water rights context. The case involved an alleged taking of a contract right to the delivery of water. The contract was between the Tulare District and the state Department of Water Resources, the holder of an appropriative water right under California law. The Court recognized

that the Tulare District's contract water rights were subject to the same limitations that applied to any appropriative water right.

> There is, as an initial matter, no dispute that all California water rights are subject to the universal limitation that the use must be both reasonable and for a beneficial purpose. Cal. Const. art. XIV, § 3, amended by Cal. Const. art. X, § 2. Included in that definition of reasonable use is the preservation of fish and wildlife. Indeed, the California legislature has specifically declared that the protection of fish and wildlife is among the purposes of the state water projects. Cal. Water Code § 11900 (Deering 1977).... [W]e accept the proposition that plaintiffs have no right to use or divert water in an unreasonable manner, nor in a way that violates the public trust. Id. at 321

While the Court addressed the issue in the context of a takings claim rather than a contract claim, the underlying principle is the same: Where a water user claims rights in water based on contract, any such contract rights are subject to the background principles limiting the underlying water rights which the contract purports to convey.

Relevance of State Regulatory Policies. The second issue raised in this case is whether application of these background principles to a contract suit against the United States turns on whether State regulators have invoked these principles to enforce state regulatory policies that parallel or exceed those imposed by federal regulators. As we explain below, this issue is governed by the California Supreme Court's landmark National Audubon Society case. It appears that there is a substantial overlap between the restrictions imposed on the operations on New Melones Dam by state water permits and

other state law mandates and by the CVPIA. We assume, however, for the sake of argument in this section, that the CVPIA has caused additional restrictions on water deliveries beyond those mandated by state law. Even if the state regulatory standards are not as restrictive as the CVPIA, plaintiffs' breach of contract claims are still barred by background principles of California law.

The basic justification for this conclusion is that the nature and scope of the underlying water right is the same regardless of whether the regulatory restrictions at issue were imposed under federal or state law. So long as the restriction at issue does not infringe on any protected contract right, there can be no breach of contract, regardless of the identity of the sovereign that is allegedly causing the breach. This conclusion follows from the bedrock principle that the issue of the existence of a contract right is distinct from the issue of whether there has been a breach of the contract, see San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989), just as in taking analysis the issue of whether a claimant has a property interest is distinct from the question of whether the property has been taken. See, e g., Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001 (1984). In this case, it is indisputable that fishery restoration and protection is within the scope of the public trust doctrine and the doctrine of public ownership of wildlife, and that the CVPIA imposes restrictions on New Melones Dam designed to protect fisheries. Because the CVPIA restrictions on plaintiffs' water use parallel and do not go beyond the limitations on plaintiffs' contract rights already imposed by state background principles, plaintiffs cannot point to a contract right that could have been breached.

The decision of the U.S. Court of Federal Claims in Tulare Lake Basin Water Storage District v. United States, 49 Fed. Cl. 313 (2001), supports a contrary conclusion, but NRDC respectfully submits that on this point Tulare Lake was incorrectly decided. As discussed above, the Court acknowledged, as a general proposition, that California background principles limit private water rights, including contractual rights to water. Nonetheless, the Court focused on the fact that the state water board, in Order D-1485, issued in 1978, had previously allocated available water to the Tulare District subject to certain conditions. Because the board had jurisdiction to enforce the public trust and reasonable use doctrines, the Court believed that this order represented an authoritative application of California background principles, at least as of the date it was issued. Because the Endangered Species Act restrictions being challenged in the U.S. Court of Federal Claims case went beyond the conditions mandated by D-1485, the Court reasoned, the ESA restrictions could not be justified on the theory that they also reflected background principles of California law. The Court recognized that the state board or the California courts might well reach a new and different conclusion about how background principles should apply based on current information. But, the Court ruled, unless and until the board or the state courts acted, D-1485 defined the extent to which the public trust doctrine and other background principles restricted the scope of plaintiffs' water rights. In the Court's words, "Once an allocation has been made [by the board] – as was done in D-1485 – that determination defines the scope of plaintiffs' property rights." Id. at 322

The Court of Federal Claims went wrong in Tulare Lake, first, by confusing the effect of background principles on the nature and scope of the underlying rights with the

effect of regulatory policies on these alleged rights. Background principles of state law limit the scope of private property rights, serving to identify sticks in the proverbial bundle of sticks that a private party cannot claim he ever owned. In other words, background principles define certain use rights in property as essentially public rather than private. To the extent regulators affect only these public rights, their actions cannot give rise to either a breach of contract claim or a taking claim. Because this conclusion rests on the definition of the underlying property right, rather than the identity of the regulator, it is not affected in the least by whether the regulations are being imposed by the federal government or the state government.

