STATE OF CALIFORNIA—THE RESOURCES AGENCY

PETE WILSON, Governor

DEPARTMENT OF FISH AND GAME
REGION 4
1234 East Shaw Avenue
Fresno, California 93710
(209) 222-3761

BUREAU OF RECLAMATION OFFICIAL FILE COPY
OCT 05 1994
2800 Ploss
2810 Bowling

September 29, 1994

Mr. Lowell Ploss, Chief
Central Valley Operations Coordinating Office
U.S. Bureau of Reclamation
2800 Cottage Way
Sacramento, California 95825-1898

Dear Mr. Ploss:

The purpose of this correspondence is to define our preferred streamflow schedule for the Stanislaus River from October 1, 1994 through February 28, 1995. My staff has worked closely with Mr. Lloyd Peterson, of your office, and Mr. Roger Guinee, U.S. Fish and Wildlife Service. We believe our scheduling of the balance of the 1987 Fishery Agreement supply is compatible with the purpose and use of the other supplies available from New Melones Reservoir.

Based on discussions with your staff and our review of streamflow records, we estimate that by the end of September, 1994 approximately 213,000 acre-feet of project water was released below Goodwin Dam. Of this total, approximately 22,000 acre-feet was released in March through April pursuant to CVPIA Section 3406 (b)(2), prior to Judge Wagner's injunction in May. Approximately 15,000 acre-feet was released in May, 1994 pursuant to CVPIA Section 3406 (b)(3). Approximately 137,000 acre-feet was released to meet the total dissolved solids standard at Vernalis on the San Joaquin River (reference D1422). Finally, approximately 39,000 acre-feet of the 98,300 acre-feet of fishery water, pursuant to the Department of Fish and Game/U.S. Bureau of Reclamation 1987 Agreement, was used. We continue to dispute your allocation of 7,200 acre-feet of this supply during the June through September, 1994 period due to the overriding demand for water quality improvements (reference D1422 TDS standard; Ripon D.O. standard). Similarly, we question the allocation of fishery supplies in March, 1994 (7,7000 acre-feet) when such large releases for water quality protection at Vernalis result in a reduction in predicted useable habitat for the juvenile salmonids present at that time. Due to our respective needs to proceed with streamflow scheduling this fall and winter, we are "agreeing to disagree" with your proposed allocation of fishery water supplies in March, and June through September, 1994.

| Classification | PRJ 13.10- |
|---|---|
| Project | CVP |
| Control No. | 10003664 |
| Folder I.D. | 34238 |
| Keyword | Stanislaus / Melones |

Mr. Lowell Ploss
September 29, 1994
Page Two

We appreciate your assistance with the special operations at New Melones and Tulloch reservoirs this fall to provide acceptable water temperatures (40 to 56°F) well below Goodwin Dam by mid-October. Our collective experience in these power bypass and cold water back-filling efforts will not only help restore the anadromous fishery in the Stanislaus River, but will be invaluable in developing an effective long-term operational plan through the Stanislaus Fishery Study and Section 3406 (e)(1) or other sections of the CVPIA.

Please contact Mr. Bill Loudermilk, of my staff, at the address or phone number on the letterhead, with any questions or concerns regarding the schedule or content of this correspondence. Again, thank you for your continued assistance with fishery maintenance and restoration in this basin.

Sincerely,

for George D. Nokes
Regional Manager

Attachment

cc: Mr. Rich Martin
South San Joaquin Irrigation District

Mr. Barrett Kehl
Oakdale Irrigation District

Mr. Don Thompson
Tri-Dam Project

Mr. Jim Sandner
U.S. Army Corps of Engineers

Mr. Jim McKevitt
U.S. Fish and Wildlife Service

FILED
2004 MAY 12 P 2:49
CLERK, US DIST. COURT
EASTERN DIST. OF CALIF
AT FRESNO
BY [illegible]
DEPUTY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MODESTO IRRIGATION DISTRICT, et al., Plaintiffs, v. DONALD L EVANS, et al., Defendants, & NORTHERN CALIFORNIA COUNCIL OF FEDERATION OF FLY FISHERS, et al., Defendants-Intervenors. | CIV-F-02-6553 OWW DLB<br>MEMORANDUM DECISION AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [FED. R. CIV. P. 56]. |

