IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---oOo---

| | |
|---|---|
| STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT, SAN JOAQUIN COUNTY, STOCKTON CITY, CALIFORNIA WATER SERVICE COMPANY, | ) |
| Plaintiff, | ) Case No. 04-541 L |
| vs. | ) |
| UNITED STATES OF AMERICA, Defendant. | |

---oOo---

DEPOSITION OF AVRY DOTAN

Tuesday, September 12, 2006

Taken at the location of:

HERUM, CRABTREE, BROWN, DYER, ZOLEZZI & TERPSTRA

2291 W. March Lane, Ste. B-100

Stockton, California

---oOo---

Reported by Antonia Severson, CSR #3430

APPEARANCES

For the Plaintiffs:

HERUM, CRABTREE, BROWN, DYER, ZOLEZZI & TERPSTRA
2291 W. March Lane, Ste. B-100
Stockton, CA 95207
(209) 472-7700
By: JENNIFER SPALETTA, Attorney at Law

For the Defendant:

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
501 I Street, Room 9-700
Sacramento, CA 95814
(916) 930-2207
By: WILLIAM SHAPIRO, Attorney at Law
JAMES E. TURNER, Assistant Regional Solicitor

Other Persons Present:

AVRY DOTAN, Deponent
Peggy Manza
Antonia Severson, Court Reporter

2

---oOo---

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 228 | 6-page Notice of Deposition | 4 |
| 229 | 36-page Expert Report of Avry Dotan | 43 |
| 230 | 37-page document re Goodwin Tunnel Capacity dated 7/14/06 | 43 |
| 231 | 65-page Staff Report dated 8/92 Office of Hydropower Licensing | 43 |
| 232 | 58-page document re e-mails from Avry Dotan to Jennifer Spaletta | 43 |
| 233 | 39-page document re e-mails | 43 |
| 234 | 37-page document with fax cover sheet dated 7/10/06 | 43 |
| 235 | 26-page document with fax cover sheet dated 7/17/06, consisting of Defendant's Amended Responses to Plaintiffs' First Set of Interrogatories | 43 |
| 236 | 34-page document consisting of Fax cover sheet dated 7/17/06, consisting of draft report | 43 |
| 237 | 16-page Memo dated 1/11/06 to Michelle Light from Levi Brekke | 43 |
| 238 | CD | 43 |
| 239 | 9-page Stanislaus Instream Study labeled draft | 83 |
| 240 | 37-page Expert Report of Avry Dotan dated 7/26/06 | 129 |
| 241 | 6-page Expert Rebuttal Report By Peggy Manza dated 8/25/06 | 129 |

3

BE IT REMEMBERED, that pursuant to notice, and on Tuesday, September 12, 2006, commencing at the hour of 9:02 a.m., at the location of HERUM, CRABTREE, BROWN, DYER, ZOLEZZI & TERPSTRA, 2291 W. March Lane, Ste. B-100, Stockton, California, before me, ANTONIA SEVERSON, a Shorthand Reporter in and for the State of California, there personally appeared

AVRY DOTAN,

called as a witness herein, having been duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

---oOo---

(Whereupon Exhibit No. 228 was premarked for Identification.)

EXAMINATION

BY MR. SHAPIRO:
Q. Good morning, Mr. Dotan. My name is Bill Shapiro. I'm a lawyer with the Department of Justice, and I'll be taking your deposition.
Can you state your name and spell it for the record, please?
A. My name is Avry Dotan, A-v-r-y, D-o-t-a-n.
Q. Mr. Dotan, you're appearing in accordance with a Notice of Deposition. I'm going to show you Exhibit 228.

4

Do you recognize this document?
A. Yes, I do.
Q. Mr. Dotan, there are requests that you bring certain documents in this notice. Did you bring certain documents in response to those requests?
A. Yes, I have.
Q. And there's a stack of materials here. Are those the materials that you brought in response?
A. I believe this is the materials that I provided to the counsel.
Q. Okay. Mr. Dotan, can you please give me a brief description of your educational background starting with college?
A. I have a bachelor degree in civil engineering from the Technion, which is the Israel Institute of Technology. I have a master degree in civil engineering from University of Minnesota.
Did you ask for my professional experience or --
Q. Well, that's going to be my next question.
A. Oh, I'm sorry.
Q. Do you have any other degrees?
A. No.
Q. Do you have a subspecialty?
A. I have ranks in the Army.

