# In the United States Court of Federal Claims

No. 04-541L
(Filed February 20, 2007)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | |
| **STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER DISTRICT, COUNTY OF SAN JOAQUIN, CITY OF STOCKTON, and CALIFORNIA WATER SERVICE COMPANY,** | Contracts; breach of contract; summary judgment; takings; Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, 106 Stat. 4600 (1992); RCFC 52(c) judgment on partial findings; third-party beneficiary status; sovereign acts doctrine and unmistakability doctrine; contract interpretation – plain meaning and ambiguity; substantial performance of contract; adverse inferences drawn from non-testifying witnesses; viability of takings claim after full prosecution of contract claims. |
| Plaintiffs, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |
| * * * * * * * * * * * * * * * * * * * | |

Roger J. Marzulla, Marzulla & Marzulla, Washington, DC, for plaintiffs; Reid W. Roberts, Stockton, CA, for plaintiff Central San Joaquin Water District; Jeanne M. Zolezzi and Jennifer L. Spaletta, Herum Crabtree Brown, Stockton, CA, for plaintiff Stockton East Water District.

William J. Shapiro, Sacramento, CA, Kristine S. Tardiff, Washington, DC, and Luther Hajek, Washington, DC, United States Department of Justice, with whom was Assistant Attorney General Matthew J. McKeown, for defendant. Shelly Randel, Attorney/Advisor, Office of the Solicitor, Branch of Water and Power, Department of the Interior.

John D. Echeverria, Georgetown Environmental Law & Policy Institute, Washington, DC, and Hamilton Candee, for amicus curiae Natural Resources Defense Council, San Francisco, CA. Clifford T. Lee and Tara L. Mueller, for amicus curiae California State Water Resources Control Board.

## OPINION

**MILLER**, Judge.

## PROCEDURAL HISTORY

This case, before the court after trial, originally was filed in the United States District Court for the Eastern District of California in 1983 and was transferred to the United States Court of Federal Claims on April 1, 2004, as a takings claim. 1/ On April 20, 2004, plaintiffs

---

1/ Although the court has considered the testimony of every witness, discussion of each is not necessary in order to render a comprehensive decision. Plaintiffs presented one expert witness, Avry Dotan, an independent consultant, who holds a Master's Degree in Civil Engineering from the University of Minnesota. Mr. Dotan was plaintiffs' expert regarding hydrology of the Stanislaus River and modeling for the New Melones Reservoir. The following fact witnesses testified for plaintiffs: (1) David G. Houston, an investment banker with Citigroup, who was employed by the United States Department of the Interior ("Interior") as Special Assistant to Commissioner Brohbent from 1981 to 1982, United States Deputy Assistant Secretary for Land and Water from 1982 to 1983, and Regional Director of the Bureau of Reclamation from 1983 to 1989; (2) Reid W. Roberts, counsel for plaintiff Central San Joaquin Water Conservation District from 1980 to the present; (3) Grant O. Thompson, a farmer in the Central San Joaquin Irrigation District and Chairman of the Board of Directors for the Central San Joaquin Water District; (4) Edward M. Steffani, a civil engineer, who was employed as General Manager of Stockton East Water District from 1983 to 1999; (5) Kevin M. Kauffman, a civil engineer, who was General Manager of Stockton East Water District from July 1999 to the present; (6) Dr. C. Mel Lytle, who holds a Ph.D. in botany with special emphasis in plant ecophysiology, employed as Water Resource Coordinator for San Joaquin County from February 2002 to the present; (7) Michael E. Camy, who was employed by California Water Service Company from 1964 to 2001, where he served as District Manager of the Stockton system from 1997 to 2001; (8) Mark J. Madison, a civil engineer, who was employed by the City of Stockton from 1990 to the present, serving as Director of Municipal Utilities from December 2002 to the present; (9) Lowell F. Ploss, a career employee of the Bureau of Reclamation from 1969 to 2002, eventually overseeing, as Operations Manager of the Central Valley Operations Office, Mid-Pacific Region, operations of the Central Valley Project from 1993 to 2000; and (10) Jeanne M. Zolezzi, who has been General Counsel for Stockton East Water District from 1990 to the present.

Defendant presented the following fact witnesses: (1) Kirk C. Rodgers, who was

amended the complaint to include a breach of contract claim. 2/ Defendant filed a motion to dismiss on June 21, 2004, which was denied on September 3, 2004. This procedural history, including the rulings of the district court and an explanation for the protracted period between filing of the action in federal district court and its eventual transfer to the Court of Federal Claims, is discussed in much greater detail in Stockton E. Water Dist. v. United States, 62 Fed. Cl. 379, 383-88 (2004). Following denial of defendant's motion to dismiss, the court ruled on cross-motions for summary judgment regarding the breach of contract claim. The court granted in part defendant's summary judgment motion, denied plaintiffs' partial summary judgment motion, and identified the issues for trial. See Stockton E. Water Dist. v. United States, 70 Fed. Cl. 515 (2006) (the "Summary Judgment Opinion").

The Summary Judgment Opinion provided parties with a description of issues that required development at trial. They included: (1) the third-party beneficiary status of California Water, the City of Stockton, and the County of San Joaquin to the Stockton East-Reclamation contract; (2) the facts regarding the possibility or impossibility of performance despite or because of the Reclamation Projects Authorization and Adjustment Act of 1992,

---

1/ (Cont'd from page 1.)

employed by the Bureau of Reclamation from 1973 to the present and has served as Regional Director of the Mid-Pacific Region from 2002 to the present; (2) John A. Renning, a civil engineer, who was employed by the Bureau of Reclamation in Sacramento from 1975 to 2005, which included employment as a member of the Central Valley Operations Office from 1993 to 2001, and as regional water-rights officer for the Mid-Pacific Region from 2001 to 2005; (3) Roger K. Patterson, a civil engineer, currently an Assistant General Manager for the Metropolitan Water District in Los Angeles, who was employed by the Bureau of Reclamation from 1974 to 1999, serving as Regional Director for the Mid-Pacific Region from 1993 to 1999; and (4) Roger O. Guinee, who was employed by the United States Fish & Wildlife Service from 1977 to 1991 and by the California Department of Fish and Game, in its Region 2 office in Rancho Cordova from December 1991 to December 1992, and who has been the Supervisory Fish and Wildlife Biologist for the United States Fish & Wildlife Service's Sacramento office from January 1993 to the present.

2/ The takings claims were stayed pending resolution of the contract claims and were not at issue at trial. See Pls.' Br. filed Sept. 25, 2006, at 2 n.1 ("The parties understand that Plaintiffs' takings claim is not a part of the upcoming October 23, 2006 trial, and that this Court has reserved consideration of the taking claim until after it rules on the breach of contract claim in this trial."); Def.'s Br. filed Oct. 10, 2006, at 2 n.1 ("The takings claims are stayed pending resolution of the contract claims and are not at issue in the trial scheduled to begin on October 23, 2006.").

Pub. L. No. 102-575, 106 Stat. 4600 (1992) (the "Central Valley Project Improvement Act" or "CVPIA"), which authorized the Central Valley Project (the "CVP"), contemplating a means to meet the water needs of the Central Valley Basin; (3) the impact of impossibility of performance on the applicability of the sovereign acts doctrine; (4) proof of a reasonable explanation, consistent with plaintiffs' obligations under the contracts, for their failure to submit schedules or their submission of schedules for lesser-than-desired quantities of water; (5) the intent of the parties in applying Article 9 of Stockton East Water District's and Central San Joaquin Water District's contracts with Reclamation (collectively, the "1983 Contracts"); (6) the "opinions and determinations" required to be issued by the contracting officer, as well as the decisions he actually issued under Article 12 of the 1983 Contracts and an evaluation of whether his determinations were arbitrary, capricious, or unreasonable under the circumstances; (7) the applicability of the New Melones Interim Plan of Operation as a mutual agreement under Article 3(h) of the 1983 Contracts; and (8) limitation of plaintiffs' water rights by background principles of state law. See Summ. J. Op.

## BACKGROUND

The parties identified sixteen lawsuits and regulatory proceedings pursuant to this court's order for limited post-trial briefing, which stated: "By November 21, 2006, the parties shall submit a Joint Chart listing all lawsuits, state and federal, and regulatory proceedings, state and federal, identifying each by name, date filed, status, issues decided, issues not reached, issues stayed, and subsequent history." Order entered Nov. 9, 2006, ¶ 1. A chronology of each of these proceedings discussing its potential impact upon the instant case follows.

### I. State and federal lawsuits

#### 1. Barcellos and Wolfsen, Inc. v. United States, No. 79-106 (E.D. Cal. filed Apr. 26, 1979)

Plaintiffs, landowners within "Area 1" of Westlands Water District, first brought an action to determine the validity of the 1963 CVP contract between Westlands Water District and the United States. The district court held that the United States was required to perform the 1963 CVP contract in 1986. In 1993 plaintiffs filed a claim to enforce the judgment, arguing that a non-alterable right to 900,000 acre-feet of water from the 1963 CVP contract could not be reduced by the United States under the Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884 (codified as amended in scattered sections of 7 and 16 U.S.C.) (the "ESA") or the CVPIA. The district court held that plaintiffs do not have an absolute contract right to the 900,000 acre-feet of water under the 1963 CVP contract and Article 11

of the 1963 CVP contract 3/ permitted the United States to reduce water deliveries to Area 1 landowners under the ESA or the CVPIA. Barcellos and Wolfsen, Inc. v. United States, 849 F. Supp. 717, 730 (E.D. Cal. 1993). The court also held that plaintiffs could not seek APA review of the agency's actions regarding the 1993 water allocation and that such a claim would have to be pursued in a separate suit. Id. at 733-34.

The United States Court of Appeals for the Ninth Circuit affirmed. O'Neill v. United States, 50 F.3d 677 (9th Cir. 1995), aff'g Barcellos and Wolfsen, Inc. v. United States, 849 F. Supp. 717 (E.D. Cal. 1993), cert denied, 516 U.S. 1028 (1995). The Ninth Circuit held the language of Article 11 of the 1963 contract "is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes,'" and that "[t]he 1963 water service contract explicitly and unambiguously limits the liability of the government for water shortages, without exception." Id. at 684, 686. The court concluded that "the contract is not immune from subsequently enacted statutes," because it did not surrender in "unmistakable terms" Congress' sovereign immunity, and, thus, "nothing in the contract precludes [a shift in reclamation law regarding the priority of water uses by the CVPIA]." Id. at 686.

2. Westlands Water District v. United States, No. 93-5327 (E.D. Cal. filed May 17, 1993).

Plaintiffs, including Westlands Water District, San Benito County Water District, San Luis Water District, and Panoche Water District, filed suit claiming a violation of due process and a taking under the Fifth Amendment due to implementation of the CVPIA and the ESA; a violation of the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (codified as amended in scattered sections of 42 U.S.C.) (the "NEPA"), due to implementation of CVPIA § 3406(b)(2); and an APA claim regarding the issuance of a biological opinion. An injunction was issued regarding the NEPA violation, which was

---

3/ Article 11 of the 1963 CVP contract contains language similar to the liability limitation language of Article 9(a) of the 1983 Contracts: "[B]ut in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising from a shortage on account of errors in operation, drought, or any other causes." O'Neill v. United States, 50 F.3d 677, 684 n.2 (9th Cir. 1995), aff'g Barcellos and Wolfsen, Inc. v. United States, 849 F. Supp. 717 (E.D. Cal. 1993). Article 9(a) of the 1983 Contracts states: "Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall accrue against the United States." Stockton East Contract art. 9(a); see also Central Contract art. 9(a).

vacated by Westlands Water District v. National Resources Defense Council, 43 F.3d 457 (9th Cir. 1994). The federal district court denied the claims of intervening Area I landowners within the Westlands Water District on jurisdictional grounds, holding that they were not intended third-party beneficiaries of the CVP contract signed in 1963. The court also held that the reclamation statutes did not constitute contracts; that claims regarding appropriative water rights, trust, and surcharges were without merit; and that no waiver of sovereign immunity existed that permitted them to file suit against the United States. The remaining claims of plaintiffs were not reached, having been dismissed voluntarily by plaintiffs.

Subsequently, the Ninth Circuit affirmed the determination that the Area I landowners were not intended third-party beneficiaries to the 1963 CVP contract and the finding that no waiver of sovereign immunity was present, rulings which were affirmed by the Supreme Court of the United States. See Orff v. United States, 358 F.3d 1137 (9th Cir. 2004), aff'd 545 U.S. 596 (2005).

3. Stockton East Water District v. United States, No. 93-5896 (E.D. Cal. filed Oct. 1, 1993).

Plaintiffs Stockton East, Central, City of Stockton, San Joaquin County, and California Water Service Company filed a complaint (1) requesting "[i]njunctive relief for violation of Fifth Amendment vested property rights and breach of contract;" (2) alleging "a NEPA violation [regarding] CVPIA implementation;" (3) arguing that "CVPIA § 3411(a) requires modification of [state water rights permits];" (4) alleging a violation of the APA by "arbitrary and capricious abuse of discretion by the United States in implementing the CVPIA;" and (5) pressing a taking in violation "of vested property rights under the [Fifth] Amendment and breach of contract." Joint Chart of Lawsuits and Regulatory Proceedings, filed Nov. 21, 2006, at 10. Plaintiffs filed an amended complaint that alleged (1) a violation of the Fifth Amendment Due Process Clause for allocation of 800,000 acre-feet of water under CVPIA § 3406(b)(2) and the formation of the 1994 Principles for Agreement; (2) a violation of APA by prescribing allocation of 800,000 acre-feet of water under CVPIA § 3406(b)(2); (3) a violation of state law, the CVPIA, and the APA for failing to obtain California state water permit modifications; (4) a violation of the APA and federal Reclamation law for using the New Melones Reservoir water outside the watershed in violation of California Water Code § 11460; (5) a violation of APA and federal Reclamation law based on non-beneficial use of water in violation of California Constitution Article X, § 2; and (6) a violation of the APA and federal Reclamation law for using New Melones water contrary to its State water permits.

The trial court granted defendant's motion to dismiss regarding plaintiffs' takings claim, with leave to amend and without prejudice to bring that claim in the United States

Court of Federal Claims. 4/ Westlands Water Dist. v. United States, 850 F. Supp. 1388 (E.D. Cal. 1994). Trial was required regarding the remaining federal law issues, Stockton E. Water Dist. v. United States, No. 93-5896 (E.D. Cal. Nov. 4, 1996, Dec. 4, 1996) (orders granting in part and denying in part cross-motions for summary judgment), and the court denied defendant's motion for summary judgment on interpretation of California Water Code § 11460 and claims four through seven of plaintiffs' amended complaint, Stockton E. Water Dist. v. United States, No. 93-5896 (E.D. Cal. Nov. 4, 1996, May 8, 1997) (orders denying summary judgment). The court declined to reach claims regarding violation of the APA through implementation of the CVPIA and transferred plaintiffs' breach of contract and takings claims to the Court of Federal Claims. Stockton E. Water Dist. v. United States, No. 93-5896 (E.D. Cal. Jan. 30, 2004) (order transferring fifth cause of action from October 1, 1993 complaint to Court of Federal Claims). The parties have agreed to stay further proceedings before the district court pending the outcome of several California State Water Resources Control Board ("State Water Control Board" or "Water Control Board") cases through March 2007. See Stockton E. Water Dist. v. United States, No. 93-5896 (E.D. Cal. Sept. 14, 2006) (order extending stay through March 21, 2007).

4. San Luis & Delta-Mendota Water Authority v. United States, No. 97-6140 (E.D. Cal. filed Nov. 21, 1997)

Plaintiffs and intervenors brought APA claims challenging the implementation of the CVPIA, which the district court bifurcated into two groups of issues, those dealing with yield calculations and accounting issues and those raising other issues. The trial court held that (1) the yield calculation was lawful; (2) the United States Department of the Interior ("Interior") was required to provide an accounting of (b)(2) yield annually; and (3) use of "offset/reset" accounting for (b)(2) water was arbitrary and capricious. San Luis & Delta-Mendota Water Auth. v. United States, No. 97-6140, slip op. at 43 (E.D. Cal. Oct. 19, 2001); San Luis & Delta-Mendota Water Auth. v. United States, No. 97-6140, slip op. at 13-14 (E.D. Cal. Feb. 5, 2002). The Ninth Circuit affirmed the district court's findings regarding "offset/reset" and the yield calculation, but reversed, in part, concluding that the district court "erred in concluding that Interior lacks discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield." Bay Institute of San Francisco v. United States, 87 F. App'x. 637, 639 (9th Cir. 2004).

---

4/ Stockton East Water District v. United States, No. 93-5896, was consolidated, in part, with Westlands Water District v. United States, No. 93-5327. See Stockton E. Water Dist. v. United States, No. 93-5896 (E.D. Cal. Mar. 28, 1994) (order consolidating cases for motions to dismiss).

5. Firebaugh Canal Co. v. United States, No. 88-634 (E.D. Cal. filed Dec. 9, 1988), and Sumner Peck Ranch, Inc. v. United States, No. 91-048 (E.D. Cal. filed Jan. 31, 1991)

Landowners sued in consolidated actions to enforce a drainage requirement and for damages based on federal legislation authorizing the San Luis Unit of the CVP. The district court held that (1) the San Luis Act required construction of drain by Interior; (2) the duty to construct drain was not repealed by appropriations riders; (3) Interior violated the San Luis Act by deciding not to provide drainage; and (4) the agency was required to file an application for discharge permit and take other actions. See Firebaugh Canal Co. v. United States, 203 F.3d 568, 572-73 (9th Cir. 2000) (discussing district court's unpublished decisions). The Ninth Circuit affirmed in part and reversed in part in Firebaugh Canal Co., 203 F.3d 568, holding that the district court improperly mandated certain actions when the statute left the decision on how to comply within the discretion of the Secretary of Interior. Id. at 574, 578.

6. Natural Resources Defense Council v. Rodgers, No. 88-1658 (E.D. Cal. filed Dec. 21, 1988)

Environmental groups brought an action seeking to enjoin Reclamation from renewing water supply contracts, alleging violations of the NEPA and the ESA, as well as challenging operations of Friant Dam as being in violation of California Fish & Game Code § 5937. The district court held that Reclamation violated the ESA by renewing water contracts and dismissed the state law claim as unripe. See Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998) (discussing district court's orders on appeal). The Ninth Circuit reversed, in part, ruling that the state law claim was ripe and upholding the violation of the ESA. Id. at 1131. On remand the district court held that California Fish & Game Code § 5937 (2006), applied to the operation of Friant Dam and that Reclamation had violated section 5937 by failing to release sufficient water for fisheries purposes. Natural Res. Def. Council v. Patterson, 333 F. Supp. 2d 906, 917, 924-25 (E.D. Cal. 2004). The trial court also held that biological opinions relating to the renewal of contracts were inadequate and in violation of the ESA. Natural Res. Def. Council v. Rodgers, 381 F. Supp. 2d 1212, 1229, 1232 (E.D. Cal. 2005). Subsequently, the parties reached a settlement, approved by the district court on October 23, 2006, to restore water flows for fisheries to the San Joaquin River below Friant Dam along with implementation of other restoration projects under the retained jurisdiction of the district court.

7. Central Delta Water Agency v. United States, No. 99-5650 (E.D. Cal. filed May 7, 1999)

Plaintiffs sought injunctive relief under the APA to prevent the release of water from the New Melones Reservoir under CVPIA § 3406(b)(2) until Reclamation had reserved water for release to meet the Vernalis salinity standards. Stockton East intervened as a plaintiff, claiming that Reclamation violated the APA by failing to comply with the terms of the 1987 Department of Fish and Game Agreement. The district court granted defendant's motion for summary judgment regarding the salinity standards claim, holding that plaintiffs had not presented evidence that Reclamation was in imminent danger of failing to meet the Vernalis salinity standard. Cent. Delta Water Agency v. United States, 327 F. Supp. 2d 1180, 1218 (E.D. Cal. 2004). The court dismissed Stockton East's claim without prejudice due to plaintiffs' failure to exhaust administrative remedies and the state's immunity to suit as an indispensable party. See Cent. Delta Water Agency v. United States, No. 99-5650 (E.D. Cal. Dec. 3, 2001) (amending order originally issued December 3, 2001, dismissing claim without prejudice).

On appeal the Ninth Circuit affirmed, "find[ing] dispositive the absence of a genuine issue of material fact as to whether the Bureau will comply with the Vernalis Salinity Standard in the foreseeable future." Cent. Delta Water Agency v. Bureau of Reclamation, 452 F.3d 1021, 1023 (9th Cir. 2006). The court stated that "the Bureau lacks the discretion to violate the Vernalis Salinity Standard. However, the Act leaves to the agency's discretion the decision of *how* to comply with those standards." Id. at 1026.

8. Association of California Water Agencies v. United States, No. 00-6148 (E.D. Cal. filed Aug. 3, 2000)

Plaintiffs challenged the critical habitat designation of steelhead trout as unlawful under the ESA and the APA due to a failure to conduct an economic analysis. This case was rendered moot by another proceeding and the Government withdrew the critical habitat designation.

9. Modesto Irrigation District v. Evans, No. 02-6553 (E.D. Cal. filed Dec. 11, 2002)

Plaintiffs filed claim protesting listing of Central Valley Steelhead Trout as endangered in 1998 by the National Marine Fisheries Service (the "NMFS," now known as NOAA Fisheries) as unlawful under the ESA and the APA. The court held that the listing was unlawful and the listing was vacated. Modesto Irrigation Dist. v. Evans, No. 02-6553, 2006 WL 1376964 (E.D. Cal. 2006).

10. Modesto Irrigation District v. Gutierrez, No. 06-0453 (E.D. Cal. filed Apr. 14, 2006)

Plaintiffs filed a challenge of the NMFS listing of the Central Valley Steelhead Trout as an endangered species under the ESA as unlawful under the ESA and the APA. This case is still pending, with briefing on summary judgment scheduled for 2007.

11. United States v. California, 694 F.2d 1171 (9th Cir. 1982)

The United States commenced a declaratory judgment action regarding its ability to impound unappropriated water without the need to comply with state law. The claim "involved cross-claims by the State of California and the United States over whether and to what extent the State of California could condition the water rights of the United States for New Melones [R]eservoir as set forth in [] Decision 1422." Joint Chart of Lawsuits and Regulatory Proceedings at 17. The United States District Court for the Eastern District of California entered judgment in favor of the United States. United States v. California, 403 F. Supp. 874 (E.D. Cal. 1975). The Ninth Circuit affirmed with modifications, United States v. California, 558 F.2d 1347 (9th Cir. 1977), and the United States Supreme Court reversed and remanded, United States v. California, 438 U.S. 645 (1978).

