**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STOCKTON EAST WATER DISTRICT, et al., | ) | |
| Plaintiffs, | ) | No. 04-541 L |
| v. | ) | Judge Christine Odell Cook Miller |
| UNITED STATES, | ) | |
| Defendant. | ) | |

# PLAINTIFFS' MOTION TO AMEND OR MODIFY DECISION

Respectfully submitted,

/s Roger J. Marzulla
Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)
Counsel for Plaintiffs

Dated: March 7, 2007

Of Counsel:
Jeanne M. Zolezzi
Jennifer L. Spaletta
Herum Crabtree Brown
2291 West March Lane
Suite B100
Stockton, CA 95207
(209) 472-7700
(209) 472-7986 (facsimile)

# TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................................1

II. ARGUMENT ..............................................................................................................1

A. THE 1997 AND 1998 AGREEMENT AS AN ACCORD AND SATISFACTION ...........................................................................................1

B. FACTUAL ERRORS..................................................................................................3

C. REQUEST TO AMEND DECISION TO REMOVE IRRELEVANT DICTA AND DISCUSSION OF PLAINTIFFS' TAKINGS CLAIM ................16

III. CONCLUSION …………………………………………………………………...17

# TABLE OF AUTHORITIES

## CASES

*State Water Resources Control Board Cases*, 136 Cal. App. 4th 674 (2006) .............................3

*Central Delta Water Agency v. Bureau of Reclamation* 452 F.3d 1021, 1023 (9th Cir. 2006).4, 5

## STATUTES

CVPIA, § 3406(b)(2), JX 25........................................................................................4, 5

## OTHER AUTHORITIES

RESTATEMENT (SECOND) OF CONTRACTS § 281 (1979) ...........................................................2

## CALIFORNIA STATE WATER RESOURCE CONTROL BOARD DECISIONS

Decision 1422 (1973).......................................................................................... 4, 5, 6

Water Right Order No. 83-3 (1983)..........................................................................4

Decision 1616 (1988).......................................................................................... 4, 5, 6

Decision 1641 (1999)............................................................................................ 6, 15

## I. INTRODUCTION

Plaintiffs, Stockton East Water District (Stockton East), Central San Joaquin Water Conservation District (Central), County of San Joaquin, City of Stockton, and California Water Service Company, hereby move this Court, pursuant to RCFC 59(e), to correct 25 factual errors in its February 20, 2007 Decision, and to amend its legal analysis with respect to the finding that Plaintiffs agreed to the Interim Plan of Operations in 1997 and 1998 pursuant to Art. 3(h) of the Contracts. Finally, Plaintiffs respectfully request the Court remove unnecessary dicta from its decision and limit its discussion of Plaintiffs' takings claim to reflect that the claim was not litigated.

In this motion, Plaintiffs do not challenge the Court's finding that Plaintiffs agreed to the Interim Operations Plan for 1997 and 1998. However, the Court incorrectly labeled the change as one pursuant to Article 3(h) of the respective Contracts, addressing *permanent* changes. This analysis is in error, but can be easily remedied by an amendment to the Decision to describe the agreement as an accord and satisfaction.

Because the Decision will be published, and will be the first of its kind, it is imperative that it be both factually accurate and limited to its facts to avoid unintended consequences throughout western water projects. The Court has taken several liberties with the facts and evidence that were not developed at trial, and included incomplete and irrelevant descriptions of ancillary litigation and administrative processes that are not useful to the Court's analysis. Plaintiffs respectfully request that the Court amend its Decision to eliminate dicta and unsupported factual assertions.

## II. ARGUMENT

**A. THE 1997 AND 1998 AGREEMENT AS AN ACCORD AND SATISFACTION**

The Court found that Stockton East and Central agreed to the 50,000 acre-foot per year deliveries under the Interim Operations Plan (IPO) for 1997 and 1998. Although they disagree, Plaintiffs do not challenge this factual determination in this motion.[1] The Court held that this agreement was an amendment to the Contracts pursuant to Article 3(h). This is the erroneous legal conclusion that Plaintiffs request the Court to correct. Plaintiffs request the Court amend its legal analysis on this issue to avoid adverse precedential impact on all other Central Valley Project (CVP) contractors whose contracts with the United States Bureau of Reclamation (Reclamation) include a similar provision.

