**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STOCKTON EAST WATER DISTRICT, et al., | ) | |
| Plaintiffs, | ) | No. 04-541 L |
| v. | ) | Judge Christine Odell Cook Miller |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION FOR RECONSIDERATION**

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Dated: March 7, 2007

Counsel for Plaintiffs

Of Counsel:
Jeanne M. Zolezzi
Jennifer L. Spaletta
Herum Crabtree Brown
2291 West March Lane
Suite B100
Stockton, CA 95207
(209) 472-7700
(209) 472-7986 (facsimile)

# TABLE OF CONTENTS


I. SUMMARY OF ARGUMENT ....1

II. ARGUMENT ....3

A. The Court Manifestly Erred In Holding The Parties Intended The Phrase " Beyond The Control Of The United States" To Mean "Reasonable Operation Of The Reservoir....3

B. The Court Manifestly Erred In Holding Plaintiffs Had The Burden To Prove Defendant's Affirmative Defense For Non-Performance....8

C. The Court Improperly Inferred That Testimony of Reclamation Employees Who Were Not Called as Witnesses Would Establish Defendant's Excuse of Non-Performance....13

D. Year-by-Year Review of Operational Evidence....18

III. CONCLUSION....28

# TABLE OF AUTHORITIES

**Statutes:**

CVPIA § 3406(b)(2)(C) ........................................................................................................12

**Cases:**

*Barnett v. United States*, 6 Cl. Ct. 631 (1984) ........................................................................16

*Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335
(7th Cir. 1983).....................................................................................................14, 16, 17

*Day & Zimmermann Serv. v. United States*, 38 Fed. Cl. 591 (1997)................................16, 17

*First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 58 Fed. Cl. 139 (2003)...............9

*Gulf Oil Corp. v. FERC* (3d Cir. 1983) 706 F.2d 444 ........................................................9, 10

*Jennie-O Foods, Inc. v. United States,* 580 F.2d 400 (Ct. Cl. 1978) ..................................9, 10

*Jones v. Otis Elevator Co*., 861 F.2d 655 (11th Cir. 1988)) ...................................................17

*Kean v. Comm'r of Internal Revenue*, 469 F.2d 1183 (9th Cir. 1972) ...................................17

*McCalden v. Cal. Library Ass'n* 955 F. 2d 1214 (9th Cir. 1967) .............................................9

*United States v. Brooks-Callaway Co,*. 318 U.S. 120 (1943).......................................9, 12, 13

## SUMMARY OF ARGUMENT

This case involves Defendant's operation of New Melones dam and reservoir. Plaintiffs have contractual rights to delivery of water from New Melones. The Court found Defendant failed to deliver the water Plaintiffs were entitled to under their contracts. The contested issue was whether Defendant had an excuse for non-performance pursuant to Article 9(a) of the contracts—an affirmative defense.

The Court found Article 9(a) to be ambiguous and invited evidence regarding the intent of the parties. All evidence presented at trial supported Plaintiffs' argument that Article 9(a) requires Defendant to use *all reasonable means* to avoid shortage and that Defendant may avoid liability only when shortages are *beyond its control.* Defendant presented no evidence related to the meaning of Article 9(a). Defendant also produced no evidence regarding its operational decision making and no evidence that it was beyond its control to release more water to Plaintiffs. Plaintiffs produced a hydrologic expert who concluded that Defendant had sufficient water to deliver to Plaintiffs each year without impacting any other releases from the reservoir. Defendant never called Peggy Manza, the operator of New Melones and their purported expert, to refute this evidence.

Despite the plain language of Article 9(a), and Plaintiffs' undisputed evidence regarding intent of the parties at the time of contracting, the Court concluded Defendant's performance was excused because there was some evidence that Defendant undertook annual forecasts of inflow, and, therefore, the Court presumed it must have acted reasonably. The Court manifestly erred in its interpretation and application of Article 9(a) by failing to determine whether there was a shortage "*beyond* [Defendant's] *control*" each year, or whether Defendant used *all* reasonable means to avoid the shortage.

The Court also manifestly erred by strapping Plaintiffs with the burden to disprove Defendant's affirmative defense. Regardless of the meaning the Court attaches to Article 9(a) (even to require only "reasonable operation"), Defendant had the burden to establish this defense by a preponderance of the evidence. The United States Supreme Court and every federal court addressing such an issue have held that this burden is unmistakably on the non-performing party, and generalized assertions about industry difficulties will not suffice to meet this burden.

Lastly, the Court manifestly erred when it improperly applied evidentiary inferences against Plaintiff related to Defendant's failure to call any operational witnesses, instead inferring in the Defendant's favor. The only legally permitted inference the Court could draw from the lack of operational evidence was in Plaintiffs' favor—that Ms. Manza would not withstand cross-examination and that it was within Defendant's control to deliver more water to Plaintiffs under these contracts. The Court erred by inferring the lack of evidence in Defendant's favor.

Based on the evidentiary record from trial, Defendant did not prove it operated New Melones reasonably, that it used all reasonable means to avoid a shortage, or that the alleged shortage in any particular year was due to causes "beyond its control." At the close of trial, and even after the Court's Decision, two questions remain: Why didn't Defendant deliver Plaintiffs' water when it was possible to do so? What was the cause beyond the control of the United States that excused performance each year? The Court properly found that CVPIA did not make performance impossible (Decision at 81), but never identified what Defendant's alternative excuse might be.

The Court's manifest legal errors, in addition to several erroneous factual conclusions, result in an indefensible holding. Plaintiffs respectfully request reconsideration.

## ARGUMENT

### A. The Court Manifestly Erred in Holding the Parties Intended the Phrase "Beyond The Control of The United States" To Mean "Reasonable Operation ff the Reservoir."

The Court's summary judgment opinion instructed the parties to present evidence on what they intended the phrase "cause . . . beyond the control of the United States" to mean. S.J. Opin. at 29. In response, Plaintiffs presented the testimony of four signatories to the contract, all of whom testified that this provision was intended to excuse Defendant only in case of an act of God, such as drought, earthquake, or failure of the dam. Defendant presented absolutely no evidence on this point. Notwithstanding Plaintiffs uncontroverted offer of proof, the Court concluded Reclamation would be excused from liability if it only acted reasonably (and, correspondingly Plaintiff had an affirmative duty to prove unreasonable operational decision making). The Court's holding is not supported by any evidence, and contradicts the very language of the contracts. The Court manifestly erred in its interpretation of Article 9(a).

