**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT, SAN JOAQUIN COUNTY, STOCKTON CITY, CALIFORNIA WATER SERVICE COMPANY, | |
| | No. 04-541 L |
| Plaintiffs, | |
| v. | Judge Christine Odell Cook Miller |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND OR MODIFY DECISION**

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division

WILLIAM J. SHAPIRO
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
501 I Street
Suite 9-700
Sacramento, CA 95814
TEL: (916) 930-2207
FAX: (916) 930-2210

KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301

LUTHER L. HAJEK
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, DC 20044-0663
Attorneys for Defendant United States

Of Counsel:

SHELLY RANDEL
United States Department of the Interior
Office of the Solicitor
Branch of Water and Power
Division of Land and Water Resources
1849 C St., N.W.
Washington, DC

JAMES E. TURNER
Assistant Regional Solicitor
United States Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825

Dated March 30, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . iv

MEMORANDUM IN SUPPORT OF RESPONSE TO PLAINTIFFS' MOTION TO AMEND OR MODIFY DECISION . . . . . . . . . . 1

I. The Rule 59 Standard . . . . . . . . . . 1

II. Plaintiffs' Repetition of Arguments About Article 3(h) Should be Rejected . . . . . . . . . . 2

III. Defendant's Responses to Plaintiffs' Alleged "Factual Errors" . . . . . . . . . . 4

IV. Plaintiffs' Demand that the Court Rewrite its Opinion Should be Rejected . . . . . . . . . . 19

A. The Court's Summary of Other Litigation and Administrative Proceedings Is Neither "Irrelevant" Nor "Confusing Dicta" as Plaintiffs Assert . . . . . . . . . . 19

B. The Court's Resolution of Plaintiffs' Takings Claims Was Proper . . . . . . . . . . 20

V. Conclusion . . . . . . . . . . 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bishop v. United States,
26 Cl. Ct. 281 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Coconut Grove Entm't, Inc. v. United States,
46 Fed. Cl. 249 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fru-Con Constr. Corp. v. United States,
44 Fed. Cl. 298 (1999), aff'd, 250 F.3d 762 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . 2, 21

Hughes Comm. Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Principal Mut. Life Ins. Co. v. United States,
29 Fed. Cl. 157 (1993), aff'd, 50 F.3d 1021 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 2

## FEDERAL RULES

RCFC 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**DEFENDANT'S MEMORANDUM IN SUPPORT OF RESPONSE TO PLAINTIFFS' MOTION TO AMEND OR MODIFY DECISION**

Pursuant to the Court's Orders dated March 12, 2007 and March 15, 2007, Defendant submits this Opposition to Plaintiffs' Motion to Amend or Modify Decision ("Plaintiffs' Motion"), which requests amendment or modification of certain statements contained in the Court's decision of February 20, 2007 ("Decision"). Focusing on mostly trivial issues that have no bearing on the holdings reached in the Court's well-reasoned 85-page Decision, Plaintiffs' Motion merely reflects Plaintiffs' continued disagreement with the substance of the Court's Decision. Many of Plaintiffs' suggested "amendments" are unsupported by, or even inconsistent with, the evidence presented at trial. As set forth below, the Court's Decision comports with applicable law and accurately reflects the trial record. Plaintiffs' Motion, therefore, should be denied.

I. The Rule 59 Standard

Although titled a Motion to Amend or Modify, Plaintiffs' Motion is properly considered a motion to reconsider, filed pursuant to Rule 59 of the Court of Federal Claims. Plaintiffs also have filed a separate Motion for Reconsideration, to which Defendant has responded. See Def.'s Resp. to Pls.' Mot. for Recons. (Docket No. 167) ("Reconsideration Response"). Due to the overlap in Plaintiffs' two motions, Defendant incorporates the discussion in its Reconsideration Response as necessary.

The Court has discretion to grant reconsideration "to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59. This Court has held that a motion for reconsideration under Rule 59 must be supported "by a showing of

extraordinary circumstances which justify relief." Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999), aff'd, 250 F.3d 762 (Fed. Cir. 2000). To meet this burden, the motion for reconsideration "must be based 'upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court.'" Id. (quoting Bishop v. United States, 26 Cl. Ct. 281, 286 (1992)). In addition, "[t]he movant does not persuade the court to grant such a motion by merely reasserting arguments which were previously made and were carefully considered by the court." Coconut Grove Entm't, Inc. v. United States, 46 Fed. Cl. 249, 255 (2000) (citing Principal Mut. Life Ins. Co. v. United States, 29 Fed. Cl. 157, 164 (1993), aff'd, 50 F.3d 1021 (Fed. Cir. 1995)). As explained below, Plaintiffs' Motion fails to meet these requirements and, therefore, must be denied.

