# United States Court of Appeals for the Federal Circuit

06-5037, - 5043

CARABETTA ENTERPRISES, INC., CARABETTA MANAGEMENT COMPANY, JOSEPH F. CARABETTA, CR HEDGEWOOD LIMITED PARTNERSHIP, CR NORWICH LIMITED PARTNERSHIP, CR SLEEPING GIANT LIMITED PARTNERSHIP, CR REDSTONE LIMITED PARTNERSHIP, CR SAYBROOK LIMITED PARTNERSHIP, CR STONEYCREST LIMITED PARTNERSHIP, CR WILLOWCREST LIMITED PARTNERSHIP, KINGSWOOD APARTMENTS, LTD., NEWFIELD TOWERS REALTY CO., NEW MEADOWS REALTY CO., ORANGE APARTMENT ASSOCIATES, PATTON APARTMENT ASSOCIATES, SILVER POND REALTY CO., SOUTHFORD PARK REALTY CO., SPRINGFIELD INVESTORS, SPRINGFIELD II INVESTORS, SPRINGFIELD III INVESTORS, STONEYCREST TOWERS REALTY CO., VILLAGE PARK REALTY I CO., and VILLAGE PARK REALTY II CO.,

Plaintiffs-Cross Appellants,

V.

UNITED STATES,

Defendant-Appellant.

Steven J. Rosenbaum, Covington & Burling, of Washington, DC, argued for plaintiffs-cross appellants.

Jane W. Vanneman, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director. Of counsel were Gerald M. Alexander, Nancy D. Christopher, and Arnette L. Georges, Department of Housing and Urban Development, of Washington, DC.

Appealed from: United States Court of Federal Claims

Senior Judge Robert H. Hodges, Jr.

# United States Court of Appeals for the Federal Circuit

06-5037,-5043

CARABETTA ENTERPRISES, INC., CARABETTA MANAGEMENT COMPANY, JOSEPH F. CARABETTA, CR HEDGEWOOD LIMITED PARTNERSHIP, CR NORWICH LIMITED PARTNERSHIP, CR SLEEPING GIANT LIMITED PARTNERSHIP, CR REDSTONE LIMITED PARTNERSHIP, CR SAYBROOK LIMITED PARTNERSHIP, CR STONEYCREST LIMITED PARTNERSHIP, CR WILLOWCREST LIMITED PARTNERSHIP, KINGSWOOD APARTMENTS, LTD., NEWFIELD TOWERS REALTY CO., NEW MEADOWS REALTY CO., ORANGE APARTMENT ASSOCIATES, PATTON APARTMENT ASSOCIATES, SILVER POND REALTY CO., SOUTHFORD PARK REALTY CO., SPRINGFIELD INVESTORS, SPRINGFIELD II INVESTORS, SPRINGFIELD III INVESTORS, STONEYCREST TOWERS REALTY CO., VILLAGE PARK REALTY I CO., and VILLAGE PARK REALTY II CO.,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

---

DECIDED: April 4, 2007

---

Before LOURIE, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

The plaintiffs, Joseph F. Carabetta and a group of companies associated with him, are the owners and managers of properties that have provided low-income rental housing under several programs sponsored by the Department of Housing and Urban Development (HUD). Based on a dispute with HUD, the plaintiffs, which we refer to

collectively as "Carabetta," brought a breach of contract action against the United States in the Court of Federal Claims. On cross-motions for summary judgment, the court held the United States liable for breach of contract. 58 Fed. Cl. 563, 568 (2003). The court then conducted a trial on damages and entered an award. 68 Fed. Cl. 410, 426 (2005). The government appeals from the trial court's liability determination, and Carabetta cross-appeals with respect to the damages award. We affirm as to both the liability appeal and the damages cross-appeal.

I

During the 1960s and 1970s, the plaintiffs acquired a number of low-income housing properties using mortgages insured by the federal government under sections 221(d)(3) and 236 of the National Housing Act, Pub. L. No. 73-479, 48 Stat. 1246 (1934), as amended by Pub. L. No. 87-70, § 101, 75 Stat. 149, 150-51 (1961), and Pub. L. No. 90-448, § 201, 82 Stat. 476, 498-501 (1968). Deeds insured under that program gave the owners the option of paying off the mortgages early, once 20 years had passed since the mortgage was issued.

