# In the United States Court of Federal Claims

No. 04-541L

(Filed April 27, 2007)

| | |
|---|---|
| **STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER DISTRICT, COUNTY OF SAN JOAQUIN, CITY OF STOCKTON, and CALIFORNIA WATER SERVICE COMPANY,**<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | Motion to amend or modify opinion; RCFC 59(e); contracts; breach of contract; summary judgment; takings; Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, 106 Stat. 4600 (1992); RCFC 52(c) judgment on partial findings; third-party beneficiary status; sovereign acts doctrine and unmistakability doctrine; contract interpretation – plain meaning and ambiguity; substantial performance of contract; adverse inferences drawn from non-testifying witnesses; viability of takings claim after full prosecution of contract claims. |

Roger J. Marzulla, Washington, DC, for plaintiffs. Nancie G. Marzulla, Marzulla & Marzulla, Washington, DC, of counsel. Reid W. Roberts, Stockton, CA, for plaintiff Central San Joaquin Water District; Jeanne M. Zolezzi and Jennifer L. Spaletta, Herum Crabtree Brown, Stockton, CA, for plaintiff Stockton East Water District.

William J. Shapiro, Sacramento, CA, with whom was Acting Assistant Attorney General Matthew J. McKeown, Kristine S. Tardiff, and Luther Hajek, Washington, DC, for defendant. Shelly Randel, Office of the Solicitor, Branch of Water and Power, Department of the Interior, Washington, DC, and James E. Turner, Assistant Regional Solicitor, Department of the Interior, Pacific Southwest Region, Sacramento, CA, of counsel.

John D. Echeverria, Georgetown Environmental Law & Policy Institute, Washington, DC, and Hamilton Candee, for *amicus curiae* Natural Resources Defense Council, San Francisco, CA. Clifford T. Lee and Tara L. Mueller, for *amicus curiae* California State Water Resources Control Board.

## ORDER ON MOTION TO AMEND OPINION

**MILLER**, Judge.

On February 20, 2007, an opinion issued finding and concluding that plaintiffs failed to prove their case by a preponderance of the evidence and entering judgment for defendant. See Stockton E. Water Dist. v. United States, 75 Fed. Cl. 321 (2007). Plaintiffs' Motion To Amend or Modify Decision was filed on March 7, 2007 (the "Motion To Amend"). Defendant filed its opposition on March 30, 2007, and plaintiffs replied on April 6, 2007. Plaintiffs argue that the court's opinion issued February 20, 2007, should be modified in three respects: (1) failure to address a legal argument in connection with the Interim Plan of Operations (the "IPO") as a modification of the contracts at issue pursuant to Article 3(h) of Stockton East Water District's contract and Article 3(h) of Central San Joaquin Water District's contract with Reclamation; (2) correction of factual errors; and (3) deletion of irrelevant dicta and discussion regarding plaintiffs' takings claim.

## FACTS

Although the findings of fact in the court's prior opinions will not be repeated, see Stockton E. Water Dist., 75 Fed. Cl. 321 (2007) (the "2007 Opinion"); Stockton E. Water Dist. v. United States, 70 Fed. Cl. 515 (2006) (the "Summary Judgment Opinion"), this order does explicate the facts relevant to plaintiffs' contentions.

## DISCUSSION

### I. Standard for motion to amend

RCFC 59(e) provides: "Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." Judgment in favor of defendant was entered on February 21, 2007, pursuant to RCFC 58. Defendant's Response to Plaintiffs' Motion To Amend or Modify Decision, filed March 30, 2007, states:

> Focusing on mostly trivial issues that have no bearing on the holdings reached in the Court's well-reasoned 85-page Decision, Plaintiffs' Motion merely reflects Plaintiffs' continued disagreement with the substance of the Court's Decision. Many of Plaintiffs' suggested "amendments" are unsupported by, or even inconsistent with, the evidence presented at trial.

Def.'s Br. filed Mar. 30, 2007, at 1.

Plaintiffs on March 7, 2007, pursuant to RCFC 59(a)(1), also filed a motion for reconsideration on the same date. Plaintiffs cited no standard for review of their motion to amend or modify. Defendant responded based on the standard for a motion to reconsider. In the absence of any authority proffered by plaintiffs and because the Motion To Amend seeks reconsideration, in part, the court utilizes the decisional law guiding reconsideration of an order or opinion.

RCFC 59(a)(1) provides:

> A new trial or rehearing or reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States. On a motion under this rule, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Id. "When addressing such a motion, the court is directed 'to consider motions for rehearing [or reconsideration] with exceptional care.'" Seldovia Native Ass'n Inc. v. United States, 36 Fed. Cl. 593, 594 (1996) (quoting Carter v. United States, 207 Ct. Cl. 316, 318 (1975)), aff'd, 144 F.3d 769 (1998). "[M]otions for reconsideration should not be entertained upon 'the sole ground that one side or the other is dissatisfied with the conclusions reached by the court, otherwise the losing party would generally, if not always, try his case a second time, and litigation would be unnecessarily prolonged.'" Seldovia Native, 36 Fed. Cl. at 594 (quoting Roche v. District of Columbia, 18 Ct. Cl. 289, 290 (1883)). "Motions for reconsideration must be supported 'by a showing of extraordinary circumstances which justify relief.'" Caldwell v. United States, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (quoting Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999), aff'd, 250 F.3d 762 (Fed. Cir. 2000) (table)).

