Parties' representatives testified that, along with representatives of Reclamation and the FWS, they were part of the Stanislaus Stakeholders meetings, where the IPO was discussed. See, e.g., Tr. at 313 ("Reid W. Roberts: But [in December 1996], [the Contracting Parties] had been involved in Stanislaus stakeholders' discussions about an interim operations plan and how it would work.").

Interior organized the Stanislaus Stakeholders meetings in 1995 and continued them through 1997, which, according to the IPO transmittal letter from Reclamation dated May 1, 1997, led to the IPO's execution after "a final [IPO] for the New Melones Reservoir was agreed to in concept [at a Stakeholders meeting on January 29, 1997]". PX 203; see Tr. at 474. In addition, Jeanne M. Zolezzi, General Counsel for Stockton East, wrote to Reclamation in a letter dated September 9, 1998, after implementation of the IPO, that "[a]s an interim stopgap measure, the stakeholders agreed to operate the New Melones Project under the two-year [IPO] in order to allow time to negotiate a more equitable long-term operations agreement." PX 222. Article 3(h) does not explicitly require the Contracting Parties to be signatories to any such mutual agreement, nor is there any requirement that such an agreement be in writing, which also is supported by an examination of other articles within the 1983 Contracts that do specify written notification or agreement. See *infra* Discussion II.1.5).

The evidence supports a finding that the Contracting Parties, while not signatories to the IPO, did agree with Reclamation as part of the Stanislaus Stakeholders meeting on January 29, 1997, to a short-term modification of their water allocations. The Contracting Parties therefore agreed to a modification of the 1983 Contracts pursuant to Article 3(h) during 1997 and 1998. This court notes as particularly relevant the involvement of the Contracting Parties in the Stanislaus Stakeholders process and the acknowledgment of an "agreement to operate the New Melones Project" under the IPO made by Stockton East as an "interim stopgap measure." PX 222. Nevertheless, the parties also made clear that the terms of the IPO would not affect certain provisions of the 1983 Contracts. See PX 227 ("It is Reclamation's position that your allocations of water under, and acceptance of the provisions of the negotiated two-year [IPO], will not trigger the build-up provisions under Article 3 and Article 5 of [the Stockton East Contract]."). Reclamation is not liable for any water allocations that met the requirements of the IPO during 1997 and 1998, although this finding is not applicable regarding any triggering of the Build-Up Schedule provisions contained in Articles 3 and 5. Alternatively, the IPO operates as an accord and satisfaction of the 1983 Contracts, as the Contracting Parties accepted performance under the IPO's terms in satisfaction of Reclamation's duty to provide allocations under the 1983 Contracts' terms. See England v. Sherman R. Smoot Corp., 388 F.3d 844, 849 (Fed. Cir. 2004) ("A claim is discharged by accord and satisfaction when 'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" (quoting O'Connor v. United States, 308 F.3d 1233, 1240 (Fed. Cir. 2002)).

i. Article 9(a)

The 1983 Contracts also include a clause that protects Reclamation from liability in case of reductions in water allocations for specified reasons.

with fourteen other lawsuits 1/, alleged (1) that California Water Code § 11460 2/ was violated by amending Reclamation's permits to impose salinity and flow objectives at Vernalis and Delta outflow objectives because the need was created by exports; (2) that Reclamation's use of water from the New Melones Reservoir to meet the Vernalis salinity objectives was unreasonable under California Constitution Article X, § 2; 3/ and (3) that the decision of the State Water Control Board to require releases from the New Melones Reservoir for salinity and flow objectives at Vernalis was unsupported by substantial evidence.

The Superior Court of California for the County of Sacramento denied all of the plaintiffs' claims; this ruling was upheld on appeal. State Water Res. Control Bd. Cases, 136 Cal. App. 4th 674. The California Court of Appeal for the Third Appellate District found no violation of California Water Code § 11460:

> [I]f the terms of a permit issued by the Board give the Bureau a range of choices in operating the CVP–only one of which might violate section 11460–there is no basis for challenging *the Board's decision* based on section 11460. As long as the Bureau has the right under its permit to operate the CVP consistently with section 11460, any violation of the statute would result solely

---

1/ The allegations contained in the other parties' coordinated claims are not discussed in any detail as they are not relevant to the issues before the court.

2/ California Water Code § 11460 (2006), provides:

> In the construction and operation by the department of any project under the provisions of this part a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the department directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein.

