# In the United States Court of Federal Claims

No. 04-541L

(Filed May 18, 2007)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | * |
| | * |
| **STOCKTON EAST WATER DISTRICT, CENTRAL SAN JOAQUIN WATER DISTRICT, COUNTY OF SAN JOAQUIN, CITY OF STOCKTON, and CALIFORNIA WATER SERVICE COMPANY,** | * Pleading and practice; motion for reconsideration; RCFC 59(a); contracts; breach of contract; summary judgment; takings; Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, 106 Stat. 4600 (1992); RCFC 52(c) judgment on partial findings; third-party beneficiary status; sovereign acts doctrine and unmistakability doctrine; contract interpretation – plain meaning and ambiguity; substantial performance of contract; adverse inferences to be drawn from non-testifying witnesses; viability of takings claim after full prosecution of contract claims. |
| Plaintiffs, | * |
| v. | * |
| **THE UNITED STATES,** | * |
| Defendant. | * |
| * * * * * * * * * * * * * * * * * * * | * |

Roger J. Marzulla, Washington, DC, for plaintiffs. Nancie G. Marzulla, Marzulla & Marzulla, Washington, DC, of counsel. Reid W. Roberts, Stockton, CA, for plaintiff Central San Joaquin Water District; Jeanne M. Zolezzi and Jennifer L. Spaletta, Herum Crabtree Brown, Stockton, CA, for plaintiff Stockton East Water District.

William J. Shapiro, Sacramento, CA, with whom was Acting Assistant Attorney General Matthew J. McKeown, Kristine S. Tardiff, and Luther Hajek, Washington, DC, for defendant. Shelly Randel, Office of the Solicitor, Branch of Water and Power, Department of the Interior, Washington, DC, and James E. Turner, Assistant Regional Solicitor, Department of the Interior, Pacific Southwest Region, Department of the Interior, Sacramento, CA, of counsel.

John D. Echeverria, Georgetown Environmental Law & Policy Institute, Washington, DC, and Hamilton Candee, for amicus curiae Natural Resources Defense Council, San Francisco, CA. Clifford T. Lee and Tara L. Mueller, for amicus curiae California State Water Resources Control Board.

## ORDER ON MOTION FOR RECONSIDERATION

**MILLER**, Judge.

On February 20, 2007, an opinion issued finding and concluding that plaintiffs failed to prove their case by a preponderance of the evidence and entering judgment for defendant. See Stockton E. Water Dist. v. United States, 75 Fed. Cl. 321 (2007). Plaintiffs' Motion for Reconsideration was filed on March 7, 2007. Defendant filed its opposition on March 27, 2007, and plaintiffs replied on April 6, 2007. On April 9, 2007, plaintiffs submitted notice of Carabetta Enterprises, Inc. v. United States, 482 F.3d 1360 (Fed. Cir. 2007). Supplemental briefing regarding the applicability of Carabetta Enterprises was concluded on April 27, 2007.

## FACTS

The pertinent facts discussed in the court's prior opinions will not be repeated. See Stockton E. Water Dist., 75 Fed. Cl. 321, as amended, 2007 WL 1344834 (Apr. 27, 2007) (the "2007 Opinion") 1/; Stockton E. Water Dist. v. United States, 70 Fed. Cl. 515 (2006) (the "Summary Judgment Opinion"). Explication of additional facts, necessitated by the parties' contentions, will be incorporated into the discussion.

## DISCUSSION

Plaintiffs assert that four aspects of the 2007 Opinion require reconsideration due to manifest error. First, plaintiffs charge that the court manifestly erred in its interpretation of Article 9(a) of the contracts signed between Stockton East Water District ("Stockton East") and Central San Joaquin Water District ("Central") (collectively, the "1983 Contracts"). Second, manifest error is found in placing the burden of proof upon plaintiffs to prove excused non-performance of the 1983 Contracts. Third, the court improperly inferred from the lack of testimony from uncalled witnesses that the testimony would support defendant's excused non-performance of the 1983 Contracts. Fourth, the court manifestly erred in its year-by-year review of operational evidence during the years 1994, 1995, and 1999-2004. Pls.' Br. filed Mar. 7, 2007, at 18 ("Motion for Reconsideration").

1/ Discussion of the 2007 Opinion includes those portions amended by the order issued on April 27, 2007. Page numbers for citations to the 2007 Opinion refer to the slip opinion.

1. Standard of review

Plaintiffs offered no standard of review regarding their motion for reconsideration, citing to RCFC 59 only in their reply brief, and for the sole purpose of deflating defendant's rejection that the request for reconsideration was untimely. See Pls.' Br. filed Apr. 6, 2007, at 5.

RCFC 59(a)(1) provides:

> A new trial or rehearing or reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States. On a motion under this rule, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Id. "When addressing such a motion, the court is directed 'to consider motions for rehearing [or reconsideration] with exceptional care.'" Seldovia Native Ass'n Inc. v. United States, 36 Fed. Cl. 593, 594 (1996) (quoting Carter v. United States, 207 Ct. Cl. 316, 318 (1975)), aff'd, 144 F.3d 769 (Fed. Cir. 1998). "[M]otions for reconsideration should not be entertained upon 'the sole ground that one side or the other is dissatisfied with the conclusions reached by the court, otherwise the losing party would generally, if not always, try his case a second time, and litigation would be unnecessarily prolonged.'" Id. at 594 (quoting Roche v. District of Columbia, 18 Ct. Cl. 289, 290 (1883)).

A motion for reconsideration is addressed to the court's discretion. See Seldovia Native, 36 Fed. Cl. at 594; see also Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990). "Motions for reconsideration must be supported 'by a showing of extraordinary circumstances which justify relief.'" Caldwell v. United States, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (quoting Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999), aff'd, 250 F.3d 262 (Fed. Cir. 2000) (table)). This showing, under RCFC 59, must be based "upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court." Bishop v. United States, 26 Cl. Ct. 281, 286 (1992) (internal quotation omitted).

To sustain its burden, the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice. See id. at 286; see also Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 376, aff'd, 39 F.3d 1198 (1994)

(table) (quoting Bishop, 26 Cl. Ct. at 285-86). "[A]n argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal." Bluebonnet Sav. Bank, F.S.B. v. United States, 466 F.3d 1349, 1361 (Fed. Cir. 2006); see Lamle v. Mattel, Inc., 394 F.3d 1355, 1359 n.1 (Fed. Cir. 2005).