The California Supreme Court's description of the public trust doctrine in Nat'l Audubon Society v. Superior Court of Alpine County, 658 P.2d 709 (Cal. 1983), supports this analysis. The Supreme Court emphasized that the public trust doctrine does not impose an absolute prohibition on private exploitation of trust resources. Rather, the Court recognized, "The prosperity and habitability of much of this state requires the diversion of great quantities of water from its streams for purposes unconnected to any navigation, commerce, fishing, recreation, or ecological use relating to the source stream." Id. at 712. At the same time, the Court recognized that the public trust doctrine places far-reaching limitations on the kinds of private property rights that can be claimed in trust resources. The Court said, "The state must have the power to grant nonvested usufructary rights to appropriate water even if such diversions harm public trust uses." Id. (Emphasis added). As this language indicates, the state water board can allocate water to a particular private use without thereby creating a vested private property right in

that use. In other words, state board permission to use trust resources does not establish vested private rights in the resources.

National Audubon Society makes clear that a private party cannot acquire a vested property right to exploit trust resources in a fashion that is harmful to trust values. Under the California public trust doctrine, "parties acquiring rights in trust property generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust." Id. at 721. As a result, regardless of whether the state water board may have allocated public trust resources to private parties in any particular state proceeding, such private parties can never acquire property rights to exploit trust resources in a fashion that harms trust values, including fisheries.

Second, Tulare Lake was incorrectly decided because, even if it were correct that the state board's prior order represented, at the time, an authoritative determination about how to apply the public trust doctrine, the Court of Federal Claims had a responsibility to determine how the public trust doctrine should be applied based on currently available information. The Court recognized that a California court (or the state water board), faced with the same evidence about threats to endangered species, would have had an obligation to consider whether protection of the public trust and the reasonable use doctrine mandated additional restrictions above those imposed by D-1485. See Tulare Lake Irr. Dist. v. United States, 49 Fed. Cl. at 322. However, in the Court's view, it, qua federal court, could not apply state law doctrines in the same fashion as a state court. In the court's terse words, "That we cannot do." Id. at 323.

This conclusion was mistaken because it ignored the responsibility of a federal court, in addressing a state law issue in a case properly before it, to faithfully apply state

law. In justifying its ruling, the Court suggested that it was avoiding the "displacement of the state regulatory regime" by declining to address matters "for which this court is not suited and with which it is not charged." Id. at 323. In reality, by declining to address the state law issue on the same basis that the California courts would, the federal court effectively arrogated to itself the power to redefine the substantive content of state law. Thus, far from reflecting respect for the principle of federalism, the court's approach undermined that principle.

Since the landmark decision in Erie Railroad v. Tompkins, 304 U.S. 64 (1938), the U.S. Supreme Court has recognized that, except in matters governed by the Constitution or Acts of Congress, the law to be applied by federal courts is state law. While Erie was a case resting on federal diversity jurisdiction, the same principle applies in any federal court case. See Wright & Miller, Federal Practice and Procedure § 4520, at 635 ("[T]he Erie doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law.").

The Supreme Court adopted the Erie doctrine, in part, to avoid divergent legal results based on whether a federal or state court is addressing a state legal issue. Erie Railroad v. Tomkins, 304 U.S. at 820-21. At bottom, however, the Erie decision reflects the fundamental constitutional principle of federalism:

> Erie ultimately rests on the principle that the federal government as a whole, including Congress and the federal courts, has no more authority than that given it by the Constitution. This fundamental principle, which is inherent in the political theory underlying the very concept and structure of the federal government, is

> reinforced by the Tenth Amendment, which reserves to the states or to the people those powers "not delegated to the federal government by the Constitution."