I. INTRODUCTION

The Modesto Irrigation District, Turlock Irrigation District, Merced Irrigation District, Oakdale Irrigation District, South San Joaquin Irrigation District, and Stockton East Water District (collectively "Plaintiffs") move for summary judgment, pursuant to Fed. R. Civ. P. 56, alleging that the National Marine Fisheries Service ("NMFS") violated the Endangered Species Act (16 U.S.C. §§ 1531-1544; "ESA") and the Administration Procedure Act (5 U.S.C. §§ 551-706; "APA") in its listing of the Central Valley California steelhead as endangered.



79

decision given an opportunity to do so, and when vacating would be disruptive." *Central & South West Servs. v. United States EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (finding EPA's failure to explain why it did not adopt a national variance for the electric utilities did not require vacatur because it may be able to justify its decision and it would be disruptive to vacate a rule that applies to other members of the regulated community) (citation and internal quotations omitted).

In this case, after balancing all the factors at issue, the listing should be preserved because (1) the protected classification is likely curable after the ESU is updated in accordance with the law; (2) although there is substantial scientific controversy on the inclusion of hatchery fish in the DPS, scientific evidence indicates that vacating the listing may pose a substantial threat of irreparable harm to the Central Valley steelhead; and (3) Plaintiffs do not face any imminent prospect of injury from preserving the listing.

The AR and the supplemental declaration of R. Craig Wingert, an NMFS employee who has participated in status reviews for the steelhead, provide the basis for preserving the listing. Wingert Declaration at 2, ¶ 2. An AR was submitted. Doc. 24, filed April 14, 2004. "Judicial review of agency decisions is generally limited to review of the administrative record." *Morongo Band*, 161 F.3d 569, 573 (9th Cir. 1998) (citing *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997)). It need not, however, be so limited. In this case, Mr. Wingert's declaration discusses threats to the survival of the Central Valley steelhead that are consistent with those that

originally gave rise to the listing and suggests that those threats are still present.

As a result of its inquiry into the status of the steelhead, the NMFS found that "[s]teelhead on the West Coast of the United States ha[d] experienced declines in abundance in the past several decades as a result of natural and human factors." 63 Fed. Reg. 13354 (March 19, 1998). The NMFS found that in 1994, "the recent total rule size to the upper Sacramento River basin is probably less than 10,000 steelhead per year, and it is believed that fewer than 2,000 of those fish were the result of natural production from native populations ...." 63 Fed. Reg. 13368 (March 19, 1998).

A number of factors were identified that contributed to the decline of west coast steelhead: "overharvest by recreational fisheries, predation by pinnipeds and piscivorous fish species, effects of artificial propagation, and the deterioration or loss of freshwater and marine habitats." 63 Fed. Reg. 13349 (March 19, 1998). The NMFS concluded that "all of the factors identified in section 4(a)(1) of the ESA have played a role in the decline of the species." 63 Fed. Reg. 13354 (March 19, 1998). These factors are: "(1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilzation for commercial, recreational, scientific, or education purposes; (3) disease or predation; (4) inadequacy of existing regulatory mechanisms; or (5) other natural or human-made factors affecting its continued existence." 63 Fed. Reg. 13354 (March 19, 1998). The threats to the steelhead's habitat include hydropower development, water

withdrawal, conveyance, storage, and flood control, and land use activities like logging, agriculture, mining, and urbanization. AR Doc. 1426 at 32403; 32405-60. Over-utilization resulted from commercial, recreational, and tribal harvest, scientific utilization, and ocean harvest. *Id.* Natural and Manmade factors include drought, floods, ocean conditions, and artificial propagation. *Id.*

The NMFS also found that some improvement in the status of the species was not necessarily enough for it to conclude that the species was not at risk. For example, although the NMFS discovered that "the risk to Central Valley steelhead ha[d] diminished since the completion of the status review in 1996[,] ... NMFS [still] conlude[d] that Central Valley steelhead warrant listing as a threatned species at this time." 63 Fed. Reg. 13368 (March 19, 1998). Therefore, even if the steelhead were currently enjoying an improved standing, this alone would not necessarily justify their de-listing.