5


Delta Deposition Reporting
(888) 477-8856 (209) 477-0837

Q. Do you have a subspecialty within the field of engineering?
A. I'm specializing in computer modeling for water and power projects.
Q. Okay. And can you describe for me, please, what that means?
A. What it means is that I'm developing computer simulation models for systems for the purpose of analyzing management of water and power, hydroelectric power.
Q. You've been identified as an expert witness in this case by Plaintiffs.
A. Yes, I have.
Q. And what is the expertise upon which you intend to testify?
A. My expertise is related to reservoir operations as far as modeling is concerned, and all the parameters associated with making a computer run.
Q. Is there any other expertise that you intend to testify about?
MS. SPALETTA: I'll object to the extent it asks for information from the witness that was previously disclosed to the United States and we have obviously not prepared this witness for his trial testimony yet.

6

BY MR. SHAPIRO:
Q. Can you answer the question?
A. Could you repeat the question?
Q. Is there any other expertise upon which you intend to testify?
A. I believe I will respond to your questions. I'm not sure I understand the questions.
(Ms. Manza entered the deposition room.)
Q. When I asked you what expertise you have, that you intend to talk about, you stated reservoir operations and computer modeling.
Is there any other expertise upon which you intend to testify about?
MS. SPALETTA: I'll object to the question as ambiguous.
THE WITNESS: Again, I'm not sure, if you asked me specific areas in which I'd be asked, I can tell you if I can respond to it.
BY MR. SHAPIRO:
Q. Have you been asked to testify about anything other than reservoir operations and computer modeling?
A. I've been asked to --
MS. SPALETTA: Again, I wanted to object to the form of the question. The United States has been given an expert disclosure and a report from Mr. Dotan.

7

I think this line of questioning is out of line.
BY MR. SHAPIRO:
Q. You can answer.
A. Well, my understanding is the purpose of this deposition is to ask me questions related to the expert report that I provided.
Q. And is there any other expertise that you intend to -- you've been asked to testify about other than computer modeling and reservoir operations?
A. I've been asked to address any questions related to the work that I've done in producing this period of time report.
Q. Okay. And anything other than what's in your expert report?
A. No, I've not been asked to.
Q. Okay. You stated that you have an expertise in reservoir operations and computer modeling. Can you be any more specific about that?
A. Well, over my professional career I've been developing -- I have developed computer models for water and power projects and got specialized in this area.
Q. When you -- when you say computer modeling, is that -- and reservoir operations, are those two separate things or are those the same thing?

8

A. Computer models are being used for various analyses, and one of them when we're dealing with water and power projects is project operation, simulation of project operation.
Q. Do you claim to be an expert in managing a reservoir?
MS. SPALETTA: Object. The question is ambiguous.
THE WITNESS: What are you -- how do you define expert in managing reservoirs?
BY MR. SHAPIRO:
Q. Do you intend to testify -- have you been asked to testify or provide an expert opinion about how to manage a reservoir?
A. How to manage a reservoir?
Q. Yes.
A. No.
Q. Have you ever been in charge of managing a reservoir?
A. No.
Q. Have you ever worked in a position where part of your responsibility was to manage a reservoir?
A. No.
Q. Do you know what the best way to -- to manage a reservoir?

9


Delta Deposition Reporting
(888) 477-8856 (209) 477-0837

MS. SPALETTA: Object, incomplete hypothetical, ambiguous.
THE WITNESS: No.
BY MR. SHAPIRO:
Q. What about specifically with regard to New Melones, do you intend to -- or have you been asked to provide an expert opinion about the best way to manage New Melones?
A. No, I have not.
Q. And do you have an opinion about the best way to manage New Melones?
A. No, I do not.
Q. What about a reasonable way to operate New Melones?
MS. SPALETTA: Object.
BY MR. SHAPIRO:
Q. Have you been asked to provide expert testimony on what may be a reasonable way to operate New Melones?
MS. SPALETTA: Object, the question asks for a legal conclusion of a witness.
THE WITNESS: Could you define what "reasonable" is, please?
BY MR. SHAPIRO:
Q. Well, do you have a sense of what "reasonable" means?