On remand the district court found that the prohibition of appropriation of water for hydropower purposes in Decision 1422 was void as contrary to congressional intent. United States v. California, 509 F. Supp. 867, 887-88 (E.D. Cal. 1981). The Ninth Circuit affirmed in part and reversed in part, holding that none of the conditions imposed by Decision 1422 was shown to be invalid and remanded to the district court. United States v. California, 694 F.2d 1171 (9th Cir. 1982).

12. State Water Resources Control Board Cases, Judicial Council Coordinated Proceeding No. 4118

Plaintiffs, including Stockton East and Central, filed an action seeking a writ of mandate against the State Water Resources Control Board. Plaintiffs challenged implementation of conditions on New Melones water right permits granted in Decision 1641 as unlawful or lacking record support. See State Water Res. Control Bd. Cases, 136 Cal. App. 4th 674, 753 (2006) (discussing County of San Joaquin v. State Water Res. Control Bd., No. 311499 (San. Fran. Cty. Super. Ct. filed Apr. 4, 2000)). The suit, which was coordinated

with fourteen other lawsuits 5/, alleged (1) that California Water Code § 11460 6/ was violated by amending Reclamation's permits to impose salinity and flow objectives at Vernalis and Delta outflow objectives because the need was created by exports; (2) that Reclamation's use of water from the New Melones Reservoir to meet the Vernalis salinity objectives was unreasonable under California Constitution Article X, § 2; 7/ and (3) that the decision of the State Water Control Board to require releases from the New Melones Reservoir for salinity and flow objectives at Vernalis was unsupported by substantial evidence.

The Superior Court of California for the County of San Francisco denied all of the plaintiffs' claims; this ruling was upheld on appeal. State Water Res. Control Bd. Cases, 136 Cal. App. 4th 674. The California Court of Appeal for the Third Appellate District found no violation of California Water Code § 11460:

> [I]f the terms of a permit issued by the Board give the Bureau a range of choices in operating the CVP–only one of which might violate section 11460–there is no basis for challenging *the Board's decision* based on section 11460. As long as the Bureau has the right under its permit to operate the CVP consistently with section 11460, any violation of the statute would result solely

---

5/ The allegations contained in the other parties' coordinated claims are not discussed in any detail as they are not relevant to the issues before the court.

6/ California Water Code § 11460 (2006), provides:

> In the construction and operation by the department of any project under the provisions of this part a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the department directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein.

7/ California Constitution Article X, § 2 provides, in relevant part:

> The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

from the Bureau's actions, rather than from the Board's decision.

Id. at 756. Additionally, the appeals court held that no violation of the reasonable and beneficial use doctrine from California Constitution Article X, § 2 occurred and the decision to impose salinity and flow standards at Vernalis on the New Melones Reservoir was not an abuse of discretion. Id. at 762.

II. State and federal regulatory proceedings

1. Southern Delta salinity objectives in 1995 Water Quality Control Plan

In response to State Water Resources Control Board Cases, 136 Cal. App. 4th 674 (2006), the State Water Control Board began proceedings to study implementation and possible amendment of the southern delta salinity objectives mandated by the 1995 Water Quality Control Plan. A public workshop was scheduled to commence on January 16, 2007.

2. Hearings regarding amendment of 1995 Water Quality Control Plan

On November 13, 2006, the State Water Control Board held hearings regarding adoption of the amended Water Quality Control Plan for the Bay Delta. No decision has been reached regarding this petition.

3. Order Adopting Cease and Desist Order and Granting Petitions for Reconsideration, Cal. State Water Res. Control Bd., WR 2006-0006 (Feb. 15, 2006) ("WR 2006-0006")

The State Water Control Board issued a draft Cease and Desist Order (the "CDO") on May 3, 2005, pursuant to California Water Code § 1834(a), in response to a threat of a failure to implement a salinity goal requiring an electrical conductivity of 0.7 millimhos per centimeter at the Vernalis compliance station. The State Water Control Board adopted the CDO on February 15, 2006, in WR 2006-0006, imposing a schedule of corrective actions upon Reclamation and the California Department of Water Resources ("DWR"). WR 2006-0006 at 28-33. Both Reclamation and DWR have filed writ of mandate actions in state and federal court to set aside WR 2006-0006, which are unresolved.

4. State Water Resources Control Board Water Rights Applications

Stockton East currently has eleven applications filed with the State Water Control Board regarding appropriation of water and assignment of state applications for water appropriation from the Calaveras River, Littlejohns Creek System, and Stanislaus River. No

decision on any of these applications has been rendered.

## FACTS

### I. Background

Plaintiffs are Stockton East Water District ("Stockton East"), Central San Joaquin Water Conservation District ("Central"), City of Stockton, County of San Joaquin, and California Water Service Company ("California Water"). These entities are involved with the provision or use of municipal, industrial, and agricultural water, as well as the operation and maintenance of water facilities within California's San Joaquin Valley. This case involves a dispute over the 1983 Contracts involving Stockton East, Central, and the United States Bureau of Reclamation ("Reclamation") for the appropriation of water from California's New Melones Dam. See Contract Between the United States and Stockton East Water District Providing for Project Water Service (the "Stockton East Contract"); Contract Between the United States and Central San Joaquin Water Conservation District Providing for Project Water Service (the "Central Contract"). Plaintiffs protest that Reclamation reduced water allocations between 1993 and 2004 below required amounts in violation of the terms of the 1983 Contracts. 8/ Plaintiffs assert that (1) Reclamation breached the 1983 Contracts by reducing water allocations below contract requirements and no portion of the contracts excuses these reductions; and (2) Reclamation did not operate the New Melones Reservoir in a manner that used "all reasonable means to guard against shortage" in violation of Article 9(a) of the 1983 Contracts. Defendant responds that (1) any reduction in water allocation was excused by the terms of the 1983 Contracts; (2) the operational decision-making of Reclamation did not violate the "all reasonable means to guard against shortage" requirement; and (3) even if a violation is found under the contracts, it would be excused by invocation of the sovereign acts and unmistakability doctrines.

The factual background of this case was recited previously in this court's denial of defendant's motion to dismiss, Stockton E. Water Dist. v. United States, 62 Fed. Cl. 379, and in this court's opinion regarding cross-motions for summary judgment, Stockton E. Water Dist. v. United States, 70 Fed. Cl. 515, and will be repeated only as necessary. The United States Supreme Court rendered an excellent history of western water rights, up to and including the formation of the New Melones Dam. See California v. United States, 438 U.S. 645 (1978). The history provides background information relevant to plaintiffs' claims, but need not be repeated here, other than to place in context this dispute by reference to what the

---

8/ Trial was limited, at the request of the parties, to liability, with the amount of recovery subject to further proceedings. See Order entered Oct. 27, 2004, ¶ 1.

Supreme Court described as:

> The final expansion of our Nation in the 19th century into the arid lands beyond the hundredth meridian of longitude, which had been shown on early maps as the "Great American Desert," brought the participants in that expansion face to face with the necessity for irrigation in a way that no previous territorial expansion had.

Id. at 648.

1. Identification of the parties

Plaintiff Stockton East is the signatory to one of the two 1983 Contracts with Reclamation. Stockton East is a public agency in San Joaquin County, created by Special Act of the California Legislature on September 29, 1971. 1971 Cal. Stat. ch. 819 (the "Special Act"). Section 3 of the Special Act provides:

> (a) The Legislature finds and declares that the problems of providing for the management of the underground water basin and the provision of supplemental water supplies, in the area of [Stockton East] are peculiar to that district and that area and for that reason it is necessary to deal specially with such area and to provide special provisions for the government and operation of that district.
>
> (b) The Legislature further finds and declares that this act is necessary to the solution of a problem arising out of the following unique and special circumstances: The water supplies in the underground basin in the area of [Stockton East] are insufficient to meet the water demands of the area, and, because . . . excessive pumping has seriously depleted the underground water storage, there has been an intrusion of saline waters into the underground water basin . . . . Further excessive pumping, without proper management . . . is certain to destroy the usefulness of a major portion of the underground water basin.

Special Act at 1-2.

Plaintiff Central is the signatory to the second 1983 Contract with Reclamation (the "Central Contract"). Central is a water conservation district organized under the California Water Code, §§ 74000-76501 (2000), formed with the specific purpose of contracting with the Central Valley Project. Joint Stipulations ¶ 2. Central also is located in San Joaquin

County, but to the south of Stockton East. Central, like Stockton East, overlies a groundwater basin that is in a state of severe overdraft and salinity intrusion, limiting one possible source of water, groundwater pumping, to the area.

Plaintiffs California Water, City of Stockton, and San Joaquin County (collectively the "Urban Contractors") claim third-party beneficiary status to the 1983 Contracts. 9/ California Water is a corporation organized and existing under the laws of the State of California that contracts for a portion of Stockton East's treated water and then provides that treated water to the residents of the city of Stockton, pursuant to the terms of the Second Amended Contract, which was executed between the Urban Contractors and Stockton East on September 25, 1983. DX 248. The City of Stockton is a municipal corporation organized under California Government Code §§ 34000-45345 (2006). Joint Stipulations ¶ 4. San Joaquin County is a political subdivision of the State of California organized under California Government Code §§ 34000-33205 (2006). Joint Stipulations ¶ 3. Both the City of Stockton and San Joaquin County also contract for water through Stockton East.

Reclamation is a federal agency that administers the New Melones Dam and its allocations of water. The New Melones Dam is managed as part of the Central Valley Project, a federal reclamation project authorized by the Flood Control Acts of 1944 and 1962 and the CVPIA. See Flood Control Act of 1944, Pub. L. No. 78-534, § 10, 58 Stat. 887, 900-02; Flood Control Act of 1962, Pub. L. No. 87-874, § 203, 76 Stat. 1173, 1191-92 ("Flood Control Act of 1962"); CVPIA. The New Melones Dam is located on the Stanislaus River approximately sixty miles upstream from the confluence of the Stanislaus with the San Joaquin River and forty miles east of Stockton, California, and has a capacity of 2.4 million acre-feet of water. Surface water trapped by the New Melones Dam is stored in the New Melones Reservoir and then sent via channel to the Tulloch Reservoir, which empties into the Goodwin Pool. Water from the Goodwin Pool then is sent via channel to the Oakdale and South San Joaquin Irrigation Districts, to Stockton East and Central (collectively, the "Contracting Parties") via the Goodwin Tunnel and Farmington Canal, or over the dam to spill into the San Joaquin river for fisheries, salinity, and flood release purposes. See Transcript of Proceedings, Stockton E. Water Dist. v. United States, No. 04-541L, at 810-14 (Fed. Cl. Oct. 23 - Nov. 2, 2006) ("Tr.").

---

9/ The court granted defendant's motion for summary judgment, in part, ruling that the Urban Contractors were not third-party beneficiaries to the Central Contract. See Summ. J. Op. at 536 ("Plaintiffs do not appear to dispute the fact that [the Urban Contractors] are not third-party beneficiaries to the Central Contract, as distinct from the Stockton East Contract. Therefore, defendant's cross-motion to disallow those three plaintiffs from enforcing the Central Contract is granted.").

2. Chronological overview of the dispute

In 1962 Congress authorized the construction of the New Melones Dam, and construction was completed in 1978. Before the reservoir could be filled, however, the Federal Government was obliged to apply for and receive appropriate permits from the State of California (the "State"). These permits were acquired in 1973, but the Federal Government disputed whether it was obligated to follow demands put upon it by the State. One of the conditions with which the Federal Government had to comply in order to fill the reservoir required the Government to commit a certain amount of water–the quantity set by the State–to fish and wildlife uses. Another condition stipulated that the Federal Government must have firm commitments from entities that would use the New Melones Reservoir water before filling the reservoir.

In order to fulfill the requirements of the State, Reclamation entered into negotiations with and received commitments from the Contracting Parties for consumptive use of surface water from the New Melones Reservoir. Reclamation then began filling the New Melones Reservoir, which was completed in 1983. On December 19, 1983, Reclamation entered into separate contracts with Stockton East and Central for delivery of certain quantities of water from the New Melones Reservoir, subject to compliance with several conditions.

In 1993 the CVPIA became effective. This law increased the amount of water that Reclamation must release for environmental purposes and changed the priorities by which water allocation decisions were made. Because of these changes in environmental law, Reclamation was required to release more water for fish and water quality needs, and this, at least in part, contributed to the fact that the Contracting Parties received less water. The Contracting Parties argue that these increased delivery obligations resulted in Reclamation reducing deliveries of water below that which was required by the terms of the 1983 Contracts, and that Reclamation operated the New Melones Reservoir in a manner that did not fulfill Reclamation's contractual obligation to "use all reasonable means to guard against shortage" to the Contracting Parties.

II. Requirements of law and regulation existing prior to and leading up to the 1983 Contracts

1. The Central Valley Project

The Central Valley Project (the "CVP") is a water conservation project that was built to serve various water needs in the Central Valley Basin. The CVP was first authorized by the Rivers and Harbors Act, Pub. L. No. 74-409, 49 Stat. 1028, 1048 (1935); the Emergency Relief Appropriation Act of 1935, Pub. L. No. 74-11, 49 Stat. 115; and the First Deficiency

Appropriation Act, Pub. L. No. 73-739, 49 Stat. 1622 (1936); see also Rivers and Harbors Improvement Act authorizing the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes, Pub. L. No. 75-392, 50 Stat. 884 (1937); Reclamation Act of 1902, 32 Stat. 388 (codified as amended in scattered sections of 43 U.S.C. (2000)). The CVP consists of twenty reservoirs, eleven power plants, over 500 miles of major canals, and includes over 250 water-service contracts for agricultural and municipal and industrial ("M&I") use. The New Melones Reservoir and Dam are part of the CVP system, and the 1983 Contracts are among the water service contracts managed by Reclamation within the CVP.

The Ninth Circuit described the CVP in Westlands Water District v. Natural Resources Defense Council, 43 F.3d 457, stating:

> California's Central Valley is one of the most fertile agricultural regions in the United States. Several state and federal water projects, including the federal Central Valley Project, make this agricultural productivity possible by diverting water from streams that flow out of the Sierra mountains. These water projects produce many agricultural and economic benefits, but the water diversions harm wildlife habitats and ecological resources. In addition, agricultural water users consume most of California's developed water yet comprise only a small fraction of California's population. As urban populations continue to grow, urban water users are demanding more water.

Id. at 459.

2. The New Melones Reservoir

The Flood Control Act of 1944, 58 Stat. 887, authorized a "plan of improvement for flood control and other purposes on the Lower San Joaquin River and tributaries," allocating "$8,000,000 for initiation and partial accomplishment of the plan." Id. at 901. Congress's later modification of the Flood Control Act directed that Reclamation construct and operate the New Melones Dam "pursuant to the Federal reclamation laws." Flood Control Act of 1962, § 203.

On June 25, 1962, the Secretary of the Army transmitted a Letter captioned, "New Melones Project, Stanislaus River, California" to the California House Committee on Public Works. H.R. Doc. No. 453, 2d Sess. (Cal. 1962) ("House Document 453"). House Document 453 contained the "views and recommendations" of "the Department of Water Resources . . . together with the comments of the Department of Fish and Game, the Division of highways, the State Reclamation Board, and the Department of Conservation." Id. at xi.

The Comments of the California Department of Water Resources to House Document 453 recognized that "the New Melones project was authorized by the Flood Control Act of 1944 at a storage capacity of 450,000 acre-feet, with provisions for possible future enlargement to 1,100,000 acre-feet." Id. at xiii. In addition, the Report from the U.S. Army Corps of Engineers concluded: "The District Engineer finds, after joint studies with [Reclamation], that the New Melones Project, to provide a gross storage capacity of about 2,400,000 acre-feet . . . , is needed for full development and maximum utilization of the water resources of the Stanislaus River basin." Id. at 8.

On October 23, 1962, Congress authorized the expansion of the New Melones Dam, Pub. L. No. 87-874, 76 Stat. 1173 (1962), by modifying the New Melones project "substantially in accordance with the recommendations of [House Document 453]." Act of October 23, 1962, 76 Stat. 1191. The authorization, however, was predicated upon certain conditions, which include a requirement that

> before initiating any diversions of water from the Stanislaus River Basin in connection with the operation of the Central Valley [P]roject, the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin and the diversions shall at all times be subordinate to the quantities so determined: *Provided further,* That the Secretary of the Army adopt appropriate measures to insure the preservation and propagation of fish and wildlife in the New Melones project and shall allocate . . . an appropriate share of the cost of constructing the same.

Id.

The California Department of Finance filed applications with the Water Control Board in 1952 for permission to appropriate water from the Stanislaus River in connection with the New Melones dam and reservoir development. Reclamation was assigned these applications for irrigation, domestic, municipal, industrial, fish culture, recreation, water quality control, and hydroelectric uses. In 1960 Reclamation filed applications in connection with a proposal to expand the size of the New Melones Reservoir for additional appropriations. These applications were the subject of a decision issued by the State Water Control Board in 1973. New Melones Project Water Rights Decision, Cal. State Water Res. Control Bd., Decision 1422 (Apr. 14, 1973) ("Decision 1422"). Decision 1422 approved, in part, the applications for expanded appropriation of water for the New Melones Reservoir. Id.

3. Senior water rights

In 1972 Reclamation entered into an Agreement and Stipulation with Oakdale

Irrigation District ("OID") and South San Joaquin Irrigation District ("SSJID"). This agreement provided OID and SSJID with:

> That portion of the New Melones Reservoir inflow required to meet the Districts' direct diversion requirements but not to exceed 1,816.6 cubic feet per second.
>
> Subject to the following limitation:
>
> The maximum quantity of water delivered each year is limited to 654,000 acre-feet or the total quantity of New Melones Reservoir inflow during the water year . . . , whichever is the smaller.

DX 3 at 2. The agreement recognized the senior water rights of OID and SSJID and required Reclamation to supply up to 654,000 acre-feet annually from the New Melones Reservoir.

A second Agreement and Stipulation in 1988 superceded the 1972 Agreement and Stipulation. The second Agreement and Stipulation, executed on August 30, 1988, between Reclamation, OID, and SSJID, required Reclamation to deliver "each water year to [OID and SSJID] for diversion at Goodwin Diversion Dam . . . . The inflow to New Melones plus the amount derived by the following formula: (600,000 - inflow) divided by 3; limited to a maximum entitlement of 600,000 acre-feet of water each water year." DX 41 at 1. In addition, the 1988 Agreement and Stipulation requires Reclamation to make available a preliminary forecast in February and March and to furnish a forecast in April predicting inflow to the New Melones Reservoir. Paragraph 4 of the Agreement and Stipulation provides that "The Districts' conserved water may be stored in New Melones Reservoir up to a cumulative total amount of 200,000 acre-feet." Id. at 2.

The Decision of the State Water Control Board in January 1988 acknowledged the existence of senior water right holders in authorizing partial filling of the New Melones Reservoir: "This permit is subject to prior rights. Permittee is put on notice that during some years water will not be available for the diversion during portions or all of the season authorized herein." Petition for Assignment of Application 14858 and Applications 27319, 27320 and 27321 of the U.S. Bureau of Reclamation Stanislaus River, Cal. State Water Res. Control Bd., Decision 1616 at 34 (Jan. 1988) ("Decision 1616").

4. State Water Control Board requirements

1) Firm commitments

The Reclamation Act of 1902 § 8 requires Reclamation to apply for appropriate state permits. See California v. United States, 438 U.S. 645, 652 (1978). The controlling state water-control entity is the State Water Control Board, which possesses the power to issue appropriative water permits in California. See Cal. Water Code § 1201. The Water Control Board granted Reclamation the required permit, but imposed twenty-five conditions on Reclamation if it wished to appropriate the water to fill the Reservoir. 10/ See Decision 1422.

The second condition to the permit authorized by Decision 1422 provided for limited filling of the New Melones Dam, but denied Reclamation's request for recreational and hydroelectric use:

> Until further order of the [Water Control Board], permittee shall impound in New Melones Reservoir only such water as is necessary to provide (a) not in excess of 98,000 acre-feet per annum for the preservation and enhancement of fish and wildlife to be released at a rate specified by the California Department of Fish and Game, plus (b) such additional water as is necessary to maintain . . . water quality conditions . . . . The above amounts are in addition to water stored for satisfaction of prior rights at existing Melones Reservoir and for flood control. No additional impoundment shall be allowed for power and recreational uses.

Decision 1422 at 30.

Condition 2 also required that Reclamation must demonstrate firm commitments or a specific plan for consumptive use before Reclamation could appropriate fully the water. See California, 438 U.S. at 652. Condition 2 provided:

> Further order of the Board shall be preceded by a showing that the benefits that will accrue from a specific proposed use will outweigh any damage that would result to fish, wildlife and recreation in the watershed . . . and that the

---

10/ This decision sparked the litigation in California v. United States, 438 U.S. 645 (1978), wherein the United States Supreme Court ultimately ruled that the Federal Government must comply with the state-imposed conditions.

> permittee has firm commitments to deliver water for such other purposes.

Decision 1422 at 30. "[T]he Board, in effect, said to [Reclamation], 'Show us your contracts and your ability to deliver the water and it may be available to you.'" United States v. Cal. State Water Res. Control Bd., 694 F.2d 1171, 1177 (9th Cir. 1982) (quoting United States v. California, 509 F. Supp. 867, 886 (E.D. Cal. 1981)).

In response to a submission by Reclamation, the Water Control Board in 1980 noted that "the reason for limiting storage in the [New Melones] reservoir was the failure of the permittee to show how and where the portion of the project yield intended for consumptive purposes would be used." Order Conditionally Accepting and Approving in Part Submittals by U.S. Water and Power Resources Service in Accordance with Condition 3 of Decision 1422, Cal. State Water Res. Control Bd., WR 80-20 at 6 (Nov. 20, 1980) ("WR 80-20"). The Water Control Board concluded that a "maximum amount of 438,000 acre-feet . . . , is accepted for satisfaction of prior rights, preservation and enhancement of fish and wildlife, and water quality until one of the alternative preconditions to full implementation of the Agreement and Stipulation occurs." Id. at 17. The Water Control Board denied a petition for reconsideration of WR 80-20 on January 14, 1981. Order Denying Petition for Reconsideration of and Clarifying Order WR 80-20, Cal. State Water Res. Control Bd., WR 81-1 (Jan. 14, 1981).