Article 3(h) provides:

> The United States and the Contractor by mutual agreement may reduce the annual quantity of water which the United States is obligated to make available and the Contractor is obligated to pay for *during the remainder of the term of this contract.*

(Emphasis added). On its face, this provision applies only to permanent amendments of the annual amount of the Contract (i.e., amendments applicable "during the remainder of the term of the contract"). It does not apply to year-to-year agreements about how much water a district is requesting or agrees to receive under its contract. In fact, the Contracts themselves do not permit such annual deviations – the build-up schedule contemplates that the districts would continue using and paying for minimum amounts of water as time progressed (presuming the water was made available and Reclamation had not waived its benefit). Contracts, Art. 3, 5. However, other legal doctrines permit the Court to reach the same conclusion without resorting to an interpretation of Art. 3(h).

---

[1] Plaintiffs' position is that the decision to accept 50,000 acre-feet each year for 1997 and 1998 was a forced choice between two levels of breach and Plaintiffs' chose the one that mitigated their damages. Plaintiffs reserve this issue for appeal.

The Court can find the Contractors and Reclamation agreed to deliveries of 50,000 acre-feet per year as an accord and satisfaction for performance of the Contract in years 1997 and 1998. *See* RESTATEMENT (SECOND) OF CONTRACTS § 281 (1979). ("An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty."). An accord is a contract in and of itself, which requires consideration to be valid. *Id.* The record contains some evidence of consideration. Reclamation did not allocate larger amounts to the districts (that were otherwise provided for in the IPO) because the districts agreed to accept the certainty of 50,000-acre-feet in both 1997 and 1998, and Reclamation, in turn, agreed to stay application of the build-up schedule while the IPO was in effect.

It is critical that this legal issue be corrected because every CVP contract contains a similar provision for permanent amendments. The Court's holding would permit Reclamation to argue that any time a contractor agrees to accept an allocated amount of water in any given year they may have amended their long-term contract. This is contrary to historical custom throughout the CVP and violates the statute of frauds. *See* Plaintiffs Motion In Limine Regarding amendment of contracts, (Docket #114) and the example contract amendment pursuant to this provision, executed in writing by the Regional Director of Reclamation and the contracting district's board of directors for San Luis Water District (Docket #121).

**B. FACTUAL ERRORS**

**1. "The Superior Court of California for the County of San Francisco denied all of the plaintiff's claims; this ruling was upheld on appeal." Decision at 11.**

**Correction:** The Superior Court of California for the County of *Sacramento* denied the claims. *See State Water Resources Control Board Cases*, 136 Cal. App. 4th 674 (2006).

**2. "The Second Amended Contract between Stockton East and California Water was executed September 25, 1983. DX 248." Decision at 15.**

**Correction:** The Second Amended Contract was executed in September 1987 on various days. *See* DX 248.

**3. "The Decision of the State Water Control Board in January 1988 acknowledged the existence of senior water right holders in authorizing partial filling of the New Melones Reservoir…("Decision 1616"). Decision at 19.**

**Correction:** Decision 1616 did not authorize the filing of New Melones. Rather, it authorized the assignment of direct diversion rights from the state-filed applications. The storage rights for filling New Melones had previously been approved in Decision 1422 (1973) and Water Right Order No. 83-3 (1983).

**4. "The over commitment of New Melones Reservoir in spite of low inflow rates required Reclamation to make operational decisions regarding the allotment of scarce surface water resources." Decision at 25.**

**Correction:** This is an overstatement that is not supported by the evidence. The only years in our relevant time period when inflows were "low" were 1993, 1994, 2003 and 2004. The only years in which water was "scarce" were 1993 and 1994, when low inflows coincided with low storage conditions. In order to make a finding of over-commitment, this Court would have to make findings of annual demands relative to annual supplies. It has not done so.