Article 9(a) of each contract provides:

> In its operation of the Project, the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall acc[ru]e against the United States…

Stockton East and Central Contracts art. 9(a) (PX 36, 37).

According to the plain language of Article 9(a), the United States may only avoid liability for shortages triggered by causes "beyond its control." On cross motions for summary judgment, Plaintiffs argued the "beyond the control" language in this section related only to causes like drought and acts of God that were truly uncontrollable by the United States.

Defendant argued the possible causes of excusable shortages were broader and encompassed any shortages that resulted from implementation of CVPIA. S.J. Opin. at 29. The Court found the clause ambiguous as to the CVPIA and asked both parties to present evidence on the interpretation of the provision.

At trial, Plaintiffs produced four witnesses who signed the contract. Mr. Houston, Reclamation's Regional Director in 1983, testified that the shortage provision meant Reclamation would provide water unless it did not have water to deliver:

> Q. Yes. Looking at the first two sentences of
> Article 9, what was your understanding of those
> provisions at the time you executed this contract?
> A. Very simply, that we would try to use all of the
> means available to us to make water available to the
> contractors. It's a typical force majeure event. If
> there's something beyond our control, obviously you
> couldn't deliver. In a drought, you couldn't deliver as
> an example; or if you were to lose a distribution system
> and they couldn't take delivery. Otherwise, it was
> essentially a complement to deliver water, if we were
> able to.

Tr. at 55. This same intent was echoed by Mr. Roberts and Mr. Steffani. Tr. at 412-13, 153-54. Mr. Houston also explained that he contemplated additional demands for water for fish at the time of execution and decidedly did not understand that these demands would be met with Plaintiffs' water—they would be met with purchases, habitat improvements or new facilities. Tr. at 55-58. These witnesses also noted (describing the context of the negotiations) that the United States could not get water right permits without the cooperation of the contracting districts, who would agree to build a $60 million dollar conveyance facility to take the water and ensure it was consumptively used. This was a bargained for exchange. Mr. Houston stressed that the purpose of building a 2.4 million acre-foot reservoir was to deliver stored water in dry periods. Tr. at 78-79. Defendants presented no contrary evidence.

Despite Defendant's failure to produce any evidence or intent to counter Plaintiffs' evidence, the Court held that Reclamation would not be liable for shortages made "necessary" by the CVPIA. Decision at 59. Yet, the Court also found the CVPIA was not the cause of Reclamation's inability to deliver. *Id.*at 81. The Court manifestly erred by failing to take the next logical step: to determine what other causes of shortage could relieve the Defendant of liability and whether any existed in this case.

This error persists in the Court's annual analysis. The Court found a shortage in only two years: 1994 and 1995. Decision at 66. Each finding is factually flawed as set forth below (*see* Section D). Critically, however, the Court fails to make a finding of shortage due to a cause *beyond the control* of the United States *for any other year*. This is not surprising, as Plaintiffs produced uncontroverted evidence that there was sufficient water in the reservoir to deliver each year. Defendant, by contrast, presented absolutely no evidence that it was beyond its control to deliver the water stored in the reservoir to Plaintiffs.

Instead of making these requisite factual findings, and contrary to the undisputed evidence presented by Plaintiffs, the Court inexplicably adopted Defendant's position that reasonable operation alone is sufficient to avoid liability. Decision at 69. The Court's holding directly conflicts with the only evidence at trial of the parties' intent and the contracts' plain language.

Indeed, the plain language of Article 9(a) affirmatively requires Reclamation to use **all** reasonable means to guard against a shortage:

> In its operation of the Project, the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract.

Contracts, Art. 9(a). The **"all"** in this section is not equivalent to a duty to use only **one** reasonable means of operation. The Court erred in holding Plaintiffs had the burden to prove Reclamation's selected mode of operation was unreasonable instead of holding that Defendant had the burden to prove it utilized **all** reasonable means of operation to avoid a shortage. The Court's holding directly contradicts its own position at trial that Defendant, in these contracts, took on a heightened duty to make "all reasonable efforts" to get water to Plaintiffs, instead of committing to a "standard of mere reasonableness." Tr. at 1272.

The plain language of Article 9(a) also excuses Defendant from liability only in circumstances where the shortage is due to a cause "beyond [its] control." The words "beyond the control" simply do not equate to "selecting one reasonable alternative among many." In other words, if one reasonable operating regime causes shortage and another does not, this provision *obligates* Reclamation to choose the latter.

Contrary to these plain requirements, the Court's analysis made no factual findings regarding whether Reclamation used "all reasonable means" to avoid a shortage, or whether the shortage was "beyond the control" of Reclamation. Instead, the Court improperly excused Defendant's failure to perform because another federal court commented that the CVP is a "complex project" and that Reclamation has discretion to operate it, and because Reclamation said it performed annual forecasts. *See* Decision at 68-69. The Court's holding is manifest error because it renders the express provisions of Article 9(a) meaningless. If Reclamation only had to act reasonably to avoid liability, Article 9(a) should have stated: "The United States shall not be liable for failure to deliver water if it operates reasonably." It did not. Moreover, anecdotal evidence that Reclamation forecasted annual inflow is not enough to find it acted reasonably.

The Court also held that the shortage determinations do not have to be formal writings, just sufficiently detailed to enable review by the Secretary. Decision at 61. But the Court reached no conclusion that Reclamation made a shortage determination each year sufficiently detailed to enable secretarial review. In fact, the Court made *no* specific findings on this issue for any year at issue. Apparently aware of this evidentiary deficiency, the Court again makes a broad unsupported statement that:

> Even when no formal announcement of shortage issued, a record of Reclamation's decision making process was available to the Contracting Parties in years in which they received water allocation reductions. Such information, if made available to the Secretary, is sufficient to base a review of the water reduction decisions made by Reclamation.

Dec. at 60-61.

However, no "record of decision making process" was ever made available to Plaintiffs—not during the years in dispute, not during discovery, and not at trial. Nor, is there any evidence that this "record" was made available to the Secretary of the Interior for review at any time. Simply put, no such "record" was placed into evidence at trial. Other than stating that such a "process" should occur, and that it should be memorialized in a "record" sufficient for review, the Court failed to reach a finding as to what should be included in this decision making process, what factors went into it, what the result was, where it was memorialized, and whether or not it was reviewed by the Secretary. This failure is error.

To give the plain language of Article 9(a) meaning this Court should have made at least the following factual findings *for each year*, based upon *evidence in the record*:

- There was a shortage—i.e., Reclamation did not have enough water to meet all of its demands that year.
- Reclamation took all reasonable means to guard against a condition of shortage.
- The cause of the shortage was identified and articulated.