## II. Plaintiffs' Repetition of Arguments About Article 3(h) Should be Rejected

Plaintiffs first challenge the Court's legal conclusion that Article 3(h) of the Stockton East Water District contract and the Central San Joaquin Water Conservation District contract ("Contracts") was implicated for water years 1997 and 1998. See Pls.' Mot. at 2. Plaintiffs state that they do not intend to "challenge this factual determination in this motion," and instead argue that the Court should have concluded that the doctrine of accord and satisfaction applied rather than Article 3(h). Id. According to Plaintiffs, the Court's analysis is wrong because Article 3(h) "applies only to permanent amendments." Id. Plaintiffs are incorrect, and the Court need not amend the basis for its conclusion.

Article 3(h) provides: "The United States and the Contractor by mutual agreement may reduce the annual quantity of water which the United States is obligated to make available and the Contractor obligated to pay for during the remainder of the term of this contract." PX-36 at

000361; PX-37 at 000391. The Court first considered Article 3(h) of the Contracts in its decision on Summary Judgment, but reserved a decision on application of that provision until after trial. See 70 Fed. Cl. 515, 522-23, 534 (2006). After considering the relevant evidence, the Court concluded that Article 3(h) was not as narrow as Plaintiffs had argued:

> Article 3(h) does not explicitly require the Contracting Parties to be signatories to any such mutual agreement, nor is there any requirement that such an agreement be in writing, which also is supported by an examination of other articles within the 1983 Contracts that do specify written notification or agreement.

Decision, slip. op. at 54 (citation omitted).

There is no error in the Court's analysis. While Article 3(h) could certainly apply to permanent amendments, it is not limited to such changes. Common sense dictates that if Article 3(h) permits a permanent reduction in quantity of water, it would also allow a temporary reduction for a certain period followed by resumption of the build-up schedule, or elimination of certain years as set forth in the Contracts' build-up schedule. Indeed, since these Contracts include build-up provisions – including a provision that established a new contractual maximum in 1999 – even a "temporary amendment" for two years could have long-term impacts on the parties' contractual obligations. See discussion, supra, § III(19).

Plaintiffs' argument that the Court's holding is "contrary to historical custom," Pls.' Mot. at 3, is unsupported in the record and should be rejected.[1/] Plaintiffs' alternative argument that the Court's holding "violates the statute of frauds," id., is an apparent attempt to resuscitate arguments made in Plaintiffs' Motion in Limine to Exclude Evidence Relating to Alleged Amendment of the Contracts (Docket No. 114). To the extent necessary, Defendant incorporates

---

[1/] Plaintiffs' statement that "every CVP contract contains a similar provision for permanent amendments" is also unsupported.

the arguments set forth in its Response to that motion. See Def.'s Resp. to Pls.' Mot. in Limine to Exclude Evidence Relating to Alleged Amendment of the Contracts (Docket No. 135).

Plaintiffs may be correct that the doctrine of accord and satisfaction provides an alternative ground to support the Court's Decision. Defendant has no objection to the Court adding the alternative ground, if the Court wishes, to supplement its analysis.

III. Defendant's Responses to Plaintiffs' Alleged "Factual Errors"

**1. "The Superior Court of California for the County of San Francisco denied all of the plaintiffs' claims; this ruling was upheld on appeal." Decision at 11.**

Plaintiffs move to amend the Court's statement on the ground that the Superior Court of California for the County of Sacramento, not San Francisco, denied Plaintiffs' claims. See Pls.' Mot. at 3. Although the edit is of no consequence to any issue involved in this litigation, Defendant has no objection to Plaintiffs' suggested edit.

**2. "The Second Amended Contract between Stockton East and California Water was executed September 25, 1983. DX-248." Decision at 15.**

Plaintiffs move to amend the Court's statement on the ground that the Second Amended Contract was executed on various days in September 1987. See Pls.' Mot. at 4 (citing DX-248). Defendant agrees with Plaintiffs' suggested edit, and notes that the change supports that portion of the Court's Decision dismissing the claims brought by California Water Service Company.

**3. "The Decision of the State Water Control Board in January 1988 acknowledged the existence of senior water right holders in authorizing partial filling of the New Melones Reservoir. . . . ('Decision 1616')." Decision at 19.**

Plaintiffs move to amend the Court's statement on the ground that State Water Resources Control Board ("SWRCB") Decision 1616 ("Decision 1616") did "not authorize the filing of

New Melones." Pls.' Mot. at 4. The Court's quotation of Decision 1616 is correct, as is the Court's statement that Reclamation's permits were subject to existing prior rights. See JX-13 at 34. Although the point is not relevant to the Court's conclusion, Plaintiffs are correct in noting that the SWRCB had earlier authorized partial filling of New Melones. SWRCB Decision 1422 ("Decision 1422"), which was entered in 1973, authorized issuance of permits for storage of water in New Melones Reservoir, but only that quantity of water needed for fish and wildlife enhancement, maintenance of water quality, satisfaction of prior rights and flood control. See id. at 2. Subsequently, in Order No. WR 83-03, the SWRCB allowed the Bureau to fill the reservoir for consumptive use purposes. See id.