As the mortgage program neared its 20-year anniversary, Congress became concerned that owners of properties insured under the program would pay off their mortgages and, freed of the mortgage restrictions, would convert the properties from low-income housing to more profitable rental units. Accordingly, Congress passed the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA), Pub. L. No. 100-242, 101 Stat. 1877, and the Low-Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA), Pub. L. No. 101-325, 104 Stat. 4249. Both statutes prohibited owners from prepaying section 221(d)(3) mortgages without

approval from HUD. The statutes instead authorized HUD to guarantee private loans on the properties in amounts up to 90 percent of the equity in the properties plus any approved rehabilitation costs. As a condition of granting such a guarantee, HUD was required to ensure that the properties would continue to operate as low-income housing and that the property owners satisfied certain other requirements. One of the requirements was that property owners had to be in compliance with all applicable HUD regulations governing the condition of the properties. 24 C.F.R. § 248.145(a)(12). The loans that HUD guaranteed were known as section 241(f) equity loans because the guarantees were authorized under section 241(f) of the National Housing Act, as amended by ELIHPA, 101 Stat. at 1884.

When Carabetta applied for section 241(f) equity loans on its properties, HUD refused to process the necessary paperwork on the ground that Carabetta was not in compliance with certain HUD regulations. Carabetta and HUD resolved that issue in August 1994 when they executed what they termed a Repayment Agreement. The Repayment Agreement provided that HUD would insure loans on eight of Carabetta's properties. Carabetta would then use $11 million of the loan proceeds to bring itself into compliance with HUD regulations. Both HUD and Carabetta fulfilled their obligations under that portion of the agreement in 1995.

The Repayment Agreement further provided that once Carabetta brought itself into compliance with the HUD regulations, HUD would insure loans on all the Carabetta properties listed on schedule D of the agreement, so long as those properties met the other eligibility requirements. Schedule D listed 25 properties the parties agree were to be insured under this provision. Another property was inadvertently omitted from

schedule D, but the parties have agreed to treat that property as if it had been included. Accordingly, the parties agree that there were at least 26 properties for which HUD promised to insure loans. Carabetta additionally contends that HUD was obligated to insure a loan for a twenty-seventh property, Southford Park, which was listed on schedule D under the designation "subject to appeal."

While Carabetta was waiting for HUD to process the loan paperwork on the schedule D properties, Congress enacted the Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997 ("Appropriations Act"), Pub. L. No. 104-204, 110 Stat. 2874 (1996). Among other things, that statute repealed section 241(f) of the National Housing Act, thus prohibiting HUD from insuring any more section 241(f) equity loans. 110 Stat. at 2884-85. Instead, the statute authorized HUD to issue $75 million in interest-free "capital loans" directly to low-income properties in three enumerated categories, the first of which included the Carabetta properties.[1] The statute gave HUD discretion regarding how to distribute the

---

[1] The relevant portion of the Appropriations Act reads as follows:

> $75,000,000 shall be available for obligation until March 1, 1997 for projects (1) that are subject to a repayment or settlement agreement that was executed between the owner and the Secretary prior to September 1, 1995; (2) whose submissions were delayed as a result of their location in areas that were designated as a Federal disaster area in a Presidential Disaster Declaration; or (3) whose processing was, in fact or in practical effect, suspended, deferred, or interrupted for a period of twelve months or more because of differing interpretations . . . .

110 Stat. at 2884.

$75 million among the three groups of properties, but it limited the amount of each loan to 65 percent of the equity in the property plus any approved rehabilitation costs.

Pursuant to the authorization provided by the Appropriations Act, HUD chose to issue a total of $25 million in direct loans to seven of Carabetta's schedule D properties. It used the remaining $50 million to fund loans to properties falling in the other two categories. The government acknowledges that it had no contractual duty to fund any of the non-Carabetta properties in the other two categories.

When HUD failed to provide capital loans for the other Carabetta properties listed on schedule D of the Repayment Agreement, Carabetta brought suit against the government in the Court of Federal Claims. It claimed that HUD had breached the Repayment Agreement and that HUD was obliged to use what was needed from the remaining $50 million of the Appropriations Act funds to provide capital loans to an additional 15 schedule D properties. Those properties included Southford Park but excluded five properties that did not qualify for loans under HUD regulations. The government argued that the Appropriations Act made performance of its obligations impossible and that the "sovereign acts doctrine" excused the government from liability. In an opinion issued in response to cross-motions for summary judgment on liability, the Court of Federal Claims agreed with the government that the Appropriations Act was a sovereign act. The court found, however, that HUD's offer of capital loans for the seven funded Carabetta properties constituted an offer to modify the Repayment Agreement by substituting capital loans for the section 241(f) loans. According to the court, Carabetta accepted that offer when it accepted the loans on the first seven properties.