A motion for reconsideration is addressed at the court's discretion. See Seldovia Native, 36 Fed. Cl. at 594; see also Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990). A party must support the motion by a showing of extraordinary circumstances which justify relief. See Bally Exp. Corp. v. Balicar, Ltd., 804 F.2d 398, 400 (7th Cir. 1986). This showing, under RCFC 59, must be based "upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court." Bishop v. United States, 26 Cl. Ct. 281, 286 (1992) (internal quotation omitted); see Cohen v. Austin, 869 F. Supp. 320, 321-22 (E.D. Pa. 1994) (discussing contested errors in law and fact). The movant may not merely recapitulate "cases and arguments considered by th[e] Court before rendering its original decision." Carteret Sav.

Bank, F.A. v. Shushan, 721 F. Supp. 705, 706 (D.N.J. 1989); see Gelco Builders & Burjay Constr. Corp. v. United States, 269 F.2d 992, 1000 n.7 (Ct. Cl. 1966) ("Litigants should not, on a motion for reconsideration, be permitted to attempt an extensive re-trial based on evidence which was manifestly available at the time of the hearing."); see also Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1231 (3d Cir. 1995) ("Whatever other circumstances may justify reconsideration, mere presentation of arguments or evidence *seriatim* does not."); Van Skiver v. United States, 952 F.2d 1241, 1243 (10th Cir. 1991) (revisiting previous issues is not purpose of motion to reconsider); Nat'l Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990) (losing party cannot simply rehash original arguments). Put simply, the rulings of a court are not "mere first drafts, subject to revision and reconsideration at a litigant's pleasure." Quaker Alloy Casting Co. v. Gulfco Indus., Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1988).

To sustain its burden, the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice. See Bishop, 26 Cl. Ct. at 286; see also Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 376 (quoting Bishop, 26 Cl. Ct. at 285-86), aff'd, 39 F.3d 1198 (Fed. Cir. 1994) (Table). Because "'[t]he litigation process rests on the assumption that both parties present their case once, to their best advantage,'" public policy precludes a reconsideration motion based on evidence that was readily available at the time the original motion was heard. Aerolease, 31 Fed. Cl. at 376 (quoting Bishop, 26 Cl. Ct. at 285-86); see Gen. Elec. Co. v. United States, 416 F.2d 1320, 1321 (Ct. Cl. 1969) (per curiam) (finding that where party had notice of potential issue, chance to present its position, failed to do so, and does not give sufficient excuse, "post-decision relief" will be denied); Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 404-05 (1993) (adopting Bishop standard for reconsideration motions). "[A]n argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal." Bluebonnet Sav. Bank v. United States, 466 F.3d 1349, 1361 (Fed. Cir. 2006); see Lamle v. Mattel, Inc., 394 F.3d 1355, 1359 n.1 (Fed. Cir. 2005).

> "The reargument of cases cannot be permitted upon the sole ground that one side or the other is dissatisfied with the conclusions reached by the court, otherwise the losing party would generally, if not always, try his case a second time, and litigation would be unnecessarily prolonged, with no more satisfactory results, as there would still be a losing party in the end."

White Mountain Apache Tribe v. United States, 9 Cl. Ct. 32, 35 (1985) (quoting Roche v. District of Columbia, 18 Cl. Ct. 289, 290 (1883)).

II. Interim Plan of Operations

Plaintiffs argue that the 2007 Opinion should be amended by applying the doctrine of accord and satisfaction to the acceptance of the IPO for 1997 and 1998, rather than applying the law of modification of contracts under Article 3(h). Article 3(h) provides: "The United States and the Contractor by mutual agreement may reduce the annual quantity of water which the United States is obligated to make available and the Contractor obligated to pay for during the remainder of the term of this contract." PX 36, art. 3(h); PX 37, art. 3(g). Plaintiffs assert that the use of the phrase "during the remainder of the term of this contract" requires that any modification be operative for permanent amendments and does not apply to temporary modifications of water allocations. The language of Article 3(h) does not limit changes to those of a permanent nature. Article 3(h) does not preclude potential temporary amendments of the contracts' terms, as the effect of a modification of a single year of the contracts' terms would manifest itself "during the remainder of the term of this contract." PX 36, art. 3(h); PX 37, art. 3(g).

Plaintiffs also argue that this reading of the IPO is "contrary to historical custom throughout the CVP [Central Valley Project] and violates the statute of frauds." Motion To Amend at 3. Defendant correctly points out that plaintiffs made the same argument in Plaintiffs' Motion *in Limine* To Exclude Evidence Relating to Alleged Amendment of the Contracts, filed September 29, 2006. The court declined to grant plaintiffs' motion in full at that time and now does not find that the defect rises to the level of manifest error or extraordinary circumstance that would require amendment of this portion of the 2007 Opinion. Nevertheless, defendant states that it "has no objection to the Court adding the alternative ground . . . to supplement its analysis." Def.'s Br. filed Mar. 30, 2007, at 4.