3/ California Constitution Article X, § 2 provides, in relevant part:

> The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

County, but to the south of Stockton East. Central, like Stockton East, overlies a groundwater basin that is in a state of severe overdraft and salinity intrusion, limiting one possible source of water, groundwater pumping, to the area.

Plaintiffs California Water, City of Stockton, and San Joaquin County (collectively the "Urban Contractors") claim third-party beneficiary status to the 1983 Contracts. 4/ California Water is a corporation organized and existing under the laws of the State of California that contracts for a portion of Stockton East's treated water and then provides that treated water to the residents of the city of Stockton, pursuant to the terms of the Second Amended Contract, which was executed between the Urban Contractors and Stockton East in September 1987. DX 248. The City of Stockton is a municipal corporation organized under California Government Code §§ 34000-45345 (2006). Joint Stipulations ¶ 4. San Joaquin County is a political subdivision of the State of California organized under California Government Code §§ 34000-33205 (2006). Joint Stipulations ¶ 3. Both the City of Stockton and San Joaquin County also contract for water through Stockton East.

Reclamation is a federal agency that administers the New Melones Dam and its allocations of water. The New Melones Dam is managed as part of the Central Valley Project, a federal reclamation project authorized by the Flood Control Acts of 1944 and 1962 and the CVPIA. See Flood Control Act of 1944, Pub. L. No. 78-534, § 10, 58 Stat. 887, 900-02; Flood Control Act of 1962, Pub. L. No. 87-874, § 203, 76 Stat. 1173, 1191-92 ("Flood Control Act of 1962"); CVPIA. The New Melones Dam is located on the Stanislaus River approximately sixty miles upstream from the confluence of the Stanislaus with the San Joaquin River and forty miles east of Stockton, California, and has a capacity of 2.4 million acre-feet of water. Surface water trapped by the New Melones Dam is stored in the New Melones Reservoir and then sent via channel to the Tulloch Reservoir, which empties into the Goodwin Pool. Water from the Goodwin Pool then is sent via channel to the Oakdale and South San Joaquin Irrigation Districts, to Stockton East and Central (collectively, the "Contracting Parties") via the Goodwin Tunnel and Farmington Canal, or over the dam to spill into the San Joaquin river for fisheries, salinity, and flood release purposes. See Transcript of Proceedings, Stockton E. Water Dist. v. United States, No. 04-541L, at 810-14 (Fed. Cl. Oct. 23 - Nov. 2, 2006) ("Tr.").

---

4/ The court granted defendant's motion for summary judgment, in part, ruling that the Urban Contractors were not third-party beneficiaries to the Central Contract. See Summ. J. Op. at 536 ("Plaintiffs do not appear to dispute the fact that [the Urban Contractors] are not third-party beneficiaries to the Central Contract, as distinct from the Stockton East Contract. Therefore, defendant's cross-motion to disallow those three plaintiffs from enforcing the Central Contract is granted.").

Irrigation District ("OID") and South San Joaquin Irrigation District ("SSJID"). This agreement provided OID and SSJID with:

> That portion of the New Melones Reservoir inflow required to meet the Districts' direct diversion requirements but not to exceed 1,816.6 cubic feet per second.
>
> Subject to the following limitation:
>
> The maximum quantity of water delivered each year is limited to 654,000 acre-feet or the total quantity of New Melones Reservoir inflow during the water year . . . , whichever is the smaller.

DX 3 at 2. The agreement recognized the senior water rights of OID and SSJID and required Reclamation to supply up to 654,000 acre-feet annually from the New Melones Reservoir.

A second Agreement and Stipulation in 1988 superceded the 1972 Agreement and Stipulation. The second Agreement and Stipulation, executed on August 30, 1988, between Reclamation, OID, and SSJID, required Reclamation to deliver "each water year to [OID and SSJID] for diversion at Goodwin Diversion Dam . . . . The inflow to New Melones plus the amount derived by the following formula: (600,000 - inflow) divided by 3; limited to a maximum entitlement of 600,000 acre-feet of water each water year." DX 41 at 1. In addition, the 1988 Agreement and Stipulation requires Reclamation to make available a preliminary forecast in February and March and to furnish a forecast in April predicting inflow to the New Melones Reservoir. Paragraph 4 of the Agreement and Stipulation provides that "The Districts' conserved water may be stored in New Melones Reservoir up to a cumulative total amount of 200,000 acre-feet." Id. at 2.