> "The reargument of cases cannot be permitted upon the sole ground that one side or the other is dissatisfied with the conclusions reached by the court, otherwise the losing party would generally, if not always, try his case a second time, and litigation would be unnecessarily prolonged, with no more satisfactory results, as there would still be a losing party in the end."

White Mountain Apache Tribe v. United States, 9 Cl. Ct. 32, 35 (1985) (quoting Roche, 18 Ct. Cl. at 290).

2. Article 9(a)

Plaintiffs assert "[t]he Court manifestly erred in its interpretation and application of Article 9(a) [of the 1983 Contracts] by failing to determine whether there was a shortage 'beyond [Defendant's] control' each year, or whether Defendant used all reasonable means to avoid the shortage." Motion for Reconsideration at 1 (emphasis omitted). Plaintiffs highlight several instances relating to the court's interpretation of Article 9(a) that, they argue, rise to the level of manifest error.

As defendant notes, plaintiffs' assertions of manifest error regarding Article 9(a) "merely repeat[] the argument they raised prior to trial in their summary judgment pleadings and in their Pre-Trial Memorandum. See, e.g., Pls.' Mem. In Supp. of Summ. J. at 25-29; Pls.' Pre-Trial Mem. at 17-25." Def.'s Br. filed Mar. 27, 2007, at 2. Reargument of issues previously raised is not appropriate for a motion for reconsideration under RCFC 59. See White Mountain, 9 Cl. Ct. at 35. Nevertheless, in order to address plaintiffs' concerns that reconsideration is necessary "to prevent manifest injustice," the court considers all of plaintiffs' arguments.

1) Plain language of Article 9(a)

Plaintiffs argue that the court manifestly erred in its interpretation of Article 9(a), stating that, "[d]espite Defendant's failure to produce any evidence or intent to counter Plaintiffs' evidence, the Court held that [the Bureau of Reclamation ("Reclamation")] would not be liable for shortages made 'necessary' by the [Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, 106 Stat. 4600 (1992) (the "CVPIA")]." Motion for Reconsideration at 5. Plaintiffs contend the holding of the court "directly

conflicts with the only evidence at trial of the parties' intent and the contracts' plain language." Id.

Article 9(a) of the 1983 Contracts provides:

> In its operation of the [Central Valley Project (the "CVP")], the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall accure [sic] against the United States or any of its officers.

PX 36, art. 9(a); PX 37, art. 9(a).

Plaintiffs maintain that the interpretation of Article 9(a) is unsupported by evidence and contradicts its plain language, arguing that "[a]ccording to the plain language of Article 9(a), the United States may only avoid shortages triggered by causes 'beyond its control.'" Motion for Reconsideration at 3. The court resolved this issue at the summary judgment stage, holding, "[t]herefore, the contracting officer's determinations under Article 9(a) can be binding on the parties under the terms of Article 9(a), provided they are not arbitrary, capricious, or unreasonable under the terms of Article 12(d)." Summary Judgment Opinion at 535. Contrary to plaintiffs' contentions, moreover, the plain language of Article 9(a) states that "if shortage does occur . . . because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States . . . ." PX 36, art. 9(a) (emphasis added); PX 37, art. 9(a) (emphasis added). The plain language of Article 9(a) supports the court's interpretation that liability would not accrue when the contracting officer makes a determination that causes are beyond the control of the United States. As defendant observes, "[p]laintiffs' interpretation requires the Court to ignore the explicit language in the Contracts giving the contracting officer the right to make shortage determinations." Def.'s Br. filed Mar. 27, 2007, at 4.

Plaintiffs' contention that the court's holding regarding Article 9(a) is unsupported by the evidence ignores the analysis of the evidence in the 2007 Opinion:

> Nevertheless, the intent of the parties is made evident through examination of (1) the Ninth Circuit's review of the Westlands contract; (2) surrounding contract terms in the 1983 Contracts; and (3) the federal Reclamation laws and their explicit instructions for CVP operations. The court concludes that, after examination of the relevant extrinsic evidence, the intent of the parties

> regarding Article 9(a) encompasses water allocation reductions to the Contracting Parties between 1993 and 2004 that occurred due to implementation of amendments to federal Reclamation law after December 19, 1983. Therefore, Reclamation is not liable for any reduction to the Contracting Parties' water allocations that were made necessary by the CVPIA.

2007 Opinion at 59.

2) Failure to determine cause of shortage

Plaintiffs argue that the court, in concluding that "the CVPIA was not the cause of Reclamation's inability to deliver," Motion for Reconsideration at 5, manifestly erred by not determining whether the shortage was "beyond the control of the United States." PX 36, art. 9(a); PX 37, art. 9(a). Plaintiffs insist that, based upon this conclusion, the court "manifestly erred by failing to take the next logical step: to determine what causes of shortage could relieve the Defendant of liability and whether any existed in this case." Motion for Reconsideration at 5.

Plaintiffs misapply the holding of the 2007 Opinion regarding the CVPIA by selectively citing to portions of it out of context. The language of the 2007 Opinion quoted by plaintiffs addresses impossibility of performance under the sovereign acts doctrine, not interpretation of Article 9(a)'s provisions: "Defendant bears the burden of demonstrating that the CVPIA made performance of the 1983 Contracts impossible, and '[p]erformance is only excused under this doctrine when it is objectively impossible.' Seaboard Lumber, 308 F.3d at 1294 (citing Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. 314 (1978))." 2007 Opinion at 80. More on point, the court concluded only that "Defendant, however, did not meet its burden of proof regarding impossibility of performance due to CVPIA § 3406(b)(2) and . . . would be barred from invoking the sovereign acts and unmistakability doctrines, if liability had been found for breach of the 1983 Contracts." Id. at 81. The court made no conclusion as to the effect of this factual determination upon Article 9(a).

In contrast, regarding the interpretation of Article 9(a), the court concluded that "Reclamation is not liable for any reduction to the Contracting Parties' water allocations that were made necessary by the CVPIA." 2007 Opinion at 59. The language used by the court, "allocations that were made necessary by the CVPIA," is not synonymous with objective impossibility. Application of the court's holding regarding defendant's failure to meet its burden of proof regarding the doctrine of impossibility of performance to the operation of Article 9(a) of the 1983 Contracts mischaracterizes the court's holding and, therefore, is insufficient to rise to the level of manifest error that would merit reconsideration.