Wright & Miller, Federal Practice & Procedure §4505, at 60.

In carrying out its duties under Erie, a federal court applying state law is "in substance 'only another court of the State.'" Bernhardt v. Polygraphic Co., 350 U.S. 190 203 (1956), quoting Guaranty Trust Co. v. York, 326 U.S. 99, 108 (1945). In other words, a federal court addressing a substantive state law issue "functions as a proxy for the entire state court system, and therefore must apply the substantive law that it conscientiously believes would have been applied in the state court system." Wright & Miller, Federal Practice & Procedure § 4507, at 126.

In accord with these teachings, federal courts addressing takings claims seek to apply state law in the same fashion as the relevant state courts. For example, in Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998), the U.S. Supreme Court addressed whether the claimant possessed a protected property interest under Texas law by faithfully applying Texas precedents. See also Esplanade Properties, LLC v. City of Seattle, 307 F.3d 978 (9th Cir. 2002), cert. denied, 123 S. Ct. 2574 (2003) (rejecting taking claim based on application of Washington precedent defining the scope of the Washington public trust doctrine); cf. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1032 n. 18 (1992) ("We stress that an affirmative decree eliminating all economically beneficial uses may be defended only if an objectively reasonable application of relevant [state law] precedents would exclude those beneficial uses in the circumstances in which the land is presently found.") (emphasis added).

Significantly, in National Audubon itself, the California Supreme Court recognized the possibility that federal courts would have occasion to interpret and apply the California public trust doctrine. See 33 Cal.3d at 451. Notably, there is no suggestion that the federal courts should somehow apply the California public trust doctrine differently than the California courts. For the reasons discussed, any such suggestion would be inconsistent with Erie. In failing to attempt to duplicate how the state courts would apply California background principles, the claims court in Tulare Lake abdicated its responsibility to faithfully apply state law.

The Tulare Lake court, without any citation to relevant supporting authority, discerned that it had an obligation to follow state law only so long as state law pointed to "a single, discrete resolution" of the issue, distinguishing the decision in Rith Energy v. United States, 44 Fed. Cl. 108 (1999). But state law commonly requires the exercise of judicial judgment, as when a court is required to decide whether an action is "negligent" or a contract "unconscionable." There is no exception to the federal court duty to faithfully apply state law for cases requiring the exercise of judicial judgment.

Accordingly, even if the Tulare Lake court were correct (it was not) in thinking that the state board's orders fix private rights in water unless and until the orders are reexamined, the Court of Federal Claims has the same authority, indeed obligation, as the state courts to conduct a fresh examination of how the public trust doctrine and other background principles should apply based on current circumstances. Thus, if this Court rejects the first alternative argument, that these breach of contract claims are categorically barred by California background principles, it should make a new and independent

evaluation of whether the public trust doctrine and the doctrine of public ownership of wildlife bar these claims.

Significantly, other courts have declined to follow the ruling in Tulare Lake that the federal courts are powerless to apply state background principles. For example, Judge Allegra, in Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504, 537-38 (2005), criticized the reasoning of the court in Tulare on the ground that it failed to come to grips with whether the rights at issue in that case were limited by background principles of state law. In particular, he criticized the Tulare court for failing to "consider whether the plaintiffs' claimed use of water violated accepted state doctrines, including those designed to protect fish and wildlife," and for concluding that the issue was "reserved exclusively to the state courts." Id. at 538. The court in Klamath concluded by saying that it "disagree[d] with the approach taken in Tulare." Id.

The California Court of Appeals recently endorsed the ruling in Klamath and rejected the approach followed in Tulare Lake. In Allegretti & Co. v. County of Imperial, 42 Cal.Rptr.3d 122 (Cal.App. 2006), in which the California Court of Appeals rejected a taking claim based on restrictions on withdrawals of underground water, the Court approvingly observed that the court in Klamath "faulted Tulare Lake for neglecting to consider whether the plaintiffs' claimed use of water violated state doctrines including those designed to protect fish and wildlife." Id. at 131-32. Agreeing with Judge Allegra, the California court observed that Tulare Lake awarded just compensation "'for the taking of interests that may well not exist under state law.'" Id. at 132, quoting Klamath Irr. Dist. v. United States, 67 Fed. Cl. at 538. The Court said, we "likewise decline to rely on Tulare Lake's reasoning." Id.