Relying primarily upon Mr. Wingert's declaration which echoes many of these original concerns, Defendants argue that the "APA does not require that defective rules necessarily be set aside during remand." Defendants' Opposition at 8.17-18. Defendants encourage the court to "balance the scope of the rule['s] defect[s] against the risk of the harm." *Id.* at 8.19-20. Defendants argue that "the removal of the Central Valley California ESU of steelhead from the list may have immediate and potentially irreparable consequences ... including further reduction in the range of the species, degradation, destruction, and blockage of freshwater habitat, and genetic introgression

with stocks that are not native to the ESU." *Id.* at 10.4-20 (quoting Wingert Declaration at 10, ¶ 22).

"In response to the September 2001 U.S. District Court ruling in Alsea, NMFS initiated updated status reviews of 25 ESUs of salmon and steelhead on the west coast, including the CV steelhead ESU."[7] Wingert Declaration at 4, ¶ 9; *see also* 2, ¶ 3. This is characterized as a review covering all such species in the Pacific Coast States.

The objectives of this review process were

> [1] to update the current status of the ESUs[,] ...
>
> [2] to more explicitly identify and evaluate hatchery populations that were considered to be part of the salmon and steelhead ESUs[, and] ...
>
> [3] [to] reconsider[] rainbow trout and their relationship to steelhead ESUs in these status review updates.

*Id.* at 4, ¶ 9. During oral arguments, Defendants reported that a final draft was to be sent out for comments on March 31, 2004. Given the complexity of the scientific issues involved, and the need for the NMFS and FWS to work together, the government requested, and was granted, a ninety (90) day extension on March 11, 2004. The final rule is expected to be put into effect one year later, in June 2005.

The NMFS competed its first status review for west coast

---

[7] In *Alsea*, Judge Hogan found "[t]he August 10, 1998 NMFS listing decision, contained at 63 Fed. Reg. 42,587, ... unlawful and set [it] aside as arbitrary and capricious." 161 F. Supp. 2d at 1163.

steelhead in 1996. Based on this review, NMFS concluded:

> steelhead occupying the Sacramento and San Joaquin rivers and tributaries in the Central Valley constituted a distinct population segment or ... ESU of the species *O. mykiss*, and that the ESU was in danger of extinction due to
>
> [1] the extirpation of steelhead from most of its historical range in the Central Valley as a result of damn construction;
>
> [2] the widespread degradation, destruction, and blockage of freshwater habitat still available to steelhead throughout the Central Valley;
>
> [3] the opportunity for genetic introgression from hatchery stocks within the ESU including several stocks that are not native to the ESU;
>
> [4] and the potential ecological interaction between introduced and native stocks.

Wingert Declaration at 2-3, ¶ 5. Defendants contend that "[w]hile the listing rule's treatment of hatchery fish is legally flawed, it is not obvious that the end result of correcting that flaw is to de-list the species." Defendants' Opposition at 10.7-8. This listing will instead be "updated." *See* Wingert Declaration at 2, ¶ 3. Defendants argue that the fish will not be de-listed because of the findings of the updated status reviews that were completed in July, 2003. These status reviews:

> reaffirm[ed] that the CV steelhead ESU continues to be in danger of extinction based on several factors. These factors include:

[1] the continued decline in total abundance of fish in the Central Valley;

[2] the extirpation of steelhead from most of its historic habitat in the Central Valley;

[3] the lack of any steelhead-specific monitoring programs;

[4] and the significant production of non-native steelhead at some Central Valley hatcheries and the possibility this is resulting in genetic introgression with native Central Valley stocks.

*Id.* at 4, ¶ 10. "[T]he preliminary findings indicate that the anadromous life form, or steelhead, is a critical component of diversity in this ESU, and therefore, the assessment of risk is based largely on that form." *Id.* This evidence provides a reasoned basis to believe that the Central Valley steelhead will remain protected after the updated has been completed.

"[T]he removal of the Central Valley California ESU of steelhead from the list may have immediate and potentially irreparable consequences." Defendants' Opposition at 10.5-6. Mr. Wingert opines that "[i]f the listing of the CV steelhead is withdrawn while the NMFS completes the listing process" substantial detrimental consequences will result.