10

MS. SPALETTA: Same objection.
THE WITNESS: I believe reasonable is something subjective, so could you be more precise as to what you mean by "reasonable" --
BY MR. SHAPIRO:
Q. Well, I would agree it's a subjective word, and I guess that's what my question is.
Have you been asked to provide an opinion about what a reasonable way to operate New Melones Reservoir is?
A. Can you relate it to this particular case?
Q. No, just in general. I mean, I guess, have you been asked for purposes of this case to provide expert testimony on what reasonable operation of New Melones Reservoir is?
A. No, I've not provided any opinion with regard to the reasonable -- how reasonable it is to operate the system.
Q. Okay. What about Reclamation's past operations of New Melones, have you been asked to develop an opinion about whether those past operations were reasonable?
MS. SPALETTA: Same objection, calls for a legal conclusion.
THE WITNESS: No, I've not been asked.

11

BY MR. SHAPIRO:
Q. Can you please describe your professional experience after college?
A. Well, maybe I should start in college and when I was doing my master's degree. My master's thesis was a project that was given to the University of Minnesota to study the hydropower potential of all the existing dams in the state of Minnesota. There are 853 dam sites, if I recall correctly, in Minnesota.
And in order to evaluate the hydropower potential for the State, I had to find the methodology to do an efficient analysis within the time frame that they had.
So with the help of my advisor, I developed a computer model that incorporates all the parameters associated with hydropower generation including economics, and analyzed for the State the hydropower potential of all 853 dam sites.
This model received a lot of recognition, or a lot of exposure, and as a result -- and I've published several papers related to this concept which was new at the time using computer models for analysis of hydro projects on the previsibility level.
And one -- the outcome of this work was that we have developed a software that was commercially

12

available to the public to help developers assess the potential of the economic viability of hydro projects.
And this program was purchased by a number of -- the computer program was purchased by a number of utilities and construction firms, engineering firms including the New York Power Authority, Bechtel.
I believe there was power utility in Canada that purchased the model. There was another company called HJ Groves, I believe.
In any event, there was a lot of exposure, and as a result of this model and one of the engineering firms in San Francisco called me and asked me to join the firm and help them expand the model for other applications within the same area.
Q. Before you talk about that, the computer model that you helped develop, that you were just talking about, was it an application that would help decide where to locate the reservoir or whether to build the reservoir, or how to operate the reservoir?
A. The first version of the model used for the State of Minnesota was to analyze the hydropower potential and the economic viability of existing dam sites.
So it was not related to new development, so we basically -- basically the model looked at an existing

13

BY MR. SHAPIRO:
Q. Did you understand the question?
A. Could you would you clarify it for me?
Q. Have you ever developed a computer model that was not intended to be a planning model but instead is intended to be a decision support system model?
A. I think the best way to answer the question is to say there is a crossover between the two.
I presented a paper in Ft. Collins, Colorado, in a conference named Decision Support System By Water Managers, something like that, or Computer Modeling For Decision Support Systems, I don't remember exactly. I think it's in my references here.
Could I look at that?
Q. Sure.
A. On page 5 of my report, there is a section called "Presentations." The second item on the list mentions an ASE workshop titled "Computerized Decision Support System for Water Managers, Ft. Collins, Colorado, June 1998."
In this workshop, which was an ASE conference, I presented a computer model that I developed that simulated the operation of the Muck Valley Hydroelectric Project.
This is an existing -- at the time when it was

18

developed, the project was in the design phase, eventually it was built, and based on -- and I believe based -- they've used the information that was developed in the model to operate and manage the reservoir.
Q. Okay. Bringing you back to the report that you put together for this case, the planning model, which you've called the NM Model, is that a planning model or is that a decision support system model?
A. This is a computer model. It simulates the operation of the New Melones Reservoir, Tulloch Reservoir and Goodwin Diversion Dam in the context of the historical period, 1983 through 2004 with some boundary conditions.
MS. SPALETTA: Can I ask Avry to clarify the time period again?
THE WITNESS: Well, the model itself starts in 1992 through 2006, June 2006. The results as represented here are for the larger time span as well for the period, which is my understanding is 1993 through 2004.
BY MR. SHAPIRO:
Q. Okay. So is it a planning model?
MS. SPALETTA: Objection, the question is ambiguous.
THE WITNESS: It's not a planning model nor