In part to demonstrate such plans or commitments for consumptive use, Reclamation entered into contract negotiations with Stockton East and Central for the use of some of the New Melones water. These negotiations aided Reclamation in receiving approval from the State Water Control Board to appropriate water for the New Melones Reservoir. The Water Control Board stated in 1983 that

> by requiring "firm commitments" the Board intended that the permittee demonstrate that it has a specific plan to use the water from New Melones Reservoir for consumptive purposes. While executed contracts would provide strong evidence that firm commitments exist, the Board did not intend that existence of such contracts be the exclusive means of showing firm commitments for New Melones water. Rather, the Board intended that the Bureau show a specific plan under which the conserved water will be used consumptively.

Order Amending Water Right Decision 1422 Authorizing Storage in New Melones Reservoir for Generation of Hydroelectric Power & for Consumptive Uses, Cal. State Water Res. Control Bd., WR 83-3 at 18 (Mar. 8, 1983) ("WR 83-3"). The Water Control Board considered the "substantial steps" taken by Reclamation "toward executing contracts with

. . . [Central] for 80,000 acre-feet, and [Stockton East] for 75,000 acre-feet" and concluded that "the permittee has established that it has firm commitments to deliver the full yield of New Melones water for consumptive uses. Furthermore, the evidence establishes that there is presently much more demand for New Melones water than the reservoir's yield." Id. at 19-20.

The Water Control Board modified Condition 1-d of Decision 1422 to permit up to 1,420,000 acre-feet of water storage to be "used for irrigation, domestic, municipal, industrial, preservation and enhancement of fish and wildlife, recreation and water quality control purposes" and granted Reclamation "nonvested usufructuary rights to appropriate at New Melones, to the full capability of the project." Id. at 26-27. Nevertheless, the State Water Control Board again reserved jurisdiction to make changes, providing that "[a]ny deliveries of water which [Reclamation] may make for consumptive uses are subject to changes in [Reclamation's] water right permits which may, in the future be made pursuant to Condition 6. Such changes could include increases in the flows required for maintenance of water quality and for fish releases." Id. at 22.

2) Initial fish and wildlife releases

The State Water Control Board imposed a requirement upon Reclamation to dedicate a portion of the estimated 2.4 million acre-feet of potential reservoir water for environmental purposes. Initially, the Water Control Board mandated that 98,000 acre-feet of water be released annually for fishery and wildlife purposes, which could be reduced to 69,000 acre-feet in dry years. Decision 1422 at 21. In addition, the Water Control Board dictated that an amount of water be released that was sufficient to dilute the lower San Joaquin River flow to a dissolved solids level of 500 parts per million or less (the "salinity standard"). Id. at 11. The Water Control Board estimated that meeting this stipulation would require an annual release of not more than 70,000 acre-feet of water. Id. In both circumstances the Water Control Board reserved jurisdiction in Condition 6 "for the purpose of revising water release requirements for water quality objectives and fish releases." Id. at 32.

Increasing demand for fish and wildlife releases was acknowledged by the Stanislaus River Basin Alternatives and Water Allocation Special Report (the "1980 Special Report") published by Interior, where it reported:

> In hearings before the State Water Resources Control Board in December 1972 . . . , it was revealed that the California Department of Fish and Game had

> concluded that increased flows would be needed for the anadromous [11/] fishery over those flows provided . . . almost the entire yield of New Melones Reservoir. If such flows were provided from New Melones, the project would then be unable to meet the agricultural and municipal and industrial water requirements as authorized which would severely impact justification of the entire project.

New Melones Unit, U.S. Dep't of the Interior, Central Valley Project - California, Stanislaus River Basin Alternatives and Water Allocation Special Report 61-62 (1980).

3) In-basin needs

In addition to complying with the requirements of the Water Control Board, the Flood Control Act of 1962 required Interior to "determine the quantity of water required to satisfy all existing and anticipated future needs within the [Stanislaus River] [B]asin . . . ." § 203, 76 Stat. at 1191. The in-basin needs were deemed superior to other uses for the water. Id. The 1980 Special Report contained three alternative basins, four alternative storage operating conditions, and six alternative plans. 1980 Special Report at 1. Interior estimated that "[w]ith a gross reservoir capacity of 2,400,000 acre-feet and a minimum pool of 300,000 acre-feet at elevation 808 feet, an estimated 180,000 acre-feet of new water supply would be provided to serve the needs of the Stanislaus River Basin and other possible CVP service areas." Id. at 2. The 1980 Special Report also indicated that a "storage reservation of 450,000 acre-feet and a downstream channel flow of 8,000 $ft^3/s$ would provide flood protection." Id. at 3.

Reclamation issued its Record of Decision on June 29, 1981, relying upon the 1980 Special Report and a final supplement to the environmental statement dated September 12, 1980. Memorandum from the Sec'y, U.S. Dep't of the Interior to the Deputy Assistant Sec'y - Land and Water Res., U.S. Dep't of the Interior (May 15, 1981); PX 15. The Record of Decision contained the Commissioner of Reclamation's recommendation to the Secretary to adopt the in-basin area as defined by the second alternative proposed in the 1980 Special Report. Id. at 1. After meeting these requirements, Interior anticipated that sufficient water would remain to supply certain amounts to Stockton East and Central, recommending that

---

11/ "Anadromous" is a type of fish "that is born in freshwater -- i.e., lays its eggs in a water or a freshwater system -- and then generally, as juveniles or yearlings, migrates down the river to the ocean." Tr. at 1677 (testimony of Roger O. Guinee, Supervisory Fish and Wildlife Biologist for the United States Fish & Wildlife Service's Sacramento office).

> [t]he interim water supply of 85,000 acre-feet in year 2000 would be allocated on a conjunctive use basis to [Central], [Stockton East], and the South Delta Water Agency. The interim water supply would be available first to [Central] and then to [Stockton East] in wet, above normal, normal, and below normal water years . . . . In dry and critically dry water years [Central] could pump groundwater as replacement water for the interim water supply.

Id. at 1.

5. Basis of Negotiation

On February 1, 1982, Interior approved a Basis of Negotiation for water service contracts from the New Melones Reservoir. PX 20 at 00343. The Basis of Negotiation included the figures from the Record of Decision, stating that "New Melones Reservoir will be operated as authorized at the full maximum capacity of 2,400,000 acre-feet and would provide 180,000 acre-feet of conservation yield to meet present and future agricultural and municipal and industrial (M&I) water needs until approximately the year 2020." Id. at 00345. The Basis of Negotiation included a chart of proposed operations at New Melones, which included:

New Melones Reservoir Operations

| Reservoir Use | Acre-Feet |
|---|---|
| Maximum storage level . . . . . . . . . . . . . | 2,400,000 |
| Flood control space . . . . . . . . . . . . . . . . | 450,000 |
| Conservation yield in year 2020 . . . . . . . | 180,000 |
| Annual releases, if needed, to meet water quality criteria up to . . . . . . | 70,000 |
| Fishery releases - normal years . . . . . . . | 98,000 |
| Fishery releases - dry years . . . . . . . . . . | 69,000 |

Id. Reclamation relied on these figures in negotiating the 1983 Contracts with Stockton East and Central.

III. The 1983 Contracts

On December 19, 1983, Reclamation signed separate, but almost identical, contracts with Stockton East and Central. The 1983 Contracts provided for the supply of certain quantities of water on an annual basis, although the proper interpretation of these contracts is at the heart of the current dispute. The Summary Judgment Opinion addressed many of the portions of the 1983 Contracts; only the portions of the 1983 Contracts relevant to

resolution of this dispute are analyzed further in this opinion. See Summ. J. Op. at 519-25.

## IV. Subsequent changes in laws and regulations

At the time the contracts were signed in 1983, the State Water Control Board anticipated that the annual fishery release from the New Melones Reservoir would be 98,000 acre-feet (or 69,000 acre-feet in dry years). Decision 1422 at 30. Amendments to federal Reclamation law revised upwards the goals for fisheries and environmental releases, and state water use permit changes modified salinity standards in the CVP. Looking at the operation of the overall system as a whole, the ever-increasing imposition of additional obligations for salinity and fisheries water releases led to a clash of management objectives and priorities, the unpredictability of available water supply, and an inherent conflict between demands for consumptive use by plaintiffs and environmental concerns. The over commitment of the New Melones Reservoir in spite of low inflow rates required Reclamation to make operational decisions regarding the allotment of scarce surface water resources. Resolution of plaintiffs' breach of contract claim contemplates discussion of the applicability of these obligations and the operation of the New Melones Reservoir. A recitation of the circumstances that led to the water release obligations therefore is instructive.

### 1. CVPIA

Passage of the CVPIA in 1993 made major changes to the allocation of water from the New Melones Reservoir. The purpose of the CVPIA was, in part,

> to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California; to address impacts of the [CVP] on fish, wildlife, and associated habitats . . . ; [and] to achieve a reasonable balance among competing demands for use of [CVP] water, including the requirements of fish and wildlife, agricultural, municipal, and industrial and power contractors.

CVPIA § 3402. The CVPIA made substantial changes to the operation of the New Melones Reservoir by imposing requirements upon Reclamation regarding allocation of water, particularly for environmental purposes.

#### 1) Priorities change under CVPIA § 3406(a)

Prior to passage of the CVPIA, the CVP was

> declared to be for the purposes of improving navigation, regulating the flow

> of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof . . . . *And provided further*, That the said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and third, for power.

§ 2, 50 Stat. at 850. The statute originally enshrined irrigation and domestic uses as superior to power use and did not mention environmental or fishery-related releases as a priority.

CVPIA § 3406(a) altered these priorities to state: "That the said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and fish and wildlife mitigation, protection and restoration purposes; and third for power and fish and wildlife enhancement." Id. Consequently, enactment of the CVPIA in 1993 modified the priorities for which the water use at the New Melones Reservoir was to be allocated to make "fish and wildlife mitigation, protection and restoration" equivalent to irrigation and domestic uses. Id. This change required Reclamation to alter the manner in which it made operational decisions regarding the allocation of water to the Contracting Parties pursuant to the 1983 Contracts.

2) Fishery releases

i. 1987 Fish and Game Agreement

On June 5, 1987, the California Department of Fish and Game and Reclamation signed the Agreement Between California Department of Fish and Game and the United States Department of the Interior Bureau of Reclamation Regarding Interim Instream Flows and Fishery Studies in the Stanislaus River Below New Melones Reservoir (the "1987 Fish and Game Agreement"). The 1987 Fish and Game Agreement was executed to (1) commit the parties to completion of a long-term study of instream flow needs for chinook salmon in the Stanislaus River and to (2) implement an interim instream flow schedule to protect chinook salmon and provide for experimentation and testing of instream flow rates to "ascertain if acceptable criteria for protection of salmon can be provided conjunctively with other beneficial water uses." 1987 Fish and Game Agreement, Recitals E 1-2. The 1987 Fish and Game Agreement stated that the parties agreed to provide an annual supply of water from New Melones between 98,300-302,100 acre-feet per year for fishery instream flows until the development of long-term salmon protection standards, provided a computational mechanism for the annual supply available for instream flow releases, and committed the parties to a proposed Plan of Studies for fishery flow needs.

On January 21, 1988, the State Water Control Board issued Decision 1616. Decision

1616 required Reclamation to "provide such interim instream flows and . . . conduct such instream flow and fisheries studies as are required by the [1987 Fish and Game Agreement]," and the Water Control Board again reserved jurisdiction "for the purpose of revising instream flow requirements for water quality objectives and fishery purposes and for establishing dry year criteria." Decision 1616 at 33.

In April 1988 the State Water Control Board issued the Order Denying Petition for Reconsideration and Amending Decision 1616, Cal. State Water Res. Control Bd., WR 88-6 (April 6, 1988) ("WR 88-6"), by which it amended Decision 1616 to require "a study of the steelhead and resident trout fishery in the Stanislaus River downstream of Goodwin Dam. The study shall address the instream flow requirements of the steelhead trout and the resident trout populations . . . and it shall assess the effects of the New Melones Project operations on the fishery." Id. at 11-12.

In response to WR 88-6 and the requirements of the 1987 Fish and Game Agreement, the United States Fish and Wildlife Service (the "FWS") issued the Draft Instream Flow Requirements for Fall-Run Chinook Salmon Spawning and Rearing in the Stanislaus River, California in February 1992 (the "Draft Instream Flow Study"). The study was issued in its final form in May 1993 (the "Final Instream Flow Study") and recommended an increase in the fishery flows to 155,700 acre-feet annually from 98,300 acre-feet. Nevertheless, the study cautioned that "[o]nly after integrating a variety of habitat variables and competing species life stage needs can a comprehensive instream flow schedule for the Stanislaus River be developed which will protect and preserve the chinook salmon resource." Final Instream Flow Study at 25; DX 271.

ii. CVPIA § 3406(b)

The CVPIA made additional alterations to the fishery flow requirements at the New Melones Reservoir. Section 3406(b)(1) of the CVPIA imposed a "doubling goal" upon Reclamation, requiring it to "implement a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels . . . ." Id. CVPIA § 3406(b)(2) provides that Reclamation is authorized and directed to

> dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help meet such obligations

> as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title.

Id. Subsection B to section 3406(b)(2) directs that "[s]uch quantity of water shall be managed pursuant to conditions specified by the [FWS] after consultation with [Reclamation] and in cooperation with the California Department of Fish and Game." CVPIA § 3406(b)(2)(B). Subsection C provides a mechanism to reduce the commitment to fishery needs under certain circumstances:

> The Secretary may temporarily reduce deliveries of the quantity of water dedicated under this paragraph up to 25 percent of such total whenever reductions due to hydrologic circumstances are imposed upon agricultural deliveries of Central Valley Project water; Provided, That such reductions shall not exceed in percentage terms the reductions imposed on agricultural services contractors; provided further, That nothing in this subsection or subsection 3406(e) shall require the Secretary to operate the project in a way that jeopardizes human health or safety.

CVPIA § 3406(b)(2)(C).

On December 15, 1994, the State of California, represented by the California Resources Agency and the California Environmental Protection Agency, and the United States of America, represented by Reclamation and the Environmental Protection Agency, executed the Principles for Agreement on Bay-Delta Standards Between the State of California and the Federal Government (the "Bay-Delta Accord" or "1994 Principles for Agreement"). The Bay-Delta Accord imposed a number of constraints upon the operation of the CVP, which included various provisions that directly impacted the operation of the New Melones Reservoir. The Bay-Delta Accord mandated limitations on the flow of exports, flexibility to accommodate the requirements of the ESA, and a financial commitment of $10 million by February 15, 1995. The Bay-Delta Accord also provided that "[a]ll CVP water provided pursuant to these Principles shall be credited toward the CVP obligation under Section 3406 (b)(2) of the [CVPIA] to provide 800,000 acre feet of project yield for specified purposes." Bay-Delta Accord at 6; see Tr. at 1194. 12/

On May 9, 1995, the FWS issued its Working Paper on Restoration Needs: Habitat

---

12/ Use of either phrase "(b)(2) water" or "(b)(2) releases" refers to the allocation of water for fishery purposes under CVPIA § 3406(b)(2) and the Bay-Delta Accord.

Restoration Actions to Double Natural Production of Anadromous Fish in the Central Valley of California (the "Anadromous Fish Restoration Paper"). The Anadromous Fish Restoration Paper stated that the quantity of water allocated from the New Melones Reservoir pursuant to the 1987 Fish and Game Agreement had been limited to 98,300 acre-feet per year and that "[t]his quantity has proven to be inadequate for survival of all life stages of chinook salmon," Anadromous Fish Restoration Paper at 3-xd-33, and recommended a flow schedule that utilized pulse flows during the fall and winter seasons and increased the total amount of water allocated for fishery needs. Id. at 3-xd-34. The FWS noted that "[n]either the existing [1987 Fish and Game Agreement] nor the 800,000 af of water dedicated to fish and wildlife purposes by [CVPIA § 3406(b)(2)] are sufficient to meet[] flow needs identified by the AFRP. Implementing this flow schedule would reduce water available to meet needs of other user groups and would thus require purchase of additional water." Id. at 3-xd-36.

On December 6, 1995, the FWS issued its Draft Anadromous Fish Restoration Plan (the "Draft AFRP"), which

> represents the [FWS's] response to [CVPIA § 3406(b)(1)'s] direction . . . to develop and implement " . . . a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period 1967-1991."

DX 324 at 018395. The FWS revised the Draft AFRP on May 30, 1997, when it issued its Revised Draft Restoration Plan for the Anadromous Fish Restoration Program (the "Revised AFRP"). The Revised AFRP maintained the same flow requirements recommended in the Draft AFRP for fishery purposes, requiring the allocation of 247,000-468,000 acre-feet of water from New Melones Dam annually to meet the fishery flow schedule specified, based upon the wet or dry character of the year.

Beginning in January 1996, a series of meetings occurred between Reclamation, the FWS, and the Stanislaus River Basin Stakeholders, a group which included the Contracting Parties and other interested parties, regarding formation of an interim New Melones Operation Plan. The various parties agreed in concept on January 29, 1997, to a final Interim Plan of Operation (the "IPO"). Although the IPO was intended to function during the 1997-98 water years, the IPO tables for releases from New Melones still are in use at the present date.

On March 20, 1998, a "collaborative effort of scientists from state and federal agencies and stakeholder groups . . . [met] to gather better scientific fisheries information on the lower San Joaquin River," which resulted in the creation of the Vernalis Adaptive

Management Plan (the "VAMP"). San Joaquin River Agreement art. 2.4, app. A (March 1, 1999); PX 231. The VAMP was designed to (1) protect and enhance fishery protection to aid in achieving a doubling of natural salmon production; (2) gather scientific information on the relative effects of water releases, export pumping, and operation of a fish barrier on salmon in the delta; and (3) substitute for the requirements of the 1995 Water Quality Control Plan.

On March 1, 1999, Reclamation, the State of California, the Contracting Parties, and various other interested parties entered into the San Joaquin River Agreement (the "SJRA"). The SJRA obligated the parties to implement the VAMP program and provide water releases during "Pulse Flow Periods," defined as "[a] period of 31 days during the months of April and May." SJRA art. 3.3, art. 5.1. The SJRA requires fishery releases at varying rates based upon existing flows, subject to modification for hydrologic conditions. Id. art. 5.5. The SJRA also permits any amount of water required for instream uses in excess of that available to be purchased by Reclamation from willing sellers, Id. art. 8.1, and imposes a limitation of export flows at the Tracy Pumping plant based upon the Target Flow released during the pulse flow period. Id. art. 6.4.

On March 15, 2000, the State Water Control Board issued Revised Water Rights Decision 1641, Cal. State Water Res. Control Bd. (Mar. 15, 2000) ("Decision 1641"), which recognized "the San Joaquin River Agreement (SJRA) and approve[d], for a period of twelve years, the conduct of the Vernalis Adaptive Management Plan (VAMP) under the SJRA instead of meeting the objectives in the [Bay-Delta Accord]." Id. at 2.

The California Department of Water Resources and Reclamation published their Biological Assessment: Effects of the Central Valley Project and State Water Project Operations from October 1998 through March 2000 on Steelhead and Spring-run Chinook Salmon in January 1999, which reported on the impact on native salmon and trout populations in the CVP. This was followed on October 5, 1999, by publication of Reclamation's Decision on Implementation of Section 3406(b)(2) of the Central Valley Project Improvement Act (the "Decision on Implementation").

Reclamation's publication of an identically-titled document on May 9, 2003 (the "Revised Decision on Implementation"), superseded the Decision on Implementation. The Revised Decision on Implementation announced that it was "the final agency action and supersedes all previous decisions. This Decision will be effective as of the date adopted and will be implemented in the 2004 Water Year." Revised Decision on Implementation at 1. The Revised Decision on Implementation modified the interpretation of CVPIA § 3406(b)(2)(C), stating that "the amount of (b)(2) water available will be reduced when deliveries to CVP agricultural water service contractors north of the Delta are reduced

because of hydrologic circumstances." Id. at 10. The Revised Decision on Implementation also set forth a detailed methodology for accounting for (b)(2) water. See id. at 3-8.

3) Salinity requirements at Vernalis

In 1988 the State Water Control Board modified the salinity standard imposed upon Reclamation in Decision 1422 by requiring that

> no consumptive use diversion is authorized under this permit [for the New Melones Reservoir] when the mean monthly total of dissolved solids concentration in the San Joaquin River at Vernalis is greater than 500 parts per million or the dissolved oxygen concentration in the Stanislaus River is less than that specified [in the Water Quality Control Plan of 1975].

Decision 1616 at 32.

The Water Quality Control Plan was revised in May 1995. The revised Water Quality Control Plan modified the salinity standard at Vernalis to require an electroconductivity ("EC") standard, rather than one measured in terms of dissolved solids. The revised salinity standard required an EC value of 0.7 during the months of April-August and an EC of 1.0 during the months of September-March of each year.

The State Water Control Board revised the Vernalis salinity standard with the issuance of Decision 1641 in 1999 and its revision in 2000. Section 10.2.2 of Decision 1641 provided: "The Vernalis salinity objectives can be achieved either by providing sufficient fresh water to dilute upstream discharges of saline water above Vernalis or by using measures to control the discharge of saline water to the river upstream of Vernalis." Decision 1641 at 83. Decision 1641 amended Term 19 of the New Melones Reservoir permits to state:

> In conjunction with other measures to control salinity, Permittee shall release water from New Melones Reservoir to maintain the Vernalis agricultural salinity objective specified . . . .
>
> Permittee shall release water from New Melones Reservoir for water quality purposes so as to maintain a dissolved oxygen concentration in the Stanislaus River as specified in the Water Quality Control Plan for the Sacramento and San Joaquin river basins.

Id. at 160. Additionally, Decision 1641 amended the permits of all of the CVP reservoirs,

except the New Melones Reservoir, to require meeting the Vernalis salinity standard. However, Decision 1641 also noted that the salinity standard requirements imposed on all of the CVP permits, including New Melones, "do[] not mandate that the Licensee/Permittee use water under this license/permit to meet this condition if it uses other sources of water or other means to meet this condition." Id. at 159-60 nn.86-87.

## V. Operation of the New Melones Reservoir

Central to the dispute between the parties is the operation of the New Melones Reservoir and the water allocations and releases made during the disputed period 1993-2004. A detailed examination of the interaction that occurred between the parties provides the context for discussion of plaintiffs' allegations.