**5. "The CVPIA made substantial changes to the operation of the New Melones Reservoir by imposing requirements upon Reclamation regarding allocation of water, particularly for environmental purpose." Decision at 25.**

**Correction:** This is a very important legal and factual error. CVPIA did not make any changes to the operation of the New Melones Reservoir; nor did it impose any operational changes on New Melones Reservoir. *See* CVPIA, § 3406(b)(2), JX 25; Ploss Test. 970:16-18. It is correct for the Court to state "CVPIA required substantial changes to operation of the CVP," or "as a result of CVPIA, Reclamation chose to make additional releases from New Melones for fishery

purposes." *See Central Delta Water Agency v. Bureau of Reclamation* 452 F.3d 1021, 1023 (9th Cir. 2006) ("While nothing in the Act requires that the Bureau use New Melones water for its § 3406(b)(2) releases, the Bureau exercised its discretion to use that water.").

**6. "Consequently, enactment of the CVPIA in 1993 modified the priorities for which the water use at the New Melones Reservoir was to be allocated to make 'fish and wildlife mitigation, protection and restoration' equivalent to irrigation and domestic uses. This change required Reclamation to alter the manner in which it made operational decisions regarding the allocation of water to the Contracting Parties pursuant to the 1983 Contracts." Decision at 26.**

**Correction:** No change of CVP priorities imposed by CVPIA *required* Reclamation to alter the manner in which it made allocations of water from New Melones. *See* CVPIA, § 3406(b)(2), JX 25; Ploss Test. 970:16-18. In addition, there is no evidence that Reclamation in fact altered the manner in which it made operational decisions as a result of CVPIA because (1) there is no evidence in the record of *how* Reclamation made its operational decisions, and (2) the contracting parties did not receive any allocations prior to CVPIA's enactment, so there was nothing to "alter." Further, the state water right conditions for New Melones have always required Reclamation to prioritize certain water quality and fishery releases before releases for irrigation and domestic use. *See* Decision 1422 and Decision 1616.

**7. "The CVPIA made additional alterations to the fishery flow requirements at the New Melones Reservoir." Decision at 27.**

**Correction:** The CVPIA did not impose any changes to fishery flow requirements at New Melones Reservoir. Ploss Test. 970:16-18. Pursuant to CVPIA, Reclamation exercised its discretion to prescribe additional flows from New Melones for fish. *See* CVPIA, § 3406(b)(2), JX 25. *See Central Delta Water Agency v. Bureau of Reclamation* 452 F.3d 1021, 1023 (9th Cir. 2006) ("While nothing in the Act requires that the Bureau use New Melones water for its § 3406(b)(2) releases, the Bureau exercised its discretion to use that water.").

**8. "The Bay-Delta Accord imposed a number of constraints upon the operation of the CVP, which included various provisions that directly impacted the operation of the New Melones Reservoir." Decision at 28.**

**Correction:** The Bay Delta Accord does not mention New Melones, and does not impose any constraints upon its operation. The Accord included Reclamation's voluntary commitment to meet a new flow standard in the San Joaquin River, but did not specify how the standard was to be met. Once again, Reclamation exercised its discretion to use water from New Melones for that purpose. Tr. at 981-983; PX 112.

**9. "On March 1, 1999, Reclamation, the State of California, the Contracting Parties . . . entered into the San Joaquin River Agreement (the 'SJRA')." Decision at 30.**

**Correction:** The Contracting Parties did NOT enter into the SJRA and in fact testified at length of their disgust that Reclamation would voluntarily make an additional contractual commitment that would impact them in the future without their involvement. Tr. at 1053-1059; PX 220, 221.