- The Contracting Officer determined that the cause of the shortage was beyond Reclamation's control.
- The Contracting Officer's determination that there was as shortage beyond its control was not unreasonable, arbitrary or capricious.

Under the Court's current holding, Reclamation can store more water than it can use, provide absolutely no evidence that it was beyond its control to deliver more water to Plaintiffs, make general assertions that its allocation was based on forecasted inflow, state the allocated amount in a press release, and it will be absolved of liability. This is patently unreasonable, contrary to the intent of the parties at the time of contracting, and a construction so favorable to the United States that it makes Article 9(a) devoid of all meaning and restriction. As Plaintiffs have set forth in Section D, *infra*, the required findings cannot be made based on the record before the Court, and hence, the Court's application of the Article 9(a) defense was manifest error.

**B. The Court Manifestly Erred in Holding Plaintiffs Had the Burden to Prove Defendant's Affirmative Defense for Non-Performance.**

Whatever the meaning of Article 9(a), it constitutes an affirmative defense on which the non-performing party, Defendant, has the burden of proof. *See United States v. Brooks-Callaway Co*., 318 U.S. 120 (1943). This Court manifestly erred by imposing on Plaintiffs the burden of disproving Defendant's affirmative defense, while relieving Defendant of that burden.

It was not the Plaintiffs' burden to prove it was impossible for the United States to perform or a specific alternative was available to the United States by which performance could have been achieved. *Jennie-O Foods, Inc. v. United States*, 580 F.2d 400, 410 (Ct. Cl. 1978). Rather, the nonperforming party has the burden to prove a valid excuse for non-performance. *Gulf Oil Corp. v. FERC*, 706 F.2d 444, 452 (3rd Cir. 1983) (citing *Brooks-Callaway Co.*, 318

U.S. at 120-21). Excuse of performance must be shown by a preponderance of the evidence. *McCalden v. Ca. Library Ass'n*, 955 F. 2d 1214, 1219 (9th Cir. 1967). The fact the United States was the non-performing party did not entitle it to special treatment or absolve it of its burden of proof. *First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 58 Fed. Cl. 139, 145 (2003) (Government's failure to perform a contract is judged by the standards of a private party's breach of contract).

Defendant's burden goes beyond merely proving the excuse. When the non-performing party seeks to rely on a "beyond its control" excuse enumerated in a contract, it must also prove it took all reasonable action to perform the contract notwithstanding the occurrence of the excuse. *Brooks-Callaway Co.*, 318 U.S. 120 (levee contractor failed to prove it could not perform even in the face of high flood events); *Jennie-O Foods*, 580 F.2d 410 (turkey supplier failed to prove it could not perform even in the face of industry disease problems).

The Court of Claims' analysis in *Jennie-O Foods* is instructive. Jennie-O was required to deliver a certain amount of turkey to the United States for a food contracting program. The contract relieved Jennie-O from liability for failure to deliver if the failure was due to circumstances "beyond its control." Jennie-O failed to deliver, claiming its performance was excused because of disease problems sweeping the turkey industry which were "beyond its control." This Court held that general claims of industry disease were insufficient to avoid liability for failure to perform. Jennie-O was required to provide more specific evidence and proof to support its self-serving assertions that performance was prohibitively expensive or difficult. 580 F.2d at 410-11; *see also Gulf Oil Corp.*, 706 F.2d at 452.

In its Decision in this case, the Court viewed the burden of proof regarding ability to perform as resting with Plaintiff, stating: "plaintiffs cannot demonstrate that Reclamation made

unreasonable decisions in violation of Article 9(a) in operating the New Melones Reservoir." Decision at 78. This was manifest error as Plaintiffs had no burden to disprove Defendant's affirmative defense in their case-in-chief. It also directly contradicts the Court's position at trial that the Court would be "focusing on Defendant . . . how Defendant made its release decisions." Tr. at 1122.

At trial, Plaintiffs proved they were entitled to performance and that Defendant did not perform. Plaintiffs went beyond their burden and also presented un-refuted evidence that performance was physically possible. Decision at 81. The burden then switched to Defendant to prove it had an excuse for non-performance. Instead of presenting evidence to support its defense, Defendant took the position that as long as Plaintiff did not prove that its operations were unreasonable *per se*, the United States had no obligation to address whether or not there were other modes of operation that may have also been reasonable and, if selected, would have provided more water to Plaintiffs. Defendant failed to present any operational testimony to explain how or why it failed to perform each year. The evidence at trial showed in many years there was no shortage at all, and, from 1997 forward, Defendant operated New Melones blindly, based on the IPO—capping Plaintiffs' allocations at 90,000 acre-feet despite some of the largest inflows in recorded history and reservoir storage levels so high the reservoir spilled hundreds of thousands of acre-feet of water (which was unreasonable on its face).

The Court grasped this at trial, stating:

> And understand that Plaintiffs have a case, even assuming the CVPIA allocations, at their maximum, were appropriately taken, they still have a case, because we've got more water. And that will be Defendant's case to show, "No, a prudent manager would not have released more water." And that's what I call the bottom-line case.

Tr. at 1132. Defendant never produced its "prudent manager."

Like Jenni-O, Defendant failed to provide sufficient specific evidence to support its defense. The scant evidence relied on by this Court amounted to no more than annual one-page press releases stating only Plaintiffs' ultimate allocation amount and the year-type classification (wet, dry, etc.), and the vague testimony of a prior Regional Director, with no operational experience, regarding the general method of annual inflow forecasting for the entire CVP (not specific to New Melones Reservoir). Defendant did not call a single witness who actually operated the reservoir or made the allocation decisions. Defendant presented no evidence of forecasted annual inflow, projected annual demands or projected carry-over storage figures that would have been used to make allocation decisions. Defendant introduced no evidence to explain its allocation methodology, including why it carried over such high volumes in storage. Given the proven amounts of water that were available to deliver, this Court has no evidence from which to conclude that shortage existed in at least 1995 through 2002.

Plaintiffs do not dispute that water supplies were scarce in 1994, and that 2003 and 2004 represented drier years with declining storage levels. However, these factors are insufficient to find that a shortage existed, let alone that it was beyond Defendant's control to deliver more water than it did (which was zero or minimal amounts). In fact, evidence of a few years of below normal inflow simply illustrate why Reclamation built a 2.4 million acre-foot reservoir—to hedge a risk Reclamation expressly understood and planned for. *See Brooks-Callaway*, 318 U.S. 122-23 (noting that risks contemplated at the time of contracting are insufficient excuses to avoid liability). To find a shortage sufficient to excuse Defendant from performance in these years, the Court must determine that the Contracting Officer reasonably believed it was *beyond its control* to deliver more water to Plaintiffs given its other, non-discretionary commitments from the Reservoir. The Court must also find Defendant used its best efforts—"*all reasonable*

*means*"—to get Plaintiffs more water in these years. Defendant produced no evidence on either subject, and the Court made no findings on either issue for any year.