Decision 1616 was intended to allow direct diversion of water: "The petition and applications presently before the Board request direct diversion of water at New Melones Reservoir and downstream locations for consumptive use." Id. Direct diversion rights are "usually essential to maximize the yield of the project." Id. at 21. Decision 1616, then, authorized issuance of permits for direct diversion rights.

**4. "The over commitment of New Melones Reservoir in spite of low inflow rates required Reclamation to make operational decisions regarding the allotment of scarce surface water resources." Decision at 25.**

Plaintiffs move to amend this sentence on the ground that it represents "an overstatement that is not supported by the evidence." Pls.' Mot. at 4. As they do elsewhere in their Motion, Plaintiffs take this statement out of context and, in so doing, misconstrue its meaning. The sentence in question appears in a summary paragraph at the beginning of a section of the Court's Decision that addresses changes in laws and regulations that occurred subsequent to the execution of the Contracts. See Decision, slip. op. at 25. The Court's general observation that

water from New Melones was overcommitted as a result of these changes is correct and fully supported by the laws and regulations summarized in the Court's Decision and by the factual record developed at trial. See, e.g., PX-131 (quoted in Decision, slip. op. at 75) ("The basic fact of life at New Melones is that it is over-committed or that there is simply not enough water for everyone."); Tr. at 995-97 (Mr. Lowell Ploss explaining that New Melones has "relatively low inflow compared to the size of the reservoir" as compared to other Central Valley Project ("CVP") reservoirs such as Folsom). Plaintiffs' charge of error here is otherwise just a belated effort to reargue the facts, which the Court should reject.

**5. "The CVPIA made substantial changes to the operation of the New Melones Reservoir by imposing requirements upon Reclamation regarding allocation of water, particularly for environmental purposes." Decision at 25.**

Plaintiffs' assertion of error is little more than nitpicking. The sentence in question is a portion of a summary paragraph, which leads into a specific discussion of certain provisions of Central Valley Project Improvement Act, Pub. L. No. 102-575, 106 Stat. 4600 (1992) ("CVPIA"), that had an impact on New Melones operations. Plaintiffs concede that the sentence would be accurate if it stated "CVPIA required substantial changes to the operation of the CVP." Pls.' Mot. at 4 (emphasis added). The Court's use of the term "made" instead of "required" does not alter the outcome of the Decision and requires no correction.

Defendant disagrees with Plaintiffs' assertion that the sentence in question should read that "as a result of CVPIA, Reclamation chose to make additional releases from New Melones. . . ." Id. The Court correctly understood the mandatory nature of the CVPIA's provisions. In addition, the consistent testimony of numerous witnesses explained that the prescriptions for the use of the 800,000 acre-feet of water under CVPIA § 3406(b)(2) came from the Fish and

Wildlife Service ("FWS"). See discussion, supra, at § III(7).

**6. "Consequently, enactment of the CVPIA in 1993 modified the priorities for which the water use at the New Melones Reservoir was to be allocated to make 'fish and wildlife mitigation, protection and restoration' equivalent to irrigation and domestic uses. This change required Reclamation to alter the manner in which it made operational decisions regarding the allocation of water to the Contracting Parties pursuant to the 1983 Contracts." Decision at 26.**

Plaintiffs move to amend this sentence on the ground that the statement mischaracterizes the evidence. See Pls.' Mot. at 5. The Court's summary is correct and Plaintiffs' limited citations to the record do not reveal any factual or legal error that requires reconsideration. The Court's Decision correctly summarizes CVPIA's restructuring of priorities for the use of CVP water, and accurately summarizes the manner in which the implementation of CVPIA § 3406(b), particularly the use of water under (b)(2), affected New Melones. See Decision, slip. op. at 26-28.

The Court's statement is well-supported by the trial record, including JX-28, which summarizes the annual quantities of water released from New Melones pursuant to Section 3406(b)(2). These releases were substantial, and the Court's conclusion that compliance with CVPIA affected the operation of New Melones is accurate and fully supported by the evidence presented at trial. No correction is required.

**7. "The CVPIA made additional alterations to the fishery flow requirements at the New Melones Reservoir." Decision at 27.**

Plaintiffs assert that this statement requires correction because "[p]ursuant to CVPIA, Reclamation exercised its discretion to prescribe additional flows from New Melones for fish." Pls.' Mot. at 5. Plaintiffs' assertion is directly contrary to the uncontroverted testimony of numerous witnesses at trial, each of whom explained that the FWS was responsible for

prescribing the use of the 800,000 acre-feet of water under CVPIA § 3406(b)(2). See Tr. at 1336-37 (testimony of Kirk Rogers explaining that FWS issues the (b)(2) prescriptions and that Reclamation is obligated to honor those prescriptions); Tr. at 1660-61 (testimony of Roger Patterson that FWS made the prescription each year on which CVP reservoirs the (b)(2) water needed to be released from, the quantity of water to be released from each reservoir, and the timing of those releases) (decisions regarding the use of (b)(2) water were within the purview of the FWS, not the Bureau of Reclamation); Tr. at 1667-68 (further testimony of Roger Patterson regarding the language of CVPIA § 3406(b)(2)); Tr. at 1747-1801, 1811-12 (testimony of Roger Guinee regarding the FWS prescriptions for the use of (b)(2) water); Tr. at 975 (testimony of Lowell Ploss that FWS "dictated to [Reclamation] how much [of the 800,000 acre-feet of (b)(2) water] would come from New Melones").