HUD's failure to fund the loans on the remaining schedule D properties, the court concluded, was a breach of the modified Repayment Agreement.

The Court of Federal Claims then conducted a trial on damages. Following that trial, the court denied Carabetta's request that damages be calculated to include three contested categories: (1) a "tax gross-up" on the proceeds of the capital loans that should have been issued; (2) additional damages attributable to the rehabilitation loans for the schedule D properties; and (3) damages attributable to the loan that Carabetta contends should have been issued for the Southford Park property, which the court did not include among the properties as to which HUD was obligated to make loans. The government appeals the liability determination, and Carabetta cross-appeals the court's ruling on those damages issues. We affirm with respect to all issues.

II

The government argues that the trial court was correct insofar as it concluded that the Appropriations Act constituted a sovereign act that shielded HUD from liability for breach of the original, unmodified contract. The government contends, however, that the trial court erred when it found that the parties agreed to a modification of the Repayment Agreement, which the government breached. Because we hold that the government is liable under the original, unmodified Repayment Agreement, we do not address the arguments relating to whether that contract was modified and, as modified, was breached.

The sovereign acts doctrine is designed to balance "the government's need for freedom to legislate with its obligation to honor its contracts." Winstar v. United States, 518 U.S. 839, 895 (1996). It holds that "the United States when sued as a contractor

cannot be held liable for an obstruction to the performance of [a] particular contract resulting from its public and general acts as a sovereign." Id. at 890 (quoting Horowitz v. United States, 267 U.S. 458, 461 (1925)). Accordingly, the sovereign acts doctrine exempts the "[g]overnment as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered performance impossible." Winstar, 518 U.S. at 904. Yet even if the sovereign acts doctrine applies, "it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach." Id.

One such requirement is embodied in the doctrine of partial impossibility or partial impracticability. According to the Restatement of Contracts, "[w]here only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if . . . it is still practicable for him to render performance that is substantial, taking account of any reasonable substitute performance that he is under a duty to render." Restatement (Second) of Contracts § 270 (1981); Yost v. Council Bluffs, 471 N.W.2d 836, 840 (Iowa 1991); Heinrich v. R.L. Oil & Gas Co., 442 N.W.2d 467, 470 (S.D. 1989); E. Allan Farnsworth, Farnsworth on Contracts § 9.9 (2001). Comment b to section 270 of the Restatement states that "if the obligor can render a reasonable substitute performance in place of the impracticable part, he must do so under his duty of good faith in performance, and that substitute performance will be considered in determining whether his performance would be substantial." Restatement (Second) of Contracts § 270, cmt. b (internal cross-references omitted); Spalding & Son, Inc. v. United States, 28 Fed. Cl. 242, 248 (1993); Heinrich, 442 N.W.2d at 470; Farnsworth

§ 9.9. In other words, if the obligor is able to render reasonable substitute performance for what has become impossible, and that performance would substantially fulfill the contract's requirements, the obligor has a duty to render that substantial performance. Whether the aggregate performance would be considered substantial depends on the expectations of the obligee. Restatement (Second) of Contracts § 270, cmt. b.

The Appropriations Act made it impossible for HUD to insure any of the section 241(f) loans for Carabetta's schedule D properties. However, the Act simultaneously provided HUD with the authority and capacity to render reasonable substitute performance: It gave HUD discretion to issue $75 million in capital loans to Carabetta and others. Carabetta made clear that it would consider such loans to be substantial performance under the Repayment Agreement; it accepted capital loans for seven of its properties and contended that the Repayment Agreement obligated the government to provide capital loans for the remaining qualifying schedule D properties. Accordingly, even if the Appropriations Act was a sovereign act, HUD was still obligated to fulfill its obligations under the Repayment Agreement through the substitute performance of providing direct loans to Carabetta's qualifying schedule D properties to the extent authorized under the Appropriations Act.