In light of the arguments raised by plaintiffs and defendant's agreement with this limited modification, the 2007 Opinion is amended to reflect the alternative ground of accord and satisfaction regarding the IPO. Page 54 of the 2007 Opinion is amended to include the following language:

> Alternatively, the IPO operates as an accord and satisfaction of the 1983 Contracts, as the Contracting Parties accepted performance under the IPO's terms in satisfaction of Reclamation's duty to provide allocations under the 1983 Contracts' terms. See England v. Sherman R. Smoot Corp., 388 F.3d 844, 849 (Fed. Cir. 2004) ("A claim is discharged by accord and satisfaction when 'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" (quoting O'Connor v. United States, 308 F.3d 1233, 1240 (Fed. Cir. 2002)).

III. Factual errors

Plaintiffs have highlighted twenty-five instances of factual errors. See Motion To Amend at 3-16. Defendant does not object to plaintiffs' asserted factual errors numbered 1, 2, 3, 9, 19, and 20. See Def.'s Br. filed Mar. 30, 2007, at 4-5, 9, 15-16. Discussion of each of plaintiffs' asserted factual errors follows. The amended pages of the 2007 Opinion originally issued February 20, 2007, incorporate those changes suggested by plaintiffs that should be implemented, and are attached to this order as Attachment 1.

> 1. "The Superior Court of California for the County of San Francisco denied all of the plaintiffs' claims; . . . ." 2007 Opinion at 11.

Plaintiffs and defendant agree that this statement should be amended to state "the Superior Court for the County of Sacramento." Page 11 of the 2007 Opinion is amended to reflect this change.

> 2. "[P]ursuant to the terms of the Second Amended Contract, which was executed between the Urban Contractors and Stockton East on September 25, 1983." 2007 Opinion at 15. 1/

Plaintiffs and defendant agree that this statement should be amended to state "was executed . . . in September 1987." Page 15 of the 2007 Opinion is amended to reflect this change.

> 3. "The Decision of the State Water Control Board in January 1988 acknowledged the existence of senior water right holders in authorizing partial filling of the New Melones Reservoir…("Decision 1616"). 2007 Opinion at 19.

Plaintiffs and defendant agree that this statement should be amended to state "senior water right holders in authorizing permits for direct diversion rights at the New Melones Reservoir." Page 19 of the 2007 Opinion is amended to reflect this change.

---

1/ Plaintiffs misquoted the 2007 Opinion, stating that it read, "The Second Amended Contract between Stockton East and California Water was executed September 25, 1983. DX 248." Motion To Amend at 4.

> 4. "The over commitment of New Melones Reservoir in spite of low inflow rates required Reclamation to make operational decisions regarding the allotment of scarce surface water resources." 2007 Opinion at 25.

Plaintiffs argue that this is an "overstatement that is not supported by the evidence. . . . the Court would have to make findings of annual demands relative to annual supplies." Motion To Amend at 4. Defendant rejoins that plaintiffs "misconstrue its meaning" and that this is "just a belated effort to reargue the facts." Def.'s Br. filed Mar. 30, 2007, at 5-6. This statement was made as a general observation based upon the factual evidence presented at trial, as detailed in the 2007 Opinion, and does not constitute a manifest error that warrants correction.

> 5. "The CVPIA made substantial changes to the operation of the New Melones Reservoir by imposing requirements upon Reclamation regarding allocation of water, particularly for environmental purposes." 2007 Opinion at 25. 2/

Plaintiffs argue that the CVPIA "did not make any changes to the operation of the New Melones Reservoir[.]" Motion To Amend at 4. The court does not agree with plaintiffs' reading of this statement, which described a sequence of events beginning with the statutory mandate of the CVPIA, that resulted in changes to the operation of the New Melones Reservoir. Nevertheless, in light of plaintiffs' strenuous objections to this statement, page 25 of the 2007 Opinion is amended to state "Implementation of the CVPIA resulted in substantial changes to the operation . . . ."

> 6. "Consequently, enactment of the CVPIA in 1993 modified the priorities for which the water use at the New Melones Reservoir was to be allocated to make 'fish and wildlife mitigation, protection and restoration' equivalent to irrigation and domestic uses. This change required Reclamation to alter the manner in which it made operational decisions regarding the allocation of water to the Contracting Parties pursuant to the 1983 Contracts." 2007 Opinion at 26 (internal citations omitted).

Plaintiffs argue that "[n]o change of CVP priorities imposed by CVPIA *required* Reclamation to alter the manner in which it made allocations of water from New Melones." Motion To Amend at 5. Again, plaintiffs misconstrue the meaning of the statement, as

---

2/ Plaintiffs misquoted the 2007 Opinion, stating that it read, "particularly for environmental purpose." Motion To Amend at 4.

defendant correctly observes, by stating that "[t]he Court's Decision correctly summarizes CVPIA's restructuring of priorities for the use of CVP water . . . ." Def.'s Br. filed Mar. 30, 2007, at 7. Plaintiffs' objection that the CVPIA did not require changes by Reclamation is contrary to the evidence adduced at trial. While the statutory language of the CVPIA did not make explicit requirements for Reclamation to make operational changes, the effect of the changes mandated by the CVPIA rendered necessary modifications to Reclamation's operational processes.