The Decision of the State Water Control Board in January 1988 acknowledged the existence of senior water right holders in authorizing permits for direct diversion rights at the New Melones Reservoir: "This permit is subject to prior rights. Permittee is put on notice that during some years water will not be available for the diversion during portions or all of the season authorized herein." Petition for Assignment of Application 14858 and Applications 27319, 27320 and 27321 of the U.S. Bureau of Reclamation Stanislaus River, Cal. State Water Res. Control Bd., Decision 1616 at 34 (Jan. 1988) ("Decision 1616").

resolution of this dispute are analyzed further in this opinion. See Summ. J. Op. at 519-25.

2. Subsequent changes in laws and regulations

At the time the contracts were signed in 1983, the State Water Control Board anticipated that the annual fishery release from the New Melones Reservoir would be 98,000 acre-feet (or 69,000 acre-feet in dry years). Decision 1422 at 30. Amendments to federal Reclamation law revised upwards the goals for fisheries and environmental releases, and state water use permit changes modified salinity standards in the CVP. Looking at the operation of the overall system as a whole, the ever-increasing imposition of additional obligations for salinity and fisheries water releases led to a clash of management objectives and priorities, the unpredictability of available water supply, and an inherent conflict between demands for consumptive use by plaintiffs and environmental concerns. The over commitment of the New Melones Reservoir in spite of low inflow rates required Reclamation to make operational decisions regarding the allotment of scarce surface water resources. Resolution of plaintiffs' breach of contract claim contemplates discussion of the applicability of these obligations and the operation of the New Melones Reservoir. A recitation of the circumstances that led to the water release obligations therefore is instructive.

a. CVPIA

Passage of the CVPIA in 1993 made major changes to the allocation of water from the New Melones Reservoir. The purpose of the CVPIA was, in part,

> to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California; to address impacts of the [CVP] on fish, wildlife, and associated habitats . . . ; [and] to achieve a reasonable balance among competing demands for use of [CVP] water, including the requirements of fish and wildlife, agricultural, municipal, and industrial and power contractors.

CVPIA § 3402. Implementation of the CVPIA resulted in substantial changes to the operation of the New Melones Reservoir by imposing requirements upon Reclamation regarding allocation of water, particularly for environmental purposes.

i. Priorities change under CVPIA § 3406(a)

Prior to passage of the CVPIA, the CVP was

> declared to be for the purposes of improving navigation, regulating the flow

1616 required Reclamation to "provide such interim instream flows and . . . conduct such instream flow and fisheries studies as are required by the [1987 Fish and Game Agreement]," and the Water Control Board again reserved jurisdiction "for the purpose of revising instream flow requirements for water quality objectives and fishery purposes and for establishing dry year criteria." Decision 1616 at 33.

In April 1988 the State Water Control Board issued the Order Denying Petition for Reconsideration and Amending Decision 1616, Cal. State Water Res. Control Bd., WR 88-6 (April 6, 1988) ("WR 88-6"), by which it amended Decision 1616 to require "a study of the steelhead and resident trout fishery in the Stanislaus River downstream of Goodwin Dam. The study shall address the instream flow requirements of the steelhead trout and the resident trout populations . . . and it shall assess the effects of the New Melones Project operations on the fishery." Id. at 11-12.

In response to WR 88-6 and the requirements of the 1987 Fish and Game Agreement, the United States Fish and Wildlife Service (the "FWS") issued the Draft Instream Flow Requirements for Fall-Run Chinook Salmon Spawning and Rearing in the Stanislaus River, California in February 1992 (the "Draft Instream Flow Study"). The study was issued in its final form in May 1993 (the "Final Instream Flow Study") and recommended an increase in the fishery flows to 155,700 acre-feet annually from 98,300 acre-feet. Nevertheless, the study cautioned that "[o]nly after integrating a variety of habitat variables and competing species life stage needs can a comprehensive instream flow schedule for the Stanislaus River be developed which will protect and preserve the chinook salmon resource." Final Instream Flow Study at 25; DX 271.