3) Record of decision-making process

Plaintiffs contend that the court's failure to make specific findings regarding the decision-making process of shortage determinations was manifest error. Plaintiffs raised this argument previously in their motion to amend or modify, which was addressed in the court's order issued April 27, 2007. See Pls.' Br. filed Mar. 7, 2007, at 8-9; see also Stockton E. Water Dist., 2007 WL 1344834, *11-14 (Fed. Cir. Apr. 27, 2007) (denying motion to amend or modify for alleged factual errors on same issue).

3. Burden of proof

Plaintiffs assert that "[t]he Court . . . manifestly erred by strapping Plaintiffs with the burden to disprove Defendant's affirmative defense." Motion for Reconsideration at 2. The failure to analyze whether Reclamation used "all reasonable means to guard against shortage," as provided under Article 9(a), draws plaintiffs' fire. PX 36, art. 9(a); PX 37, art. 9(a). Plaintiffs argue that "[t]he Court erred in holding Plaintiffs had the burden to prove Reclamation's selected mode of operation was unreasonable instead of holding that Defendant had the burden to prove it utilized **all** reasonable means of operation to avoid a shortage." Motion for Reconsideration at 6. Plaintiffs rely on several cases to support the legal conclusion that "[w]hatever the meaning of Article 9(a), it constitutes an affirmative defense on which the non-performing party, Defendant, has the burden of proof." Id. at 8.

Plaintiffs cite United States v. Brooks-Callaway Co., 318 U.S. 120 (1943), as support for the proposition that "[w]hen the non-performing party seeks to rely on a 'beyond its control' excuse enumerated in a contract, it must also prove it took all reasonable action to perform the contract notwithstanding the occurrence of the excuse." Motion for Reconsideration at 9. Defendant counters that Brooks-Callaway is distinguishable because it involved a contractual clause that permitted assessment of liquidated damages except for those "due to unforeseeable causes beyond the control and without the fault or negligence of the contractor." 318 U.S. at 121 n.1 (quoting Article 9 of the Standard Form of Government Construction Contract). The Supreme Court of the United States explained:

> The purpose of the proviso to protect the contractor against the unexpected, and its grammatical sense both militate against holding that the listed events are always to be regarded as unforeseeable, no matter what the attendant circumstances are. Rather, the adjective 'unforeseeable' must modify each event set out in the 'including' phrase.

Id. at 122-23. The Supreme Court held that, "[w]hether high water or flood, the sense of the proviso requires it to be unforeseeable before remission of liquidated damages for delay is

warranted," and reversed and remanded "with instructions to determine whether respondent is concluded by the findings of the contracting officer, and, if not, for a finding by the court whether the 183 days of high water or any part of that time were in fact foreseeable." Id. at 124, 125. In contrast, Article 9(a) of the 1983 Contracts includes no requirement of foreseeability -- only a requirement that the cause of shortage be beyond the control of the United States in the opinion of the Contracting Officer, a factor which proved to be instrumental to the Supreme Court's holding.

Plaintiffs place principal reliance upon the United States Court of Claims' decision in Jennie-O Foods, Inc. v. United States, 580 F.2d 400 (Ct. Cl. 1978). In Jennie-O Foods a series of supply contracts was executed between Jennie-O Foods, Inc. ("Jennie-O") and the United States Department of Agriculture ("USDA") regarding delivery of turkeys, "designed in part to remove surplus turkeys from the market and in part to supply food to schools, hospitals and similar public institutions." 580 F.2d at 403. Jennie-O was unable to make timely deliveries; liquidated damages were accessed pursuant to a provision for late delivery, which provided, in relevant part, "'Contractor shall not be liable to USDA for damages sustained by reason of delay . . . if the failure to perform arises out of causes beyond the control and without the fault or negligence of Contractor.'" Id. at 404 (quoting Article 38(c) of the Consumer and Marketing Service Purchase Document No. 1, Revision No. 1 of August 1969 (the "Jennie-O Contract")). The contract's express terms defined the term "causes," and included the requirements that "'in every case the failure to perform must be beyond the control and without the fault or negligence of the party to the contract seeking excuse from liability'" and that "'[d]eterminations as to whether causes for delay are beyond the control . . . shall be made by the contracting officer.'" Id. at 404, 407 (quoting Articles 3(c), 37(a)).

The Jennie-O Contract's express terms, while similar to those at issue in the 1983 Contracts, display significant differences. Most relevant, the terms of the Jennie-O Contract require that "in every case the failure to perform must be beyond the control . . . of the party to the contract seeking excuse from liability," Jennie-O Foods, 580 F.2d at 404, while the 1983 Contracts only require that delays, "in the opinion of the Contracting Officer, are beyond the control of the United States," PX 36, art. 9(a); PX 37, art. 9(a). No provision that parallels Article 12(d) of the 1983 Contracts was involved in Jennie-O Foods. See 2007 Opinion at 57-61 (discussing interpretation of Article 9(a) when read in context of Article 12(d) of the 1983 Contracts). Plaintiffs pressed the point of interpretation of the contract as a whole in their pre-trial memorandum:

> A contract must be "interpreted so as to harmonize and give meaning to all of its provisions, and [thus] an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of its [sic]

> useless, in explicable [sic], inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical results." Arizona v. United States, 216 Ct. Cl. 221, 236 (1978). Similarly, in California, where these contract [sic] were written, the rules of construction requires [sic] that "[i]n the construction of a statute or an instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, *or to omit what has been inserted: and if there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all*.["] Cal. Code Civ. Proc. §1858 (emphasis added).

Pls.' Br. filed Sept. 25, 2006, at 22.

In Jennie-O Foods the claim involved an appeal of the decision of a board of contract appeals that no cause beyond the control of Jennie-O had been demonstrated. Defendant states that "[t]he Court of Claims gave great deference to the contracting officer's decision, refusing to overturn the decision without evidence from Jennie-O showing that the decision was incorrect." Def.'s Br. filed Mar. 27, 2007, at 12. Defendant cites to numerous cases in support of the deference that courts have given to agency determinations and the decisions of a contracting officer. In United States v. Gleason, 175 U.S. 588 (1900), the Supreme Court interpreted a contractual provision which related to the timing of performance. The contract provided that delays by the contractor that

> in the judgment of the engineer in charge, fail to prosecute faithfully and diligently the work in accordance with the specifications and requirements of this contract, then in either case the party of the first part, or his successor legally appointed, shall have power, with the sanction of the Chief of Engineers, to annul this contract by giving notice in writing . . . ; provided, however, that if the party or parties of the second part shall, by freshets, ice, or other force or violence of the elements, and by no fault of his or their own, be prevented either from commencing or completing the work or delivering the materials at the time agreed upon in this contract, such additional time may in writing be allowed him or them for such commencement or completion as, in the judgment of the party of the first part or his successor, shall be just and reasonable; but such allowance and extension shall in no manner affect the rights or obligations of the parties under this contract, but the same shall subsist, take effect, and be enforceable precisely as if the new date for such commencement or completion had been the date originally herein agreed upon.