This Court should decline to follow Tulare Lake as well.

## IV. PLAINTIFFS' CLAIMS ARE BARRED BY THE SOVEREIGN ACTS DOCTRINE.

Assuming for the sake of argument that restrictions on water deliveries from New Melones Dam constituted a breach of contract, judgment should still be entered for the United States because any breach is excused by the sovereign acts doctrine. In its April 10, 2006, Opinion, this Court stated that impossibility of performance is a precursor to application of the sovereign acts doctrine. Based on the conclusion that the possibility of performance was disputed, and taking the view that the sovereign acts doctrine raises various "legal intricacies," the Court directed the parties to focus on the impossibility issue, pretermitting the issue of whether this case was covered by the sovereign acts doctrine. In their pretrial memorandum, however, plaintiffs elected to argue both that performance of the contract was not impossible and that the sovereign acts doctrine does not apply. Amicus NRDC respectfully suggests that the Court should reconsider, especially in view of the recent decision in Casitas Municipal Water Dist. v. United States, --- Fed.Cl. ----, 2006 WL 2838882 (Fed.Cl. Oct 2, 2006), the conclusion that traditional impossibility analysis is a precursor to application of the sovereign acts doctrine. NRDC further submits that the sovereign acts doctrine, properly applied, bars these claims.

The Irrelevance of Traditional Impossibility Analysis. No authoritative precedent supports the conclusion that traditional impossibility analysis is a precursor to application of the sovereign acts doctrine. The doctrine of impossibility has, of course, long been an established element of common law contract law. See generally Farnsworth, Contracts §9.15. But none of the seminal sovereign acts cases incorporates an impossibility

analysis. Rather, they focus exclusively on the sovereign nature of the government action. See, e.g., Deming v. United States, 1 Cl. Ct. 190 (1865) (passage of Legal Tender Act); Jones v. United States, 1 Cl. Ct. 383 (1865) (removal of troops from Indian Territory); Horowitz v. United States, 267 U.S. 458 (1925) (embargo on silk deliveries). Recent Federal Circuit decisions also apply the sovereign acts doctrine without linking it to traditional impossibility analysis. See, e g., Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1575 (Fed.Cir. 1997); Commonwealth Edison Co. v. United States, 271 F.3d 1327 (Fed.Cir 1997); Centex Corp. v. United States, 395 F.3d 1283, 1307 (Fed.Cir. 2005).[3]

Moreover, apart from the plurality opinion in Winstar, there is no Supreme Court authority for treating traditional impossibility analysis as a precursor to application of the sovereign acts defense. The Winstar plurality opinion, because it failed to command the support of a majority of the Justices, does not bind this Court. To be sure, Justice Souter, speaking for himself and several other Justices, treated the sovereign acts doctrine as a subset of the doctrine of impossibility. Winstar Corp. v. United States, 518 U.S. 839, 904 (1996) (Souter, J.). However, no other Justice joined in Justice Souter's analysis to form a Court majority. See Centex Corp. v. United States, 395 F.3d 1283, 1307 (Fed. Cir. 2005) (recognizing that only the plurality connected the sovereign acts and impossibility doctrines). Justice Scalia, in a separate concurring opinion, addressed the sovereign acts doctrine only briefly. After observing that the doctrine had been applied by the Supreme

[3] Court of Federal Claims decisions linking the sovereign acts doctrine with the doctrine of impossibility are obviously not binding precedent on this Court See Penzoil-Quaker State Co. & Subsidiaries v. United States, 62 Fed. Cl. 689, 696 (2004) (decisions by particular judges of the Court of Federal Claims not binding on other judges of the Court of Federal Claims).