(1) "[T]he management of Federal, State, County, and local projects and activities likely will change and provide less protection for the species since they will no longer have a legal obligation to provide such protections."

(2) "Anticipated changes in the management of State and Federal water projects, water diversions, fish

hatcheries, recreational fisheries, forest resources, as well as municipal, residential, commercial and industrial development would reduce the quantity and quality of a significant amount of the spawning, rearing, and migration habitat and result in a reduction in the abundance and distribution of the species."

(3) "Operation of the Central Valley Project (CVP) and State Water Project (SWP) will likely change to maximize the efficiency of water storage, power production, and water deliveries for irrigation and other contracts. These operational changes generally will cause adverse effects to CV steelhead and their habitat by [1] causing flow reductions and fluctuations during critical spawning and migration periods, [2] increasing water temperatures during critical rearing periods, and [3] exporting flows from the Sacramento/San Joaquin Delta during peak juvenile migration periods."

Wingert's Declaration at 5, ¶¶ 11-12.

Mr. Wingert opines that removing the steelhead from the listing will return it to its 1996 conditions. Wingert Declaration at 2, ¶ 5. He alleges that "irreparable harm ... would likely occur to CV steelhead if they are denied protection under the ESA during the time it will take for NMFS to complete new listing determinations that are consistent with the U.S. District Court ruling in the *Alsea* case." *Id.* at 2, ¶ 4. "Municipal, residential, commercial and industrial development

activities would likely not include adequate avoidance, minimizations and compensation measures to protect steelhead since they would no longer have any legal requirement to do so." *Id.* at 9, ¶ 20. This harm could include "reducing the quantity and quality of habitat currently available to the species from instream flow reductions, water temperature increases, water quality degradation, loss of riparian habitat, and poor fish passage conditions." *Id.* at 10, ¶ 22. The scientific evidence Defendants and Intervenors provide indicates that the fish faces serious and irreparable harm if removed from the list and that, given its numbers, its listing is likely to be preserved after the review and update. This scientific evidence militates against de-listing. Granted, there is some uncertainty based on the opinion that the Central Valley steelhead's population decline is not of the same magnitude as originally believed.

Plaintiffs allege, in response, that the listing error is prejudicial to them. Plaintiffs seek to prohibit Defendants from enforcing the steelhead listing, i.e., to delist the CV steelhead and remand the rule to the agency. Plaintiffs' Motion at 12.9-13.21. Plaintiffs request injunctive relief to protect them from the alleged harm that will be caused by the NMFS classification. On May 2, 2003, NMFS petitioned the Federal Energy Regulatory Commission ("FERC") to "modify the minimum flow provisions of the Don Pedro license as necessary to protect both steelhead and Chinook salmon in the Tuolumne River." Doc. 61 "Ward's Declaration") at 3, ¶ 6; *see also* Exh. A. "Central Valley steelhead were not listed as threatened under the ESA until March 19, 1998, approximately three years after the Settlement

Agreement and two years after FERC amended the License at issue." *Id.* at Exh. A, 11. The license does not currently provide for the protection of the steelhead. Because the steelhead and Chinook salmon "have different life cycles," if the petition is granted, irrigation districts like Plaintiffs will be required "to release even more water," because the steelhead reside in the Tuolumne River year round, which they claim "will cause ... irreparable harm." *Id.* at 4, ¶¶ 7-8. Plaintiffs oppose NMFS' listing of Central Valley steelhead because it will require them to devote more water to protect steelhead in the rivers of the Central Valley.

Plaintiffs allege that they "face the irreparable harm of loss of water supply in the FERC [i.e., Federal Energy Regulatory Commission] proceeding, and civil-and potentially criminal-penalties in an enforcement action." *Id.* at 13.19-21; *see also* Doc. 41 at 26.21-26. Plaintiffs allege that "[t]here is no evidence in the record of any potential harm to the species should the listing be invalidated." Plaintiffs' Reply to Defendants at 5.8-9. Plaintiffs argue that there is no support for Wingert's claim that by the withdrawal of the listing, "the management of Federal, State, County, and local projects and activities likely will change and provide less protection for the species." *Id.* at 5.8-20; Defendants' Opposition at 10.7-22. Plaintiffs allege that their licence with the FERC "contains a requirement that certain minimum flows be maintained" and that they "will be required to maintain the status quo in terms of river flows affecting the species should the listing be set aside." Plaintiffs' Reply to Defendants 5.21-27. Plaintiffs,

also argue that if projects are altered to the detriment of the steelhead, Defendants have a legal remedy under 5 U.S.C. § 553. *Id.* at 6.23-25.