19

operation -- nor operator's model. It's a simulation model of the system given -- for a given time period in the history of the project.
BY MR. SHAPIRO:
Q. And it's different than a planning model how?
A. A planning model could -- usually involves larger time span, longer time span where you could see -- where you look at the variability of the system over the long-term period.
Q. And your model doesn't do that?
A. No. It models specifically the historical operation -- well, the operation of the system in a specific time period.
Q. What about -- how is it different than a decision support system model?
A. As I said, there is sometimes crossover between the two. Decision support system could be anything like defining release schedule for the very near future. It could be realtime or what we call near realtime operation.
Planning model is larger, longer time span.
Q. Okay. So how is the NM Model that you developed and described in this report, how is that different than a decision support system model?
A. The model is not making decisions as to how to

20

operate, true operate the reservoir in every time step.
Q. It's just looking at past known data; is that correct?
A. It's using, as I said, historical operation of the system as a base case and then it would look at the sensitivity of the system to assume variable, or variables.
Q. Okay. Well, we'll get more into that. You described your time at Tudor Engineering. Was there anything else that you wanted to add about your experience with Tudor Engineering, or do you feel like you've adequately described what your experience there was?
A. Well, during the -- as I mentioned we've expanded the model. Initially it was for existing dam. The model was expanded to include project in the form of run-of-river operation, hydro project run-of-river operation, a project with storage, meaning dam reservoir, and even the pump storage configuration.
So there were various configurations that you can model and analyze with this software. Published several papers about it, presented papers at international conferences, and we've used the model to size and to eventually design a number of projects throughout the U.S.

21

concept and the assumptions relevant to this particular system.
Q. So you're looking at historic inflows, historic outflows, and what that would mean in a change in storage; is that correct?
A. Mass-balance calculations, as I explain here, is -- the first part of my explanation I'm explaining it in a general form. It's not specifically whether it was historical or simulated or hypothetical.
What it tells you, that if you have a certain inflow into a system that has storage component in it and you subtract from that the outflow, you will derive a change in storage in a very general way.
This is not applicable only to historical inflow.
Q. Okay. Am I -- tell me if this statement is correct. The model that you've developed, the NM Model, looks at what would have happened if everything had stayed exactly the same except Reclamation had released 155,000 acre-feet to Plaintiffs in every year from 1993 to 2004?
A. When you say "everything," I think it's too broad.
Q. Can you explain what you mean by that?
A. Because once you reoperate the system, not

94

everything stays the same. Evaporation changes, storage changes, the two --
Q. How does your model take into account a different operation if you had released 155,000 acre-feet to Plaintiffs every year?
A. I'm not sure I understand the question.
Q. Well, I guess I'm not sure if I understand your response.
A. Okay. You said everything stays the same, and I'm trying to qualify.
Q. With one exception, that Reclamation would release 155,000 acre-feet to Plaintiffs every year. They would operate the reservoir in such a way to release 155,000 acre-feet to Plaintiffs in every year?
A. The model assumes historical inflow to the system and historical diversions to other water users, water users other than the plaintiffs, and historical releases downstream of Goodwin Dam.
These are all parameters that stay the same with and without the 155 maximum allocation. All the rest of the numbers that are derived in the analyses are computed as a result of those assumptions.
Q. Okay. So the only change is that 155,000 acre-feet is released to Plaintiffs in every year?
A. That's the only change in the diversion.

95

Q. Okay. Does your model consider how the storage volume in any year would affect the day-to-day operation of the reservoir?
A. No.
Q. Does the model examine anything except the impact to storage volumes?
A. It computes storage volumes and it computes a simulated delivery to the Plaintiffs.
Q. But as far as the impact of operating a reservoir like that?
A. It looks at the impact of the storage.
Q. Storage only.
A. Correct.
Q. Doesn't look at temperature?
A. No.
Q. Does it look at whether the Reclamation would be able to meet its permit requirements in any year?
MS. SPALETTA: I'll object to the extent it asks for a legal conclusion of the witness.
BY MR. SHAPIRO:
Q. I'm not asking you to even tell me what the permit requirements are, I'm just asking you whether the model considers that?
MS. SPALETTA: Same objection. The question is impossible to answer without making a legal conclusion.