### 1. Schedules by and allocations to the Contracting Parties

Article 4 of the 1983 Contracts required both Stockton East and Central to submit schedules to Reclamation that detailed the monthly water allocations requested by the Contracting Parties. Article 4(a) of their respective contracts obligated the Contracting Parties to provide schedule requests to Reclamation in order to receive water allocations from the New Melones Reservoir for agricultural and municipal use. Article 4(a) of the Stockton East Contract provides:

> For each year the Contractor will submit a schedule, subject to the provision of Article 3, indicating the amounts of agricultural and M&I water required monthly. The first schedule shall be submitted 2 months prior to the initial delivery of water. Thereafter, annual schedules indicating monthly water requirements for the subsequent years shall be submitted not later than November 1 of each year or at such other times as determined by the Contracting Officer to assure coordination of Project operations. The United States shall attempt to deliver water in accordance with said schedules, or any revisions thereof satisfactory to the Contracting Officer which are submitted to the Contracting Officer within a reasonable time before the desired time of delivery. The inability, failure, or refusal or the Contractor to submit a schedule shall not relieve it of its payment obligations.

Stockton East Contract art. 4(a). The language of the Central contract with Reclamation is identical. See Central Contract art. 4(a). Thus, the Contracting Parties were required to submit annual schedules to Reclamation indicating monthly water needs for the upcoming year, two months prior to the initial delivery of water, and by November 1 of each subsequent

year. The sequence of events took place in the following general form: (1) Central and Stockton East would submit schedules in writing to Reclamation; (2) Reclamation would make forecasts for predicted allocations, followed by a formal allocation of available water to the Contracting Parties; (3) Central and Stockton East would submit a delivery schedule to Reclamation that indicated how much water would be required and when it would be required; and (4) Reclamation would deliver water to the Contracting Parties based on their acceptance of the allocated amounts.

1) Initial delivery announcement

Reclamation announced the initial delivery of water on May 5, 1988, via a letter to Stockton East's Board of Directors which stated:

> The purpose of this letter is to announce the initial delivery date for water availability from New Melones Reservoir for purposes of your water service contract . . . . Water has been determined available as of April 6, 1988, and the initial delivery date for water from New Melones for purposes of this contract shall be January 1, 1989.

PX 49 at 07927. This letter also noted that "[i]n accordance with Article 4, [Stockton East] must submit a schedule at least two months prior to the initial delivery of water on November 1, 1988." Id. at 07928.

2) 1988-92

During the period between 1988-92, no water was delivered to the Contracting Parties from the New Melones Reservoir due to drought conditions, and the Contracting Parties submitted no schedules.

3) 1993

No written schedule was submitted by either Stockton East or Central to Reclamation in 1993. Reid W. Roberts, General Counsel for Central, testified that Edward M. Steffani, General Manager of Stockton East at the time, submitted an oral schedule request for 1993, on behalf of both Central and Stockton East, for a total of 20,000 acre-feet of water, with each district requesting 10,000 acre-feet to be allocated. See Tr. at 165. Central and Stockton East were allocated no water from New Melones for 1993 and a total of 0 acre-feet was delivered to the Contracting Parties in 1993 from the New Melones Reservoir.

4) <u>1994</u>

Stockton East submitted an initial schedule to Reclamation on October 22, 1993, for delivery of 75,000 acre-feet of water from the New Melones Reservoir from October 1994 through September 1995. This schedule included a request for 9,700 acre-feet of water during the months of October-December of 1994.

Reclamation made its initial forecast of available CVP water for 1994 based on "conditions caused by California's fourth driest year in 85 years . . . . result[ing] in Reclamation forecasting a critically dry year" in an announcement dated February 15, 1994. DX 276. This initial forecast provided a "zero water supply" for Stockton East and Central for 1994, stating that "every effort is needed to avoid allowing the level of New Melones [R]eservoir to drop below the minimum storage level (300,000 acre-feet) needed to generate power . . . . The available water will be allocated to fish and wildlife, and to meet water quality requirements." <u>Id.</u> On March 15, 1994, Stockton East submitted a second schedule to Reclamation that included requests for delivery of 24,800 acre-feet of water from the New Melones Reservoir for June 1994 through March 1995. The schedule included a request for 18,564 acre-feet of water to be delivered in 1994 and the remaining amount to be delivered in 1995. Central submitted its 1994 schedule to Reclamation on March 17, 1994. The schedule requested a total of 25,000 acre-feet of water to be delivered during the months of June-September 1994. Reclamation responded by letter dated May 24, 1994, stating that

> Reclamation, in analyzing the water supply conditions through May 1994, has determined that no water could be delivered to CVP contractors from New Melones in 1994. Rain and snowfall conditions in the watershed supplying the reservoir have not been sufficient to support CVP contract deliveries.
>
> The shortage provision in your contract provides for the apportionment of CVP water among users from the same source when there is a shortage in the quantity of water available to CVP contractors. In accordance with that authority, the United States hereby informs you that there will be no available water supply from New Melones Reservoir for meeting your contractual commitments for the 1994 water year.

PX 99.

5) <u>1995</u>

1995 was the first year during which water actually was allocated to the Contracting

Parties, although a series of events would reduce the amount eventually delivered and force the Contracting Parties to accept deliveries late in the irrigation season.

i. Schedules and allocations

Stockton East submitted a schedule request for 65,300 acre-feet of water from New Melones on October 22, 1993, to be delivered from January-September 1995. Stockton East modified the rate of deliveries on March 15, 1994, when Stockton East requested 6,236 acre-feet to be delivered from January-March 1995. Stockton East clarified any confusion caused by the contradictory schedule requests on October 3, 1994, confirming that the amount requested for 1995 was 65,000 acre-feet. Central submitted its schedule request to Reclamation on October 25, 1994, requesting 50,000 acre-feet to be delivered from New Melones in 1995.

On April 10, 1995, Reclamation wrote to Central and Stockton East announcing that 37,000 acre-feet of water would be made available to the Contracting Parties from New Melones for 1995. This letter noted that Reclamation had made a commitment to California State Senator Michael Machado on March 14, 1995, to deliver 10,000 acre-feet of water to Stockton East, and it requested that Central forego 10,000 acre-feet of its allocation to permit Stockton East to receive its full promised amount. Also, on April 10, 1995, Reclamation issued an announcement forecasting delivery of water in the CVP. Reclamation stated that "[s]torage in New Melones Reservoir on the Stanislaus River has not recovered to the same extent as at other CVP reservoirs. With the improved conditions in March at New Melones, Reclamation has allocated up to 37,000 acre-feet to CVP contractors from the Stanislaus River." PX 121 at 05904.

On May 23, 1995, Central replied to Reclamation's allocation, stating that it would be taking delivery of water from the New Melones Reservoir, but that a schedule for releases would be forthcoming.

ii. Water conservation plan delays

A dispute regarding the water conservation plans submitted by Central and Stockton East delayed delivery of water allocated in 1995 by Reclamation. Condition 21 of Decision 1616 states:

> Prior to any diversion of water for municipal, domestic or irrigation purposes, [Reclamation] shall consult with the Chief of the Division of Water Rights and develop a Water Management Program in conformance with State Water Resources Control Board requirements as appropriate. The proposal

> program shall be presented to the Board for approval.

Decision 1616 at 35. In addition, Article 19 in both of the 1983 Contracts provides:

> The Contractor shall develop and implement an effective water conservation program for all uses of water which is provided from, or conveyed through, Federally constructed or Federally financed facilities for the Contractor's use.
>
> . . . .
>
> The original water conservation program shall be submitted to and approved by the Contracting Officer prior to one or all of the following: (1) service of Federally stored/conveyed water; (2) transfer of operation and maintenance of the Project facilities to the Contractor; or (3) transfer of the Project to an operation and maintenance status.

Stockton East Contract art. 19(a)-(b); see also Central Contract art. 19(a)-(b).

Central and Stockton East submitted their water conservation plans in December 1993 to Reclamation. On June 9, 1995, two years after the Contracting Parties' submission, Reclamation wrote to Central, stating:

> We have been informed by our Water Conservation office in Sacramento that [Central's] water conservation plan does not meet our criteria. We have also been informed that we must submit an acceptable water management program to the [Water Control Board] before we can initiate deliveries from New Melones. The [Water Control Board] has stated that a water conservation plan meeting our criteria will meet their requirements.
>
> Please update your water conservation plan to meet Reclamation criteria and inform us of your schedule for water delivery as soon as possible.

PX 130; see also Tr. at 183-84 (discussing similar problems with Stockton East's water conservation plan).

On June 20, 1995, Central submitted a request to have deliveries continue while the "very minor" errors were corrected. Reclamation denied this request. The State Water Control Board approved the revised water conservation plan of Central on August 9, 1995, and the revised water conservation plan of Stockton East on August 28, 1995.

iii. Water deliveries and usage

Central made a request for delivery of 5,000 acre-feet of water from the New Melones Reservoir on July 28, 1995. Reclamation wrote to Stockton East on August 10, 1995, and offered the remaining 32,000 acre-feet to Stockton East. Stockton East accepted Reclamation's offer of 32,000 acre-feet on August 17, 1995, requesting 6,750 acre-feet to be delivered from September 18, 1995 to December 31, 1995, and the remainder to be stored pursuant to CVPIA § 3408(c). Reclamation responded to Stockton East on August 21, 1995, in which it denied Stockton East's request for storage under CVPIA § 3408(c) and approved the request for 6,750 acre-feet to be delivered during calendar year 1995. Reclamation also responded to a request for storage under CVPIA § 3408(d) from Stockton East on September 15, 1995, in which it stated that carry-over storage under the water banking provisions of § 3408(d) was within Reclamation's discretion and would not be allowed until guidelines for implementation were developed.

The amount delivered to Stockton East in 1995 was 4,003 acre-feet, and the amount delivered to Central in 1995 was 4,564 acre-feet. Deliveries to Central may have been hindered in part by a failure to enclose payment for the water allocation in Central's July 28, 1995 acceptance of 5,000 acre-feet of Reclamation's 1995 allocation.

6) 1996

Stockton East submitted its 1996 schedule request for water to Reclamation on October 27, 1995, wherein it requested delivery of a total of 32,400 acre-feet. Central's schedule was submitted November 30, 1995, and requested delivery of 40,000 acre-feet of water for 1996. Reclamation announced an allocation of 49,000 acre-feet of water from the New Melones Reservoir to the Contracting Parties via letter dated February 22, 1996. On March 19, 1996, Reclamation allocated Stockton East's full schedule request of 32,400 acre-feet to be made available for delivery. Stockton East responded to Reclamation on March 27, 1996, by which it revised its schedule submission, reducing the amount requested in its October 27 letter to 4,000 acre-feet. This request was made due to "the wet, '95-'96 winter, and because of the unusually large amount of storage in New Hogan Reservoir, [Stockton East's] primary source." DX 331. Stockton East again revised its delivery request for 1996 on May 20, 1996, requesting a total of 6,520 acre-feet of water.

Delivery of water from the New Melones Reservoir in 1996 for consumptive purposes totaled 17,508 acre-feet for Central and 15,197 acre-feet for Stockton East.

7) 1997

1997 marked the first year of the operation of the IPO. The IPO was developed after a series of meetings between Reclamation, the FWS, and the Stanislaus River Basin Stakeholders, a group made up of the Contracting Parties and other interested entities affected by the operation of the New Melones Reservoir. The development of the IPO began in 1995 and terminated on May 1, 1997, when Reclamation and the FWS signed the IPO. The IPO originally was intended to be operational for the period between 1997-98 and was to be replaced by a long-term plan of operations, but this substitution has not yet occurred.

The IPO provides for a computational mechanism that allocates water to the Contracting Parties based upon the annual storage and inflow at the New Melones Reservoir. The IPO was designed to operate for the 1997 and 1998 water years, prescribing the amounts and rates of water releases from the New Melones Reservoir for CVP contractors, fisheries, water quality, and the Bay-Delta Accord, based upon the storage and inflow received at the New Melones Reservoir as follows:

(All numbers are reported as a minimum - maximum range in thousands of acre-feet of water.)

| New Melones Storage + Inflow | Fisheries | Vernalis Water Quality | Bay-Delta Accord | CVP Contractors |
|---|---|---|---|---|
| 1,400 - 2,000 | 98 - 125 | 70 - 80 | 0 - 0 | 0 - 0 |
| 2,000 - 2,500 | 125 - 345 | 80 - 175 | 0 - 0 | 0 - 59 |
| 2,500 - 3,000 | 345 - 467 | 175 - 250 | 75 - 75 | 90 - 90 |
| 3,000 - 6,000 | 467 - 467 | 250 - 250 | 75 - 75 | 90 - 90 |

See IPO at 2 tbl.2; PX 194. This equation provides for a range of available water from 0-90,000 acre-feet per year for Stockton East and Central, based upon forecast conditions. The IPO, however, notes that "it was negotiated that CVP contractors will receive [50,000 acre-feet] per year during 1997 and 1998" and that the calculation would not be used for those years. IPO at 2.

Reclamation forecast 100% of the Contracting Parties' requests and an allocation of 50,000 acre-feet of water on February 14, 1997. Reclamation announced the allocation of 27,000 acre-feet of water from the New Melones Reservoir to Central on February 18, 1997,

for the 1997 calendar year. On February 19, 1997, Reclamation announced the allocation of the remaining 23,000 acre-feet of water to Stockton East for 1997. Stockton East accepted the full allocation of 23,000 acre-feet on February 24, 1997, and received delivery of 23,256 acre-feet, while Central received delivery of 27,537 acre-feet of water from the New Melones Reservoir in 1997.

8) 1998

Stockton East submitted a schedule for water delivery in 1998 to Reclamation on October 23, 1997. This schedule requested allocation of 23,000 acre-feet of water in accordance with the negotiated amount from the IPO. Central did not submit a written schedule request for 1998. Reclamation allocated 50,000 acre-feet to Central, with any remaining amount to be made available to Stockton East. The amount of water delivered during 1998 was 23,066 acre-feet for Central and 21,343 acre-feet for Stockton East.

9) 1999-2004

The following two tables summarize the schedules submitted by Stockton East and Central, the allocations made by Reclamation, and the amount of water delivered to each plaintiff for each year from 1999-2004.

**Stockton East:** (all amounts in acre-feet)

| Year | Scheduled | Allocated | Delivered |
|---|---|---|---|
| 1999 | 23,000 (PX 228) | 60,000*(PX 232) | 31,112 |
| 2000 | 24,000 (PX 255) | 90,000* (PX 245) | 7,377 |
| 2001 | 24,000 (PX 255) | 34,000* (PX 254) | 7,030 |
| 2002 | 24,000 (PX 255); 3,500** (DX 388) | 15,500* (DX 385) | 3,493 |
| 2003 | 6,000 (DX 297); 10,000*** (DX 403) | 10,000* (PX 303) | 2,210 |
| 2004 | None submitted | 0 (DX 407) | 1,486 |

**Central:**

| Year | Scheduled | Allocated | Delivered |
|---|---|---|---|
| 1999 | None submitted | 60,000*(PX 232) | 33,786 |
| 2000 | None submitted | 90,000* (PX 245) | 27,759 |
| 2001 | None submitted | 34,000* (PX 254) | 25,747 |
| 2002 | 12,000 (DX 388) | 15,500* (DX 385) | 10,508 |
| 2003 | 10,000** (DX 403) | 10,000* (PX 303) | 9,846 |
| 2004 | 25,000 (DX 409) | 15,000 (DX 412) | 13,605 |

Legend: * = amount is allocated for both Stockton East and Central
** = amount listed is revision of initial schedule amount
*** = amount listed is revision of initial schedule amount and a combined schedule request for both Stockton and Central

See also JX 28.

2. (b)(2) water

Water was released from the New Melones Reservoir annually between 1993-2004 for purposes of fishery needs under the CVPIA. Prescriptions provided by the FWS to Reclamation on an annual basis requested release of (b)(2) water from April 1 of the current year through March 31 of the following year. 13/ Based on the annual prescription, Reclamation then provided water releases from the CVP, including releases from the New Melones Reservoir, for fishery purposes. Beginning in 1997 and in subsequent years, however, implementation of (b)(2) releases was not accomplished by issuance of prescription letters from the FWS, but, rather, based upon the table of releases generated in the IPO. See Tr. 1811-12. All (b)(2) releases for 1997-2004 from the New Melones Reservoir are summarized in the following table:

---

13/ "Water year," when used in reference to the (b)(2) releases and prescriptions, refers to the period between April 1 of the current year and March 31 of the following year. The annual (b)(2) release amounts reported below are tracked by calendar year, not by the water year used for (b)(2) releases.

| **Year** | **(b)(2) releases** (in acre-feet) |
|---|---|
| 1997 | 79,575 |
| 1998 | 129,134 |
| 1999 | 133,010 |
| 2000 | 98,819 |
| 2001 | 69,705 |
| 2002 | 70,245 |
| 2003 | 67,732 |
| 2004 | 76,030 |

JX 28.

## DISCUSSION

I. Third-party beneficiary status

In the Summary Judgment Opinion, this court granted defendant's cross-motion for summary judgment regarding the third-party beneficiary claims of California Water, the City of Stockton, and the County of San Joaquin with respect to the Central Contract. Summ. J. Op. at 527. In addition, the Summary Judgment Opinion stated that "[t]he facts involving the intent of the parties regarding third-party beneficiary status are disputed and will be resolved at trial. . . . the parties will prove their intentions at trial, citing evidence from outside the contract as needed to demonstrate whether Reclamation and Stockton East intended California Water, the City of Stockton, and the County of San Joaquin to be beneficiaries of their water contract." Id. at 528.

Plaintiffs argue that the Urban Contractors are intended third-party beneficiaries to the Stockton East Contract as recipients of the water from the New Melones Reservoir. Defendant asserts that the Urban Contractors are not intended third-party beneficiaries to the Stockton East Contract and therefore should not benefit from the terms of the 1983 Contracts.

Qualification as a third-party beneficiary to a contract with the Government requires a demonstration that the United States waived its defense of sovereign immunity. Chancellor Manor v. United States, 331 F.3d 891, 898 (Fed. Cir. 2003). "Waivers of the Government's

sovereign immunity, to be effective, must be unequivocally expressed." United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992) (internal citations and quotations omitted). The Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), includes a waiver of the Government's sovereign immunity defense for claims "founded . . . upon any express or implied contract with the United States." See Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) (noting that the Tucker Act "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and . . . waives the Government's sovereign immunity for those actions"). Nevertheless, the court's Tucker Act jurisdiction extends only to plaintiffs in privity of contract with the Government. Chancellor Manor, 331 F.3d at 899 (holding that, "for the government to be sued on a contract pursuant to the Tucker Act, there must be privity of contract between the plaintiff and the United States"); see Katz v. Cisneros, 16 F.3d 1204, 1210 (Fed. Cir. 1994) (holding that, "[a]bsent privity between [plaintiffs] and the government, there is no case").

"[I]n order to prove third-party beneficiary status, [plaintiffs] must demonstrate that the contract . . . reflects an express or implied intention to benefit the part[ies] . . . directly[.]" Chancellor Manor, 331 F.3d at 901; see also Flexfab, LLC v. United States, 424 F.3d 1254, 1259 (Fed. Cir. 2005). Those parties who benefit indirectly or incidentally from a contract are not third-party beneficiaries. See Chancellor Manor, 331 F.3d at 901.

The Federal Circuit has held:

> In order to prove third[-]party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly. Third[-]party beneficiary status is an "exceptional privilege" and, to avail oneself of this exceptional privilege, a party must "at least show that [the contract] was intended for his direct benefit."

Glass v. United States, 258 F.3d 1349, 1354 amended on reh'g, 273 F.3d 1072 (Fed. Cir. 2001) (quoting German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)). "To establish a right of action by a third person who is not a party to or identified in the contract as a beneficiary of its performance, the contract must show the intention of the contracting parties to provide a benefit to that person." Roedler v. Dep't of Energy, 255 F.3d 1347, 1352 (Fed. Cir. 2001).

The intent of the contracting parties to provide a benefit to the third party is the "cornerstone of a claim for third-party beneficiary status." Flexfab, 424 F.3d at 1259. The intent to benefit the third party must be clear. Montana v. United States, 124 F.3d 1269, 1273 (1997) (holding that third party "must fall within a class clearly intended to be

benefitted" by the contract). However, "[t]he intended beneficiary need not be specifically or individually identified in the contract . . . ." Id. If this intent is not expressly stated, it may be deduced from evidence outside the contract. Roedler, 255 F.3d at 1352. One method of ascertaining such intent is "to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." Montana, 124 F.3d at 1273. "The underlying question of whether the shareholders are third [-]party beneficiaries to the alleged contract is a mixed question of law and fact, but the appropriate test for third[-]party beneficiary status is a question of law." Glass, 258 F.3d at 1353.

Plaintiffs rely principally on H.F. Allen Orchards v. United States, 749 F.2d 1571 (Fed. Cir. 1984), which, they point out, is factually analogous to their own circumstances to support their status as intended third-party beneficiaries. In H.F. Allen Orchards, the Federal Circuit stated that farmers were third-party beneficiaries to a contract between their area water district and Reclamation. Id. at 1576 ("The irrigation districts, which contracted with the Bureau, act as a surrogate for the aggregation of farmers."). The Summary Judgment Opinion noted "that statement was dictum, coming as it did after the court's determination that the underlying cause of action sounded in tort rather than contract," Summ. J. Op. at 527, and as such, is not binding authority. Moreover, H.F. Allen Orchards is distinguishable. That claim was brought pursuant to a 1945 consent decree "entered ending a suit for declaratory judgment to determine the obligation of the Bureau to deliver water to the Sunnyside irrigation district to determine the respective water rights of all the users of the Yakima River." H.F. Allen Orchards, 749 F.2d at 1575. In contrast, this case presents no such consent decree regarding the rights of water users.

Plaintiffs also cite to Klamath Irrigation District v. United States, 67 Fed. Cl. 504 (2005). Judge Allegra concluded in Klamath, after analyzing the language of the contracts at issue, that

> [a] review of the relevant district contracts reveals that they each express the intent of the relevant district and the United States to benefit the irrigators directly by having the district assume the primary responsibility for providing water within the district in exchange for collecting amounts owed by the irrigator in payment for their water.

Id. at 533. Several sections of the 1983 Contracts, plaintiffs assert, support a similar conclusion. Article 13(a) of the Stockton East Contract provides: "The obligation of the contractor to pay the United States as provided in this contract is a general obligation of the Contractor notwithstanding the manner in which the obligation may be distributed among the Contractor's water users." See also Central Contract art. 13(a). Article 10 states: "Water

furnished to the Contractor pursuant to this contract shall not be sold, exchanged, or otherwise disposed of for use outside the Contractor's service area without prior written consent of the Contracting Officer." Stockton East Contract art. 10; see also Central Contract art. 10. In contrast, the contract at issue in Klamath expressly incorporated preexisting contracts between the water users and the United States formed under the Warren Act, ch. 141, 36 Stat. 925 (1911) (codified at 43 U.S.C. §§ 523-35 (2000)). 67 Fed. Cl. at 529-30 ("Over time, many of the above-referenced contracts were subsumed and supplanted by contracts between the United States or the Bureau and various water districts."). No preexisting agreements are evident in the cited language from the Stockton East Contract regarding the Urban Contractors, which distinguishes their situation from the circumstances present in Klamath.