**10. "In 1988 the State Water Control Board modified the salinity standard imposed upon Reclamation in Decision 1422 . . . ." Decision at 31.**

**Correction:** Decision 1616, in 1988, did not modify the salinity standard. Decision 1422, issued in 1973, imposed the 500 parts per million dissolved solids standard. *See* Decision 1422 at 31. The standard itself was modified in the 1995 Water Quality Control Plan, but the condition on New Melones remained the same until Decision 1641, when the standard's nomenclature and timing were changed to an electrical conductivity (EC) measurement. Tr. at 1503-1504.

**11. "During the period between 1988 and 1992, no water was delivered to the Contracting Parties from the New Melones Reservoir due to drought conditions, and the Contracting Parties submitted no schedules." Decision at 33.**

**Correction:** No water was delivered to the Contracting Parties from New Melones Reservoir from 1988 to 1992 because Plaintiffs requested no water and were still building the conveyance

facilities required to take water, as provided by the Contract. These facilities were not completed until 1993. Tr. at 415-419.

**12. "Central and Stockton East submitted their water conservation plans in December 1993 to Reclamation." Decision at 36.**

**Correction:** Stockton East submitted its required water conservation plan to Reclamation in 1986, and again in 1993. Central submitted its first plan in 1993. Tr. at 458; PX 44, PX 85.

**13. "First, the parties dispute . . . whether Reclamation is bound to follow the decisions of the State Water Control Board in Reclamation's operation of the New Melones Reservoir." Decision at 47.**

**Correction:** Plaintiffs have never taken this position in this case or in any other. Plaintiffs stipulated at the onset of trial that they had no such dispute. Joint Fact Stipulations Nos. 21, 22 (Docket No. 149).

**14. "According to Roger K. Patterson, who was Regional Director of the Mid-Pacific Region for Reclamation, the Central Valley Operations Office, which he headed, was in charge of actual day-to-day operations of the CVP." Decision at 60.**

**Correction:** Mr. Patterson was the bureaucratic head of the Mid-Pacific Regional office of Reclamation from 1991 through 1999. Tr. at 1563-64. The Central Valley Operations Office is one of the regional departments, but Mr. Patterson did not head it. The head of the Central Valley Operations Office was Donald Paff in 1991, Lowell Ploss until 2000 and Chester Bowling from 2000 through 2004. These gentlemen, and their staff at the Central Valley Operations Office, dealt with the day-to-day operations of New Melones, with which Mr. Patterson was not involved. Tr. at 947, 1636-37.

Along with having no personal knowledge of the New Melones operations during his tenure between 1991 and 1999, Mr. Patterson was actually in Nebraska between 1999 and 2005 (Tr. at 1565-66) and could not, and did not, provide testimony about the operations or forecasting

for New Melones between 1999 and 2004. Mr. Patterson admitted he did not know why Stockton East and Central received the allocations that they did. Tr. at 1669-70.

**15. "In 1995 Reclamation anticipated, upon review of prevailing conditions at the time, that the lesser recovery of snowpack for the New Melones Reservoir would result in a reduced allocation to ensure sufficient water for environmental and other in-basin purposes. This determination was supported by observation of snowpack amounts built up over the winter, indicating a dry year for the New Melones Reservoir." Decision at 66.**

**Correction:** This factual finding is contradicted by the record. Reclamation's 1995 allocation press release stated: "extremely high snowpack to produce runoff to CVP reservoirs" and 1995 was projected to be a "wet" year. PX 115. There is no evidence Reclamation forecasted a "dry year for New Melones Reservoir," or that there was a "lesser recovery of snowpack for New Melones Reservoir." *See* PX 115.

The only reference to New Melones in the press release stated: "Storage in New Melones on the Stanislaus River has not recovered to the same extent as at other CVP reservoirs." PX 115. This statement is meaningless, however, unless we know the relative difference in recovery. It is also contradicted by Reclamation's own records of inflow and storage which showed that reservoir storage was climbing so rapidly that it approached 1,000,000 acre-feet a quarter of the way through the year, and almost 1,800,000 by mid-year. *See* PX 321 at 25, Figure 10.