Conversely, Plaintiffs introduced uncontroverted evidence that even in years when water supplies were less plentiful, Defendant could have released more water from storage. Alternatively, Defendant had the ability to reduce demands on New Melones by using other CVP water sources to help control salinity at Vernalis (including direct releases from San Luis Reservoir or Friant dam).[1] Tr. 986, 1510-12, 1516, 1522. As the Court itself recognized, the salinity obligation was placed on all CVP permits, not just New Melones. Decision at 31-32. Plaintiffs also produced uncontroverted evidence that the Secretary of the Interior had the discretion to limit CVPIA prescriptions to 600,000 acre-feet due to hydrologic conditions. CVPIA § 3406(b)(2)(C). Defendant admitted that it never utilized this option in an effort to supply Plaintiffs with water. Tr. at 1830-31.

The Court notes that Plaintiffs' expert, Mr. Dotan, demonstrated that water was available to render "full contract deliveries to the Contracting Parties a possibility, but not necessarily commercially practicable." This statement highlights the Court's legal error. Plaintiffs *proved* the water was there to deliver and Defendant did not deliver it. Plaintiffs were not required to prove more; they were not required to prove it was "commercially practicable" to provide the water. Commercial impracticability is an affirmative defense—the burden of which rests squarely with the non-performing party, in this case, Defendant. *Brooks-Callaway*, 318 U.S. 122-23.

---

[1] Notably, this option is entirely separate from the "recirculation" option which Plaintiffs do not address in this motion. Rather than a direct release from Friant or San Luis Reservoir, re-circulation uses Sacramento River water, pumped at the Delta, and then re-directed to the lower San Joaquin River.

### C. The Court Improperly Inferred that Testimony of Reclamation Employees Who Were Not Called as Witnesses Would Establish Defendant's Excuse of Non-Performance.

Not a single Reclamation employee testified either (1) that a cause beyond the control of the United States resulted in shortage each year, or (2) that Reclamation operated New Melones using all reasonable means, or even reasonably. Yet, this Court bizarrely held Defendant sufficiently established this defense by "inferring," in Defendant's favor, the evidence it chose not to present. Specifically, the Court presumed Reclamation had data and analysis to support its annual allocation decisions even though no evidence of this data or analysis was presented at trial. The evidentiary rule is exactly opposite: An employer who fails to produce an employee to testify suffers the adverse inference that the employee would have testified in a manner unfavorable to the employer. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983).

At trial, Defendant identified but failed to call numerous so-called "expert" witnesses on the subject of reasonable operation of New Melones. Defendant's witness list (Docket No. 125) proclaims:

Chester Bowling

> "Mr. Bowling is a Civil Engineer and was formerly the Operations Manager for the Central Valley Operations Office…. Mr. Bowling's testimony is expected to address New Melones operations during his tenure …issues bearing on decisions regarding quantities of water available to deliver to Plaintiffs SEWD and Central."

John Burke

> "Mr. Burke is a fact witness who has personal knowledge of issues related to this matter based on his work with the Bureau. Mr. Burke may be called to testify about water supply forecasting for the CVP."

John Davis

> "Mr. Davis may be called to testify about issues related to operation of the CVP and issues bearing on decisions regarding quantities of water to deliver to Plaintiffs SEWD and Central."

Paul Fujitani

> "Mr. Fujitani is a Civil Engineer and currently serves as the Chief of the Water Operations Division, Central Valley Operations Office… He is expected to provide testimony about issues related to operations of the CVP, including operations of New Melones from 1989 to 1992 and from 2000 to the present time, forecasting for New Melones, issues bearing on decisions regarding quantities of water available to deliver to Plaintiffs SEWD and Central."

Peggy Manza

> "Ms. Manza is a Hydraulic Engineer for the Central Valley Operations Office… Ms. Manza's testimony is expected to include issues related to New Melones planning, modeling in the Mid-Pacific Region, operations forecasting and real-time operations of the New Melones Unit. In addition, Ms. Manza has prepared an Expert Rebuttal Report responding to the Report prepared by Avry Dotan for Plaintiffs, and she will provide expert testimony in connection with that report."

Lloyd Peterson

> "His prior work experience with the Bureau includes oversight of New Melones and Folsom operations between July 1992 and September 1994. Mr. Peterson's testimony may address the actual operation of New Melones during his tenure as chief of those operations (1992-1994), operational decision-making and the factors that influence operational decisions, compliance with applicable laws and permitting requirements, the implementation of various agreements that affected New Melones and other CVP operations during that time period."

All of these witnesses were either regularly employed by Reclamation or employed as "retired annuitants" at the time of trial. The Court will recall that Plaintiffs successfully struck the "expert" nature of these designations pre-trial, but the Court expected that these witnesses, or at least Ms. Manza, would take the stand to explain why Reclamation did what it did. *See* Order dated October 18, 2007 (Docket No. 147).

The proper inference to be draw from Defendant’s failure to call these employee witnesses is not that they would have offered some unidentified evidence in support of Defendant’s defense, but that they would have been unable to do so. An adverse inference is the “well settled principle of evidence which provides that, where a party fails to call a witness available to him and who has knowledge of material facts, the court may draw the inference that the testimony of the witness concerning those facts would have been unfavorable to the party.” *Day & Zimmermann Serv. v. United States*, 38 Fed. Cl. 591, 603 (1997) (citing *Barnett v. United States*, 6 Cl. Ct. 631, 671 (1984)); *see also Chicago College of Osteopathic Medicine*, 719 F.2d 1335 (7th Cir. 1983) (cited at least 18 times for the proposition that according to the “missing witness” rule, when a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, but chooses not to call them, an inference arises that the testimony, if produced, would be unfavorable.)

Accordingly, the Court was correct in stating:

> The absence of additional operational testimony by Reclamation employees might support an inference adverse to Reclamation. “[I]f a party knows of the existence of an available witness on a material issue and such witness is within the party's control and is not called by that party, the finder of fact *may* draw an inference that the testimony of the witness would have been unfavorable to such party.” *Contract Master Servs., Inc. v. United States*, 225 Ct. Cl. 735, 737 (1980); *see also Brasseler, U.S.A. L.L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1384 n. 7 (Fed. Cir. 2001); *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1399-1400 (Fed. Cir. 1986). “A determinative factor in analyzing control is the relationship which the potential witness bears to the parties, the logical inference being the party will likely call as a witness one bound to him by ties of interest.”