In each of the years at issue in this case, the FWS – the agency with an expertise in such matters – called for the release of certain water from New Melones for (b)(2) purposes. See JX-28 (showing the annual quantities of water released by Reclamation in accordance with the prescriptions issued by the FWS). No correction to the statement challenged by Plaintiffs is necessary or required. Indeed, the "correction" requested by Plaintiffs contradicts the testimony and documentary evidence presented at trial.

**8. "The Bay-Delta Accord imposed a number of constraints upon the operation of the CVP, which included various provisions that directly impacted the operation of the New Melones Reservoir." Decision at 28.**

Plaintiffs move to amend this sentence on the ground that the Court's statement mischaracterizes the evidence. See Pls.' Mot. at 6. The corrections demanded by Plaintiffs are not required. Contrary to Plaintiffs' assertions, the Court did not state or find that the Bay-Delta

Accord specifically mentions New Melones. The Bay-Delta Accord itself is in the record. See PX-112. No correction or even clarification is required on this point.

In addition, the Court's observation that various provisions of the Bay-Delta Accord directly impacted the operation of New Melones Reservoir is correct and is fully supported by the record, including the testimony of Lowell Ploss, which Plaintiffs cite in their Motion. See Pls.' Mot. at 6. The remaining suggested "corrections" are simply Plaintiffs' attempt to reargue their case.

**9. "On March 1, 1999, Reclamation, the State of California, the Contracting Parties . . . entered into the San Joaquin River Agreement." Decision at 30.**

Plaintiffs move to amend the Court's statement on the ground that the "Contracting Parties" – Plaintiffs in the instant case – did not sign the San Joaquin River Agreement. See Pls.' Mot. at 6. Although the edit is of no consequence to any issue involved in this litigation, Defendant agrees that Plaintiffs did not sign the San Joaquin River Agreement.

**10. "In 1988 the State Water Control Board modified the salinity standard imposed upon Reclamation in Decision 1422. . . ." Decision at 31.**

Plaintiffs' assertion of error is based on their isolated, and unnecessarily narrow, reading of the statement. The above sentence is part of a section entitled "Salinity requirements at Vernalis." Decision, slip. op. at 31. In this section, the Court accurately summarizes relevant permit requirements the SWRCB had imposed. Although Decision 1616 did not change the salinity standard, it did change the permit requirement by precluding diversions for consumptive use unless the specified standard was met.[2] This preclusive language, which is quoted in the

[2] In Decision 1422, water quality was to be assessed by measuring the concentration of total dissolved solids ("TDS"), which includes salinity. The standard, to be measured at Vernalis, was 500 parts per million ("ppm"). In Decision 1616, the SWRCB retained the 500 ppm TDS

Court's Decision, was a new requirement that was imposed by Decision 1616. Accordingly, the Court's statement is accurate when read in context and no "correction" is required.

**11. "During the period between 1988 and 1992, no water was delivered to the Contracting Parties from the New Melones Reservoir due to drought conditions, and the Contracting Parties submitted no schedules." Decision at 33.**

Plaintiffs move to amend the Court's sentence on the ground that is mischaracterizes the evidence. Defendant disagrees. The parties agree that Plaintiffs did not submit schedules during this period. In addition, the fact that Reclamation faced a multi-year drought in the late 1980s and early 1990s is undisputed. For example, Mr. Patterson testified that when he was appointed regional director of the Mid-Pacific Region in 1991, "we were probably three years into the drought. . . ." Tr. at 1574. He described the dire hydraulogic situation Reclamation faced: "Well, like I say, we were three years into a drought, so we had storage that had been drawn down to continue to operate the project as we went into the drought. Some of the reservoirs were – you know, they were pretty low." Tr. at 1574-75. Mr. Patterson accurately described the situation at New Melones as being particularly dire at the end of 1992: "New Melones was very low. I don't remember the exact numbers, but as I recall, it was down to 100,000 acre-feet or less. I think it was actually a little under 100,000 acre-feet. It was very low." Tr. at 1577; see also PX-321 at 29 (Mr. Dotan's Report showing extremely low storage levels at New Melones Reservoir in 1992-1993). The Court's statement, therefore, is correct and should not be amended.

---

standard. As the Court correctly notes in its decision, that measurement was modified in Decision 1641 to an electroconductivity or "EC" standard. Decision, slip. op. at 31.