The government argues that capital loans are "markedly different" from section 241(f) equity loans. It points out that the new loans were direct loans instead of simply insured loans, that the size of each loan was reduced, and that the recipients were required to satisfy additional requirements to qualify for capital loans. Those differences are insufficient to make capital loans ineligible to serve as substitute performance for the promised section 271(f) equity loans. Any decrease in the amount of the loan or

increase in the qualification requirements only benefits the government by lowering its potential liabilities. Since Carabetta was prepared to accept the capital loans in place of HUD's promised performance, only an additional burden on HUD sufficient to make providing capital loans to Carabetta unreasonable would make the capital loans an inappropriate substitute for the section 241(f) equity loans. The only additional burden the government points to is the fact that issuing capital loans required HUD to make direct monetary outlays instead of just insuring private loans. At best, that argument is only an assertion that substituting direct capital loans for the section 241(f) loans made its performance more costly. HUD does not suggest that it lacked the capacity or legal authority to provide capital loans for the schedule D properties in dispute. Indeed, HUD admits that it had no obligation to provide loans to any non-Carabetta property and that it had discretion to divide the $75 million in capital loans in any way it saw fit. Accordingly, while providing capital loans for the disputed schedule D properties may have made performance more expensive than it would have been absent the statutory change, HUD has not met its burden of showing that providing capital loans was unreasonable as a form of substitute performance. Because HUD was obligated to provide capital loans as substitute performance but failed to do so, we affirm the trial court's grant of summary judgment of liability on that ground.

III

On cross-appeal, Carabetta argues that the trial court erred as a matter of law when it denied expectation damages for (1) a tax gross-up on the damages amount corresponding to the loans Carabetta would have received, (2) the repair and rehabilitation loans Carabetta would have received had it been granted the capital

loans, and (3) the loan allegedly owed to Southford Park, the property whose inclusion on schedule D was designated as being subject to appeal. We hold that the trial court was correct to reject each of those damages claims.

A

The parties agree that the capital loans Carabetta would have received absent the breach would have been tax-free, but that the damages award it will now receive is taxable. Carabetta argues that in light of the differing tax treatment accorded to funds that would have been obtained through actual performance and to the funds that will be obtained pursuant to a damages award, it is entitled to an increase in the amount of the award to offset the taxes it will be required to pay.

While it is true that a "tax gross-up" is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable, Home Sav. of Am. v. United States, 399 F.3d 1341, 1356 (Fed. Cir. 2005), that is not the case here because Carabetta is not being compensated for the loss of untaxable funds. The measure of Carabetta's expectation damages is the amount it would have gained from receiving the capital loans. Because Carabetta would have had to repay the loans, the only benefit Carabetta would have realized from each loan was the investment income earned on the principal minus any interest it would have been required to pay over the life of the loan. HUD's capital loans were interest-free, meaning that Carabetta's benefit would be measured by the total amount of the loan's investment income.

Carabetta's method of measuring damages is actually consistent with the foregoing analysis. Where Carabetta's argument for an additional tax gross-up on that amount goes awry is the point at which it assumes that its method results in a damages

amount attributable to something other than interest earned on the loan principal. Carabetta measured its expectation damages by starting with the amount of the loans it would have received under the contract, adjusting that amount to present value, and subtracting the amount it would have had to repay on the maturity date of the loans, adjusted to present value. Because the capital loans would have been provided on an interest-free basis, the amount Carabetta would have received under the contract is the same as the amount it would have had to repay. Accordingly, the only difference between the two amounts is the adjustment to present value. Since the adjustment to present value is a way of accounting for the estimated value of interest over time, Carabetta's damages model simply takes into account the amount of interest, in today's dollars, that would accumulate over the life of the loan. That is another way of describing investment income. Because, as Carabetta admits, investment income from tax-free money is taxable, Carabetta's lost income would have been taxable and thus Carabetta is not entitled to a tax gross-up.[2]