> 7. "The CVPIA made additional alterations to the fishery flow requirements at the New Melones Reservoir." 2007 Opinion at 27.

Plaintiffs object to the characterization that the CVPIA imposed changes on fishery flow requirements, given that such a determination was made in the discretion of Reclamation in implementing the CVPIA. Plaintiffs misconstrue this statement, which was directed to the CVPIA's application to fishery flow requirements. Nevertheless, in order to provide additional specificity and clarity, page 27 of the 2007 Opinion is amended to state, "Implementation of the CVPIA made additional alterations . . . ."

> 8. "The Bay-Delta Accord imposed a number of constraints upon the operation of the CVP, which included various provisions that directly impacted the operation of the New Melones Reservoir." 2007 Opinion at 28.

Plaintiffs argue that the Bay-Delta Accord did not constrain the New Melones Reservoir's operations; rather, Reclamation had discretion to allocate water from the New Melones Reservoir to meet the requirements of the Bay-Delta Accord. Defendant responds that plaintiffs misconstrue the statement's meaning, as the language of the Bay-Delta Accord is not interpreted as mandating changes to the operation of the New Melones Reservoir. The 2007 Opinion merely states that provisions of the Bay-Delta Accord "directly impacted" its operation. 2007 Opinion at 28. Plaintiffs' reading, placed in context, is not consistent with the fact that the Bay-Delta Accord directly impacted the New Melones Reservoir.

> 9. "On March 1, 1999, Reclamation, the State of California, the Contracting Parties . . . entered into the San Joaquin River Agreement (the 'SJRA')." 2007 Opinion at 30.

Plaintiffs and defendant agree that this statement is inaccurate because the twenty eight entities listed do not include the Contracting Parties. Page 30 of the 2007 Opinion is amended to read, "On March 1, 1999, Reclamation, the State of California, . . . . entered into the San Joaquin River Agreement (the 'SJRA')."

10. "In 1988 the State Water Control Board modified the salinity standard imposed upon Reclamation in Decision 1422 . . . ." 2007 Opinion at 31.

Plaintiffs argue that the State Water Control Board in 1988 did not modify the salinity standard imposed upon Reclamation, and that the 500 parts per million total dissolved solids standard was retained by the State Water Control Board in 1988. Motion To Amend at 6. Defendant counters that the statement is intended to reflect the fact that the overall salinity standard was altered by precluding consumptive use diversions unless the salinity standard was met, which was not a condition of the salinity standard prior to 1988. Also, as noted by defendant, the statement, when read in context, specifically cites the language of Decision 1616 modifying the salinity standard:

> In 1988 the State Water Control Board modified the salinity standard imposed upon Reclamation in Decision 1422 by requiring that
>
> > no consumptive use diversion is authorized under this permit [for the New Melones Reservoir] when the mean monthly total of dissolved solids concentration in the San Joaquin River at Vernalis is greater than 500 parts per million or the dissolved oxygen concentration in the Stanislaus River is less than that specified [in the Water Quality Control Plan of 1975].
>
> Decision 1616 at 32.

2007 Opinion at 31 (emphasis added).

11. "During the period between 1988-92, no water was delivered to the Contracting Parties from the New Melones Reservoir due to drought conditions, and the Contracting Parties submitted no schedules." 2007 Opinion at 33. 3/

Plaintiffs object to the statement that no water was delivered "due to drought," contesting that no deliveries were made because plaintiffs still were constructing their conveyance facilities. Motion To Amend at 6-7. Testimony elicited at trial substantiates the finding that severe drought conditions between 1988-92 existed and would have precluded

---

3/ Plaintiffs misquoted the 2007 Opinion, stating that it read, "During the period between 1998 and 1992, no water was delivered . . . ." Motion To Amend at 6.

allocation of water to plaintiffs regardless of their ability to request water. See Transcript of Proceedings, Stockton E. Water Dist. v. United States, No. 04-541L, at 1577 (Fed. Cl. Oct. 23 - Nov. 2, 2006) ("Tr.") (testimony of Roger K. Patterson, Regional Director of the Mid-Pacific Region for Reclamation, the Central Valley Operations Office: "[New Melones Reservoir] was down to 100,000 acre-feet or less. It think it was actually a little under 100,000 acre-feet. It was very low.") Nevertheless, in order to more precisely reflect the fact that plaintiffs did not submit any requests for water allocation between 1988-92, page 33 of the 2007 Opinion is amended to read, "The Contracting Parties submitted no schedules during this period."

> 12. "Central and Stockton East submitted their water conservation plans in December 1993 to Reclamation." 2007 Opinion at 36.

Plaintiffs highlight that Stockton East Water District first submitted its water conservation plan in 1986 and did so for a second time in 1993. Defendant is correct that the language of the court's opinion does not specify that the 1993 date was the first time the water conservation plan was submitted. Therefore, no error exists that requires correction.