(1) CVPIA § 3406(b)

Implementation of the CVPIA made additional alterations to the fishery flow requirements at the New Melones Reservoir. Section 3406(b)(1) of the CVPIA imposed a "doubling goal" upon Reclamation, requiring it to "implement a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels . . . ." Id. CVPIA § 3406(b)(2) provides that Reclamation is authorized and directed to

> dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help meet such obligations

Management Plan (the "VAMP"). San Joaquin River Agreement art. 2.4, app. A (March 1, 1999); PX 231. The VAMP was designed to (1) protect and enhance fishery protection to aid in achieving a doubling of natural salmon production; (2) gather scientific information on the relative effects of water releases, export pumping, and operation of a fish barrier on salmon in the delta; and (3) substitute for the requirements of the 1995 Water Quality Control Plan.

On March 1, 1999, Reclamation, the State of California, and various other interested parties entered into the San Joaquin River Agreement (the "SJRA"). The SJRA obligated the parties to implement the VAMP program and provide water releases during "Pulse Flow Periods," defined as "[a] period of 31 days during the months of April and May." SJRA art. 3.3, art. 5.1. The SJRA requires fishery releases at varying rates based upon existing flows, subject to modification for hydrologic conditions. Id. art. 5.5. The SJRA also permits any amount of water required for instream uses in excess of that available to be purchased by Reclamation from willing sellers, Id. art. 8.1, and imposes a limitation of export flows at the Tracy Pumping plant based upon the Target Flow released during the pulse flow period. Id. art. 6.4.

On March 15, 2000, the State Water Control Board issued Revised Water Rights Decision 1641, Cal. State Water Res. Control Bd. (Mar. 15, 2000) ("Decision 1641"), which recognized "the San Joaquin River Agreement (SJRA) and approve[d], for a period of twelve years, the conduct of the Vernalis Adaptive Management Plan (VAMP) under the SJRA instead of meeting the objectives in the [Bay-Delta Accord]." Id. at 2.

The California Department of Water Resources and Reclamation published their Biological Assessment: Effects of the Central Valley Project and State Water Project Operations from October 1998 through March 2000 on Steelhead and Spring-run Chinook Salmon in January 1999, which reported on the impact on native salmon and trout populations in the CVP. This was followed on October 5, 1999, by publication of Reclamation's Decision on Implementation of Section 3406(b)(2) of the Central Valley Project Improvement Act (the "Decision on Implementation").

Reclamation's publication of an identically-titled document on May 9, 2003 (the "Revised Decision on Implementation"), superseded the Decision on Implementation. The Revised Decision on Implementation announced that it was "the final agency action and supersedes all previous decisions. This Decision will be effective as of the date adopted and will be implemented in the 2004 Water Year." Revised Decision on Implementation at 1. The Revised Decision on Implementation modified the interpretation of CVPIA § 3406(b)(2)(C), stating that "the amount of (b)(2) water available will be reduced when deliveries to CVP agricultural water service contractors north of the Delta are reduced

year. The sequence of events took place in the following general form: (1) Central and Stockton East would submit schedules in writing to Reclamation; (2) Reclamation would make forecasts for predicted allocations, followed by a formal allocation of available water to the Contracting Parties; (3) Central and Stockton East would submit a delivery schedule to Reclamation that indicated how much water would be required and when it would be required; and (4) Reclamation would deliver water to the Contracting Parties based on their acceptance of the allocated amounts.

1) Initial delivery announcement

Reclamation announced the initial delivery of water on May 5, 1988, via a letter to Stockton East's Board of Directors which stated:

> The purpose of this letter is to announce the initial delivery date for water availability from New Melones Reservoir for purposes of your water service contract . . . . Water has been determined available as of April 6, 1988, and the initial delivery date for water from New Melones for purposes of this contract shall be January 1, 1989.

PX 49 at 07927. This letter also noted that "[i]n accordance with Article 4, [Stockton East] must submit a schedule at least two months prior to the initial delivery of water on November 1, 1988." Id. at 07928.

2) 1988-92

During the period between 1988-92, no water was delivered to the Contracting Parties from the New Melones Reservoir. The Contracting Parties submitted no schedules during this period.

3) 1993

No written schedule was submitted by either Stockton East or Central to Reclamation in 1993. Reid W. Roberts, General Counsel for Central, testified that Edward M. Steffani, General Manager of Stockton East at the time, submitted an oral schedule request for 1993, on behalf of both Central and Stockton East, for a total of 20,000 acre-feet of water, with each district requesting 10,000 acre-feet to be allocated. See Tr. at 165. Central and Stockton East were allocated no water from New Melones for 1993 and a total of 0 acre-feet was delivered to the Contracting Parties in 1993 from the New Melones Reservoir.