Id. at 590-91 (internal quotations omitted). The Court noted that a "well-settled rule[] in this branch of law" establishes:

> [I]t is competent for parties to a contract, of the nature of the present one, to make it a term of the contract that the decision of an engineer, or other officer, of all or specified matters of dispute that may arise during the execution of the work, shall be final and conclusive, and that, in the absence of fraud or of mistake so gross as to necessarily imply bad faith, such decision will not be subjected to the revisory power of the courts.

Id. at 602 (citing Martinsburg & P. R. Co. v. March, 114 U.S. 549 (1885); Chicago S.F. & C.R. Co. v. Price, 138 U.S. 185 (1891)). The court construed the language of the contract provision, as follows:

> [W]e interpret it to mean that, as between the United States and the contractors, the latter were to be relieved from their contract obligation to complete the work within the time limited, only if, in the judgment of the engineer in charge, their failure so to do was occasioned by freshets or other force of the elements, and by no fault of their own; and that, if and when, in his judgment, the failure to complete was, in point of fact, due to the extraneous causes, he was also to decide what additional time should be just and reasonable. In other words, the parties agreed that if the contractors should fail to complete their contract within the time stipulated, they should have the benefit of the judgment of the engineer as to whether such failure was the result of their own fault or of forces beyond their control, and, in the latter event, of his judgment as to what extension of time would be just and reasonable.

Id. at 604. Reversing the decision of the Court of Claims, the Court held:

> The fallacy, as we think, in the position of the court below, was in assuming that it was competent to go back of the judgment of the engineer, and to revise his action by the views of the court. This, we have seen, could only be done upon allegation and proof of bad faith, or of mistake or negligence so great, so gross, as to justify an inference of bad faith.

Id. at 607.

The language of the contract provision in Gleason bears many similarities to Article 9(a) of the 1983 Contracts. Moreover, defendant cites to additional authority that supports

regarding the decision of the contracting officer as conclusive. See United States v. Mason & Hanger Co., 260 U.S. 323, 326 (1922) (holding that, in interpreting a contract provision permitting approval and ratification of expenditures by contracting officer, "[w]e have decided that the parties to the contract can so provide and that the decision of the officer is conclusive upon the parties"). As in Gleason, Article 9(a) provides that a determination based on the opinion of a person in the employ of the contracting party is determinative as to non-performance of the obligations required by the contract. The language of the contract provision in Gleason is more relevant to the discussion of the burden of proof required by plaintiffs under Article 9(a), compared to the factually distinguishable cases relied upon by plaintiffs. Plaintiffs do not make a showing of manifest error requiring reconsideration of the decision of the court to read the contract terms in their entirety and to place the burden of proof upon plaintiffs to demonstrate an unreasonable, arbitrary or capricious determination by the contracting officer regarding water shortages.

4. Inferences from non-testifying witnesses

Plaintiffs assert that "the Court manifestly erred when it improperly applied evidentiary inferences against Plaintiff related to Defendant's failure to call any operational witnesses, instead inferring in the Defendant's favor." Motion for Reconsideration at 2. Plaintiffs disagree with the 2007 Opinion insofar as it did not apply the adverse inference principle, finding that "plaintiffs had ample opportunity to call Reclamation employees included on their witness list who could have supplied the operational evidence to complement Mr. Dotan's expert testimony." 2007 Opinion at 73. Plaintiffs argue that the witnesses cited by the court as appearing on their witness list were "potential rebuttal witness[es] . . . [and] these Reclamation employees were not legally *available* to the Plaintiffs." Motion for Reconsideration at 16.

Plaintiffs cite to Day & Zimmermann Services v. United States, 38 Fed. Cl. 591 (1997), which described an adverse inference as a "'well settled principle of evidence [which provides] that, where a party fails to call a witness available to him and who has knowledge of material facts, the court may draw the inference that the testimony of the witness concerning those facts would have been unfavorable to the party.'" Id. at 603 (quoting Barnett v. United States, 6 Cl. Ct. 631, 671 (1984)). Notably, by use of the word "may," the adverse inference was defined as a principle that is applied in the court's discretion. Plaintiffs also cite to Chicago College of Osteopathic Medicine v. George A. Fuller Co., 719 F.2d 1335 (7th Cir. 1983), for the proposition that "the employee/employer relationship equates to control and availability." Motion for Reconsideration at 16; see Chi. Coll., 719 F.2d at 1353 ("'[W]here an employee who could give important testimony relative to issues in litigation is not present and his absence is unaccounted for by his employer, who is a party to the action, the presumption arises that the testimony of such employee would be

unfavorable to his employer.'" (quoting Ellerman v. Skelly Oil Co., 227 Minn. 65, 70 (1948)). Kean v. Comm'r., 469 F.2d 1183 (9th Cir. 1972), is also called upon for the proposition that "availability depends upon all the facts and circumstances bearing upon the witness's relation to the parties and not merely upon his physical presence at trial or accessibility for service of a subpoena. The potential witness must be equally available both legally and practically." Id. at 1188 (citations omitted).

Based on the employer/employee relationship present between the witnesses associated with Reclamation, plaintiffs argue that "[t]he Court simply erred in finding that 'no essential witness that was not called was within the control of defendant.'" Motion for Reconsideration at 16. According to plaintiffs, employee witnesses listed by defendant, including Peggy Manza, Chester Bowling, and others, were unavailable to them based on the witnesses' financial bias, so that the failure to apply the adverse witness inference against defendant constituted error.