Court "in only a single case," he said that in his view the doctrine "adds little, if anything at all, to the 'unmistakability' doctrine, and is avoided whenever that one would be," that is, when the government has made an explicit commitment not to invoke its sovereign powers. Winstar, 518 U.S. at 923-24 (Scalia, J., concurring). Given Justice Scalia's "quite different" reasons for concurring in the judgment, Winstar, 518 U.S. at 919 (Scalia, J., concurring), Justice Scalia's opinion does not link to Justice Souter's opinion to form an implicit majority on the impossibility issue. Commentators have recognized this, noting that while Justice Souter adopted a clear and distinctive position linking the sovereign acts doctrine with the common law doctrine of impossibility, the position did not command the support of a majority of the Justices. See, e.g., Gregory C. Sisk, LITIGATING WITH THE FEDERAL GOVERNMENT: CASES AND MATERIALS 567 (2000); John Cibinic, Jr., "Retroactive Legislation and Regulations and Federal Government Contracts," 51 ALA. L. REV. 963, 971-72 (2000). Nor did any of the other concurring or dissenting Justices embrace this element of Justice Souter's opinion. [4]

More fundamentally, the approach taken by the Winstar plurality opinion is problematic because it appears to ignore the special considerations that justify granting the government broad latitude to take action that may incidentally affect its contract obligations and that support the existence of the sovereign acts defense in the first place. The traditional doctrine of impossibility and the sovereign acts doctrine serve very different values and functions. The doctrine of impossibility, which grew up in the

---

[4] Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000), does not provide any persuasive, much less controlling, authority on this question. The case did not involve an impossibility defense, and the Court expressly stated that the possible application of the sovereign acts doctrine was not in issue in the case before the Court. See id. at 620. Thus, whatever Mobil had to say about the present issue is purest dictum.

context of purely private contractual arrangements, seeks to balance the social utility of enforceable contractual arrangements with a recognition that, in some circumstances, "justice requires a departure from the general rule that a promisor bears the risk of increased difficulty of performance." Farnsworth, Contracts 624 (4th Ed. 2004). Historically, the doctrine was frequently explained in terms of individual morality. See, e.g., James Gordley, "Impossibility and Changed and Unforeseen Circumstances," 52 AM. J. COMP. L. 513 (2004) (describing canonical and natural law origins of the doctrine of impracticability). In the modern era, the doctrine has more frequently been characterized as an economically-efficient rule for allocating risk between private parties. See, e g., Robert Cooter & Thomas Ulen, LAW AND ECONOMICS 277-81 (1988).

By contrast, as another Judge of the U.S. Court of Federal Claims has explained, the sovereign acts doctrine, which grew up in the specific context of government contracting, is designed " to shield exercises of the law making function that involves sovereign powers." Cuyahoga Metr. Housing Auth. v. United States, 57 Fed. Cl. 751, 774 n.31 (2003). The doctrine attempts to balance "the Government's need for freedom to legislate with its obligation to honor its contracts." Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1575 (Fed. Cir.1997). The doctrines are obviously related in that both address, in a broad sense, the legal significance of supervening events for contractual relations. But given their distinctive origins and functions, it is implausible as well as illogical to view the sovereign acts doctrine as simply a corollary of the doctrine of impossibility.

The Sovereign Act Defense Applies. Applying the sovereign acts doctrine to this case, both the enactment of the CVPIA and the decisions made by U.S. Bureau of

Reclamation officials about how to implement the Act represent sovereign acts that shield the United States from liability. While the plaintiffs were, and remain, free to challenge the agency's implementation of the CVPIA under the Administrative Procedure Act, they cannot raise what are essentially back-door APA claims in a contract action in order to challenge the reasonableness of the agency's judgments in managing the CVP. In the context of this contract suit, the only issue is whether performance was barred by the agency's decisions.