During oral arguments, Plaintiffs reiterated their fear that they would suffer injuries from the enforcement of the listing if it were not vacated. Plaintiffs did not explain how Defendants could legally enforce a presently flawed rule. The relative harms can be balanced, while the rule remains in effect. Plaintiffs may apply for injunctive relief against any enforcement actions under the flawed rule during the period in which the listing is under review. Plaintiffs must, however, meet all existing permit obligations that were effective on the date the listing was adopted in 1998. The court has further ordered that Defendants not further prosecute the FERC license modification unless and until the flawed listing review is completed and all aspects of the ESA are lawfully satisfied in respect to the ESA listing of the Central Valley steelhead as threatened. In the event Interior has not completed its review within the one year period, the present rule will then be vacated as unlawful.

Under these protective provisions any harm to Plaintiffs is minimized. Given the apparent substantial threat to the continued existence of the Central Valley steelhead described by the Wingert declaration, the absence of court resources to resolve the scientific dispute, it is likely that the species, however the DSP is defined, will continued to be listed after the review. In the event any party is actually threatened with imminent injury, appropriate application can be made to the court

for interim injunctive relief. The is one of the rare cases where equitable discretion should be exercised to not vacate a listing to prevent irreparable harm to the species, and yet to retain equitable jurisdiction to review this decision should Defendants take action that imminently threatens irreparable harm to Plaintiffs. Defendants' and Intervenors' motions to stay vacating the listing, is GRANTED on the terms and conditions specified.

C. <u>Motion to File Reply to *Amicus Curiae* Brief</u>

Cal-Pac filed their *Amicus Curiae* after Intervenors filed their opposition. Cal-Pac's brief refers repeatedly to Intervenor's arguments and responds to Intervenors' opposition. Doc. 68 ("*Amicus Curiae*"), at 1.2; 1.22-2.1; 3.14-17; 4.1-9, 12; 5.11-12. The *Amicus Curiae* brief is a second reply to Intervenors' opposition. Intervenors were allowed to present all their arguments in reply to the *Amicus Curiae* brief during oral arguments. Although it will not affect the current decision, Intervenors are granted leave to submit a reply brief to be filed to the *Amicus* brief. Intervenors' motion for leave to reply to the *Amicus Curiae* is GRANTED.

IX. <u>CONCLUSION</u>

For all the reasons stated above, Plaintiffs' motion for summary judgment as to admitted flaws in the listing decision in erroneously treating natural-spawned and

hatchery-spawned Central Valley steelhead classifications is GRANTED;

Plaintiffs' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 on the anadromous and resident Central Valley steelead populations is DENIED WITHOUT PREJUDICE;

Defendants and Intervenors' request to Stay the Order on Plaintiffs' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 is GRANTED, upon the following terms and conditions:

(A) the court expressly reserves jurisdiction to address any threatened irreparable injury during the period of the stay;

(B) Interior shall not prosecute the FERC petition to modify the process of the Don Pedro license on the Tuolumne River, unless there is an independent unrelated grant to protect Chinook Salmon not at issue in this case; and

(B) If Defendants remand and review of the listing of Central Valley steelhead as threatened is not completed, and a lawful promulgation of the listing is not completed, on or before June 11, 2005, Defendants shall show cause, if any they have, on July 11, 2005 why the listing should not be VACATED as unlawful;

Intervenors' motion for leave to reply to the *Amicus Curiae*

brief is GRANTED. Any such reply brief shall be filed within fifteen (15) days following the date of service of this decision.

SO ORDERED.

DATED: April 12, 2004.

Oliver W. Wanger

UNITED STATES DISTRICT JUDGE