96

THE WITNESS: Answer?
MS. SPALETTA: You can try.
THE WITNESS: To the extent that the Bureau met their obligations, I only can say that those obligations and releases, to me those obligations are reflected in the releases that I've simulated because I've used historical.
So if historically they made their changes, I didn't change anything.
Q. Okay. Do you know if they met their permit obligations --
THE WITNESS: I don't remember.
BY MR. SHAPIRO:
Q. Let me finish my question. Do you know if they met their permit obligation every year from '93 to 2004?
A. No, I do not know.
Q. Does your model consider whether -- let me ask it this way.
Does your model assume that meeting the permit requirements would not change at all if you made the releases to Plaintiffs, the 155,000 to Plaintiffs?
MS. SPALETTA: Objection. The question is ambiguous.
THE WITNESS: I've not been asked to look at permits and agreements in the basin and the relationship

97



Delta Deposition Reporting
(888) 477-8856 (209) 477-0837

flood control requirement conceptually, when the inflow is greater than the required outflow, it will be spilled, and those spills are then introduced downstream.

Q. Okay. I'm still not seeing what you're -- on page 12 here, when you say that the actual release could be in excess of the defined release because of flood control re- -- or flood control requirements, are you able to explain it in any other way that I might be able to get that? Let's start with this.

A. Let me give you an example. Let's assume the New Melones is full and you have downstream requirements of 100 acre-feet as I said before.

The model, and in real life, this is the only amount of water that you essentially would like to release or you're trying to release because there is no need for more than that.

If the reservoir is full and the inflow is greater than this required or this defined release, then you are building up storage in the reservoir.

Well, if the reservoir is full, the reservoir cannot handle the additional water so this excess water is being released to minimize -- to eliminate what we call a spill.

The difference between full reservoir and what

102

you see here is that flood control requirement just provided you with levels that vary by a function of the time of the year, I mean by month or by period.

Q. So is what you're saying is rather than calling it flood control releases, you're instead turning some of that into releases for Plaintiffs to satisfy the 155,000 acre-feet?

A. Oh, no. I'm saying this is all flood control releases from New Melones Reservoir.

Q. Is the flood control release under the -- okay. We've got two scenarios. The one scenario is the actual historical releases during this time period. The other scenario is the releases that -- under your NM Model.

Is the flood control releases for both of those situations the same or are they different?

A. They're different.

Q. Okay. And how are they different?

A. Because in one we are simulating additional take-out of water from the system to supply the Plaintiffs in full.

So when you run a simulation with the additional demand, you will see that there is additional withdrawal from storage and additional -- and this change in storage would be in the -- it's not replicating the exact operation, historical operation of

103

the system.

Q. Okay. So you'd have to -- I guess if you gave more to Plaintiffs, that would lower the reservoir, then when the new inflow came in the next year, that would mean that maybe you would have less flood control releases that year?

A. Taking more water from the system changes the system state in terms of storage, and as a result of that -- it would affect future flood control releases, that is correct.

Q. I see. Okay. All right. Let's turn to Section 5.2 under your "Assumptions." You discuss the time period. I understand you to be saying that it's January 1993 to December 2004.

Is that just -- are you using those years because that's what you were told to use?

A. This is my understanding to be the dispute period and that's what I've been asked to look at.

Q. You then get into a discussion of the true natural flow. How do you determine the true natural flow for purposes of this report?

A. The true natural flow was obtained from CDEC, California Data Exchange Center.

Q. Okay. And on Figure 2 there is a chart showing what the true natural flow is over a certain time

104

period?

A. What page are we on?

Q. 14.

A. Oh, 14. Sorry. Yes.

Q. What is the lowest and highest true natural flow during this time period?

A. The information is shown on the left-hand side in tabular form, and it shows a TNF in 1977 of 188,000, that was the maximum, and 2,983,000 in 1983.

Q. Are you familiar with the historic true natural flows for any other reservoirs, for any other rivers?

A. I've done many --

MS. SPALETTA: Excuse me, I didn't understand your question. Any what?