Similarly, plaintiffs cite to Barcellos & Wolfsen, Inc. v. Westlands Water District, 899 F.2d 814 (9th Cir. 1990), and Henderson County Drainage District No. 3 v. United States, 53 Fed. Cl. 48 (2002), as factually similar situations in which courts have granted third-party beneficiary status to water users. In Barcellos the Ninth Circuit, without presenting any analysis of the language of the contract at issue, concluded that landowners who purchased water from the Westlands Water District ("Westlands") pursuant to a 1963 agreement between Reclamation and Westlands "are beneficiaries of the 1963 Contract, even though they are not parties to it." 899 F.2d at 816. The Ninth Circuit's approach in Barcellos stands in stark contrast to the requirements of the Federal Circuit's formulation of the third-party beneficiary test set forth in Glass, which requires a showing "that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." Glass, 258 F.3d at 1354. In addition to being non-binding on this court, the circumstances in Henderson County can be distinguished based upon the fact that the contracting parties were "drainage districts . . . created in 1913 under state authority in Illinois and Missouri, respectively, by farmer landowners along the Mississippi River," 53 Fed. Cl. at 50, not irrigation districts formed under state law, as was the case with Reclamation and plaintiffs. See 43 U.S.C. § 423e (limiting contracting authority of Reclamation to "irrigation districts organized under State law"). In addition, the dispute in Henderson County involved a circumstance whereby "any financial impact on the drainage districts directly affects the amounts paid by the landowners in land assessments and drainage taxes," and "'Congressional reports express the understanding of the United States that any damages to the landowners as a result of the maintenance of the nine-foot navigation channel would be remedied by way of payments to cover the increased operational costs of the Drainage Districts.'" 53 Fed. Cl. at 52 (quoting Defendant's Appendix of Evidence in Support of Motion for Summary Judgment at 36). Neither of these two circumstances exists in this case.

Defendant's case law regarding the Urban Contractors' third-party beneficiary status

is more instructive. In Smith v. Central Arizona Water Conservation District, 418 F.3d 1028 (9th Cir. 2005), the Ninth Circuit concluded that landowners who subcontracted for water through irrigation districts to be delivered through operation of a contract between Interior and the irrigation districts were not intended third-party beneficiaries of the contracts with Interior. Id. at 1037 ( "We conclude here, as we did in Klamath, that to allow third-party beneficiary status to all of the groups potentially benefitted under the subcontracts would produce a result certainly not intended."). Plaintiffs in Smith cited to portions of the contract and subcontracts that provided for similar restrictions upon distribution of water by the irrigation districts. Id. at 1036 ("Paragraph 8.17 provides 'the Contractor [Central Arizona Water Conservation District] agrees that all project facilities will be available for the diversion, transportation, and carriage of water for Indian and non-Indian uses pursuant to arrangements or contracts therefor entered into on their behalf with the Secretary.'" (quoting Amended Master Repayment Contract ¶ 8.17)). Similarly, in Orff v. United States, 358 F.3d 1137 (9th Cir. 2004), aff'd 545 U.S. 596 (2005), the Ninth Circuit also denied third-party beneficiary status to landowners and water users who were not named parties to a contract formed between irrigation districts and the United States. While the plaintiffs in Orff relied on two provisions of the subject contract that referred to the water users, the court ultimately concluded that "neither provision evinces a clear intent to make the farmers intended beneficiaries." Id. at 1145.

"For determination of contractual and beneficial intent when . . . the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." Roedler, 255 F.3d at 1352. In this case the governing statute restricts Reclamation's contracting authority to extend only to irrigation districts and other such entities organized under state law, not individual water users. See 43 U.S.C. § 423e ("No water shall be delivered upon the completion of any new project or new division of a project until a contract or contracts in form approved by the Secretary of the Interior shall have been made with an irrigation district or irrigation districts organized under State law."). In addition, section 9(d) of the Reclamation Project Act of 1939, Pub. L. No. 76-260, 53 Stat. 1187, states: "No water may be delivered for irrigation of lands in connection with any new project . . . until an organization, satisfactory in form and powers to the Secretary, has entered into a repayment contract," id. at 1195, and section 2(g) defines "organization" as "any conservation district, irrigation district, water users' association, or other organization, which is organized under State law and which has capacity to enter into contracts with the United States pursuant to the Federal reclamation laws," id. at 1188. See 43 U.S.C. §§ 485h(d), (e) (2000); see also Peterson v. United States Dep't of the Interior, 899 F.2d 799, 804 (9th Cir. 1990). These governing statutes further support defendant's argument that the Urban Contractors should not be granted third-party beneficiary status, as the intent of Congress would appear to limit the power of Reclamation to enter into contracts with such entities.

Finally, in response to the court's direction that "the parties will prove their intentions at trial, citing evidence from outside the contract," Summ. J. Op. at 528, plaintiffs stated at trial their intent to call three witnesses regarding third-party beneficiary status: "Dr. Mel Lytle, who is the director of Water Resources for the County of San Joaquin; Mr. Mark Madison, who is the director of Public Works for the City of Stockton; and Mr. Michael Camy, who is an official with California Water Company." Tr. at 33-34. Plaintiffs stated that "[e]ach of those will testify to their involvement in and reliance upon obtaining the water supply through these contracts, the intent to which they were involved in communications during the time that the contracts were being investigated and negotiated, and the impact of not receiving water on their operations." Id. at 34.

Dr. Lytle testified regarding the dangers of salinity intrusion on groundwater supplies, an ongoing study regarding salinity intrusion; the prohibitively high cost of pursuing a surface water supply alternative to the New Melones Reservoir; and the County of San Joaquin's role as a middleman, rather than an end user, of water from Stockton East. Specifically, Dr. Lytle testified that the County of San Joaquin distributes water received from Stockton East under the Second Amended Contract to "about 100 different county service areas and maintenance districts . . . . organized under California state law and governed by the San Joaquin County Board of Supervisors." Tr. at 721. The testimony of Dr. Lytle, while informative regarding the function and scope of the impact of the Stockton East Contract, did not provide information regarding the intent of the parties in contracting.

Mr. Madison testified regarding the service area of the City of Stockton, particularly highlighting its growing demands for water supply, where even "[a]s of a year ago, [the City of Stockton was] issuing close to 4,000 building permits for homes every year," Tr. at 758; the computation of costs under the Second Amended Contract, whereby "in general, the expenses incurred by the Stockton East Water District, including their [agricultural water] expenses, M&I expenses, and the administrative expenses, are divided between [agricultural] and the urban contractors," Tr. at 760; and the high cost of the pursuit of alternative surface water sources in light of the amount of water being supplied to Stockton East by Reclamation. Significantly, Mr. Madison offered no testimony regarding the intent of the parties.

Mr. Camy testified more specifically regarding the negotiations for the Stockton East Contract, stating that he believed that Stockton East was deputized to represent California Water in its negotiations with Reclamation. Tr. at 740. Nevertheless, he recounted that a prior agreement existed between California Water and Stockton East for water provision under which California Water started receiving water in 1977 and that the Second Amended Contract did not specify that any water from Stockton East sent to the Urban Contractors was required to be transmitted from the New Melones Reservoir pursuant to the Stockton East

Contract. Tr. at 745-46.

In light of the record developed at trial, defendant moved for judgment on partial findings, pursuant to RCFC 52(c), at the close of plaintiffs' case-in-chief. Tr. at 1247, 1251. The court granted, in part, and denied, in part, this motion, holding that the arguments presented by plaintiffs regarding the third-party beneficiary status of the Urban Contractors were insufficient, as a matter of fact and law, and denied defendant's motion as to plaintiffs. Tr. at 1274.

II. Breach of contract

What remains at issue are the various elements of plaintiffs' breach of contract claim. This court denied defendant's motion to dismiss this claim, holding that the relation-back doctrine gave the Court of Federal Claims jurisdiction, stating:

> Based on the transfer order itself, the district court's authority to enter it, and the viability of the claim transferred, the court finds that takings claim was transferred, upon which the later-pleaded breach of contract was based. Because the contract claim relates back to the filing date of the 1993 Complaint, and because it appears on the face of the complaint that the date of accrual for the breach of contract claim occurred within six years before the filing date, no statutory bar prevents consideration of this claim.

Stockton E. Water Dist. v. United States, 62 Fed. Cl. at 392 (footnotes omitted). 14/

The parties join issue on a variety of arguments as to whether Reclamation breached its contract for failing to deliver water according to the terms of the 1983 Contracts. First, the parties dispute the application of background principles of state law to the performance of Reclamation regarding the 1983 Contracts, and whether Reclamation is bound to follow the decisions of the State Water Control Board in Reclamation's operation of the New Melones Reservoir. Second, plaintiffs dispute the interpretation of various articles of the 1983 Contracts, including (1) whether the protection of Article 9(a) applies to any reductions due to future amendments to federal Reclamation law; (2) the interpretation of Article 3(h) and its invocation relating to the IPO; and (3) the nature of opinions and determinations required by Articles 9(a) and 12(d) of the 1983 Contracts. Third, plaintiffs contend that Reclamation violated its obligations under Article 4 and the Build-Up Schedule provisions

---

14/ See Stockton E. Water Dist. v. United States, 62 Fed. Cl. at 390-93, for additional discussion regarding the application of the relation-back doctrine to plaintiffs' claim for breach of contract.

of the 1983 Contracts. Finally, plaintiffs find a breach of Article 9(a) due to Reclamation's failure to take "all reasonable means to guard against a condition of shortage" by making unreasonable operational decisions to reduce water allocations to plaintiffs when other sources of water were available to meet federal and state environmental release requirements.

1. Contract interpretation

1) Standard of review

Contract interpretation is a question of law. See Teg-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1336 (Fed. Cir. 2006); Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996); Gov't Sys. Advisors, Inc. v. United States, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988). "Contract interpretation begins with the language of the written agreement." Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). "The Agreement must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." Coast Fed. Bank, 323 F.3d at 1038 (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).

The court's examination begins with the plain language that the parties used in contracting. See Textron Def. Sys. v. Widnall, 143 F.3d 1465, 1468 (Fed. Cir. 1998); McAbee, 97 F.3d at 1435; Aleman Food Servs., Inc. v. United States, 994 F.2d 819, 822 (Fed. Cir. 1993). When the contract language is unambiguous, the court's inquiry is at an end, and the plain language of the contract is controlling. See Textron Def. Sys., 143 F.3d at 1469 (citing Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991)); McAbee, 97 F.3d at 1435; Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988).

A contract provision is ambiguous when it is "susceptible to more than one reasonable meaning." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375-76 (Fed. Cir. 2004) (citing Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986)). In determining whether a contract is ambiguous, it "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "Wherever possible, courts should look to the plain language of the contract to resolve any questions of contract interpretation." Aleman Food Servs., 994 F.2d at 822 (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). "When a contract is ambiguous, before resorting to the doctrine of *contra proferentem*, 'we may appropriately look to extrinsic evidence to aid in our interpretation of the contract.'" Gardiner, Kamya & Assoc., P.C. v. Jackson, 467 F.3d 1348 (Fed. Cir. 2006) (quoting Metro. Area Transit, Inc. v. Nicholson, 463 F.3d 1256, 1260

(Fed. Cir. 2006)); see Sylvania Elec. Prod., Inc. v. United States, 458 F.2d 994, 1005 (Ct. Cl. 1972); see also Highway Prods., Inc. v. United States, 530 F.2d 911, 917 (Ct. Cl. 1976) ("Where there is an ambiguity in the contract instrument, it is appropriate to go outside the formal documents and ascertain the intent of the parties . . . ."). Nevertheless, "[a]lthough extrinsic evidence may not be used to interpret an unambiguous contract provision, [the Federal Circuit has] looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning." Teg-Paradigm, 465 F.3d at 1338 (citing Coast Fed. Bank, 323 F.3d at 1040). In resolving a contract ambiguity, the joint intent of the parties, if ascertainable, is decisive. See Edward R. Marden Corp., 803 F.2d at 705. "'It is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises.'" Id. (quoting United States v. Cross, 477 F.2d 317, 318 (10th Cir. 1973)). The court does so by "utiliz[ing] extrinsic evidence to derive a construction that effectuates the parties' intent at the time they executed the contract." Teg-Paradigm, 465 F.3d at 1338.

"Ambiguities in a government contract are normally resolved against the drafter. An exception to that general rule applies, however, if the ambiguity is patent." Triax Pac. Co. v. West, 130 F.3d 1469, 1474 (Fed. Cir. 1997); see Dureiko v. United States, 209 F.3d 1345, 1356-57 (Fed. Cir. 2000). "Basic contract construction principles require us first to decide whether the language at issue was patently ambiguous at the time of contracting. If it was, then a duty arises on the nondrafting party to inquire as to its meaning." Fort Vancouver Plywood Co. v. United States, 860 F.2d 409, 414 (Fed. Cir. 1988) (citing United States v. Turner Constr. Co., 819 F.2d 283 (Fed. Cir. 1987)). "A patent ambiguity is one that is 'so glaring as to raise a duty to inquire.'" Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting Newsom v. United States, 676 F.2d 647, 650 (Ct. Cl. 1982)). If a contract is not patently ambiguous, "we next examine whether the interpretation of the contract by the party that did not write it was reasonable. Under the rule of *contra proferent*[*e*]*m*, the contract is construed against its drafter if the interpretation advanced by the nondrafter is reasonable." Fort Vancouver, 860 F.2d at 414.

2) Limitation of the Contracting Parties' water rights by background principles of state law

The Summary Judgment Opinion stated, "In particular, defendant and amicus press the argument that plaintiffs' water rights were limited by background principles of state law. The court does not rule on this argument. It may be addressed at trial and in the related briefing." Summ. J. Op. at 536 n.13. Defendant argues that a reduction in the amount of water available for delivery to the Contracting Parties due to Reclamation's compliance with state and federal law does not constitute, as a matter of law, a breach of contract. Seconded

by amicus curiae California State Water Resources Control Board, defendant contends that case law and provisions of the 1983 Contracts mandate the operation of the CVP by Reclamation in compliance with state law, unless inconsistent with clear congressional directives.

Previously, however, the court had ruled that

> Evidence that delivery of more water to plaintiffs would have resulted in violation of the public trust doctrine, the doctrine of public ownership of wildlife, or the doctrine of reasonable and beneficial use is excluded, except insofar as it involves the impact of the 1987 Department of Fish and Game Agreement.

Order entered Oct. 18, 2006 ¶ 13.

i. Enabling legislation

Examination of the statutory history underlying Reclamation's activities and the creation of the CVP provides insight regarding the application of state law principles to the 1983 Contracts. The Reclamation Act, 43 U.S.C. § 372 (2000), states that "[t]he right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." The Reclamation Act § 383, provides:

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

Thus, Congress' intent to operate the CVP and the New Melones Reservoir pursuant to state law is made explicit. Review of the legislative history also supports this view, as expounded upon by the Supreme Court:

> From the legislative history of the Reclamation Act of 1902, it is clear that state law was expected to control in two important respects. First, and of controlling importance to this case, the Secretary would have to appropriate,

> purchase, or condemn necessary water rights in strict conformity with state law. According to Representative Mondell, the principal sponsor of the reclamation bill in the House, once the Secretary determined that a reclamation project was feasible and that there was an adequate supply of water for the project, "the Secretary of the Interior would proceed to make the appropriation of the necessary water *by giving the notice and complying with the forms of law of the State or Territory in which the works were located*." 35 Cong. Rec. 6678 (1902) (emphasis added). The Secretary of the Interior could not take any action in appropriating the waters of the state streams "which could not be undertaken by an individual or corporation if it were in the position of the Government as regards the ownership of its lands." H. R. Rep. No. 794, 57th Cong., 1st Sess., 7-8 (1902).

California v. United States, 438 U.S. 645, 665 (1978). The Supreme Court concluded in California that "[t]he legislative history of the Reclamation Act of 1902 makes it abundantly clear that Congress intended to defer to the substance, as well as the form, of state water law." Id. at 675.

ii. Contractual recognition of state law

The 1983 Contracts expressly acknowledge observance of state law regarding water use. Article 2(b) states that "water availability shall not be declared until all applicable requirements of State and Federal law with respect to utilization and delivery of Stanislaus River water for the purpose of this contract have been complied with." Stockton East Contract art. 2(b); Central Contract art. 2(b). Article 12(c) echoes this language, stipulating that "[t]he Contracting Officer shall have the right to make . . . rules and regulations consistent with the provisions of this contract, the laws of the United States and the State of California . . . . The Contractor shall observe such rules and regulations." Stockton East Contract art. 12(c); Central Contract art. 12(c). Article 16 directs that "[t]he Contractor, in carrying out this contract, shall comply with all applicable water and air pollution laws and regulations of the United States and the State of California, and shall obtain all required permits or licenses from the appropriate Federal, State, or local authorities." Stockton East Contract art. 16; Central Contract art. 16. Finally, Article 19(a) acknowledges state regulation of water rights: "[T]he contents and standards of a given water conservation program are primarily matters of State and local determination." Stockton East Contract art. 19(a); Central Contract art. 19(a). These provisions demonstrate that the parties recognized background principles of state law as a potentially limiting factor in the allocation of water from the New Melones Reservoir.

iii. Key water rights decisions

Defendant argues that "Plaintiffs' contractual rights are derived from, and thus limited by, the water rights acquired by Reclamation for New Melones under state law. Plaintiffs do not possess a contractual right . . . if the delivery and use of such water are not supported by background principles of state law." Def.'s Br. filed Oct. 10, 2006, at 11. According to defendant, three principles of state law – the public trust doctrine, the doctrine of public ownership of wildlife, and the doctrine of reasonable and beneficial use – place limitations on the Contracting Parties' consumptive use of water from the New Melones Reservoir pursuant to the 1983 Contracts, a position which is supported by the brief of amicus curiae California State Water Resources Control Board. See California State Water Resources Control Board as Amicus Curiae Supporting Defendant, filed Oct. 10, 2006, at 11.

In California v. United States, the Supreme Court examined the challenge of twenty-five conditions imposed by the State Water Control Board upon a permit issued for water impounded at the New Melones Reservoir by Reclamation. 438 U.S. 645. The Court noted that "[t]he history of the relationship between the Federal Government and the States in the reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent thread of purposeful and continued deference to state water law by Congress." Id. at 653. The Court held that state laws relating to the "control, appropriation, use, or distribution of water" must be complied with unless a specific congressional directive mandates otherwise. Id. at 674-75 (disavowing dictum from Ivanhoe Irrigation District v. McCracken, 357 U.S. 275 (1958), City of Fresno v. California, 372 U.S. 627 (1963), and Arizona v. California, 373 U.S. 546 (1963), that stated "nothing in § 8 [] compels the United States to deliver water on conditions imposed by the State." (quoting Ivanhoe, 357 U.S. at 291-92)).

On remand the Ninth Circuit interpreted the Supreme Court's holding as requiring "a state limitation or condition on the federal management or control of a federally financed water project [to be] valid unless it clashes with express or clearly implied congressional intent or works at cross-purposes with an important federal interest served by the congressional scheme." United States v. California, 694 F.2d 1171, 1177 (9th Cir. 1982). No express or clearly implied congressional intent has displaced the Supreme Court's overarching decision that Reclamation must comply with state law in its operation of the CVP.

California law grants the State Water Control Board the power to make decisions regarding water appropriation. See Cal. Water Code § 1201 ("All water flowing in any natural channel, . . . is hereby declared to be public water of the State and subject to appropriation in accordance with the provisions of this code"); Cal. Water Code § 102 ("All

water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law"); see also Envtl. Def. Fund v. E. Bay Mun. Util. Dist., 605 P.2d 1, 7 (1980) (describing water appropriation permit application process). Because no express or clearly implied congressional intent contradicts this state mandate, background principles of state law obligated Reclamation to comply with state-imposed requirements for water releases. See, e.g., Cent. Delta Water Agency v. Bureau of Reclamation, 452 F.3d 1021, 1026 ("The Delta parties are correct that the Bureau lacks the discretion to violate the Vernalis Salinity Standard."). Because no evidence of express or clearly implied congressional intent was adduced regarding any of the state-mandated water permit conditions or other mandated releases, Reclamation was bound to comply with all state-imposed requirements.

3) Article 3(h)

The 1983 Contracts provided for four methods for reducing water allocations to the Contracting Parties, which, if properly invoked, could preclude a finding of breach of contract for failure to provide water allocations as required by other provisions of the 1983 Contracts. Only one of these provisions is pertinent to plaintiffs' claim of breach. Article 3(h) of the Stockton East Contract and Article 3(g) of the Central Contract provide: "The United States and the Contractor by mutual agreement may reduce the annual quantity of water which the United States is obligated to make available and the Contractor obligated to pay for during the remainder of the term of this contract." Stockton East Contract art. 3(h); Central Contract art. 3(g). The parties dispute whether, after execution of the IPO, this provision properly was invoked to modify the 1983 Contracts.

The Summary Judgment Opinion noted: "The parties allegedly agreed to the New Melones Interim Plan of Operation in 1997, which may have represented a mutual agreement to modify the original contracts under . . . Article 3. The interpretation of this agreement is disputed." Summ. J. Op. at 523. Defendant argues that any resulting delivery of a reduced water allocation from the New Melones Reservoir pursuant to the IPO constitutes a mutual agreement of the parties that precludes liability for breach of contract, as provided in Article 3(h) of the 1983 Contracts. Plaintiffs counter that the IPO was not a mutual agreement, as the Contracting Parties were not a party to its execution.

According to Grant O. Thompson, Chairman of the Board of Directors for Central, Central "never approved [the IPO]." Tr. at 374. Edward M. Steffani, who served as General Manager of Stockton East between 1983 and 1999, testified that Stockton East never agreed to the IPO, never signed the IPO agreement, and did not consider the IPO to be an amendment of the Stockton East Contract. Tr. at 485-86. The signatories to the IPO included only Reclamation and the FWS. See PX 203 at 4. Nevertheless, the Contracting

Parties' representatives testified that, along with representatives of Reclamation and the FWS, they were part of the Stanislaus Stakeholders meetings, where the IPO was discussed. See, e.g., Tr. at 313 ("Reid W. Roberts: But [in December 1996], [the Contracting Parties] had been involved in Stanislaus stakeholders' discussions about an interim operations plan and how it would work.").