**16. "Mr. Patterson testified that the forecast process involved 'an analytical process of really looking at what is available and what is anticipated to be available as far as water supply each year,' and confirmed the details. Tr. at 1571." Dec. at 60.**

**Correction:** Mr. Patterson testified only to the general forecasting process used by Reclamation for the CVP. He did not testify specifically about the process or "confirm any details." Particularly, he did not testify about the process used for New Melones, or as to

whether any such process occurred, or what its results were for any particular year. Tr. at 1570-72. This testimony cannot form the basis for any conclusion of fact as to New Melones.

**17. "Even when no formal announcement of shortage is issued, a record of Reclamation's decision-making process was made available to the Contracting Parties in years during which they received water allocation reductions." Decision at 60-61.**

**Correction:** This statement is unsupported by any evidence at trial, and the court does not cite to any evidence. There was no evidence at trial that any "record of Reclamation's decision-making" was ever compiled, and none was produced during discovery. The evidence at trial showed that in *most* years Reclamation eventually notified the Contracting Parties of their allocation, usually through one sentence in a cursory CVP-wide press release. In 1994 and 1995, Reclamation also sent letters to the districts indicating that the reason was hydrology and regulatory "requirements." However, these requirements were not described, nor was the "decision-making process" made available – only the final decision was released. From 1999 through 2004, allocations were made based on the IPO. There was no evidence at trial, however, regarding the rationale behind the IPO, or any evidence that these allocation decisions represented all that Reclamation could allocate in any given year without impinging on its ability to meet water right conditions or CVPIA releases. There also was no evidence that this information was made available to the Contracting Parties, despite their repeated requests.

**18. "Such information, if made available to the Secretary, is sufficient to base a review of the water reduction decisions made by Reclamation." Decision at 61.**

**Correction/Clarification:** The court asserts that if a "record of Reclamation's decision-making" were compiled, and if that information were "made available to the Secretary," it would be sufficient to base a review of the water reduction decisions made by Reclamation. Plaintiffs might agree; however, there was no evidence at trial that either of these conditions occurred.

**19. The Build-Up Schedule set forth on page 67-68 of the Decision contains a typographical error and requires some clarification.**

**Correction/Clarification:** The Court sets forth the build-up amounts from the two Contracts on pages 67-68 of its Decision and characterizes them as "annual minimum purchase and supply" amounts. The chart contains an error in the Central column for years 1999-2004. These amounts should be 80,000 acre-feet rather than 56,000 pursuant to Article (3)(c)(3). The Court has not provided any explanation for limiting Central to 56,000 acre-feet and we assume this is a typographical error.

Also, the Court specifically found the IPO did not trigger the Build-Up Schedule provisions of Articles 3 and 5 of the Contracts. Decision at 54. Because the parties need to continue to function under this Contract, Plaintiffs desire some clarification in the Court's holding with respect to the Build-Up Schedule. Plaintiffs understood that any affirmative requirements on Plaintiffs to pay for and use the amounts set forth in the Build-up Schedule have been waived by Reclamation, or at least held in abeyance, since Reclamation decided to use the IPO and limit Plaintiffs' ability to request and receive water under their Contracts. *See* DX 369, 372. It appears that the Court agreed with Plaintiffs. Plaintiffs request that the Court amend the Decision to state this finding expressly.

**20. Numbered Item 3 on page 61 of the Decision should be Item 2.**

**21. "Following the IPO's two-year modification of the 1983 Contracts, Reclamation discharged its obligation to meet the schedules provided by the Contracting Parties in all years." Decision at 65.**

**Correction/Clarification:** The evidence at trial indicated that the Plaintiffs did not use schedules after 1998 to request water under their Contract, but rather only to indicate how they would take the limited supplies made available by Reclamation. The Court's statement that

"Reclamation discharged its obligation to meet the schedules provided by the Contracting Parties in all years" is unclear in that it presumes there were schedules, which there were not.