Decision at 72-73.

The Court erred by refusing to apply the inference against Defendant because: “plaintiffs had ample opportunity to call Reclamation employees included on their witness list who could have supplied the operational evidence to complement Mr. Dotan’s expert testimony”. Decision

at 73. Despite appearing as potential rebuttal witness on Plaintiffs' list (as required by Court Rule), these Reclamation employees were not legally *available* to the Plaintiffs. And, Plaintiffs did not have the burden of explaining Defendant's operations.

For purposes of the "missing witness" rule, the employee/employer relationship equates to control and availability. *See Chicago College*, 719 F. 2d at 1353 ("employees are usually not considered to be 'equally available'" to other parties). If an employee could give important testimony relative to issues in litigation, and his absence is unaccounted for, the presumption arises that his testimony would be unfavorable to his employer. *Id.* The missing witnesses in this trial were all Reclamation employees, controlled by Reclamation, who were *not* "available" to Plaintiffs for practical purposes.

Determining availability "depends upon all the facts and circumstances bearing upon the witness's relation to the parties and not merely upon his presence at trial or accessibility for service of a subpoena. The potential witness must be equally available both legally and practically." *Kean v. Comm'r of Internal Revenue*, 469 F.2d 1183, 1988 (9th Cir. 1972). Availability turns on "the witness' relationship with the non-producing party. A witness is unavailable in a practical sense when this relationship is such that it creates bias or hostility against the opposing party. Because of an employee's economic interest, the employer-employee relationship is recognized as one creating practical unavailability [to the opposing party]." *Day & Zimmermann*, 38 Fed. Cl. at 604 (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 659-60 (11th Cir. 1988)).

The Court simply erred in finding that "no essential witness that was not called was within the control of defendant." Decision at 73. Defendant identified Ms. Manza, Mr. Bowling, Mr. Fujitani, and several other employees as key factual witnesses with personal

knowledge of how operational decisions were made, including allocations to Plaintiffs. Ms. Manza was deposed three times and prepared an expert report purporting to respond to Plaintiffs' expert witness, Mr. Dotan. These employee witnesses had a financial bias toward Defendant thereby making them unavailable to Plaintiffs. They possessed operational evidence essential to establish Defendant's affirmative defense and the Court should have applied the adverse inference against Defendant for its failure to produce them at trial. The Court not only erred in refusing to apply the inference, but also erroneously presumed the testimony of these missing witnesses was favorable to Defendant.

The Court's obvious error, and resulting injustice, is best illustrated in the Court's treatment of Mr. Dotan's opinion, Plaintiffs' expert hydrologist. Plaintiffs were not privy to Reclamation's decision-making process, nor were they provided with the details necessary to understand it either at the time the decisions were made or during trial. Plaintiffs did not have the cooperation of Reclamation staff. Plaintiffs only option was to retain a hydrologic expert to duplicate historic operations and explain to the Court whether Reclamation had the water to deliver, assuming all other historic releases remained unchanged.

Mr. Dotan testified entirely objectively, which the Court appreciated and commended at trial. Tr. at 944, 1122. Three months later, and without a scintilla of adverse evidence from Defendant, this Court called Mr. Dotan's opinion "speculative." Decision at 71. The Court erred. Mr. Dotan's opinion was fact—a precise mathematical model using Reclamation's own numbers reflecting daily releases for all project purposes, including regulatory compliance. PX 321 at 31. In fact, Mr. Dotan refused to speculate or opine as to what was reasonable given the result of his model runs, and left that decision to the Court. What the Court did instead was to

*presume* Reclamation had valid operational reasons to short Plaintiffs even though Defendant produced no such evidence at trial.

By adopting this assumption, the Court applied an adverse inference against Plaintiffs, and a positive inference in Defendant's favor. The Court's error places an impossible evidentiary burden upon the Plaintiffs—if Defendant refuses to provide discovery information to explain its shortages, Plaintiffs have nothing to present at trial, and Defendant can prevail based upon favorable presumptions. The law does not support such an absurd result.

**D. Year-by-Year Review of Operational Evidence.**

The year-by-year evidence summarized below highlights the Court's manifest errors. In 1995, 1999, 2000, 2001 and 2002 Reclamation held so much water in New Melones that the reservoir was spilling. Yet, it presented no testimony to this Court explaining why it failed to deliver the amounts due Plaintiffs under their contracts. In 1994, 2003 and 2004, Reclamation faced dry conditions—meaning only that inflow amounts were relatively low. Nevertheless, there was sufficient water in storage to deliver at least a portion of Plaintiffs contractual amounts, without impact on other project uses or to carryover storage. Again, Reclamation failed to provide testimony explaining why it limited Plaintiffs' allocations to only 15,500 and 10,000 acre-feet in 2002 and 2003, and zero in 1994 and 2004.

The Court's factual findings and conclusions of law are erroneous for the years 1994, 1995, and 1999 through 2004. Plaintiffs reviewed the facts relevant to each year in the context of the only operational testimony from trial, from Mr. Patterson and Mr. Ploss.

Roger Patterson was Defendant's only witness to describe Reclamation's method of forecasting and allocating CVP water. Mr. Patterson testified as to this process only for the

period of his tenure (covering the disputed period from 1993 through 1999). He provided no testimony specific to New Melones. The following is his description of the forecasting process:

- "it's an analytical process of really looking at what is available and what is anticipated to be available as far as water supply each year." Page 1571 lines 13-15.

- "Water years generally start, let's say, October 1st. So at that time you know how much water is in storage in the various reservoirs. . . " Page 1571 lines 19-21.

- "and computations measurements will be made of the snowpack. You will determine how much water is in the snowpack. And forecasts will be made for how much flow that's going to create in the rivers when it melts." Page 1572 lines 5-8.

Mr. Patterson also described how allocation decisions were made CVP-wide:

- "One, there were certain contracts that had guaranteed minimums. So, for instance, the Sacramento River water-right holders and the San Joaquin River exchange contractors could not be shorted below 75 percent. . . .So that's one, is are there any special provisions in the contract." Page 1578 lines 22-25, Page 1579 lines 1-2.

- "Second is, where is that contractor physically located within the CVP service area, and what sources of supply can you draw on to make water deliveries to that contractor? Because that will vary, depending on what supplies you have available to draw on." Page 1579 lines 3-7.