**12. "Central and Stockton East submitted their water conservation plans in December 1993 to Reclamation." Decision at 36.**

Plaintiffs critique the Court's sentence on the ground that Stockton East Water District ("SEWD") "submitted its required water conservation plan to Reclamation in 1986, and again in 1993." Pls.' Mot. at 7. The Court's statement is correct, and Plaintiffs' suggested correction is inconsistent with the testimony. SEWD did, in fact, submit a water conservation plan in December 1993. See PX-85. The challenged sentence introduces a discussion of correspondence between the parties regarding Plaintiffs' water conservation plans. That correspondence relates to the water conservation plan that SEWD had submitted in 1993. Hence, the Court's statement is correct.

Plaintiffs' critique of the Court's statement is inaccurate because it implies that its 1986 water conservation plan is exactly the same as its 1993 water conservation plan. However, Mr. Steffani testified that the 1993 plan was a "revision" of its earlier plan. See Tr. at 459. The two plans are in evidence and are clearly different. Compare PX-85 with PX-44. The Court's sentence is correct, and Plaintiffs' suggested edit should be rejected.

**13. "First, the parties dispute . . . whether Reclamation is bound to follow the decisions of the State Water Control Board in Reclamation's operation of the New Melones Reservoir." Decision at 47.**

Plaintiffs move to amend the Court's statement on the ground that Plaintiffs concede that Reclamation is bound to follow the decisions of the SWRCB in operating New Melones reservoir. See Pls.' Mot. at 7. Although the edit is irrelevant to any issue impacting liability, if the Court is inclined to acknowledge Plaintiffs' concession, Defendant has no objection to such an edit.

**14. "According to Roger K. Patterson, who was Regional Director of the Mid-Pacific Region for Reclamation, the Central Valley Operations Office, which he headed, was in charge of actual day-to-day operations of the CVP." Decision at 60.**

Plaintiffs move to amend the Court's statement on the ground that Mr. Patterson did not "head" the Central Valley Operations Office. See id. The Court's statement is correct and need not be amended. Mr. Patterson is the former Regional Director of the Mid-Pacific Region for Reclamation, "which meant that the responsibilities of the Bureau of Reclamation for the Mid-Pacific Region were all under [his] jurisdiction." Tr. at 1564. Mr. Patterson described that the Central Valley Operations Office, which is a part of Reclamation's Mid-Pacific Region and therefore under his leadership, was in charge of the actual day-to-day operations of the CVP. Tr. at 1568-70. The Court's statement, therefore, is correct.

**15. "In 1995 Reclamation anticipated, upon review of prevailing conditions at that time, that the lesser recovery of snowpack for the New Melones Reservoir would result in a reduced allocation to ensure sufficient water for environmental and other in-basin purposes. This determination was supported by observation of snowpack amounts built up over the winter, indicating a dry year for the New Melones Reservoir." Decision at 66.**

Plaintiffs' challenge to the foregoing statement is duplicative of their challenge to the same statement in their Motion for Reconsideration. See Pls.' Mot. for Recons. at 23. Contrary to Plaintiffs' assertion, the challenged statement is directly supported by Reclamation's 1995 allocation decisions, which were communicated to Plaintiffs in February, April, and August 1995. See PX-115, PX-120, PX-141; see also PX-103, PX-108 (correspondence regarding the process for and timing of water allocation decisions); Tr. at 188-89, 228-29, 288-90 (testimony of Mr. Roberts regarding notification of 1995 allocations); Tr. at 574-77 (testimony of Mr. Steffani regarding notification of 1995 allocations); Tr. at 1644-53 (testimony of Mr. Patterson

regarding allocations in 1995). As the February and April decisions state, "[s]torage in New Melones Reservoir on the Stanislaus River has not recovered to the same extent as at other CVP reservoirs." PX-115 at SE05896; PX-121 at SE05904. On December 31, 1994, for example, there was only 425,000 acre-feet of water in New Melones Reservoir, approximately 17% of capacity. See JX-28. The Court's statement, therefore, is plainly correct. No amendment or modification is necessary or required.

**16. "Mr. Patterson testified that the forecast process involved 'an analytical process of really looking at what is available and what is anticipated to be available as far as water supply each year,' and confirmed the details. Tr. at 1571." Decision at 60.**

Repeating an argument they make in their Motion for Reconsideration, Plaintiffs argue that this sentence misrepresents Mr. Patterson's testimony. See Pls.' Mot. at 8. Defendant disagrees. The sentence correctly quotes and cites Mr. Patterson's testimony, which included a description of the "forecasting element of CVP operations." Tr. at 1571-72. Mr. Patterson also described the factors Reclamation had to consider in making allocation decisions and an explanation of the timing of Reclamation's decisions. E.g., Tr. at 1578-79; see also Def.'s Recons. Resp. at 5.[3]

In addition to Mr. Patterson's testimony about the process for determining water availability each year, the actual forecast decisions for the years at issue were entered into the

[3] In addition, Mr. Lowell Ploss, former Operations Manager of New Melones Reservoir, testified about how operational decisions are made, including a discussion of the 1.4 million acre-foot carryover storage target, which was intended to "meet [all of the] these project demands, other than the demands of Stockton East and Central, through the five-year period of the worst drought in history." Tr. at 963.

record.[4] Plaintiffs' argument that the contracting officer never reached allocation or shortage decisions cannot be supported. There is no error in the Court's statement and no correction is needed.