---

[2] This point can be illustrated with a simple example. Assume a one-year zero-interest loan of $1000 and an investment interest rate of 10 percent per year. At the end of the year, the loan recipient will have $1100 and will have to pay back $1000, leaving a profit equal to the (taxable) investment income of $100. At oral argument, Carabetta's counsel asserted that this was the wrong way to think about the problem. Counsel argued that if, on the day the loan issued, Carabetta invested the portion of the loan principal that, together with the accrued interest on that sum, would be sufficient to repay the loan at the end of the loan term, the remainder would be equivalent to cash given to it tax free. In the example, Carabetta would need to invest $909.09 of the principal to repay the loan at the end of the year and would have $90.91 remaining in a second account to invest separately. The $909.09 invested principal would produce $90.91 in (taxable) interest income, and the $90.91 in the second account would produce $9.09 in (taxable) interest income. At the end of the year, the loan recipient would use the invested principal to pay back the $1000 loan and would be able to keep the $100, consisting of the $90.91 initially in the second account plus the $9.09 interest

B

Carabetta next argues that it is entitled to damages corresponding to the capital loans it would have received to rehabilitate and repair the properties. When processing loan application paperwork, HUD would identify and approve certain necessary repairs to the properties collateralizing the loans. The Appropriations Act provided that the capital loan granted to a property could include the amount needed to pay for those repairs. 110 Stat. at 2885 (limiting the amount of the loan to "the cost of rehabilitation . . . plus 65 percent of the property's preservation equity"). Repair funds were placed in escrow accounts and disbursed only as the approved repairs were completed, so Carabetta would have had the funds only long enough to pay the contractor or supplier. Carabetta, 68 Fed. Cl. at 420. Carabetta argues that repairs enabled by the loans would have maintained or enhanced property values while making the properties more appealing, thereby facilitating the attraction and retention of quality tenants. It argues that it is entitled to damages for those lost benefits and that the correct measure of damages is, again, the present value of the loan disbursement less the present value of the repayment amount. That measure equals the investment income on the dollar amount of the repair loans.

---

earned in that account. Because a total of $100 in the two accounts would be investment income, that amount would be subject to tax. The example thus demonstrates that no matter how the loan principal is divided at the outset, the value of the loan to the recipient is $100, and because that $100 is all investment income, it is taxable. To put it simply, the value of a zero-interest loan is always equal to the investment proceeds obtained from it.

As the trial court correctly held, the flaw in that argument is that the benefits lost do not correspond to the damages claimed. Carabetta's method of measuring damages uses the same interest and discount rates that are used to measure the return on unencumbered funds. But the repair portion of the loan was not unencumbered; Carabetta was required to invest it in repairing the mortgaged properties. While there might be some positive return on that investment, Carabetta did not introduce evidence sufficient to demonstrate, with reasonable certainty, what the rate of return would be. See Nat'l Austl. Bank v. United States, 452 F.3d 1321, 1326 (Fed. Cir. 2006) ("It is axiomatic that expectancy damages must be proved with reasonable certainty."). Carabetta's damages model is predicated on a "cash-flow" theory, which measures the difference in cash flows over time between the real world and a hypothetical world where there was no breach. The property value increase would be realized as a positive cash flow, if at all, only when the properties were sold,[3] and would then need to be discounted back to present value from the time of sale. Yet no evidence was offered to show what the change in property values would be at that time. There was also no reliable evidence presented on any cash flows associated with the easier retention and attraction of quality tenants. Accordingly, Carabetta has presented no evidence from which the court can conclude that Carabetta is entitled to the income that could be

[3] As correctly noted by the trial court, the very short time the repair funds would have been in Carabetta's account between repair completion and payment would not generate a net positive cash flow to Carabetta. Any benefit earned in that time would be negligible.

made by investing the repair loans at the same rates of return that would be available if the same funds were unencumbered.[4]

Carabetta also argues that, as when a contractor fails to complete work on a property, the value of the repairs is the cost of the repairs. On that theory, Carabetta contends that the value of the repairs is measured by the amount of the loan as approved by HUD. That argument is also inconsistent with the measure of damages requested, which was restricted to the investment value of the loan principal because the Repayment Agreement was a contract for a loan, not a contract for repairs. To give Carabetta the amount the repairs cost to perform, which is a portion of the loan principal, would be to treat Carabetta as if it were not obligated to repay the loan. Because the value of the repair loans is not equal to either the amount of the loan disbursement or the investment value of the repair loan at the rates used for unencumbered cash, the trial court properly concluded that Carabetta failed to prove its entitlement to those damages.