> 13. "First, the parties dispute . . . whether Reclamation is bound to follow the decisions of the State Water Control Board in Reclamation's operation of the New Melones Reservoir." 2007 Opinion at 47.

Plaintiffs cite their concession of this dispute in their stipulations of fact. See Joint Stipulations of Fact for Trial, filed Oct. 24, 2006, ¶¶ 21-22. The court highlighted the discussion of this issue in the Summary Judgment Opinion:

> Other arguments put forth by plaintiffs and defendant were explored during oral argument. While the court has considered these arguments, it has found them unpersuasive at the summary judgment stage.
>
> In particular, defendant and amicus press the argument that plaintiffs' water rights were limited by background principles of state law. The court does not rule on this argument. It may be addressed at trial and in the related briefing. The court does note, however, that the California case that amicus filed as supplementary authority is unpublished and cannot be cited under California rules, and plaintiffs correctly object to the citation on those grounds. Material of this nature submitted by amicus is unhelpful.

Summary Judgment Opinion at 31, 31 n.13. Nevertheless, in light of plaintiffs' concession highlighted above and defendant's acquiescence to the change, the 2007 Opinion is amended

to delete the portion of the discussion quoted above. The number of arguments reflected on page 47 is reduced from four to three.

> 14. "According to Roger K. Patterson, who was Regional Director of the Mid-Pacific Region for Reclamation, the Central Valley Operations Office, which he headed, was in charge of actual day-to-day operations of the CVP." 2007 Opinion at 60.

Plaintiffs argue that Mr. Patterson did not head the Central Valley Operations Office and that he was the bureaucratic head of the Mid-Pacific Regional office for Reclamation. Defendant counters that Mr. Patterson was the former Regional Director of the Mid-Pacific Region for Reclamation, "which meant that the responsibilities of the Bureau of Reclamation for the Mid-Pacific Region were all under [his] jurisdiction." Tr. at 1564. Notably, Mr. Patterson testified:

> Q: You mentioned the Central Valley operations office as sort of being the group that was in charge of actually operating the CVP. And you were, obviously, the regional director in charge of that group; is that right?
>
> A [Mr. Patterson]: Yes.

Tr. at 1570 (emphasis added). The testimony of Mr. Patterson confirmed his responsibility with respect to the Central Valley Operations office as Regional Director of the Mid-Pacific Region for Reclamation. No amendment is called for.

> 15. "In 1995 Reclamation anticipated, upon review of prevailing conditions at the time, that the lesser recovery of snowpack for the New Melones Reservoir would result in a reduced allocation to ensure sufficient water for environmental and other in-basin purposes. This determination was supported by observation of snowpack amounts built up over the winter, indicating a dry year for the New Melones Reservoir." 2007 Opinion at 66.

Plaintiffs assert that "[t]his factual finding is contradicted by the record," Motion To Amend at 8, and "[t]here is absolutely NO EVIDENCE of 'lesser recovery of snowpack' or 'dry' conditions at New Melones in 1995 – in fact the opposite is true." Pls.' Br. filed Apr. 6, 2007, at 6. Defendant cites direct support for the lesser recovery of snowpack, contrary to plaintiffs' contentions, as supported by Reclamation's 1995 allocation decisions in February, April, and August. See, e.g., PX 115 ("Storage in New Melones Reservoir on the Stanislaus River has not recovered to the same extent as at other CVP reservoirs.") (emphasis added), PX 121 (same). The testimony of Reid W. Roberts, counsel for plaintiff Central San

Joaquin Water Conservation District, supports the second portion of the findings in the 2007 Opinion:

> Q. Okay, and allocation decisions for 1995 would have been made when? Early in 1995; correct?
>
> A. Yes. But they're based upon storage and projected inflow from snowpack. And that's how you end up with the storage at the end of the year.
>
> Q. Right. So basically what happened is, you're coming out of 1994, where the storage level at the end of that year was right around 420,000 acre-feet, which was fairly low. You would agree with that; wouldn't you?
>
> A. Yes.
>
> Q. And at the beginning of 1995, Reclamation, as you understand it, is preparing its allocation decision. But at that point, the storage level was significantly less than 1.8 million acre-feet?
>
> A. Well, my assumption is that it would have been less, yes. But, again, the components that go into their projections, as you indicated from their releases, are a measurement of snowpack, carryover storage from the previous year to project what the inflow and capacity of the reservoir will be. That's an ongoing process throughout the year, the way that the snow melt affects New Melones Reservoir, it's a significant basis for determining what the storage will be in the reservoir during the year.

Tr. at 288-89 (emphasis added). No correction is required of the nature suggested by plaintiffs.

> 16. "Mr. Patterson testified that the forecast process involved 'an analytical process of really looking at what is available and what is anticipated to be available as far as water supply each year,' and confirmed the details. Tr. at 1571." 2007 Opinion at 60.