Contract. Tr. at 745-46.

In light of the record developed at trial, defendant moved for judgment on partial findings, pursuant to RCFC 52(c), at the close of plaintiffs' case-in-chief. Tr. at 1247, 1251. The court granted, in part, and denied, in part, this motion, holding that the arguments presented by plaintiffs regarding the third-party beneficiary status of the Urban Contractors were insufficient, as a matter of fact and law, and denied defendant's motion as to plaintiffs. Tr. at 1274.

3. Breach of contract

What remains at issue are the various elements of plaintiffs' breach of contract claim. This court denied defendant's motion to dismiss this claim, holding that the relation-back doctrine gave the Court of Federal Claims jurisdiction, stating:

> Based on the transfer order itself, the district court's authority to enter it, and the viability of the claim transferred, the court finds that takings claim was transferred, upon which the later-pleaded breach of contract was based. Because the contract claim relates back to the filing date of the 1993 Complaint, and because it appears on the face of the complaint that the date of accrual for the breach of contract claim occurred within six years before the filing date, no statutory bar prevents consideration of this claim.

Stockton E. Water Dist. v. United States, 62 Fed. Cl. at 392 (footnotes omitted). 5/

The parties join issue on a variety of arguments as to whether Reclamation breached its contract for failing to deliver water according to the terms of the 1983 Contracts. First, plaintiffs dispute the interpretation of various articles of the 1983 Contracts, including (1) whether the protection of Article 9(a) applies to any reductions due to future amendments to federal Reclamation law; (2) the interpretation of Article 3(h) and its invocation relating to the IPO; and (3) the nature of opinions and determinations required by Articles 9(a) and 12(d) of the 1983 Contracts. Second, plaintiffs contend that Reclamation violated its obligations under Article 4 and the Build-Up Schedule provisions

---

5/ See Stockton E. Water Dist. v. United States, 62 Fed. Cl. at 390-93, for additional discussion regarding the application of the relation-back doctrine to plaintiffs' claim for breach of contract.

The Build-Up Schedule contained in Article 3 of the 1983 Contracts provides for a minimum annual supply that specifies that agricultural ("Ag") water needs and M&I water needs are to be addressed. Article 3(b) of the Stockton East contract reads:

> Subject to the terms and conditions herein stated, the United States shall make available annually to the Contractor a maximum of 75,000 acre-feet of interim water: Provided, That this quantity may be increased pursuant to subdivisions (f) and (g) of [Article 3]: Provided further, That if the total water quantity is reduced pursuant to subdivision (a) of [Article 3], the maximum and minimum quantities of specified in subdivisions (c) and (d) shall be adjusted proportionately to such reduction or otherwise adjusted in a manner mutually agreed to by the Contracting Officer and the Contractor . . . .

Stockton East Contract art. 3(b); see also Central Contract art. 3(b) (providing similar terms for differing quantities of water). The Stockton East Contract Article 3(c) states that "[Reclamation] shall make available and [Stockton East] shall pay for, as a minimum, such quantities of agricultural water as specified." Stockton East Contract art. 3(c). The Central Contract contains an identical provision. Central Contract art. 3(c). Article 3(d) of the Stockton East Contract mirrors this requirement as related to M&I water supply. Stockton East Contract art. 3(d); see also Central Contract art. 3(d) (including similar language).

Article 3(b) places a limitation on these provisions, as it states, "[I]f the total water supply is reduced pursuant to [Article 3(a)], the maximum and minimum quantities specified in [Article 3(c) and (d)] shall be adjusted proportionately to such reduction or otherwise adjusted in a manner mutually agreed to." Stockton East Contract art. 3(b); Central Contract art. 3(b). Yet, this court was not made aware of any notification that conformed to the requirements of Article 3(a), which required notice to be provided in writing at least one year in advance of any reduction.