The cases standing for the proposition that the existence of an employer/employee relationship between a potential witness and a party can be equated to non-availability to an opposing party bear factual distinctions that are material to their applicability to this case. In Chicago College the United States Court of Appeals for the Seventh Circuit affirmed the denial of the application of the adverse witness inference against defendants when "[t]he district court considered it unfair for a plaintiff to list a witness he plans to call, then decide not to call the witness." 719 F.2d at 1353 n.30. In addition, the appellate court approved the trial court's conditioning the application of the adverse inference on the establishment of unavailability prior to invocation of adverse inference, stating,

> [B]efore a party can properly argue to the jury the possibility of drawing such an inference from the absence of a witness, the party must establish that the missing witness was peculiarly within the adversary's power to produce by showing either that the witness is physically available only to the opponent or that the witness has the type of relationship with the opposing party that pragmatically renders his testimony unavailable to the opposing party.

Id. at 1353. Because plaintiffs in the case at bar did not establish unavailability prior to any attempt to invoke the adverse witness rule, an attempt to do so for the first time in connection with a motion for reconsideration is inappropriate. See Bluebonnet Sav. Bank, 466 F.3d at 1361; see also Tr. at 2019 (discussing plaintiffs' criticism of defendant's failure to call witnesses, but not including a request by plaintiffs to invoke adverse inferences); Tr. at 2167 (declining to draw adverse inference because both parties listed witnesses).

In addition, Kean explicitly states that a determination of availability requires consideration of "all the facts and circumstances bearing upon the witness's relation to the parties and not merely upon his physical presence at trial or accessibility for service of a subpoena." 469 F.2d at 1188. Defendant cites to the opinion of the United States Court of Appeals for the Fifth Circuit in Herbert v. Wal-Mart Stores, Inc., 911 F.2d 1044 (5th Cir. 1990), limiting "the uncalled-witness rule [as having] no place in federal trials conducted under the Federal Rules of Evidence and the Federal Rules of Civil Procedure." Id. at 1047. While the Fifth Circuit "d[id] not undertake to overrule the cases that rely on the rule," id. at 1049, the rationale for the Fifth Circuit's statement is particularly instructive:

> It is not difficult to demonstrate how the evidentiary scheme created by the Federal Rules of Evidence, as complemented by the Federal Rules of Civil Procedure, renders the uncalled-witness rule an anachronism. A litigant may use modern discovery procedures to ascertain the identity and proposed testimony of witnesses identified with her opponent. If the district court finds that a party is concealing the identity and location of persons with knowledge of discoverable matter, the court may impose an appropriate penalty. If a litigant wishes to call a hostile witness but the witness is unwilling to testify, the litigant may resort to compulsory process. When the litigant has the hostile witness on the stand, she may use leading questions to interrogate the witness, and if necessary impeach the witness under Rule 607 by any of the standard means, including use of the witness's prior inconsistent statements.

Id. at 1048 (internal citations omitted). Consideration of "all the facts and circumstances bearing upon the witness's relation to the parties" includes consideration of the availability of witnesses to plaintiffs under the Federal Rules of Evidence. Kean, 469 F.2d at 1188.

Plaintiffs called and examined Lowell F. Ploss, Operations Manager of the Central Valley Operations Office, Mid-Pacific Region, who oversaw operations of the Central Valley Project from 1993 to 2000, as a hostile witness under FRE 611. Tr. at 945 (Counsel for plaintiffs: "Your Honor, we are going to be invoking Rule 61[1], to use Mr. Ploss as an adverse witness."). Mr. Ploss testified that he was employed by Reclamation:

> Q [Plaintiff]. Have you also been employed by Reclamation?
>
> A. I'm currently employed by the Bureau of Reclamation for this case.
>
> Q. In what capacity?
>
> A. As a factual witness.

Q. Are they paying you for your testimony as a factual witness?

A. Yes.

Tr. at 948 (testimony of Mr. Ploss).

Mr. Ploss was identified as an adverse witness in plaintiffs' witness list using language almost identical to the other witnesses discussed in the 2007 Opinion. See 2007 Opinion at 72-73; compare Plaintiffs' Trial Witness List, filed Sept. 25, 2006, at 5-6 ("Mr. Ploss is identified as an adverse witness. Mr. Ploss will testify to Operations of New Melones Reservoir and the Operations of the Central Valley Project, and such other matters as are covered in his depositions and declarations.") with id. at 1-2 ("[Chester] Bowling is identified as an adverse witness. Mr. Bowling will testify to Operations of New Melones Reservoir and the Operations of the Central Valley Project, and such other matters as are covered in his depositions and declarations."); id. at 5 ("[Peggy] Manza is identified as an adverse witness. Ms. Manza will testify to Operations of New Melones Reservoir and the Operations of the Central Valley Project, and such other matters as are covered in her depositions and declarations."); id. at 3 ("[Paul] Fujitani is identified as an adverse witness. Mr. Fujitani will testify to Operations of New Melones Reservoir and the Operations of the Central Valley Project, and such other matters as are covered in his depositions and declarations."). Plaintiffs' examination of Mr. Ploss as an adverse witness demonstrates that plaintiffs had the opportunity to examine the other witnesses listed on their witness list in a similar manner and undermines plaintiffs' assertion of unavailability. Plaintiffs do not show that the court's exercise of its discretion that an adverse inference was not warranted in the circumstances constituted manifest error.

Plaintiffs assert that "[t]he Court's obvious error, and resulting injustice, is best illustrated in the Court's treatment of" the testimony of Avry Dotan, plaintiffs' expert regarding hydrology of the Stanislaus River and modeling for the New Melones Reservoir. Motion for Reconsideration at 17. Plaintiffs contend that characterization of Mr. Dotan's testimony as "speculative," 2007 Opinion at 71, amounted to "an adverse inference against Plaintiffs, and a positive inference in Defendant's favor." Motion for Reconsideration at 18. The basis for this argument is plaintiffs' position that they "were not privy to Reclamation's decision-making process, nor were they provided with the details necessary to understand it at the time the decisions were made or during trial." Id. at 17.

The adverse inference principle is applicable in circumstances where there is a failure to call a witness unavailable to the opposing party, not in circumstances such as those

highlighted by plaintiffs regarding Mr. Dotan's testimony. Plaintiffs pressed this argument during trial:

> The Government has, in short, presented not one iota of evidence that the operations that are set forth in Mr. Dotan's report and in the schematics that he's provided, was anything other than both possible, but also prudent and reasonable.
>
> And, therefore, we think that the Court can simply decide this case strictly on the basis of Mr. Dotan's determination.

Tr. at 2019-20 (closing argument for plaintiffs). The court considered carefully and rejected plaintiffs' argument in the 2007 Opinion. See 2007 Opinion at 69-71. A motion for reconsideration cannot be used to reargue the point.