This approach in applying the sovereign acts defense is supported by the decision of the U.S. Court of Federal Claims in the Casitas case. In that case, the plaintiff water district (represented by some of the same counsel representing plaintiffs in this case) argued that the sovereign acts defense did not bar a breach of contract suit based on the application of ESA mandates to the operation of a Bureau-constructed water project. The plaintiff, like the plaintiffs in this case, argued that because the government made a discretionary determination between alternative approaches to protecting the fish, its performance was not excused by the sovereign acts defense. The Court of Claims dismissed this argument on the ground that no meaningful analytical distinction could be drawn between legislative mandates and executive branch implementation. In either case, the Court explained, the government action is sovereign in character and the sovereign acts defense applies. "[T]he fact that [the agency] could have addressed the issue [by other means] does not alter the sovereign character of its action any more than if that requirement had originated with Congress itself." Casitas Municipal Water District v. United States, --- Fed.Cl. ----, 2006 WL 2838882 at 10.

In fact, this Court has repeatedly accepted sovereign defenses to contract claims based upon an agency's implementation of wildlife protections, without regard to the multiple options available to the agency in choosing how best to implement a statutory mandate. See, e.g., Ryco Const., Inc. v. United States., 55 Fed. Cl 184 (2002) (decision to suspend work due to presence of endangered species is a sovereign act); Precision Pine & Timber, Inc. v. United States., 50 Fed. Cl. 35 (2001) (contract suspensions resulting from agency compliance with mandates of the ESA was a public and general sovereign act); see also Croman Corp. v. United States, 44 Fed.Cl. 796 (1999) (enactment of ESA, listing of species under the ESA, and implementation of ESA requirements, were all public and general sovereign acts under sovereign acts doctrine), reconsidered, 49 Fed.Cl. 776 (2001), vacated on other grounds, 89 Fed. Appx 237 (Fed. Cir. 2004).

By the same token, the Bureau's decisions about how to implement the CVPIA also represents a sovereign act that bars a breach of contract claim, regardless of whether that action involved a measure of administrative judgment. Any challenge to the Bureau's process of implementing the CVPIA, on the other hand, was properly brought in the District Court under the APA. See, e.g., Bennett v. Spear, 520 U.S. 154, 174-175 (1997). In a similar contractual challenge to the Bureau's allocation of water between consumptive and environmental uses in operating the CVP, the federal District Court in California distinguished between the Bureau's "method" of complying with the CVPIA, and the "necessity" that it must comply. The Court found that the Bureau's method was properly subject to challenge under the APA, not as a suit for breach of contract See Barcellos & Wolfson Inc. v. Westlands Water Dist., 849 F.Supp. 717, 733-734 (E.D. Cal. 1993).

CVPIA is General and Public. The Supreme Court has held that the basic question under the sovereign acts doctrine is whether the government action preventing performance of the contract is "general and public." Winstar Corp. v. United States, 518 U.S. 837, 891 (1996). Although incidental impacts on contractual relations are of no legal consequence, acts specifically targeted at the government's own contracts do not qualify as public and general. The critical issue is whether the government has taken targeted action for the purpose of advancing the government's self-interest. In Winstar, the Supreme Court defined illegitimate governmental self-interest as involving "instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties." Winstar Corp., 518 U.S. at 896. The Court explained that "[t]he greater the Government's self-interest … the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence." Id. at 898. Accordingly, the Federal Circuit has held that an enactment does not qualify as a sovereign act when it "was specifically targeted at appropriating the benefits of a government contract." Centex Corp. v. United States, 395 F.3d 1283, 1308 (Fed. Cir. 2005).

The CVPIA is not targeted legislation because it seeks to advance broad public objectives rather than to advance narrow governmental self interest. Significantly, Judge Wanger has specifically so ruled in other litigation involving the CVPIA. See San-Luis & Delta-Mondota Water Authority v. United States, Nos. CV-F-97-6140, CV-F-98-5261. Judge Wanger determined, based on a lengthy and exhaustive inquiry, that CVPIA section 3406(b)(2) did not target CVP contractors. See Order After Evidentiary Hearing

for Preliminary Injunction, December 20, 1999. In relevant part, the Order stated (at page 31):

> The statute provides that annually, and subject only to the conditions in (b)(2)(c), 800,000 AF of CVP yield must be dedicated to (b)(2) measures. The statute says nothing about taking the water from contractors…. There is no direction in the statute to take 800,000 AF 'from CVP contractors.' The annual net effect of (b)(2) measures is to reduce CVP yield in the aggregate. Where, within the CVP, the Bureau appropriates water for CVP purposes is committed to the Bureau's sound discretion. Congressional history reveals legislators intended that (b)(2) take an annual, finite allocation of CVP yield for the environment without any specification from what CVP-user the water should be taken.