BY MR. SHAPIRO:

Q. Are you familiar with the historic true natural flows for any other rivers besides the Stanislaus?

A. I'm sure I've looked at those -- I mean similar numbers that represent similar concepts on other basins.

Q. The variance that historically has been seen on the Stanislaus River, is that -- how does that compare to the other reservoirs true natural -- or the other streams true natural flows that you're familiar with?

A. I think I'll have to go and investigate that because it was not done as part of this job, and I

105





Delta Deposition Reporting
(888) 477-8856 (209) 477-0837

occurred in the year when the reservoir was full and spilling.
That's the only thing I'm saying.
Q. Is it your opinion that Reclamation -- it's wrong for Reclamation to operate each year based on the experience in 1992?
MS. SPALETTA: Objection. The question is vague and an incomplete hypothetical.
THE WITNESS: I don't think they do. If you look at how much water was delivered in 1992 to various entities, and you compare it to 1993, '94, '95, to any other year, you will see there are differences. So --
BY MR. SHAPIRO:
Q. You don't think the experience in 1992 and the water level that storage reached in 1992, had an influence on the way Reclamation operates New Melones?
A. When the reservoir was full and spilling?
Q. In 1992.
MS. SPALETTA: Your question represents an incomplete hypothetical, and it's vague and ambiguous.
THE WITNESS: I'm not sure I understand the question.
BY MR. SHAPIRO:
Q. Just so I understand what your point is, are you saying that you don't know whether Reclamation looks

142

to the experience in 1992 in determining how to operate New Melones Reservoir?
Or do you know whether they do or whether they don't?
A. Well, first of all, I don't know the policies of how they manage the reservoir. What I'm saying here is conceptually that the situation in 1992 is not similar to other years and operating every year in the same manner that they operated in 1992 is simply incorrect, incorrect historically.
Q. What's that based on?
A. Because I don't think that -- based on my general knowledge, I don't think the Bureau of Reclamation is releasing exactly the same water every year as they have released in 1992. But I think it's a reasonable statement.
Q. Well, certainly even though they may not be releasing the exact number of acre-feet for each of the purposes, you would agree, wouldn't you, that Reclamation has to -- or do you know whether Reclamation looks at the experience in 1992 when the storage levels that New Melones reached in that year in deciding how to operate New Melones?
MS. SPALETTA: Same objection. It's an incomplete hypothetical, lacks foundation.

143

MR. SHAPIRO: It's not even a hypothetical. It's a question as to whether you know that's something that New Melones operators considered.
THE WITNESS: I have no knowledge as to how the operation in 1992 has been implemented or the knowledge gained in that year has been implemented in the overall strategy of how the Bureau of Reclamation is operating on a year-by-year basis.
BY MR. SHAPIRO:
Q. In fact, you don't have any idea how New Melones makes decisions on how to operate -- or how Reclamation makes operating decisions with respect to New Melones, do you?
A. If I don't know how what?
Q. You don't know how Reclamation makes operating decisions with respect to New Melones?
A. Specifically all the steps they're undertaking before they make a release? No, I do not know.
Q. On paragraph No. 2, you say that you think that's not significant. Do you disagree with the statement in paragraph 2?
A. I'd like to explain that issue even though it's insignificant as a result.
Q. If you can answer my question, do you believe that's an incorrect statement some?

144

A. This is not -- I have no opinion about it because I have no -- I haven't seen any specific literature that talks about the 8,000 cfs.
The reason I've selected the 5,000 cfs capacity constraint was that -- and this is what we've been doing with the HEC-5Q for the past six years when we're studying what-if scenarios on the system is based on examining just the historical operation, and since we did not encounter releases higher than 5,000 cfs, we have assumed that this is one of the parameters that the Bureau of Reclamation is considering when they make flood control releases.
Q. With regard to paragraph 3, I'm going to stipulate that because you've talked about that, paragraph 4 you've written, I believe,
"Only the capability to direct this amount"?
A. Divert.
Q. "Divert this amount." So I guess you would agree that you did not take into consideration whether the contractors were able to physically take delivery of the full 155,000 acre-feet in any given year?
A. Yeah. I think I've already answered that question before, and repeated that I've looked only at the capability to convey the water to the service area

145