Interior organized the Stanislaus Stakeholders meetings in 1995 and continued them through 1997, which, according to the IPO transmittal letter from Reclamation dated May 1, 1997, led to the IPO's execution after "a final [IPO] for the New Melones Reservoir was agreed to in concept [at a Stakeholders meeting on January 29, 1997]". PX 203; see Tr. at 474. In addition, Jeanne M. Zolezzi, General Counsel for Stockton East, wrote to Reclamation in a letter dated September 9, 1998, after implementation of the IPO, that "[a]s an interim stopgap measure, the stakeholders agreed to operate the New Melones Project under the two-year [IPO] in order to allow time to negotiate a more equitable long-term operations agreement." PX 222. Article 3(h) does not explicitly require the Contracting Parties to be signatories to any such mutual agreement, nor is there any requirement that such an agreement be in writing, which also is supported by an examination of other articles within the 1983 Contracts that do specify written notification or agreement. See *infra* Discussion II.1.5).

The evidence supports a finding that the Contracting Parties, while not signatories to the IPO, did agree with Reclamation as part of the Stanislaus Stakeholders meeting on January 29, 1997, to a short-term modification of their water allocations. The Contracting Parties therefore agreed to a modification of the 1983 Contracts pursuant to Article 3(h) during 1997 and 1998. This court notes as particularly relevant the involvement of the Contracting Parties in the Stanislaus Stakeholders process and the acknowledgment of an "agreement to operate the New Melones Project" under the IPO made by Stockton East as an "interim stopgap measure." PX 222. Nevertheless, the parties also made clear that the terms of the IPO would not affect certain provisions of the 1983 Contracts. See PX 227 ("It is Reclamation's position that your allocations of water under, and acceptance of the provisions of the negotiated two-year [IPO], will not trigger the build-up provisions under Article 3 and Article 5 of [the Stockton East Contract]."). Reclamation is not liable for any water allocations that met the requirements of the IPO during 1997 and 1998, although this finding is not applicable regarding any triggering of the Build-Up Schedule provisions contained in Articles 3 and 5.

4) Article 9(a)

The 1983 Contracts also include a clause that protects Reclamation from liability in case of reductions in water allocations for specified reasons.

The second part of Article 9(a) states :

> Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall acc[ru]e against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

Stockton East Contract art. 9(a); Central Contract art. 9(a). Where the parties dispute the interpretation of Article 9(a) read in conjunction with Article 12(d), this court previously ruled:

> Nonetheless, the evidence regarding what sort of "opinions and determinations" was required to be issued by the contracting officer, as well as what decisions he actually issued, has not been developed sufficiently enough to sustain a finding. Second, assuming that the contracting officer issued the necessary determinations, it remains to be determined if they were arbitrary, capricious, or unreasonable under the circumstances. Trial will allow the parties to expand upon the evidence bearing on both of these questions.

Summ. J. Op. at 535.

Plaintiffs contend that the intent of the parties regarding the scope of Article 9(a) was limited to natural causes, such as floods or earthquakes, and does not contemplate enactment of federal legislation, such as the CVPIA. Therefore, plaintiffs proceed, the actions taken by Reclamation to comply with the requirements of the CVPIA breached the 1983 Contracts. Mr. Roberts, General Counsel for Central, testified that he had raised the interpretation of Article 9(a) with Merv de Haas, a Contracting Officer for Reclamation, in a meeting during the latter part of 1982:

> Q. At this meeting, did Merv De Haas have anything to say about Article 9, the provision that the United States shall use all reasonable means to guard against shortage to contractors and that, nevertheless, should shortage occur, which in the opinion of the contracting officer is due to drought or other causes beyond the control of the United States, there shall be no liability? Was there any discussion of that provision?
>
> A. Well, at a meeting we discussed that issue at length.
>
> I was concerned with a district that had no surface water supply, and we

> were going to have to go out and build and finance a project, that the water was going to be there for us.
>
> And that provision indicated that it could be taken away for reasons of drought or other causes which, in the opinion of the contracting officer -- et cetera. So I wanted to discuss and delineate what the terms and conditions would be.
>
> Merv De Haas assured me, and indicated that that language meant that it was drought or physical causes for which they could not deliver the water, meaning, that there was some problem -- an earthquake, some problem with the delivery system. Again, the water was not there to deliver to us because it hadn't flown into the reservoir but drought or physical causes that made delivery of the water untenable.

Tr. at 153-54. Mr. Steffani, General Manager of Stockton East, described the intent of Stockton East at the time of the contract was executed:

> A. To us, [Article 9(a)] meant, as Reid Roberts said earlier, testified to, at that water would be there every year except we would receive a reduced amount in dry years.
>
> Q. Did you understand that there could be reductions for any other reason?
>
> A. Well, and other physical problems -- failure of the reservoir or earthquakes, that sort of thing.

Tr. at 413.

Plaintiffs assert that Article 9(a) is a "a classic *force majeure* clause in which the parties to a contract agree that certain future events that can neither be anticipated nor controlled will relieve one of them of liability," Pls.' Br. filed Sept. 25, 2006, at 18; that the proper interpretation of this contract provision is limited to physical causes such as drought; and thus that passage of the CVPIA, a federal statue, does not fall within this provision.

In support of this interpretation, plaintiffs cite to Westlands Water District v. United States, 337 F.3d 1092 (9th Cir. 2003), in which a Westlands Water District contract clause provided:

> There may occur at times during any year a shortage in the quantity of water available for furnishing to the District through and by means of the Project, but in no event shall any liability accrue against the United States . . . for any damage . . . arising from a shortage on account of errors in operation, drought, or any other causes.

Id. at 1097 (quoting Article 11(a) of the Westlands Water District contract). Plaintiffs contend that the inclusion of "any other causes" in the Westlands contract differs from the use of "other causes" in Article 9(a) of the 1983 Contracts, to the end that the provision is distinguishable in scope. Plaintiffs also maintain that the existence of Article 26, an article that provided for renegotiation of the contract upon amendment of federal Reclamation law, also distinguishes this situation from their own.

Defendant responds with the Ninth Circuit's analysis of Article 11(a) of the Westlands Water District contract in O'Neill v. United States, 50 F.3d 677 (9th Cir. 1995). "On its face, Article 11(a) unambiguously disclaims any liability for damages in the event the United States is unable to supply water in times of shortage." Id. at 683. Defendant points out that Westlands did not include any language of limitation within the provision. 15/ The court stated: "We conclude that the contract's liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.'" Id. at 684. The factor that most dominated the Ninth Circuit's analysis was the lack of "language of limitation within the provision," not the use of the word "only." Notably, the sole language of limitation in the second part of Article 9(a) requires "other causes" to be "in the opinion of the Contracting Officer . . . beyond the control of the United States." Stockton East Contract art. 9(a); Central Contract art. 9(a). The Ninth Circuit also considered the effect of Article 26 upon the Westlands contract and concluded that "[r]elieving the government from liability for delivering Westlands' full contractual amount of water where a reduction is mandated by statute, including by amendments to reclamation law, is not incompatible with giving Westlands an option to renegotiate its contract to conform to changes in reclamation law." O'Neill, 50 F.3d at 684. The presence of Article 26 was of little consequence to the determination made by the Ninth Circuit in O'Neill, which suggests that its absence should be of similar significance to the present case.

---

15/ The Westlands contract Article 11(a) analyzed in O'Neill is identical to the one at issue in Westlands. See Westlands Water Dist. v. United States, 337 F.3d 1092, 1101 (9th Cir. 2003) ("We have previously addressed the interpretation of the Westlands Contract, specifically Article 11(a), the same article which is at issue in this case. See O'Neill, 50 F.3d 677.").

In addition, David G. Houston who signed the 1983 Contracts on behalf of Reclamation, testified as to his understanding of Reclamation's interpretation of Article 9(a):

> Q. So with respect to your understanding of the particular contracts that you signed, did you anticipate that they, by their own terms, anticipated that the contractor would bear the risk of future changes in the Reclamation law?
>
> A. In most respects, I believe we're silent on that in the contracts. But the notion is, my expectation is that if you have a contract, the United States would live up to its contracts the same way any private party would. And that was basically the negotiation that we all had in that time, is that everybody will honor their contracts and you'll provide them.

Tr. at 59-60.

An examination of the congressional authorization for the CVP can also be illustrative regarding the applicability of federal Reclamation law to the 1983 Contracts. The Flood Control Act of 1962 expanded the CVP and, in part, modified the authorization of the New Melones Reservoir. The Flood Control Act of 1962 required the New Melones Reservoir to be "an integral part of the [CVP] and be operated and maintained by the Secretary of the Interior pursuant to the Federal reclamation laws, except that flood control operation of the project shall be in accordance with the rules and regulations prescribed by the Secretary of the Army." 76 Stat. at 1191. The Flood Control Act of 1962 was modified by the enactment of the CVPIA in 1992, which also instructed Interior to "operate the [CVP] to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, et seq., and all decisions of the California State Water Resources Control Board." CVPIA § 3406(b). Both the Flood Control Act and the CVPIA noted that the CVP was to be operated pursuant to federal Reclamation laws. See, e.g., Flood Control Act of 1962, 76 Stat. at 1191 ("[T]he project shall . . . be operated and maintained . . . pursuant to the Federal reclamation laws.").

The language of the 1983 Contracts provides additional support for interpreting the scope of Article 9(a) to encompass future amendments to federal Reclamation law. The parties agreed that "the delivery of irrigation water . . . pursuant to this contract is subject to the acreage and ownership limitations and pricing provisions of Reclamation law, as amended and supplemented . . . ." Stockton East Contract art. 12(a); Central Contract art. 12(a). The 1983 Contracts mention several specific Reclamation laws, but does not expressly limit itself to them. See, e.g., Stockton East Contract, Preamble at 1, Explanatory Recitals

at 2, art. 12(a). The Contracting Parties also agreed to follow any rules made by the contracting officer that were "consistent with the provisions of [the] contract, the laws of the United States and the State of California . . . ." Stockton East Contract art. 12(c); Central Contract art. 12(c).

In resolving the ambiguity present in Article 9(a), the court grants great weight to plaintiffs' evidence of the intent of Stockton East and Central. Nevertheless, the intent of the parties is made evident through examination of (1) the Ninth Circuit's review of the Westlands contract; (2) surrounding contract terms in the 1983 Contracts; and (3) the federal Reclamation laws and their explicit instructions for CVP operations. The court concludes that, after examination of the relevant extrinsic evidence, the intent of the parties regarding Article 9(a) encompasses water allocation reductions to the Contracting Parties between 1993 and 2004 that occurred due to implementation of amendments to federal Reclamation law after December 19, 1983. Therefore, Reclamation is not liable for any reduction to the Contracting Parties' water allocations that were made necessary by the CVPIA.

5) Articles 9(a) and 12(d)

Reclamation's contractual obligation to provide water to the Contracting Parties included a commitment to act in a reasonable manner. The first portion of Article 9(a) of the 1983 Contracts states that "[i]n its operation of the Project, the United States will use all reasonable means' to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this agreement." Stockton East Contract art. 9(a); Central Contract art. 9(a). In addition, Article 12(d) provides:

> Where the terms of this contract provide for action to be based upon the opinion or determination of either party to this contract, whether or not stated to be conclusive, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations.

Stockton East Contract art. 12(d); Central Contract art. 12(d). Reviewing the language of Article 12(d) and complementary provisions demonstrates that, where an action, such as a reduction in water supply, is based upon a determination or opinion of the contracting officer, the decision may not be made in a manner that is arbitrary, capricious, or unreasonable. Thus, reductions in water supply pursuant to any decision or opinion of the contracting officer are subject to examination for arbitrariness, capriciousness, or unreasonableness.

During the summary judgment phase, unburdened by the context that a trial provides, this court determined that the terms of Articles 9(a) and 12(d) were ambiguous as they relate

to "opinions and determinations" and directed the parties to provide extrinsic evidence regarding the intent of the parties. Summ. J. Op. at 535; see Teg-Paradigm, 465 F.3d at 1339. Plaintiffs assert that the terms of Article 12(d), which provides for appeal of any such opinion or determination to the Secretary of Interior, when read in context with Article 9, require Reclamation to "render a decision sufficiently clear to allow review by the Secretary." Pls.' Br. filed Sept. 25, 2006, at 24. They reason that a decision that would permit review requires a formal invocation in writing by Reclamation, as their right to appeal such a determination otherwise would be rendered meaningless. Mr. Houston, Regional Director for Reclamation from 1983 to 1999, testified that Reclamation's understanding of Article 9(a) at the time of its execution was that "[Reclamation] would try to use all of the means available to us to make water available to the contractors. . . . Otherwise, it was essentially a [commitment] to deliver water, if [Reclamation was] able to." Tr. at 55.

Examination of the provisions of the 1983 Contracts in context reveals that specific sections of the Stockton East Contract explicitly memorialize when written notification or approval is necessary, in contrast to other sections, such as Article 12(d), that do not include such a limitation. Compare Stockton East Contract art. 2(b) ("The Contracting Officer shall provide a written notification . . . announcing the initial delivery date . . . of water availability."), art. 3(a) ("upon a minimum one year written notification . . . . [t]he Contractor's interim water supply may be reduced . . . ."), art. 10 ("Water furnished to the Contractor . . . shall not be sold, exchanged, or otherwise disposed of . . . without prior written consent of the Contracting Officer."), with Stockton East Contract art. 11(a) ("Water . . . may be transported through distribution facilities . . . if the Contracting Officer determines that such mingling is necessary."), art. 3(f) ("[S]aid maximum quantity may be increased only if the Contracting Officer has determined . . . additional Project water is available."); see also Central Contract (providing identical contract terms, except for art. 3(a)(2) and (f), which are similar in substance).

Because plaintiffs assert that a violation of Article 12(d) occurred in relation to water-allocation reductions in years when no formal announcement of water shortage was made, review of the actual circumstances of the decision-making process for water reductions is instructive. According to Roger K. Patterson, who was Regional Director of the Mid-Pacific Region for Reclamation, the Central Valley Operations Office, which he headed, was in charge of actual day-to-day operations of the CVP. Mr. Patterson testified that the forecast process involved "an analytical process of really looking at what is available and what is anticipated to be available as far as water supply each year," and confirmed the details. Tr. at 1571. As he described it, the process includes snowpack measurements in the early winter, followed by a preliminary assessment at the annual water users conference held in January, monthly forecasts published starting February 15, and examination of water storage levels in the reservoirs. Even when no formal announcement of shortage is issued, a record of

Reclamation's decision-making process was made available to the Contracting Parties in years during which they received water allocation reductions. Such information, if made available to the Secretary, is sufficient to base a review of the water reduction decisions made by Reclamation.

After examining the language of Article 12(d), its relation to complementary contract provisions, and extrinsic evidence regarding its function relative to water supply reductions, this court rules that the interpretation of Article 12(d) presented by plaintiffs is not reasonable under the circumstances, particularly in light of the processes detailed above regarding allocation forecasting. When read in context with Article 9(a), Article 12(d) does not require a water reduction decision or opinion to be based on a formal invocation or an invocation in writing of a critically dry year, but, rather, on a factual basis for the decision sufficient to provide review by the Secretary of Interior.

3. Alleged violations of contract provisions

Taking into account the interpretation of the various terms of the 1983 Contracts that were in dispute, plaintiffs assert that Reclamation breached the 1983 Contracts based on three actions. First, Reclamation did not provide water pursuant to its schedule allocation obligations under Article 4. Second, Reclamation violated the terms of the Build-Up Schedule in Articles 3 and 5 of the 1983 Contracts by failing to meet minimum requirements for allocations of water. Finally, Reclamation violated Article 9(a) by making unreasonable operational decisions that evidenced a failure to "use all reasonable means to guard against a condition of shortage" to the Contracting Parties. See Stockton East Contract art 9(a); Central Contract art. 9(a).

1) Schedules and water allocations

In addition to their commitment to make payments for water allocations, the 1983 Contracts obligated the Contracting Parties to submit schedules prior to the delivery of water on an annual basis. Article 4(a) states:

> For each year the Contractor will submit a schedule, . . . indicating the amounts of agricultural and M&I water required monthly. The first schedule shall be submitted 2 months prior to the initial delivery of water. Thereafter, annual schedules indicating monthly water requirements for the subsequent years shall be submitted not later than November 1 of each year or at such other times as determined by the Contracting Officer to assure coordination of Project operations. The United States shall attempt to delivery water in accordance with said schedules, or any revisions thereof . . . .

Stockton East Contract art. 4(a). Review of companion provisions of the 1983 Contracts supports a literal interpretation of this contractual obligation to require submission of annual schedules. See Stockton East Contract art. 3(c) ("The United States shall make available to the Contractor the annual quantities of agricultural water . . . as specified in the schedule submitted by the Contractor . . . ."); Stockton East Contract art. 3(d) ("The United States shall make available to the Contractor the annual quantities of M&I water . . . as specified in the schedule submitted by the Contractor."). See also Central Contract art. 3(c), (d) (providing for similar requirements for furnishing of agricultural and M&I water).

The Contracting Parties were required to submit annual schedules to Reclamation indicating monthly water needs for the upcoming year two months prior to the initial delivery of water, and by November 1 of each subsequent year. The sequence of events took place in the following general form: (1) Central and Stockton East would submit schedules in writing to Reclamation; (2) Reclamation would make forecasts for predicted allocations, followed by a formal allocation of available water to the Contracting Parties; (3) Central and Stockton East would submit a delivery schedule to Reclamation that indicated how much water would be required and when it would be required; (4) Reclamation would deliver water to the Contracting Parties based on their acceptance of the allocated amounts.

This court ruled in the Summary Judgment Opinion that

> [t]he parties agree that these were enforceable contracts and that Reclamation did have a duty under the contracts to provide plaintiffs with at least the amount of water that they specified in their schedules, albeit with limitations and provisos. See [Transcript of Proceedings, Stockton E. Water Dist. v. United States, No. 04-541L, at 65-66 (Fed. Cl. Jan. 6, 2006)]. Therefore, defendant, in theory, admits liability in those situations where plaintiffs submitted valid schedules for water and Reclamation did not provide it, as long as Reclamation's performance was not excused by one of the other provisions of the contract–most notably, but not limited to, Article 9(a).

Summ. J. Op. at 532-33. Thus, water deliveries and schedules must be examined for (1) whether the Contracting Parties provided schedules; (2) if so, whether Reclamation met its obligation to meet the schedule demands; (3) if Reclamation did not meet the demands, whether performance was excused by Article 9(a); and (4) whether these decisions complied with Article 12(d).

2) The Contracting Parties' submission of schedules

Article 4(a) requires the Contracting Parties to "submit a schedule, . . . indicating the

amounts of agricultural and M&I water required monthly," which indicates that a valid schedule would include specific details as to the amounts of water to be delivered on a monthly basis, by category. Stockton East Contract art. 4(a); Central Contract art 4(a). Plaintiffs' testimony regarding an oral request by Mr. Steffani in 1993 did not provide such details and therefore is insufficient to meet the requirements of a valid submission in 1993. The Contracting Parties, however, provided valid schedules pursuant to the requirements of Article 4 during 1995, and Stockton East made additional schedule submissions in 1994, 1996, and 1998. Central's schedule was submitted late in both 1994 and 1996, rendering each invalid, and not at all in 1998. Thus, Reclamation was obligated under Article 9(a) to make deliveries to Stockton East from 1994-96 and in 1998 and to Central in 1995.

Based on the parties' representations, this court concluded that "[i]n order to show liability, plaintiffs must offer a reasonable explanation, consistent with their obligations under the contract, for their failure to submit schedules or their submission of schedules for smaller-than-desired quantities of water." Summ. J. Op. at 533. Defendant argues that failure to submit schedules for given years resulted in a material breach of contract by the Contracting Parties, so that Reclamation is not liable for any water allocation reductions that subsequently occurred. Plaintiffs counter that the correspondence exchanged between Reclamation and the Contracting Parties made submission of schedules a "completely useless exercise," and, thus, futile. Pls.' Br. filed Sept. 25, 2006, at 28. Alternatively, plaintiffs argue that the lack of submitted schedules pursuant to Article 4 was a minor deviation and immaterial to substantial performance of the 1983 Contracts, thereby not operating to excuse any breach of contract by Reclamation.

Plaintiffs cite to Border Brokerage Co. v. United States, 36 C.C.P.A. 83 (1949), for the proposition that Reclamation's correspondence excused non-performance of plaintiffs' requirement to submit schedules. Id. at 86 ("The general rule is a sound one, that when the tender of performance of an act is necessary to the establishment of any right against another party, the tender or offer to perform is waived or becomes unnecessary, when it is reasonably certain that the offer will be refused.") 16/; see also 17A Am. Jur. 2d Contracts § 598 (2006) ("[A] tender or offer of performance is unnecessary, even though it might otherwise be required, if it appears that it would be useless."). Plaintiffs highlight the history of correspondence with Reclamation regarding the schedules and allocations discussed above. See *supra* Facts V.1. Plaintiffs draw particular attention to the long delays between the submitted schedules prior to November and the allocation announcements that took place

16/ "Decisions of the Court of Customs and Patent Appeals are binding precedent on [the Federal Circuit]." BMW Mfg. Corp. v. United States, 241 F.3d 1357, 1362 n.3 (Fed. Cir. 2001) (citing South Corp. v. United States, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc)).

during the spring and summer of the following years, as well as the inability of Reclamation to supply the requested water in 1994 and 1995. As discussed above, however, Reclamation invoked the shortage provisions of the 1983 Contracts for 1994 and 1995, and its water allocation determinations reflected an analysis of future climate conditions based on winter snowpack, which was observed in the winter and confirmed by observation through the spring months. The prediction of climate aridity is not an exact science and requires observation of various factors over a period of time. While Reclamation's time frame may not have been convenient to the Contracting Parties in light of their agricultural and M&I needs and requirement of a stable water supply, plaintiffs' evidence does not establish that the submissions were a "completely useless exercise" and therefore does not excuse them from submitting schedules. Pls.' Br. filed Sept. 25, 2006, at 28.

Alternatively, plaintiffs cite to Franklin E. Penny Co. v. United States, 207 Ct. Cl. 842 (1975), for the holding that "[s]ubstantial performance, as that term is used here, refers to the equitable doctrine that guards against forfeiture in situations where a party's contract performance departs in minor respects from that which had been promised." Id. at 856. The failure to submit schedules was such a minor deviation, in plaintiffs' view, and should not excuse any failure by Reclamation to comply with the 1983 Contracts' terms, particularly in light of the contractual obligation to construct facilities in order to receive water. See Stockton East Contract art. 7(a); Central Contract art 7(b); see also 17A Am. Jur. 2d Contracts § 616 ("The general test of performance, except with regard to express conditions not resulting in a forfeiture, is not whether a party has literally complied with a contract's terms, but whether one has substantially done so." (footnotes omitted)). In addition, Article 4(a) states that "[t]he inability, failure, or refusal of the Contractor to submit a schedule shall not relieve it of its payment obligations." Stockton East Contract art. 4(a); Central Contract art. 4(a).