**22. "For example, Mr. Ploss explained that Reclamation chose not to release water from other sources to fulfill fishery needs because releases from other CVP contractors would have required their cooperation." Decision at 75.**

**Correction:** This is not an accurate summary of Mr. Ploss's testimony. Mr. Ploss never stated that use of water otherwise delivered to other CVP contractors would have required their cooperation, nor that this was the reason that Reclamation chose not to release water for this purpose. "Cooperation" was a term used by the Court. On re-direct examination, Mr. Ploss unequivocally clarified that: (1) Reclamation could have taken water from other contractors; (2) the other contracts provided for this possibility; (3) it was within Reclamation's power to do so; and (4) as of 1999, when the State Water Resource Control Board adopted Decision 1641, meeting the salinity standard in the San Joaquin River was a condition on all CVP permits, including those used to deliver water to South of the Delta contractors. The Court acknowledged at trial that on redirect, Mr. Ploss came "*full circle*:"

> THE COURT: Now, you have to establish, Ms. Spaletta, is whether Mr. Ploss was an Indian-giver or not. I hope that's not a politically incorrect term.
>
> REDIRECT EXAMINATION BY MS. SPALETTA
>
> Q. First, Mr. Ploss, I'd like to clarify. You indicated in your testimony that if you had implemented the program which you characterize as recirculation, which you essentially pumped additional water back to the San Joaquin River and used it to help meet the Vernalis salinity or flow standard, that that might impact the west side contractors of the CVP?
>
> A. Yes.
> Q. And Westlands Water District is one of those such contractors; correct?
> A. Correct.
> Q. And they have a water supply contract in excess of a million acre-feet?
> A. Yes.

Q. And, as far as you know, there's nothing in that contract that would prevent you from utilizing some of the water pumped from the delta to help meet salinity or flow standards, is there?
A. I don't believe so.

THE COURT: But I understood you to say they'd have the right to object?

THE WITNESS: I believe we might be here with them today then.

**Q. BY MS. SPALETTA: They don't, actually, have a specific right to object, do they, in their contract?**
**A. There's no specific right.**

**THE COURT: Perhaps I phrased that poorly. I thought the witness testified that the Bureau couldn't order them to do this without their consent, is what I was getting at.**

**MS. SPALETTA: Maybe we should clarify.**

**THE COURT: We should.**

**Q. BY MS. SPALETTA: That this action would actually be taken by the Bureau of Reclamation, not Westlands Water District; correct?**
**A. Correct.**

THE COURT: And that was my question. I mean, could the BOR require other contractors on the west side to contribute to an effort to meet the water-quality objectives at Vernalis?

THE WITNESS: There's nothing that I'm aware of that would require them to do that. It would be a Bureau action to carry it out.

**THE COURT: But the Bureau has the authority to do it?**

**THE WITNESS: I believe so, yes.** I believe so, yes.

THE COURT: And I gathered from your earlier testimony with Ms. Spaletta, that you were saying that -- whether or not they're looking at recirculation now, the Bureau, at least from 1993 to 2002, utilized the New Melones option.

THE WITNESS: Yes.

**THE COURT: But it did have the power, had it wanted to, to attempt to proceed with other alternatives that would have taken water from**

**other contractors, whether it ultimately would have found itself in this courtroom at this time or not?**

**THE WITNESS: Yes.**

Tr. 1004:15-1007:3.

Q. And turning toward the back of Revised Decision 1641, on page 159. Do you see, about the middle of the page, it states, "It is further ordered that license 1986, application 23, and permits 11,315," and so on and so forth, getting down to the B. That paragraph, "Of the USBR CVP, except New Melones, are amended by following the permitted condition. "This permit is conditioned upon implementation of the water-quality objectives for the agricultural beneficial uses in the southern delta as specified in Table 2, attached at the following locations in the southern delta: "A," San Joaquin River at Airport Way Bridge, Vernalis." Does that refresh your recollection that Decision 1641 actually imposed an affirmative condition on all of the permits in the Central Valley Project to meet the salinity condition at Vernalis?
A. I believe so, yes.