- "And then third is what kind of regulatory obligations have to be met, and how does that affect water supply that can be made available to the contractors in that area? And those vary, depending on where you are in the CVP service area." Page 1579 lines 8-12.

This was the complete testimony of Roger Patterson—none of which pertained specifically to New Melones.

The *only* operational evidence presented to the Court was the testimony of Lowell Ploss, provided by Plaintiffs, whose last year of employment in Central Valley Project Operations was 2000. He testified that Reclamation loosely used a 1.4 million acre-foot carry-over storage target

for New Melones. Tr. at 960. Mr. Ploss also testified that no law, regulation or agreement required Reclamation to maintain a particular level or carryover storage. Tr. at 962-963. He described the rationale for this target as providing sufficient water to carry Reclamation through a repeat of the worst drought in history—a “doomsday” scenario. Tr. at 963-968; PX 347. Mr. Dotan, Plaintiffs’ hydrologic expert, testified Reclamation’s own studies project the likelihood of a repeat of this drought as one in 250 to 400 years. Tr. at 942-43.

With this backdrop, the remaining operational information presented at trial was purely objective data relating to annual inflows, outflows, and carryover storage. Plaintiffs review each year in turn.

**<u>1994</u>**

- Reclamation started the year with 747,512 acre-feet of storage in New Melones. JX 28 Actual inflow was 477,000 acre-feet. DX 223, PX 321, page 14.

- On February 15, 1994, Reclamation issued a press release declaring 1994 a “critically dry year” and stating:

  > “Stanislaus River customers who receive Project water from New Melones are forecast to receive zero water supply. In addition, every effort is needed to avoid allowing the level of New Melones reservoir to drop below the minimum storage level (300,000 acre-feet) needed to generate power. The projected end of year storage level in New Melones will meet the minimum power generation level. The available water will be allocated to fish and wildlife, and to meet water quality requirements.” DX 276.

- The Central Valley Project Authorization Act requires that Reclamation operate its reservoirs for irrigation and domestic purposes *before* power generation. PX 25A.

- Reclamation allocated its available supplies in 1994 to prior right holders, fish, and water quality, and was able to retain storage sufficient to exceed the minimum power pool (300,000 acre-feet) by more than 125,000 acre-feet. JX 28.

- Reclamation released 70,600 acre-feet for fish pursuant to CVPIA in 1994, and had dedicated more than 130,000 acre-feet to CVPIA in 1993. JX 28. The net effect of these releases for CVPIA in 1993 and 1994 was to reduce storage in New Melones by 200,000 acre-feet. The Secretary of the Interior had the ability to reduce total CVPIA dedications

in 1993 and 1994 by 25% due to drought conditions, but did not exercise this discretion pursuant to CVPIA Section 3406 (b)(2)(C).

- Stockton East and Central collectively requested 43,564 acre-feet of water in 1994 but received nothing. Dec. at 34.

- Reclamation ended 1994 with 425,405 acre-feet in storage at New Melones. If it had delivered 30% of Plaintiffs' requested water (about 14,000 acre-feet), it would have ended the year with only 3% less water in storage, without impacting any other project use that year. [This finding was encompassed in Mr. Dotan's analysis, but can be derived using simple addition and subtraction].

- In May of 1994, Reclamation said "rain and snowfall conditions in the watershed supplying the reservoir have not been sufficient to support CVP contract deliveries." PX 99. There is no evidence that Reclamation considered using water from storage in the reservoir to serve its contractors.

- No law, regulation or contract prevented Reclamation from releasing more water to contractors in 1994, even if it would have required a release from storage.

- This Court concluded:

> "Given that Article 9(a) does not impose the requirement of a formal written order, combined with the facts that, at the end of calendar year 1994, the total New Melones Reservoir storage was 425,405 acre-feet and that a long drought period of over five years immediately preceded the allocations, the determination of the contracting officer that the shortage was due to causes outside of the control of the United States is supported adequately by the facts. The records of forecasting activity meet the requirements of Article 12(d), as these records provide information sufficient upon which to base a review by the Secretary of the Interior." Dec. at 66.

- Defendant produced no "records of forecasting activity" described by the Court, nor any evidence that the Secretary reviewed the allocation decision.

The Court's factual finding is clearly erroneous. No reasonable fact finder could find that Reclamation's voluntary choice to provide its contractors with a zero water supply, in exchange for a miniscule percentage increase in carryover storage, is a reasonable, non-arbitrary determination that a shortage existed that was "beyond the control" of Reclamation, particularly in the face of zero operational testimony from Defendant. Further, Reclamation's choice to preserve power generation at the expense of contractor deliveries

was directly contrary to federal law. Most importantly, the Court based its finding that the circumstances were beyond the control of the United States solely on inflow to and storage in the reservoir. Inflow and storage, however, are only two relevant factors; to completely analyze liability the Court must also understand required releases from the reservoir and Reclamation's allocation methodology. The Court had insufficient evidence to conclude there was shortage beyond Defendant's control, or to evaluate Reclamation's shortage determination.

## **1995**

- Reclamation started the year with 425,405 acre-feet of storage. JX 28. 1995 was one of the fifth wettest years in recorded history. DX 223. Inflow into the reservoir during that year exceeded 2.2 million acre-feet – the storage capacity of New Melones Reservoir. DX 223, PX 321, page 14.

- By February 15, 1995, with 60% of the precipitation season behind it, and record January precipitation, Reclamation forecast above normal conditions and "extremely high snowpack to produce runoff into CVP reservoirs." PX 115. Reclamation's conservative forecast projected end of year storage in all CVP reservoirs at 6.0 million acre-feet. Reclamation provided no information to Plaintiffs regarding projected end of year storage in New Melones, stating instead:

> "Storage in New Melones on the Stanislaus River has not recovered to the same extent as at other CVP reservoirs. Concerns about the demands for satisfactory fish flow needs and water quality requirements on the lower San Joaquin River and flows for Bay-Delta Estuary protection need to be analyzed to determine the long-term sustainable yield of this facility." PX 115.

- The United States submitted no evidence that this analysis was ever undertaken.

- In 1995 Reclamation allocated New Melones supplies to prior right holders, fish and water quality and released 150,000 acre-feet for fish pursuant to CVPIA. Altogether, Reclamation released 820,000 acre-feet of water from New Melones in 1995, only one-third of the inflow into the reservoir that year. JX 28.