**17. "Even when no formal announcement of shortage is issued, a record of Reclamation's decision-making process was made available to the Contracting Parties in years during which they received water allocation reductions." Decision at 60-61.**

See discussion below regarding Paragraph 18.

**18. "Such information, if made available to the Secretary, is sufficient to base a review of the water reduction decisions made by Reclamation." Decision at 61.**

As they do in their Motion for Reconsideration, Plaintiffs argue that the sentences in Paragraphs 17 and 18 are not supported by the trial record. See Pls.' Mot. at 9. As noted in Defendant's Response to Plaintiffs' Motion for Reconsideration, Plaintiffs are mistaken. See Def.'s Recons. Resp. at 4-7 (discussing the Court's decision regarding the contracting officer's decisions). The annual water allocation decisions are part of the trial record, and clearly show the contracting officer's decisions in every year in dispute. See id. It is undisputed that the decisions were communicated to the Contracting Parties. See id. Plaintiffs' continued arguments that these decisions were never made or never communicated to the Plaintiffs is

---

[4] See DX-276 (Feb. 15, 1994); PX-115 (Feb. 15, 1995); PX-120 (Apr. 10, 1995); PX-141 (Aug. 10, 1995); PX-171 (Feb. 22, 1996); PX-176 (Mar. 19, 1996); DX-342 (Feb. 19, 1997); DX-162 (Mar. 30, 1998); DX-356 (Jan. 22, 1999); DX-357 (Feb. 16, 1999); PX-232 (Mar. 16, 1999); PX-240 (Jan. 21, 2000); PX-241 (Feb. 17, 2000); PX-245 (Mar. 20, 2000); DX-370 (Feb. 15, 2001); DX-371 (Mar. 15, 2001); DX-373 (Apr. 16, 2001); PX-254 (May 16, 2001); PX-258 (Jan. 25, 2002); DX-378 (Feb. 15, 2002); DX-380 (Mar. 15, 2002); DX-381 (Apr. 15, 2002); DX-385 (May 16, 2002); PX-289 (Feb. 14, 2003); DX-394 (Mar. 18, 2003); PX-298 (Apr. 23, 2003); PX-303 (May 22, 2003); DX-406 (Jan. 23, 2004); PX-312 (Feb. 13, 2004); DX-412 (June 21, 2004).

simply not supported by the record.

**19. The Build-Up Schedule set forth on page 67-68 of the Decision contains a typographical error and requires some clarification.**

Plaintiffs complain that the build-up amounts set forth for Central San Joaquin Water District ("Central") contain an error for water years 1999-2004. See Pls.' Mot. at 10. Defendant agrees that the build-up schedule contains a typographical error, but disagrees with Plaintiffs' proposed correction. Article 3(c)(2) of the Central contract requires Central to schedule a "minimum quantity of 28,000 acre-feet" in 1994, 1995, and 1996, and a "minimum of 56,000 acre-feet" in 1997 and 1998. See PX-37 at 000389. Article 3(c)(3) states that beginning in 1999 (the 11th year), and going forward, the contract minimum will be "the quantity of water scheduled in the 11th year." Id. Article 3(c)(3) also says that "the United States shall not be obligated to furnish any quantity greater than the quantity scheduled in [1999] and such quantity shall constitute the new contract maximum for the remaining term." Id. (emphasis added). It is undisputed that Central did not submit a schedule in 1999. Defendant notes that the schedule for SEWD contains a similar error.[5/]

Plaintiffs suggest that the build-up schedule for Central should include 80,000 acre-feet as the new contract minimum for 1999 to 2004. See Pls.' Mot. at 10. This is incorrect. The 80,000 acre-foot figure in Central's contract (like the 65,000 acre-foot figure in SEWD's

[5/] SEWD's contract states that the minimum quantity is 22,750 acre-feet for years 6-8, and 45,500 acre-feet for years 9 and 10. See PX-36 at 000357. As with Central's contract, Article 3(c)(3) of SEWD's contract states that beginning in 1999 (the 11th year), and going forward, the minimum will be "the quantity of water scheduled in the 11th year." Id. The amount scheduled in 1999 also becomes the new contract maximum for 1999 and later. See PX-36 at art. 3(c)(3). Article 3(c)(3) of SEWD's contract also says that the annual quantity shall not exceed 65,000 acre-feet, but that is stated as a maximum, not a minimum, figure.

contract) is defined as a maximum, not a minimum. See PX-37 at 000389 ("In no event shall the annual quantity furnished for agricultural purposes exceed 65,000 acre-feet, except as provided pursuant to subdivisions (f) and (g) of this article.").