---

[4] One of Carabetta's damages experts, David Smith, testified that Carabetta would also have benefited from the repair loans by avoiding the need to expend its own funds to perform the repairs. Mr. Smith may have been indicating that Carabetta would have been able to take the money it no longer needed for repairs and invest it elsewhere, just as it could do with the cash disbursements. That might mean that Carabetta should recover the amount it expended to complete repairs at the same interest and discount rates as the cash disbursements. Mr. Smith, however, also indicated that Carabetta did not perform all the repairs listed, and there is no evidence relating to the amount Carabetta expended on the repairs it performed. Accordingly, even if that theory would otherwise be viable, Carabetta failed to demonstrate damages to a reasonable certainty and thus is not entitled to recovery on that ground. See Nat'l Austl. Bank, 452 F.3d at 1326. Nor can the court grant Carabetta the investment value of the full amount of the repair loans, as is requested, without giving Carabetta an impermissible double recovery. Some of the money that would be compensated for was not used to repair the properties and thus was available for unencumbered investment regardless of the breach.

C

Last, Carabetta argues that an additional property, Southford Park, is entitled to damages under the Repayment Agreement. In 1983, Southford Park executed a "Use Agreement" with HUD in order to receive a flexible subsidy loan under section 221(d)(3) of the National Housing Act, 75 Stat. at 150-51. Paragraph 1 of that agreement obligated Southford Park to operate in accordance with the requirements of section 221(d)(3) until February 2010. A typewritten addition to that paragraph, however, stated the following: "[HUD] will consider a request from [Southford Park] for permission to cease operation under Section 221(d)(3). Under certain circumstances such permission will not be unreasonably withheld."

In 1992, Carabetta applied for benefits under section 241(f) for Southford Park. HUD denied that application because Southford Park's obligations under the Use Agreement made it ineligible to participate in the 241(f) equity loan program. Later, during negotiations over the Repayment Agreement, HUD argued that Southford Park should not be included on schedule D because of that ineligibility determination. In the end, Southford Park was placed on schedule D "subject to appeal," and a footnote was added to the contract stating that "schedule D also includes . . . Southford Park, which Carabetta is appealing to HUD to include as Sec. 241(f) eligible in light of HUD's current determination that it is not."

Shortly after the Repayment Agreement was signed, Carabetta sought to have HUD reverse its eligibility determination for Southford Park. One of the steps that Carabetta took was to submit a "waiver request" in which it argued that the Use Agreement footnote constituted an "extenuating circumstance[]" that allowed Southford

Park to terminate the agreement and made Southford Park eligible for a section 241(f) loan. In its response, HUD refused the requested waiver and noted that waivers were occasionally given to properties that had virtually no equity and that were being sold to non-profit organizations for operation as low-income housing in perpetuity. Because Southford Park did not fit that profile, HUD concluded that it was not appropriate to waive the section 221(d) requirements and allow Southford Park to receive section 241(f) incentives.

Carabetta now argues that, by operation of law, it must be deemed to have been released from its obligations under the section 221(d)(3) program because HUD unreasonably withheld its permission to withdraw from that program. Carabetta further argues that the Repayment Agreement obligated HUD to include Southford Park on schedule D and to insure its section 241(f) loan. Were these arguments correct, Southford Park would be entitled to damages.

Carabetta's argument, however, fails at the first step. To prevail, Carabetta must show that Southford Park was eligible for the section 241(f) incentives, which requires it to establish that HUD was obligated to allow Southford Park to withdraw from the section 221(d)(3) program. In an effort to make that showing, Carabetta argues that HUD did not present any reasonable justification for refusing to waive all of Southford Park's obligations under the Use Agreement. Carabetta, however, does not address HUD's explanation for denying Carabetta's waiver request, which was that Carabetta's request did not comport with HUD's standard policy for determining when to grant such waivers. Instead, Carabetta focuses on negating HUD's arguments that Southford Park would be ineligible for 241(f) incentives regardless of whether HUD allowed that

property to be withdrawn from the section 221(d)(3) program. Accordingly, Carabetta has failed to show that HUD's denial of the requested waiver was unreasonable or that it violated the terms of the Use Agreement for HUD to apply its standard policies to Carabetta's waiver request. Because Carabetta has failed to show that HUD breached its contractual obligations with respect to Southford Park, it is not entitled to damages for HUD's denial of loan benefits for that property.

Because the trial court did not err with respect to any of the appealed damages issues, we affirm the trial court's judgment on the cross-appeal.

Each party shall bear its own costs for this appeal and cross-appeal.

AFFIRMED.