Plaintiffs assert that the court's statement that Mr. Patterson "confirmed the details" should be deleted from the 2007 Opinion as factually unsupported. As defendant counters, Mr. Patterson provided details regarding the timing and considerations in making water allocation decisions:

Q. There's been some discussion in trial already about the forecasting element of CVP operations. And I wonder if you could, as regional director, what was your understanding of how the forecasts are actually completed?

A. Well, it's an analytical process of really looking at what is available and what is anticipated to be available as far as water supply each year.

Q. And I guess that's what I'm interested in is what is anticipated to be available for the next year?

A. Well, for instance, let's start in the fall. Water years generally start, let's say, October 1st. So at that time you know how much water is in storage in the various reservoirs because you're getting close to the end of the season. Deliveries have slowed down, and so you know how much is in the reservoirs. Demand is probably not real high at that point. So that's sort of a starting point.

And then as you move into the winter, to the degree you get rainfall during the rainy season here, you'll see storage develop in the reservoirs, and then you get into the snowpack season. And computations – measurements will be made of the snowpack. You will determine how much water is in the snowpack. And forecasts will be made for how much flow that's going to create in the rivers when it melts. And so you will take all of those into consideration, what you have and what you're going to get when the snow melts, so that you know what you have.

Q. We've seen in prior testimony, allocation announcements.

A. Yes.

Q. Are you familiar with the process of announcing the allocations?

A. Yes.

Q. When, generally, does the Bureau of Reclamation announce its allocation decisions?

A. Well, when I was here, I know there was a requirement in at least some of the contracts that we had to make the first official allocation no later than February 15th of each year. And so as a matter of practice, we notified -- we

> tried to notify all of the contractors, even those that didn't have that provision in their contract. That on February 15th, we would make the first official allocation of anticipated supplies for the upcoming year.
>
> We also had an annual water-users conference in January each year. And even though we weren't required to provide an allocation, we would generally make an advance -- unofficial allocation, if you will, in January at the water users conference, just to give contractors an idea of what they can expect, at least how the year is developing.
>
> And then those allocations would be updated at least monthly. As new snowpack came in and was measured at the first of the month, then we would update the allocations monthly as we went through the year. Because in California, a large amount of the snowfall comes in late spring. So you're going to get a lot of snow in even March and April and into May. And so as you start accumulating that, then you know what you have for snowpack. So you would update the allocation so that people continually track and know what to anticipate as far as water supply.

Tr. at 1571-73 (testimony of Mr. Patterson). Based on the testimony of Mr. Patterson, as cited, no amendment of this portion of the 2007 Opinion is required.

> 17. "Even when no formal announcement of shortage is issued, a record of Reclamation's decision-making process was made available to the Contracting Parties in years during which they received water allocation reductions." 2007 Opinion at 60-61.
>
> This item is discussed below regarding objection 18.
>
> 18. "Such information, if made available to the Secretary, is sufficient to base a review of the water reduction decisions made by Reclamation." 2007 Opinion at 61.

Plaintiffs assert that no record evidence supports the finding quoted in No. 17 above. Defendant draws attention to the fact that the annual water allocation decisions provided by Reclamation to plaintiffs several times a year contained the determinations made by Reclamation over the course of the months leading up to a final allocation decision. See, e.g., PX 115; PX 120; PX 141; PX 171; PX 176. Additionally, as described above, the allocation predictions provided by the announcements involved a process of measurement, observation, and forecast of snowpack and other relevant factors by Reclamation's personnel.

See Tr. at 1571-73 (testimony of Mr. Patterson regarding forecast decision-making). This decision-making process, as described in the 2007 Opinion, immediately preceding the quoted section above, gives context for the full discussion on point:

> Because plaintiffs assert that a violation of Article 12(d) occurred in relation to water allocation reductions in years when no formal announcement of water shortage was made, review of the actual circumstances of the decision-making process for water reductions is instructive. According to Roger K. Patterson, who was Regional Director of the Mid-Pacific Region for Reclamation, the Central Valley Operations Office, which he headed, was in charge of actual day-to-day operations of the CVP. Mr. Patterson testified that the forecast process involved "an analytical process of really looking at what is available and what is anticipated to be available as far as water supply each year," and confirmed the details. Tr. at 1571. As he described it, the process includes snowpack measurements in the early winter, followed by a preliminary assessment at the annual water users conference held in January, monthly forecasts published starting February 15, and examination of water storage levels in the reservoirs.

2007 Opinion at 60-61. The court's reference to "[s]uch information" includes the details of the analytical process described by Mr. Patterson, as well as the allocation announcements described. No amendment of the 2007 Opinion is necessary in the manner suggested by plaintiffs in objections 17 or 18.

> 19. The Build-Up Schedule set forth on page 67-68 of the 2007 Opinion contains a typographical error and requires some clarification.