The Build-Up Schedule created an annual minimum purchase and supply schedule as detailed in the following chart:

| Year | Build-Up Stockton East | Build-Up Central |
|---|---|---|
| 1993 | 500 | 0 |
| 1994 | 23,350 | 28,000 |
| 1995 | 23,450 | 28,000 |
| 1996 | 25,550 | 28,000 |
| 1997 | 46,400 | 56,000 |

| | | |
|---|---|---|
| 1998 | 46,500 | 56,000 |
| 1999 | 46,700 | 56,000 |
| 2000 | 47,400 | 56,000 |
| 2001 | 48,100 | 56,000 |
| 2002 | 48,800 | 56,000 |
| 2003 | 49,500 | 56,000 |
| 2004 | 50,200 | 56,000 |

See Stockton East Contract art. 3, 5; see also Central Contract art. 3, 5; PX 36; PX 37.

These amounts, however, are subject to two conditions. First, for any year in which Central or Stockton East schedules a quantity greater than the minimum amount for the following year, the increased quantity substitutes for the minimum amount until the schedule amount exceeds the increased quantity. Stockton East Contract art. 3(c)(2); Central Contract art. 3(c)(2). Second, Reclamation is obligated to supply only the amount of water actually scheduled in 1999 for delivery as a minimum amount beginning in 2000 and going forward, and the amount scheduled in 1999 would also constitute the contract maximum, as well. Stockton East Contract art. 3(c)(3); Central Contract art. 3(c)(3).

Article 3(j) of the 1983 Contracts provides: "If in any year after the Contracting Officer has approved a schedule or any revision thereof submitted by the Contractor, the United States is unable to furnish any of the water . . . the Contractor shall be entitled to an adjustment as provided in Article 6." Stockton East Contract art. 3(j); Central Contract art. 3(I). Article 6 provides for a method of issuing credit for overpayments by the Contracting Parties for any reduced water supply, noting that "[s]uch adjustment shall constitute the sole remedy of the Contractor." Stockton East Contract art. 6; Central Contract art. 6. This court ruled in the Summary Judgment Opinion that "[a]s a matter of law, the court interprets this provision to specify only the remedy in the case of overpayment; it is not intended to be the exclusive remedy for all breaches." Summ. J. Op. at 531-32. Therefore, for the purposes of this analysis, Article 6 relates only to overpayment – not to plaintiffs' claim relating to any failure to provide water in the requested or contractually negotiated amounts.

Based upon the language of the 1983 Contracts, Reclamation's failure to provide the minimum amount of water listed in the Build-Up Schedule violates the requirements of Article 3. Nonetheless, this does not equate to a finding of liability on the part of

Reclamation's decision-making process was made available to the Contracting Parties in years during which they received water allocation reductions. Such information, if made available to the Secretary, is sufficient to base a review of the water reduction decisions made by Reclamation.

After examining the language of Article 12(d), its relation to complementary contract provisions, and extrinsic evidence regarding its function relative to water supply reductions, this court rules that the interpretation of Article 12(d) presented by plaintiffs is not reasonable under the circumstances, particularly in light of the processes detailed above regarding allocation forecasting. When read in context with Article 9(a), Article 12(d) does not require a water reduction decision or opinion to be based on a formal invocation or an invocation in writing of a critically dry year, but, rather, on a factual basis for the decision sufficient to provide review by the Secretary of Interior.

2. Alleged violations of contract provisions

Taking into account the interpretation of the various terms of the 1983 Contracts that were in dispute, plaintiffs assert that Reclamation breached the 1983 Contracts based on three actions. First, Reclamation did not provide water pursuant to its schedule allocation obligations under Article 4. Second, Reclamation violated the terms of the Build-Up Schedule in Articles 3 and 5 of the 1983 Contracts by failing to meet minimum requirements for allocations of water. Finally, Reclamation violated Article 9(a) by making unreasonable operational decisions that evidenced a failure to "use all reasonable means to guard against a condition of shortage" to the Contracting Parties. See Stockton East Contract art 9(a); Central Contract art. 9(a).

i. Schedules and water allocations

In addition to their commitment to make payments for water allocations, the 1983 Contracts obligated the Contracting Parties to submit schedules prior to the delivery of water on an annual basis. Article 4(a) states:

> For each year the Contractor will submit a schedule, . . . indicating the amounts of agricultural and M&I water required monthly. The first schedule shall be submitted 2 months prior to the initial delivery of water. Thereafter, annual schedules indicating monthly water requirements for the subsequent years shall be submitted not later than November 1 of each year or at such other times as determined by the Contracting Officer to assure coordination of Project operations. The United States shall attempt to delivery water in accordance with said schedules, or any revisions thereof . . . .