Plaintiffs rely heavily on their characterization of defendant's burden of proof. See Motion for Reconsideration at 17-18 ("What the Court did instead was to *presume* Reclamation had valid operational reasons to short Plaintiffs even though Defendant produced no such evidence at trial."). As discussed above, reconsideration of the court's determination of the burden of proof is not appropriate. The burden of proof to demonstrate an arbitrary or capricious decision by Reclamation or a failure to use all reasonable means to avoid shortage under Article 9(a) properly is placed upon plaintiffs. The court's findings regarding the speculative nature of Mr. Dotan's testimony were based upon plaintiffs' inability to meet their burden of proof. The court relied on the totality of evidence presented, including Mr. Dotan's own admissions regarding his failure to consider the effect of operational decision-making on the allocation of water:

> While Mr. Dotan's report enables a greater understanding of the potential for delivery of full contract amounts of water to the Contracting Parties in hindsight, the lack of real-time consideration of operational factors renders his opinion speculative. Mr. Dotan's simulation admittedly is limited to computation of physical possibility, not operational decision-making. See Tr. at 939 ("I did not express any opinion about how the reservoir should have been operated."). Violation of Article 9(a) requires a demonstration by the Contracting Parties that Reclamation failed to take "all reasonable means" to avoid shortage, not all means. Mr. Dotan stated that "what the model does, it takes the full allocation and distributes that over 365 days in the year. So when it moves one time step, one day, . . . there is a certain amount of water that is being diverted over and above what historically occurred." Tr. at 857. What Mr. Dotan does not take into account, then, is the possibility that operational

> decisions and the schedule requests may have required allocation of more or less water during certain periods of the year, not an equitable distribution over the entire water year, or even a particular distribution at any given time of the year. Mr. Dotan also conceded that "this model is not taking into consideration permits," Tr. at 909, and that he "did not try in [the] analysis to validate whether all the parties below Goodwin or below -- in the system as a whole -- received their entitlement based on permits and agreements." Tr. at 911. He stated that "I'm not putting myself in the driver's seat and making decisions how to manage the system." Tr. at 913.

2007 Opinion at 71.

5. Year-by-year review of operational evidence

Plaintiffs charge that, "[b]ased on the evidentiary record from trial, defendant did not prove it operated New Melones reasonably, that it used all reasonable means to avoid a shortage, or that the alleged shortage in any particular year was due to causes 'beyond its control.'" Motion for Reconsideration at 2. This argument is grounded upon plaintiffs' characterization of the invocation of Article 9(a) as an affirmative defense, which would place the burden of proof upon defendant. As noted above, interpretation of Article 9(a), in context with the other provisions of the 1983 Contracts, places the burden of proof upon plaintiffs, rather than defendant, to demonstrate a breach of the 1983 Contracts as a whole. Plaintiffs' attempt to re-characterize the evidence presented at trial as requiring a review of annual releases does not rise to the level of error requiring reconsideration.

6. The sovereign acts doctrine and impossibility of performance

Defendant wants to pretermit the analysis of evidence adduced at trial by utilizing the sovereign acts doctrine to bar plaintiffs' claims:

> Defendant respectfully notes that the Court's discussion appears to have erroneously conflated the sovereign acts doctrine with the common-law defense of impossibility of performance. In so doing, the Court's discussion applies the wrong legal standard in assessing the applicability of the sovereign acts doctrine in this case. [2007 Opinion] at 79-80. Defendant notes that the relationship between the sovereign acts doctrine and the common-law impossibility defense was recently dissected in Klamath Irrigation District v. United States, No. 01-591, 2007 WL 853018 (Fed. Cl. March 16, 2007) (Allegra, J.), a decision that post-dates this Court's Decision. In Klamath, Judge Allegra determined that the sovereign acts doctrine should not be

> viewed as a precondition to a common-law impossibility defense, nor should it be viewed as simply an element of a common law impossibility defense. Defendant submits that the analysis set forth in Klamath is correct and, if applied here, establishes that the sovereign acts doctrine provides an alternative ground for entering judgment in Defendant's favor.

Def.'s Br. filed Mar. 27, 2007, at 11 n.4. 2/

Plaintiffs rejoin that Klamath is distinguishable factually. The court in Klamath found that the Endangered Species Act, 16 U.S.C. § 1536 (2000) (the "ESA"), required the allocation of water for environmental purposes. See Klamath, 75 Fed. Cl. at 687 ("Hence, most of the plaintiffs before the court are, in one fashion or another, bound by the prior judicial rejections of their claims and are prohibited from relitigating whether the Bureau was bound by the ESA to reduce water deliveries in 2001."). In contrast, the CVPIA mandated a release of water throughout the CVP, but did not specify the exact manner in which it was to be implemented within each individual reservoir. See Cent. Delta Water Agency v. Bureau of Reclamation, 452 F.3d 1021, 1023 (9th Cir. 2006) ("While nothing in the Act requires that the Bureau use New Melones water for its § 3406(b)(2) releases, the Bureau exercised its discretion to use that water." (citing Cent. Delta Water Agency v. United States, 306 F.3d 938, 945 (9th Cir. 2002)). The Klamath opinion postulates that "at least where the law does not imbue an agency with substantial discretion, the focus should remain fixed on what the law demands, not how it is applied." 75 Fed. Cl. at 690 n.18. Klamath further reasoned that "[i]f, as concluded above, the statute left the agency with little alternative but to deny water, it makes little sense legally to focus on the individual application of the law, rather than its passage, in applying the sovereign acts doctrine." Id. at 690. As made clear

---

2/ Plaintiffs object as untimely defendant's reliance on the sovereign acts doctrine as an alternative ground for ruling in favor of the United States, having been raised more than ten days after the issuance of the 2007 Opinion. Plaintiffs characterize defendant's tactic as a motion for reconsideration which should have been timely filed by March 7, 2007, and note that, pursuant to RCFC 6(b), the court lacks discretion to extend the time limitation regarding a motion for reconsideration. See Pls.' Br. filed Apr. 6, 2007, at 6. Defendant had asserted the sovereign acts doctrine in its cross-motion for summary judgment, see Def.'s Br. filed Oct. 26, 2005, and raised it again in response to plaintiffs' motion. This argument properly was presented as a ground to uphold the judgment for defendant and not as a new ground for relief. See Nautilus Group, Inc. v. Icon Health & Fitness, Inc., 437 F.3d 1376, 1377-78 (Fed. Cir. 2006) (holding appellee can present "'all arguments supported by the record and advanced in the trial court in support of the judgment'") (quoting Bailey v. Dart Container Corp., 292 F.3d 1360, 1362 (Fed. Cir. 2002)).

by the Ninth Circuit's holding in Central Delta Water Agency, 452 F.3d at 1023, this conclusion is inapposite to the CVPIA, which granted Reclamation discretion in implementation of its terms, contrary to the ESA, the statute involved in Klamath.