Plaintiffs fail to distinguish between mere recognition that federal legislation may have an incidental impact upon water contracts and a legislative "purpose" to repudiate the government's contracts. This Court has explained that "[t]he Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, <u>for the purpose</u> of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties." <u>Stockton East Water Dist. v. United States</u>, 70 Fed. Cl. at 529 (quoting <u>Yankee Atomic</u>, 112 F.3d at 1575) (emphasis added). In <u>Winstar</u>, the plurality explained that the legislative record showed that "the statute not only had the purpose of eliminating … accounting gimmicks …, but <u>the specific object</u> of

abrogating … acquisition contracts….” Winstar Corp., 518 U.S. at 900 (emphasis added).[5] Plaintiffs cannot establish that the CVPIA had such an objective.

Finally, the Court of Federal Claims in the Casitas case recently observed that "[t]he targeting of a particular contract is not itself an action that would foreclose reliance on the sovereign acts doctrine. Rather the defense is unavailable where the government's action also serves to relieve the government of its own contractual responsibilities." Casitas Municipal Water District v. United States, --- Fed.Cl. ----, 2006 WL 2838882 at 8. In that case, Judge Weise held that "no economic advantage accrued to the United States, as a contracting party, as a result of [ESA implementation] so as to invalidate defendant's sovereign acts defense." Id. at 9. As in Casitas, here the United States did not take action in order to save itself money or otherwise advance its self interest. The United States is not seeking to protect itself from escalating insurance liabilities as in Winstar, or directly increasing its coffers by repealing tax benefits, as in Centex. Rather, as shown by NRDC and the United States, the United States acted in its sovereign capacity to further public and general goals when it enacted the CVPIA. Accordingly, the sovereign acts doctrine bars these claims.

## V. PLAINTIFFS ARE SEEKING AN UNFAIR WINDFALL AT TAXPAYER EXPENSE.

Lacking any support either in the law or the four corners of their contracts, plaintiffs' claim for relief essentially rests on an equitable argument, that is, that their alleged expenditure of tens of millions on dollars on a distribution network for the water

[5] The plurality turned to the legislative record to establish whether the challenged legislation had a "substantial impact" upon the government's own contracts. Id. at 902. Notably, this standard for determining which sovereign acts qualify under the public and general criteria of the sovereign acts doctrine was not a majority holding of the Court.

anticipated from New Melones Dam entitles them to a financial recovery from the U.S. taxpayer. While superficially appealing, the argument is ultimately unavailing.

First, these arguments are essentially inequitable because plaintiffs are seeking a recovery that, according to plaintiffs' own theory of the case, is not available to other districts that draw water from the Central Valley Project. For example, plaintiffs distinguish their claims from those of Westlands, and argue that while Westlands may have been denied recovery as a result of the decision in O'Neill, they are entitled to recovery in this case Beyond that, plaintiffs seek to affirmatively rely on the inability of other water districts to obtain a recovery by arguing that the United States should not be permitted to rely on the sovereign act defenses if it could restrict deliveries to other districts without incurring financial liability. The plaintiffs are arguing that they and they alone are entitled to a recovery.

Second, plaintiffs' reliance argument is unconvincing because plaintiffs knew when they entered into these contracts that they were acquiring contract water rights that were among the most junior and least secure of any of the contracts related to the CVP. As discussed, the terms of the contract made clear that the Bureau's contractual obligations were subject to the mandates of any supervening congressional legislation, and that the United States would not be liable for any shortage due to any cause that the Bureau reasonably judged to be "beyond the control of the United States." Beyond that, however, the contracts expressly provided that the plaintiffs were at risk of reductions in deliveries in order to meet the needs of other water users. The Flood Control Act of 1962, which modified the authorization for the New Melones Dam, provided that "any diversion from the Stanislaus River in connection with the Central Valley Project… shall