After examination of the 1983 Contracts' terms and evidence presented regarding schedule-related correspondence between Reclamation and the Contracting Parties, the court finds that the Contracting Parties' payment for water and construction of multi-million dollar facilities to transmit the water allocations pursuant to the 1983 Contracts constituted substantial performance. 17/ Failure by the Contracting Parties to submit schedules therefore would not excuse any future breach of contract by Reclamation.

---

17/ Central did not fund construction of the water delivery system. Instead, it pays Stockton East for its use. Mr. Steffani, General Manager of Stockton East Water District from 1983 to 1999, testified that the cost of the completed facility was approximately $60 million. Tr. at 415-17. These facilities were substantially in place by December 31, 1994.

3) Reclamation's obligation to meet the schedules

Because the Contracting Parties' non-submission of schedules does not excuse Reclamation's obligations under Article 4(a), the court must scrutinize Reclamation's performance of its obligations. Reclamation failed to provide any water at all in 1994 after Stockton East made a schedule request for 9,700 acre-feet to be delivered. In 1995 Stockton East and Central made requests for 115,000 acre-feet to be delivered, while Reclamation made only 37,000 acre-feet available. Stockton East and Central modified their delivery requests in July and August of 1995, following the dispute regarding water conservation plans. Nevertheless, this modification would not excuse Reclamation's reduced allocation; Reclamation already had violated Article 4(a)'s requirements by announcing that only 37,000 acre-feet would be made available to the Contracting Parties. In 1996 Stockton East submitted an initial schedule for 32,400 acre-feet of water beginning in April 1996, which was met by Reclamation on March 19, 1996. Stockton East subsequently reduced its demands to 4,000 acre-feet on March 27, 1996, which Reclamation also fully allocated. While delay occurred in approving the initial allocation, Reclamation complied with Article 4(a) by fully allocating water sufficient to meet all of the schedule amounts submitted by Stockton East in 1996. No violation occurred in 1998, as Reclamation met fully Stockton East's schedule for 23,000 acre-feet by allocating 50,000 acre-feet pursuant to the IPO. Following the IPO's two-year modification of the 1983 Contracts, Reclamation discharged its obligations to meet the schedules provided by the Contracting Parties in all years.

4) Invocation of water shortage provisions

Reclamation provided no water to Stockton East in 1994, but explicitly invoked the shortage provision of Article 9(b) on May 24, 1994, which permits the reduction of Stockton East's water supply in water shortage years. See Stockton East Contract art. 9(b); Central Contract art. 9(b). The requirements of Article 12(d) mandate that this determination be made in a manner that is not arbitrary, capricious, or unreasonable. Reclamation supported this determination by noting that California had just suffered from the "fourth driest year in 85 years," DX 276, and that "[r]ain and snowfall conditions in the watershed supplying the reservoir have not been sufficient to support CVP contract deliveries." PX 99. Reclamation stated that "every effort is needed to avoid allowing the level of New Melones reservoir to drop below the minimum storage level (300,000 acre-feet) needed to generate power . . . . The available water will be allocated to fish and wildlife, and to meet water quality requirements." DX 276. Examination of the storage level of the New Melones Reservoir at the end of calendar year 1993, 747,512 acre-feet, as compared to the end of calendar year 1994, 425,405 acre-feet, is consistent with the reasonable assertion of a critically dry year in 1994. JX 28. The understanding of Mr. Roberts, General Counsel for Central, with respect to the Central Contract was that "[i]f there was no water to give [Central], if there was a

drought and there was no water, [Central's allocation] would be zero." Tr. at 286.

In 1995 Reclamation authorized the release of only 37,000 acre-feet of water in response to the Contracting Parties' initial schedules for 115,000 acre-feet to be delivered. Reclamation justified this reduced allocation by noting the continued dry forecast for the New Melones Reservoir, stating, "Storage in New Melones Reservoir on the Stanislaus River has not recovered to the same extent as at other CVP reservoirs. With the improved conditions in March at New Melones, Reclamation has allocated up to 37,000 acre-feet to CVP contractors from the Stanislaus River." PX 121. In 1995 Reclamation anticipated, upon review of the prevailing conditions at the time, that the lesser recovery of snowpack for the New Melones Reservoir would result in a reduced allocation to ensure sufficient water for environmental and other in-basin purposes. This determination was supported by observation of snowpack amounts built up over the winter, indicating a dry year for the New Melones Reservoir. As discussed above, Article 12(d) cannot be interpreted to require a formal, written opinion to invoke the protection of Article 9(a). Given that Article 9(a) does not impose the requirement of a formal written order, combined with the facts that, at the end of calendar year 1994, the total New Melones Reservoir storage was 425,405 acre-feet and that a long drought period of over five years immediately preceded the allocation, the determination of the contracting officer that the shortage was due to causes outside of the control of the United States is supported adequately by the facts. The records of forecasting activity meet the requirements of Article 12(d), as these records provide information sufficient upon which to base a review by the Secretary of the Interior.

The determination of shortage by Reclamation in 1994 and 1995 was not made in an arbitrary, capricious, or unreasonable manner in violation of Article 12(d). Reclamation made the determination of shortage on the basis of forecasted hydrology measured against available water storage levels in the New Melones Reservoir. Because the evidence does not support a finding that Reclamation violated Article 12(d), this court finds that Reclamation validly invoked Article 9(b)'s shortage provision in 1994 and 1995, thereby excusing its non-performance pursuant to Article 4(a).

5) <u>Build-Up Schedule amounts versus schedule requests</u>

Plaintiffs argue that the correct computation for the amount of water that Reclamation owed them for any given year should not be based on schedules; rather, it should be based on the minimum amount of water listed in the Build-Up Schedule contained in Article 3 of the 1983 Contracts. <u>See</u> Stockton East Contract art. 3; Central Contract art. 3. Defendant rejoins that the Contracting Parties were required to submit schedules per Article 4(a) of the 1983 Contracts and that the Contracting Parties should be limited to that which was submitted in accordance to the schedule requirements.

The Build-Up Schedule contained in Article 3 of the 1983 Contracts provides for a minimum annual supply that specifies that agricultural ("Ag") water needs and M&I water needs are to be addressed. Article 3(b) of the Stockton East contract reads:

> Subject to the terms and conditions herein stated, the United States shall make available annually to the Contractor a maximum of 75,000 acre-feet of interim water: Provided, That this quantity may be increased pursuant to subdivisions (f) and (g) of [Article 3]: Provided further, That if the total water quantity is reduced pursuant to subdivision (a) of [Article 3], the maximum and minimum quantities of specified in subdivisions (c) and (d) shall be adjusted proportionately to such reduction or otherwise adjusted in a manner mutually agreed to by the Contracting Officer and the Contractor . . . .

Stockton East Contract art. 3(b); see also Central Contract art. 3(b) (providing similar terms for differing quantities of water). The Stockton East Contract Article 3(c) states that "[Reclamation] shall make available and [Stockton East] shall pay for, as a minimum, such quantities of agricultural water as specified." Stockton East Contract art. 3(c). The Central Contract contains an identical provision. Central Contract art. 3(c). Article 3(d) of the Stockton East Contract mirrors this requirement as related to M&I water supply. Stockton East Contract art. 3(d); see also Central Contract art. 3(d) (including similar language).

Article 3(b) places a limitation on these provisions, as it states, "[I]f the total water supply is reduced pursuant to [Article 3(a)], the maximum and minimum quantities specified in [Article 3(c) and (d)] shall be adjusted proportionately to such reduction or otherwise adjusted in a manner mutually agreed to." Stockton East Contract art. 3(b); Central Contract art. 3(b). Yet, this court was not made aware of any notification that conformed to the requirements of Article 3(a), which required notice to be provided in writing at least one year in advance of any reduction.

The Build-Up Schedule created an annual minimum purchase and supply schedule as detailed in the following chart:

| Year | Build-Up Stockton East | Build-Up Central |
|---|---|---|
| 1993 | 500 | 0 |
| 1994 | 23,350 | 28,000 |
| 1995 | 23,450 | 28,000 |
| 1996 | 25,550 | 28,000 |

| | | |
|---|---|---|
| 1997 | 46,400 | 56,000 |
| 1998 | 46,500 | 56,000 |
| 1999 | 66,700 | 56,000 |
| 2000 | 67,400 | 56,000 |
| 2001 | 68,100 | 56,000 |
| 2002 | 68,800 | 56,000 |
| 2003 | 69,500 | 56,000 |
| 2004 | 70,200 | 56,000 |

See Stockton East Contract art. 3, 5; see also Central Contract art. 3, 5; PX 36; PX 37.

These amounts, however, are subject to two conditions. First, for any year in which Central or Stockton East schedules a quantity greater than the minimum amount for the following year, the increased quantity substitutes for the minimum amount until the schedule amount exceeds the increased quantity. Stockton East Contract art. 3(c)(2); Central Contract art. 3(c)(2). Second, Reclamation is obligated to supply only the amount of water actually scheduled in 1999 for delivery as a minimum amount beginning in 2000 and going forward, and the amount scheduled in 1999 would also constitute the contract maximum, as well. Stockton East Contract art. 3(c)(3); Central Contract art. 3(c)(3).

Article 3(j) of the 1983 Contracts provides: "If in any year after the Contracting Officer has approved a schedule or any revision thereof submitted by the Contractor, the United States is unable to furnish any of the water . . . the Contractor shall be entitled to an adjustment as provided in Article 6." Stockton East Contract art. 3(j); Central Contract art. 3(I). Article 6 provides for a method of issuing credit for overpayments by the Contracting Parties for any reduced water supply, noting that "[s]uch adjustment shall constitute the sole remedy of the Contractor." Stockton East Contract art. 6; Central Contract art. 6. This court ruled in the Summary Judgment Opinion that "[a]s a matter of law, the court interprets this provision to specify only the remedy in the case of overpayment; it is not intended to be the exclusive remedy for all breaches." Summ. J. Op. at 531-32. Therefore, for the purposes of this analysis, Article 6 relates only to overpayment – not to plaintiffs' claim relating to any failure to provide water in the requested or contractually negotiated amounts.

Based upon the language of the 1983 Contracts, Reclamation's failure to provide the minimum amount of water listed in the Build-Up Schedule violates the requirements of Article 3. Nonetheless, this does not equate to a finding of liability on the part of

Reclamation unless the allocation reduction action was based upon a determination or opinion of Reclamation that did not comport with the requirements of Article 12(d). The court notes that the testimony of Reclamation witnesses regarding the complex operational forecasting of hydrology undertaken, on an annual basis, is of particular significance in considering whether Reclamation fulfilled Article 12(d)'s requirement to provide a determination or opinion that had sufficient factual basis to permit review by the Secretary of the Interior. See, e.g., Tr. at 1571 (testimony of Mr. Patterson, who served as Regional Director for the Mid-Pacific Region at Reclamation, regarding Reclamation's forecasting process). Based on the records of communication between the parties, the annual announcement of snowpack and forecast conditions reported by Reclamation as discussed above, and the analyses of hydrologic conditions that accompanied the eventual allocations, this court finds that plaintiffs have not proven that a reduction from the Build-Up Schedule between 1993 and 2004 was made in violation of Article 12(d).

4. Operational decision-making

Finally, plaintiffs assert that the allocation of water from the New Melones Reservoir, in light of the state-mandated releases, federally mandated releases, contractual obligations for senior water rights, and other operational needs, did not satisfy the requirement of Article 9(a), as Reclamation did not "use all reasonable means to guard against a condition of shortage in the quantity of water available." Stockton East Contract art. 9(a); Central Contract art. 9(a). The parties and the court previously had identified unreasonable operational decision-making by Reclamation as a breach of contract in violation of Article 9(a). See, e.g., Def.'s Br. filed Oct. 10, 2006, at 29 ("In other words, Reclamation may not operate the CVP in a manner that arbitrarily imposes a condition of shortage. If, however, in its operation of the CVP, Reclamation makes a reasonable determination . . . then Article 9 provides that the United States will not be liable.").

In making this argument, plaintiffs highlight three types of evidence which, they assert, constitute a breach of Article 9(a): (1) Avry Dotan's expert report and testimony for plaintiffs demonstrate that full allocations by Reclamation were physically possible from the New Melones Reservoir between 1993 and 2004; (2) Reclamation did not pursue studies to justify mandated fishery releases; and (3) Reclamation did not adopt alternatives to water releases that were permissible under state water permits. The circumstances surrounding this evidence include the Ninth Circuit's recognition in the past that operation of the CVP is "an extremely difficult task: to operate the country's largest federal water management project in a manner so as to meet the Bureau's many obligations." Centr. Delta Water Agency v. Bureau of Reclamation, 452 F.3d 1021, 1027 (9th Cir. 2006). Congress recognized the operational difficulties of the CVP and granted Reclamation "considerable discretion in determining how to meet those obligations." Id.

1) The Dotan report

Plaintiffs argue that Reclamation unreasonably operated the New Melones Reservoir in violation of the mandate of Article 9(a) by providing reduced allocations when water was available for distribution. Plaintiffs principally rely on their expert witness, Mr. Dotan, to substantiate this assertion. Mr. Dotan developed a computer model "to simulate the operations of the New Melones Reservoir and Stanislaus River and the ancillary facilities related to the issues in this case." Avry Dotan, Expert Report at 8 (July 26, 2006) (the "Expert Report"); PX 321. Mr. Dotan stated that he "develop[ed] a computer simulation model of the system . . . . to simulate or analyze whether or not it was possible to deliver the 155,000 acre-feet every year to the Plaintiffs throughout the disputed period. . . . without diminishing the water allocation to all other users." Tr. at 807. "The objective was to look at what could have been delivered to -- whether or not it was possible -- or physically possible -- to deliver the full 155,000 acre-feet to the Plaintiffs in the dispute period, which is 1993 to 2004." Id. at 823-24.

The model developed by Mr. Dotan performs mass-balance calculations using historical hydrological information, combined with historic data relating to diversions and water releases for environmental, flood control, and other purposes. It computes, on a daily basis, the water storage level in the New Melones Reservoir, based upon the difference between all inflows to and all outflows from the system. Mr. Dotan validated the model by running it using historic diversion figures and comparing the resulting storage numbers to historic figures and a previously validated model. The results of these validation processes showed that the model, when provided with historic data, could predict historical reservoir storage levels to a high degree of accuracy, although Mr. Dotan conceded: "I said, in my expert report, I did not express any opinion about how the reservoir should have been operated." Tr. at 939; see also Expert Report at 23 ("The models cannot 'duplicate' all decision making by operators in real time.").

Mr. Dotan used his model to "augment the annual deliveries that historically occurred up to the full 155,000 acre-feet every year." Tr. at 846. When the model is run using historical releases as actually occurred from 1993 through 2004 and substituting a "full allocation" amount of 155,000 acre-feet of water to the Contracting Parties, Mr. Dotan's "conclusion [was] that assuming the districts would have received the full allocation of 155,000 acre-feet per year during the dispute period . . . the water would be physically available . . . without drying up New Melones and without diminishing the historical water that was released downstream." Tr. at 853. During this period the "total shortfall," defined by Mr. Dotan as "the difference between what has been delivered versus what would have been the full allocation," Tr. at 888, of which 853,600 acre-feet, or 55.8%, came from flood-release reductions, and 40.8% from storage drawdown. Id. at 889-91. The minimum storage

volume in the New Melones Reservoir in the full-allocation scenario would have been 118,248 acre-feet in September 1994, see Tr. at 899, near the historical low storage level at the New Melones Reservoir, measured at 83,631 acre-feet in the critically dry year of 1992. Id. at 895.

While Mr. Dotan's report enables a greater understanding of the potential for delivery of full contract amounts of water to the Contracting Parties in hindsight, the lack of real-time consideration of operational factors renders his opinion speculative. Mr. Dotan's simulation admittedly is limited to computation of physical possibility, not operational decision-making. See Tr. at 939 ("I did not express any opinion about how the reservoir should have been operated."). Violation of Article 9(a) requires a demonstration by the Contracting Parties that Reclamation failed to take "all reasonable means" to avoid shortage, not all means. Mr. Dotan stated that "what the model does, it takes the full allocation and distributes that over 365 days in the year. So when it moves one time step, one day, . . . there is a certain amount of water that is being diverted over and above what historically occurred." Tr. at 857. What Mr. Dotan does not take into account, then, is the possibility that operational decisions and the schedule requests may have required allocation of more or less water during certain periods of the year, not an equitable distribution over the entire water year, or even a particular distribution at any given time of the year. Mr. Dotan also conceded that "this model is not taking into consideration permits," Tr. at 909, and that he "did not try in [the] analysis to validate whether all the parties below Goodwin or below -- in the system as a whole -- received their entitlement based on permits and agreements." Tr. at 911. He stated that "I'm not putting myself in the driver's seat and making decisions how to manage the system." Tr. at 913.

Lowell F. Ploss, who was Operations Manager of the Central Valley Operations office in the Mid-Pacific Region from 1993 to 2000, testified:

> Q. During your tenure at Central Valley operations, Mr. Ploss, Reclamation developed a carryover storage target of approximately 1.4 million acre-feet for New Melones Reservoir; didn't it?
>
> A. I don't know if I could define that as a target we developed. It was a desired reservoir level that came out of some planning studies that were done at the time.
>
> . . . .
>
> Q. Isn't it true that New Melones Reservoir can be drawn down as low as seventy to eighty thousand acre-feet?

A. Yes.

Q. But the carryover storage target of 1.4 million acre-feet is far in excess of that; correct?

A. Correct.

Tr. at 960-61. According to Mr. Ploss, the carryover storage target was created in order to give sufficient water to avoid a "doomsday scenario" of an extended period of severe drought, similar to what had occurred in the years leading up to 1995. Tr. at 966. Mr. Dotan's model applies a "flood control rule curve," which is the "Corps of Engineers-mandated levels in the reservoir that have got to be maintained at different times of the year in order to provide for enough flood space to capture flood events," Tr. at 818-19, but does not provide any accommodation for operational storage targets like the one discussed by Mr. Ploss. Although Mr. Dotan indicated that a large proportion of the releases to the Contracting Parties could have been taken from storage at the New Melones Reservoir, his model does not take into account the operational decision to set a "carryover target" of 1.4 million acre-feet of water in storage. For example, while the minimum storage level in the New Melones Reservoir during the "full-allocation" run of Mr. Dotan's model was 118,248 acre-feet, an amount well-below the "carryover target" of 1.4 million acre-feet, the model continues to make full allocations to the Contracting Parties. The inability of Mr. Dotan's model to take into account operational decision-making precludes the court from finding liability for unreasonable operational decisions based on the expert testimony and model alone.

The court observes that Mr. Ploss obviously was sympathetic to plaintiffs' plight of having contracted on the basis of reasonable expectations for quantities of water and having been frustrated from the outset. Defendant's able cross-examination of the witness countered Mr. Ploss's effectiveness, and thereby diminished his credibility, when Mr. Ploss had to admit to the operational limitations within which Reclamation managed the water that flowed into the New Melones Reservoir.

The absence of additional operational testimony by Reclamation employees might support an inference adverse to Reclamation. "[I]f a party knows of the existence of an available witness on a material issue and such witness is within the party's control and is not called by that party, the finder of fact *may* draw an inference that the testimony of the witness would have been unfavorable to such party." Contract Master Servs., Inc. v. United States, 225 Ct. Cl. 735, 737 (1980); see also Brasseler, U.S.A. L.L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1384 n.7 (Fed. Cir. 2001); A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1399-1400 (Fed. Cir. 1986). "A determinative factor in analyzing control is the relationship

which the potential witness bears to the parties, the logical inference being the party will likely call as a witness one bound to him by ties of interest." Contract Master Servs., 225 Ct. Cl. at 737; Althaus v. United States, 7 Cl. Ct. 688, 692 (1985).

In this case, however, plaintiffs had ample opportunity to call Reclamation employees included on their witness list who could have supplied the operational evidence to complement Mr. Dotan's expert testimony. See, e.g., Pls.' Br. filed Sept. 25, 2006, at 1, 3 (listing Chester Bowling, former Operations Manager for the Central Valley Operations Office, and Paul Fujitani, Chief of the Water Operations Division of the Central Valley Operations Office at Reclamation, to "testify to Operations of New Melones Reservoir and the Operations of the Central Valley Project"). Although plaintiffs called and examined several Reclamation employees, and posed questions regarding operational decisions to them, they did not elicit testimony regarding the operational parameters within which decisions were made. In addition, the parties did not note as unavailable to testify any particular person who possessed information regarding operational decision-making. Since no essential witness that was not called was within the control of defendant, no adverse inference regarding the operational decision-making of Reclamation is warranted in this case. See A.B. Dick Co., 798 F.2d at 1400 (affirming district court's finding that "it was not necessary to, and that it did not, draw inferences" for a failure to testify).

Mr. Steffani, General Manager of Stockton East from 1983-99, set forth, in essence, what this dispute over operational decision-making reduces to:

> The only way I can respond is to go back to what I had said earlier about operating the reservoir less conservatively.
>
> The Bureau, I believe, will tell you that, "Hey, we've got to pretend that we're going to see another five- or seven-year dry period."
>
> . . . .
>
> But by doing that, you are reducing the yield substantially because you're going to throw away a bunch of this water if you're wrong. . . . So it's a matter of judgment.

Tr. at 479-80. Plaintiffs argue that the decision to operate the New Melones Reservoir in a conservative manner violates Article 9(a), because implementation of conservative goals precluded Reclamation from using all reasonable means to avoid shortage to the Contracting Parties pursuant to Article 9(a). Operating the New Melones Reservoir conservatively, however, does not equate to a breach of contract without further demonstration by plaintiffs

that Reclamation's operational decisions were unreasonable.

2) Fishery studies

Plaintiffs argue that Reclamation's failure to pursue studies to support the implementation of fishery flows is a violation of Article 9(a). Plaintiffs assert that Reclamation's reliance on studies that are not "cause-and-effect" based and do not demonstrate the incremental value of pulse flows for fishery enhancement is evidence of unreasonable operation of the New Melones Reservoir. Roger O. Guinee of the FWS testified that, while the studies relied upon by Reclamation and the FWS do not provide incremental values for pulse flows, they do provide correlative information that can be used to estimate the benefit of additional pulse flows, and "it's not a cause and effect, but it is the best available data that we have." Tr. at 1947. The court finds that reliance on correlative, rather than cause-and-effect incremental, studies on pulse flow benefit is not sufficient to demonstrate unreasonable operation of the New Melones Reservoir in violation of Article 9(a).