THE COURT: As of the date of the decision? And then it was this decision that has been in litigation, was subject to the recent endless opinion I read.

MS. SPALETTA: Correct.

Q. BY MS. SPALETTA: In looking at Joint Exhibit 28 again, the column of, "Water quality, Vernalis releases."
A. Yes.
Q. Isn't it true that the vast majority of the water-quality releases that the Bureau of Reclamation has made from New Melones have occurred since Decision 1641 imposed this condition on all of the other CVP permits in the system?
A. Yes.
Q. And isn't it also true, Mr. Ploss, that these releases are generally required in the drier years?
A. That's when it has to be met most, is in dry years, yes.
Q. And, in fact, those are the same years when it's most critical to the Plaintiffs in this case to have a water supply from New Melones Reservoir; correct?

MR. SHAPIRO: I'll object to the extent it calls for speculation.

THE COURT: Well, this man had a career in the field, so he wouldn't be speculating. I'll allow him to answer.

THE WITNESS: It would be difficult for me to say for sure because I know that at least Stockton East also has conjunctive-use programs under way to use groundwater. So it would be difficult for me to say. But generally, contractors need the water in dry years, yes.

Q. BY MS. SPALETTA: I'd like to turn your attention to Joint –

THE COURT: Excuse me. One question to ask counsel -- and Mr. Shapiro can correct your answer if he disagrees with it -- do I understand from the 2006 decision, that 1614 has not fully gone into effect?

MS. SPALETTA: No, Your Honor. I'll make an offer of proof. Decision 1641 actually remained in effect from its issuance. That was actually an agreement of the parties litigating. And when the Court appeal overturned a portion of the decision, that's gone back and is subject to review by the State Board, but the rest of the decision has remained in effect.

THE COURT: And with respect to the imposition of participating with -- or imposing a new condition on all permits relative to water quality, has that been in force since March 15th, 2000?

MS. SPALETTA: It's my understanding it was in force since December of 1999, when the original decision was issued.

THE COURT: Okay, do I understand that the other permittees are making water quality -- I don't know -- releases that have anything to do with water quality at Vernalis?

MS. SPALETTA: I believe it was Mr. Ploss' testimony that there have been no other CVP reservoirs that have released water to meet the water-quality standard at Vernalis.

THE COURT: So the decisions in effect, the permits have been amended; but the only releases have been taken from New Melones; correct?

MS. SPALETTA: That's my understanding.

THE COURT: Is that a correct understanding?

THE WITNESS: That's correct, yes.

**THE COURT: So we've come full circle.**

Tr. 1008:5-1011:14.

**23. "Pumping at the delta for use by south-of-the-delta users, which includes residential use for the Los Angeles area, is not only the primary cause of salinity deposits that require releases from the New Melones Reservoir." Decision at 82.**

**Correction:** Reclamation does not pump water from the Delta to deliver to residential customers in Los Angeles. There was no evidence presented at trial that the use of water by residential customers in Los Angeles contributes to salinity in the lower San Joaquin River. The evidence at trial was that Reclamation's pumping of water from the Delta and delivery of water to west-side farmers (Reclamation's "South of the Delta Contractors") are the primary causes of salinity discharges into the lower San Joaquin River (from surface and subsurface drainage). Reclamation releases fresh water from New Melones to dilute this salinity at Vernalis. *See* Decision 1641 at 81-82, JX 23.

**24. "Surface water has been leached from every damable river, which is made evident upon reviewing a map of the CVP. See e.g., DX 219. As a consequence of the modification of the natural flow of every river that historically supported spawning of salmon in the CVP, the fish are being killed in the process of redirecting them to the river whence they came." Decision at 82.**

**Correction:** The Court's comments represent an unfortunate misunderstanding and are not supported by the evidence at trial, nor by Mr. Guinee's testimony. DX 219 is a map of 21 dams blocking historic spawning habitat, but less than half, only ten, are CVP projects. One is a California State Water Project dam and the remaining ten are owned by other water right holders who are equally governed by background principles of California water law. The Court has mistakenly presumed that the CVP is responsible for the decline in spawning habitat. This is not only false, but was not the subject of evidentiary presentation at trial. It is improper for the Court to make factual statements that are both false and outside the scope of this case.