- Because Reclamation did not produce its actual 1995 forecast information, we must infer that operators had at least the following information at their disposal when they made allocation decisions:

| | |
|---|---|
| +425,405 | Starting Storage |
| <u>+1,100,000 to 2,200,000</u> | Plus Average to Actual Inflow |

| | |
|---|---|
| 1,535,405 to 2,625,405 | Equals Projected Supply |
| -820,000 | Minus Projected Demands |
| 715,405 to 1,805,405 | Equals Projected Carryover |

- Stockton East and Central requested 115,000 acre-feet. Reclamation allocated nothing to them in February or March. Reclamation allocated 100% to all other CVP contractors.

- In April, after the irrigation season had begun, Reclamation allocated 37,000 acre-feet to Plaintiffs. In June, Reclamation told the districts they could not have the water after all because a conservation plan the districts had submitted to Reclamation for approval in 1993 (two years prior) was recently deemed inadequate. By the time the conservation plan fiasco was resolved, the irrigation season was almost over and Plaintiffs could use very little water.

- Reclamation had 1,825,784 acre-feet in storage in New Melones at year end and was making flood releases. JX 28

- No law, regulation or contract prevented Reclamation from releasing more water to contractors in 1995.

- This Court concluded:

  "In 1995 Reclamation anticipated, upon review of prevailing conditions at the time, that the lesser recovery of snowpack for the New Melones Reservoir would result in a reduced allocation to ensure sufficient water for environmental and other in-basin purposes. This determination was supported by observation of snowpack amounts built up over the winter, indicating a dry year for the New Melones Reservoir." Dec. at 66.

  This factual finding is not based upon anything in the record, and in fact, the record expressly contradicts such a finding. The 1995 press release is the only information provided by the United States supporting its allocation decision.

- There is no evidence that Reclamation forecast a "dry year for New Melones Reservoir." The forecast was undeniably "wet". See PX 115, JS 28.

- The press release <u>does not</u> state that "**the lesser recovery of snowpack for the New Melones Reservoir would result in a reduced allocation to ensure sufficient water for environmental and other in-basin purposes.**"

- The only reference to "snowpack" in the 1995 press release stated: "extremely high snowpack to produce runoff to CVP reservoirs." PX 115.

- The press release stated: "Storage in New Melones on the Stanislaus River has not recovered to the same extent as at other CVP reservoirs." PX115. This statement is

meaningless, however, unless we know the relative difference in recovery, which is not provided. It is also contradicted by Reclamation's own records of inflow and storage which showed that reservoir storage was climbing so rapidly that it approached 1,000,000 acre-feet a quarter of the way through the year, and almost 1,800,000 by mid-year. *See* PX 321, page 25, Figure 10.

The Court's conclusion that there was a shortage beyond Reclamation's control is clearly erroneous and contradicted by Reclamation's own evidence.

## **1997 and 1998:**

The Court found that Plaintiffs agreed to a 50,000 acre-foot allocation in each of 1997 and 1998, and hence, Defendant is not liable. Although Plaintiffs do not agree with the Court's conclusion, it is not clearly erroneous based on the factual record. Nonetheless, the Court committed a legal error in holding that the parties' agreement constituted an amendment of the Contracts pursuant to Article 3(h), which applies to permanent amendments to the Contracts. Plaintiffs respectfully request that the Court modify its Decision to correct this error. Rather than an amendment pursuant to Article 3(h) of the Contracts, the parties' agreement to terms that differed from the terms of the Contracts was a binding "accord and satisfaction" as to 1997 and 1998. *See* Plaintiffs' Motion to Modify/Amend Decision filed herewith.

## **1999**

- New Melones was so full in 1999 that it was spilling on January 1. JX 28. The United States carried over so much water in storage from 1998 that reservoir storage hovered at the flood control curve for an entire year. PX 323-12.

- 1999 was an above normal water year. JX 28. Inflows were in excess of 1.3 million acre-feet. PX 323-2, PX 321, page 14.

- Defendant limited allocations to Plaintiffs to 60,000 acre-feet, less than half of their contractual entitlement. The allocation was purportedly based on a chart in the expired 2-year Interim Plan of Operations. Dec. at 38. Yet, by the terms of the IPO, allocations to Plaintiffs should have been 90,000 acre-feet because storage plus inflow exceeded 2.5 million acre-feet. Dec. 38.

- Reclamation's 1999 press release of CVP allocations provided no explanation for the reduced allocation; and did not provide any information on projected carryover storage levels for New Melones. In addition, the news release failed to provide a range of allocations for New Melones contractors depending on the year type – instead it just gave the 60,000 acre-foot allocation regardless of year type. PX 232.

- At the end of 1999, New Melones was so full it was spilling, with more than 2 million acre feet in storage. PX 323-12. Presuming Defendant had a carry-over storage goal of 1.4 million acre feet, Defendant's actual carry-over storage exceeded this goal by more than 600,000 acre-feet. If Defendant had allocated 155,000 acre-feet to Plaintiffs, it would have still ended the year with more than 1.9 million acre-feet in storage – 500,000 acre-feet in excess of the 1.4 million acre-foot level.

- Defendant produced <u>no evidence</u> as to why it limited allocations to only 60,000 acre-feet in 1999 in the face of maximum historic storage levels and above average inflow conditions.

As the Court correctly noted at trial:

> "The idea that the operators would be under the assumption that they were coming out of an historic drought is relevant to certain decisions that they made, but it has nothing to do with calculating what occurred during the period in dispute." Tr. 934.

This insight is particularly appropriate for 1999. Faced with the highest storage levels ever, above-normal inflows, and plenty of water to meet all regulatory obligations and still carry over almost 2 million acre-feet, Reclamation still refused to allocate Plaintiffs' full contractual entitlement. There is absolutely no evidence that in 1999 this operation was reasonable, that there was a shortage beyond Reclamation's control, or that no other reasonable mode of operations could have been used to get water to Plaintiffs. Defendant is therefore liable.

## <u>2000</u>

- Once again New Melones was so full that it was spilling at the beginning of 2000. JX 28, PX 323-12. 2000 was another above-normal year with annual inflow in excess of 1.16 million acre-feet. PX 321, page 14. Nonetheless, Reclamation constrained releases such that end of year storage was 1,866,916 acre-feet, even greater than the storage levels at the end of 1999. JX 28, PX 323-12.

- Reclamation limited allocations to Plaintiffs to 90,000 acre-feet pursuant to the IPO, and <u>again</u> provided no evidence at trial to indicate why a shortage was imposed.

- Reclamation's February and March 2000 news releases of CVP allocations stated only the amount allocated to Plaintiffs, and provided no information explaining the reduced allocation or the hydrologic conditions for New Melones. PX 242, 245.