In conjunction with this argument, Plaintiffs request "clarification in the Court's holding with respect to the Build-Up Schedule." Pls.' Mot. at 10. Defendant does not understand the Court's Decision to make any general pronouncement regarding the parties' future contractual duties. There is, therefore, nothing for the Court to clarify. In addition, Plaintiffs' Second Amended Complaint does not pray for the declaratory relief that Plaintiffs now seek. The Court decided the issues before it, and the Court's Decision needs no further clarification.

**20. Numbered item 3 on page 61 of the Decision should be item 2.**

Although the critique is unnecessary nitpicking, Defendant has no objection to Plaintiffs' suggested edit.

**21. "Following the IPO's two-year modification of the 1983 Contracts, Reclamation discharged its obligations to meet the schedules provided by the Contracting Parties in all years." Decision at 65.**

Plaintiffs move to amend this sentence on the ground that the sentence is "unclear." Pls.' Mot. at 10. Plaintiffs' argument is based on Plaintiffs' reading of the sentence in isolation, and Plaintiffs' desire for additional language about the legal significance of Plaintiffs' failure to submit water schedules. Read in context of the Decision as a whole, the Court's statement is unambiguous and need not be amended or supplemented.

**22. "For example, Mr. Ploss explained that Reclamation chose not to release water from other sources to fulfill fishery needs because releases from other CVP contractors would have required their cooperation." Decision at 75.**

Plaintiffs move to amend this sentence on the ground that the statement does not

accurately summarize Mr. Ploss' testimony, quoting seven full pages of testimony to support their argument. As the finder of fact in this case, the Court is entitled to summarize the two weeks of testimony presented by the parties, and to draw conclusions based on that testimony and evidence presented. The Court's use of the term "cooperation" is not in error. As Mr. Ploss testified, if Reclamation had reduced water deliveries to other CVP contractors to fulfill fishery or water quality requirements, he believed the United States would have been sued by those contractors instead of the Plaintiffs. See Tr. at 1004-07 (quoted in Pls.' Mot. at 12-13).

Plaintiffs also take the challenged sentence out of context, ignoring the Court's subsequent reference to the SWRCB's acknowledgment that New Melones has historically been used to meet Vernalis objectives because of its location. See Decision, slip. op. at 76.

**23. "Pumping at the delta for use by south-of-the-delta users, which includes residential use for the Los Angeles area, is not only the primary cause of salinity deposits that require releases from the New Melones Reservoir." Decision at 82.**

Although this sentence may include a typographical error (i.e., "not only" rather than "not the only"), Plaintiffs' contention that the substance of this sentence needs to be corrected is based on an over-reading of the Court's statement. Contrary to Plaintiffs' assertions, the Court did not state that Reclamation "pump[s] water from the Delta to deliver to residential customers in Los Angeles." Instead, the quoted sentence properly and accurately summarizes testimony that both Reclamation and the State of California pump water out of the delta for delivery to south-of-delta users. See Tr. at 1285-86. The water pumped by Reclamation goes to its south-of-the-delta contractors; the water pumped by the State goes primarily to municipal and industrial uses in cities located south of the delta, including Los Angeles. See id.; Tr. at 1567-68; Tr. at 1628-29. Moreover, Defendant does not read this sentence as having drawn a causal link between pumping

water from the delta for residential use in Los Angeles with salinity deposits requiring releases from New Melones. Instead, when the sentence in question is read in context, it is clear that the sentence is simply part of a broader discussion in which the Court recognized correctly that there are numerous competing demands for water, and that the obstacles to achieving the "doubling goal" imposed by CVPIA § 3406(b)(1) are varied and complex. For these reasons, no factual correction is required or necessary.

**24. "Surface water has been leached from every damable river, which is made evident upon reviewing a map of the CVP. See, e.g., DX-219. As a consequence of the modification of the natural flow of every river that historically supported spawning of salmon in the CVP, the fish are being killed in the process of redirecting them to the rivers whence they came." Decision at 82.**

These sentences are included in a section of the Court's Decision that summarizes the "Nature of the evidence presented," and Plaintiffs' critiques of the Court's statements are of no consequence to the Court's analysis. Nevertheless, Plaintiffs move to amend these sentences on the ground that they are based on "an unfortunate misunderstanding" of the evidence. Pls.' Mot. at 15. Defendant disagrees.

The Court's citation to, and discussion of, DX-219 is correct. That exhibit identifies all rivers that have been dammed by federal, state or other entities, including rivers related to the CVP. See DX-219; Tr. at 1681-82 (testimony of Mr. Guinee). Mr. Guinee testified about the adverse impact on fish habitats as a result of dam construction and FWS's concern about sufficient releases of water to protect fish resources on these dammed rivers. E.g., Tr. at 1674-75, 1684-85 (discussing dams interference with fish habitats on the Stanislaus River). The Court's statement regarding the decline of salmon in these rivers is correct and supported by the evidence.