Plaintiffs assert that the Build-Up Schedule should include 80,000 acre-feet for Central from 1999 through 2004. Defendant explains that the 80,000 acre-feet amount cited by plaintiffs in Article 3(c)(3) of the Central Contract is a maximum amount, not a minimum required allocation. See PX 37, art. 3(c)(3) ("[I]n no event shall the annual quantity furnished for agricultural purposes exceed 80,000 acre-feet . . . .") (emphasis added). Article 3(c)(3) states that "Each year beginning in the 11th year and continuing for the remaining contract term, the quantity of water scheduled in the 11th year (which quantity shall be at least equal to or greater than the quantity made available and paid for in the 10th year . . . )." The minimum allocation amount listed for the tenth year of the Central contract is 56,000 acre-feet. PX 37, art. 3(c)(2) ("Each year . . . for years 9 and 10 the minimum quantity of 56,000 acre-feet . . . ."). Therefore, the minimum allocation amount required by the terms of the Build-Up provisions of the Central contract only mandates a distribution of 56,000 acre-feet, unless otherwise modified by the terms of the contract. As the 80,000 acre-

feet amount cited by plaintiffs is a maximum, not a minimum, no amendment of the 2007 Opinion is required.

Defendant points out that the court miscomputed the Build-Up Schedule amounts for Stockton East. Provisions similar to those cited above for the Central contract limit the minimum amount of allocation of agricultural water in 1999 through 2004 for Stockton East to 45,000 acre-feet, not 65,000 acre-feet, as was mistakenly utilized by the court. See PX 36, art. 3(c)(2), (3). Therefore, pages 67-68 of the 2007 Opinion are amended to correct the computation of the Build-Up Schedule for Stockton East in line with the 45,000 acre-feet figure.

20. Numbered Item 3 on page 61 of the Decision should be Item 2.

Plaintiffs and defendant agree that the 2007 Opinion should be corrected to reflect this change.

> 21. "Following the IPO's two-year modification of the 1983 Contracts, Reclamation discharged its obligation to meet the schedules provided by the Contracting Parties in all years." 2007 Opinion at 65.

Plaintiffs assert that this statement requires clarification, as "unclear in that it presumes there were schedules, which there were not." Motion To Amend at 11. Defendant's position is that "[r]ead in context of the Decision as a whole, the Court's statement is unambiguous and need not be amended or supplemented." Def.'s Br. filed Mar. 30, 2007, at 16. No amendment or supplementation of this statement is deemed necessary.

> 22. "For example, Mr. Ploss explained that Reclamation chose not to release water from other sources to fulfill fishery needs because releases from other CVP contractors would have required their cooperation . . . ." 2007 Opinion at 75.

Plaintiffs assert that this statement was not supported by the cross-examination of Mr. Ploss. Motion To Amend at 11. In response to a question directly from the court, Mr. Ploss confirms the factual basis for the court's statement:

> THE WITNESS: Well, that gets to why Reclamation didn't release water from other sources.
>
> THE COURT: So while Reclamation theoretically could have, it would have had to have had the cooperation of those other contractors?

THE WITNESS: Yes, yes.

Tr. at 1000 (testimony of Mr. Ploss). While plaintiffs cite extensively to the testimony of Mr. Ploss, the court notes that the 2007 Opinion assessed the credibility of Mr. Ploss, in light of the contradictory testimony that he provided:

> The court observes that Mr. Ploss obviously was sympathetic to plaintiffs' plight of having contracted on the basis of reasonable expectations for quantities of water and having been frustrated from the outset. Defendant's able cross-examination of the witness countered Mr. Ploss's effectiveness, and thereby diminished his credibility, when Mr. Ploss had to admit to the operational limitations within which Reclamation managed the water that flowed into the New Melones Reservoir.

2007 Opinion at 72. In addition, Mr. Ploss conditioned his description of Reclamation's authority by stating that a reduction of water deliveries to other CVP contractors would have resulted in those contractors suing Reclamation.

> Q. And, as far as you know, there's nothing in that contract that would prevent you from utilizing some of the water pumped from the delta to help meet salinity or flow standards, is there?
>
> A. I don't believe so.
>
> THE COURT: But I understood you to say they'd have the right to object?
>
> THE WITNESS: I believe we might be here with them today then.

Tr. at 1005 (testimony of Mr. Ploss). The court's framing of the factual determinations within the 2007 Opinion, as noted by defendant, represents an effort "to summarize the two weeks of testimony presented by the parties, and to draw conclusions based on that testimony and evidence presented." Def.'s Br. filed Mar. 30, 2007, at 17. No amendment or modification of the 2007 Opinion therefore is required.

> 23. "Pumping at the delta for use by south-of-the-delta users, which includes residential use for the Los Angeles area, is not only the primary cause of salinity deposits that require releases from the New Melones Reservoir." 2007 Opinion at 82.

Plaintiffs assert that "Reclamation does not pump water from the Delta to deliver to residential customers in Los Angeles." Motion To Amend at 15. Defendant recognizes the distinction that the court did not state that Reclamation pumps, but, rather, that pumping, which includes pumping by the State of California, is used for residential purposes in Los Angeles. This statement is supported by the record:

> Q. So Metropolitan supplies the water for 18 million people in the LA Basin; right?
>
> A. We do. We do that through 26, we call them "member agencies." So Metropolitan is like the wholesaler in the region, and then these 26 agencies are the ones that actually deliver to the customers.
>
> Q. And about how much of that water comes out of the delta?
>
> A. You know, that varies. I think our long-term plans have in it -- it's less than I would have thought. It's less than a half a million acre-feet on average that comes out.