Nevertheless, while distinguishable factually, the Klamath opinion addresses the issue of the application of the common law defense of impossibility to an invocation of the sovereign acts doctrine. See Klamath, 70 Fed. Cl. at 691 ("Lastly, plaintiffs asseverate that, even if applicable, the sovereign acts defense does not necessarily excuse defendant's nonperformance here, as defendant has not shown that it meets the common law test for impossibility of performance."). The Klamath opinion states:

> While the plurality opinion [in United States v. Winstar, 518 U.S. 839 (1996),] should be given considerable weight (and, indeed, in other respects, has been followed in this and many other opinions), there are many reasons why its treatment of the sovereign acts doctrine as being linked to the common law impossibility defense should not be viewed as the law-certainly, not in this circuit, where the sovereign acts doctrine first emerged.

75 Fed. Cl. at 692. The Klamath opinion also concludes:

> Treating the sovereign act doctrine as a prelude to a common law impossibility defense, indeed, clashes with the underlying rationale of that doctrine and of the unmistakability doctrine, as well.
>
> . . . .
>
> Viewed in this fashion, the sovereign act and unmistakability doctrines intertwine to create a "double helix" of contract interpretation applicable only to sovereign entities, see Cuyahoga, 57 Fed. Cl. at 776, no strand of which depends upon-or should depend upon-the existence of parameters uniquely related to a private common law defense, *to wit*, the common law version of the impossibility defense.

Id. at 693-94.

Following issuance of the Klamath opinion, the Federal Circuit confirmed the applicability of the doctrine of impossibility in Carabetta Enterprises, Inc. v. United States, 482 F.3d 1360 (Fed. Cir. 2007):

> Accordingly, the sovereign acts doctrine exempts the "[g]overnment as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered performance impossible." Winstar, 518 U.S. at 904, 116 S. Ct. 2432. Yet even if the sovereign acts doctrine applies, "it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach." Id.

Id. at 1365. The Federal Circuit continued to apply the doctrine of partial impossibility to the United States' invocation of the sovereign acts doctrine defense, concluding that "[a]ccordingly, even if the Appropriations Act was a sovereign act, HUD was still obligated to fulfill its obligations under the Repayment Agreement through the substitute performance of providing direct loans to Carabetta's qualifying schedule D properties to the extent authorized under the Appropriations Act." Id. at 1366.

Contrary to defendant's remarkable reconciliation of Klamath and Carabetta Enterprises as presenting no conflict, the Federal Circuit's holding negates the conclusion in Klamath that "[Winstar's] treatment of the sovereign acts doctrine as being linked to the common law impossibility defense should not be viewed as the law," Klamath, 75 Fed. Cl. at 692, by applying the doctrine of partial impossibility, a subset of the common law impossibility doctrine, to the United States' invocation of sovereign acts.

Defendant's attempts to distinguish Carabetta Enterprises from the 2007 Opinion are also unpersuasive. The requirement that plaintiffs prove unreasonable decision-making by the contracting officer, pursuant to the 1983 Contracts, is not material to the invocation of the sovereign acts defense. While HUD was provided "the authority to render reasonable substitute performance" in a discretionary manner by Congress, defendant's attempt to characterize the CVPIA as non-discretionary is not persuasive. See Cent. Delta Water Agency, 452 F.3d at 1023 ("While nothing in the Act requires that the Bureau use New Melones water for its § 3406(b)(2) releases, the Bureau exercised its discretion to use that water." (citing Cent. Delta Water Agency, 306 F.3d at 945)). The CVPIA, in part, mandated appropriation of 800,000 acre-feet of water for fish, wildlife, and habitat restoration, but did not specify the exact manner in which this appropriation was to be implemented across the individual CVP reservoirs. As the 2007 Opinion found, Mr. Dotan's expert report and testimony made it evident that, in spite of the mandated releases due to the CVPIA's implementation, sufficient water theoretically, if not operationally, remained available within the New Melones Reservoir to provide for full allocations to plaintiffs. See 2007 Opinion at 69-71. This determination closely parallels the facts in Carabetta Enerprises, where HUD was provided sufficient means to meet its contractual obligations, which negated the availability of a sovereign acts defense.

Even prior to the issuance of Carabetta Enterprises, however, the Federal Circuit consistently applied the Winstar opinions regarding the sovereign acts doctrine in a manner which "respect[ed] the views of the five justices" and was also "in harmony with the views of the plurality justices." Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1579 (Fed. Cir. 1997); see Centex Corp. v. United States, 395 F.3d 1283, 1307-08 (Fed. Cir. 2005) ("A prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated. As the plurality opinion in *Winstar* noted, 'the application of the [unmistakability] doctrine . . . turns on whether enforcement of the contractual obligation would block the exercise of a sovereign power of the Government.'"); Yankee Atomic, 112 F.3d at 1578-79 ("Based on the reasoning contained in the Winstar opinions, we conclude that the unmistakability doctrine applies in the present case."). Moreover, the Federal Circuit has cited favorably to the Winstar plurality's definition of the common law doctrine of impossibility. See Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002) ("The Supreme Court [in Winstar] has reformulated the common law doctrine of impossibility . . . .").

Klamath states in footnote 26:

> *Dicta* in the recent decision of this court in Stockton East Water Dist. v. United States, 75 Fed. Cl. 321 (2007)[,] could be read as indicating that the Federal Circuit has held that the sovereign acts doctrine applies only where performance is "objectively impossible." Id. at 372-73 (quoting Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002)). However, Seaboard Lumber did not consider the sovereign acts doctrine, but instead merely involved a contractor asserting an impossibility defense. 308 F.3d at 1294.

75 Fed. Cl. at 693 n.26.

The Winstar plurality concluded that, "even if the Government stands in the place of a private party with respect to 'public and general' sovereign acts, it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach." 518 U.S. at 904. After citing the standard for impossibility later quoted by the Federal Circuit in Seaboard Lumber, the Winstar plurality concluded:

> Thus, since the object of the sovereign acts defense is to place the Government as contractor on par with a private contractor in the same circumstances, *Horowitz*, 267 U.S. at 461, the Government, like any defending party in a

> contract action, must show that . . . the language or circumstances do not indicate that the Government should be liable in any case.