at all times be subordinate" to "all existing and anticipated future needs within the [Stanislaus] basin." In accordance with this arrangement, the state water board's Decision 1422 recognized the extensive prior claims to Stanislaus water of the Oakdale Irrigation District and South San Joaquin Irrigation District. In addition, the contracts provided that, upon one year's notice, the plaintiffs' "interim" water supplies could be reduced in order to meet any unspecified new demands within the basin. See Stockton-East contract, para 3(a); Central contract, para. 3(a)(2). More specifically, the contracts provided that deliveries under the contracts could be reduced in order to increase the interim water supply to the South San Joaquin Irrigation District. Id. In proceeding with contracts containing these terms, plaintiffs obviously took a calculated risk.

Plaintiffs evidently chose to take this gamble because they believed that the potential rewards of receiving water from a federally-subsidized water development were quite large. It is by now well recognized that Bureau of Reclamation Water projects provide relatively low-cost water at a substantial cost to the U.S. taxpayer. See, e.g., U.S. General Accounting Office, "Bureau of Reclamation: Information on Allocation and Repayment of Costs of Constructing Water Projects" (July 1996) (available on GAO website). The taxpayer subsidy is primarily attributable to the fact that the construction cost of Bureau projects is repaid without interest over an extended period of time, and to various financial "charge-offs" that reduce water users financial obligations.

NRDC is not in a position to document the full scope of the subsidies enjoyed by the plaintiffs. One indication of these subsidies is provided, however, by the rates paid by Central for irrigation water supplies derived from New Melones Dam. See http://www.sbr.gov/mp/cvp.waterates/ratebooks, Irrigation, Table A1. This table

indicates that in 2004, for example, Central paid for water at the contract rate of $13.67 per acre-foot, whereas the Bureau's actual "cost of service" (operating costs and capital repayment costs) was $16.34 per acre-feet, and the Bureau's "full cost" (including interests on the capital expenditures) was $23.99 or $26.86 per acre-foot. These data show that in 2004 Central paid for irrigation water supplies at approximately half the cost to the taxpayer of providing the water. To the extent Stockton-East received water deliveries from New Melones in 2004, these apparently consisted of M & I water. See id. Special Rates, Table T1. This table indicates that the cost of service rate for the Stanislaus River was $28.72 per acre-foot, which apparently includes operating costs, capital repayment, and interest. While this suggests that Stockton East paid for M & I supplies at a rate that compensated the United States for its costs, there is at least some evidence being submitted by the government that this rate is far below current market rates for water. See Water Transfer Agreement By and Between Oakdale Irrigation District, South San Joaquin Irrigation District and Stockton East Water District, dated April 1, 1997 (agreement by Stockton to pay $55 per acre-foot in wet years and $90 per acre-foot in dry years for M& I and irrigation water supply).

Many years ago, the U.S. Supreme Court observed, in the context of litigation involving a Bureau of Reclamation project, "'It is hardly a lack of due process for the Government to regulate that which it subsidizes.'" Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 296 (1958), quoting Wickard v. Filburn, 317 U.S. 111, 131 (1942). See also Peterson v. U.S. Department of the Interior, 899 F.2d 799, 805 (9th Cir. 1990) (discussing the "enormous" subsidies enjoyed by the beneficiaries of the Central Valley Project). The same practical approach should apply to contract interpretation and

implementation In view of the significant federal subsidy for the water involved, as well as the uncertainty of the water supply that the Bureau could deliver to the plaintiffs, it makes all the sense in the world for the United States to have insisted on a contract that protected the taxpayer from liability if deliveries had to be reduced. In fairness, plaintiffs are entitled to no more than they actually bargained for in these contracts.

CONCLUSION

For the foregoing reason, the Natural Resources Defense Council urges the Court to enter judgment for the United States.

Respectfully submitted,

___/S/________________

John D. Echeverria
Sanjukta Misra
Georgetown Environmental Law & Policy Institute
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9863
(202) 662-9005

Hamilton Candee
Natural Resources Defense Council
111 Sutter St., 20th Floor
San Francisco, CA 94104
(415) 875-6100
(415) 875-6161

Counsel for *amicus curiae* NRDC

October 10, 2006