3) Water release alternatives

Plaintiffs protest as unreasonable the operational decisions of Reclamation in determining that salinity and fishery releases were to be made from the New Melones Reservoir. Plaintiffs argue that Reclamation (1) did not pursue salinity and fishery releases from other CVP contractors when these were permissible; and (2) did not pursue "recirculation" 18/ and other related proposals for alternatives to fishery releases from the New Melones Reservoir.

I. Salinity and fishery releases from other CVP contractors

Plaintiffs argue that Decision 1641 and the Bay-Delta Accord permitted Reclamation

---

18/ "Recirculation" describes a proposal to pump water from the South Delta Tracy Pumping Plant, "[c]onveyed down the Delta-Mendota Canal to O'Neil Forebay. And at O'Neil Forebay, the water is then pumped a second time up into San Luis Reservoir," past the Vernalis salinity measuring point. Tr. at 985-86 (testimony of Mr. Ploss, who oversaw operations of the CVP for Reclamation). The Tracy Pumping Plant is the "mechanism whereby [Reclamation] remove[s] water from the delta, and place[s] it in canals for use south of the delta." Tr. at 1316 (testimony of Kirk C. Rodgers, Regional Director of the Mid-Pacific Region for Reclamation).

to decide what source of water to use for meeting salinity standards at Vernalis and that Reclamation chose to use water from the New Melones Reservoir in a manner that violated Article 9(a). Mr. Ploss testified that it physically was possible to use other CVP water sources for salinity releases at Vernalis. The release of water for salinity purposes exclusively from the New Melones Reservoir was, in his opinion, "inequitable." Tr. at 979-80. Mr. Ploss also indicated that he believed Reclamation did so knowingly. Tr. at 983 ("Q. Yet Reclamation made the decision to use additional New Melones water for this purpose, knowing that that decision would adversely impact its ability to deliver water to the New Melones contractors in the future; correct? A. I believe so, yes."). John A. Renning, who was employed by Reclamation in the Central Valley Operations office, similarly testified that he personally questioned the reasonableness of the fishery releases from the New Melones Reservoir. Tr. at 1503. Plaintiffs also noted the contents of an e-mail dated June 9, 1995, from Mr. Renning to Chester Bowling, former Operations Manager for the Central Valley Operations office of Reclamation, which states:

> The basic fact of life at New Melones is that it is over-committed or that there is simply not enough water for everyone. Therefore if we are to supply [Stockton East] anymore water than we presently plan on supplying (little or none) then some other use will have to be shorted. Those uses are:
>
> Prior rights
> Fisheries
> Water quality
>
> . . . .
>
> Alex [Hildebrand, a director of the South Delta Water Agency], is getting a real good deal with New Melones. He is much better off . . . . Anyway, the question is again - What is reasonable? To the extent we can reduce our requirement for water quality, that will make water available for contracts.

PX 131; see also Tr. at 1513-14 (testimony of Mr. Renning).

On the other hand, while Mr. Ploss testified favorably to further plaintiffs' case, cross-examination drew qualifications to his testimony to show that he was speaking in ideal, rather than practical, terms, which diminishes the weight of his testimony in light of the need for operational decision-making parameters. For example, Mr. Ploss explained that Reclamation chose not to release water from other sources to fulfill fishery needs because releases from other CVP contractors would have required their cooperation:

THE COURT: So for all practical purposes then, when you were testifying that the New Melones contractors, because of this feature in their permits, bore this inequitable burden, is there anything that you believe that [Reclamation] could have done in the period 1993 to 2002 to address that inequity?

[Mr. Ploss]: Exclusive of taking water from other contractors elsewhere, in the San Joaquin, such as on the west side of San Joaquin, no. . . .

Tr. at 1000-01. The State Water Control Board distinguished the unique circumstances of the New Melones Reservoir as the historically preferred release point for salinity releases at Vernalis: "unlike the other CVP facilities, [the New Melones Reservoir] is in a location close to Vernalis where it can conveniently meet the objectives at Vernalis by water releases, and has historically been required to meet Vernalis objectives, whereas other CVP facilities have less influence on Vernalis flows." Order Denying Petitions for Reconsideration and Amending SWRCB Decision 1641, Cal. State Water Res. Control Bd., WR 2000-02 at 31 (Mar. 15, 1999). Plaintiffs, therefore, have not met their burden of proof in demonstrating that environmental water release allocations could have been made from alternate sources within the CVP. No violation of Article 9(a) occurred due to the decision made by Reclamation to use water from the New Melones Reservoir for environmental water releases mandated by the CVPIA.

Plaintiffs also protest the inequitable nature of the water allocations for agricultural and M&I purposes made to other CVP contractors listed on the forecast announcements. These other CVP contractors received greater water allocations in terms of the percentage of requests fulfilled by Reclamation on an annual basis. For example, plaintiffs cite the April 11, 1995 forecast announcement by Reclamation, which states that "[w]ell above-average precipitation in March and hefty snowpack have created optimum conditions in the [CVP] making it possible to boost all agricultural and urban water allocations to 100 percent," but "[s]torage in New Melones Reservoir on the Stanislaus River has not recovered to the same extent as other CVP reservoirs. . . . Reclamation has allocated up to 37,000 acre-feet to [the Contracting Parties]." PX 121 at 1-2. However, Mr. Ploss testified that the relatively low inflow and high storage capacity of the New Melones Reservoir differed from other CVP reservoirs, and this difference "impacted [Reclamation's] decisions on how we planned the operations for New Melones, recognizing that we had relatively low inflow compared to the size of the reservoir." Tr. at 996-97. Mr. Patterson, Regional Director for Reclamation between 1993-99, stated that it was not Reclamation's policy to allocate water equally to all

CVP contractors:

> In fact, to the contrary. [Reclamation] would take into consideration, I guess, really three things: One, there were certain contracts that had guaranteed minimums.
>
> . . . .
>
> Second is, where is that contractor physically located within the CVP service area, and what sources of supply can you draw on to make water deliveries to that contractor?
>
> . . . .
>
> And then third is what kind of regulatory obligations have to be met, and how does that affect water supply that can be made available to the contractors in that area?

Tr. at 1578-79. Reclamation had ample justification for making different allocation proportions to the Contracting Parties as compared to other CVP contractors and, therefore, the court finds no violation of Article 9(a) occurred based on comparative allocations.

ii. Recirculation and other proposals

Plaintiffs contend that Reclamation should have considered and implemented a recirculation proposal to reduce salinity release needs at the New Melones Reservoir. Mr. Ploss stated that such a proposal is physically possible. According to Mr. Ploss, Reclamation had investigated the possibility of recirculation over the past few years, had run a four-week experimental study, and continues to conduct such studies. Tr. at 986. The reason for Reclamation's decision not to pursue recirculation was that "it was a general feeling that doing such would take water away from the west side of the San Joaquin Valley," that "[t]here would be an additional cost of pumping water at Tracy, . . . and there was some reluctance because it wasn't certain just what conductivity could be used on a long-term basis." Id. at 987.

Mr. Renning testified that "[u]ndertaking the recirculation proposal could result in higher cost to project operations. It could affect project water users. And there are potential environmental effects on the San Joaquin River that could be caused by the proposal." Tr. at 1435. Decision 1641 noted several concerns with recirculation that included environmental concerns over spawning. Moreover, "at particular times [recirculation] will

make the San Joaquin River smell like the delta. . . . And when [the salmon] return several years later, . . . it would smell like their home, and they would be disoriented and not be able to return back up the San Joaquin River." Tr. at 1530 (testimony of Mr. Renning); see Decision 1641 at 16. Decision 1641 pointed out that recirculation would move water through the Newman Wasteway, which might release contaminants such as pesticides and chlorides. Decision 1641 at 16; Tr. at 1530. Finally, use of recirculation was not favored as it would require a larger quantity of water to meet the salinity standard because of the difference in water quality at the delta versus the New Melones Reservoir. After considering the evidence of testing and study of the recirculation proposal by Reclamation, as well as the important environmental and cost concerns raised by the testimony and Decision 1641, the court finds that no violation of Article 9(a) can be based on Reclamation's consideration of the recirculation option.

Mr. Renning testified as to the possibility of construction of the San Luis master drain as another option to reduce salinity releases from the New Melones Reservoir. While the master drain project has been required since authorization of the San Luis Unit of the CVP in the 1960's and a small section of the drain was built twenty-five years ago, the drain has not been constructed for number of reasons, which include political controversy, ongoing litigation, and the location of the drain storage. In light of these difficulties, plaintiffs have not provided sufficient evidence to support a finding that Reclamation's inability to complete the San Luis master drain was an unreasonable operational decision in violation of Article 9(a).

Because plaintiffs cannot demonstrate that Reclamation made unreasonable decisions in violation of Article 9(a) in operating the New Melones Reservoir, no liability accrues based on Reclamation's allocation decisions.

## III. The sovereign acts and unmistakability doctrines

As Reclamation is not liable for breach of contract, the court need not address defendant's invocation of the sovereign acts doctrine. Assuming, *arguendo*, that Reclamation were held liable for water reductions due to the requirements of the CVPIA, defendant interposes the sovereign acts and unmistakability doctrines to preclude a finding of liability. See Def.'s Br. filed Oct. 10, 2006, at 49. The Summary Judgment Opinion stated:

> In order to take advantage of the sovereign acts doctrine, defendant has the burden of proving that performance in the face of the supposed sovereign act–in this case, the CVPIA–was impossible. Plaintiffs claim that, even with

> the passage of the CVPIA and its requirement that Reclamation must find 800,000 acre-feet of Central Valley Project water, performance of the Stockton East and Central Contracts was possible because Reclamation could have taken the water from other contractors.
>
> . . . .
>
> The facts regarding the possibility or impossibility of performance despite or because of the CVPIA are disputed and underdeveloped and must be established at trial.

Summ. J. Op. at 530-31.

1. Standard of review

The sovereign acts doctrine immunizes the Government for unintentional breaches of contract caused by the passage of laws of general applicability, but not those laws specifically aimed at relieving the Government of contractual liability. See, e.g., United States v. Winstar Corp., 518 U.S. 839, 895 (1996); Centex Corp. v. United States, 395 F.3d 1283, 1306-07 (Fed. Cir. 2005). "It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." Horowitz v. United States, 267 U.S. 458, 461 (1925). However, "the sovereign acts doctrine does not apply to 'legislation targeting a class of contracts to which [the Government] is a party.'" Centex, 395 F.3d at 1307 (quoting Resolution Trust Corp. v. Federal Sav. and Loan Ins. Corp., 25 F.3d 1493, 1501 (10th Cir. 1994)).

In order to assert the sovereign acts doctrine, defendant bears the burden of showing that performance was impossible because of the sovereign act. See Winstar Corp, 518 U.S. at 904 ("[T]he Government . . . must show that the passage of the statute rendering its performance impossible was an event contrary to the basic assumptions on which the parties agreed, and must ultimately show that the language or circumstances do not indicate that the Government should be liable in any case."). Impossibility is met by a four-part test that requires "(I) a supervening event made performance impracticable; (ii) the non-occurrence of the event was a basic assumption upon which the contract was based; (iii) the occurrence of the event was not [plaintiffs'] fault; and (iv) [plaintiffs] did not assume the risk of occurrence." Seaboard Lumber v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002); see also Winstar Corp., 518 U.S. at 904.

The court must decide whether the government action preventing performance of the

contract is "public and general." Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1574 (Fed. Cir. 1997). If the action is "public and general," then the court must determine whether the contract contains an "unmistakable promise" that the Government would refrain from exercising its sovereign power. Id. at 1578. If the legislation preventing performance of the contract is not general and public, the court must decide whether the legislation is targeted at specific contracts with the "substantial effect of releasing the Government from its contractual obligations. . . ." Winstar, 518 U.S. at 899.

If the court finds that the legislation was targeted in such a manner, the sovereign acts doctrine does not apply. Id. This is because "[t]he Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties." Yankee Atomic Elec., 112 F.3d at 1575. "The sovereign acts doctrine attempts to 'balance[ ] the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor.'" Id. (quoting Winstar, 518 U.S. at 896). Finding this balance requires "not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether . . . that legislation was designed to target prior governmental contracts." Id.

2. Analysis

The Summary Judgment Opinion explained: "As a precondition to excusing liability for breach under the sovereign acts doctrine, defendant bears the burden of showing that performance was impossible because of the legislation." Summ. J. Op. at 529. Defendant bears the burden of demonstrating that the CVPIA made performance of the 1983 Contracts impossible, and "[p]erformance is only excused under this doctrine when it is objectively impossible." Seaboard Lumber, 308 F.3d at 1294 (citing Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. 314 (1978)). "The test devolves to proof of commercial impracticability. The Federal Circuit has applied the same test to determine whether a claim of impossibility or a claim of impracticability has been met." Short Bros. v. United States, 65 Fed. Cl. 695, 783 (2005) (citing Seaboard Lumber, 308 F.3d at 1294-95).

Plaintiffs represented that they could prove that Reclamation could have taken water from other CVP contractors in lieu of the New Melones Reservoir. Transcript of Proceedings, Stockton E. Water Dist. v. United States, No. 04-541L, at 102 (Fed. Cl. Jan. 6, 2006) (Mr. Marzulla: "So there are places they could have gone without breaching contracts, people who had contracts different from ours that would have come up with a different result."). While witnesses did testify as to availability of water in the abstract, no witness stated that operational decisions could be made to fulfill the CVPIA and ESA water-release

requirements without impacting the contractual rights of other water districts. See *supra* Discussion II.4. Plaintiffs cite Mr. Dotan's Expert Report and model, which demonstrate that delivery of 155,000 acre-feet to the Contracting Parties between 1993-2004 was feasible, but do not take into account day-to-day operational decision-making. Mr. Dotan demonstrated a confluence of available water supply on a daily basis throughout the period in question that renders full contract deliveries to the Contracting Parties a possibility, but not necessarily commercially practicable. Defendant, however, did not meet its burden of proof regarding impossibility of performance due to CVPIA § 3406(b)(2), and therefore, would be barred from invoking the sovereign acts and unmistakability doctrines, if liability had been found for breach of the 1983 Contracts.

## IV. Plaintiffs' Fifth Amendment takings claim

"[T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978) (citation omitted). "Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." Hughes Comm. Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (citations omitted); see Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 798 (Fed. Cir. 1993) (holding that federal agency acted "in the government's proprietary capacity, not its sovereign capacity, and therefore did not constitute a taking").

Plaintiffs' Fifth Amendment takings claim alleges a regulatory taking due to the impact of the CVPIA on fulfillment of the 1983 Contracts. Reclamation was instructed by congressional mandate under the federal Reclamation laws to enter into contracts with the Contracting Parties for consumptive water allocation from the New Melones Reservoir. The Government acted primarily in its in its commercial capacity in executing and implementing the 1983 Contracts, not in its sovereign capacity. Therefore, the court finds that the appropriate remedy for plaintiffs' claims "arise[s] from the contracts themselves, rather than from the constitutional protection of private property rights." Hughes Comm. Galaxy, 271 F.3d at 1070.

## V. Nature of evidence presented and ichthyicide

Much of the evidence adduced at trial established the absence of evidence that the

existence of regulation of California's water supply – both groundwater and surface water – has achieved, or even has the possibility of achieving, the goals of providing water for residential, municipal, and environmental purposes. The mass of good intentions, competing interests, and limited and depleted resources collided with the reality that Reclamation and the FWS still are engaged in undertaking congressionally mandated studies, decades after the fact, that are preparatory to solving the problems of man versus fish and the availability of water to satisfy the ebullition of population centers in Southern and Central California that are sink holes for fresh water supplies. Nevertheless, while plaintiffs vigorously protest the lack of sufficient scientific basis for the releases made, the FWS made fishery release determinations based on "the best available information on the level of restoration needed." DX 88 at 59670; see also Tr. at 1946-47 (testimony of Mr. Guinee, the Supervisory Fish and Wildlife Biologist for the FWS's Sacramento office from January 1993 to the present: "[T]hose studies show that flow is one of those significant variables. And through that correlation, we can estimate to what extent. But it's not a cause and effect, but it is the best available data that we have.").

Ground water is virtually a non-viable resource for plaintiffs and other water users in the CVP; indeed, it is depleted to the extent of salt intrusion, which, if left unchecked, could result in the destruction of viable farmland. See Tr. at 357-58 (testimony of Mr. Thompson, Chairman of Central's board: "Q. Okay, so what does the saline intrusion do to trees? A. It will kill them eventually. Q. And how about other kinds of crops as well? A. Well, it would kill it all, if you got enough of it."). Surface water has been leached from every dam-able river, which is made evident upon reviewing a map of the CVP. See, e.g., DX 219. As a consequence of the modification of the natural flow of every river that historically supported spawning of salmon in the CVP, the fish are being killed in the process of redirecting them to the rivers whence they came. For example, fishery releases from the New Melones Reservoir have resulted in a net decrease in the number of fall-run chinook salmon produced annually on the Stanislaus River. See DX 210 (computing average production of fall-run chinook salmon between 1967-1991 as 10,868 and average between 1992-2005 since implementation of the CVPIA, as 7,540).

Pumping at the delta for use by south-of-the-delta users, which includes residential use for the Los Angeles area, is not only the primary cause of salinity deposits that require releases from the New Melones Reservoir. Pumping causes the "entrainment" of hundreds of thousands of salmon on an annual basis. Entrainment, as described by Mr. Guinee, "means that as those fish are swimming past the pumps, they get brought in or entrained into the pumping plant." Tr. at 1863. The FWS described the tragic details of the impact of entrainment in its Working Paper on Restoration Needs, in reporting: "Annual losses of chinook salmon at the SWP and CVP Delta export facilities have usually ranged from 400,000 to 800,000 in recent years, assuming 75% mortality." DX 88 at 59953. Mr. Guinee

also provided a shocking description of the process by which twenty-five percent of entrained fish are salvaged:

> Well, "entrainment" doesn't refer to the process of chopping them up and dying. . . . There's actually fish salvage facilities at both the CVP and SWP. So they don't necessarily die. Some of them are salvaged, put into trucks. And then they're actually driven -- if you can imagine this, they're driven in trucks downstream of the pumping plant, so down toward Port Chicago, away from the influence of the pumps. And then many of those do survive, but some of them do die as well.

Tr. at 1863.

These numbers stand in stark contrast to the estimated yearly fish production numbers for the Stanislaus River, reported as 10,868 per year between 1967 and 1991, and 7,540 between 1994-2005. The "doubling goal" imposed by CVPIA § 3406(b)(1) sets the restoration goal of fisheries water releases and other habitat enhancements at 22,000, a number which is multiplied twenty to forty times over each year by pumping entrainment. See DX 210; CVPIA § 3406(b)(1); Tr. at 1692-93 (testimony of Mr. Guinee: "If you look at the average, it's approximately 11,000. And so the law said to make all efforts to double; and so we established the goal on the Stanislaus of 22,000 for natural production of, in this case, fall-run chinook."). Reclamation, however, has considered, see Tr. at 1861 (Mr. Guinee: "Although [pumping restriction] was the technical team's first recommendation as the most likely to ensure double survival in the delta, the team recognized the need to provide minimal exports to satisfy health and safety concerns. We've assumed that these health-and-safety concerns would be satisfied with combined CVP and SWP exports of 1,200 cfs."), and continues to consider the reduction of pumping as an alternative habitat enhancement activity, see Tr. at 1951 (Mr. Guinee: "(b)(2) water that gets used in the delta is -- at certain times of the year, when fish are in the vicinity of the pumps and vulnerable to being entrained and lost in the pumps, we use the (b)(2) water to reduce the CVP Tracy pumping plant. And then also during the Vernalis Adaptive Management Program that we talked about yesterday, there's a planned 31-day export reduction, which we use the (b)(2) water to reduce the Tracy pumping."); see also DX 270 at 05766 (May 27, 1993 letter from FWS stating: "It is recognized that all exports cannot be eliminated . . . because some consumptive needs south and west of the Delta do not have significant offstream storage available."). While it may have been advantageous to have such studies proceed in a more timely fashion, Reclamation's decision regarding the sufficiency of scientific data for the release amounts to rely upon the determinations of the FWS' study of the "best available information," based on the evidence, does not support a finding that Reclamation did not use all reasonable means to guard against shortage.

That no one legislative authority, state or federal, can trump the other to solve the conflicting demands for limited water resources in the State of California lies at the heart of this impasse. Congress's response of commissioning studies and, almost as an afterthought, attempting to address the predictable deleterious impact on fish by prioritizing them has not been sufficient to resolve the problems raised by the competing needs of a rapidly growing population in a historically arid region and the mitigation of damage to the ecosystem. It takes an enormous amount of courage for any political unit–city, county, or state–to adopt a no-growth policy. Tossing the problem into the litigation hopper is breathtakingly ineffective.

The 1983 Contracts were not breached, according to their terms, by the actions of Reclamation or any other federal agency. Plaintiffs could not prove that the allocation decisions, as a matter of operational management of water resources, did not "use all reasonable means to guard against a condition of shortage" to the Contracting Parties, nor did they prove that any of the opinions or determinations of the contracting officer were made in a manner that was arbitrary, capricious, or unreasonable. Nor could plaintiffs prove that the implementation of the CVPIA was inconsistent with the commitments of the 1983 Contracts, as the latter were not unqualified or were qualified to the extent of accommodating the CVPIA's priorities.

## CONCLUSION

Defendant is entitled to judgment because plaintiffs have not met their burden of proof. Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. The Clerk of the Court shall enter judgment for defendant with respect to the Central Contract against plaintiffs County of San Joaquin, City of Stockton, and California Water Service Company, in accordance with the opinion issued on April 10, 2006, Stockton E. Water Dist. v. United States, 70 Fed. Cl. 515 (2006), which granted, in part, defendant's motion for summary judgment.

2. The Clerk of the Court shall enter judgment for defendant with respect to the Stockton East Contract against plaintiffs County of San Joaquin, City of Stockton, and California Water Service Company in accordance with the grant of defendant's RCFC 52(c) motion.

3. The Clerk of the Court shall enter judgment for defendant against plaintiffs Stockton East Water District and Central San Joaquin Water District in accordance with this opinion.

s/ Christine O.C. Miller

____________________________________

**Christine Odell Cook Miller**
Judge