**25. "As a consequence of the modification of the natural flow of every river that historically supported spawning of salmon in the CVP, the fish are being killed in the process of redirecting them to the river whence they came. For example, fishery releases from the New Melones reservoir have resulted in a net decrease in the number of fall-run**

**Chinook salmon produced annually on the Stanislaus River. See DX 210 (computing average production of fall-run Chinook salmon between 1967-1991 as 10,868 and average between 1992-2005 since implementation of the CVPIA, as 7,540)." Decision at 82.**

**Correction:** Again, the Court has made a false factual conclusion unsupported by the evidence at trial. DX 210 did no more than illustrate that salmon populations have declined during the period of time that CVPIA has been implemented. In no way did this exhibit prove that fishery releases from New Melones have *resulted* in a decrease in salmon numbers. In fact, there are many other reasons for fishery decline. The Court can at most conclude only that CVPIA releases on the Stanislaus River have not produced increased salmon populations.

### C. REQUEST TO AMEND DECISION TO REMOVE IRRELEVANT DICTA AND DISCUSSION OF PLAINTIFFS' TAKINGS CLAIM

#### 1. Dicta Regarding Irrelevant Litigation and Administrative Proceedings

The Court's recitation of very cursory information regarding several state and federal lawsuits and administrative proceedings in Background Sections I and II of the Decision is confusing, unnecessary dicta. The Court did not utilize this information in reaching findings of fact or conclusions of law in this case. Further, the Court's decision recites each case as if the same Plaintiffs in this case were parties to each of the listed cases. This is not true. For the most part, these other cases involved other parties. Further, some of the numbered items in the decision occurred after the relevant time period for this case (i.e., after 2004). In particular, all of the items under Background Section II are administrative proceedings that post-date the relevant time period and are entirely inadmissible and irrelevant to the issues in this case. This is confusing and appears to have no relation to the rationale or decision reached by the Court in this breach of contract action. Plaintiffs respectfully request that the Court remove the irrelevant and confusing dicta from its Decision.

### 2. The Court's Comments on Plaintiffs' Takings Claim Should be Removed as this Issue was Not Litigated

This Court bifurcated Plaintiffs' case and specifically placed the takings claim on hold pending resolution of the breach of contract claim. The parties produced no evidence or argument on the takings claim – including no evidence or argument regarding whether the claim was one of a physical or regulatory taking. Nevertheless the Court's Decision states: "Plaintiffs' Fifth Amendment takings claim alleges a regulatory taking due to the impact of the CVPIA on fulfillment of the 1983 Contracts." Decision at 81. In fact, it is Plaintiffs' position that the government's use of the New Melones yield, previously contracted to Plaintiffs, for a new environmental use, is a physical taking, not a regulatory taking. However, Plaintiffs have never been able to argue this point to the Court, because the takings claim has not yet been litigated.

The Court should remove from its Decision any holdings with respect to the takings claim and set a further status conference with the parties to determine whether Plaintiffs will pursue the takings claim.

## III. CONCLUSION

For all of these reasons, Plaintiffs ask this Court to grant their motion to amend or modify the Court's Decision.

Respectfully submitted,

_/s Roger J. Marzulla___________

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760

(202) 822-6774 (facsimile)
Counsel for Plaintiffs

Dated: March 7, 2007

Of Counsel:
Jeanne M. Zolezzi
Jennifer L. Spaletta
Herum Crabtree Brown
2291 West March Lane
Suite B100
Stockton, CA 95207
(209) 472-7700
(209) 472-7986 (facsimile)