- Even assuming that Reclamation's decision to use a 1.4 million acre-foot carryover storage goal was reasonable, which Plaintiffs dispute, Reclamation ended the year more than half a million acre-feet ahead of this goal. If Reclamation had allocated Plaintiffs the balance of their contractual entitlement (only 65,000 acre-feet) it still would have exceeded its desired carry-over storage.

The record contains no evidence that there was a shortage beyond the control of Reclamation in 2000 or that no other reasonable mode of operations could have been used to get more water to Plaintiffs under their contracts. Again, Defendant is liable.

Notably, the Court makes no factual findings specific to the year 2000, but states:

> "Based on the records of communications between the parties, the annual announcements of snowpack and forecast conditions reported by Reclamation as discussed above, and the analyses of hydrologic conditions that accompanied the eventual allocations, this court finds that plaintiffs have not proven that a reduction from the Build-Up Schedule between 1993 and 2004 was made in violation of Article 12(d)."

The sole evidence the Court cites to support its factual finding is one page of Roger Patterson's testimony, the regional director of the Mid-Pacific Region from 1991 through part of 1999. Tr. at 1571. Mr. Patterson was not even employed by Reclamation during the 2000 water year, and could not, and did not, testify as to the allocation process for that year.

Mr. Patterson admitted he had no knowledge post-dating 1999, nor did he have any direct knowledge of what the Central Valley Operations office did during his tenure. Tr. at 1636-1638. No reasonable fact finder could conclude, based on Mr. Patterson's testimony, that Reclamation produced evidence of hydrologic analysis for New Melones for each year from 1999 through 2004 that supported a finding of shortage beyond the control of Reclamation.

## **<u>2001</u>**

- New Melones began the year near the flood control curve, with 1,866,916 acre-feet in storage. JX 28, PX 323-12. 2001 was a dry year, with inflows of 611,000 acre-feet. PX

321, page 14. Reclamation constrained releases such that end of year storage dipped by only about 300,000 acre-feet to 1,529,338 acre-feet. JX 28, PX 323-12.

- Reclamation limited allocations to Plaintiffs to 34,000 acre-feet. No evidence or witnesses at trial explained the basis for this allocation or why it was beyond the control of the United States to have allocated more water to the Plaintiffs. Reclamation's May 2001 press releases stated only that general CVP conditions were dry, it made no reference to projected demands or carryover storage, or why it was beyond Reclamation's control to deliver more water to Plaintiffs. PX 254.

- In 2001 Plaintiffs specifically requested more information about the allocation decision from Reclamation, but Reclamation refused to provide it. PX 256.

- There is no other evidence in the record regarding Reclamation's allocation decision for 2002.

- Presuming Reclamation had a valid reason to use a 1.4 million acre-foot carryover storage goal for planning purposes, Reclamation ended the year 129,000 acre-feet ahead of this goal.

## 2002

- New Melones began the year with 1,529,338 acre-feet in storage. JX 28, PX 323-12. 2002 was a dry year, with inflows of 851,000 acre-feet. PX 321, page 14. Reclamation constrained releases such that end of year storage dipped by only 180,000 acre-feet to 1,352,270 acre-feet. JX 28, PX 323-12.

- Reclamation limited allocations to Plaintiffs to 15,500 acre-feet. Reclamation put forth no evidence or witnesses to explain the basis for this allocation or why it was beyond its control to allocate more. The press releases for 2002 indicate dry year conditions, but say nothing about demands on New Melones, projected carryover, or why it was beyond Reclamation's control to deliver more. PX 258, 273.

- There is no other evidence in the record regarding Reclamation's allocation decision for 2002.

## 2003

- New Melones began the year with 1,352,270 acre-feet in storage. JX 28, PX 323-12. 2003 was a below normal year, with inflows of 950,000 acre-feet. PX 321, page 14. Reclamation constrained releases such that end of year storage dipped by only 70,000 acre-feet to 1,282,899 acre-feet. JX 28, PX 323-12.

- Reclamation limited allocations to Plaintiffs to 10,000 acre-feet. Reclamation put forth no evidence or witnesses to explain the basis for this allocation or why it was beyond its control to allocate more. The 2003 press releases indicate a dry year classification, but

make no mention of projected demands or carryover storage for New Melones, although specific information about other reservoirs is contained in the releases. PX 289, 298, 303.

- The final release provides the conclusory statement that "water supply allocation is based on New Melones Reservoir storage and the inflow to New Melones Reservoir." PX 303. For all we know, Reclamation's projected storage and inflow showed that it was within their control to deliver 300,000 acre-feet to Plaintiffs.

**2004**

- New Melones began the year with 1,282,899 acre-feet in storage. JX 28, PX 323-12. 2004 was a dry year, with inflows of 776,000 acre-feet. PX 321, page 14. Reclamation constrained releases such that end of year storage dipped by only 120,000 acre-feet to 1,162,060 acre-feet. JX 28.

- Reclamation allocated nothing to Plaintiffs. Reclamation put forth no evidence or witnesses to explain the basis for this allocation or why it was beyond its control to allocate *some* water to Plaintiffs. Its press releases regarding allocations provide no assistance with this inquiry, noting only that it was a dry year. PX 312.

Nonetheless, the Court found Defendant not liable based solely on the generalized description of annual forecasting and allocation decisions undertaken by Reclamation for the CVP as a whole, as described by the Regional Director who was no longer employed by Reclamation in 2000, 2001, 2002, 2003 or 2004. In so doing, the Court ignored Mr. Patterson's own explanation that allocation decisions require a review of at least three variables: inflow, storage and demands. Absent operational testimony that annual demands required the reduced allocations, the Court cannot determine that a shortage existed in any of these years.

**CONCLUSION**

For the foregoing reasons, the Court's decision is legally indefensible. Plaintiffs respectfully request that the Court reconsider its decision to correct its manifest errors of law and fact and set a date for oral argument. The issues in this case are technical: the case involves twelve years of data. The two hours of oral argument afforded at trial for closing were obviously

insufficient. Plaintiffs strongly urge the Court to hear oral argument on the issues raised in this motion.

Respectfully submitted,

s/ Roger J. Marzulla
Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Counsel for Plaintiffs

Dated: March 7, 2007

Of Counsel:
Jeanne M. Zolezzi
Jennifer L. Spaletta
Herum Crabtree Brown
2291 West March Lane
Suite B100
Stockton, CA 95207
(209) 472-7700
(209) 472-7986 (facsimile)