**25. "As a consequence of the modification of the natural flow of every river that historically supported spawning of salmon in the CVP, the fish are being killed in the process of redirecting them to the rivers whence they came. For example, fishery releases from the New Melones reservoir have resulted in a net decrease in the number of fall-run Chinook salmon produced annually on the Stanislaus River. See DX-210 (computing average production of fall-run Chinook salmon between 1967-1991 as 10,868 and average between 1992-2005 since implementation of the CVPIA, as 7,540)." Decision at 82.**

As with their complaints in Paragraph 24 above, Plaintiffs' critiques of the statements in Paragraph 25 have little bearing on the breach of contract issues involved in this case. Nevertheless, Plaintiffs move to amend these sentences on the ground that they are based on a "false factual conclusion unsupported by the evidence at trial." Pls.' Mot. at 16. As the Court correctly noted, the graph identified as DX-210 shows a decline in fall-run chinook salmon. Mr. Guinee's testimony supports the Court's statement. See Tr. at 1684-85 (discussing, *inter alia*, the estimate "that as much as 80 percent of the original salmon-spawning habitat has been blocked or lost in the Central Valley" as a result of dam construction).

Defendant understands the Court's statement that "fishery releases . . . resulted in a net decrease in the number of fall-run Chinook salmon," to mean that there the fall-run Chinook salmon have experienced a decline, not that the water released from New Melones Reservoir for the benefit of the fish precipitated the decline. Plaintiffs' critiques of the Court's statements should be rejected.

## IV. Plaintiffs' Demand that the Court Rewrite its Opinion Should be Rejected

### A. The Court's Summary of Other Litigation and Administrative Proceedings Is Neither "Irrelevant" Nor "Confusing Dicta" as Plaintiffs Assert

Plaintiffs attack the Court's decision to summarize certain other lawsuits, administrative proceedings and decisions in its opinion. See Pls.' Mot. at 16. The Court's decision to do so is

well within the Court's discretion, particularly where it was apparent that certain issues raised and arguments advanced during the course of the trial were the same as, or similar to, issues being litigated elsewhere. Pursuant to the Court's post-trial order of November 9, 2006 (Doc. No. 153), the parties prepared and filed a Joint Chart of Lawsuits and Regulatory Proceedings on November 21, 2006 (Doc. No. 155). To the extent that these other lawsuits and proceedings either formed a backdrop for the Court's understanding of the varied and complex issues that affect CVP operations, or informed the Court's understanding of the issues in this case, the Court's reference to these other lawsuits and proceedings was proper. The Court should reject Plaintiffs' efforts to re-write the Court's Decision and deny Plaintiffs' Motion.

B. The Court's Resolution of Plaintiffs' Takings Claims Was Proper

Plaintiffs' assertion that the Court improperly rejected their takings claim requires little response. See Pls.' Mot. at 17. The Court resolved Plaintiffs' takings claim as a matter of law. See Decision, slip. op. at 81. No evidentiary hearing or opportunity for argument by the parties was required or necessary for the Court to render this ruling. As the result of a two-week trial on Plaintiffs' contract claims, the Court has a thorough and detailed understanding of the contractual relationship between Plaintiffs and Defendant. Based on this understanding, the Court determined "that the appropriate remedy for plaintiffs' claims 'arise[s] from the contracts themselves, rather than from the constitutional protection of private property rights.'" Decision, slip. op. at 81 (quoting Hughes Comm. Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001)). The ruling is consistent with the precedential decisions of the Federal Circuit cited by the Court, and is correct.

Plaintiffs have not established that this ruling was based upon a manifest error of law and

thus have not established that this aspect of the Court's ruling warrants reconsideration. See Fru-Con Constr. Corp., 44 Fed. Cl. at 300 (identifying a "manifest error of law" as one of the "extraordinary circumstances" that might justify reconsideration of a court's decision). Therefore, Plaintiffs' request that the Court reconsider its ruling as to their takings claim should be rejected.

## V. Conclusion

For the reasons set forth above, the Court's Decision is fully supported by the law and the facts presented at trial. Plaintiffs' Motion to Amend or Modify the Court's Decision should be denied.

Respectfully submitted this 30th day of March, 2007,

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division

__/s/ William J. Shapiro__
WILLIAM J. SHAPIRO
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
501 I Street
Suite 9-700
Sacramento, CA 95814
TEL: (916) 930-2207
FAX: (916) 930-2210

KRISTINE S. TARDIFF
United States Department of Justice Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301

LUTHER L. HAJEK
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, DC 20044-0663
Attorneys for Defendant United States

Of Counsel:

SHELLY RANDEL
United States Department of the Interior
Office of the Solicitor
Branch of Water and Power
Division of Land and Water Resources
1849 C St., N.W.
Washington, DC

JAMES E. TURNER
Assistant Regional Solicitor
United States Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825