Tr. at 1628-29 (testimony of Mr. Patterson). No amendment is required based on plaintiffs' argument.

> 24. "Surface water has been leached from every damable river, which is made evident upon reviewing a map of the CVP. See, e.g., DX 219. As a consequence of the modification of the natural flow of every river that historically supported spawning of salmon in the CVP, the fish are being killed in the process of redirecting them to the river whence they came." 2007 Opinion at 82.

Plaintiffs assert that the statement above should be amended because the "map of the CVP" includes projects that are not part of the CVP, and that "[t]he Court has mistakenly presumed that the CVP is responsible for the decline in spawning habitat." Motion To Amend at 15. While it is true that the map cited as an example does include non-CVP dams, it does encompass those CVP projects involved in this case. The court's statement does not suggest that the map is limited exclusively to CVP dams. The court notes that the map was produced under the auspices of the CVPIA. See Tr. at 1681 (tesimony of Roger O. Guinee, Supervisory Fish and Wildlife Biologist for the United States Fish & Wildlife Service's Sacramento office: "Q. Okay, I'm going to ask you to turn next to Defendant's Exhibit 219. . . . A. Yes, I am familiar with it. I believe this was produced by one of the CVPIA programs.").

The second portion of the 2007 Opinion cited above summarizes the testimony regarding adverse impact on fish habitats due to dams elicited during trial and the adverse impact of entrainment of salmon in the pumping facilities utilized by the CVP, as well as the trucking of salmon that survive the entrainment process back to the rivers. See Tr. at 1863 (testimony of Mr. Guinee); 2007 Opinion at 82-83 (summarizing adverse impact of pumping and habitat reduction through use of dams on salmon populations). These statements are supported by the facts developed at trial and require no amendment in response to plaintiffs' objections.

> 25. "As a consequence of the modification of the natural flow of every river that historically supported spawning of salmon in the CVP, the fish are being killed in the process of redirecting them to the river whence they came. For example, fishery releases from the New Melones Reservoir have resulted in a net decrease in the number of fall-run chinook salmon produced annually on the Stanislaus River. See DX 210 (computing average production of fall-run chinook salmon between 1967-1991 as 10,868 and average between 1992-2005 since implementation of the CVPIA, as 7,540)." 2007 Opinion at 82.

Plaintiffs assert that "the Court has made a false factual conclusion unsupported by the evidence at trial." Motion To Amend at 16. Plaintiffs contend that DX 210 did not demonstrate that fishery releases resulted in a decrease in salmon numbers. They view this exhibit as illustrating only a net decline in the number of salmon during implementation of the CVPIA and argue that fishery decline can be attributed to other causes. Defendant chides plaintiffs for misreading the 2007 Opinion, which does not exclusively limit the cause of reductions of salmon on the Stanislaus River to fishery releases from the New Melones Reservoir. The statement relates the modest proposition that "the fall-run Chinook salmon have experienced a decline, not that the water released from New Melones Reservoir for the benefit of the fish precipitated the decline." Def.'s Br. filed Mar. 30, 2007, at 19. Therefore, no amendment of this portion of the 2007 Opinion is warranted.

## IV. Discussion of relevant litigation and disimssal of plaintiffs' takings claim

### 1. Litigation and administrative proceedings

Plaintiffs argue that "[t]he Court's recitation of very cursory information regarding several state and federal lawsuits and administrative proceedings in Background Sections I and II of the Decision is confusing, unnecessary dicta." Motion To Amend at 16. The parties provided information discussed in the Background section of the 2007 Opinion regarding litigation and administrative proceedings pursuant to the post-trial order of

November 9, 2006. The parties submitted this information in the form of a Joint Chart of Lawsuits and Regulatory Proceedings on November 21, 2006. The court did not quote the chart, but restated it in the context of discussing the rulings of the background litigation. No amendment of the 2007 Opinion regarding this objection therefore is required.

2. Dismissal of takings claim

Plaintiffs assert that the portion of the 2007 Opinion dismissing plaintiffs' Fifth Amendment takings claim should be removed as not litigated. Defendant reminds the court that the dismissal was resolved as a matter of law, rather than based on facts, and does not require an evidentiary hearing or opportunity for argument. Plaintiffs do not demonstrate extraordinary circumstances such as a "manifest error of law" that would justify reconsideration of this portion of the court's decision. No amendment of this portion of the 2007 Opinion is called for.

## CONCLUSION

1. Plaintiffs' Motion To Amend or Modify Decision is granted in part, and denied in part, consistent with the foregoing. The amended pages of Stockton East Water District v. United States, 75 Fed. Cl. 321 (2007), are attached to this order as Attachment 1.

2. Page 1 of Stockton East Water District v. United States, 75 Fed. Cl. 321 (2007), is amended with the changes reflected in Attachment 2 to this order.

**IT IS SO ORDERED.**

s/ Christine O.C. Miller

________________________________________

**Christine Odell Cook Miller**
Judge