Winstar, 518 U.S. at 904.

The discussion of the doctrine of common law impossibility in Seaboard Lumber excuses "[p]erformance . . . under this doctrine when it is objectively impossible." 308 F.3d at 1294 (citing Jennie-O Foods, 580 F.2d at 409); see also id. (quoting Winstar, 518 U.S. at 904, regarding "reformulat[ion of] the common law doctrine of impossibility"). The application of the common law doctrine of impossibility is not conditioned by the Supreme Court's plurality in Winstar upon a formulation unique to the sovereign acts doctrine, but, rather, application of the doctrine as it exists. See, e.g., Carabetta Enters., 482 F.3d at 1365 ("Yet even if the sovereign acts doctrine applies, 'it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach.'" (quoting Winstar, 518 U.S. at 904)). Reliance on the interpretation of the common law doctrine of impossibility by the Federal Circuit as set forth in Seaboard Lumber, seconded Winstar's plurality, which, despite the Klamath court's relegating the plurality to advisory status, see 75 Fed. Cl. at 691 n.21, is regarded by the Court of Federal Claims' appellate court as decisive. See Carabetta Enters., 482 F.3d at 1365 (citing Winstar, 518 U.S. at 904). 3/

Judge Allegra's dissertation on the foundations of the sovereign acts doctrine in this circuit and his conclusion that the common law version of the impossibility doctrine as incompatible are interesting. See Klamath, 75 Fed. Cl. at 691-95. The issuance of Carabetta Enterprises subsequent to both Klamath and the 2007 Opinion, with the appellate court's

---

3/ Interestingly enough, the Klamath court made this observation later in the opinion. See Klamath, 75 Fed. Cl. at 693 ("Third, the only Federal Circuit decision to apply the sovereign acts doctrine since Winstar - Yankee Atomic - indisputably did so without conducting any impossibility analysis whatsoever, reversing a judgment against the United States in the process."). It is important, however, to note that the Federal Circuit in Yankee Atomic "conclude[d] that the contracts between Yankee Atomic and the Government did not include an unmistakable promise that precluded the Government from later imposing an assessment." 112 F.3d at 1580. Analysis of impossibility was unnecessary to the disposition. Since Winstar, the Federal Circuit has addressed the sovereign acts doctrine in applying the unmistakability doctrine. See, e.g., First Nationwide Bank v. United States, 431 F.3d 1342, 1351 (Fed. Cir. 2005) ("The 'doctrine of unmistakability' is explained in Winstar, where the Court makes clear that when the government enters into a contract with a private person, the government is not precluded from acting in its sovereign capacity notwithstanding the contract unless there is an unmistakable promise not to act . . . ."); Centex Corp. v. United States, 395 F.3d 1283, 1307-08 (Fed. Cir. 2005) ("A prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated.").

desire to make a determination "in harmony with the views of the plurality justices" in Winstar, Yankee Atomic, 112 F.3d at 1579, strongly suggests that the accepted approach, particularly at the trial court level, requires application of current doctrine, instead of restructuring the law to correspond with the sources of its antecedents. The 2007 Opinion concluded that the sovereign acts doctrine necessarily implicates the common law doctrine of impossibility. See Winstar, 518 U.S. at 904; Carabetta Enters., 482 F.3d at 1365. The common law doctrine of impossibility, as set forth by the Federal Circuit, excuses "[p]erformance . . . only . . . when it is objectively impossible." Seaboard Lumber, 308 F.3d at 1294 (citing Jennie-O Foods, 580 F.2d at 409).

Although the court therefore declines to reconsider this portion of the 2007 Opinion, it is important to consider some potential adverse consequences of adoption of the Klamath formulation of sovereign acts. The elimination of the evaluation of impossibility of performance when the Government invokes the sovereign acts doctrine -- whether through application of the common law doctrine of impossibility or some other formulation to be determined by the Federal Circuit or the Supreme Court -- is tantamount to granting the Government *carte blanche* to displace private property interests in circumstances such as those present in this case. If the invocation of immunity from liability under the sovereign acts doctrine were not limited, any sovereign act that meets the requirements of unmistakability and adversely impacts the performance of a contract entered into by the Government would immunize the Government from liability.

The formulation of the sovereign acts doctrine by the Supreme Court in Horowitz, as quoted in Klamath, contemplates that "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." Horowitz v. United States, 267 U.S. 458, 461 (1925). The Winstar court held:

> The unmistakability doctrine invoked by the Government was stated in Bowen v. Public Agencies Opposed to Social Security Entrapment: "'[S]overeign power . . . governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'" 477 U.S., at 52 (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982)).

518 U.S. at 871-72. Evaluation of the unmistakability of an act of Congress requires, "a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." Yankee Atomic, 112 F.3d at 1575.

Taken to an extreme, dispensing with an evaluation of impossibility of performance only requires, then, that a court determine when an act of Congress is targeted to prior governmental contracts as obstructions to performance. For example, a hypothetical act of Congress could require allocation of a single acre-foot of water from the 1983 Contracts for environmental purposes that met the public and general act requirement. This act conceivably could obstruct implementation of the 1983 Contracts. In such a circumstance, invocation of the sovereign acts doctrine would immunize the Government from liability for any reductions in water allocations that were attributed by Reclamation to the hypothetical legislation. Without consideration of the impossibility or possibility of performance in spite of the public and general act, no contracting party would be permitted to recover for losses caused by the reductions. While the Klamath opinion limits itself to consideration of circumstances where "the statute left the agency with little alternative but to deny water," 75 Fed. Cl. at 690, exclusion of any consideration of impossibility of performance does not leave the court with a means to dampen the exuberance of sovereign acts. Eliminating consideration of the possibility of partial performance under the impossibility doctrine when sovereign acts are implicated is imprudent, as it would open the door to wide-ranging immunity for non-performance of contracts entered into by the Government.

## CONCLUSION

Plaintiffs have not sustained their burden of proof regarding their motion for reconsideration. Accordingly, based on the foregoing, plaintiffs' motion for reconsideration is denied.

**IT IS SO ORDERED**.

s/ Christine O.C. Miller

________________________________________

**Christine Odell Cook Miller**
Judge